# Exhibit 4
## to
## Motion to Exclude
## (Dr. Nielson – HTC)

1    [ALL COUNSEL LISTED ON SIGNATURE PAGE]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

_____
                                        )
IN RE KONINKLIJKE PHILIPS           )     Case No. 4:18-cv-1885-HSG-EDL
PATENT LITIGATION                  )
                                          )     **DEFENDANTS' AND MICROSOFT'S**
                                          )     **DISCLOSURES UNDER PATENT**
                                          )     **L.R. 3-3**
_____ )

## I.    INTRODUCTION

Defendants[1] hereby: (a) identify each item of prior art that anticipates each asserted claim or renders it obvious; (b) specify whether each item of prior art anticipates each asserted claim or renders it obvious, and here obviousness is alleged, an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness; (c) submits a chart identifying specifically where and how in each item of prior art each limitation of each asserted claim is found, including, for each limitation that is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function; (d) identifies the grounds of invalidity based on 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) of any of the asserted claims.

Philips has asserted each of the following patents ("the Patents-in-Suit") and claims ("the Asserted Claims") against one or more of the Defendants.[2]

| U.S. Patent No. | Asserted Claims |
| --- | --- |
| RE44,913 | 1, 3, 4, 5, 8, 9, 12, 13, 16 |
| 6,690,387 | 9, 11, 12 |
| 7,184,064 | 1, 2, 3, 5, 6, 8 |
| 7,529,806 | 1, 4, 5, 6, 7, 12, 13, 15 |
| 5,910,797 | 1, 6 |
| 6,522,695 | 14, 15, 17 |
| 8,543,819 | 1, 6, 8, 9, 10, 11 |
| 6,772,114 | 20 |
| RE43,564 | 1, 2, 3, 4, 5, 7 |
| 9,436,809 | 1, 2, 3, 4, 6, 9, 11, 14, 34, 35, 36, 37, 41, 43, 46, 49, 50, 52, 53, 54, 55, 56, 58, 59, 60 |

---

[1] ASUSTeK Computer Inc., ASUS Computer International, HTC Corp., HTC America, Yifang USA, Inc. D/B/A E-Fun, Inc., Acer Inc., Acer America Corporation, and Intervenor-Plaintiff/Counterclaim Defendant-in-Intervention Microsoft Corporation (collectively, "Defendants").

[2] Each Defendant adopts the contentions asserted in this Joint Fourth Supplemental Invalidity Contentions to the extent applicable to the claims asserted by Philips against that Defendant.

Defendants contend that each asserted claim of the Patents-in-Suit is invalid under at least 35 U.S.C. §§ 101, 102, 103, 112 and/or 251. Defendants reserve the right to supplement these Invalidity Contentions pursuant to the Federal Rules of Civil Procedure, the Civil Local Rules, the Patent Local Rules, the Court's Chamber Rules, or any other order or schedule entered by the Court. Defendants further reserve the right to supplement these Invalidity Contentions in response to any change in Philips' read of the asserted patents, the accused products, and to the extent that Philips' November 1, 2018, motion to amend its infringement contentions is granted. *See* Docket Nos. 529 and, as corrected, 542.

## A.    Preliminary Statement

Defendants' Invalidity Contentions reflect Defendants' present knowledge and contentions regarding the Asserted Claims. Thus, the following contentions are based on Defendants' current knowledge, understanding, and belief as to the facts and information available as of the date of these Invalidity Contentions. Discovery has not yet been completed in this matter. Thus, Defendants have not yet completed their investigation, discovery, or analysis of matters relating to the invalidity or unenforceability of the Asserted Claims, including without limitation invalidity due to on-sale or public use statutory bars, or unenforceability due to inequitable conduct. In addition, Defendants' search for prior art is ongoing. Accordingly, Defendants reserve the right to amend, modify, and supplement, without prejudice, these Invalidity Contentions as additional information is discovered or otherwise identified or appreciated, including testimony about the scope and content of the claimed inventions or state of the prior art.

Defendants submit these Invalidity Contentions without waiving or contradicting Defendants' position that Philips' Infringement Contentions do not adequately identify with sufficient specificity the basis for Philips' contention that any accused product meets the limitations of any of the Asserted Claims. Nothing stated herein is or shall be treated as an admission or suggestion that Defendants agree with Philips regarding either the scope of any of the Asserted Claims or the claim constructions advanced directly or implicitly by Philips' Infringement Contentions or in any other pleading, discovery request or response, or written or verbal communications with Defendants. Additionally, nothing in these Invalidity Contentions shall be treated as an admission that any of the Defendants' accused products meet any limitation of the Asserted Claims. The disclosures herein are not and should not be construed as a

statement that no other persons have discoverable information, that no other documents, data compilations, or tangible things exist that Defendants may use to support their claims or defenses, or that no other legal theories or factual bases will be pursued.

In compiling these contentions, Defendants have relied in part on Philips' Disclosure of Asserted Claims and Infringement Contentions under Patent L.R. 3-1.  In those contentions, Philips appears to assign constructions to indefinite claim language, to pursue overly broad claim constructions in an effort to assert infringement where none exists, and to accuse products that do not infringe the claims. Defendants' contentions and claim charts take into account Philips' apparent constructions and may reflect aspects of the prior art that satisfy Philips' apparent claim constructions. Defendants' assertion that a particular limitation is disclosed by a prior art reference, or Defendants' assertion that a particular limitation is disclosed by a prior art reference in a particular manner, may be based in part on Philips' apparent claim interpretations.  In relying in part on Philips' apparent claim interpretations, Defendants do not admit that Philips' apparent claim interpretations are supportable or proper or that the claim limitations in question are definite or otherwise amenable to construction.  Defendants' contentions and claim charts also take into account the constructions adopted by the Court and the Defendants reserve all appellate rights as well as the right to seek reconsideration of the Court's Markman order as appropriate.

Defendants' Invalidity Contentions are made in the alternative, and should not be interpreted to rely upon, or in any way affect, the non-infringement arguments Defendants intend to assert in this case. Defendants reserve the right to supplement, without prejudice, these Invalidity Contentions as appropriate depending upon any findings as to the priority dates of the Patents-in-Suit or positions that Philips or its expert witnesses may take concerning claim interpretation, infringement, or invalidity issues.

The accompanying claim charts include obviousness combinations of references under 35 U.S.C. § 103.  As reflected in the attached exhibits, the discussion herein, and in the references themselves, the elements of Philips' Asserted Claims are all disclosed in the art before the patents' earliest possible priority dates, and one of skill would readily fit their teachings together.  The references cited herein and in the attached exhibits may be combined and modified in a number of obvious ways to achieve the claimed apparatus and systems, including those disclosed in the attached exhibits.

Defendants are not aware of all ways in which Philips may attempt to distinguish the prior art cited herein.  Accordingly, Defendants reserve the right to supplement or modify these Invalidity Contentions based on Philips' contentions, any further claim construction, and further discovery to the extent permitted by the Federal Rules of Civil Procedure, the Civil Local Rules, the Patent Local Rules, the Court's Chamber Rules, and any other order or schedule entered by the Court.  As an example, for any claim limitation that Philips alleges is not disclosed in a particular prior art reference, Defendants reserve the right to assert that any such limitation is (a) inherent in the disclosed reference; (b) obvious to one of ordinary skill in the art at the time, in light of the same; or (c) disclosed in one or more prior art references, including without limitation those disclosed in the prior art items listed below or in the attached exhibits, and in combination would have rendered the Asserted Claims obvious.  Further, the suggested obviousness combinations are in the alternative to Defendants' anticipation contentions.  The obviousness contentions set forth in these contentions should not be construed to suggest that any reference is not anticipatory in its own right.

> ### B.        The Combination of Prior Art Teachings and References

In general, a claimed invention is invalid due to obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art." 35 U.S.C. § 103; *Graham v. John Deere Co.*, 383 U.S. 1, 13–14 (1966).  The ultimate determination of whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including:  "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 877 (Fed. Cir. 1993); *see also Graham*, 383 U.S. at 17–18.

The U.S. Supreme Court decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739 (2007) reaffirmed *Graham*, but at the same time held that a claimed invention can be obvious even if there is no explicit teaching, suggestion, or motivation for combining the prior art to produce that invention.  In summary, KSR holds that patents that are based on new combinations of elements or components already known in a technical field may be found to be obvious.  *See generally KSR*, 127 S. Ct. at 1727.

Specifically, the Supreme Court in *KSR* rejected a rigid application of the "teaching, suggestion, or motivation [to combine]" test. *Id*. at 1741. "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation or the avowed purpose of the patentee controls. What matters is the objective reach of the claim." *Id*. at 1741–42. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id*. at 1742.

In addition, in *KSR*, the Supreme Court emphasized the principle that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S. Ct. at 1739. A key inquiry is whether the "improvement is more than the predictable use of prior art elements according to their established functions." *Id*. at 1740. In view of the Supreme Court's KSR decision, the PTO issued a set of new Examination Guidelines. *See* Examination Guidelines for Determining Obviousness Under 35 U.S.C. § 103 in view of the Supreme Court Decision in *KSR International Co. v. Teleflex, Inc.*, 72 Fed. Reg. 57526 (October 10, 2007). Those Guidelines summarized the *KSR* decision, and identified various rationales for finding a claim obvious, including those based on other precedents. Those rationales include:

(a)     Combining prior art elements according to known methods to yield predictable results;

(b)     Simple substitution of one known element for another to obtain predictable results;

(c)     Use of a known technique to improve similar devices (methods, or products) in the same way;

(d)     Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(e)     "Obvious to try" — choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

(f)     Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art;

(g)      Some teaching, suggestion, or motivation in the prior art that would have led one

of ordinary skill to modify the prior art reference or to combine prior art reference

teachings to arrive at the claimed invention.

*Id.* at 57529.  Defendants contend that one or more of these or other rationales apply in considering

the obviousness of the Asserted Claims.

## II.      IDENTIFICATION OF PRIOR ART UNDER PATENT L.R. 3-3(a)

Defendants hereby provide the identity of each item of prior art that anticipates each asserted claim

or renders it obvious.

### A.      RE44,913

The following prior art references anticipate or render each of the asserted claims of Philips'

RE'913 patent obvious.  To the extent one or more prior art patents, publications, or systems are identified

in the claim charts attached as Exhibits A-1 through A-17 to this document, but are not included in the

tables and lists below for each patent, those prior art patents, publications, or systems should also be

considered as prior art to the asserted patents.

#### 1.      Patents

The following patent references, including those patents listed in Exhibits. A-1 through A-17,

anticipate or render obvious the asserted claims of the RE'913 patent.

| Number | Country | Date Issued or Published |
| --- | --- | --- |
| U.S. Patent No. 5,258,748 ("Jones") | US | November 2, 1993 |
| U.S. Patent No. 6,639,586 ("Gerpheide") | US | October 28, 2003 |
| JP2000-148366 ("Sakata II") | JP | May 26, 2000 |
| U.S. Patent No. 6,686,902 ("Lee") | US | April 11, 2002 |
| U.S. Patent No. 6,271,835 ("Hoeksma") | US | August 7, 2001 |
| U.S. Patent No. 5,805,167 ("Van Cruyningen") | US | September 8, 1998 |
| U.S. Patent No. 6,169,538 ("Nowlan") | US | January 2, 2001 |
| U.S. Patent No. 6,975,304 ("Hawkins")[3] | US | December 13, 2005 |
| JP4019512 ("Sakata I") | JP | February 25, 2000 |

[3] Hawkins is prior art at least based on its provisional application filed June 11, 2001.  *See* Exhibit A-8.

| JP Patent Application No. H6-202784 ("Nakano") | JP | July 22, 1994 |
| Defendants U.S. Patent No. 6,094,197 ("Buxton") | US | July 25, 2000 |
| U.S. Patent No. 5,956,021 ("Kubota") | US | September 21, 1999 |

### 2. Publications

The following printed publications, including those publications listed in Exhibits A-1 through A-17, anticipate or render obvious the asserted claims of the RE'913 patent.

| Title | Date of Publication | Author or Publisher |
|-------|---------------------|---------------------|
| Newton Apple MessagePad Handbook ("Newton Manual") | 1995 | Apple |

### 3. Non-Patent or Publication References

Defendants also contend that the RE'913 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known. Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the RE'913 Patent, including documents and source code describing the same:

- Hitachi Handheld PC HPW-600ETM ("Hitachi HPC") is a handheld communication device that was offered for sale and sold by Hitachi in the United States in 1999, as demonstrated by the deposition testimony of Andrew Mulazzi and the corresponding deposition exhibits.

The features and capabilities of the Hitachi HPC became publicly known as of the same date.

- Casio Cassiopeia E-115 ("Casio E-115") is a handheld communication device that was offered for sale and sold no later than April 2001 as demonstrated by Casio sales data produced in response to a subpoena (Casio 000297) and a Casio press release dated April 19, 2000 and available via the Internet Archive.  The features and capabilities of the Casio E-115 became publicly known as of the same date.  *See* https://web.archive.org/web/20000512021759/http://www.casio.com:80/corporate /index.cfm?act=10&ID=897&CFID=245701&CFTOKEN=1096133.

- Philips Nino 300 Series ("Nino") series was released, offered for sale, and sold in 1998 in the United States at least by Philips.  The Philips Nino 500 ("Nino 500") series was released, offered for sale, and sold in 1999 in the United States at least by Philips.  *See, e.g.*, PHILIPS00027052-53, PHILIPS00027054-56, PHILIPS00027057-58 (Philips' press releases).  The features and capabilities of the Nino devices became publicly known as of the same dates.  Philips has thus far refused to provide sales information for the Nino devices.

- Apple Newton Messagepad 120 device running the Newton Operating System Version 2.0 was offered for sale and sold in the United States in January 1995.  *See, e.g.*, APL-ACER_00007216 (1995 Network World article noting that the MessagePad 120 was "released in late January" in the United States).  The features and capabilities of the Newton became publicly known as of the same date.

Additional details on these invalidating references are included in Exhibits A-1 through A-17. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits A-1 through A-17.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.   Invalidity of the RE'913 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits A-1 to A-17 anticipate and/or render obvious each asserted claim of the RE'913 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the RE'913 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations. *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the RE'913 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the RE'913 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need.**  There was no long-felt but unsolved need that the RE'913 patent solved.  The concepts described in the RE'913 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.**  Philips has provided no evidence that the accused functionality for the RE'913 patent was copied, or more specifically, that any functionality that practices the asserted claim of the RE'913 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.**  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the RE'913 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the RE'913 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.**  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in RE'913 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the RE'913

patent. *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the RE'913 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness. *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention of the RE'913 patent or any functionality that allegedly practices the RE'913 patent.  To the extent any praise is related to any functionality that allegedly practices the RE'913 patent, that praise is not due to the allegedly novel features of the RE'913 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the asserted claim of the RE'913 patent were combined.  Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim.  These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim.  Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.**  Philips has presented no evidence that others were skeptical before the alleged invention date of the RE'913 patent of the viability of what is claimed in the RE'913 patent.  In fact, there was no industry skepticism concerning the claimed concepts that predates the RE'913 patent. Thus, there was no industry skepticism that using or combining these well-known prior art concepts would

be viable; others in the field were already combining them in the same manner as arranged in the RE'913 patent.

**No licensing.**  Philips has not presented any evidence it has successfully licensed the RE'913 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the RE'913 patent.  Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the RE'913 patent.  *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

**B.    6,690,387**

The following prior art references anticipate or render each of the asserted claims of Philips' '387 patent obvious.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits B-1 through B-21 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

**1.    Patents**

The following patent references, including those patents listed in Exhibits B-1 through B-21, anticipate or render obvious the asserted claims of the '387 patent.

| Number | Country | Date Issued or Published |
|---|---|---|
| European Published Application EP 0 880 091 A2 ("Korhonen") | EP | November 25, 1998 |
| U.S. Patent No. 6,160,551 ("Naughton") | US | December 12, 2000 |
| U.S. Patent No. 7,450,114 ("Anwar") | US | November 11, 2008 |
| PCT Published Application WO 99/38149 ("Westerman PCT") | WO | July 29, 1999 |
| U.S. Patent No. 6,323,846 ("Westerman U.S.") | US | November 27, 2001 |
| Japanese Patent Application No. JPH10161628A ("Kamata") | JP | June 19, 1998 |
| Japanese Unexamined Patent Application Publication No. S63–206827 ("Asami") | JP | August 26, 1988 |

| U.S. Patent No. 6,714,221 ("Christie") | US | March 30, 2004 |
| U.S. Patent No. 5,844,547 ("Minakuchi") | US | December 1, 1998 |
| Japanese Patent Application No. JPH11102274A ("Yamagiwa") | JP | April 13, 1999 |
| U.S. Patent No. 6,707,449 ("Hinckley") | US | March 16, 2004 |
| U.S. Patent No. 5,327,161 ("Logan") | US | July 5, 1994 |
| U.S. Patent No. 6,943,778 B1 ("Astala") | US | September 13, 2005 |
| Japanese Patent Application Publication No. H06-309138 ("Narutaka") | JP | November 4, 1994 |
| U.S. Patent No. 6,677,930 ("Nakamura") | US | April 18, 2002 |
| U.S. Patent No. 6,587,093 ("Shaw") | US | July 1, 2003 |
| U.S. Patent No. 5,880,411 ("Gillespie") | US | June 6, 1992 |

### 2. Publications

The following printed publications, including those publications listed in Exhibits B-1 through B-21, anticipate or render obvious the asserted claims of the '387 patent.

| Title | Date of Publication | Author or Publisher |
| --- | --- | --- |
| Getting Started with PenPoint version 1.0 ("PenPoint Guide") | 1992 | Go Corporation |
| PenPoint Operating System Overview and Application Development ("PenPoint Application Development") | 1993 | IBM |
| "Introducing PenPoint" (video) | 1991 | Go Corporation |
| PenPoint Demonstration (video) | 1991 | Go Corporation |
| The Power of PenPoint ("The Power of PenPoint") | 1991 | Robert Carr and Dan Shafer |
| Getting Started With Your EO Personal Communicator ("EO Getting Started") | 1993 | AT&T |
| Using PenPoint ("Using PenPoint") | 1991 | Go Corporation |
| Manipulating Simulated Objects with Real-World Gestures Using a Force and Position Sensitive Screen, Computer Graphics Vol. 18, No. 3 ("Minsky") | 1984 | Margaret R. Minsky |

| Two-Handed Document Navigation, Xerox Disclosure Journal | 1994 | William A. S. Buxton |
|---|---|---|
| An Overview of the ParcTab Ubiquitous Computing Experiment," IEEE Personal Communications ("Want") | 1995 | Roy Want, et al. |
| A GUI Paradigm Using Tablets, Two-hands and Transparency | 1997 | George Fitzmaurice et al. |
| An Empirical Evaluation of Some Articulatory and Cognitive Aspects Of Marking Menus | 1993 | Gordon Kurtenbach et al. |
| One-Handed Touch-Typing on a QWERTY Keyboard (1996) | 1996 | Matias et al. |
| A Taxonomy of Window Managers | 1988 | Myers |
| All the Widgets (video) | 1990 | Myers |
| User Interface Guidelines for TI-83 Plus | 1999 | Texas Instruments |
| A Comparison of User Interface for Panning on a Touch-Controlled Display | 1995 | Jeff Johnson |
| A Collection of Papers from FirstPerson | 1995 | Jeff Johnson |
| A Prototype Futuristic Technology for Distance Education | 1992 | Randall B. Smith |

### 3.    Non-Patent or Publication References

Defendants also contend that the '387 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '387 Patent, including

documents and source code describing the same:

- The Sun Microsystems Star7 / Green Project System ("Star7") was developed in or around 1992 by the Green Project team at Sun Microsystems, Inc., and by the Sun Microsystems' subsidiary FirstPerson, Inc., and was both known and used in the United States at least as early as May 29, 1996.  The features and capabilities of the Star7 became publicly known at least as of the same date.

- The PenPoint Operating System ("PenPoint OS") was an operating system developed by the Go Corporation for tablet computers and personal digital assistant devices ("PenPoint Devices") and was released at least as early as 1991.  The features and capabilities of the PenPoint OS became publicly known as of the same date.  PenPoint Devices include at least the EO Personal Communicator from the AT&T Corporation and the Xerox PARCtab ("PARCtab") is a handheld device that was known or used in the United States before the purported invention of the '387 patent, on sale or in public use in the United States more than one year before the effective filing date of the '387 patent.  The features and capabilities of the PARCtab became publicly known at least as early as 1988.  *See, e.g.,* http://research.microsoft.com/en-us/um/people/bibuxton/buxtoncollection/ detail.aspx?id=51;  Roy Want, et al., "An Overview of the ParcTab Ubiquitous Computing Experiment," IEEE Personal Communications (Dec. 1995) ("Want").  The use of the PARCtab in the manner described in "Two-Handed Document Navigation" by William A. S. Buxton became publicly known at least as early as April 1994 upon the publication of that paper in the Xerox Disclosure Journal.

    ad 700T from IBM.

Additional details on these invalidating references are included in Exhibits B-1 through B-21. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits B-1 through B-21.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products,

systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4. Invalidity of the '387 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits B-1 to B-21 anticipate and/or render obvious each asserted claim of the '387 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '387 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations. *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps

that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the '387 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '387 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need.**  There was no long-felt but unsolved need that the '387 patent solved.  The concepts described in the '387 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.**  Philips has provided no evidence that the accused functionality for the '387 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '387 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others**.  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '387 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '387 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.**  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '387 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc*., 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips

has not shown and cannot show that its success is due to the alleged invention of the '387 patent. *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '387 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness. *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.** Philips has presented no evidence of industry praise for the alleged invention of the '387 patent or any functionality that allegedly practices the '387 patent. To the extent any praise is related to any functionality that allegedly practices the '387 patent, that praise is not due to the allegedly novel features of the '387 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.** There is no evidence of any unexpected results when the elements of the asserted claim of the '387 patent were combined. Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim. These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim. Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.** Philips has presented no evidence that others were skeptical before the alleged invention date of the '387 patent of the viability of what is claimed in the '387 patent. In fact, there was no industry skepticism concerning the claimed concepts that predates the '387 patent. Thus,

there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '387 patent.

**No licensing**.  Philips has not presented any evidence it has successfully licensed the '387 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '387 patent.  Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '387 patent.  *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

C.     **7,184,064**

     1.     **Patents**

The following patent references, including those patents listed in Exhibits C-1 through C-21, anticipate or render obvious the asserted claims of the '064 patent.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits C-1 through C-21 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| European Published Application EP 0 880 091 A2 ("Korhonen") | EP | November 25, 1998 |
| U.S. Patent No. 6,160,551 ("Naughton") | US | December 12, 2000 |
| U.S. Patent No. 7,450,114 ("Anwar") | US | November 11, 2008 |
| PCT Published Application WO 99/38149 ("Westerman PCT") | WO | July 29, 1999 |
| U.S. Patent No. 6,323,846 ("Westerman U.S.") | US | November 27, 2001 |
| Japanese Patent Application No. JPH10161628A ("Kamata") | JP | June 19, 1998 |
| Japanese Unexamined Patent Application Publication No. S63–206827 ("Asami") | JP | August 26, 1988 |
| U.S. Patent No. 6,714,221 ("Christie") | US | March 30, 2004 |

| U.S. Patent No. 5,844,547 ("Minakuchi") | US | December 1, 1998 |
| Japanese Patent Application No. JPH11102274A ("Yamagiwa") | JP | April 13, 1999 |
| U.S. Patent No. 6,707,449 ("Hinckley") | US | March 16, 2004 |
| U.S. Patent No. 5,327,161 ("Logan") | US | July 5, 1994 |
| U.S. Patent No. 6,943,778 B1 ("Astala") | US | September 13, 2005 |
| Japanese Patent Application Publication No. H06-309138 ("Narutaka") | JP | November 4, 1994 |
| U.S. Patent No. 6,677,930 ("Nakamura") | US | April 18, 2002 |
| U.S. Patent No. 6,587,093 ("Shaw") | US | July 1, 2003 |
| U.S. Patent No. 5,880,411 ("Gillespie") | US | June 6, 1992 |

## 2.    Publications

The following printed publications, including those publications listed in Exhibits C-1 through C-21, anticipate or render obvious the asserted claims of the '064 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| Getting Started with PenPoint version 1.0 ("PenPoint Guide") | 1992 | Go Corporation |
| PenPoint Operating System Overview and Application Development ("PenPoint Application Development") | 1993 | IBM |
| "Introducing PenPoint" (video) | 1991 | Go Corporation |
| PenPoint Demonstration (video) | 1991 | Go Corporation |
| The Power of PenPoint ("The Power of PenPoint") | 1991 | Robert Carr and Dan Shafer |
| Getting Started With Your EO Personal Communicator ("EO Getting Started") | 1993 | AT&T |
| Using PenPoint ("Using PenPoint") | 1991 | Go Corporation |
| Manipulating Simulated Objects with Real-World Gestures Using a Force and Position Sensitive Screen, Computer Graphics Vol. 18, No. 3 ("Minsky") | 1984 | Margaret R. Minsky |
| Two-Handed Document Navigation, Xerox Disclosure Journal | 1994 | William A. S. Buxton |

| An Overview of the ParcTab Ubiquitous Computing Experiment," IEEE Personal Communications ("Want") | 1995 | Roy Want, et al. |
|---|---|---|
| A GUI Paradigm Using Tablets, Two-hands and Transparency | 1997 | George Fitzmaurice et al. |
| An Empirical Evaluation of Some Articulatory and Cognitive Aspects Of Marking Menus | 1993 | Gordon Kurtenbach et al. |
| One-Handed Touch-Typing on a QWERTY Keyboard (1996) | 1996 | Matias et al. |
| A Taxonomy of Window Managers | 1988 | Myers |
| All the Widgets (video) | 1990 | Myers |
| User Interface Guidelines for TI-83 Plus | 1999 | Texas Instruments |
| A Comparison of User Interface for Panning on a Touch-Controlled Display | 1995 | Jeff Johnson |
| A Collection of Papers from FirstPerson | 1995 | Jeff Johnson |
| A Prototype Futuristic Technology for Distance Education | 1992 | Randall B. Smith |

### 3.    Non-Patent or Publication References

Defendants also contend that the '064 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '064 Patent, including documents and source code describing the same:

- The Sun Microsystems Star7 / Green Project System ("Star7") was developed in or around 1992 by the Green Project team at Sun Microsystems, Inc., and by the Sun Microsystems' subsidiary FirstPerson, Inc. that both known and used in the United States as early as May 29, 1996.  The features and capabilities of the Star7 became publicly known as of the same date.

- The PenPoint Operating System ("PenPoint OS") was an operating system developed by the Go Corporation for tablet computers and personal digital assistant devices ("PenPoint Devices") and was released at least as early as 1991.  The features and capabilities of the PenPoint OS became publicly known as of the same date.  PenPoint Devices include at least the EO Personal Communicator from the AT&T Corporation and the ThinkPad 700T from IBM.

- Xerox PARCtab ("PARCtab") is a handheld device that was known or used in the United States before the purported invention of the '064 patent, on sale or in public use in the United States more than one year before the effective filing date of the '064 patent.  The features and capabilities of the PARCtab became publicly known at least as early as 1988.  *See, e.g.,* http://research.microsoft.com/en-us/um/people/bibuxton/buxtoncollection/detail.aspx?id=51; Roy Want, et al., "An Overview of the ParcTab Ubiquitous Computing Experiment," IEEE Personal Communications (Dec. 1995) ("Want");  The use of the PARCtab in the manner described in "Two-Handed Document Navigation" by William A. S. Buxton became publicly known at least as early as April 1994 upon the publication of that paper in the Xerox Disclosure Journal.

Additional details on these invalidating references are included in Exhibits C-1 through C-21.  Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits C-1 through C-21.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.      Invalidity of the '064 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits C-1 to C-21 anticipate and/or render obvious each asserted claim of the '064 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103.  Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art.  Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '064 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious.  In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations.  *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the

asserted claims of the '064 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '064 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need**.  There was no long-felt but unsolved need that the '064 patent solved.  The concepts described in the '064 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying**.  Philips has provided no evidence that the accused functionality for the '064 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '064 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others**.  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '064 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '064 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success**.  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '064 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '064 patent. *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening,

non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '064 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise**.  Philips has presented no evidence of industry praise for the alleged invention of the '064 patent or any functionality that allegedly practices the '064 patent.  To the extent any praise is related to any functionality that allegedly practices the '064 patent, that praise is not due to the allegedly novel features of the '064 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results**.  There is no evidence of any unexpected results when the elements of the asserted claim of the '064 patent were combined.  Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim.  These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim.  Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism**.  Philips has presented no evidence that others were skeptical before the alleged invention date of the '064 patent of the viability of what is claimed in the '064 patent.  In fact, there was no industry skepticism concerning the claimed concepts that predates the '064 patent.  Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '064 patent.

**No licensing**.  Philips has not presented any evidence it has successfully licensed the '064 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '064 patent.  Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '064 patent.  *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

### D.    7,529,806

#### 1.    Patents

The following patent references, including those patents listed in Exhibits D-1 through D-17, anticipate or render obvious the asserted claims of the '806 patent.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits D-1 through D-17 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| U.S. Patent No. 6,389,473 ("Carmel") | US | May 14, 2002 |
| U.S. Patent No. 7,502,808 ("Hui") | US | March 10, 2009 |
| U.S. Patent No. 5,751,968 ("Cohen") | US | May 12, 1998 |
| U.S. Pat. No. 5,996,015 ("Day") | US | Nov. 30, 1999 |

#### 2.    Publications

The following printed publications, including those publications listed in Exhibits D-1 through D-17, anticipate or render obvious the asserted claims of the '806 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| W3C Recommendation, "Synchronized Multimedia Integration Language (SMIL) 1.0 Specification" ("SMIL 1.0 Specification") | 1998 | Synchronized Multimedia Working Group (WG) of the World Wide Web Consortium |

| | | |
|---|---|---|
| W3C Proposal, "Timed Interactive Multimedia Extensions for HTML (HTML + TIME) Extending SMIL into the Web Browser" ("HTML+TIME") | 1998 | Patrick Schmitz of Microsoft, Jin Yu of Compaq/DEC, and Peter Santangeli of Macromedia |
| A Client Controlled Adaptation Framework for Multimedia Database Systems ("Hollfelder") | 1997 | Hollfelder, et al. |
| 2PSM: an efficient framework for searching video information in a limited-bandwidth environment ("Hua") | 1999 | Hua, et al. |
| GRiNS 0.5 Quick Start Guide | 1999 | Oratrix Development BV |
| GRiNS 1.0 Quick Start Guide | 1999 | Oratrix Development BV |
| Real Time Stream Protocol Specification ("RTSP"), Request for Comments: 2326 | 1998 | Schulzrinne, et. al. |
| RealSystem G2 Production Guide | 1998 | RealNetworks, Inc. |
| Specification and Support of Adaptable Networked Multimedia, Journal of Multimedia Systems | 1993 | Bulterman |
| Embedded Video in Hypermedia Documents: Supporting Integration and Adaptive Control, ACM Transactions on Information Systems | 1995 | Bulterman |
| The CMIF Presentation Model: Structure, Format and WWW Implications | 1997 | Bulterman, et al. |
| Models, Media and Motion: Using the Web to Support Multimedia Documents ("Bulterman97"); | 1997 | Bulterman |
| GRiNS: A GRaphical INterface for creating and playing SMIL documents, World Wide Web Conference | 1998 | Bulterman et al. |
| Supporting Adaptive and Adaptable Hypermedia Presentation Semantics | 1999 | Bulterman et al. |
| Enabling Technology for Distributed Multimedia Applications, IBM Systems Journal ("Wong97") | 1997 | Wong, et al. |
| An Object-Oriented SGML/HyTime Compliant Multimedia Database Management System, Proceedings of ACM Multimedia '97 ("Ozsu97") | 1997 | Ozsu, et al. |
| MetaData Modeling for Quality of Service (QoS) Management in the World Wide Web (WWW), Proceedings in Multimedia Modeling '98 ("Madja98") | 1998 | Madja, et al. |
| The Use of SMIL: Multimedia Research Currently Applied on a Global Scale, Proceedings of Multimedia Modeling '99 ("Rutledge99") | 1999 | Rutledge, et al. |
| A Comparison of Multimedia Document Models Concerning Advanced Requirements, Technical Report, U. of Ulm ("BollJan99") | 1999 | Boll, et al. |
| A CrossMedia Adaptation Strategy for Multimedia | 1999 | Boll, et al. |

DEFENDANTS' AND MICROSOFT'S DISCLOSURES UNDER PATENT L.R. 3-3

| | | |
|---|---|---|
| Presentations, Proceeding of ACM Multimedia '99 ("BollOct99") | | |
| Presenting Multimedia on the Web and in TV Broadcast, Proceedings of the European Conference on Multimedia Applications, Services, and Techniques (ECMAST '98) | 1998 | ten Kate et al., |
| Architectural Design of Adaptive Distributed Multimedia Systems, Proceedings of the International Workshop on Multimedia Software Development ("Bochmann96") | 1996 | Bochmann, et al. |
| Authoring and Formatting of Hypermedia Documents ("Soares") | 1998 | Soares |
| Comparative Evaluation of Server-push and Client-pull Architectures for Multimedia Servers, Proceedings of the 6th International Workshop on Network and Operating System Support for Digital Audio and Video (NOSSDAV '96) ("Rao96") | 1996 | Rao |
| Modeling of Adaptable Multimedia Documents, Proceedings of the Interactive Distributed Multimedia Systems and Telecommunication Services Conference ("Wirag97") | 1997 | Wirag |
| Specification and Scheduling of Adaptive Multimedia Documents, University of Stuttgart ("Wirag99") | 1999 | Wirag |
| Lynda Hardman, Modelling and Authoring Hypermedia Documents ("Hardman") | — | Hardman |
| Scheduling Bandwidth-Constrained Multimedia Traffic, Computer Communications, 38187 (1992) | 1992 | T. D. C. Little et al. |
| Investigation of a Prefetch Model for Low Bandwidth Networks, Proceedings of the 1st ACM International Workshop on Wireless Mobile Multimedia (WOWMOM '98) | 1998 | Tuah, et al. |
| Building XML Applications | 1999 | St. Laurent, et al. |

### 3.    Non-Patent or Publication References

Defendants also contend that the '806 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became

known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known. Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '806 Patent, including documents and source code describing the same:

- Microsoft NetShow's first public release was in 1996, and by August 1998, a beta release of NetShow 3.0 was released to the public.

- The RealSystem G2 system was developed by RealNetworks, Inc. consisting of at least three components (RealPlayer, RealServer, and RealProducer) and was released in public beta in July 1998 and in full release in November 1998. The features and capabilities of the RealSystem G2 became publicly known as of the same dates. *See, e.g.,* PRIORART036551–52 (Press Release, RealNetworks Ships Final Release of RealSystem G2, Next Generation Media Delivery System (Nov. 23, 1998)); PRIORART051214–16 (Press Release, RealNetworks Releases RealSystem G2 (Jul. 13, 1998)). The RealSystem G2 system was on sale and in public use more than one year before the priority date, thus qualifying as prior art under 35 U.S.C. § 102(b); was publicly known and used as of July 1998 and was thus prior art under 35 U.S.C. § 102(b); and was invented in the United States before the claimed invention, thus qualifying as prior art under 35 U.S.C. § 102(g).

- Internet Explorer 5.0 was a web browser which was publicly available by Microsoft by at least as early as June 8, 1998 for its beta release and in March 1999 for its major release. The features and capabilities of Internet Explorer 5.0 became publicly known as of the same dates. *See, e.g.,* MSFT_PHILIPS_00015697.

- The GRiNS 0.5 System, consisting of at least two components (GRiNS 0.5 Player and GRiNS 0.5 Editor), was developed by Oratix Development BV was released at least as early as May 20, 1999, and was publicly known and used in the United States as of that date, and certainly before the invention of U.S. Patent No. 7,529,806. In particular, the GRiNS 0.5 System was made available as of this date for download over the Internet, including to users in the United States, and upon information and belief was downloaded

by users in the United States on or before the priority date, thereby making it publicly known and in use under 35 U.S.C. § 102(a), and upon information and belief also was used by those users.  The features and capabilities of the GRiNS 0.5 System became publicly known as of the same dates.  *See, e.g.,* GRiNS 0.5 Player software ("GRiNS 0.5 Player"); GRiNS 0.5 Editor software ("GRiNS 0.5 Editor"); Source code from GRiNS 0.5 System; http://www.oratrix.com:80/GRiNS/Examples/GS-examples1.html.; http://web.archive.org/web/19990819111938/http://www.oratrix.com:80/GRiNS/Docs/GS-documentation1.html; http://web.archive.org/web/19990819114901/; http://www.oratrix.com:80/GRiNS/Examples/GS-examples1.html.

- The GRiNS 1.0 System, consisting of at least two components (GRiNS 1.0 Player and GRiNS 1.0 Editor), was developed by Oratix Development BV was released at least as early as August 31, 1999, and was publicly known and used in the United States before the invention of U.S. Patent No. 7,529,806.  In particular, the GRiNS 1.0 System was made available as of this date for download over the Internet, including to users in the United States, and upon information and belief was downloaded by users in the United States on or before the priority date, thereby making it publicly known and in use under 35 U.S.C. § 102(a), and upon information and belief also was used by those users.The features and capabilities of the GRiNS 1.0 System became publicly known as of the same dates.  *See, e.g.,* GRiNS 1.0 Player software ("GRiNS 1.0 Player"); GRiNS 1.0 Editor software ("GRiNS 1.0 Editor"); Source code from GRiNS 1.0 System; http://www.oratrix.com:80/GRiNS/Examples/GS-examples1.html; http://web.archive.org/web/19990819111938/http://www.oratrix.com:80/GRiNS/Docs/GS-documentation1.html; http://web.archive.org/web/19990819114901/http://www.oratrix.com:80/GRiNS/Examples/GS-examples1.html.

Additional details on these invalidating references are included in Exhibits D-1 through D-17. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits D-1 through D-17.  Defendants have made

or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.     Invalidity of the '806 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits D-1 to D-17 anticipate and/or render obvious each asserted claim of the '806 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '806 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such

1    combinations.  *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps

2    that a person of ordinary skill in the art would employ").

3            Defendants have identified one or more potential combinations that would render each of the

4    asserted claims of the '806 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges

5    the correspondence of any of these references with respect to particular limitations of the asserted claims

6    of the '806 patent, Defendants reserve the right to supplement these invalidity contentions to identify

7    additional combinations, motivations to modify, or explanations for particular references with additional

8    particularity.

9            Additionally, Defendants believe that non-party Oratrix Development BV and current or former

10   employees thereof ("Oratrix") have possession of relevant information and/or documents constituting

11   prior art to the '806 patent.  In particular, Defendants are in the process of seeking such information and/or

12   documents from former employees of Oratrix.  Defendants reserve the right to supplement these invalidity

13   contentions to identify additional references, combinations, motivations to modify, or explanations for

14   particular references based on any information and/or documents provided by Oratrix.  Defendants also

15   believe that non-party RealNetworks, Inc. and current or former employees thereof ("RealNetworks")

16   have possession of relevant information and/or documents constituting prior art to the '806 patent.  In

17   particular, Defendants are in the process of seeking such information and/or documents from current and

18   former employees of RealNetworks.  Defendants reserve the right to supplement these invalidity

19   contentions to identify additional references, combinations, motivations to modify, or explanations for

20   particular references based on any information and/or documents provided by RealNetworks.

21           Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but

22   unsolved need; copying; failure of others; commercial success due to the patented invention; industry

23   praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

24           **No long felt but unsolved need.**  There was no long-felt but unsolved need that the '806 patent

25   solved.  The concepts described in the '806 patent were all well known before the alleged invention date

26   as evidenced by the patent itself, the file history and references cited therein, and the prior art identified

27   herein, including identified in the above-referenced exhibits.

28

**No copying.**  Philips has provided no evidence that the accused functionality for the '806 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '806 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.**  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '806 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '806 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.**  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '806 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter."  *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '806 patent.  *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '806 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.,* 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists.");  *In re Huai-Hung Kao,* 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention.");  *Ormco Corp. v. Align Tech., Inc.,* 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.** Philips has presented no evidence of industry praise for the alleged invention of the '806 patent or any functionality that allegedly practices the '806 patent. To the extent any praise is related to any functionality that allegedly practices the '806 patent, that praise is not due to the allegedly novel features of the '806 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.** There is no evidence of any unexpected results when the elements of the asserted claim of the '806 patent were combined. Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim. These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim. Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.** Philips has presented no evidence that others were skeptical before the alleged invention date of the '806 patent of the viability of what is claimed in the '806 patent. In fact, there was no industry skepticism concerning the claimed concepts that predates the '806 patent. Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '806 patent.

**No licensing.** Philips has not presented any evidence it has successfully licensed the '806 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '806 patent. Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '806 patent. *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

### E.     5,910,797

#### 1.     Patents

The following patent references, including those patents listed in Exhibits E-1 through E-15, anticipate or render obvious the asserted claims of the '797 patent. To the extent one or more prior art

patents, publications, or systems are identified in the claim charts attached as Exhibits E-1 through E-15 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| U.S. Patent No. 5,602,566 ("Motosyuku") | US | February 11, 1997 |
| PCT Published Application WO 95/04327 A1 ("Hopper") | WO | February 9, 1995 |
| JPH6-289802 ("Onozawa") | JP | October 18, 1994 |
| JPH0713554 ("Kimura") | JP | January 17, 1995 |
| PCT Published Application US Pat. No. 4,912,662 ("Butler") | US | March 27, 1990 |
| Published Japanese Application JPH6-4208 ("Tsukamoto") | JP | January 14, 1994 |
| Japanese Unexamined Patent App. Pub. H6-318058 ("Usui") | JP | November 15, 1994 |
| Japanese Unexamined Patent App. Pub. No. H7-36421 ("Ito") | JP | February 7, 1995 |
| U.S. Patent No. 5,432,720 ("Lucente") | US | July 11, 1995 |
| U.S. Patent No. 5,544,295 ("Capps") | US | August 6, 1996 |
| U.S. Patent No. 4,797,836 ("Witek") | US | January 10, 1989 |
| U.S. Patent No. 5,327,158 ("Takahashi") | US | July 5, 1994 |
| U.S. Patent No. 5,313,835 ("Dunn") | US | May 24, 1994 |
| U.S. Patent No. 5,428,725 ("Sugai") | US | June 27, 1995 |
| U.S. Patent No. 4,839,838 ("LaBiche") | US | June 13, 1989 |

## 2.    Publications

The following printed publications, including those publications listed in Exhibits E-1 through E-15, anticipate or render obvious the asserted claims of the '797 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| Virtual reality for palmtop computers, ACM Transactions on Information Systems | 1993 | Fitzmaurice, George, Zhai, Shumin & Chignell, Mark |

| Situated information spaces and spatially aware palmtop computers, Communications of the ACM | 1993 | Fitzmaurice, George W. |
| InfoWorld Volume 12, Issue 17 | 1990 | InfoWorld |

### 3.     Non-Patent or Publication References

Defendants also contend that the '797 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '797 Patent, including documents and source code describing the same:

- The Chameleon Palmtop computer prototype ("Chameleon System") was developed no later than 1993.  Chameleon was publicly known, used, and/or sold in the United States before the invention of U.S. Patent No. 5,910,797 ("the '797 Patent"), on sale or in public use in the United States more than one year before the effective filing date of the '797 Patent.  The features and capabilities of the Chameleon System became publicly known as of the same date.

- The Radius Pivot Monitor ("Pivot") was developed by Radius, Inc. and was released at least as early as April 1990.  Pivot was publically known, used, and sold in the United States before the invention of U.S. Patent No. 5,910,797 ("the '797 Patent"), on sale or in public use in the United States more than one year before the effective filing date of the '797 Patent.  The features and capabilities of the Pivot became publicly known as of the

same date. *See, e.g.*, Computer Chronicles: Computer Displays, no. 904, copyright 1991 Stewart Cheifet Productions, available at https://archive.org/details/displays_2 ("Pivot Video"). The Pivot Video was published in 1991, as demonstrated by at least the document itself, the records of the publisher, and/or the testimony of knowledgeable witnesses and corroborating documents.

Additional details on these invalidating references are included in Exhibits E-1 through E-15. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits E-1 through E-15.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.   Invalidity of the '797 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits E-1 to E-15 anticipate and/or render obvious each asserted claim of the '797 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103.  Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art.  Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '797 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have

been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious.  In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations.  *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the '797 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '797 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need.**  There was no long-felt but unsolved need that the '797 patent solved.  The concepts described in the '797 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.**  Philips has provided no evidence that the accused functionality for the '797 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '797 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.**  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '797 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '797 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.**  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '797 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter."  *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '797 patent.  *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '797 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention of the '797 patent or any functionality that allegedly practices the '797 patent.  To the extent any praise is related to any functionality that allegedly practices the '797 patent, that praise is not due to the allegedly novel features of the '797 patent, but instead only to features present in the prior art, which is not a

sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See*

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the asserted claim of the '797 patent were combined.  Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim.  These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim.  Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.**  Philips has presented no evidence that others were skeptical before the alleged invention date of the '797 patent of the viability of what is claimed in the '797 patent.  In fact, there was no industry skepticism concerning the claimed concepts that predates the '797 patent.  Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '797 patent.

**No licensing.**  Philips has not presented any evidence it has successfully licensed the '797 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '797 patent.  Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '797 patent.  *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

### F.     6,522,695

#### 1.     Patents

The following patent references, including those patents listed in Exhibits F-1 through F-13, anticipate or render obvious the asserted claims of the '695 patent.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits F-1 through F-13 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| U.S. Patent No. 5,177,480 ("Clark") | US | January 5, 1993 |
| European Patent Application No. EP 0810532 A2 ("Riley"), | EP | December 3, 1997 |
| U.S. Patent No. 6,009,549 ("Bliss") | US | December 28, 1999 |

### 2.    Publications

The following printed publications, including those publications listed in Exhibits F-1 through F-13, anticipate or render obvious the asserted claims of the '695 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| "Consultative Committee for Space Data Systems Report Concerning Space Data System Standards: Lossless Data Compression," Green Book, Issue 1, CCSDS 120.0-G-1 ("CCSDS Green Book") | 1997 | Consultative Committee for Space Data Systems Published by CCSDS / NASA |
| "Consultative Committee for Space Data Systems Report Concerning Space Data System Standards: Lossless Data Compression," Blue Book, Issue 1, CCSDS 120.0-B-1 ("CCSDS Blue Book") | 1997 | Consultative Committee for Space Data Systems Published by CCSDS / NASA |
| A Very High Speed Lossless Compression/Decompression Chip Set ("Venbrux 1991") | 1991 | Jack Venbrux, et al. Published by NASA Jet Propulsion Laboratory |
| A VLSI Chip Set for High-Speed Lossless Data Compression ("Venbrux 1992") | 1992 | Jack Venbrux, et al. Published by IEEE |
| A Simple Block-Based Lossless Image Compression Scheme ("Chang") | 1996 | S. Grace Chang et al. Published by IEEE |
| Automatic Synthesis of Compression Techniques for Heterogeneous Files ("Hsu") | 1995 | William H. Hsu and Amy E. Zwarico Published by John Wiley & Sons |
| DEFLATE Compressed Data Format Specification version 1.3 ("DEFLATE") | 1996 | L. Peter Deutsch Published as Request for Comments: 1951 |
| GZIP File Format Specification 4.3 ("GZIP Spec") | 1996 | L. Peter Deutsch Published as Request for Comments: 1952 |
| PNG (Portable Network Graphics) Specification Version 1.0 | 1997 | T. Boutell, et. al. Published as Request for Comments 2083 |

| Algorithms for a Very High Speed Universal Noiseless Coding Module ("Rice 1991") | 1991 | Robert F. Rice, et al. Published by NASA Jet Propulsion Laboratory |
| Algorithms for High-Speed Universal Noiseless Coding Module ("Rice 1993") | 1993 | Robert F. Rice, et al. Published by American Institute of Aeronautics and Astronautics |
| Spinoff 1994 | 1994 | James J. Haggerty Published by National Aeronautics and Space Administration |
| An Adaptive, Lossless Data Compression Algorithm and VLSI Implementations | 1993 | Jack Venbrux et al. Published by NASA |

### 3. Non-Patent or Publication References

Defendants also contend that the '695 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known. Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '695 Patent, including documents and source code describing the same:

- Microsoft Internet Explorer v4 ("IE4") was released no later than October 1, 1997, as demonstrated, for example, by the Microsoft press release dated October 1, 1997. The features and capabilities of IE4 became publicly known as of the same date. IE4 was compatible with PCs running Windows 95 and was included with Windows 98. *See, e.g.*, MSFT_PHILIPS_00335841 - 852.

- Microsoft Internet Explorer IE4.01 was made publicly available no later than December 2, 1997, as demonstrated, for example, by the Microsoft press release dated December 2, 1997. *See, e.g.*, MSFT_PHILIPS_00344818 - 820. The features and capabilities of IE4.01 became publicly known as of the same date.

- The Universal Source Encoder ("USE") and Universal Source Decoder ("USD") chips are based on the Rice algorithm and were developed in or around 1991 or 1992 by NASA Space Engineering Research Center for VLSI System Design, University of Idaho, under NASA grant NAGW-1406 with the National Aeronautics and Space Administration, and the Goddard Space Flight Center.  Commercial versions of these chips appear to have been manufactured for use and/or sale by at least Advanced Hardware Architectures ("AHA")) for medical/scientific imaging applications and were available to the public by at least 1993.  The features and capabilities of USE and USD became publicly known as of the same dates.

- GZIP is an open source compression utility for UNIX and other platforms.  GZIP v1.2.4 was released in 1993 and widely available for download via the Internet.  *See, e.g.*, gzip change log at http://git.savannah.gnu.org/gitweb/?p=gzip.git;a=shortlog;h=v1.3.13;pg=1; ftp://ftp.gnu.org/gnu/gzip/ (listing date modified for gzip-1.2-4.tar as 8/19/93); http://www.math.utah.edu/docs/info/gzip_toc.html (user manual for version 1.2.4 dated July 1993).  The features and capabilities of GZIP became publicly known as of the same dates.

- Mosaic is open source web browser for UNIX and other platforms. Mosaic v2.7b5 for Unix was released in 1996 and widely available for download via the Internet.  *See* ftp://ftp.ncsa.uiuc.edu/Mosaic/Unix/source/ (date modified: 7/17/96).  The features and capabilities of Mosaic became publicly known as of the same dates.

Additional details on these invalidating references are included in Exhibits F-1 through F-13. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits F-1 through F-13.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products,

systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

Defendants contend that the prior art references set forth in Exhibits F-1 to F-13 anticipate and/or render obvious each asserted claim of the '695 patent.

### 4. Invalidity of the '695 Patent Under 35 U.S.C. §§ 102 and 103

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '695 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such

combinations. *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the '695 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '695 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Defendants further note that the European Patent Office (EPO) considered and rejected EP patent application EP 0981862 (A2), which was a foreign counterpart to the '695 patent.  EP 0981862 (A2) included claims that were substantially identical to, if not narrower than, the asserted claims of the '695 patent.  These claims were found unpatentable for, among other things, lack of novelty and lack of inventive step over the prior art.  Defendants contend that the asserted claims of the '695 patent are invalid under at least 35 U.S.C. §§ 102 and 103 for the reasons stated and the prior art identified by the EPO.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need.**  There was no long-felt but unsolved need that the '695 patent solved.  The concepts described in the '695 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.**  Philips has provided no evidence that the accused functionality for the '695 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '695 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.**  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '695 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '695

patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.**  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '695 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '695 patent.  *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '695 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention of the '695 patent or any functionality that allegedly practices the '695 patent.  To the extent any praise is related to any functionality that allegedly practices the '695 patent, that praise is not due to the allegedly novel features of the '695 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the asserted claim of the '695 patent were combined.  Instead, as discussed above, the concepts contained in

the claim were already combined in the same manner as the asserted claim. These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the claim. Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.** Philips has presented no evidence that others were skeptical before the alleged invention date of the '695 patent of the viability of what is claimed in the '695 patent. In fact, there was no industry skepticism concerning the claimed concepts that predates the '695 patent. Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '695 patent.

**No licensing.** Philips has not presented any evidence it has successfully licensed the '695 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '695 patent. Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '695 patent. *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

### G.    RE44,006

On November 2, 2018, Philips notified defendants by email that the RE'006 patent "is no longer being asserted in this litigation."

### H.    8,543,819

#### 1.    Patents

The following patent references, including those patents listed in Exhibits H-1 through H-13, anticipate or render obvious the asserted claims of the '819 patent. To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits H-1 through H-13 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| PCT Published Application WO 02/35036 ("Lundkvist") | WO | May 2, 2002 |

| U.S. Patent No. 6,550,011 B1 ("Sims, III") | US | Apr. 15, 2003 |
| U.S. Patent No. 7,242,766 ("Lyle") | US | July 10, 2007 |
| U.S. Patent No. 7,516,325 ("Willey") | US | April 3, 2003 |
| EP 1100035 A1 to Ishibashi ("Ishibashi") | EP | May 16, 2001 |
| U.S. Patent No. 7,898,977 ("Roese") | US | November 20, 2003 |

### 2. Publications

The following printed publications, including those publications listed in Exhibits H-1 through H-13, anticipate or render obvious the asserted claims of the '819 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| Internet Security Association and Key Management Protocol (ISAKMP), Request For Comments 2408 ("RFC 2408") | 1998 | Internet Engineering Task Force (IETF) |
| Digital Transmission Content Protection Specification Revision 1.2a (Informational Version) ("DTCP") | 2002 | Digital Transmission Licensing Administrator |
| Applied Cryptography (2d ed. 1996) ("Schneier") | 1996 | Bruce Schneier |
| International Standards ISO/IEC 9798 (2d ed.) ("ISO 9798") | 1999 | International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC) |
| International Standards ISO/IEC 11770 (1st ed.) ("ISO 11770") | 1999 | International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC) |
| High-bandwidth Digital Content Protection System, Revision 1.0 ("HDCP 1.0") | 2000 | Intel Corporation |

### 3. Non-Patent or Publication References

Defendants also contend that the '819 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '819 Patent, including documents and source code describing the same:

- The SmartRight System, also called Extended Conditional Access or XCA, was developed by Thomson Multimedia beginning at least as early as 1998, and was publicly demonstrated at least as early as January 8, 2002.  The features and capabilities of SmartRight System became publicly known as of the same dates.  *See, e.g.*, Press Release, Micronas and Thomson Multimedia Showcase a New Copy Protection System That Will Drive the Future of Digital Television (Jan. 8, 2002), available at https://www.micronas.com/de/node/1597.  *See also* SmartRight™ Certification for FCC Approval for Use with the Broadcast Flag, March 1, 2004; SmartRight™ Copy Protection for System for Digital Home Networks, Deployment Process, CPTWG, November 28, 2001; SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, May 24, 2001; SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, July 11, 2001; SmartRight™ Digital Broadcast Content Protection, MB Docket No. 04-59, Presentation to FCC, April 2, 2004; SmartRight™ Technical White Paper, Version 1.7, January 2003 ("White Paper"); DVB-CPT-715 SmartRight Answer to the Call for Proposals for content protection & copy management technologies, Version 1.0, October 19, 2001 ("DVB-CPT-715")

Additional details on these invalidating references are included in Exhibits H-1 through H-13. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits H-1 through H-13.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products,

systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4. Invalidity of the '819 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits H-1 to H-13 anticipate and/or render obvious each asserted claim of the '819 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103.  Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art.  Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '819 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious.  In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such

combinations. *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the '819 patent obvious in the attached exhibits. If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '819 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing. Each of these is discussed below.

**No long felt but unsolved need**. There was no long-felt but unsolved need that the '819 patent solved. The concepts described in the '819 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.** Philips has provided no evidence that the accused functionality for the '819 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '819 patent was copied. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.** Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '819 patent. Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '819 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.** Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '819 patent. A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject

1  matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips

2  has not shown and cannot show that its success is due to the alleged invention of the '819 patent.  *See,*

3  *e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening,

4  non-covered technological innovations, popularity of accessories, and advertising expense are all relevant

5  to the nexus determination).

6  If any commercial success is due to any of the concepts discussed in the '819 patent, those

7  concepts are also present in the prior art, as described above, and thus does not support any commercial

8  success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d

9  1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus

10  exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary

11  consideration actually results from something other than what is both claimed and novel in the claim, there

12  is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299,

13  1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the

14  success is not pertinent.").

15  **No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention

16  of the '819 patent or any functionality that allegedly practices the '819 patent.  To the extent any praise is

17  related to any functionality that allegedly practices the '819 patent, that praise is not due to the allegedly

18  novel features of the '819 patent, but instead only to features present in the prior art, which is not a

19  sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See*

20  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

21  **No unexpected results.**  There is no evidence of any unexpected results when the elements of the

22  asserted claim of the '819 patent were combined.  Instead, as discussed above, the concepts contained in

23  the claim were already combined in the same manner as the asserted claim.  These prior art systems, as

24  described in the above-referenced exhibits, disclosed the same combination of elements, and the same

25  result of that combination, that is recited in the claim.  Thus, there were no unexpected results that arose

26  from combining the well-known elements in the asserted claim.

27  **No industry skepticism.**  Philips has presented no evidence that others were skeptical before the

28  alleged invention date of the '819 patent of the viability of what is claimed in the '819 patent.  In fact,

there was no industry skepticism concerning the claimed concepts that predates the '819 patent. Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '819 patent.

**No licensing.** Philips has not presented any evidence it has successfully licensed the '819 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '819 patent. Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '819 patent. *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

## I.     6,772,114

### 1.     Patents

The following patent references, including those patents listed in Exhibits I-1 through I-7, anticipate or render obvious the asserted claims of the '114 patent. To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits I-1 through I-7 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| U.S. Patent No. 4,757,517 ("Yatsuzuka") | US | July 12, 1988 |
| PCT Publication No. WO 98/52187 ("Tucker") | WO | November 19, 1998 |

### 2.     Publications

The following printed publications, including those publications listed in Exhibits I-1 through I-17, anticipate or render obvious the asserted claims of the '114 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| Multirate Systems and Filter Banks ("Vaidyanathan") | 1993 | P. P. Vaidyanathan |

| 16 kbit/s Wideband Speech Coding Based on Unequal Subbands ("Paulus & Schnitzler") | 1996 | Proceedings of the 1996 IEEE International Conference on Acoustics, Speech and Signal Processing, Volume 1, 25558 |
|---|---|---|
| Wideband Speech Coding with 12 Bit Per Sample ("Paulus") | 1995 | J. W. Paulus |
| A 13.0 Kbit/S Wideband Speech Codec Based on SBACELP ("Schnitzler") | 1998 | Jurgen Schnitzler |

### 3.   Non-Patent or Publication References

Defendants also contend that the '114 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '114 Patent, including documents and source code describing the same:

- VoiceAge ACELP.wide codec was known, in public use, sold, and/or offered for sale on or before November 13, 1999 based on, among other things, publicly available press releases, documentation, and audio samples, from VoiceAge Inc.'s and its predecessor's (Sipro's) websites, and the testimony of Dr. Redwan Salami of VoiceAge.  The ACELP.wide source code that has been authenticated and produced by VoiceAge has a copyright date of 1999 and was available to be licensed and implemented on Texas Instruments' and other processors as early as the first half of 1999.  The features and capabilities of VoiceAge ACELP.wide codec became publicly known as of the same dates.

Additional details on these invalidating references are included in Exhibits I-1 through I-17. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits I-1 through I-17. Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.    Invalidity of the '114 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits I-1 to I-17 anticipate and/or render obvious each asserted claim of the '114 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '114 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render the asserted claim obvious.  In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations.  *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render the asserted claim of the '114 patent obvious in the attached exhibits.  If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claim of the '114 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing.  Each of these is discussed below.

**No long felt but unsolved need.**  There was no long-felt but unsolved need that the '114 patent solved.  The concepts described in the '114 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.**  Philips has provided no evidence that the accused functionality for the '114 patent was copied, or more specifically, that any functionality that practices the asserted claim of the '114 patent was copied.  *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.**  Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '114 patent.  Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '114 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success**.  Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in '114 patent.  A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter."  *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987).  Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '114 patent.  *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '114 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness.  *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention of the '114 patent or any functionality that allegedly practices the '114 patent.  To the extent any praise is related to any functionality that allegedly practices the '114 patent, that praise is not due to the allegedly novel features of the '114 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the asserted claim of the '114 patent were combined.  Instead, as discussed above, the concepts contained in the claim were already combined in the same manner as the asserted claim.  These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same

result of that combination, that is recited in the claim. Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claim.

**No industry skepticism.** Philips has presented no evidence that others were skeptical before the alleged invention date of the '114 patent of the viability of what is claimed in the '114 patent. In fact, there was no industry skepticism concerning the claimed concepts that predates the '114 patent. As discussed above, many entities and individuals were already using the concepts claimed in the '114 patent. Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '114 patent.

**No licensing.** Philips has not presented any evidence it has successfully licensed the '114 patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the '114 patent. Philips' litigation activity, including the number of Defendants to these matters, indicates that Philips has not been successful in licensing the '114 patent. *See, e.g., Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

**Simultaneous Invention.** As demonstrated by the evidence cited and described herein and in the attached exhibits, individuals working independently of the named inventors simultaneously or near simultaneously invented similar subject matter to the asserted claim. For example, as stated above, VoiceAge was intimately involved in the development of the AMR-WB standard, and U.S. Patent No. 6,795,805 objectively demonstrates that VoiceAge invented the same subject matter before the priority date of the '114 patent. This evidence supports a finding that the asserted claim would have been obvious to a person of ordinary skill in the art at the time of the invention. *See Geo. M. Martin Co. v. Alliance Mach. Sys.*, 618 F.3d 1294, 1305–06 (Fed. Cir. 2010) ("Independently made, simultaneous invention, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill." (citing *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184 (1925)) (internal quotations omitted)); *see also Ecolochem, Inc. v. So. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000). Moreover, the relevant codec that became the AMR-WB standard

was publicly presented at 3GPP standards meetings on or before the October 23-27, 2000 3GPP meetings that took place in Osaka, Japan.  Documentation from those October 2000 meetings submitted by Nokia, including Tdcoc S4 (00)0465 (also known as TS26.090WB) confirms that Nokia submitted the AMR-WB codec candidate (with assistance from VoiceAge) that was ultimately selected as the AMR-WB standard.  To the extent that the AMR-WB standard infringes the '114 patent, the public submission of this standards documentation to 3GPP as early as October 2000 underscores that entities other than Philips came up with the claimed invention at a near simultaneous timeframe to the priority date of the '114 patent.

Additionally, Defendants believe that non-party VoiceAge Corporation and current or former employees thereof ("VoiceAge") have possession of relevant information and/or documents constituting prior art to the '114 patent.  In particular, Defendants are in the process of seeking such information and/or documents from the named inventors of U.S. Patent No. 6,795,805.  Defendants also believe that Texas Instruments Inc. ("Texas Instruments") purchased pertinent AMR-WB technology from VoiceAge before the priority date of the '114 Patent, and therefore that VoiceAge made bona fide offers to sell potentially-invalidating prior art well before the priority date of the '114 patent.   Defendants reserve the right to supplement these invalidity contentions to identify additional references, combinations, motivations to modify, or explanations for particular references based on any information and/or documents provided by VoiceAge, Texas Instruments, or any other company that may have been involved with VoiceAge's AMR-WB products.

### J. RE43,564

#### 1. Patents

The following patent references, including those patents listed in Exhibits J-1 through J-33, anticipate or render obvious the asserted claims of the RE'564 patent.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits J-1 through J-33 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| U.S. Patent No. 5,615,384 ("Allard") | US | March 25, 1997 |
| U.S. Patent No. 6,321,158 ("DeLorme") | US | November 20, 2001 |

| | | |
|---|---|---|
| Japanese Unexamined Patent Application Publication H10-269022 ("Murase") | JP | October 9, 1998 |
| U.S. Patent No. 6,073,036 ("Heikkinen") | US | June 6, 2000 |
| U.S. Patent No. 5,579,037 ("Tahara") | US | November 26, 1996 |
| U.S. Patent No. 6,157,935 ("Tran") | US | December 5, 2000 |
| U.S. Patent No. 6,121,960 ("Carroll") | US | September 19, 2000 |
| U.S. Patent No. 5,754,348 ("Soohoo") | US | May 19, 1998 |
| U.S. Patent No. 5,596,346 ("Leone (346)") | US | January 21, 1997 |
| U.S. Patent No. 6,498,865 ("Brailean") | US | December 24, 2002 |
| PCT Published Application WO 99/54807 ("Choi") | WO | October 28, 1999 |
| U.S. Patent No. 6,104,334 to Allport ("Allport") | US | August 15, 2000 |
| U.S. Patent No. 6,160,551 ("Naughton") | US | December 12, 2000 |
| U.S. Patent No. 6,449,638 to Wecker ("Wecker '638") | US | September 10, 2002 |
| U.S. Patent No. 5,920,327 ("Seidensticker") | US | July 6, 1999 |
| U.S. Patent No. 5,670,984 ("Robertson) | US | September 23, 1997 |
| U.S. Patent No. 7,339,993 ("Brooks") | US | March 4, 2008 |
| WO 99/59312 ("Priestman") | Int'l | November 18, 1999 |
| U.S. Patent No. 6,289,464 to Wecker ("Wecker '464") | US | September 11, 2001 |

## 2. Publications

The following printed publications, including those publications listed in Exhibits J-1 through J-33, anticipate or render obvious the asserted claims of the RE'564 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| The DragMag Image Magnifier, Chi '95 Mosaic of Creativity, May 7-11, 1995 ("Ware") | 1995 | Colin Ware |
| Newton Apple MessagePad Handbook ("Newton Manual") | 1995 | Apple Inc. |
| Newton Internet Enabler User's Manual ("Newton Internet Enabler") | 1997 | Apple Inc. |
| NetHopper Version 3.0 User's Manual ("NetHopper Manual") | 1997 | AllPen Software |

| WEST: A Web Browser for Small Terminals ("Bjork") | 1999 | Staffan Bjork et al. Association for Computing Machinery (ACM) |
| Guide to Opportunities in Volunteer Archaeology: Case study of the use of a hypertext system in a museum exhibit ("Plaisant") | 1999 | Catherine Plaisant |

### 3.      Non-Patent or Publication References

Defendants also contend that the RE'564 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, each alleged sale or public use shall be identified by specifying the item offered for sale or publicly used or known, the date the offer or use took place or the information became known, and the identity of the person or entity which made the use or which made and received the offer, or the person or entity which made the information known or to whom it was made known.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the RE'564 Patent, including documents and source code describing the same:

- DeLorme Solus Pro™ as used in handheld devices (such as Windows CE operated) was launched in January 1999, as demonstrated by at least the article Turn your PalmPilot™ into a Personal Navigator, available at https://web.archive.org/web/19990210071352/http:/www.delorme.com/products/palmpilot/, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of DeLorme Solus Pro™ became publicly known as of the same dates.

- The Newton Messagepad 120 device running the Newton Operating System Version 2.0 was released on October 1, 1994 and was in public use or on sale in the United States more than one year before the U.S. filing date of the application for the '564 patent.  The features

and capabilities of Newton Messagepad 120 Device became publicly known as of the same dates.

- Pocket Streets as used on Windows CE - operated and/or Pocket PC devices was launched in 1997, as demonstrated by at least the articles CD-ROM-Link, Microsoft's street-finding software helps travelers (Nov/Dec 1997) and Computers & High Tech, "Street-finding" programs are all over the map Usefulness of software varies widely [Rockies Edition] (May 5, 1997), and/or the testimony of knowledgeable witnesses and corroborating documents. The conception of Pocket Streets occurred at least as early as May 5, 1997. The features and capabilities of Pocket Streets became publicly known as of the same dates.

- Microsoft Pocket PC was launched in April 2000, as demonstrated by at least the article ComputerWorld, Pocket PCs to Debut April 19 (Mar. 23, 2000), and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Microsoft Pocket PC became publicly known as of the same dates.

- ESRI ArcPad$^{TM}$ ("ArcPad") was launched in March 2000, as demonstrated by at least its white paper - ArcPad$^{TM}$: Taking GIS to the Field, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of ArcPad$^{TM}$ became publicly known as of the same dates.

- The Hitachi Handheld PC HPW-600ETM ("Hitachi HPC") was released, offered and sold in 1999 in the United States at least by Hitachi, as demonstrated by the deposition testimony of Andrew Mulazzi and the corresponding deposition exhibits. The features and capabilities of Hitachi HPC became publicly known as of the same dates.

- PacketVideo Corp. ("PacketVideo"), as demonstrated by PacketVideo's website prior to April 8, 2000, *see, e.g.,* https://web.archive.org/web/20000408140631/http://www.packetvideo.com:80/html/Products.html, and/or the testimony of knowledgeable witnesses and corroborating documents that will be produced in the ongoing discovery. The features and capabilities of PacketVideo became publicly known as of the same dates.

- IBM Simon was launched in 1994, as demonstrated by at least the IBM Simon Users Manual, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of IBM Simon became publicly known as of the same dates.

- Marcosoft Quo Vadis ("Quo Vadis") as used on handheld (such as Palm III) was launched in 1997, as demonstrated by at least its User Manual, Marcosoft Quo Vadis Version 3.0 User Manual, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Quo Vadis became publicly known as of the same dates.

- Ansyr Primer as used on handheld (e.g., Windows CE) devices was launched in January 2000, as demonstrated by at least its press release, Ansyr Technology's Primer™ Brings PDF Viewing to Palm-Size and Handheld Computers, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Ansyr Primer became publicly known as of the same dates.

- Microsoft Windows CE was launched in 1996, as demonstrated by at least the book Frank McPherson, How to Do Everything with Your Pocket PC & Handheld PC (Osborne / McGraw-Hill 2000), and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Microsoft Windows CE became publicly known as of the same dates.

- The IDEO Eyemodule ("Eyemodule") was publicly available for purchase at least as early as 1999, as demonstrated by at least the device itself, the corresponding User's Manual produced at PRIORART038424 - PRIORART038431, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Eyemodule became publicly known as of the same dates.

- Philips Pronto Universal Intelligent Remote Control ("Pronto TSU2000") was publicly available for purchase in 1999, as demonstrated by at least the device itself, the corresponding User Guide and Specifications produced at PRIORART049283 to PRIORART04934, and/or the testimony of knowledgeable witnesses and corroborating

documents. The features and capabilities of Pronto TSU2000 became publicly known as of the same dates.

- Philips Pronto Universal Intelligent Remote Control ("Pronto TS1000") was publicly available for purchase in 1998, as demonstrated by at least the device itself, the corresponding User Guide and Specifications produced at PRIORART041145 - PRIORART041168, and/or the testimony of knowledgeable witnesses and corroborating documents. The features and capabilities of Pronto TS1000 became publicly known as of the same dates.

- Pocket Streets 98 was publicly available no later than August 26, 1997 as demonstrated, for example, by a Microsoft press release dated August 26, 1997. *See, e.g.,* MSFT_PHILIPS_00352294 - 98.  Pocket Streets was included with Microsoft Expedia Streets 98.  Pocket Streets 98 was also included on the Windows CE Services CD-ROMs distributed with Windows CE devices sold in 1998 and 1999 and available for download free from Microsoft's website.  *See, e.g.*, MSFT_PHILIPS_00353231; MSFT_PHILIPS_00353278-302; MSFT_PHILIPS_00352621-624.  The features and capabilities of Pocket Streets 98 became publicly known as of the same dates.

- Philips Nino 300 ("Nino 300") series was released in 1998.  The features and capabilities of Nino 300 became publicly known as of the same dates.  *See, e.g.*, PHILIPS00027041 at 42 (Philips' annual report); PHILIPS00027049-51 (Philips' press release).  The Philips Nino 500 ("Nino 500") series was released in 1999.  *See, e.g.*, PHILIPS00027052-53, PHILIPS00027054-56, PHILIPS00027057-58 (Philips' press releases). Philips has thus far refused to provide sales information for the Nino devices.

- Pocket Streets 2001 was publicly available no later than May 10, 2000 as demonstrated, for example, by Microsoft web page archived by the Internet Archive on May 10, 2000.  *See, e.g.*, MSFT_PHILIPS_00344527 - 30; MSFT_PHILIPS_00344531 - 532; MSFT_PHILIPS_00336238. The features and capabilities of Pocket Streets 2001 became publicly known as of the same dates. Pocket Streets 2001 was included with Microsoft Streets and Trips 2001 and Microsoft MapPoint 2001 which were released, offered, and

sold by Microsoft in the United States in 2000.  Pocket Streets 2001 was also made available for download.

- The Proxim RangeLAN2 7410 PC Card was released no later than 1999, offered and sold in the U.S. at least by Proxim.  *See, e.g.*, MSFT_PHILIPS_0033640-459; MSFT_PHILIPS_00336460-461; MSFT_PHILIPS_00352161-164; MSFT_PHILIPS_00352334.  The features and capabilities of the Proxim RangeLAN2 7410 PC Card became publicly known as of the same dates.

- The Sierra Wireless AirCard 300 PC Card was released no later than 1999, offered and sold in the U.S. at least by Sierra Wireless.  *See, e.g.*, PRIORART044717 - 738; PRIORART044743 - 744; PRIORART049282; PRIORART054633-634.  The features and capabilities of the Sierra Wireless AirCard 300 became publicly known as of the same dates.

- The Socket Digital Phone Card was released no later than 1999, offered and sold in the U.S. at least by Socket and MobilePlanet.  *See, e.g.*, MSFT_PHILIPS_00352285; MSFT_PHILIPS_00336462 - 508; MSFT_PHILIPS_00336509 - 544; MSFT_PHILIPS_00336545 - 548; MSFT_PHILIPS_00336549 - 550.  The features and capabilities of Socket Digital Phone Card became publicly known as of the same dates.

Additional details on these invalidating references are included in Exhibits J-1 through J-33. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits J-1 through J-33.  Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.    Invalidity of the RE'564 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits J-1 to J-33 anticipate and/or render obvious each asserted claim of the RE'564 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. §

103. Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art. Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the RE'564 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations. *See KSR*, 127 S. Ct. at 1741 ("a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ").

Defendants have identified one or more potential combinations that would render each of the asserted claims of the RE'564 patent obvious in the attached exhibits. If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the RE'564 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing. Each of these is discussed below.

**No long felt but unsolved need.** There was no long-felt but unsolved need that the RE'564 patent solved. The concepts described in the RE'564 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.** Philips has provided no evidence that the accused functionality for the RE'564 patent was copied, or more specifically, that any functionality that practices the asserted claim of the RE'564 patent was copied. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.** Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the RE'564 patent. Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the RE'564 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.** Philips has not provided any evidence of alleged success of its products or any other products is due to the alleged invention claimed in RE'564 patent. A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F. 2d 1015, 1027 (Fed. Cir. 1987). Here, Philips has not shown and cannot show that its success is due to the alleged invention of the RE'564 patent. *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F. 2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the RE'564 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness. *See Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d

1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus

exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary

consideration actually results from something other than what is both claimed and novel in the claim, there

is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299,

1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the

success is not pertinent.").

**No industry praise.**  Philips has presented no evidence of industry praise for the alleged invention

of the RE'564 patent or any functionality that allegedly practices the RE'564 patent.  To the extent any

praise is related to any functionality that allegedly practices the RE'564 patent, that praise is not due to the

allegedly novel features of the RE'564 patent, but instead only to features present in the prior art, which is

not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See*

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the

asserted claim of the RE'564 patent were combined.  Instead, as discussed above, the concepts contained

in the claim were already combined in the same manner as the asserted claim.  These prior art systems, as

described in the above-referenced exhibits, disclosed the same combination of elements, and the same

result of that combination, that is recited in the claim.  Thus, there were no unexpected results that arose

from combining the well-known elements in the asserted claim.

**No industry skepticism.**  Philips has presented no evidence that others were skeptical before the

alleged invention date of the RE'564 patent of the viability of what is claimed in the RE'564 patent.  In

fact, there was no industry skepticism concerning the claimed concepts that predates the RE'564 patent.

Thus, there was no industry skepticism that using or combining these well-known prior art concepts would

be viable; others in the field were already combining them in the same manner as arranged in the RE'564

patent.

**No licensing.**  Philips has not presented any evidence it has successfully licensed the RE'564

patent, much less evidence of any nexus between licensing activity and any allegedly novel features of the

RE'564 patent.  Philips' litigation activity, including the number of Defendants to these matters, indicates

that Philips has not been successful in licensing the RE'564 patent.  *See, e.g., Iron Grip Barbell Co. v.*

*USA Sports, Inc.,* 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'").

### K.    9,436,809

#### 1.    Patents

The following patent references, including those patents listed in Exhibits K-1 through K-13, anticipate or render obvious the asserted claims of the '809 patent.  To the extent one or more prior art patents, publications, or systems are identified in the claim charts attached as Exhibits K-1 through K-13 to this document, but are not included in the tables and lists below for each patent, those prior art patents, publications, or systems should also be considered as prior art to the asserted patents.

| Number | Country | Date Issued or Published |
|---|---|---|
| PCT Published Application WO 02/35036 ("Lundkvist") | WO | May 2, 2002 |
| U.S. Patent No. 6,550,011 ("Sims, III") | U.S. | April 15, 2003 |
| U.S. Patent No. 7,242,766 ("Lyle") | U.S. | July 10, 2007 |
| U.S. Patent No. 7,516,325 ("Willey") | U.S. | April 3, 2003 |
| U.S. Patent No. 7,898,977 ("Schneier") | U.S. | March 1, 2011 |
| EP 1100035 A1 to Ishibashi ("Ishibashi") | EP | May 16, 2001 |
| U.S. Patent No. 7,898,977 ("Roese") | US | November 20, 2003 |

#### 2.    Publications

The following printed publications, including those publications listed in Exhibits K-1 through K-13, anticipate or render obvious the asserted claims of the '809 patent.

| Title | Date of Publication | Author or Publisher |
|---|---|---|
| Internet Security Association and Key Management Protocol (ISAKMP), Request For Comments 2408 ("RFC 2408") | 1998 | Internet Engineering Task Force (IETF) |
| Digital Transmission Content Protection Specification Revision 1.2a (Informational Version) ("DTCP") | 2002 | Digital Transmission Licensing Administrator |
| Applied Cryptography (2d ed. 1996) ("Schneier") | 1996 | Bruce Schneier |

| International Standards ISO/IEC 9798 (2d ed.) ("ISO 9798") | 1999 | International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC) |
|---|---|---|
| International Standards ISO/IEC 11770 (1st ed.) ("ISO 11770") | 1999 | International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC) |
| High-bandwidth Digital Content Protection System, Revision 1.0 ("HDCP 1.0") | 2000 | Intel Corporation by or through Digital Content Protection LLC ("DCP") |

### 3.    Non-Patent or Publication References

Defendants also contend that the '809 patent is invalid in view of public knowledge and uses or offers for sale of products and services that are prior art under 35 U.S.C. §102(a) or (b), and/or prior inventions made in the United States by other inventors who had not abandoned, suppressed, or concealed them under 35 U.S.C. § 102(g), and that anticipate or render obvious the asserted claims.

Defendants provide the below list of each item of prior art under 35 U.S.C. § 102(a), (b), or (g) and, to the extent now known, when the item became publicly known or was used, offered for sale, or sold, the identities of the persons or entities that made the item public, publicly used it, or made the offer for sale, and the identities of the person(s) or entities involved in, and the circumstances surrounding the making of, the invention.  Defendants' investigation is ongoing, and defendants may rely on all versions of the following prior art systems commercially sold, publicly known or used before the priority date of the '809 Patent, including documents and source code describing the same:

- The SmartRight System, also called Extended Conditional Access or XCA, was developed by Thomson Multimedia beginning at least as early as 1998, and was publicly demonstrated at least as early as January 8, 2002.  The features and capabilities of SmartRight System became publicly known as of the same dates.  *See, e.g.,* Press Release, Micronas and Thomson Multimedia Showcase a New Copy Protection System That Will Drive the Future of Digital Television (Jan. 8, 2002), available at https://www.micronas.com/de/node/1597.  *See also* SmartRight[TM] Certification for FCC Approval for Use with the Broadcast Flag, March 1, 2004; SmartRight[TM] Copy Protection

for System for Digital Home Networks, Deployment Process, CPTWG, November 28, 2001; SmartRight[TM] Copy Protection System for Digital Home Networks, CPTWG, May 24, 2001; SmartRight[TM] Copy Protection System for Digital Home Networks, CPTWG, July 11, 2001; SmartRight[TM] Digital Broadcast Content Protection, MB Docket No. 04-59, Presentation to FCC, April 2, 2004; SmartRight[TM] Technical White Paper, Version 1.7, January 2003 ("White Paper"); DVB-CPT-715 SmartRight Answer to the Call for Proposals for content protection & copy management technologies, Version 1.0, October 19, 2001 ("DVB-CPT-715").

Additional details on these invalidating references are included in Exhibits K-1 through K-13. Defendants may use physical samples, executable software, or source code as evidence of the relevant functionality of these prior art systems, as described in Exhibits K-1 through K-13. Defendants have made or, at a mutually convenient time, will make available for inspection any physical samples of products, systems, or software listed above, or any source code, that it has in its possession or that becomes available to defendants in the future.

### 4.      Invalidity of the '809 Patent Under 35 U.S.C. §§ 102 and 103

Defendants contend that the prior art references set forth in Exhibits K-1 through K-13 anticipate and/or render obvious each asserted claim of the '809 patent.

To the extent that any claim limitation is not anticipated pursuant to 35 U.S.C. § 102, Defendants contend that the claimed invention would have been obvious to one of ordinary skill under 35 U.S.C. § 103.  Each asserted claim would have been obvious in view of each reference cited above either alone or combined with the knowledge that was possessed by one of ordinary skill in the art.  Additionally, each asserted claim would have been obvious to one of ordinary skill in the art in view of the combination of any one of the prior art references identified above with one or more of the other references identified.

In particular, those of ordinary skill in the art at the time of the alleged invention of the '809 patent would have been motivated to modify or combine the prior art references set forth herein because, inter alia, (a) the references in general deal with the same or related subject matter; (b) one of ordinary skill in the art would have been motivated by the problem that the inventor was attempting to solve, or with other problems that would have been faced in reaching a solution, and would have looked to references that

concerned similar issues or taught how to overcome the problems faced; (c) the combinations were obvious to try and would have operated in their known and expected way; (d) the combinations were within the skill and understanding of a person of ordinary skill in the art; (e) the combinations would have been motivated by the developments in technology; (f) the combinations reflect various design choices that would have been known to one of ordinary skill in the art and within that person's technical capability to implement; and (g) the combinations would enhance commercial opportunities and make the product more desirable, for example, by improving performance, expanding functionality, and/or increasing reliability.

The various motivations described above provide a basis for combining or modifying references, as detailed below, to render each of the asserted claims obvious. In addition, the Court can consider the inferences and creative steps a person of ordinary skill in the art would employ in making such combinations. *See KSR*, 127 S. Ct. at 1741 (holding that "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ"). Defendants have identified one or more potential combinations that would render each of the asserted claims of the '809 patent obvious in the attached exhibits. If, and to the extent, Philips challenges the correspondence of any of these references with respect to particular limitations of the asserted claims of the '809 patent, Defendants reserve the right to supplement these invalidity contentions to identify additional combinations, motivations to modify, or explanations for particular references with additional particularity.

Furthermore, there is no evidence of any indicia of nonobviousness, including any long-felt but unsolved need; copying; failure of others; commercial success due to the patented invention; industry praise; unexpected results; industry skepticism; or licensing. Each of these is discussed below.

**No long felt but unsolved need.** There was no long-felt but unsolved need that the '809 patent solved. The concepts described in the '809 patent were all well known before the alleged invention date as evidenced by the patent itself, the file history and references cited therein, and the prior art identified herein, including identified in the above-referenced exhibits.

**No copying.** Philips has provided no evidence that the accused functionality for the '809 patent was copied, or more specifically, that any functionality that practices any asserted claim of the '809 patent

was copied. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) (allegedly copied feature must be an embodiment of the patented claims).

**No failure of others.** Philips has not shown that there is any evidence of a failure of others to invent or use the claimed techniques before the alleged invention date of the '809 patent. Nor could it, as the asserted claim recites concepts that were already known before the alleged invention of the '809 patent, as described above and in the references described in charts attached hereto, including in the above-referenced exhibits.

**No commercial success.** Philips has not provided any evidence that any alleged success of its products or any other products is due to the alleged invention claimed in '809 patent. A patentee bears the burden of demonstrating that the relevant commercial success is attributable to the claimed invention "as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec. Prods, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed. Cir. 1987). Here, Philips has not shown and cannot show that its success is due to the alleged invention of the '809 patent. *See, e.g., Windsurfing Int'l Inc. v. AMF*, 782 F.2d 995 (Fed. Cir. 1986) (considerations such as intervening, non-covered technological innovations, popularity of accessories, and advertising expense are all relevant to the nexus determination).

If any commercial success is due to any of the concepts discussed in the '809 patent, those concepts are also present in the prior art, as described above, and thus does not support any commercial success that is relevant to the question of obviousness. *Tokai Corp. v. Easton Enters, Inc.*, 632 F.3d 1358, 1369–70 (Fed. Cir. 2011) ("If commercial success is due to an element in the prior art, no nexus exists."); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("Where the offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

**No industry praise.** Philips has presented no evidence of industry praise for the alleged invention of the '809 patent or any functionality that allegedly practices the '809 patent. To the extent any praise is related to any functionality that allegedly practices the '809 patent, that praise is not due to the allegedly

novel features of the '809 patent, but instead only to features present in the prior art, which is not a sufficient nexus to be relevant to the question of industry praise for purposes of obviousness.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

**No unexpected results.**  There is no evidence of any unexpected results when the elements of the asserted claims of the '809 patent were combined. Instead, as discussed above, the concepts contained in the asserted claims were already combined in the same manner as the asserted claims.  These prior art systems, as described in the above-referenced exhibits, disclosed the same combination of elements, and the same result of that combination, that is recited in the asserted claims.  Thus, there were no unexpected results that arose from combining the well-known elements in the asserted claims.

**No industry skepticism.**  Philips has presented no evidence that others were skeptical before the alleged invention date of the '809 patent of the viability of what is claimed in the '809 patent.  In fact, there was no industry skepticism concerning the claimed concepts that predates the '809 patent.  Thus, there was no industry skepticism that using or combining these well-known prior art concepts would be viable; others in the field were already combining them in the same manner as arranged in the '809 patent.

## III.  IDENTIFICATION OF ANTICIPATION AND OBVIOUSNESS REFERENCES UNDER PATENT L.R. 3-3(b)

Some or all of the asserted claims are invalid as anticipated under 35 U.S.C. § 102 in view of each of the prior art references identified above and in the accompanying claim charts, which identify specific examples of where each limitation of the asserted claims is found in the prior art references.

The accompanying claim charts include obviousness combinations of references under 35 U.S.C. § 103.  As reflected in the attached exhibits, the discussion herein, and in the references themselves, the elements of Philips' Asserted Claims are all disclosed in the art before the patents' earliest possible priority dates, and one of skill would readily fit their teachings together.  The references cited herein and in the attached exhibits may be combined and modified in a number of obvious ways to achieve the claimed apparatus and systems, including those disclosed in the attached exhibits.

Defendants are not aware of all ways in which Philips may attempt to distinguish the prior art cited herein.  Accordingly, Defendants reserve the right to supplement or modify these Invalidity Contentions based on Philips' contentions, any further claim construction, and further discovery to the extent permitted

by the Federal Rules of Civil Procedure, the Civil Local Rules, the Patent Local Rules, the Court's Chamber Rules, and any other order or schedule entered by the Court.  As an example, for any claim limitation that Philips alleges is not disclosed in a particular prior art reference, Defendants reserve the right to assert that any such limitation is (a) inherent in the disclosed reference; (b) obvious to one of ordinary skill in the art at the time, in light of the same; or (c) disclosed in one or more prior art references, including without limitation those disclosed in the prior art items listed below or in the attached exhibits, and in combination would have rendered the Asserted Claims obvious.  Further, the suggested obviousness combinations are in the alternative to Defendants' anticipation contentions.  The obviousness contentions set forth in these contentions should not be construed to suggest that any reference is not anticipatory in its own right.

These obviousness combinations reflect defendants' present understanding of the scope of the claims that Philips asserts and should not be construed as defendants' agreement with Philips' interpretation of any patent claims.

## A.    RE44,913

Defendants identify prior art references rendering the asserted claims of Philips' RE'913 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits A-1 through A-17.  Exhibits A-1 through A-17 include specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are disclosed.

Each of the primary references teaches all or nearly all of the limitations of the RE'913 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references.  In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims.  For example, the problem of providing efficient text entry on a device with a keypad was well-known in the art long before the RE'913 patent.

**B.    6,690,387**

Defendants identify prior art references rendering the asserted claims of Philips' '387 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits B-1 through B-21.  Exhibits B-1 through B-21 include specific combinations of references, including citations to where in the references the teachings, suggestions, and motivations to combine the references are disclosed.

Each of the primary references teaches all or nearly all of the limitations of the '387 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references.  In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims.  For example, the problem of providing intuitive gestures for scrolling and moving objects in a touchscreen user interface was well-known in the art long before the '387 patent.

**C.    7,184,064**

Defendants identify prior art references rendering the asserted claims of Philips' '064 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits C-1 through C-21.

Each of the primary references teaches all or nearly all of the limitations of the '064 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references.  In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims.  For example, the problem of providing intuitive gestures for scrolling and moving objects in a touchscreen user interface was well-known in the art long before the '064 patent.

**D.    7,529,806**

Defendants identify prior art references rendering the asserted claims of Philips' '806 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits D-1 through D-17.

Each of the primary references teaches all or nearly all of the limitations of the '806 patent asserted claims. To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references. In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims. For example, the problem of providing high-quality multimedia presentations over a network and adapting those presentations based on constraints of the system on which the presentation is being displayed was well-known in the art long before the '806 patent.

**E.    5,910,797**

Defendants identify prior art references rendering the asserted claims of Philips' '797 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits E-1 through E-15.

Each of the primary references teaches all or nearly all of the limitations of the '797 patent asserted claims. To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references. In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims. For example, allowing gravity to affect the motion of on-screen objects on a handheld device was well-known in the art long before the '797 patent.

**F.    6,522,695**

Defendants identify prior art references rendering the asserted claims of Philips' '695 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits F-1 through F-13.

Each of the primary references teaches all or nearly all of the limitations of the '695 patent asserted claims. To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references. In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the

asserted claims. For example, the problem that a given compression technique can actually increase the size of certain data was well-known in the art long before the '695 patent as was the approach of not applying compression to segments of data where doing so is counterproductive.

**G.     RE44,006**

On November 2, 2018, Philips notified defendants by email that the RE'006 patent "is no longer being asserted in this litigation."

**H.     8,543,819**

Defendants identify prior art references rendering the asserted claims of Philips' '819 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits H-1 through H-13.

Each of the primary references teaches all or nearly all of the limitations of the '819 patent asserted claims. To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references. In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims. For example, the problem of authenticating devices to allow secure transfer of content was well-known in the art long before the '819 patent.

**I.     6,772,114**

Defendants identify prior art references rendering the asserted claims of Philips' '114 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits I-1 through I-7.

Each of the primary references teaches all or nearly all of the limitations of the '114 patent asserted claims. To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references. In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims. For example, the problem of encoding a wideband signal efficiently was well-known in the art long before the

'114 patent, as was the solution of encoding the high band portion of a wideband signal using LPC and/or gain coefficients that are then applied to a noise signal at the decoder.

### J.      RE43,564

Defendants identify prior art references rendering the asserted claims of Philips' RE'564 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits J-1 through J-33.

Each of the primary references teaches all or nearly all of the limitations of the RE'564 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references.  In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims.  For example, the problem of implementing zoom functionality on small screens to make it easier for users to visualize and select downloaded items or material on those screens was well-known in the art long before the RE'564 patent.

### K.      9,436,809

Defendants identify prior art references rendering the asserted claims of Philips' '809 patent obvious, alone or in combination with other references, as discussed below and included in Exhibits K-1 through K-13.

Each of the primary references teaches all or nearly all of the limitations of the '809 patent asserted claims.  To the extent any claim elements are found to missing from the primary references, secondary references are designated for combination with the primary references.  In addition to the obviousness references in defendants' claim charts, defendants may rely on background prior art to demonstrate the state of the prior art in the relevant period, which is relevant to obviousness of the asserted claims.  For example, the problem of authenticating devices to allow secure transfer of content was well-known in the art long before the '809 patent.

## IV.     CLAIM CHARTS UNDER PATENT LOCAL RULE 3-3(c)

Defendants submit herewith charts attached in Exhibits A through K identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found, including for each

limitation that defendants contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function.

## V.      CONTENTIONS UNDER PATENT L.R. 3-3(d)

Defendants contend the following asserted claims of the asserted patents are invalid under 35 U.S.C. § 101, indefinite under 35 U.S.C. § 112(2) or lack sufficient enablement or written description under 35 U.S.C. § 112(1).

At least based upon Philips' apparent claim interpretations, Philips' claims are invalid under 35 U.S.C. § 112 for the following reasons:  (1) the specifications of the Patents-in-Suit lack a written description of the claimed inventions in full, clear, concise, and exact terms as required by 35 U.S.C. § 112(1); (2) the specifications of the Patents-in-Suit lack an enabling disclosure as required by 35 U.S.C. § 112(1); (3) the Asserted Claims are invalid as indefinite under 35 U.S.C. § 112(2) because the claims fail to particularly point out and distinctly claim the subject matter which the applicants regarded as their invention; and (4) the Asserted Claims are invalid as indefinite under 35 U.S.C. § 112(6) because the specification fails to disclose adequate structure corresponding to means-plus-function claim limitations, as described above.

In particular, the specifications of one or more of the Patents-in-Suit lack a written description of the alleged invention in full, clear, concise and exact terms as required by 35 U.S.C. § 112(1), and thus fail to provide sufficient information in the original disclosure to show the inventor possessed the invention at the time of the original filing.  *See Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927–28 (Fed. Cir. 2004).  Defendants thus contend that one or more of the Asserted Claims are invalid under 35 U.S.C. § 112(1).

Further, the specifications of one or more of the Patents-in-Suit lack an enabling disclosure as required by 35 U.S.C. § 112(1).  *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008) (holding that the inventors must set forth sufficient information in the specification to enable one of ordinary skill in the art to make and use the invention without undue experimentation).  Defendants thus contend that one or more of the Asserted Claims of the Patents-in-Suit are not enabled.

Further, the claim language of one or more claims of the Patents-in-Suit, as construed by Philips, "simply describe[s] the claimed function," not a specific structure or algorithm, and thus fail to sufficiently

describe a specific structure to meet the requirements of 35 U.S.C. § 112(6).  *See, e.g., Keithley v. Homestore.com, Inc.*, 636 F. Supp. 2d 978, 993-95 (N.D. Cal. 2008); *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

Finally, United States patent law requires that a patent contain one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112(2).  A claim is considered indefinite, however, if it does not "give notice to the public of the extent of the legal protection offered by the patent, so that interested members of the public, e.g., competitors or the patent owner, can determine whether or not they infringe."  *Default Proof Credit Card Sys. Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302–03 (Fed. Cir. 2005) (internal quotes and citations omitted).  Such a claim is invalid.  *See id.*; *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002).  Defendants thus contend that one or more of the Asserted Claims are invalid for failure to satisfy the definiteness requirement of 35 U.S.C. § 112(2).  Defendants also note that Defendants' charting of a prior art reference for a claim or limitation that Defendants contend is invalid for lack of definiteness in no way represents an admission or concession that the scope of the claim or limitation is definite or ascertainable.

When this case was pending before the District of Delaware, the Court declined to resolve indefiniteness issues in its claim construction ruling.  *See, e.g.*, Docket No. 212 at 3 n.2; Docket No. 415 § II(C)(2), at 15-16.  After transfer to the Northern District of California, Defendants and Microsoft submitted an administrative motion setting forth their views of how best to address certain claim terms with pending indefiniteness issues.  At a case management conference before this Court on October 2, 2018, the Court ruled that, in its view, the claim construction order issued by the District of Delaware did resolve indefiniteness issues, and that accordingly this Court would not consider further briefing on indefiniteness arguments it found the District of Delaware had already decided.  *E.g.,* October 2, 2018, Case Management Conference Tr. at 5:10-19.  Defendants reserve all appellate rights as well as the right to seek reconsideration of the Court's *Markman* order as appropriate.

## A.     RE44,913

The asserted claims of the RE'913 patent are invalid for failing to comply with 35 U.S.C. § 112 for at least the following claim language or limitations:

- "at least one of the keys has a primary character, a plurality of secondary characters and an associated display area": the reference to keys "having" characters or a display area is indefinite because a POSA would not be able to understand how a key could "have" a primary character, plurality of secondary characters, and an associated display area. For instance, the POSA would not have understood whether this requires that all characters that the key "has" must be displayed, and if not, under what circumstances the key would otherwise "have" the characters. As for the display area, a POSA would not understand, in a keyboard with multiple keys, how one key could "have" an associated display area. Nor would the POSA be able to understand the metes and bounds of each key's associated display area. The POSA would also be confused because the claims limitations refer to a "respective" display area, and it is unclear whether or how the "respective" display area relates to or differs from the "associated" display area";

- "returning the primary character as an input character in response to selection of the at least one key for a period shorter than a predetermined time period": the reference to "returning" a character "as an input character" is indefinite because a POSA would not be able to understand whether a character must be displayed in order to be "returned...as an input character," and if not, under what circumstances an input character may be "returned";

- "switching to a second state after detecting a first key selection of the at least one key for a period longer than the predetermined time period": the limitation "switching to a second state" is indefinite because a POSA would not have understood when and how to switch a keypad to a "second state." The term "second state" appears nowhere in the specification, and to the extent the specification describes any state change at all, it only describes changing the characters displayed on each key. The claim is vague as to what other embodiments may be qualify as "switching to a second state," and the specification lacks written description support for any other embodiment. Moreover, the specification does not enable any other embodiment, especially for the means plus function claims, but also for the remaining asserted claims;

- "displaying each of the secondary characters associated with the first selected key in a respective display area": this term is indefinite because the term "respective display area" is vague; a POSA would not have understood the metes and bounds of the display area that is "respective" to any one key, as opposed to another key, or how and whether the "respective" display area relates to or differs from the "associated" display area set forth in the preamble. The patent lacks also written description support for, and does not enable, any embodiment of "displaying each of the secondary characters...in a respective display area" other than the embodiment shown in the figures, in which the only change between the first and second state is that the various keys display different characters. The specification does not provide written description support for, or enable, any other embodiment, e.g., pop-up keys;

- "detecting a second key selection": The RE'913 patent only discloses and enables one embodiment for "detecting a second key selection," namely, detecting the selection of a second "key" on the keypad from among the keys that are displayed in the first state (as shown in the patent's figures). To the extent Philips contends that another embodiment may infringe (i.e., detecting a second key selection on a separate "pop-up" keypad), the RE'913 patent does not describe any specific teachings or technology for detecting the selection of a "key" on a separate "pop-up" keypad. Thus, if Philips is correct, the claims are invalid for lack of enablement and lack of written description;

- "associated display area": as set forth above, this term is indefinite because the term is vague; a POSA would not have understood the metes and bounds of the display area that is associated with any one key, as opposed to another key, or how and whether the "associated" display area relates to or differs from the "respective" display area set forth in the claims;

- "respective display area": this term is indefinite because the term is vague; a POSA would not have understood the metes and bounds of the display area that is "respective" to any one key, as opposed to another key, or how and whether the "respective" display area relates to or differs from the "associated" display area set forth in the preamble; and

- "a display means adjacent the key for displaying the display area associated with the at least one key:" this term is indefinite for the reasons set forth above with respect to the associated display area.

Defendants contend that the asserted claims of the RE'913 patent are also invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (i.e., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "means for displaying in a default state the primary character associated with the at least one key in the associated display area";
- "means for returning the primary character as an input character in response to selection of the at least one key for a period shorter than a predetermined time period";
- "means for displaying each of the secondary characters associated with the selected key in a respective display area";
- "means responsive to a second key selection for selecting as the input character the secondary character associated with the second key selection";
- "a display means adjacent the key for displaying the display area associated with the at least one key"; and
- "means for detecting a sliding across the keypad from the first key selection to the second key selection."

**Invalidity of the RE'913 Patent Under 35 U.S.C. § 251.** Defendants contend that the RE'913 patent is also invalid for failure to comply with 35 U.S.C. § 251 ("No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."). The reissue proceedings that resulted in the RE'913 patent took place outside the two-year period for a broadening reissue specified by § 251. The original claims of the RE'913 patent covered only a sequence of two key presses — a single selection of a first key press followed by a single selection of a second key. However, the patentee improperly enlarged the scope of the original claims through amendments that resulted in claims that cover a method and means for detecting three key presses

-- two selections of the first key followed by a selection of a second key — as set forth in the following limitations:

- "in the default state, returning the primary character as an input character in response to selection of the at least one key for a period shorter than a predetermined time period switching to a second state after detecting a first key selection of the at least one key for a period longer than the predetermined time period; in the second state"; and

- "the keypad in a default state displaying the primary character associated with the at least one key in the associated display area."

The improper broadening during re-issue of the above claim limitations renders the RE'913 patent invalid under § 251.

**B.    6,690,387**

The asserted claims of the '387 patent are invalid for failing to comply with 35 U.S.C. § 112 for at least the following claim language or limitations:

- "scroll-like display of data."  The claim phrase "scroll-like display of data" is not a term of art, and a person of ordinary skill in the art would be unable to ascertain the scope of this phrase with any reasonable certainty.  The '387 patent specification fails to inform what could qualify as a "display of data," much less what would render that display "scroll-like."  The '387 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use a "scroll-like display of data" without undue experimentation.  The '387 patent specification does not describe any specific teachings or technology for achieving any display whatsoever, let alone a "scroll-like display of data."

- "sensing the duration of finger touch contact time with an electronic display screen having scrollable data displayed thereon."  Claim 9 of the '387 patent requires "sensing the duration of finger touch contact time" but makes no other reference to this sensed duration.  A person of ordinary skill in the art would be unable to ascertain with reasonable certainty how claim 9 requires that duration of finger touch to be "sensed" and whether it must be sensed for any particular purpose.

- "sensing the speed and direction of motion of said finger touch contact with said display screen." The '387 patent specification does not describe or enable how to sense the speed or the direction of motion of a finger touch contact with a display screen and a POSA would not be able to make and use the invention without undue experimentation. The '387 patent specification does not describe any specific teachings or technology for sensing the speed and direction of finger touch contact with a display screen. Further, Philips appears to contend that "sensing the speed and direction of finger touch" reads on velocities computed with formulas based on a weighted sequence of point samples. A person of ordinary skill in the art reading the written description of the '387 patent specification would not have understood the drafters of the '387 patent to be in possession of the claimed invention as Philips now purports to interpret it. Finally, Philips appears to contend that the claims of the '387 patent read on circumstances where the "sens[ed] speed and direction" do not correspond to the actual speed or direction of the finger on screen (e.g., where the finger moves diagonally but the content only scrolls vertically and more slowly than the speed of finger movement). Philips' apparent construction of this phrase is contrary to its plain and ordinary meaning and would render the claims indefinite as a person of ordinary skill in the art would be unable to ascertain with reasonable certainty what is required for a computed velocity to satisfy the claim's requirement of "sensing the speed and direction of finger touch."

- "initiating scrolling motion of said scrollable data on said display screen in said sensed direction and at said sensed speed." Philips appears to construe this element to allow "initiating" scrolling motion if the content was already scrolling at the time that content was supposedly "initiated." Philips' apparent construction of this phrase is contrary to its plain and ordinary meaning and would render the claims indefinite as a person of ordinary skill in the art would be unable to ascertain with reasonable certainty when and how software instructions could "initiate" scrolling of content that is already scrolling. Further, as described above, Philips appears to contend that this limitation is satisfied even if if the "sens[ed] speed and direction" at which scrolling is "initiated" does not correspond to the

actual speed or direction of the finger on screen (e.g., where the finger moves diagonally but the content only scrolls vertically and more slowly than the speed of finger movement). Again, Philips' apparent construction of this phrase is contrary to its plain and ordinary meaning and would render the claims indefinite, as a person of ordinary skill in the art would be unable to ascertain with reasonable certainty when scrolling is "initiat[ed] . . . in said sensed direction and at said sensed speed."

- "slowing the speed of said scrolling motion from the initiated speed thereof, at a predetermined rate." The '387 patent specification does not describe any specific teachings or technology for slowing the speed of scrolling at a predetermined rate. Instead, it states only that "the speed of displacement is caused to decay at a selected rate (units of displacement per unit of time, or a function thereof)" without providing any description of what type of "function" to use or why. Accordingly, the '387 patent specification lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation. Further, a person of ordinary skill in the art would be unable to ascertain with reasonable certainty what constitutes a "predetermined rate" within the meaning of the claim and whether any given "function" satisfies that claim requirement or not. Finally, Philips appears to construe "predetermined rate" to cover circumstances where the method and manner of "slowing" is not predetermined but rather is determined on-the-fly at the moment the finger is lifted. Philips's apparent construction is inconsistent with the plain and ordinary meaning of "predetermined," and a person of ordinary skill in the art reading the written description of the '387 patent specification would not have understood the drafters of the '387 patent to be in possession of the claimed invention as Philips now purports to interpret it.

- "terminating said scrolling motion when one of the conditions comprising the following group of conditions is sensed: (a) a substantially stationary finger touch having a finite duration is sensed." A person of ordinary skill in the art would be unable to ascertain with reasonable certainty how to determine if a finger touch was "substantially" stationary within the meaning of the claim language. Similarly, a person of ordinary skill in the art

would be unable to ascertain with reasonable certainty the scope of the limitation's requirement that the touch "hav[e] a finite duration."  A person of ordinary skill in the art would understand that a touch cannot have an infinite duration, so the claim phrase must impose some meaningful limit on the duration of the touch or else it would be entirely superfluous, but the '387 patent provides no clarity as to how much duration is required and/or how much motion is allowed for the claim limitation to be satisfied.

- "terminating said scrolling motion when … (b) an end-of-scroll signal is sensed."  The phrase "end-of-scroll signal" is not a term of art and a person of ordinary skill in the art would not be able to ascertain with reasonable certainty what constitutes an "end-of-scroll signal" within the meaning of the claim.  Philips appears to construe the requirement to cover software instructions that merely evaluate whether or not scrolling has already terminated.  Philips's apparent construction is contrary to the plain and ordinary meaning of "signal" and would provide no basis for a person of ordinary skill in the art to evaluate whether or not an "end-of-scroll signal" is sensed.

- "said first given preset minimum time" / "said first given time."  Dependent claims 11 and 12 both recite "said first given preset minimum time" without a discernible antecedent basis.  A person of ordinary skill in the art would not be able to ascertain with reasonable certainty whether the drafters intended claims 11 and 12 to invoke a new "first given preset minimum" or to refer to some requirement for a preset minimum time threshold that was supposed to be, but was not, included in claim 9.  Moreover, a person of ordinary skill in the art would not understand how and to what extent the "first given preset minimum" time requirements in claim 11 and 12 interact with one another — for example, whether the "first given preset minimum" time requirement in claim 12 must relate to scrolling or whether any time threshold used for any purpose could suffice.

- "sensing a finger touch on said screen having a duration greater than said first given preset minimum time and less than a second given preset minimum time which is greater than said first given time and then moving said display in correspondence with movement of the finger touch."  As described above, this limitation of claim 11 is indefinite at least insofar

as the term "said first given preset minimum time" lacks antecedent basis such that a person of ordinary skill in the art would be unable to ascertain the scope of the claimed invention.  Further, Philips appears to construe the term to cover circumstances where the scrolling content moves at a different speed and in a different direction than the finger (e.g., where the finger moves diagonally but the content only scrolls vertically and more slowly than the speed of finger movement).  Philips' apparent construction is inconsistent with the plain and ordinary meaning of the phrase "moving said display in correspondence with movement of the finger touch" and would leave a person of ordinary skill in the art unable to ascertain with reasonable certainty whether any particular scrolling motion was or was not "in correspondence" with the movement of a finger.  The '387 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  The '387 patent specification does not describe any specific teachings or technology for sensing duration of finger touches nor would it enable a person of ordinary skill in the art to determine whether or not a touch was "in correspondence" with the movement of a finger under Philips's apparent construction of that term.

- "sensing a stationary finger touch on said screen having a duration greater than a second preset given minimum time which is greater than said first given preset time and then moving a touch-selected item relative to the stationary display in correspondence with movement of the finger touch."  As described above, this limitation of claim 12 is indefinite at least insofar as the term "said first given preset minimum time" lacks antecedent basis such that a person of ordinary skill in the art would be unable to ascertain the scope of the claimed invention.   Further, Philips appears to construe the term to cover circumstances where the an item is scrolled above an background that changes and hence is not "stationary."  Philips' apparent construction is inconsistent with the plain and ordinary meaning of the phrase "moving a touch-selected item relative to the stationary display" and would leave a person of ordinary skill in the art unable to ascertain with reasonable certainty whether any particular drag operation was or was not "relative to" a "stationary

display." The '387 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation. The '387 patent specification does not describe any specific teachings or technology for sensing duration of finger touches or moving an item relative to a stationary display.

**'387 Patent Is Directed to Patent-Ineligible Subject Matter.** As apparently construed by Philips, the '387 patent is directed to nothing more than the abstract idea of scrolling on a touchscreen in a manner that feels "natural" and obeys the basic laws of physics — i.e., that the scrolling continues in the direction of motion when the finger is lifted (inertia) and slows at a given rate (friction) and stops if it hits a boundary or senses a stationary finger touch (reacting to forces). Indeed, this abstract idea is nothing more than a basic application of the laws of nature to replicate natural phenomena. As a result, the '387 patent falls within one or more judicially recognized exceptions to 35 U.S.C. § 101. Moreover, the application of this abstract idea to touchscreen devices was already well-known in the art. *See, e.g.*, U.S. Patent No. 6,323,846 at 2:22–25 ("Another common method for reducing motion and repetition is to automatically continue pointing or scrolling movement signals once the user has stopped moving or lifts the finger."); *see also id.* at 2:41–47 ("[M]otion continuation can be a function solely of lateral finger velocity and direction at liftoff. Motion continuation decays due to a friction factor or can be stopped by a subsequent touchdown on the surface.").

The dependent claims of the '387 patent are directed to similar abstract ideas that replicate natural phenomena and were well-known in the art. For example, claim 11 is directed merely to the abstract idea of scrolling a display region in correspondence with a finger's movement (i.e., such that the display "sticks to the finger"). Claim 12 is directed merely to the abstract idea of dragging a single item in correspondence with a finger's movement (i.e., such that the selected item "sticks to the finger."). Both of these are nothing more than abstract attempts to replicate the natural phenomena of moving objects over a flat surface with one's finger, and applying those abstract ideas to touchscreen devices is described in the '387 patent as having been already well known in the art. *See, e.g.*, '387 patent at 1:25–30 (describing prior art for "engaging and 'dragging' the screen image in a desired direction"); id. at 3:34–37 (describing the "known process of 'touch-dragging'").

Moreover, to the extent that '387 patent attempts to claim anything above and beyond this patent-ineligible subject matter, these additions are insignificant and lack sufficient "inventive concept" to transform the nature of the claims into a patent-eligible application.  For example, to the extent that the asserted dependent claims of the '387 patent can be construed, they appear to include limitations directed to the duration of the touch.  However, distinguishing between touch events and modes based on the duration of a touch is a trivial addition that was well known in the art, *see e.g.*, U.S. Patent No. 6,943,778 at 9:12–21, and does not provide an "inventive concept" sufficient to transform the claims into patent-eligible material.

### C.    7,184,064

The asserted claims of the '064 patent are invalid for failing to comply with 35 U.S.C. § 112 for at least the following claim language or limitations:

- "scroll format data."  The claim phrase "scroll format data" is not a term of art, and a person of ordinary skill in the art would be unable to ascertain the scope of this phrase with any reasonable certainty.  The '064 patent specification fails to inform what is needed for "data" to be considered "scroll format data" within the meaning of the claims.  The '064 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use "scroll format data" without undue experimentation.

- "scroll format display."  Similarly, the claim phrase "scroll format display" is not a term of art, and a person of ordinary skill in the art would be unable to ascertain the scope of this phrase with any reasonable certainty.  Neither the claim nor the '064 specification explain what the claims mean by a "scroll format display" and how it relates to the "scroll format data" separately recited in the claim.

- "source of scroll format data" / "scroll format data source."  Likewise, the claim phrases "source of scroll format data" and "scroll format data sources" are not terms of art, and a person of ordinary skill in the art would be unable to ascertain the scope of these phrases with any reasonable certainty.  Neither the claim nor the '064 specification explain what the claims mean by a "scroll format display" and how it relates to the "scroll format data" separately recited in the claim.  The only description in the '064 patent specification is that

"for the purposes of this disclosure, the internal memory unit may be assumed to be the source of scrollable data display . . . ."  *See* '064 patent, at 5:23-25.  That specific scenario is covered by dependent claim 6, suggesting that independent claim 1 must be broader and cover "scroll format data sources" other than the internal memory unit.  By its own admission, the '064 patent fails to describe any such "scroll format data sources" and a person of ordinary skill in the art would be unable to determine with reasonable certainty whether any particular hardware or software element in a system constitutes a "scroll format data source" within the meaning of the claims.

- "finger touch program instructions associated with said microprocessor for sensing the speed, direction and time duration of a finger touch contact with said display screen."  This limitation recites function with no corresponding structure (i.e., no special-purpose hardware or software algorithm) for performing the function, so it should be construed as subject to 35 U.S.C. § 112, ¶ 6, under *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. June 16, 2015) (en banc).  As described below, the '064 patent specification further fails to disclose hardware or an algorithm for performing the function "sensing the speed, direction and time duration of a finger touch contact with said display screen," rendering the claim indefinite.  Similarly, the '064 patent specification lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  The '064 patent specification does not describe any specific teachings or technology for sensing the speed, direction, or duration of finger touch contact with a display screen.  Further, Philips appears to contend that "sensing the speed and direction of finger touch" reads on velocities computed with formulas based on a weighted sequence of point samples.  A person of ordinary skill in the art reading the written description of the '064 patent specification would not have understood the drafters of the '064 patent to be in possession of the claimed invention as Philips now purports to interpret it.   Finally, Philips appears to contend that the claims of the '064 patent read on circumstances where the "sens[ed] speed and direction" do not correspond to the actual speed or direction of the finger on screen (e.g., where the finger moves diagonally but the

content only scrolls vertically and more slowly than the speed of finger movement).
Philips' apparent construction of this phrase is contrary to its plain and ordinary meaning
and would render the claims indefinite as a person of ordinary skill in the art would be
unable to ascertain with reasonable certainty what is required for a computed velocity to
satisfy the claim's requirement of "sensing the speed [and] direction . . . of" a finger touch.

- "said sensed initial speed" / "responsive to said duration of said finger touch contact such
  that, when said duration exceeds a first given preset minimum time and is accompanied by
  motion along the surface of said screen followed by separation of said finger touch from
  said screen, a scroll format display on said screen is caused to begin to scroll in said sensed
  direction and at said sensed initial speed."  Philips appears to construe this element to allow
  the requirement that the "screen is caused to begin to scroll" to be satisfied even if the
  content on screen was already scrolling.  Philips further appears to construe the "sensed
  direction and sensed initial speed" not to correspond to the direction and scrolling at which
  scrolling is first initiated but rather with a sensed direction and speed of finger movement
  once scrolling has already begun.  Philips' apparent construction of this phrase is contrary
  to its plain and ordinary meaning and would render the claims indefinite as a person of
  ordinary skill in the art would be unable to ascertain with reasonable certainty when and
  how software instructions could "begin" scrolling content that is already scrolling.  Further,
  as described above, Philips appears to contend that this limitation is satisfied even if if the
  "sensed direction and sensed initial speed" at which scrolling is "begun" does not
  correspond to the actual speed or direction of the finger on screen (e.g., where the finger
  moves diagonally but the content only scrolls vertically and more slowly than the speed of
  finger movement).  Again, Philips' apparent construction of this phrase is contrary to its
  plain and ordinary meaning and would render the claims indefinite, as a person of ordinary
  skill in the art would be unable to ascertain with reasonable certainty when the "scroll
  format display on said screen is caused to begin to scroll in said sensed direction and at said
  sensed initial speed."

- "time decay program instructions associated with said microprocessor for reducing the rate of scrolling displacement on said display screen at a given rate until motion is terminated." This limitation recites function with no corresponding structure (i.e., no dedicated hardware or software algorithm) for performing the function, so it should be construed as subject to 35 U.S.C. § 112, ¶ 6, under *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. June 16, 2015) (en banc).  As described below, the '064 patent specification further fails to disclose hardware or an algorithm for performing the function "reducing the rate of scrolling displacement on said display screen at a given rate until motion is terminated," rendering the claim indefinite.  Similarly, the '064 patent specification lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  The '064 patent specification does not describe any specific teachings or technology for reducing the rate of scrolling displacement at a given rate.  Instead, it states only that "the speed of displacement is caused to decay at a selected rate (units of displacement per unit of time, or a function thereof)" without providing any description of what type of "function" to use or why.  Accordingly, the '064 patent specification lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  Further, a person of ordinary skill in the art would be unable to ascertain with reasonable certainty what constitutes a "given rate" within the meaning of the claim and whether any given "function" satisfies that claim requirement or not.  Finally, Philips appears to construe "given rate" to cover circumstances where the method and manner of "reducing" the rate is not a given but rather is determined on-the-fly at the moment the finger is lifted.  Philips's apparent construction is inconsistent with the plain and ordinary meaning of "given rate," and a person of ordinary skill in the art reading the written description of the '064 patent specification would not have understood the drafters of the '064 patent to be in possession of the claimed invention as Philips now purports to interpret it.

- "terminating scrolling displacement of the image on said screen upon . . . a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum

time."  A person of ordinary skill in the art would be unable to ascertain with reasonable certainty how to determine if a finger touch was "substantially" stationary within the meaning of the claim language.  Similarly, a person of ordinary skill in the art would be unable to ascertain with reasonable certainty the scope of the limitation's requirement that the touch "endur[e] for a period longer than a preset minimum time."  Philips appears to construe this term to be satisfied under circumstances where inertial scrolling is terminated immediately upon sensing a subsequent finger touch, regardless of the duration of that touch and/or whether the touch is moving or stationary.  Philips' apparent construction of this limitation is inconsistent with its plain and ordinary meaning and would render the claims indefinite, as a person of ordinary skill in the art would be unable to ascertain with reasonable certainty what the claim means by its requirement that the touch to terminate inertial scrolling be "substantially stationary" and "endur[e] for a period longer than a preset minimum time."

- "terminating scrolling displacement of the image on said screen upon … an end-of-scroll signal received from the scroll format data source."  As described above, the claim phrase "scroll format data source" is itself indefinite.  Moreover, the phrase "end-of-scroll signal" is not a term of art and a person of ordinary skill in the art would not be able to ascertain with reasonable certainty what constitutes an "end-of-scroll signal" within the meaning of the claim, much less whether the alleged "end-of-scroll signal" is "received from" the "scroll format data source."  Philips appears to construe the requirement to cover software instructions that merely evaluate whether or not scrolling has already terminated and ignores the explicit requirement that the "end-of-scroll signal" is received from the "scroll format data source."  Philips's apparent construction is contrary to the plain and ordinary meaning of "signal" and would provide no basis for a person of ordinary skill in the art to evaluate whether or not an "end-of-scroll signal" is received, much less whether the signal is received from the "scroll format data source."

- "move said display in correspondence with movement of the finger touch, in response to [movement / motion] following a touch having a stationary duration greater than said first

preset given minimum time and less than [a / said] second given preset minimum time." Philips appears to construe this phrase to cover circumstances where the scrolling content moves at a different speed and in a different direction than the finger (e.g., where the finger moves diagonally but the content only scrolls vertically and more slowly than the speed of finger movement). Philips' apparent construction is inconsistent with the plain and ordinary meaning of the phrase "move said display in correspondence with movement of the finger touch" and would leave a person of ordinary skill in the art unable to ascertain with reasonable certainty whether any particular scrolling motion was or was not "in correspondence" with the movement of a finger.

- "said second given preset minimum time." Dependent claim 3 of the '064 patent recites "said second given preset minimum time" without a discernible antecedent basis. A person of ordinary skill in the art would not be able to ascertain with reasonable certainty what the drafters of the claim intended by that phrase. For example, a person of ordinary skill in the art would be unable to determine whether the drafters intended claim 3 to invoke a new "second given preset minimum time" or whether they intended claim 3 to depend from claim 2 (rather than claim 1) and hence to refer back to the "second given preset minimum time" recited in that claim. As a result, a person of ordinary skill in the art would be unable to determine with any reasonable certainty whether the "second given preset minimum" time requirements in claim 3 needs to be the same time threshold related to scrolling set forth in claim 2 or whether any time threshold used for any purpose could suffice.

- "move a touch-selected item relative to the stationary display in correspondence with movement of said finger touch, in response to motion following a touch having a stationary duration greater than said second given preset minimum time." As described above, this limitation of claim 3 is indefinite at least insofar as the term "said second given preset minimum time" lacks antecedent basis such that a person of ordinary skill in the art would be unable to ascertain the scope of the claimed invention. Further, Philips appears to construe the term to cover circumstances where the an item is scrolled above an background that changes and hence is not "stationary." Philips' apparent construction is

inconsistent with the plain and ordinary meaning of the phrase "move a touch-selected item relative to the stationary display" and would leave a person of ordinary skill in the art unable to ascertain with reasonable certainty whether any particular drag operation was or was not "relative to" a "stationary display."  The '064 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  The '064 patent specification does not describe any specific teachings or technology for sensing duration of finger touches or moving an item relative to a stationary display.

Defendants contend that the asserted claims of the '064 patent are also invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (i.e., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "finger touch program instructions associated with said microprocessor for sensing the speed, direction and time duration of a finger touch contact with said display screen"; and
- "time decay program instructions associated with said microprocessor for reducing the rate of scrolling displacement on said display screen at a given rate until motion is terminated."

**'064 Patent Is Directed to Patent-Ineligible Subject Matter.**  As apparently construed by Philips, the '064 patent is directed to nothing more than the abstract idea of scrolling on a touchscreen in a manner than feels "natural" and obeys the basic laws of physics — i.e., that the scrolling continues in the direction of motion when the finger is lifted (inertia) and slows at a given rate (friction) and stops if it hits a boundary or senses a stationary finger touch (reacting to forces).  Indeed, this abstract idea is nothing more than a basic application of the laws of nature to replicate natural phenomena.  As a result, the '064 patent falls within one or more judicially recognized exceptions to 35 U.S.C. § 101.  Moreover, the application of this abstract idea to touchscreen devices was already well-known in the art.  *See, e.g.*, U.S. Patent No. 6,323,846 at 2:22–25 ("Another common method for reducing motion and repetition is to automatically continue pointing or scrolling movement signals once the user has stopped moving or lifts the finger."); *see also id*. at 2:41–47 ("[M]otion continuation can be a function solely of lateral finger

velocity and direction at liftoff.  Motion continuation decays due to a friction factor or can be stopped by a subsequent touchdown on the surface.").

The dependent claims of the '064 patent are directed to similar abstract ideas that replicate natural phenomena and were well-known in the art.  The dependent claims recite abstract attempts to replicate the natural phenomena of moving objects over a flat surface with one's finger, and applying those abstract ideas to touchscreen devices is described in the '064 patent as having been already well known in the art. *See, e.g.*, '064 patent at 1:24–29 (describing prior art for "engaging and 'dragging' the screen image in a desired direction"); *id.* at 3:39–42 (describing the "known process of 'touch-dragging'").

Moreover, to the extent that '064 patent attempts to claim anything above and beyond this patent-ineligible subject matter, these additions are insignificant and lack sufficient "inventive concept" to transform the nature of the claims into a patent-eligible application.  For example, to the extent that the asserted dependent claims of the '064 patent can be construed, they appear to include limitations directed to the duration of the touch.  However, distinguishing between touch events and modes based on the duration of a touch is a trivial addition that was well known in the art and does not provide an "inventive concept" sufficient to transform the claims into patent-eligible material.

D.     7,529,806

The asserted claims of the '806 patent are invalid for failing to comply with 35 U.S.C. § 112 for at least the following claim language or limitations:

- "parsing a control information file" / "the client device parsing the control information file."  "Control information file" is not a term of art and a person of ordinary skill in the art would be unable to ascertain its scope with reasonable certainty.  The '806 patent fails to inform how a person of ordinary skill would determine whether any given "file" constitutes a "control information file" within the meaning of the claims.  Moreover, Philips appears to contend that the term "[a/the] control information file" (singular) may cover a set of multiple files and that "parsing a control information file" may be satisfied by downloading and parsing a subset of those "control information" files.  Philips' apparent construction of this phrase is contrary to the plain and ordinary meaning of "file" and would render the claims indefinite, as a person of ordinary skill in the art could not tell with reasonable

DEFENDANTS' AND MICROSOFT'S DISCLOSURES UNDER PATENT L.R. 3-3

certainty whether any given method or system satisfies the requirement of "parsing the control information."  Moreover, the '806 specification further lacks adequate description to enable one of ordinary skill in the art to "pars[e] a control information file" without undue experimentation.  The '806 patent merely states that "[p]arsing of XML is well known in the art," *see* '806 patent at 2:64–65, but the claims of the '806 patent purport to cover files other than XML files, *compare id.* claim 1 with *id.* claim 7.  The '806 patent specification fails to provide any indication as to how a non-XML control information file would be formatted, much less how such a file would be "parsed."  A person of ordinary skill in the art reading the written description of the '806 patent specification would not have understood the named inventors to be in possession of an invention for parsing control information files of arbitrary format.

- "a given segment" / "a give[n] segment" / "identifying multiple alternative [flies / files] corresponding to a [given / give] segment of the media presentation."   Philips appears to construe "identifying multiple alternative [files] corresponding to a [given] segment of the media presentation" based on parsing of "the control information" to cover circumstances where a system only identifies a *single* file for a particular segment of the media presentation.  Philips' apparent construction of this limitation is contrary to its plain and ordinary meaning and would render the claims indefinite as a person of ordinary skill in the art could not tell with reasonable certainty whether any given method or system satisfies the requirement of "identifying *multiple* alternative [files] corresponding to a [given] segment of the media presentation."  Moreover, the '806 patent specification further lacks adequate description to enable a person of ordinary skill in the art to "identify multiple alternative [flies / files] corresponding to a [given / give] segment of the media presentation" without undue experimentation.  The '806 patent makes only vague statements as to how multiple files could be identified and only for the specific file format excerpt provided in Fig. 2.  *See* '806 patent at 3:47–54.  The '806 patent provides no indication or suggestion as to how multiple alternative files could be identified in any other format, and a person of ordinary skill in the art reading the written description of the '806

patent would not have understood the named inventors to be in possession of an invention that for identifying multiple alternative files corresponding to a given media segment within a control information file of arbitrary format.

- "determining which files of the multiple alternative files to retrieve based on system restraints." A person of ordinary skill in the art would be unable to ascertain the meaning of the term "system restraint" with any reasonable certainty. The inventor of the '806 patent testified that the use of the term "system restraint" in claim 1 was an error and that that term did not have meaning in the art and was not defined in the '806 patent. *See* Shteyn Depo. Transcript at 180:3-4. Moreover, Philips appears to construe the term "system constraint" (which never appears in the '806 patent) so as to *exclude* certain constraints relating to the system (e.g., a user setting indicating the system's bandwidth). Philips' apparent construction would render the claim indefinite, and the '806 patent would not provide a person of ordinary skill in the art with reasonable certainty as to whether any particular selection criteria constitutes a "system [constraint/restraint]" or not. The '806 specification further lacks adequate description to enable one of ordinary skill in the art to perform the requirement of "determining which files of the multiple alternative files to retrieve based on system [restraints / constraints]" without undue experimentation.

- "wherein if the determined file is one of a plurality of files required for the media presentation . . ." A person of ordinary skill in the art would be unable to ascertain the scope of this claim phrase with reasonable certainty. Philips appears to construe this limitation as covering circumstances where *none* of the "files" that allegedly correspond to "a given segment" of the media presentation are *required* for the media presentation. Philips' apparent construction would leave a person of ordinary skill in the art no basis for evaluating whether or not a determined file is "required for the media presentation," much less whether or not it belongs to a "plurality of files" so required. The '806 patent specification further lacks adequate description to enable one of ordinary skill in the art to perform the required evaluation without undue experimentation. The '806 patent specification does not describe particular files being "required for the media presentation"

and a person of ordinary skill in the art would not have understood the named inventor to have been in possession of an invention with such functionality.

- "wherein partitioning of media presentation information between the multiple related files is described within the control information file using tags corresponding to respective files." Philips appears to construe this limitation to require partitioning the media *content* itself rather than partitioning the *information* relating to the media presentation within the control information file. Philips' apparent construction term is inconsistent with the plain and ordinary meaning of this phrase, which related to the partitioning of media presentation *information* "within the control information file" using "tags." Moreover, under Philips' apparent construction, the '806 patent specification further lacks adequate written description to enable one of ordinary skill in the art to perform the recited "partitioning" without undue experimentation. A person of ordinary skill in the art would have understood that partitioning video files into arbitrary "given segments" posed technical obstacles that would require significant effort and experimentation, and the '806 patent specification does not even mention such obstacles, much less indicate how they could be overcome.

- "means for parsing, based on parsing of the control information file: identifying . . . determining . . . retrieving . . ." This limitation is indefinite because a person of ordinary skill in art would be unable to ascertain its scope with reasonable certainty. The limitation itself is grammatically incorrect, improperly mixes apparatus and method elements, and makes no sense. It is not apparent, and would not have been comprehensible to the person of ordinary skill, how a "means for parsing" could "pars[e] based on parsing," nor does this claim language inform, with reasonable certainty, how the parsing to be carried out by this second "means for parsing" relates to the requirements for "indentifying . . . ," "determining . . . ," and "retreiving . . ." in the phrases following the colon. As described below, this limitation further renders the claim indefinite because the '806 patent fails to articulate sufficient corresponding structure (i.e., special-purpose hardware or a software algorithm comprising specific steps) for the various "functions" associated with the

claimed means, but, as an initial matter, a person of ordinary skill in the art would be unable to even understand what is meant by this second claimed "parsing" function that the "means" is supposed to be perform.

- "the means for parsing" / "the means for parsing comprises means for:  concurrent with the media presentation, retrieving a next file; and using content of the next file to continue the media presentation."  The term "means for parsing" lacks antecedent basis, and is indefinite, because there are multiple means for parsing in the claim and the claim does not provide reasonable certainty as to which "means for parsing" the term refers back to, nor what it would even mean for these additional claimed functions (which relate to media retrieval and playback) to be incorporated into either "means for parsing."

- "the control information" / "the control information to retrieve multiple files from the computer network for sequential play-out."  Philips appears to construe this limitation in dependent claim 15 as synonymous with the independent claim's requirement for "concurrent with the media presentation, retrieving a next file; and using content of the next file to continue the media presentation."  Under at least Philips' apparent construction of this limitation, a person of ordinary skill in the art would be unable to ascertain what additional requirements this dependent claim imposes and when and how any such additional requirements would be satisfied.  Philips also appears to construe this limitation as satisfied even when a substantial portion of the data that it alleges is the "control information" is not even downloaded, much less used "for sequential playback."  Under at least Philips' apparent construction of this term, a person of ordinary skill in the art would be unable to ascertain how and to what extent the "control information" must be used "for sequential playback."

Defendants contend that the asserted claims of the '806 patent are also invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "means for downloading files to the client device"

- "means for parsing a control information file"
- "means for parsing, based on parsing: … identifying … determining … retrieving"
- "means for: . . . concurrent with the media presentation, retrieving a next file; and using content of the next file to continue the media presentation"

Claim 12 of the '806 patent and dependents thereof are also invalid as indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005), for reciting both an apparatus and a method of use of that apparatus. *See id.* at 1384. In particular, the device claim 12 recites the functional steps of "identifying . . . ," "determining . . . ," and "retrieving . . ." disconnected from the preceding "means for parsing, based on parsing . . ." limitation. One of skill in the art would not be able to ascertain with reasonable certainty whether claim 12 is infringed by a device or by a use of that device corresponding to the disconnected functional limitations, rendering claim 12 invalid under *IPXL*. *See id.*

**'806 Patent Is Directed to Patent-Ineligible Subject Matter.** The '806 patent is directed to a patent-ineligible abstract idea. The patent claims retrieving a multimedia presentation over a network for seamless playback, which amounts to nothing more than "conventional steps at a high level of generality" that fail to provide sufficient "inventive concept" to render the subject matter patent-eligible. *See, e.g.*, Memorandum Granting Google's Motion for Judgment on the Pleadings at 18, *VideoShare, LLC v. Google, Inc. and Youtube, LLC*, 1:13-cv-00990-GMS (Aug. 2, 2016) (Dkt. 183). It also claims the idea of dividing the presentation into one or more segments and selecting alternatives to display from among those segments. The conventional steps of splitting a multimedia presentation in segments, providing multimedia in alternative formats or quality levels, providing information to clients about multimedia segments to download, and selecting between multimedia alternatives based on system constraints were all well-known in the art, as the '806 patent itself admits. *See, e.g.*, '806 patent at 1:18–31 (describing "known [RealNetworks] technology compris[ing] an automatic, variable bit-rate encoding and delivery system for audio and video" that "scales to megabit connection rates and dynamically adjusts the transmission rate as delivery rate varies due to network congestion."); *id.* at 1:42–45 ("Another known method is downloading of a content file from a remote computer with subsequent play-out on the client."); *id.* at 3:62–63 ("Combining multiple sequenced inputs is well understood in the industry."). The limitations of the asserted claims, when considered both individually and as an ordered combination, do

not contain an inventive concept and fail to transform the abstract idea into patent-eligible material.  *See, e.g., VideoShare, supra*, at 17.  The '806 patent is therefore ineligible for patent protection under 35 U.S.C. § 101.

**E.    5,910,797**

The asserted claims of the '797 patent are invalid for failing to comply with 35 U.S.C. § 112 for at least the following claim language or limitations:

- "acceleration based motion pattern":  this term is indefinite because the terms "acceleration based" and "motion pattern" are vague such that a POSA would not have understood what pattern of motion is claimed, and what relationship that pattern of motion has to acceleration.  The '797 patent specification fails to inform the POSA what relationship qualifies, nor whether the motion must, for example, follow the path of the acceleration in order to be an "acceleration based motion pattern."  The Delaware District Court, in rejecting defendants' claim construction, found that "[w]hile the specification and prosecution history may suggest a relationship between the measured acceleration of the screen and the motion pattern imparted to the object, the claim language does not evince any particular type of acceleration."  Docket No. 212 at 10 n.17.  The POSA would accordingly be unable to ascertain with reasonable certainty when and how an "acceleration based motion pattern" is achieved.  The '797 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use an "acceleration based motion pattern" without undue experimentation.  The '797 patent specification does not describe any specific teachings or technology for achieving any motion pattern, nor how the motion pattern is "based" on acceleration.

- "motion is nonuniform in time under control of a static said orientation of the screen means.":  this term is indefinite because the terms "nonuniform in time" and "under control of a static said orientation" are vague such that a POSA would not have understood what motion is specifically claimed.  The '797 patent specification further lacks adequate description to enable one of ordinary skill in the art to make and use a "motion [that] is nonuniform in time under control of a static said orientation of the screen means" without

undue experimentation.  The '797 patent specification further does not describe any specific teachings or technology for achieving any motion, nor a motion "nonuniform in time under control of a static said orientation of the screen means."

In addition, claims 1–10 of the '797 patent issued in error and Philips cannot pursue them because it has not received a certificate of correction.  On April 15, 1999, Philips filed an Amendment Under Rule 312, amending claims 1 and 2 to "improve form, notably to provide complete congruity between the 'sensor' elements recited on lines 6 and 11."  The Examiner reflected these changes in handwritten edits to the Notice of Allowance, from May 5, 1998, but the claims as issued do not reflect them.  For example, reflecting Philips' Amendment Under Rule 312, claim 1 should have read:

> A manipulatable apparatus having data processing means and screen means for displaying one or more graphical or other objects presented by said data processing means, a gravitation-controlled sensor means integrated with said screen means and feeding said data processing means for measuring an acceleration of said screen means induced by user manipulation of the screen means, wherein said data processing means have programmed calculating means for under control of a screen motion sensed by said sensor means imparting an acceleration based motion pattern to a predetermined selection among said objects.

Issued in error, claim 1 reads:

> A manipulatable apparatus having data processing means and screen means for displaying one or more graphical or other objects presented by said data processing means, a gravitation-controlled sensor integrated with said screen means and feeding said data processing means for measuring an acceleration of said screen means induced by user manipulation of the screen means, wherein said data processing means have programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to a predetermined selection among said objects.

Thus, for example, claim 1 should have required "a gravitation-controlled sensor means integrated with said screen means," but instead erroneously requires "a gravitation-controlled sensor integrated with said screen means."  Similarly, claim 1 should have required "calculating means for under control of a screen motion sensed by said sensor means," but instead erroneously requires "calculating means for under control of a screen motion sensed by said sensing means," in which "sensing means" has no antecedent basis.  Thus, as issued, claim 1 and its dependent claims omit a material limitation, and Philips cannot assert these claims until they have been corrected by the PTO.  *HW Tech. v. Overstock.com*, 758 F. 3d 1329 (Fed. Cir. 2014).

Defendants contend that the asserted claims of the '797 patent are invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "data processing means";
- "programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to a predetermined selection among said objects"; and
- "screen means for displaying one or more graphical or other objects presented by said data processing means."

**'797 Patent Is Directed to Patent-Ineligible Subject Matter.**  As apparently construed by Philips, the '797 patent is directed to an abstract idea.  The patent claims imparting an "acceleration based motion pattern" to a virtual object based on the orientation and movement of the device.  The limitations of the asserted claims, when considered both individually and as an ordered combination, do not contain an inventive concept and fail to transform the abstract idea into patent-eligible material.  The '797 patent is therefore ineligible for patent protection under 35 U.S.C. § 101.

### F.      6,522,695

Defendants contend that the asserted claims of the '695 patent are invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "receiving means for receiving a composite signal from a transmission medium" ;
- "demultiplexing means for deriving at least one signal portion from the composite signal and for deriving a first identification signal of a first type and a second type from the composite signal";
- "decoding means for decoding at least one signal portion and for decoding a signal portion into a portion of the digital information signal and to supply the portion of a digital

information signal depending on a control signal of a first type and to supply a signal portion as a portion of the digital information signal in a substantially unmodified form depending on a control signal of a second type" ;

- "means for generating the control signal for application to the decoding means including a control signal of the first type depending on the first identification signal of the first type" ;

- "means for generating the control signal generate a control signal of the second type depending on the first identification signal of the second type" (claim 15) ;

- "channel decoding means for the channel decoding of the read-out signal" (claim 17); and

- "error detection/correction means detecting and correcting errors in the read-out signal" (claim 18).

Further, the asserted claims of the '695 patent are invalid for failing to comply with definiteness requirement of 35 U.S.C. § 112(6) because the term "the digital information signal" lacks antecedent basis and fails to inform those of ordinary skill in the art with reasonable certainty as to the scope of the claimed invention.

The asserted claims of the '695 patent are also invalid for failing to comply with definiteness requirement of 35 U.S.C. § 112(6) because the term "substantially unmodified form" fails to inform those of ordinary skill in the art with reasonable certainty as to the scope of the invention beyond an "unmodified form."  The specification does not provide any guidance or examples that would allow a person of ordinary skill in the art to determine whether a given signal modification is substantial or insubstantial.

**'695 Patent Is Directed to Patent-Ineligible Subject Matter.**  The '695 patent is directed to nothing more than an abstract concept: compressing portions of data when doing so would improve efficiency, while not compressing portions when doing so would not improve efficiency.  Indeed, this abstract idea is nothing more than a basic application of mathematical principles.  Furthermore, the asserted claims contain no "inventive concept" that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.  Instead, as construed, they recite only routine and conventional electronics (e.g., a switch, a demultiplexer) and generic functional blocks (e.g., an "identifier") that perform recited functions in order to practice the abstract idea.  As a

result, the '695 patent falls within one or more of the judicially recognized exceptions to 35 U.S.C. § 101. The asserted claims of the '695 patent therefore describe patent-ineligible subject matter under 35 U.S.C. § 101.

**G.     RE44,006**

On November 2, 2018, Philips notified defendants by email that the RE'006 patent "is no longer being asserted in this litigation."

**H.     8,543,819**

The asserted claims of the '819 patent are invalid for failing to comply with the enablement, written description, and/or regards as invention requirements of 35 U.S.C. §§ 112(1) and 112(2) because the purported invention relates to "performing authenticated distance measurement" between a first and second communication device ('819 patent, Abstract), but the asserted claims do not include any requirement of "distance measurement."  The asserted claims recite instead a "round trip time measurement," but the specification provides no explanation how to convert a round trip time measurement into a distance measurement.  The '819 patent specification thus lacks an adequate description sufficient to enable one of ordinary skill in the art to make and use the invention without undue experimentation or to demonstrate the inventor possessed the claimed invention, and/or fails to claim that which the inventor regarded as the invention.

Defendants contend that the asserted claims of the '819 patent are also invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in  the following means-plus-function claim limitations:

- "means arranged to securely share the common secret with the second device by encrypting the common secret using a public key of a private/public key-pair"; and
- "means for securely sharing a common secret with the second communication device after the second communication device is authenticated."

**I.     6,772,114**

Defendants contend that the asserted claims of the '114 patent are also invalid for under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a

software algorithm comprising specific steps) for the functions recited in the following
means-plus-function claim limitations:

- "said first decoder for sequentially applying a narrow-band decoder, an up-sampler and a low-pass filter to the first coded signal to generate a first reconstructed signal within the low frequency range"

- "a combiner for combining the first reconstructed signal and the second reconstructed signal"

**'114 Patent Is Directed to Patent-Ineligible Subject Matter.**  As apparently construed by Philips, the '114 patent is directed to nothing more than generic principles of audio encoding to model the natural phenomenon of a human voice.  Indeed, this abstract idea is nothing more than a basic application of the laws of nature to replicate a natural phenomenon.  As a result, the '114 patent falls within one or more of the judicially recognized exceptions to 35 U.S.C. § 101.  The asserted claims of the '114 patent therefore describe patent-ineligible subject matter under 35 U.S.C. § 101.

**J.     RE43,564**

The asserted claims of the RE'564 patent are invalid for failing to comply with the written description and/or enablement requirements of 35 U.S.C. § 112(1) for at least the use of the following claim language:  "facilitating selection of a feature."  The specification does not describe or enable how rendering an image at a second scale enables a feature to be selected where it was previously not enabled for selection.  Further, the specification only enables an embodiment where the zoom is exactly centered on the touch location.  It does not enable or describe, for example, implementations where the zoom is centered at a location between multiple touch locations.  The RE'564 patent specification thus lacks an adequate description sufficient to enable one of ordinary skill in the art to make and use the invention without undue experimentation or to demonstrate the inventor possessed the claimed invention.

Claim 5 of the RE'564 patent is invalid for failing to comply with the enablement requirement of 35 U.S.C. § 112(1) for at least the use of the following claim language:  "wherein the data comprises streaming video."  The RE'564 patent specification lacks an adequate description sufficient to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  The RE'564 patent does not describe any specific teachings or technology for displaying streaming video wirelessly

received by a handheld communication device, let alone zooming in on a streaming video or selecting anything within a streaming video.

The asserted claims of the RE'564 patent are invalid for failing to comply with definiteness requirement of 35 U.S.C. § 112 for at least the following claim language or limitations:

- "substantially centered around the touch location" (all claims): the term "substantially centered around the touch location" is indefinite because "substantially centered" is vague especially in the context of a handheld device having a display of "substantially small size" as recited in claim 1.  A POSA would not understand how to distinguish between a zoom that is "substantially centered" around a location versus one that is insubstantially centered, and the specification provides no written description guidance.  The specification only enables an embodiment where the zoom is exactly centered on the touch location;

- "a display that has a substantially small size suitable for the handheld communication device" (all claims): the term "substantially small size suitable for the handheld communication device" because "substantially small size" is vague.  A POSA would not understand how to determine when a display is "substantially small" enough to practice the claims.  Similarly, "suitable for the handheld communication device" is also vague.  A POSA would not understand when a display becomes small enough to be "suitable" for a handheld device, and the specification provides no written description guidance;

- "arbitrary with respect to the touch screen" (claim 2): this term is indefinite because a POSA would not understand when a position is "arbitrary," because this term is vague and the specification provides no guidance as to its meaning; and

- "a window containing the selected portion displayed at the second scale to scroll across the image such that successive new selected portions of the image are displayed at the second scale" (claim 7): this term is indefinite because a POSA would not understand whether a "window" must be a boundary within the display, as opposed to the frame of the entire display.  The specification provides no written description guidance, aside from its depiction of a window bounded within the display, and does not enable any other embodiment.

Defendants contend that the asserted claims of the RE'564 patent are also invalid under 35 U.S.C. § 112(6) for failing to disclose adequate corresponding structure (e.g., special-purpose hardware or a software algorithm comprising specific steps) for the functions recited in the following means-plus-function claim limitations:

- "a data processing system . . . for processing the received data and for rendering an image corresponding to the data received" (all claims);
- "a data processing system . . . operative to enable the user to select through a touch location on the touch screen a portion of the image, when displayed at a first scale" (all claims); and
- "a data processing system . . . for rendering the selected portion on the display at a second scale larger than the first scale thereby facilitating a selection of a feature" (all claims).

**RE'564 Patent Is Directed to Patent-Ineligible Subject Matter.** As construed by Philips, the RE'564 patent is directed to nothing more than magnifying content to facilitate selecting a portion of said content. Indeed, this abstract idea is nothing more than a basic application of the laws of nature to replicate a natural phenomenon. Furthermore, the asserted claims contain no "inventive concept" that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself. Instead, the claims recite only routine and insignificant pre- and post-solution activity such as a "wireless modem," a "display," and a "data processing system" operative to perform generic functions to practice the abstract idea. As a result, the RE'564 patent falls within one or more of the judicially recognized exceptions to 35 U.S.C. § 101. The asserted claims of the RE'564 patent therefore describe patent-ineligible subject matter under 35 U.S.C. § 101.

**RE'564 Patent Under 35 U.S.C. § 251.** Defendants contend that the RE'564 patent is also invalid for failure to comply with 35 U.S.C. § 251 ("No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."). The reissue proceedings that resulted in the RE'564 patent took place outside the two-year period for a broadening reissue specified by § 251. However, the patentee improperly enlarged the scope of the original claims through amendments that changed the limitation "first scale" to "second scale," and changed the limitation "substantially centered around the touch screen" to "substantially centered around the touch location." The improper broadening during re-issue of the above-referenced claim limitations

renders the '564 patent invalid under § 251.  The grounds for this defense are set forth in Defendants'

Motion for Judgment on the Pleadings, which is fully incorporated by reference herein.

**RE'564 Patent Does Not Recite Proper Inventorship.**  The '564 patent incorrectly lists Jan Van

Ee as its sole inventor.  Sung M. Choi is an inventor of U.S. Patent No. 6,211,856 (the "'856 patent),

entitled "Graphical User Interface Touch Screen with an Auto Zoom Feature," which is a parent to the

'564 patent.  Mr. Choi testified that he "came up with the idea" of auto-zoom on a small touchscreen and

that he then brought that idea to Jan Van Ee, who implemented the invention in software.  Choi Dep. Tr.

28:10-16, 29:21-23, 30:23-31:7.  The claims of the '564 patent incorporate that concept.  Accordingly, Mr.

Choi made a significant contribution to the conception of the claims of the '564 patent.  Nonetheless, Mr.

Choi is not listed as an inventor of the '564 patent.  Therefore, the '564 patent is invalid for failure to

comply with at least 35 U.S.C. § 102(f) (pre-AIA).

Philips' response in its latest round of contentions does not address the critical fact that Mr. Choi,

not Mr. Van Ee, invented the core functionality of auto-zoom on a small touchscreen.  Indeed, the

testimony Philips cites from Mr. Van Ee concedes that Choi was involved with the "original conception of

let's zoom" on the touchscreen.  To the extent that the '564 patent was an extension of the original

auto-zoom concept taught in the '856 patent, Mr. Choi needed to be named as an inventor.  Even if Mr.

Van Ee added the concept of zooming-in on a downloaded image, Mr. Choi still contributed to the core

functionality, and Mr. Van Ee's contribution is to a very minor improvement relative to the prior art.

To the extent that Philips asserts that the Defendants must allege deceptive intent, Defendants

reserve all rights to show that Philips has acted deceptively in failing (and continuing to fail) to list Mr.

Choi as a proper co-inventor of the '564 patent.

### K.      9,436,809

The asserted claims of the '809 patent are invalid for failing to comply with the enablement,

written description, and/or regards as invention requirements of 35 U.S.C. §§ 112(1) and 112(2) because

the purported invention relates to "performing authenticated distance measurement" between a first and

second communication device ('809 patent, Abstract), but the asserted claims do not include any

requirement of "distance measurement." Rather, the asserted claims require, e.g., "determin[ing] whether a

time difference between providing the first signal and receiving the second signal is less than a

predetermined time" and "allow[ing] the protected content to be provided to the second device when . . . the time difference is less than the predetermined time." (Claim 1).  The written description discloses only allowing access based on distance; it does not disclose any embodiment in which access to protected content is allowed (or not allowed) based on time difference.  The '809 patent specification thus lacks an adequate description sufficient to enable one of ordinary skill in the art to make and use the invention without undue experimentation or to demonstrate the inventor possessed the claimed invention, and/or fails to claim that which the inventor regarded as the invention.

The asserted claims of the '809 patent are also invalid for failing to comply with definiteness requirement of 35 U.S.C. § 112 for at least the following claim language or limitations:

- "provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules";
- "the predetermined time is based on a communication system associated with the first device";
- "provide an indication when said modified first signal is identical to the second signal"; and
- "determine from the certificate if the second device is compliant."

Date:   November 15, 2018

_Matthew S. Warren_
Matthew S. Warren

Bruce Genderson *(pro hac vice)*
Kevin Hardy *(pro hac vice)*
Aaron Maurer *(pro hac vice)*
David Krinsky *(pro hac vice)*
Kyle Thomason *(pro hac vice)*
Christopher A. Suarez *(pro hac vice)*
Andrew Trask *(pro hac vice)*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, District of Columbia, 20005
viceroy@wc.com

Matthew S. Warren (Bar No. 230565)
Patrick M. Shields (Bar No. 204739)
Erika H. Warren (Bar No. 295570)
Amy M. Bailey (Bar No. 313151)
WARREN LEX LLP
San Francisco, California, 94110
18-1885@cases.warrenlex.com

*Attorneys for Defendants Acer, Inc., Acer America Corporation, ASUSTeK Computer Inc. and ASUS Computer International*

TECHKNOWLEDGE LAW GROUP LLP
Kai Tseng (Bar No. 193756)
Hsiang ("James") H. Lin (Bar No. 241472)
Craig Kaufman (Bar No. 159458)
100 Marine Parkway, Suite 200
Redwood Shores, California, 94065
acer.philips-tklgall@tklg-llp.com

*Attorneys for Defendants Acer, Inc. and Acer America Corporation*

ALSTON & BIRD LLP
Michael J. Newton (Bar No. 156225)
2828 North Harwood Street, Suite 1800
Dallas, Texas, 75201
asus-philips@alston.com

*Attorneys for Defendants ASUSTeK Computer Inc. and ASUS Computer International*

PERKINS COIE LLP
John Schnurer (Bar No. 185725)
Kevin Patariu (Bar No. 256755)
Ryan Hawkins (Bar No. 256146)
Louise Lu (Bar No. 256146)
Vinay Sathe (Bar No. 256146)
11988 El Camino Real, Suite 350
San Diego, California, 92130

Ryan McBrayer (*pro hac vice*)
Jonathan Putman (*pro hac vice*)
Antoine McNamara (Bar No. 261980)
Stevan Stark *(pro hac vice)*
1201 Third Avenue, Suite 4900
Seattle, Washington, 98101
htc-philipsperkinsservice@perkinscoie.com

*Attorneys for Defendants HTC Corp. and HTC America, Inc.*

LUCIAN C. CHEN, ESQ. PLLC
Lucian C. Chen (*pro hac vice*)
Wing K. Chiu (*pro hac vice*)
One Grand Central Place
60 East 42nd Street, Suite 4600
New York, New York, 10165
lucianchen@lcclegal.com
wingchiu@lcclegal.com

*Attorneys for Defendant YiFang USA, Inc. D/B/A E-Fun, Inc*

DEFENDANTS' AND MICROSOFT'S DISCLOSURES UNDER PATENT L.R. 3-3

PERKINS COIE LLP
Judith Jennison (Bar No. 165929)
Christina McCullough (Bar No. 245944)
1201 Third Avenue, Suite 4900
Seattle, Washington, 98101

Chad Campbell (Bar No. 258723)
2901 North Central Avenue, Suite 2000
Phoenix, Arizona, 85012

Patrick J. McKeever (Bar No. 245944)
Sarah Stahnke (Bar No. 264838)
11988 El Camino Real, Suite 350
San Diego, California, 92130
msft-philipsteam@perkinscoie.com

*Attorneys for Intervenor-Plaintiff/Counterclaim Defendants Microsoft Corporation and Microsoft Mobile, Inc.*

No. 18-cv-1885-HSG-EDL

DEFENDANTS' AND MICROSOFT'S DISCLOSURES UNDER PATENT L.R. 3-3

**Exhibit K-9**

**Invalidity Claim Chart for U.S. Patent No. 9,436,809 vs. Digital Transmission Content Protection Specification Revision 1.2a (Informational Version) ("DTCP")**

Digital Transmission Content Protection Specification Revision 1.2a (Informational Version) ("DTCP") was published as of February 25, 2002, as demonstrated by at least the document itself and/or the testimony of knowledgeable witnesses and corroborating documents.

DTCP anticipates some or all asserted claims under at least 35 U.S.C. §§ 102(a) and (b). Based on information currently available, the persons or entities involved in the conception and diligent reduction to practice of the ideas in DTCP include at least the authors and the copyright holder. The conception of DTCP occurred at least as early as February 25, 2002. Discovery is ongoing and Defendants will update this chart as appropriate based on the results of their investigation, including third-party discovery.

In addition to DTCP, the claim chart below relies on the following prior art:

- Crosby S., Goldberg I., Johnson R., Song D., Wagner D. (2002), "A Cryptanalysis of the High-Bandwidth Digital Content Protection System," In: Sander T. (eds) Security and Privacy in Digital Rights Management. DRM 2001. Lecture Notes in Computer Science, vol 2322320. Springer, Berlin, Heidelberg (first online May 7, 2002);
- Bruce Schneier, Applied Cryptography: Protocols, Algorithms, and Source Code in C (2d ed. 1996), published 1996 by John Wiley & Sons, Inc. 1996 ("Schneier");
- ISO/IEC 9798 (2d ed., 1999) and 11770 (1st ed., 1999) ("ISO 9798 and 11770"), published by a Joint Technical Committee of the International Organization of Standardization and International Electrotechnical Commission;
- U.S. Patent No. 6,550,011 B1 to J. Robert Sims, III ("Sims, III"): issued April 15, 2003, country of origin: US;
- Internet Security Association and Key Management Protocol (ISAKMP), Request For Comments 2408 ("RFC 2408"), published November 1998 by the Internet Society;
- U.S. Patent No. 7,242,766 ("Lyle"): issued July 10, 2007, country of origin: US;
- U.S. Patent No. 7,516,325 ("Willey"): issued April 7, 2009, country of origin: US; and
- U.S. Patent No. 7,898,977 ("Roese"): issued March 1, 2011, country of origin: US.

The claim chart below sets forth the following invalidity contentions:

- DTCP alone anticipates or renders obvious all asserted claims charted below

- DTCP + Crosby + Schneier renders obvious all asserted claims charted below

- DTCP + ISO 9798 and 11770 renders obvious all asserted claims charted below

- DTCP + Crosby + ISO 9798 and 11770 renders obvious all asserted claims charted below

- DTCP + Sims, III renders obvious all asserted claims charted below

- DTCP + RFC 2408 renders obvious all asserted claims charted below

- DTCP + Lyle renders obvious all asserted claims charted below

- DTCP + Willey renders obvious all asserted claims charted below

- DTCP + Roese renders obvious all asserted claims charted below

- DTCP + Willey + Crosby + Schneier renders obvious all asserted claims charted below

- DTCP + Willey + ISO 9798 and 11770 renders obvious all asserted claims charted below

- DTCP + Willey + Sims, III renders obvious all asserted claims charted below

- DTCP + Willey + RFC 2408 renders obvious all asserted claims charted below

- DTCP + Willey + Lyle renders obvious all asserted claims charted below

- DTCP + Willey + Roese renders obvious all asserted claims charted below

2

As demonstrated in the chart below, DTCP anticipates all asserted claims under at least 35 U.S.C. §§ 102(a), (b), and/or (g), and further renders all asserted claims invalid as obvious under 35 U.S.C. § 103 in view of the knowledge of a person of ordinary skill in the art.

Additionally, as demonstrated by the chart below, DTCP combined with Scott Crosby, et al., "A Cryptanalysis of the High-bandwidth Digital Content Protection System ("Crosby") and Bruce Schneier, Applied Cryptography (2d ed. 1996) ("Schneier") renders each asserted claim invalid as obvious under 35 U.S.C. § 103. These references are all directed to improving methods for authenticating devices to facilitate the communication and transmission of common and encrypted data while preventing unauthorized users from obtaining the data. Crosby is specifically directed towards improving HDCP and discusses how to improve a potential weakness by adding the described technology pertinent to public and private key pairs. Schneier is charted separately in Exhibit K-10, and the citations in that chart for each claim limitation are hereby incorporated by reference. Schneier is a classic textbook that teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication. A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into the invention of DTCP would provide increased security, thereby achieving the goal of secure transmission of data. These references were designed to work with and improve upon existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data. Schneier describes such a PKI scheme.

Additionally, as demonstrated by the chart below, DTCP combined with International Standard ISO/IEC 11770-3 (1st ed.) ("ISO 11770-3"); U.S. Patent No. 6,550,011 B1 to J. Robert Sims, III ("Sims, III"); Internet Security Association and Key Management Protocol (ISAKMP), Request For Comments 2408 ("RFC 2408"); U.S. Patent No. 7,242,766 ("Lyle"); U.S. Patent No. 7,516,325 ("Willey"); and U.S. Patent No. 7,898,977 ("Roese") individually or in combination renders each asserted claim invalid as obvious under 35 U.S.C. § 103. These references teach and describe systems and methods for authenticating devices and to facilitate and enable network devices to share common and encrypted data based on certain rules and requirements.

Sims, III is charted separately in Exhibit K-03, and the citations in that chart for each claim limitation are hereby incorporated by reference. A person of ordinary skill in the art would have found it obvious to combine the teachings of DTCP and Sims, III in the manner described in the chart below for multiple reasons. DTCP discloses the use of a round trip time (RTT) measurement as part of a system and method to protect digital content. The disclosed RTT measurement procedures in this and other references involve a verification process in which a first device provides a first signal to a second device, a second signal is received by the first device from the second device, a determination is made as to whether the second signal is derived from a secret known to the first device, and the RTT (e.g., the time difference between providing the first signal and receiving the second signal) is less than a predetermined time.

3

Therefore, systems needed to be made compatible with such IP-based networks in which an authentication process using public key certificates would take place before the devices exchanged signals/information that may be used for other purposes such as an RTT measurement.

In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409:

- RFC 2407 defined The Internet IP Security Domain of Interpretation for ISAKMP;
- RFC 2408 Internet Security Association and Key Management Protocol (ISAKMP); and
- RFC 2409 defined The Internet Key Exchange (IKE)

IKE establishes a secure authenticated communication channel by using the Diffie–Hellman key exchange algorithm to generate a shared secret key to encrypt further IKE communications. This negotiation results in one single bi-directional ISAKMP Security Association (SA).

The TECHNICAL FIELD of Sims, III provides:

The present invention relates to the protection, distribution, acquisition, and utilization of content, such as digital music content, and more particularly to systems and methods for providing distribution of such content over unsecure communication channels, including open systems such as the Internet, and establishing a robust set of rules for the authorized utilization of such content.

Sims, III at 1:11–19.

Accordingly, there was a motivation and effort in the art to provide content protection schemes for distributing digital content over unsecure channels using techniques in which a first device securely shares information/signals with the second device after having authenticated the second device based on the receipt of valid public key certificate. Sims, III, for example, provides a common secret sharing process according to a key management protocol after an authentication process that involves the first device verifying a certificate transmitted from the second device, as discussed above.

Sims, III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data. These references could be applied to then-existing public key infrastructure

4

(PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data. Many of these references use a public key in conjunction with a secret key for secure communications. DTCP and Sims, III were in the same field of endeavor (secure transmissions over a network) and shared the same fundamental goal of authenticating devices so that they can securely share information while preventing unauthorized users from obtaining the information. At the time of the invention, devices typically had limited computing power, and one skilled in the art would understand that combining DTCP with Sims, III would advantageously result in increased computational efficiency. Furthermore, one skilled in the art would understand that combining these would be advantageous because the security measures of Sims, III, such as increased reliance on certificates and on key transport protocols, would provide additional security, and facilitate the goal of enabling more secure transmissions. In addition, at the time of the invention, there was a recognition in the art that security measures were needed to protect proprietary content, such as music or video content. One skilled in the art would have recognized that DTCP and Sims, III could be combined to provide increased security for such proprietary content.

Additionally, RFC 2408 is charted separately in Exhibit K-04, and the citations in that chart for each claim limitation are hereby incorporated by reference. A person of ordinary skill in the art would have found it obvious to combine the teachings of DTCP and RFC 2408 in the manner described in the chart below for multiple reasons. At the time of invention, there was a recognition in the art that many networks were moving towards being IP-based. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409:

- RFC 2407 defined The Internet IP Security Domain of Interpretation for ISAKMP;
- RFC 2408 Internet Security Association and Key Management Protocol (ISAKMP); and
- RFC 2409 defined The Internet Key Exchange (IKE).

IKE establishes a secure authenticated communication channel by using the Diffie–Hellman key exchange algorithm to generate a shared secret key to encrypt further IKE communications. This negotiation results in one single bi-directional ISAKMP Security Association (SA). Accordingly, there was a motivation and effort in the art to provide content protection schemes for distributing digital content over unsecure channels using techniques in which a first device securely shares a common secret with the second device according to a key management protocol after having authenticated the second device. RFC 2408, for example, provides a common secret sharing process according to a key management protocol after an authentication process that involves the first device verifying a certificate transmitted from the second device, as discussed in further detail below. Both DTCP and RFC 2408 were in the same field of endeavor (secure transmissions over a network) and shared the same fundamental goal of authenticating devices so that they can securely share information while preventing unauthorized users from obtaining the information. Furthermore, one skilled in

5

the art would understand that combining DTCP and RFC 2408 would be advantageous because the security measures of RFC 2408, such as increased reliance on certificates and on key transport protocols, would provide additional security, and the goal of DTCP was to enable secure transmissions.

Willey is charted separately in Exhibit K-06, and the citations in that chart for each claim limitation are hereby incorporated by reference.  A person of ordinary skill in the art would have found it obvious to combine the teachings of Willey and DTCP in the manner described in the chart below for multiple reasons.  Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data.  Willey uses a public key in conjunction with a secret key for secure communication,.  A person of ordinary skill in the art would be familiar with the techniques taught by DTCP, and would understand that incorporating these techniques into the invention of Willey would provide increased security, thereby achieving the goal of more secure transmission of data.  In addition, Willey was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data, which would provide enhanced security to DTCP.  These references were in the same field of endeavor (secure transmissions over a network) and shared the same fundamental goal of authenticating devices so that they can securely share information while preventing unauthorized users from obtaining the information.

Further, person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Lyle is charted separately in Exhibit K-05, and the citations in that chart for each claim limitation are hereby incorporated by reference.  A person of ordinary skill in the art would have found it obvious to combine the teachings of Lyle and DTCP in the manner described in the chart below for multiple reasons.  Lyle describes a network communication system that uses an external agent to authenticate data over a network using a key encryption technique, specifically directed to protecting video or audio data.  Lyle and DTCP are directed to the same field of endeavor.

Roese is charted separately in Exhibit K-12, and the citations in that chart for each claim limitation are hereby incorporated by reference.  A person of ordinary skill in the art would have found it obvious to combine the teachings of Roese and DTCP in the manner described in the chart below for multiple reasons.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Roese is directed towards using signal information, including timer and time information, to determine aspects of the network devices such as their location.  It also contemplates the use of a key certification technique to authenticate the network communication.  One would understand that using Roese with DTCP could improve upon the security systems and the efficiencies provided for in DTCP.  For example, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.

It would have been obvious to a person of ordinary skill in the art to combine and/or substitute known elements of DTCP with elements of these references to yield predictable results as described in additional detail below.

With respect to the obviousness of the asserted claims under 35 U.S.C. § 103, one or more of the principles enumerated by the United States Supreme Court in *KSR v. Teleflex*, 550 U.S. 398 (2007) apply, including:  (a) combining various claimed elements known in the prior art according to known methods to yield a predictable result; and/or (b) making a simple substitution of one or more known elements for another to obtain a predictable result; and/or (c) using a known technique to improve a similar device or method in the same way; and/or (d) applying a known technique to a known device or method ready for improvement to yield a predictable result; and/or (e) choosing from a finite number of identified, predictable solutions with a reasonable expectation of success or, in other words, the solution was one which was "obvious to try"; and/or (f) a known work in one field of endeavor prompting variations of it for use either in the same field or a different field based on given design incentives or other market forces in which the variations were predictable to one of ordinary skill in the art; and/or (g) a teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill in the art to modify the prior art reference or to combine the teachings of various prior art references to arrive at the claimed invention.  It therefore would have been obvious to one of ordinary skill in the art to combine the disclosures of these references in accordance with the principles and rationales set forth above.

7

In compiling these contentions, Defendants have relied in part on Philips' Disclosure of Asserted Claims and Infringement Contentions under Patent L.R. 3-1.  In those contentions, Philips appears to assign constructions to indefinite claim language, to pursue overly broad claim constructions in an effort to assert infringement where none exists, and to accuse products that do not infringe the claims.  Defendants' contentions and claim charts take into account Philips's apparent constructions and may reflect aspects of the prior art that satisfy Philips' apparent claim constructions.  Defendants' assertion that a particular limitation is disclosed by a prior art reference, or Defendants' assertion that a particular limitation is disclosed by a prior art reference in a particular manner, may be based in part on Philips' apparent claim interpretations.  In relying in part on Philips' apparent claim interpretations, Defendants do not admit that Philips' apparent claim interpretations are supportable or proper or that the claim limitations in question are definite or otherwise amenable to construction.  Defendants' contentions and claim charts also take into account the constructions adopted by the Court and the Defendants reserve all appellate rights as well as the right to seek reconsideration of the Court's *Markman* order as appropriate.

8

| Claim 1 | DTCP:  Exemplary Citations |
|---|---|
| [1.p]  A first device for controlling delivery of protected content to a second device, the first device comprising: | To the extent the preamble is limiting, DTCP discloses "A first device for controlling delivery of protected content to a second device." *See, e.g.*:<br><br>The Digital Transmission Content Protection Specification defines a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms such as a high-performance serial bus that conforms to the IEEE 1394-1995 standard. Only legitimate entertainment content delivered to a source device via another approved copy protection system (such as the DVD Content Scrambling System) will be protected by this copy protection system.<br><br>DTCP at 9.<br><br>This specification addresses four layers of copy protection:<br>• **Copy control information (CCI)**<br>Content owners need a way to specify how their content can be used ("copy-one-generation," "copynever," etc.). This content protection system is capable of securely communicating copy control information (CCI) between devices in two ways:<br>`— The Encryption Mode Indicator (EMI) provides easily accessible yet secure transmission of CCI via the most significant two bits of the sy field of the isochronous packet header.`<br>`— CCI is embedded in the content stream (e.g. MPEG). This form of CCI is processed only by devices which recognize the specific content format.`<br>• **Device authentication and key exchange (AKE)**<br>Before sharing valuable information, a connected device must first verify that |

9

another connected device is authentic. To balance the protection requirements of the content industries with the real-world requirements of PC and consumer electronics (CE) device users, this specification includes two authentication levels, Full and Restricted.

`– Full Authentication can be used with all content protected by the system.`
`– Restricted Authentication enables the protection of "copy–one–generation" and "no–more–copies" content only. Copying devices such as digital VCRs employ this kind of authentication.`

**• Content encryption**

Devices include a channel cipher subsystem that encrypts and decrypts copyrighted content. To ensure interoperability, all devices must support the specific cipher specified as the baseline cipher. The subsystem can also support additional ciphers, whose use is negotiated during authentication.

**• System renewability**

Devices that support Full Authentication can receive and process system renewability messages (SRMs) created by the DTLA and distributed with content and new devices. System renewability ensures long-term integrity of the system through the revocation of compromised devices.

DTCP at 9.

10



Figure 1 gives an overview of content protection. In this overview, the source device has been instructed to transmit a copy protection stream of content. In this and subsequent diagrams, a source device is one that can send a stream of content. A sink device is one that can receive a stream of content. Multifunction devices such as PCs and record/playback devices such as digital VCRs can be both source and sink devices.

**Figure 1 Content Protection Overview**

1. The source device initiates the transmission of a stream of encrypted content marked with the appropriate copy protection status (e.g., "copy-one-generation," "copy-never," or "no-more-copies") via the EMI bits.

2. Upon receiving the content stream, the sink device inspects the EMI bits to determine the copy protection status of the content. If the content is marked "copy-never," the sink device requests that the source device initiate Full AKE. If the content is marked "copy-one-generation" or "no-more-copies" the sink device will request Full AKE, if supported, or Restricted AKE. If the sink device has already performed the appropriate authentication, it can immediately proceed to Step 4.

3. When the source device receives the authentication request, it proceeds with the type of authentication requested by the sink device, unless Full AKE is requested but the source device can only support Restricted AKE, in which case Restricted AKE is performed.

4. Once the devices have completed the required AKE procedure, a content channel encryption key can be exchanged between them. This key is used to encrypt the

11

content at the source device and decrypt the content at the sink.

If content requested by a sink device is protected, the source device may choose to transmit an empty content stream until at least one device has completed the authentication procedure required to access the content stream.

DTCP at 10.



Figure 5 shows the various states of operation for a device that is a source of content.

**Figure 5 Content Source Device State Machine**

Figure 6 shows the various states of operation of a device that is a sink for content.



**Figure 6 Content Sink Device State Machine**

DTCP at 17-18.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. The concept of determining whether protected content from a first device can be accessed from a second device using time measurement and secret protocol techniques was well known in the art . *See, e.g.*, Scott Crosby, et al., "A Cryptanalysis of the High-bandwidth Digital Content Protection System ("Crosby"); Bruce Schneier, Applied Cryptography (2d ed. 1996) ("Schneier"); International Standard ISO/IEC 11770-3 (1st ed.) ("ISO 11770-3"); U.S. Patent No. 6,550,011 B1 to J. Robert Sims, III ("Sims, III"); Internet Security Association and Key Management Protocol (ISAKMP), Request For Comments 2408 ("RFC 2408"); U.S. Patent No. 7,242,766 ("Lyle"); U.S. Patent No. 7,516,325 ("Willey"); and U.S. Patent No. 7,898,977 ("Roese").

A person of ordinary skill in the art would have found it obvious and trivial to further develop or enhance a method of accessing protected content over a network.

13

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See* citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-03, Sims III teaches protected content that is communicated among various networked devices that uses public and private key cryptography.  *See* citations and chart corresponding to this limitation in Exhibit K-03.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III.  Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 teaches improving security concepts for transmitting and verifying information over large scale public networks, such as the Internet, including amongst various networked devices.  "This memo describes a protocol utilizing security concepts necessary for establishing Security Associations (SA) and cryptographic keys in an Internet environment. A Security Association protocol that negotiates, establishes, modifies and deletes Security Associations

14

and their attributes is required for an evolving Internet, where there will be numerous security mechanisms and several options for each security mechanism." RFC-2408, Abstract. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey teaches "establishing a link key between correspondents in a public key cryptographic scheme, one of the correspondents being an authenticating device and the other being an authenticated device." Willey, Abstract. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches encrypting and decrypting data between a transmitter and a receiver using a cipher engine to assist in the distribution of protected content between these two devices. "Some embodiments of the invention are methods and systems for content protection using a transmitter that encrypts data, a receiver that receives and decrypts the encrypted data, and an external agent that communicates with at least one of the transmitter and receiver to facilitate the encryption

| | |
|---|---|
| | and decryption." Lyle, 1:7-16. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.<br><br>For further example, Roese teaches using information communicated over a data network between multiple devices to exchange and determine certain information and measuring certain signal information. "A method of determining a physical location of a device connected to a data network infrastructure including a plurality of connection points at different physical locations, the method including establishing a connection with the data network infrastructure via a cable-based transmission medium, wherein a communication signal passes via the cable-based transmission medium including at least one of the plurality of connection points." Roese, Abstract; *see also* 2:15-3:60. *See* citations and chart corresponding to this limitation in Exhibit K-12. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese. Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. *See generally* Roese, 1:38-2:12, citations to limitation 1.p in this chart and in Exhibit K-12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols, including those such as DHCP. Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
| [1.1]  a memory; | DTCP discloses "a memory." *See, e.g.*:<br><br>$X_{SRMC}$ = Indicates the number of SRM part(s) which are currently stored in the non- |

16

| | |
|---|---|
| | volale memory of the device.<br><br>DTCP at 22.<br><br>Device Generation ($X_{SRMG}$) (4 bits). This field indicates the non-volatile memory capacity and therefore the maximum generation of renewability messages that this device supports (Described in Chapter 7). The encoding 0 indicates that the device shall have a non-volatile memory capacity for storing First-Generation SRM. The encoding 1 indicates that the device shall have a non-volatile memory capacity for storing Second-Generation SRM.<br><br>DTCP at 23.<br><br>One of ordinary skill in the art would understand DTCP would necessarily include "a memory."<br><br>Further, the cited prior art combinations all disclose a memory.  See citations for limitation 1.1 in the respective charts cited above. |
| [1.2.1]  a processor, said processor arranged to: | One of ordinary skill in the art would understand DTCP would necessarily include "a processor."  For example, DTCP teaches that computations are performed in the DTCP system, which a person of ordinary skill in the art would understand were necessarily performed by a processor.  *See, e.g.*:<br><br>The following signature algorithm is based on the ECSSA digital signature scheme using the DLSP-DSA signature primitive and EMSA-SHA-1 encoding method defined in IEEE P1363/D3 (May 11, 1998) . . .<br><br>**Step 1.** Generate a random value, *u*, satisfying $0 < u < r$, using **RNGF**. A new value for *u* is generated for every signature and shall be unpredictable to an adversary for every signature computation. Also, calculate the elliptic curve point, $V = uG$.<br>**Step 2.** Calculate $c = xV$ mod *r (the x-coordinate of V reduced modulo r)*. If $c = 0$, then go to **Step 1**. |

**Step 3.** Calculate $f = $ [SHA-1($M$)]msb_bits_in_$r$. That is, calculate the SHA-1 hash of $M$ and then take the most significant bits of the message digest that is the same number of bits as the size of $r$.

**Step 4.** Calculate $d = [u\text{-}1(f + cX\text{-}1)]$ mod $r$ *(note that u-1 is the modular inverse of u mod r while X-1 is the private key of the signing device)*. If $d = 0$, then go to **Step 1**.

**Step 5.** Set first 160 bits of S$X$-$1$[$M$] equal to the big endian representation of $c$, and the second 160 bits of S$X$-$1$[$M$] equal to the big endian representation of $d$. (S$X$-$1$[$M$] = c ‖ d)

…

The following verification algorithm is based on the ECSSA digital signature scheme suing the DLVP-DSA signature primitive and EMSA-SHA1-1 encoding method defined in of IEEE P1363/D3 (May 11, 1998) . . .

**Algorithm:**
**Step 1.** Set $c$ equal to the first 160 bits of S$X$-$1$[$M$] interpreted as in big endian representation, and $d$ equal to the second 160 bits of S$X$-$1$[$M$] interpreted as in big endian representation. If $c$ is not in the range $[1, r-1]$ or $d$ is not in the range $[1, r-1]$, then output "invalid" and stop.

**Step 2.** Calculate $f = $ [SHA-1($M$)]msb_bits_in_$r$. That is, calculate the SHA-1 hash of $M$ and then take the most significant bits of the message digest that is the same number of bits as the size of $r$.

**Step 3.** Calculate $h = d\text{-}1$ mod $r$, $h1 = (fh)$ mod $r$, and $h2 = (ch)$ mod $r$.

**Step 4.** Calculate the elliptic curve point $P = (xP, yP) = h1G + h2X1$. If $P$ equals the elliptic curve point at infinity, then output "invalid" and stop.

**Step 5.** Calculate $c' = xP$ mod $r$. If $c' = c$, then output "valid"; otherwise, output "invalid."

. . .

The following shared secret derivation algorithm is based on the ECSVDP-DH

<table>
<tr>
<td></td>
<td>

primitive defined in IEEE P1363/D3 (May 1998) . . .

**Algorithm:**
**Step 1.** Generate a random integer, *XK*, in the range [1, r-1] using **RNGF**. A new value for *XK* is generated
for every shared secret and shall be unpredictable to an adversary. Also, calculate the elliptic
curve point, *XV = XKG*.
**Step 2.** Output *XV*.
**Step 3.** Calculate *XKYV*. Output the x-coordinate of *XKYV* as the secret shared.

DTCP at 26-27.

Efficient implementations of an elliptic curve cryptosystem can be realized by performing computations within the Montgomery space using new definitions of the basic arithmetic operations of addition, subtraction, multiplication, and inverse.

DTCP at 27.

Further, the cited prior art combinations all disclose a processor. See citations for limitation 1.2.1 in the respective charts cited above.

</td>
</tr>
<tr>
<td>

[1.2.2] receive a certificate of the second device, the certificate providing information regarding the second device;

</td>
<td>

DTCP discloses a processor arranged to "receive a certificate of the second device, the certificate providing information regarding the second device." *See, e.g.*:

</td>
</tr>
</table>

19

Figure 10 gives an overview of the Full Authentication protocol flow.



**Figure 10 Full Authentication Protocol Flow Overview**

During Full Authentication:

1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

20

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated with the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Sending and verifying the authenticity of certificates and encryption protocol information was well known in the art.

For example, Crosby teaches this element. *See, e.g.*, Crosby, 1–4, 7–9. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Crosby as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier. As demonstrated in Exhibit K-10, Schneier

21

teaches this element.  *See e.g.*, Schneier 34–44, 466–74, 574–77; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-03, Sims III provides for authenticating a network device based upon receiving a certificate.  "Accordingly, at step 214 the host device (whether a server, storage, or use device) requests the destination (whether storage or use) device's public key and/or any certificates, in order to confirm the identity of the device as a compliant device authorized by the content provider."  Sims III, 17:1-22.  *See* citations and chart corresponding to this limitation in Exhibit K-03.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III.  Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 discusses the then-state-of-the-art regarding certificates and their importance (and common use) in a network environment.  "Certificates are an essential part of a digital signature authentication mechanism. Certificates bind a specific entity's identity (be it host, network, user, or

22

application) to its public keys and possibly other security-related information such as privileges, clearances, and compartments. Authentication based on digital signatures requires a trusted third party or certificate authority to create, sign and properly distribute certificates." RFC 2408, Section 1.5. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey explains the use and importance of certificates for authenticating devices and communications. "A certificate signed by a Certificate Authority would be required for each device in order to avoid a man-in-the-middle attack." Willey 2:52–56. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches receiving a certificate from connected devices in order to authenticate the device or validity of the protected content. "Before the transmitter begins to transmit HDCP encrypted, encoded video data, the transmitter and receiver communicate bidirectionally with each other to execute an 15

23

authentication protocol (to verify that the receiver is authorized to receive protected content, and to establish shared secret values for use in encryption of input data and decryption of transmitted encrypted data)." Lyle 3:31–54. "In some such embodiments and in other embodiments, the content authority performs the functions of a conventional "certificate authority." A conventional "certificate authority" is a trusted third-party agent that issues digital certificates that are used to create or verify digital signatures and public-private key pairs (e.g., for secure communication over the internet), to guarantee that the individual granted the unique certificate is, in fact, who he or she claims to be." Lyle, 13:41-62. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses relying on certificates to ensure the validity of information concerning the network devices. "If the location information came from a GPS and/or has been verified by a third party certificate with security features allowing for a low level of probability of providing a false location, system 100 can trust the location information, but with a lower level of trust value than if the location information came from system 100 itself." *See, e.g.*, Roese 15:20-25; *see* citations and chart corresponding to this limitation in Exhibit K-12. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese. Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. *See generally* Roese, 1:38-2:12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art

24

| | would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|
| [1.2.3]  determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate; | DTCP discloses a processor arranged to "determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate." *See, e.g.*: <br><br> A device certificate is given to each compliant device by the DTLA. This certificate is stored in the compliant device and used during the authentication process. <br><br> DTCP at 22. <br><br> All compliant devices that support Full Authentication (that is, each item manufactured, regardless of brand and model) will be assigned a unique Device ID (XID) and device EC-DSA public/private key pair (*X1*, *X-1*) generated by the DTLA. *X-1* must be stored within the device in such a way as to prevent its disclosure. Compliant devices must also be given a device certificate (XCert) by the DTLA. This certificate is stored in the compliant device and used during the authentication process. In addition, the compliant device will need to store the other constants and keys necessary to implement the cryptographic protocols. <br><br> DTCP at 24. |

25

Figure 10 gives an overview of the Full Authentication protocol flow.



**Figure 10 Full Authentication Protocol Flow Overview**

During Full Authentication:

1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

26

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

$X_{Cert}$= A device certificate given to compliant device X by the DTLA and used during the authentication process.

DTCP at 30.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Sending and verifying the authenticity of certificates and encryption protocol information was well known in the art.

For example, Crosby teaches this element. *See, e.g.*, Crosby, 1–4, 7–9. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Crosby as both references were directed to improving methods for

27

authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For further example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 34–44, 466–74, 574–77; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier. Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would have been familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, ISO-11770-3 teaches this element. *See, e.g.*, ISO-11770-3 1–3, 12–20, 22–23. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with ISO-11770-3 as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For further example, as demonstrated in Exhibit K-03, Sims III teaches verifying the certificates based upon a certificate authority that would require a set of predefined compliance rules.  "At step 216, the public key and/or the certificate may be compared to the content use information, such as may be decrypted using the content key available to the storage device, to determine if the device is authorized to receive/utilize the content. If neither of the key and/or certificate appear in the acceptable device list of the content use information, then processing proceeds to step 217 wherein a failure condition halts transfer

28

of protected information, such as the content key. It should be appreciated that until this point in the processing, no secret information has been exchanged and, thus, until the destination device is properly identified no secret information will be exchanged. If either or both the key and certificate appear in the acceptable device list of the content use information, then processing continues to step 218." Sims III at 17:23-37. *See* citations and chart corresponding to this limitation in Exhibit K-03. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III. Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 discusses the then-state-of-the-art regarding certificates and the use of predefined compliance rules to ensure authenticity. "Certificates require an infrastructure for generation, verification, revocation, management and distribution. The Internet Policy Registration Authority (IPRA) [RFC-1422] has been established to direct this infrastructure for the IETF. The IPRA certifies Policy Certification Authorities (PCA). PCAs control Certificate Authorities (CA) which certify users and subordinate entities. Current certificate related work includes the Domain Name System (DNS) Security Extensions [DNSSEC] which will provide signed entity keys in the DNS." RFC 2408, Section 1.5.1. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey teaches the use of predefined rules provided by a third party trusted source. "Furthermore, to validate a certificate, an online check with a server on the Internet may be required to check a certificate revocation list or an online certificate status protocol client. This online check guards against the compromise of a device's private key. Without this check, the devices may be vulnerable to a man-in-the-middle attack perpetrated by an attacker having a compromised private key." Willey 2:60–67. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches receiving a certificate from connected devices in order to authenticate the device or validity of the protected content. "Before the transmitter begins to transmit HDCP encrypted, encoded video data, the transmitter and receiver communicate bidirectionally with each other to execute an 15 authentication protocol (to verify that the receiver is authorized to receive protected content, and to establish shared secret values for use in encryption of input data and decryption of transmitted encrypted data)." Lyle 3:31–54. "In some such embodiments and in other embodiments, the content authority performs the functions of a conventional "certificate authority." A conventional "certificate authority" is a trusted third-party agent that issues digital certificates that are used to create or verify digital signatures and public-private key pairs (e.g., for secure communication over the internet), to guarantee that the individual granted the unique certificate is, in fact, who he or she claims to be." Lyle, 13:41-62. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial

| | |
|---|---|
| | to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.<br><br>For further example, Roese discusses relying on certificates to ensure the validity of information concerning the network devices.  "If the location information came from a GPS and/or has been verified by a third party certificate with security features allowing for a low level of probability of providing a false location, system 100 can trust the location information, but with a lower level of trust value than if the location information came from system 100 itself."  *See, e.g.*, Roese 15:20-25; *see* citations and chart corresponding to this limitation in Exhibit K-12.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
| [1.2.4]  provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules; | DTCP discloses a processor arranged to "provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules."  *See, e.g.*:<br><br>During Full Authentication:<br>1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or |

"Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

32

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Transmitting signals between devices was well known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 31–34; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey teaches transmitting signals between networked devices.  "In another aspect of the invention, the invention provides a method for establishing a key between a first device and a second device, and includes the step of establishing a shared secret in the first device and in the second device."  Willey 4:42–46.  *See* citations and chart corresponding to this limitation in Exhibit K-06.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications.  Both references leveraged

33

existing PKI systems and improved upon those systems.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending bidirectional signals in order to communicate and learn about connected network devices, including initiating a communication process by transmitting a signal to a second device.  "Before the transmitter begins to transmit HDCP encrypted, encoded video data, the transmitter and receiver communicate bidirectionally with each other to execute an authentication protocol (to verify that the receiver is authorized to receive protected content, and to establish shared secret values for use in encryption of input data and decryption of transmitted encrypted data)....To initiate the first part of an authentication exchange between the transmitter and receiver, the transmitter asserts its key selection vector known as "AKSV"), and a pseudo-randomly generated session value ("An") to the receiver. In response the receiver sends its key selection vector (known as "BKSV") and a repeater bit (indicating whether the receiver is a repeater) to the transmitter, and the receiver also implements a predetermined algorithm using "AKSV" and the receiver's array of forty private keys to calculate a secret value ("Km")." Lyle 3:31–54.  *See* citations and chart corresponding to this limitation in Exhibit K-05.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese transmits information from a first device to a second device (e.g. location client) to begin a communication process.  "Referring to process 300, the network entity (e.g., 114 a) transmits (step 305) connection information (e.g., in the form of data packets) to the location client (e.g., 104 a) that allows for the detection of a unique connection point ID. This connection information can represent the port to which the connection point is physically connected. The connection information can be in a format compliant with many different protocols." Roese, 17:5-36.  *See also* Roese, 3:8-18, Fig. 1, Fig. 2, 6:50-65, 12:18-36; *see* citations and chart corresponding to this limitation in Exhibit K-12.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese.  Both are directed to methods for

34

| | exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. *See generally* Roese, 1:38-2:12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|
| [1.2.5] receive a second signal from the second device after providing the first signal; | DTCP discloses a processor arranged to "receive a second signal from the second device after providing the first signal." *See, e.g.*:<br><br>During Full Authentication:<br>1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.<br><br>2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2). |

35

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Transmitting signals between devices was well known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 31–34; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how

36

to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey teaches a second device will transmit a signal in order to compute a timed event.  "In another aspect of the invention, the invention provides a method for establishing a key between a first device and a second device, and includes the step of establishing a shared secret in the first device and in the second device."  Willey 4:42–46.  "A device 200 securely determines the distance to the other device 1010 using a challenge. In FIG. 11, the challenge is a random number with the same number of bits as the antispoof variable 36; the random number acts as a challenge of the authenticated device 1010. The authenticating device 200 transmits the challenge to the authenticated device 1010 in multiple portions. . . . The authenticated device 1010 transmits a response to each portion of the challenge after receipt of the portion of the challenge. The authenticated device 1010 generates the response by inputting the received portion of the challenge and a particular piece of information into a function whose output is the response." Willey 13:33–52.  *See* citations and chart corresponding to this limitation in Exhibit K-06.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices.  For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications.  Both references leveraged existing PKI systems and improved upon those systems.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending bidirectional signals in order to communicate and learn about connected network devices, including a

second device responding with a second signal to continue the communication process. "In response the receiver sends its key selection vector (known as "BKSV") and a repeater bit (indicating whether the receiver is a repeater) to the transmitter, and the receiver also implements a predetermined algorithm using "AKSV" and the receiver's array of forty private keys to calculate a secret value ("Km"). In response to the value "BKSV" from the receiver, the transmitter implements the same algorithm using the value "BKSV" and the transmitter's array of forty private keys to calculate the same secret value ("Km") as does the receiver." Lyle 3:31–54. "After a new key is supplied to the receiver (and the same new key should have been supplied to the transmitter) and before the receiver can use the new key, the challenge-response procedure is performed to allow the receiver to validate the transmitter by verifying that the transmitter has proper knowledge of the new key." Lyle 8:31–39. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese transmits information from a first device to a second device (e.g. location client) to begin a communication process. "This connection information can represent the port to which the connection point is physically connected. The connection information can be in a format compliant with many different protocols. The location client receives (step 310) the connection information and determines (step 315) a connection point ID. For example, the location client can extract the connection point ID from one of the example packet types." Roese, 17:5-36. "In one example where system 100 determines (step 225) the location of a device, thus assigning a high level of trust value to that location, the device receives connection information from a network entry device (e.g., 114 a, 114 b). The connection information includes information that the network entry device has, such as a network entry device identifier and a port number of the network entry device to which the connection point is connected. The device transmits the received connection information, or a portion thereof, to system 100, or more specifically, to a portion of the network maintaining the location information database (e.g., location server 134)." Roese, 15:35-54. *See also* Roese, 3:8-18, Fig. 1, Fig. 2, 6:50-65, 12:18-36; *see* citations and chart

38

<table>
<tr>
<td></td>
<td>corresponding to this limitation in Exhibit K-12.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.</td>
</tr>
<tr>
<td>[1.2.6]  determine whether the second signal is derived from a secret known by the first device;</td>
<td>DTCP discloses a processor arranged to "determine whether the second signal is derived from a secret known by the first device."  *See, e.g.*:

During Full Authentication:
1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device</td>
</tr>
</table>

39

has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Using key and key management protocols to transmit and receive encrypted data was well known.

For further example, Crosby teaches this element. *See, e.g.*, Crosby, 1–4, 7–9.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Crosby as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

40

For further example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, ISO-11770-3 teaches this element. *See, e.g.*, ISO-11770-3 1–3, 12–20, 22–23. As described above, a person of ordinary skill in the art would have it obvious and trivial to combine the teachings of DTCP with ISO-11770-3 as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For further example, as demonstrated in Exhibit K-03, Sims III teaches providing information only when a device is authenticated based on a key management protocol.  "At step 218, the host device (whether a server, storage, or use device) encrypts the content key with the destination device's public key. Accordingly, the content key is rendered useless to all except the holder of a secret key corresponding to the destination device's public key. This secure version of the content key is provided to the destination device."  Sims III at 17:37-54.  *See* citations and chart corresponding to this limitation in Exhibit K-03.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III.  Sims III teaches systems and methods for

authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 explains that the use of key authorities to verify devices and communication was a well known part of the art. "Key Exchange Authentication: Key exchanges may be authenticated during the protocol or after protocol completion. Authentication of the key exchange during the protocol is provided when each party provides proof it has the secret session key before the end of the protocol. Proof can be provided by encrypting known data in the secret session key during the protocol echange [sic]." RFC 2408, Section 6.1. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey provides for sending data only after authenticating a second device. "During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other device 100 or 300. The next step 4 includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36. The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret." Willey 6:53–63. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary

skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending encryption key data. "In preferred embodiments, the system of the invention implements a symmetric content protection protocol including a challenge-response procedure. After a new key is supplied to the receiver (and the same new key should have been supplied to the transmitter) and before the receiver can use the new key, the challenge-response procedure is performed to allow the receiver to validate the transmitter by verifying that the transmitter has proper knowledge of the new key." Lyle 8:31–39. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using the invention within a protected or encrypted environment that allows for communication of keys and/or common secrets. "The location information, and any additional information, may also be protected with a security feature. For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3. "In this example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62. As described above, a person of ordinary skill in the art would have found it obvious and

| | |
|---|---|
| | trivial to combine the teachings of DTCP with Roese; *see* citations and chart corresponding to this limitation in Exhibit K-12.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
| [1.2.7]  determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and | To the extent DTCP does not expressly disclose this limitation, it renders it obvious in view of the knowledge of one killed in the art at the time of the alleged invention.  One of skill in the art would understand that this limitation was an obvious design choice.  Such modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.<br><br>It also would have been obvious to one of skill in the art to combine DTCP with U.S. Patent No. 7,898,977 ("the '977 patent"), filed on February 28, 2003, to provide a processor arranged to "determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time."  *See, e.g.*:<br><br>    System 100 can employ a number of known triangulation techniques, including the use of signal strength, angle of arrival, and relative time delay approaches.<br>'977 patent at 8:52-54.<br><br>    In one approach to determining a location of a device using wireless transmission medium 119, system 100 determines the location of user device 104 b relative to typically multiple network devices (e.g., 120 a and 120 b) that receive transmitted signals from user device 104 b. System 100 uses signal characteristics, such as |

44

relative time delay or signal strength of the signal received at the different network devices in combination with the known location of the wireless access points 120 a-b.

'977 patent at 6:3-11.

The method can further include employing a function that relates values for signal characteristics to respective physical locations. The signal characteristics can include a time delay. The signal characteristics can include time delay, time-domain reflectometry, signal attenuations, and/or round-trip delay.

'977 patent at 3:12-18.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Generating a round trip time based on two time calculations is a straightforward process that was well-known and well-practiced in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier. As demonstrated in Exhibit K-10, Schneier teaches this element. *See* citations and chart corresponding to this limitation in Exhibit K-10. As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier. Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology. A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey computes a round trip time based on signals sent from respective devices. "Upon reception of the response, the

45

authenticating device 200 determines the round trip time from the time the transmittal of the challenge and the time of the response. In step 46, the authenticating device 200 then multiplies this time by the speed of the signal used and divides it by two to determine the distance of device 1010 from device 200. A determination is made by device 200 as to whether the other device 1010 is within the maximum allowed distance, in step 48. If the other device 1010 is not within the maximum allowed distance then the authentication process is aborted and can be restarted. However, if the other device 1010 is determined to be within the maximum allowed distance, then the authenticating device 200 proceeds 14 with the authentication process, in step 50." Willey 15:33–46.  *See* citations and chart corresponding to this limitation in Exhibit K-06.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices.  For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications.  Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches comparing and analyzing network signals that could have included computing a round trip time based on earlier sent signals. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a

46

| | modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|
| [1.2.8]  allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time. | To the extent DTCP does not expressly disclose this limitation, it renders it obvious in view of the knowledge of one killed in the art at the time of the alleged invention.  One of skill in the art would understand that this limitation was an obvious design choice.  Such modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.<br><br>It also would have been obvious to one of skill in the art to combine DTCP with the '977 patent to provide a processor arranged to "allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time." *See, e.g.*:<br><br>System 100 also restricts flow of data through infrastructure 101 based on location restrictions of that data. For example, the system 100 can restrict data from the accounting databases to stay within the accounting department offices (e.g., an area defined by certain coordinates). In one approach to implement such restrictions, the data has a tag that contains the location restrictions (e.g., permitted and/or prohibited locations). For example, the application generating the data and/or the server generating a data packet to transport the data over the network can add this tag while generating the data and/or packet. Devices and applications within system 100 enforce those restrictions by not allowing the data to be routed to a device outside of the permitted location, by destroying the data if it is in a location outside of the permitted location, and/or denying access to (e.g., reading, opening) the data outside a permitted location.<br>'977 patent at 6:50-65.<br><br>In general overview of the authentication process, a user device 104 connects to the network infrastructure 101, via a connection point 160. System 100 authenticates the device. System 100 receives the location of the device 104 from the device 104 itself and/or from infrastructure 101. System 100 receives user credentials and authenticates the user. During this authentication, system 100 verifies the location of |

47

device 104 employing the techniques described herein. If the user is authenticated and the location is both verified and authenticated for the requested network resources, system 100 proceeds in allowing device 104 to access the requested resources. System 100 can log each of these events for administrative use.

'977 patent at 22:39-51.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Comparing signals and checking signals against threshold or predefined levels was well-known in the art, as well as not allowing certain actions unless certain predetermined qualifications are met.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier. As demonstrated in Exhibit K-10, Schneier teaches this element. *See* citations and chart corresponding to this limitation in Exhibit K-10. As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier. Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology. A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey uses the computed round trip time to allow or deny access to certain protected data or communications. "In step 42, the authenticating device 200 measures the time of the response from authenticated device 1010. In the following step 44, the authenticating device 200 determines whether the response is a function of the portion of the challenge that was transmitted and the particular

48

piece of information in the authenticated device 1010. If the response meets these two requirements, the process proceeds to the next step 46, else authentication fails and can be restarted. This verification function may be performed with an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's public key." Willey 15:15–25. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches not allowing communication of data unless certain encryption protocols are met based upon a comparison of earlier received signals and information. "In preferred implementations of the described example of the challenge-response procedure, each of the messages transmitted between the transmitter and receiver contains a pseudo-random value than [sic] cannot be known or predicted by the other side unless the encryption and decryption operations work properly using a shared key (the new key) known to both the transmitter and receiver. The procedure thus provides proof that each side knows the correct shared key, and it also prevents "known plaintext" attacks by outside agents." Lyle 47:1–10. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using network signals to confirm authenticity. *See, e.g.*, 13:7-12; *see* citations and chart corresponding to this limitation in Exhibit K-12. As

49

<table>
<tr><td colspan="2"></td></tr>
</table>

|  | described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|

| **Claim 2** | **DTCP:  Exemplary Citations** |
|---|---|
| [2]  The first device of claim 1, wherein the first signal comprises a random number. | DTCP discloses the elements of claim 1 as set forth above, *see supra*.<br><br>DTCP discloses "first signal comprises a random number."  *See, e.g.*:<br><br>**4.4.3.2 Elliptic Curve Diffie-Hellman (EC-DH)**<br>The following shared secret derivation algorithm is based on the ECSVDP-DH primitive defined in IEEE P1363/D3 (May 11, 1998).<br>**Input:**<br>• $Y_v$ = *the Diffie-Hellman first phase value generated by the other device (an elliptic curve point)*<br>• p, a, b, G, *and* r = *the elliptic curve parameters associated with* X-1<br>**Output:**<br>• $X_v$ = *the Diffie-Hellman first phase value (an elliptic curve point) the x-coordinate of* $X_K Y_v$ = *the shared secret generated by this algorithm (must be kept secret from third parties)* |

**Algorithm**:

**Step 1.** Generate a random integer, $X_k$, in the range [1, r-1] using **RNG**$_F$. A new value for $X_k$ is generated for every shared secret and shall be unpredictable to an adversary. Also, calculate the elliptic curve point, $XV = XKG$.

**Step 2.** Output $XV$.

**Step 3.** Calculate $XKYV$. Output the x-coordinate of $XKYV$ as the secret shared.

DTCP at 27.

During Full Authentication:

1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the

message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Transmitting randomly generated bit-words was common and well-known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier. As demonstrated in Exhibit K-10, Schneier teaches this element. *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10. As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier. Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology. A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit

52

K-10.

For further example, as demonstrated in Exhibit K-03, Sims III teaches encrypting information using a random generated word. "Additionally, the content key may be further protected, if desired. For example, information unique to the destination device, such as a random number generated by the destination device, any be compounded with the content key, such as by as a mathematical operation, e.g. exclusive OR (XOR) function. Accordingly, even where multiple destination devices share the same public/secret key set, recording of the conversation will not result in the useful download of the content to a second device." Sims III at 17:37-54. *See* citations and chart corresponding to this limitation in Exhibit K-03. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III. Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 explains that the use of randomly generated words was already well known in the art. "An example of key transport is the use of the RSA algorithm to encrypt a randomly generated session key (for encrypting subsequent communications) with the recipient's public key." RFC 2408, Section 1.6.1. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey provides for sending data only after authenticating a second device based on a random generated bit word. "In FIG. 11, the response is a single bit and is the output of an exclusive or (XOR) function whose inputs are the just received bit of the random number and a bit of the device's antispoof variable 36 (which may be one based upon its own address). For example, the first response bit is formed by taking the XOR of the received most significant bit of the random number and the most significant bit of the antispoof variable 36; subsequent response bits are formed by taking the XOR of the received bit of the random number and subsequently less significant bits." Willey 13:62–14:4. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending encryption key data. "To initiate the first part of an authentication exchange between the transmitter and receiver, the transmitter asserts its key selection vector known as "AKSV", and a pseudo-randomly generated session value ("An") to the receiver. In response the receiver sends its key selection vector (known as "BKSV") and a repeater bit (indicating whether the receiver is a repeater) to the transmitter, and the receiver also implements a predetermined algorithm using "AKSV" and the receiver's array of forty private keys to calculate a secret value ("Km")." Lyle 3:31–54. "In preferred implementations of the described example of the challenge-response procedure, each of the messages transmitted between the transmitter and receiver contains a pseudo-random value than [sic] cannot be known or predicted by the other side unless the encryption and decryption operations work properly using a shared key (the new key) known to both the transmitter and receiver. The procedure thus provides

54

|  | proof that each side knows the correct shared key, and it also prevents "known plaintext" attacks by outside agents." Lyle 47:1–10.  *See* citations and chart corresponding to this limitation in Exhibit K-05.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|

| **Claim 3** | **DTCP:  Exemplary Citations** |
|---|---|
| [3]  The first device of claim 1, wherein the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal. | DTCP discloses the elements of claim 1 as set forth above, *see supra*.

To the extent DTCP does not expressly disclose this limitation, it renders it obvious in view of the knowledge of one killed in the art at the time of the alleged invention.  One of skill in the art would understand that this limitation was an obvious design choice.  Such modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.

It also would have been obvious to one of skill in the art to combine DTCP with U.S. Patent No. 7,516,325 ("the '325 patent"), filed April 8, 2002, to provide "the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal."  *See, e.g.*: |

Returning to FIG. 11, in order to overcome the man-in-the-middle attack, both devices 200, 1010 perform a key agreement, and then each device 200, 1010 computes two separate antispoof variables 36 based on the shared secret (one for itself and one for the other device). The devices 200, 1010 then authenticate each other based upon distance from one another. A secure method to determine the distance from one device 200 to the other device 1010 follows and is used for the authentication based upon distance. A device 200 securely determines the distance to the other device 1010 using a challenge. In FIG. 11, the challenge is a random number with the same number of bits as the antispoof variable 36; the random number acts as a challenge of the authenticated device 1010. The authenticating device 200 transmits the challenge to the authenticated device 1010 in multiple portions. As an example, the random number is transmitted one bit at a time, starting with the most significant bit and continuing with successively less significant bits. The authenticated device 1010 transmits a response to each portion of the challenge after receipt of the portion of the challenge. The authenticated device 1010 generates the response by inputting the received portion of the challenge and a particular piece of information into a function whose output is the response.

It is important that the function generates a response that varies both depending upon the received portion of the challenge and also depending upon the particular piece of information. The response is preferably short and equal in length to the received portion of the challenge. The particular piece of information may be an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's private key. If public key cryptography is used, it is substantially difficult for an attacker to determine the private key based on the output of the function. In FIG. 11, the response is a single bit and is the output of an exclusive or (XOR) function whose inputs are the just received bit of the random number and a bit of the device's antispoof variable 36 (which may be one based upon its own address). For example, the first response bit is formed by taking the XOR of the received most significant bit of the random number and the most significant bit of the antispoof variable 36; subsequent response bits are formed by taking the XOR of the received bit of the

random number and subsequently less significant bits.

Generally, the time between the reception of the portion of the challenge by the authenticated device 1010 and the transmission of the response is related to the amount of time it takes for the transmitted signal to travel a distance twice the tolerable error in measurement. For example, suppose that the authenticating device 200 wishes that the authenticated device 1010 to be no more than one foot away, then the authenticating device 200 permits one half foot of error for processing time, however. In a case where RF is used to transmit the portion of the challenge and the response, one nanosecond of processing time is allowed for a half of a foot of error because the speed of light is about one foot per nanosecond. In a case where audio is used to transmit the random bit and the response, one millisecond of processing time is allowed for a half of a foot of error because the speed of sound is about one foot per millisecond. The authenticated device 1010 is configured to return a response within this amount of processing time, since longer processing times would give an attacker an opportunity to appear to be closer. Accordingly, in FIG. 11, the shared secret and antispoof variable 36 are precomputed and the only computation required by the authenticated device 1010 is an XOR of a single bit which, according to current technology, can easily be performed within an amount of time that would correspond to an acceptably short error distance devoted to processing time for either RF or audio signal transmission.

'325 patent at 13:29-14:30.

In FIG. 11, the response is a single bit and is the output of an exclusive or (XOR) function whose inputs are the just received bit of the random number and a bit of the device's antispoof variable 36 (which may be one based upon its own address).

'325 patent at 15:28-32.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Using XOR operations was extremely common and well-known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art

57

in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-03, Sims III teaches encrypting information using a random generated word.  "Additionally, the content key may be further protected, if desired. For example, information unique to the destination device, such as a random number generated by the destination device, any be compounded with the content key, such as by as a mathematical operation, e.g. exclusive OR (XOR) function. Accordingly, even where multiple destination devices share the same public/secret key set, recording of the conversation will not result in the useful download of the content to a second device."  Sims III at 17:37-54.  *See* citations and chart corresponding to this limitation in Exhibit K-03.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III.  Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 explains that the use of randomly generated words was already known in the art. "An example of key transport is the use of the RSA algorithm to encrypt a randomly generated session key (for encrypting subsequent communications) with the recipient's public key." RFC 2408, Section 1.6.1. *See* citations and chart corresponding to this limitation in Exhibit K-04. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408. Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this. In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications (Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey provides for sending data only after authenticating a second device based on a random generated bit word. "In FIG. 11, the response is a single bit and is the output of an exclusive or (XOR) function whose inputs are the just received bit of the random number and a bit of the device's antispoof variable 36 (which may be one based upon its own address). For example, the first response bit is formed by taking the XOR of the received most significant bit of the random number and the most significant bit of the antispoof variable 36; subsequent response bits are formed by taking the XOR of the received bit of the random number and subsequently less significant bits." Willey 13:62–14:4. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

59

<table>
<tr><td></td><td>For further example, as demonstrated in Exhibit K-05, Lyle teaches sending encryption key data. "To initiate the first part of an authentication exchange between the transmitter and receiver, the transmitter asserts its key selection vector known as "AKSV"), and a pseudo-randomly generated session value ("An") to the receiver. In response the receiver sends its key selection vector (known as "BKSV") and a repeater bit (indicating whether the receiver is a repeater) to the transmitter, and the receiver also implements a predetermined algorithm using "AKSV" and the receiver's array of forty private keys to calculate a secret value ("Km")." Lyle 3:31–54. "In preferred implementations of the described example of the challenge-response procedure, each of the messages transmitted between the transmitter and receiver contains a pseudo-random value than [sic] cannot be known or predicted by the other side unless the encryption and decryption operations work properly using a shared key (the new key) known to both the transmitter and receiver. The procedure thus provides proof that each side knows the correct shared key, and it also prevents "known plaintext" attacks by outside agents." Lyle 47:1–10. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.</td></tr>
</table>

| Claim 4 | DTCP:  Exemplary Citations |
|---|---|
| [4]  The first device of claim 1, wherein the processor is further arranged to provide the secret to the | DTCP discloses the elements of claim 1 as set forth above, *see supra*.<br><br>DTCP discloses "the processor is further arranged to provide the secret to the second |

| second device. | device." *See, e.g.*: |
|---|---|
| | During Full Authentication:<br><br>1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.<br><br>2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).<br><br>3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).<br><br>Each device calculates an authentication key by completing the EC-DH key |

exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Transmitting "common secret" or encrypted data and keys was well known.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey explains how devices can both hold commonly held data or keys and use this information to generate network communications and signals.  "In another aspect of the invention, the invention provides a method for establishing a key between a first device and a second device, and includes the step of establishing a shared secret in the first device and in the second device." Willey

62

4:42–46. "The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret." Willey 6:53–63. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending encryption key data. Lyle 3:31–54; Lyle 8:31–39. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using the invention within a protected or encrypted environment that allows for communication of keys and/or common secrets. "The location information, and any additional information, may also be protected with a security feature. For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3. "In this example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62; *see* citations and chart corresponding to this limitation in Exhibit K-12. As described above, a person of ordinary skill in the art would have found it obvious and trivial to

63

|  | combine the teachings of DTCP with Roese. Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. *See generally* Roese, 1:38-2:12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results. |
|---|---|

| Claim 6 | DTCP: Exemplary Citations |
|---|---|
| [6] The first device of claim 4, wherein the processor arranged to provide the secret to the second device comprises the processor arranged to provide the secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number. | DTCP discloses the elements of claim 4 as set forth above, *see supra*.<br><br>To the extent DTCP does not expressly disclose this limitation, it renders it obvious in view of the knowledge of one killed in the art at the time of the alleged invention. One of skill in the art would understand that this limitation was an obvious design choice. Such modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.<br><br>It also would have been obvious to one of skill in the art to combine DTCP with U.S. Patent No. 6,550,011 ("the '011 patent"), filed October 7, 1999, to provide "the processor arranged to provide the secret to the second device comprises the processor arranged to provide the secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number." *See, e.g.*: |

Thereafter, whenever a device presents its certificate, the content provider may be assured that when the certificate is decrypted using the certificate authority's public key, and a content key is encrypted with the resulting device public key, that only a device meeting the desired level of operational standards will be able to utilize the content.

'011 patent at 5:53-59.

The preferred embodiment of the present invention utilizes both public and private key cryptography. For example, public key cryptography is utilized to distribute keys allowing for subsequent encrypted communications, such as the transfer of an encrypted content key through an unsecure communication channel. Accordingly, a public key may be provided from one compliant device, such as a playback device, to another compliant device, such as a storage device, through an unsecure communication channel to enable the other compliant device to encrypt a secret content key, and possibly other data associated with the particular content, and transfer this encrypted key back through the channel to the other device. Thereafter, content protected, and presumably also communicated between the devices through the unsecure communication channel, using encryption with this secret key may be decrypted for use by the receiving device.

'011 patent at 10:43-59.

In order to accommodate secure exchanges through unsecure communication channels as described above, the preferred embodiment compliant information use device includes a preselected device secret key. This key is preferably not readable by any element external to the information use device and, therefore, is preferably stored in the above described secure area. Also to accommodate secure exchanges through unsecure communication channels, the preferred embodiment compliant information use device includes a device public key corresponding to the device secret key. However, as this key is a public key, it is preferably directly readable or other wise available to elements external to the information use device and,

65

therefore, is stored outside the above described secure area, such as within storage area 117.

'011 patent at 11:65-12:12.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Using public/private key and public key management protocols to transmit and receive encrypted data was well known.

For further example, Crosby teaches this element. *See, e.g.*, Crosby, 1–4, 7–9.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Crosby as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For further example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, ISO-11770-3 teaches this element. *See, e.g.*, ISO-11770-3 1–3, 12–20,

22–23. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with ISO-11770-3 as both references were directed to improving methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data.

For further example, as demonstrated in Exhibit K-03, Sims III teaches encrypting information using a public key of a private/public key pair.  "The preferred embodiment of the present invention utilizes both public and private key cryptography. For example, public key cryptography is utilized to distribute keys allowing for subsequent encrypted communications, such as the transfer of an encrypted content key through an unsecure communication channel. ." Sims III at 10:43-11:4.  *See* citations and chart corresponding to this limitation in Exhibit K-03.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Sims III. Sims III teaches systems and methods for authenticating devices to allow the devices to share data, such as audio data, while preventing unauthorized users from obtaining the data and was designed to work in existing public key infrastructure (PKI) schemes (also called public key cryptography), in which each device has a public key that can be used to encrypt data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-03.

For further example, as demonstrated in Exhibit K-04, RFC 2408 explains that the use of public keys to encrypt data was well known.  "Key Exchange Authentication: Key exchanges may be authenticated during the protocol or after protocol completion. Authentication of the key exchange during the protocol is provided when each party provides proof it has the secret session key before the end of the protocol. Proof can be provided by encrypting known data in the secret session key during the protocol echange [sic]." RFC 2408, Section 1.6.1.  *See* citations and chart corresponding to this limitation in Exhibit K-04.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with RFC 2408.  Improving the network communication and security concepts was a necessary and continuous process that often combined art such as this.  In this regard, the Internet Engineering Task Force (IETF) originally defined the Internet Key Exchange in November 1998 in a series of publications

67

(Request for Comments--RFC) known as RFC 2407, RFC 2408 and RFC 2409. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-04.

For further example, as demonstrated in Exhibit K-06, Willey provides for sending data only after authenticating a second device based on a public key encryption protocol. "During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other device 100 or 300. The next step 4 includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36. The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret." Willey 6:53–63. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches sending encryption key data. "In preferred embodiments, the system of the invention implements a symmetric content protection protocol including a challenge-response procedure. After a new key is supplied to the receiver (and the same new key should have been supplied to the transmitter) and before the receiver can use the new key, the challenge-response procedure is performed to allow the receiver to validate the transmitter by verifying that the transmitter has proper knowledge of the new key." Lyle 8:31–39. *See* citations and chart

68

corresponding to this limitation in Exhibit K-05.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using the invention within a protected or encrypted environment that allows for communication of keys and/or common secrets.  "The location information, and any additional information, may also be protected with a security feature.  For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3.  "In this example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62; *see* citations and chart corresponding to this limitation in Exhibit K-12.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.

| Claim 9 | DTCP:  Exemplary Citations |
|---|---|

| | |
|---|---|
| [9.p]  The first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: | DTCP discloses the elements of claim 1 as set forth above, *see supra*.<br><br>DTCP discloses that "the processor arranged to determine whether the second signal is derived from the secret is arranged to" perform the steps recited in claim 9.  *See* discussion and citations accompanying claims 9.1, 9.2, and 9.3, *infra*. |
| [9.1]  modify the first signal according to the secret; | DTCP discloses that the processor is arranged to "modify the first signal according to the secret." *See, e.g.*:<br><br>During Full Authentication:<br>1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.<br><br>2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).<br><br>3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the |

70

message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art. Comparing signals to identify information, such as authenticity, was well known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier. As demonstrated in Exhibit K-10, Schneier teaches this element. *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10. As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier. Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data. Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology. A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data. *See*

71

*generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey teaches how to compare signals to verify the authenticity of other network devices and communications.  how devices can both hold commonly held data or keys and use this information to generate network communications and signals.  "During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other device 100 or 300. The next step 4 includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36. The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret."  Willey 6:53–63.  *See* citations and chart corresponding to this limitation in Exhibit K-06.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices.  For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications.  Both references leveraged existing PKI systems and improved upon those systems.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches verifying authenticity through a third-agent by comparing and analyzing network signals.  "More generally, an external agent is employed in such a system including a TMDS-like link in accordance with the invention to perform at least one encryption, decryption, or authentication function," Lyle 7:58–8:14.  *See* citations and chart corresponding to this limitation in Exhibit K-05.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for

72

<table>
<tr>
<td></td>
<td>exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using network signals to confirm authenticity as well as comparing signals to determine certain information. "The location information, and any additional information, may also be protected with a security feature. For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3. "In this example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62. "In addition, the use of multiple access points (e.g., signals from user device 104 b received at 120 a compared with signals received at 120 b) may improve relative location accuracy in a type of triangulation or averaging of signal strength indicators." Roese, 9:12-50; *see* citations and chart corresponding to this limitation in Exhibit K-12. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese. Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. *See generally* Roese, 1:38-2:12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.</td>
</tr>
<tr>
<td>[9.2]  compare the modified first signal with the second signal; and</td>
<td>DTCP discloses that the processor is arranged to "compare the modified first signal with the second signal." *See, e.g.*:</td>
</tr>
</table>

73

During Full Authentication:

1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

74

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Comparing signals to identify information, such as authenticity, was well known in the art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey teaches how to compare signals to verify the authenticity of other network devices and communications.  how devices can both hold commonly held data or keys and use this information to generate network communications and signals.  "During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other

device 100 or 300. The next step 4 includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36. The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret." Willey 6:53–63. *See* citations and chart corresponding to this limitation in Exhibit K-06. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and protocols for protecting content distribution between devices. For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications. Both references leveraged existing PKI systems and improved upon those systems. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches verifying authenticity through a third-agent by comparing and analyzing network signals. "More generally, an external agent is employed in such a system including a TMDS-like link in accordance with the invention to perform at least one encryption, decryption, or authentication function," Lyle 7:58–8:14. *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle. Both are directed to methods for exchanging protected content. *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using network signals to confirm authenticity as well as comparing signals to determine certain information. "The location information, and any additional information, may also be protected with a security feature. For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3. "In this

<table>
<tr>
<td></td>
<td>example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62. "In addition, the use of multiple access points (e.g., signals from user device 104 b received at 120 a compared with signals received at 120 b) may improve relative location accuracy in a type of triangulation or averaging of signal strength indicators." Roese, 9:12-50; <em>see</em> citations and chart corresponding to this limitation in Exhibit K-12. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Roese. Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network. <em>See generally</em> Roese, 1:38-2:12. Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols. Roese, col. 28-31.

To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention. A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.</td>
</tr>
<tr>
<td>[9.3] provide an indication when said modified first signal is identical to the second signal.</td>
<td>DTCP discloses that the processor is arranged to "provide an indication when said modified first signal is identical to the second signal." <em>See, e.g.</em>:

During Full Authentication:
1. The sink device requests authentication by sending a random challenge and its device certificate. This can be the result of the sink device attempting to access a protected content stream (whose EMI is set to "Copy-never," "No-more-copies," or "Copy-one-generation"). The sink device may request authentication on a speculative basis, before attempting to access a content stream. If a sink device attempts speculative authentication, the request can be rejected by the source.</td>
</tr>
</table>

2. Device A then returns a random challenge and its device certificate. If the value of the other device's certificate type or format fields is reserved, the authentication should be immediately aborted. After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked. If the other device has not been revoked, each device calculates a EC-DH key exchange first-phase value (See section 4.4.3.2).

3. The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device, and a message signature containing the other device's random challenge concatenated to the preceding components. The devices verify the signed messages received by checking the message signature using EC-DSA with the other device's public key. This verifies that the message has not been tampered with. If the signature cannot be verified, the device refuses to continue. In addition, by comparing the exchanged version numbers, devices can at a later time invoke the system renewability mechanisms (See Section 7.2 for the details of this procedure).

Each device calculates an authentication key by completing the EC-DH key exchange.

A detailed description of the Full Authentication protocol and associated state machine can be found in the DTCP Specification available under license from the DTLA.

DTCP at 28.

DTCP further renders this element obvious in view of the knowledge of one of skill in the art.  Comparing signals to identify information, such as authenticity, was well known in the

art.

For example, this element would have been obvious to a person of ordinary skill in the art in view of DTCP combined with Schneier.  As demonstrated in Exhibit K-10, Schneier teaches this element.  *See e.g.*, Schneier 4–5, 31–34, 466–74; citations and chart corresponding to this limitation in Exhibit K-10.  As described above, a person of ordinary skill in the art would have been motivated to combine DTCP and Schneier.  Schneier teaches systems and methods for encrypting communications to allow for secure transmission of data, while preventing unauthorized users from obtaining the data.  Schneier is a textbook designed for use in university courses in computer science, and teaches techniques that were well known in the art at the time of its publication and is intended to teach those of skill in the art how to understand and improve upon the related technology.  A person of ordinary skill in the art would be familiar with the techniques taught by Schneier, and would understand that incorporating these techniques into DTCP would provide increased security and better, more secure transmission of data.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-10.

For further example, as demonstrated in Exhibit K-06, Willey teaches how to compare signals to verify the authenticity of other network devices and communications.  how devices can both hold commonly held data or keys and use this information to generate network communications and signals.  "During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other device 100 or 300. The next step 4 includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36. The symmetric key 36 or antispoof variable or [sic] is computed in device 100, 300 to ensure that both devices 100, 300 have the same secret key. The antispoof variable 36 is based upon a one way function of the shared secret."  Willey 6:53–63.  *See* citations and chart corresponding to this limitation in Exhibit K-06.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Willey. Both references are directed to improving network communication and

protocols for protecting content distribution between devices.  For example, Willey teaches systems and methods for authenticating devices, such as personal digital assistants (PDAs), cellular phones, and headsets, to allow them to share data while preventing unauthorized users from obtaining the data and also employs a public key in conjunction with a secret key for secure communications.  Both references leveraged existing PKI systems and improved upon those systems.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-06.

For further example, as demonstrated in Exhibit K-05, Lyle teaches verifying authenticity through a third-agent by comparing and analyzing network signals.  "More generally, an external agent is employed in such a system including a TMDS-like link in accordance with the invention to perform at least one encryption, decryption, or authentication function," Lyle 7:58–8:14.  *See* citations and chart corresponding to this limitation in Exhibit K-05. As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of DTCP with Lyle.  Both are directed to methods for exchanging protected content.  *See generally* citations and chart corresponding to the 1.p limitation in this chart and in Exhibit K-05.

For further example, Roese discusses using network signals to confirm authenticity as well as comparing signals to determine certain information.  "The location information, and any additional information, may also be protected with a security feature. For example, the information may be encrypted with a temporary key associated only with the particular connection point to which the location client is connected." Roese, 17:59-18:3.  "In this example, system 100 performs the authentication and any re-authentication using an encryption key process. Specifically, an end user, that system 100 has authenticated by user and by location, is provided with an encryption key that is designed to work only on the port through which the key was supplied, and no other." Roese, 26:17-62.  "In addition, the use of multiple access points (e.g., signals from user device 104 b received at 120 a compared with signals received at 120 b) may improve relative location accuracy in a type of triangulation or averaging of signal strength indicators." Roese, 9:12-50; *see* citations and chart corresponding to this limitation in Exhibit K-12.  As described above, a person of ordinary skill in the art would have found it obvious and trivial to combine the teachings of

80

<table>
<tr><td></td><td>DTCP with Roese.  Both are directed to methods for exchanging electronic data over a communications network and for analyzing certain signal information to determine certain information and characteristics about the device in the network.  *See generally* Roese, 1:38-2:12.  Further, Roese discusses at length using its teachings to improve existing network infrastructures and protocols.  Roese, col. 28-31.<br><br>To the extent these references do not expressly disclose this limitation, either alone or in combination, the limitation is obvious in view of the knowledge of a person of ordinary skill in the art at the time of the alleged invention.  A person of ordinary skill in the art would understand that this limitation was an obvious design choice. For example, such a modification would simply apply one of a finite number of well-known techniques in a predictable manner, to achieve well-known, predictable results.</td></tr>
</table>

| Claim 11 | DTCP:  Exemplary Citations |
|---|---|
| [11]  The first device of claim 1, wherein the processor is further arranged to determine an identity of the second device using the certificate. | DTCP discloses the elements of claim 1 as set forth above, *see supra*.<br><br>DTCP discloses "the processor is further arranged to determine an identity of the second device using the certificate."  *See, e.g.*:<br><br>    Device certificates are comprised of the following Baseline Format fields: . . .<br>      ● The **device's ID** number ($X_{ID}$, 40 bits) assigned by the DTLA.<br><br>DTCP at 23.<br><br>    *See* discussion and citations accompanying claims 1.2.2 and 1.2.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed in claim 1.2.2 and 1.2.3 above. |

| Claim 14 | DTCP:  Exemplary Citations |
|---|---|
| [14]  The first device of claim 1, wherein the predetermined time is based on a communication system associated with the first device. | DTCP discloses the elements of claim 1 as set forth above, *see supra*.<br><br>DTCP discloses "the predetermined time is based on a communication system associated with the first device." *See, e.g.*:<br><br>    As an alternative or in addition to the predefined database, system 100 can use characteristics of signal propagation through a cable-based transmission medium to determine the location of a device. More specifically, system 100 can use a characteristic of a signal that varies with the length of the cable-based transmission medium (e.g., time delay, time-domain reflectometry (TDR) techniques, signal attenuations, round-trip delay and the like) to determine the length of cable through which the signal is traveling. For a connection point, system 100 measures the particular signal characteristic and based on that measurement, system 100 determines the length of the cable. As described above for wireless connections, system 100 employs a lookup table, database, and/or function that relates the characteristic measurement to a location for cable connections also. Data for the signal characteristics (e.g., round-trip training for cable-based media) can be performed at the same time connection points 160 are being mapped with a trusted GPS, as described above, so that location is not based solely on estimating delay.<br><br>'977 patent at 12:18-44.<br><br>    *See* discussion and citations accompanying claims 1.2.6 and 1.2.7, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed in claim 1.2.6 and 1.2.7 above. |

82

| Claim 34 | DTCP:  Exemplary Citations |
|---|---|
| [34.p]  A method of a first device controlling delivery of protected content to a second device, the method comprising: | To the extent the preamble is limiting, DTCP discloses "[a] method of a first device controlling delivery of protected content to a second device."<br><br>*See* discussion and citations accompanying claim 1.p, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.1]  receiving a certificate of the second device, the certificate providing information regarding the second device; | DTCP discloses "receiving a certificate of the second device, the certificate providing information regarding the second device."<br><br>*See* discussion and citations accompanying claim 1.2.2, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.2]  determining whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate; | DTCP discloses "determining whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate."<br><br>*See* discussion and citations accompanying claim 1.2.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.3]  providing a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules; | DTCP discloses "providing a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules."<br><br>*See* discussion and citations accompanying claim 1.2.4, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| | |
|---|---|
| [34.4]  receiving a second signal from the second device after providing the first signal; | DTCP discloses "receiving a second signal from the second device after providing the first signal."<br><br>*See* discussion and citations accompanying claim 1.2.5, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.5]  determining whether the second signal is derived from a secret known by the first device; | DTCP discloses "determining whether the second signal is derived from a secret known by the first device."<br><br>*See* discussion and citations accompanying claim 1.2.6, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.6]  determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and | DTCP discloses "determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.7, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [34.7]  allowing the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time. | DTCP discloses "allowing the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.8, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 35 | DTCP:  Exemplary Citations |
|---|---|
| [35]  The method of claim 34, wherein the first signal comprises a random number. | DTCP discloses the elements of claim 34 as set forth above, *see supra*.<br><br>DTCP discloses "the first signal comprises a random number."<br>    *See* discussion and citations accompanying claim 2, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 36 | DTCP:  Exemplary Citations |
|---|---|
| [36]  The method of claim 34, wherein the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal. | DTCP discloses the elements of claim 34 as set forth above, *see supra*.<br><br>DTCP discloses "the second signal is formed by modifying the first signal based on the secret, wherein the modification comprises performing an XOR operation on the first signal."<br><br>    *See* discussion and citations accompanying claim 3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 37 | DTCP:  Exemplary Citations |
|---|---|
| [37]  The method of claim 34, further comprising providing the secret to the | DTCP discloses the elements of claim 34 as set forth above, *see supra*. |

85

| second device. | DTCP discloses "providing the secret to the second device." |
| | *See* discussion and citations accompanying claim 4, above. |
| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 41 | DTCP:  Exemplary Citations |
| --- | --- |
| [41.p]  The method of claim 34, wherein the step of determining whether the second signal is derived from the secret comprises: | DTCP discloses the elements of claim 34 as set forth above, *see supra*.<br><br>DTCP discloses that "the step of determining whether the second signal is derived from the secret comprises" the steps recited in claim 41.  *See* discussion and citations accompanying claims 41.1, 41.2, and 41.3, *infra*.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [41.1]  modifying the first signal according to the secret; | DTCP discloses "modifying the first signal according to the secret."<br><br>*See* discussion and citations accompanying claim 9.1, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [41.2]  comparing the modified first signal with the second signal; and | DTCP discloses "comparing the modified first signal with the second signal."<br><br>*See* discussion and citations accompanying claim 9.2, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| [41.3]  providing an indication when said modified first signal is identical to the second signal. | DTCP discloses "providing an indication when said modified first signal is identical to the second signal."<br><br>*See* discussion and citations accompanying claim 9.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
|---|---|

| **Claim 43** | **DTCP:  Exemplary Citations** |
|---|---|
| [43]  The method of claim 34, further comprising determining an identity of the second device using the certificate. | DTCP discloses the elements of claim 34 as set forth above, *see supra*.<br><br>DTCP discloses "determining an identity of the second device using the certificate."<br><br>*See* discussion and citations accompanying claim 11, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| **Claim 46** | **DTCP:  Exemplary Citations** |
|---|---|
| [46]  The method of claim 34, wherein the predetermined time is based on a communication system associated with the first device. | DTCP discloses the elements of claim 34 as set forth above, *see supra*.<br><br>DTCP discloses "the predetermined time is based on a communication system associated with the first device."<br><br>*See* discussion and citations accompanying claim 14, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with |

| | prior art for the same reasons discussed above. |

| **Claim 49** | **DTCP:  Exemplary Citations** |
|---|---|
| [49.p]  A first device for controlling delivery of protected content to a second device, the first device comprising: | To the extent the preamble is limiting, DTCP discloses "A first device for controlling delivery of protected content to a second device."<br><br> *See* discussion and citations accompanying claim 1.p, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.1]  a memory; | DTCP discloses "a memory."<br><br> *See* discussion and citations accompanying claim 1.1, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.1]  a processor, said processor arranged to: | DTCP discloses "a processor."<br><br> *See* discussion and citations accompanying claim 1.2.1, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.2]  receive a certificate from the second device prior to sending a first signal; | DTCP discloses a processor arranged to "receive a certificate from the second device prior to sending a first signal."<br><br> *See* discussion and citations accompanying claim 1.2.2, above. |

| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
|---|---|
| [49.2.3]  determine from the certificate if the second device is compliant; | DTCP discloses a processor arranged to "determine from the certificate if the second device is compliant." *See* discussion and citations accompanying claim 1.2.3, above. It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.4]  provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number; | DTCP discloses a processor arranged to "provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number." *See* discussion and citations accompanying claim 6, above. It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.5]  provide the first signal to the second device; | DTCP discloses a processor arranged to "provide the first signal to the second device." *See* discussion and citations accompanying claim 1.2.4, above. It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.6]  receive a second signal from the second device after providing the first signal; | DTCP discloses a processor arranged to "receive a second signal from the second device after providing the first signal." *See* discussion and citations accompanying claim 1.2.5, above. It further would have been obvious to one of skill in the art to combine HDCP 1.0 with |

89

| | prior art for the same reasons discussed above. |
|---|---|
| [49.2.7]  determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret; | DTCP discloses a processor arranged to "determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret."<br><br>*See* discussion and citations accompanying claims 1.2.6, 9.1, 9.2, and 9.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.8]  determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and | DTCP discloses a processor arranged to "determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.7, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [49.2.9]  allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time. | DTCP discloses a processor arranged to "allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.8, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 52 | DTCP:  Exemplary Citations |
|---|---|
| [52]  The first device of claim 49, | DTCP discloses the elements of claim 49 as set forth above, *see supra*. |

| wherein the modification is a XOR operation using the first signal. | DTCP discloses "the modification is a XOR operation using the first signal."<br><br>*See* discussion and citations accompanying claim 3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| --- | --- |

| Claim 53 | DTCP:  Exemplary Citations |
| --- | --- |
| [53]   The first device of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: | DTCP discloses the elements of claim 49 as set forth above, *see supra*.<br><br>DTCP discloses or renders obvious that "the processor, arranged to determine that the second signal is derived from the secret, is further arranged to" perform the steps recited in claim 53.  *See* discussion and citations accompanying claims 53.1, 53.2, and 53.3, *infra*.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [53.1]  modify the first signal according to the secret; | DTCP discloses the processor arranged to "modify the first signal according to the secret."<br><br>*See* discussion and citations accompanying claim 9.1, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [53.2]  compare the modified first signal with the second signal; and | DTCP discloses the processor arranged to "compare the modified first signal with the second signal."<br><br>*See* discussion and citations accompanying claim 9.2, above. |

91

| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| --- | --- |
| [53.3]  determine that the modified first signal is identical to the second signal. | DTCP discloses the processor arranged to "determine that the modified first signal is identical to the second signal."<br><br>*See* discussion and citations accompanying claim 9.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| **Claim 54** | **DTCP:  Exemplary Citations** |
| --- | --- |
| [54]  The first device of claim 49, wherein the first signal comprises a random number. | DTCP discloses the elements of claim 49 as set forth above, *see supra*.<br><br>DTCP discloses "the first signal comprises a random number."<br><br>*See* discussion and citations accompanying claim 2, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| **Claim 55** | **DTCP:  Exemplary Citations** |
| --- | --- |
| [55.p]  A method of a first device controlling delivery of protected content to a second device, the method comprising: | To the extent the preamble is limiting, DTCP discloses "[a] method of a first device controlling delivery of protected content to a second device."<br><br>*See* discussion and citations accompanying claim 1.p, above. |

| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
|---|---|
| [55.1]  receiving a certificate from the second device prior to sending a first signal; | DTCP discloses "receiving a certificate from the second device prior to sending a first signal." *See, e.g.*:<br><br>    *See* discussion and citations accompanying claim 1.2.2, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [55.2]  determining from the certificate if the second device is compliant; | DTCP discloses "determining from the certificate if the second device is compliant."<br><br>    *See* discussion and citations accompanying claim 1.2.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [55.3]  providing a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number; | DTCP discloses "providing a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number."<br><br>    *See* discussion and citations accompanying claim 6, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [55.4]  providing the first signal to the second device; | DTCP discloses "providing the first signal to the second device."<br><br>    *See* discussion and citations accompanying claim 1.2.4, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| [55.5] receiving a second signal from the second device after providing the first signal; | DTCP discloses "receiving a second signal from the second device after providing the first signal."<br><br>*See* discussion and citations accompanying claim 1.2.5, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
|---|---|
| [55.6] determining if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret; | DTCP discloses "determining if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret."<br><br>*See* discussion and citations accompanying claims 1.2.6, 9.1, 9.2, and 9.3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [55.7] determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and | DTCP discloses "determining whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.7, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [55.8] allowing the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time. | DTCP discloses "allowing the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time."<br><br>*See* discussion and citations accompanying claim 1.2.8, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 58 | DTCP:  Exemplary Citations |
|---|---|
| [58]  The method of claim 55, wherein the modification is a XOR operation using the first signal. | DTCP discloses the elements of claim 55 as set forth above, *see supra*.<br><br>DTCP discloses "the modification is a XOR operation using the first signal."<br><br>    *See* discussion and citations accompanying claim 3, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 59 | DTCP:  Exemplary Citations |
|---|---|
| [59.p]  The method of claim 55, wherein the step of determining that the second signal is derived from the secret comprises: | DTCP discloses the elements of claim 55 as set forth above, *see supra*.<br><br>DTCP discloses or renders obvious that "the step of determining that the second signal is derived from the secret comprises" the steps recited in claim 59.  *See* discussion and citations accompanying claims 59.1, 59.2, and 59.3, *infra*.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [59.1]  modifying the first signal according to the secret; | DTCP discloses "modifying the first signal according to the secret."<br><br>    *See* discussion and citations accompanying claim 9.1, above.<br><br>It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

95

| [59.2] comparing the modified first signal with the second signal; and | DTCP discloses "comparing the modified first signal with the second signal." |
|---|---|
| | *See* discussion and citations accompanying claim 9.2, above. |
| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |
| [59.3] determining that the modified first signal is identical to the second signal. | DTCP discloses "determining that the modified first signal is identical to the second signal." |
| | *See* discussion and citations accompanying claim 9.3, above. |
| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |

| Claim 60 | DTCP:  Exemplary Citations |
|---|---|
| [60] The method of claim 55, wherein the first signal comprises a random number. | DTCP discloses the elements of claim 55 as set forth above, *see supra*. |
| | DTCP discloses "the first signal comprises a random number." |
| | *See* discussion and citations accompanying claim 2, above. |
| | It further would have been obvious to one of skill in the art to combine HDCP 1.0 with prior art for the same reasons discussed above. |