# Exhibit 20

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL – SOURCE CODE

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| In Re Koninklijke Philips Patent Litigation | Case No. 4:18-cv-01885-HSG<br><br>JURY TRIAL DEMANDED<br><br>**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY** |

**EXPERT REPORT OF NATHANIEL POLISH, PH.D.,
REGARDING INFRINGEMENT BY ASUS OF U. S. PATENT NO. 7,529,806**

concurrent with the media presentation, retrieving a next file; and

using content of the next file to continue the media presentation.

### D.     PERSON OF ORDINARY SKILL IN THE ART

84.    A person of ordinary skill in the art to which the '806 patent pertains would have held a Bachelor's degree in Computer Science, or an equivalent degree, and at least two years of experience in designing and/or implementing the downloading and/or streaming of multimedia presentations over a network using a client-server architecture, or equivalent academic experience.  Additional education could substitute for years of experience.

85.    I have been informed that Google, Inc., Acer, Inc., Acer America Corp., ASUSTeK Computer Inc., ASUS Computer International, and Microsoft Corporation have taken the position in proceedings before the USPTO that a person of at least ordinary skill in the art (a "POSA") to which this patent pertains "would have at least an undergraduate degree in computer science or computer engineering, or the equivalent.  In addition, the POSA would have at least 3-5 years' experience developing multimedia presentations using a markup language and/or developing software tools to automate the development of multimedia presentations, or equivalent academic experience (*e.g.*, a master's degree with a similar focus)."  I disagree with this definition.

86.    For one thing, the invention of the '806 patent is not limited to the development of multimedia presentations using a markup language.  A markup language is not required to implement the invention of the '806 patent.  As one example, through claim differentiation with respect to dependent claims 7, 10, and 13, independent claims 1, 9, and 12 respectively cover a control information file that is not written in a markup language such as XML.  *See also, e.g.,* '806 patent 2:60-63 ("The control information describes the locations, e.g., URL's, and size of

**'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)**

the various file segments, and provides, e.g., UI functionalities at the client. **In this example**, the control information is coded in XML.")  (emphasis added.)

87. Secondly, the invention of the '806 patent is not limited to software tools which automate the development of multimedia presentations.  Automating the development of multimedia presentations through software tools is not required to implement the invention of the '806 patent.  The invention instead relates to a device and method for forming a media presentation with no requirement that software tools be used to develop the media presentation.

88. Regardless, under any of these definitions, based on my experience described above in Section II, I exceed the qualifications of a POSA in the art to which the '806 patent is directed.

E.  **CLAIM CONSTRUCTION**

    i.  **Claim Construction Ruling**

89. I understand that patent claim terms may need to be construed to determine the scope of the patent owner's right to exclude.  I further understand from counsel that the Court has issued a claim construction ruling (4:18-cv-1885-HSG, D.I. 241), which I have reviewed and adopted below.

| Claim(s) | Term | Court's Construction |
|---|---|---|
| 1 | "alternative flies" | **"alternative files"**<br><br>I understand this construction was agreed-upon by the parties and adopted by the Court. |
| 12 | "give" | **"given"**<br><br>I understand this construction was agreed-upon by the parties and adopted by the Court. |

'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)

32

218. As another example, a Google website entitled "Google Video Quality Report" has a section called "What YouTube is Doing" which explains that "We have an open peering policy for our internal network, which means we'll directly interconnect with any ISP who can reach our 70 points of presence worldwide without charge. We often deploy servers within your ISP's network, vastly reducing the distance the video has to travel and minimizing the chance for congestion." ("What YouTube is Doing" available at https://www.google.com/get/videoqualityreport/#what_youtube_is_doing.) A Google website, (https://peering.google.com/#/infrastructure) provides additional detail, explaining Google's use of Core Data Centers, Edge Points of Presence, and Edge Caching and Service Nodes. As Google explains, "Static content that is very popular with the local host's user base, including YouTube and Google Play, is temporarily cached on edge nodes. Google's traffic management systems direct user requests to an edge node that will provide the best experience." ("Our Infrastructure" available at https://peering.google.com/#/infrastructure.)

219. Further, as shown below, the YouTube application requests the protocol buffer file and the media segment chunk files from the YouTube servers where they are stored.

    **ii.**  **Limitation 12(b):** **means for downloading files to the client device;**

220. I understand that this term was not part of the claim construction proceedings, and therefore a construction for this term was not provided by the Court.

221. In my opinion, the term "means for downloading files to the client device" connotes sufficient structure to the POSA to perform the claimed function and so should be afforded its plain and ordinary meaning rather than be subject to § 112, ¶ 6. Namely, "means for downloading" connotes well-known programming instructions for downloading a file from a server to a client. However, in the event that the Court finds this term to be subject to § 112, ¶ 6,

**HIGHLY CONFIDENTIAL – SOURCE CODE**

it is my opinion that, under a means-plus-function analysis, the term "means for downloading files to the client device" has the function and corresponding structure for performing this function as below:

> The function is: "downloading files to the client device."
>
> The corresponding structure is: "single purpose media player or multipurpose computing device programmed with software to perform the function, such as the algorithm disclosed in Figure 1 and at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14."

222. The algorithm disclosed in the '806 patent at 2:57-63 includes "the client contacts the server selects the particular content file and downloads the control information that enables the retrieving and playing out of the segmented file." One manner of performing the algorithm is disclosed in the '806 patent at 3:3-7 and includes Java 2.0 "standard classes that enable retrieving a remote file into a buffer or as a stream."

223. With respect to the recited function, as discussed above, the ASUS YouTube Accused Products include a YouTube application that downloads files to the device, including the protocol buffer file and the media segment files. With respect to the corresponding structure, as discussed further below, the ASUS YouTube Accused Products are multipurpose computing devices programmed with software (the YouTube application) that performs the functionality described by this limitation.

224. In particular, each ASUS YouTube Accused Product is a multipurpose computing device that is programmed with software (the YouTube application) to perform the function "downloading files to the client device." Specifically, each ASUS YouTube Accused Product includes a microprocessor that is programmed with software, by being preloaded with the YouTube application, for downloading streams of data, such as the protocol buffer file and

'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)

96

with the media presentation, retrieving a next file" connotes sufficient structure to the POSA to perform the claimed function and so should be afforded its plain and ordinary meaning rather than be subject to § 112, ¶ 6.  Namely, "means for retrieving" connotes well-known programming instructions for retrieving a file from a server to a client.  However, in the event that the Court finds this term to be subject to be subject to § 112, ¶ 6, it is my opinion that, under a means-plus-function analysis, the term "wherein if the determined file is one of a plurality of files required for the media presentation, the means for parsing comprises means for: concurrent with the media presentation, retrieving a next file" has the function and corresponding structure for performing this function as below:

>The function is: "concurrent with the media presentation, retrieving a next file."

>The corresponding structure is: "single purpose media player or multipurpose computing device programmed with software to perform the function, such as the algorithm disclosed in Figure 1 and at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14."

283.  The algorithm disclosed in the '806 patent at 2:57-63 includes "In step 102, the client contacts the server selects the particular content file and downloads the control information that enables the retrieving and playing out of the segmented file."

284.  The algorithm is further disclosed in the '806 patent at 3:14-30 and includes "In step 110, the next file segment is downloaded at the client and stored in a buffer while the previous file segment, here the first file segment, is being played out. One option is to have the downloaded files buffered in a sequence or linked list of buffers. This functionality is typically provided by the operating system of the client. For example, MS Windows family of products creates a memory buffer associated with the file every time an API call opens the file. Alternatively, in a thread- and/or process-rich environment, several threads and/or processes can

be organized to independently retrieve file segments, while playing out the content of other segments. Working with threads is a skill common for software engineers. For example, Java 2.0 from Sun Microsystems provides classes supporting multiple threads. Similarly, Microsoft SDK for the Windows family of products makes thread- or process-related functionalities available to programmers."

285. The algorithm is further disclosed in the '806 patent at 3:57-4:14 and includes "[T]he content of the first part is downloaded from the location specified and playing out is started automatically under application control. Combining multiple sequenced inputs is well understood in the industry. For example, Java JDK v.1.2 from Sun Microsystems, Inc. provides a class java.io.SequenceInputStream as a standard component of the io class library. SequenceInputStream represents the logical concatenation of other input streams. It starts out with an ordered collection of input streams and reads from the first one until end of file is reached, whereupon it reads from the second one, and so on, until end of file is reached on the last of the contained input streams. An object of the java.io.SequenceInputStream class can be initialized by, e.g., enumeration of objects of the InputStream class. This abstract class is the superclass of all classes representing an input stream of bytes, including the class FileInputStream. In case of the downloading of multiple file parts, an application can create instances of the FileInputStream class from local temporary files into which the parts are being downloaded. The contents of those multiple local files will be supplied to the Sequencer. The rendering component of the application will read the information out it as if it were just a single local file."

286. With respect to the recited function, as discussed above, the ASUS YouTube Accused Products include a YouTube application that retrieves a next file to the device, the

**HIGHLY CONFIDENTIAL – SOURCE CODE**

## XV. THE ASUS WINDOWS ACCUSED PRODUCTS INFRINGE CLAIM 12 OF THE '806 PATENT

374. In addition to the ASUS YouTube Products discussed above, it is also my opinion that certain ASUS products that run version 10 of the Windows operating system ("Windows 10") (an operating system from Microsoft) infringe Claim 12 of the '806 patent. (See Appendix C for a list of ASUS Windows Accused Products and hardware information concerning those products).

375. In my opinion, the ASUS Windows Accused Products infringe Claim 12 of the '806 patent as explained below. In brief, Windows 10 includes native implementations of HLS and MPEG-DASH as part of the Edge Browser. I reviewed these implementations, including their source code and the operations of these features and confirmed that when Windows 10 is installed on a computing device, that device infringes Claim 12 because the device includes Windows 10's implementation of HLS and MPEG-DASH. Each of the ASUS Windows Accused Products is a computing device that includes Windows 10, with unmodified native implementations of HLS and MPEG-DASH. Therefore, each of those devices infringe Claim 12.

376. I understand that Philips served an interrogatory request (Interrogatory No. 6) seeking Microsoft's position on whether there were any material differences between the representative products identified in Philips' infringement contentions—including representative products for the '806 patent—and products running the same operating system, and if so, what material differences exist.

377. I understand that, in response to Philips' Interrogatory No. 6, Microsoft stated as follows:

'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)
163

**HIGHLY CONFIDENTIAL – SOURCE CODE**

[lines 1–13: redacted]

(Microsoft's Response to Interrogatory No. 6; see also Microsoft's Response to Interrogatory No. 1).

378.  I further understand that Alan Lai, an ASUS 30(b)(6) witness, testified that ASUS does not modify or alter in any way the Windows operating systems that are installed and used in the ASUS Windows Accused products.  (See Lai Tr. at 17:9-20:18; 41:12-42:25 ("The operating system would not allow the vendors to change any of the source code inside.")).

379.  I have concurrently submitted an expert report that describes in detail the operation of Windows 10, including with respect to the native implementation of HLS and MPEG-DASH provided as part of Windows 10's Edge Browser ("Microsoft '806 Report").  I incorporate my Microsoft '806 Report herein in its entirety, and I have attached a copy of my Microsoft '806 Report hereto as Appendix D.

'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)
164

**HIGHLY CONFIDENTIAL – SOURCE CODE**

380. Because ASUS does not modify Windows 10, the ASUS Windows Accused Products infringe the '806 patent for the same reasons as the Microsoft Accused Products identified in the Microsoft '806 Report. In the Microsoft '806 Report, I use the Surface Pro 4, which runs Windows 10 as a representative product to explain why it is that all Microsoft Products that run Windows 10 infringe the '806 patent. The Surface Pro 4 is similarly representative of ASUS products that run Windows 10 (i.e., the ASUS Windows Accused Products) and therefore, the explanation I provide as to why the Surface Pro 4 infringes the '806 patent applies to the ASUS Windows Accused Products.

381. Similarly, since ASUS does not modify Windows 10 source code, my analysis in the Microsoft '806 Report as to why the Windows source code meets the limitations of the asserted '806 patent claims applies to the ASUS Windows Accused Products. Also germane are the documents, deposition testimony, and other materials and analysis I provide related to the native implementation of HLS and MPEG-DASH in Windows 10.

382. I note that certain claim limitations in the '806 patent require hardware – specifically that the accused device be a single purpose media player or multipurpose computing device programmed with software to perform claimed functions. All of the ASUS Windows Accused Products are multipurpose computing devices (I do not believe this point is contested). Moreover, all of these Products are Windows 10 products, which means they are programmed to run the Windows 10 source code I have analyzed in the Microsoft '806 Report. Therefore, not only do the ASUS Windows Accused Products include the infringing software (the native implementation of HLS and Edge Browser included in Windows 10), they include the requisite hardware (they are multipurpose computing devices) as well. (See Appendix C, which lists the

'806 PATENT –INFRINGEMENT REPORT (ASUS DEFENDANTS)

**HIGHLY CONFIDENTIAL – SOURCE CODE**

ASUS Windows Accused Products and includes certain hardware information (e.g., processor type) for each such Product).

383. I have also reviewed ASUS's non-infringement contentions (response to Philips' Interrogatory No. 4) and ASUS's response to Philips' Interrogatory No. 6. In neither of these documents did ASUS identify any material differences between the ASUS Accused Windows Products and Microsoft Accused Products, or across the ASUS Accused Windows Products. Should ASUS or its experts identify any such differences I reserve all rights to address those differences.

384. And I reviewed the transcript of Alan Lai and Wen-bin Jian, who I understand to be ASUS's 30(b)(6) witness on topics related to the ASUS Windows Accused Products. I note that neither witness identified any material differences between the ASUS Accused Windows Products and Microsoft Accused Products, or across the ASUS Accused Windows Products.

385. In sum, in my opinion, the ASUS Accused Windows Products directly infringe Claim 12 of the '806 patent for the reasons described in my Microsoft '806 Report. (*See id.*).

386. More particularly, for the same reasons discussed above (including because the same, unaltered version of the Windows software is included in each of the ASUS Accused Windows Products), it is my opinion that the ASUS Accused Windows Products infringe Claim 12 of the '806 patent. (*See id.*). As discussed above, each ASUS Accused Windows Product includes Windows 10 and is a multipurpose computing device that together meet the limitations of Claim 12 as described in my Microsoft '806 Report. (*See id.*). As explained in the Microsoft '806 Report, these devices running the native implementations of HLS or MPEG-DASH perform the claimed algorithm for adaptive streaming described in the '806 patent. Thus, for the reasons discussed in my Microsoft '806 Report, it is my opinion that the ASUS Accused Windows

Products infringe Claim 12 of the '806 patent (literally or under the doctrine of equivalents). (See id.).

## XVI. RESERVATION OF RIGHTS

387. Because it is unclear at this time which theories ASUS may advance in expert discovery, which specific alleged prior art references ASUS will rely upon, and in which combination(s) they might attempt to rely upon those alleged prior art references, I reserve my ability to respond to any opinions which may be proffered based upon them, and thereafter respond with opinions of my own on related subjects, including, but not limited to, on objective indicia of non-obviousness.

388. My opinions are subject to change based on additional opinions that ASUS's experts may present, and information I may receive in the future or additional work I may perform. With this in mind, based on the analysis I have conducted and for the reasons set forth above, I have preliminarily reached the conclusions and opinions in this Report.

389. In connection with my anticipated testimony in this action, I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Report. I have not yet selected the particular exhibits that might be used. In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so to further support the positions in this Report.

390. At trial, and as discussed above, I may rely on visual aids and may rely on, *e.g.*, demonstrated use of the accused products I refer to in my Report, and analogies concerning elements of the '806 patent, the YouTube application, or any related technologies.

HIGHLY CONFIDENTIAL – SOURCE CODE

## XVII. CONCLUSION

391.   For the reasons set forth above, it is my opinion that ASUS infringes the asserted claims of the '806 patent, directly and/or indirectly.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Date: April 25, 2019

_____

Nathaniel Polish, Ph.D.