Bruce Genderson *(pro hac vice)*
Kevin Hardy *(pro hac vice)*
Aaron Maurer *(pro hac vice)*
David Krinsky *(pro hac vice)*
Andrew Trask *(pro hac vice)*
Kyle Thomason *(pro hac vice)*
Christopher A. Suarez *(pro hac vice)*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
+1 (202) 434-5000
+1 (202) 434-5029 facsimile
viceroy@wc.com

Matthew S. Warren (Bar No. 230565)
Erika H. Warren (Bar No. 295570)
Angela M. He (Bar No. 319351)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
18-1885@cases.warrenlex.com

Michael J. Newton (Bar No. 156225)
Sang (Michael) Lee *(pro hac vice)*
Derek Neilson *(pro hac vice)*
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas, 75201
+1 (214) 922-3400
+1 (214) 922-3899 facsimile
asus-philips@alston.com

*Attorneys for Defendants ASUSTeK Computer Inc. and ASUS Computer International*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

|  |  |
|---|---|
| IN RE KONINKLIJKE PHILIPS PATENT LITIGATION | ) Case No. 4:18-cv-1885-HSG-EDL ) ) JURY TRIAL DEMANDED ) ) **ASUS'S NOTICE OF MOTION AND MOTION** ) **FOR SUMMARY JUDGMENT** ) ) Date: November 14, 2019 ) Time: 2:00 p.m. ) Place: Courtroom 2, 4th Floor (Oakland) ) Judge: Hon. Haywood S. Gilliam, Jr. |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## **NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 14, 2019, at 2:00 p.m. PST, in the courtroom of the Honorable Haywood S. Gilliam, Jr., 1301 Clay Street, Oakland, California, defendants ASUSTeK Computer Inc. and ASUS Computer International (collectively "ASUS") will and hereby do move this Court for summary judgment under Fed. R. Civ. P. 56.

This Motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum of Points and Authorities, and the Declaration of Angela M. He and exhibits attached to it, as well as the pleadings and papers on file in this action, any matters on which the Court may take judicial notice, and evidence or argument ASUS may present at or before the hearing on this matter.

Date:  August 29, 2019

Respectfully submitted,

Bruce Genderson *(pro hac vice)*
Kevin Hardy *(pro hac vice)*
Aaron Maurer *(pro hac vice)*
David Krinsky *(pro hac vice)*
Andrew Trask *(pro hac vice)*
Kyle Thomason *(pro hac vice)*
Christopher A. Suarez *(pro hac vice)*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C., 20005
+1 (202) 434-5000
+1 (202) 434-5029 facsimile
viceroy@wc.com

Michael J. Newton (Bar No. 156225)
Sang (Michael) Lee  *(pro hac vice)*
Derek Neilson *(pro hac vice)*
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas, 75201
+1 (214) 922-3400
+1 (214) 922-3899 facsimile
asus-philips@alston.com

Matthew S. Warren
Erika H. Warren
Angela M. He
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
18-1885@cases.warrenlex.com

INTRODUCTION ……………………………………………………………….. 1

LEGAL STANDARD ……………………………………………………………….1

ARGUMENT …………………………………………………………………...2

I.   ASUS's Products Do Not Infringe the '797 Patent……………………………………2

    A.   The '797 Patent Requires Measuring Acceleration Induced By User Manipulation and Using it to Control the Display of Objects ……………………………2

    B.   The Accused Functionality Does Not Measure Acceleration Induced By User Manipulation or Use It To Control the Display of Objects ………………………………3

    C.   The Accused ASUS Devices Do Not Infringe the Asserted Claims ………………….....4

II.   ASUS's Android and Chrome Products Do Not Infringe the '064 Patent …………………………5

    A.   Detection of a "Substantially Stationary Finger Touch" Requires a Minimum of Two Scans…………………………………………………………………....6

    B.   The Operation of the Accused Android and Chrome Devices ……………………….…...7

    C.   The Accused Devices Do Not Have Code That Terminates a Fling After Detecting a Substantially Stationary Finger Touch ………………………………………8

III.   The Asserted Claims of The RE'564 Patent Are Invalid………………………………………9

IV.   ASUS's Products Do Not Infringe The '809 Patent ……………………………………………12

V.   The '806 Patent Fails to Provide Corresponding Structure for "Means for Downloading"……..16

    A.   "Means for Downloading" Is a Means-Plus-Function Term ……………………………16

    B.   Philips is Limited to the Agreed Corresponding Structure……………………………....17

    C.   The Agreed Corresponding Structure Includes No Algorithm For Downloading……….18

CONCLUSION …………………………………………………………………21

*Cases*                                                                                          **Pages**

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.,*
    841 F.3d 1334 (Fed. Cir. 2016) …………………………………………………..2

*Apple, Inc. v. Samsung Elecs. Co.,*
    876 F. Supp. 2d 1141 (N.D. Cal. 2012) …………………………………………16

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) …………………………………………………...11

*Blackboard, Inc. v. Desire2Learn, Inc.,*
    574 F.3d 1371 (Fed. Cir. 2009)…………………………………………………19

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)………………………………………………………………1

*DESA IP v. EML Techs.,*
    211 Fed. App'x. 932 (Fed. Cir. 2007)…………………………………………....16

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n,*
    899 F.3d 1291 (Fed. Cir. 2018) …………………………………………...16, 17

*Dolly, Inc. v. Spalding & Evenflo Cos.,*
    16 F.3d 394 (Fed. Cir. 1994) …………………………………………………...1

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC,*
    785 F.3d 616 (Fed. Cir. 2015) …………………………………………………2

*ePlus, Inc. v. Lawson Software, Inc.,*
    700 F.3d 509 (Fed. Cir. 2012)…………………………………………...20, 21

*Function Media, L.L.C. v. Google, Inc.,*
    708 F.3d 1310 (Fed. Cir. 2013)…………………………………………………19

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004) ………………………………………………...11

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014) ………………………………………………10

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003) …………………………………………………………20

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
    572 U.S. 898 (2014) ………………………………………………………………2, 10

*Net MoneyIN, Inc. v. VeriSign, Inc.,*
    545 F.3d 1359 (Fed. Cir. 2008) …………………………………………………...16, 20

*Sage Prod., Inc. v. Devon Indus., Inc.,*
    126 F.3d 1420 (Fed. Cir. 1997)………………………………………………………16

*Slot Speaker Techs., Inc. v. Apple, Inc,*
    No. 13-01161, 2018 WL 1581985 (N.D. Cal. Mar. 27, 2018) ………………………………1

*SPEX Techs., Inc. v. Kingston Tech. Corp., et al.,*
    No. 16-07349, 2017 WL 5495149 (C.D. Cal. Oct. 18, 2017) ………………………16, 18

*TechSearch, L.L.C. v. Intel Corp.,*
    286 F.3d 1360 (Fed. Cir. 2002) …………………………………………………………...1

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
    247 F.3d 1316 (Fed. Cir. 2001) …………………………………………………………...1

## STATUTES

35 U.S.C. § 112………………………………………………………………....1, 2, 16, 17

Fed. R. Civ. P. 56 …………………………………………………………………………1

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

As a result of decisions by the Patent Office and voluntary case narrowing by Plaintiffs Koninklijke Philips N.V. and U.S. Philips Corporation (collectively "Philips"), a total of six patents remain asserted in this action against products sold by ASUS. Those products include smartphones, tablets and laptops that use the Windows operating system from Microsoft, as well as other products that use the ChromeOS or Android software platforms from Google. The patents cover a wide array of technologies, including technology relating to user interfaces and data transmission. Despite their technological differences, the asserted claims share a commonality: Philips has stretched them beyond their breaking point in its attempt to cover technologies it did not invent, leading to inescapable problems of non-infringement and invalidity. This motion, if granted, would resolve all asserted claims for five of the six patents remaining at issue: U.S. Patent No. 5,910,797 (non-infringement); U.S. Patent No. 7,184,064 (non-infringement); U.S. Patent No. RE43,564 (invalidity); U.S. Patent No. 7,529,806 (invalidity); and U.S. Patent No. 9,436,809 (non-infringement). For the reasons set forth below, there are no triable issues of fact on those claims, and ASUS should receive partial summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). To show infringement of a patent, "[t]he patent holder has the burden to prove that each accused product 'includes every limitation of [an asserted] claim.'" *Slot Speaker Techs., Inc. v. Apple, Inc.*, No. 13-1161, 2018 WL 1581985, at *2 (N.D. Cal. Mar. 27, 2018) (quoting *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994)). Because "all of the elements of the claim, as correctly construed, must be present in the accused system," *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002), "'[a]ny deviation from the claim precludes' a finding of literal infringement," *Slot Speaker*, 2018 WL 1581985, at *2 (quoting *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001)).

35 U.S.C. § 112 requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable

certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). While a defendant has the burden to establish invalidity under § 112 by clear and convincing evidence, because the "ultimate determination of indefiniteness is a question of law," *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1341 (Fed. Cir. 2016), the Court may decide it on summary judgment. *See EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 619 (Fed. Cir. 2015).

## ARGUMENT

### I.    ASUS's Products Do Not Infringe The '797 Patent

Philips alleges that the accused devices infringe U.S. Patent No. 5,910,797 through "automatic screen rotation" functionality, which rotates what is displayed on the screen to match the landscape or portrait orientation of the device. Philips asserts independent claim 1 and its dependent claim 6. The heart of these claims—and the reason the Examiner allowed them over the prior art—is the requirement that the claimed apparatus measures an *acceleration* of the device *induced by a user's manipulation of the screen* to control the movement of items displayed on the device's screen. Because there is no dispute that the accused devices measure their *orientation* in determining whether to rotate the screen, *not* acceleration induced by a user, the Court should grant summary judgment of non-infringement.

### A.    The '797 Patent Requires Measuring Acceleration Induced By User Manipulation and Using it to Control the Display of Objects

Independent claim 1 requires a device that measures user-induced acceleration and that, under control of that sensed motion, causes objects on the screen to move. The claim recites a "manipulatable apparatus having data processing means and screen means [and] . . . a gravitation- controlled sensor . . . feeding said data processing means for *measuring an acceleration of said screen means induced by user manipulation of the screen means*, wherein said data processing means have programmed calculating means for *under control of a screen motion sensed by said sensing means* imparting an acceleration based motion pattern to a predetermined selection among said objects." Ex. 1 ('797 patent) at 4:41-51 (emphasis added).[1] As relevant here, the Court construed the function of "programmed calculating means" as "*receiving screen motion information* and imparting an acceleration based motion pattern to one or more or all displayed objects." Ex. 2 (Markman Order) at 12 (emphasis added).

---

[1] All exhibits are attached to the concurrently filed Declaration of Angela M. He.

Philips added the limitation of "measuring an acceleration of said screen means induced by user manipulation of the screen means" during prosecution. Prior to this amendment, the Examiner rejected the application multiple times over U.S. Patent No. 5,526,022 (Ex. 3) to Donahue. Ex. 4 (Excerpts of the '797 prosecution history) at PHILIPS00004214. Donahue disclosed a device including a sensor that measured the device's orientation, which Philips described in prosecution as follows: "Donahue illustrates a tilt orientation sensor 22 which 'operates in the principle of comparing orientation of the sensor to the Earth's gravitational field.'" Ex. 4 ('797 prosecution history) at PHILIPS0004214-16. To avoid Donahue, Philips amended its claims to replace the term "measuring a *spatial orientation* of said screen means" with "measuring an *acceleration* of said screen means *induced by user manipulation of the screen means*."

Philips argued that "[w]hile Donahue's sensor can measure tilt by measuring the angle of rotation of the housing about the sphere, it *cannot measure acceleration* as do the sensors in the present invention" (emphasis in original). Ex. 4 ('797 prosecution history) at PHILIPS0004214-16; *see also id*. at PHILIPS0004232 ("[I]f the Examiner is to continue to apply Donahue against the claims, the Examiner is respectfully requested to provide evidence as to where Donahue suggests imparting an acceleration based movement to an object which corresponds to *an acceleration of the display screen*.") (emphasis added). At the same time, Philips amended the patent specification in response to the rejection over Donahue to further distinguish determining the "overall spatial orientation of the apparatus with respect to the direction of gravity" from "measuring dynamical changes of the spatial orientation, *such as by acceleration of the screen*." Ex. 1 ('797 patent) at 3:6-11 (amendment emphasized); Ex. 4 ('797 prosecution history) at PHILIPS0004212.

## B. The Accused Functionality Does Not Measure Acceleration Induced By User Manipulation or Use It To Control the Display of Objects

The parties do not dispute how the accused screen reorientation functionality operates. ASUS's expert Dr. Cockburn described its operation in his non-infringement report, *see* ex. 5 ¶¶ 32-44, and Philips' expert, Dr. Greenspun, does not dispute this description. *See* Ex. 6 (July 18 Greenspun Tr.) at 58:6-59:7 ("I don't think there are substantial disagreements regarding which code is involved, how it works . . . ."), 54:17-21 ("any disagreement between my opinions and those of Dr. Cockburn's were not

about how the source code works but how to then interpret what that means in the context of the claims.").

Critically, the accused screen reorientation functionality is based on orientation, not acceleration. It senses the orientation of the device screen and controls the orientation of the image displayed on the screen such that the image is oriented with the right side up. Ex. 5 (Cockburn report) ¶ 32. It decides whether to rotate the image on the screen by comparing the physical orientation of the device to the orientation of the image displayed on the screen. *Id*. ¶ 34. In order to determine the physical orientation of the device, the code receives inputs from sensors, including the device's accelerometer, which it uses to determine the direction of gravity and the angle of the device in relation to the gravitational vector. Applying pre-defined constants, it then uses this information to determine whether the device is in a landscape or portrait orientation. *Id*. ¶ 37. The accelerometer continuously reports orientation-relevant information to the processor, regardless of whether or not the device's orientation is changing. *Id*. ¶ 38. If the device's physical orientation and the currently displayed orientation are determined to be different, the display orientation changes to match. *Id*. ¶ 35.

Notably, the device must be *stable* before the screen will rotate. If the system determines that the device is undergoing external acceleration, the code prevents reorientation of the screen until movement stops for a set period of time. *Id*.; *see also id*. ¶ 56. The purpose of this code is to prevent reorientation while the device is undergoing external acceleration induced by the user. *Id*. ¶ 42.

### C.     The Accused ASUS Devices Do Not Infringe the Asserted Claims

Given the requirements of the asserted claims and the undisputed operation of the accused devices, there is no infringement of asserted claim 1 (or its dependent claim 6) for two reasons.

First, claim 1 requires "a gravitation-controlled sensor integrated with said screen means and feeding said data processing means for measuring an acceleration of said screen means induced by user manipulation of the screen means." Ex. 1 ('797 patent) at 4:44-47. But rotation of the screen image in the accused devices is not triggered by a measurement of *acceleration* "induced by user manipulation." The parties do not dispute that the accused devices instead determine the *orientation* of a device by sensing the direction of gravity, comparing that to the static angle of the device, and then using the result to decide whether or not to rotate the screen display.

Second, claim 1 requires "programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to a predetermined selection among said objects." Ex. 1 ('797 patent) at 4:48-51. The Court construed the function of this limitation to be "receiving screen motion information and imparting an acceleration based motion pattern to one or more or all displayed objects." Ex. 2 (Markman Order) at 12. Because the screen reorientation functionality of the accused devices is based on orientation, not acceleration, "screen motion information" likewise does not impact the accused screen reorientation functionality.

Philips' only answer is to contend that these limitations are satisfied because, in order for the device to have changed orientations, a user must have manipulated the device. But Philips elides the requirements that the *acceleration* measured by the sensor be used to impart an *acceleration based* motion pattern that is "induced by user manipulation." There is no dispute that the accused devices do not rotate the screen image based on *acceleration* of the screen induced by the user. Indeed, the code isolates and ignores the acceleration of the device that is induced by user movement of the device by refusing to reorient the screen display until the device is stable. *See, e.g.*, Ex. 5 (Cockburn report) ¶¶ 35, 55-57. The accused ASUS devices use a sensor to determine the static orientation of a device, exactly what Philips carved out of its claims and specification to avoid Donahue. Having done so, Philips cannot support a finding of infringement here.

## II. ASUS's Android and Chrome Products Do Not Infringe the '064 Patent

U.S. Patent No. 7,184,064 (Ex. 7) relates to scrolling on a touchscreen. Philips asserts infringement of claims 1 and 8 (independent), and 2 and 3 (depending from 1). This motion concerns the limitation (found in all asserted independent claims) describing conditions under which scrolling is stopped. The relevant limitation requires "stopping motion program instructions":

> 1. An improved touch-screen image scrolling system, comprising: . . . a microprocessor coupled to said display screen to display information thereon . . .
> **stopping motion program instructions associated with said microprocessor for terminating scrolling displacement of the image on said screen upon first occurrence of any signal in the group of signals comprising**
> **(a) a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time, and**
> (b) an end-of-scroll signal received from said scroll format data source.

Ex. 7 ('064 patent) at 6:2-7 (emphasis added). The "stopping motion program instructions" limitation was construed by the Court "in accordance with its plain and ordinary meaning." Ex. 2 (Markman Order) at 7. There is no dispute that "program instructions" refers to code that is executed by the microprocessor. Ex. 5 (Cockburn report) ¶ 117; Ex. 8 (Schmidt report) ¶¶ 63, 355, 488, 572. Likewise, there is no dispute that the program instructions must cause the device to terminate scrolling the first time either condition (a) or condition (b) is met. *Id.*; Ex. 2 (Markman Order) at 7 n.10.

The focus of this motion is on condition (a), which requires code that terminates scrolling when "a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time" is sensed. The accused ASUS Android and Chrome devices do not have any such code.

### A. Detection of a "Substantially Stationary Finger Touch" Requires a Minimum of Two Scans of the Touchscreen

Philips relies on a generic description of so-called "commodity touchscreens," and an assumption that each accused device uses such a screen. *E.g.*, Ex. 8 (Schmidt report) ¶¶ 86-89.[2] Philips' expert Dr. Schmidt explains that these commodity touchscreens can sense the location of a finger touch and report it to the system, for example as an X, Y coordinate. *Id.* ¶¶ 88-89. Philips contends that the touchscreens used in the accused devices "are scanned continuously," such as every 10 milliseconds, "which means all possible intersections are measured many times per second." *Id.* ¶ 88. Philips' expert explains that "this scan rate also means that a user's finger(s) must be in touch with the screen for some minimum amount of time (e.g., enough milliseconds relative to the touchscreen scan rate) to ensure the touch is detected." *Id.* The parties agree that the touchscreen itself does not determine whether a finger touch is stationary or moving. Ex. 5 (Cockburn report) ¶ 99; Ex. 8 (Schmidt report) ¶ 109. Movement of the finger is instead determined by the system's processor using timing information and touch location information from the touch screen. *Id.*

Critically, the parties' experts further agree that, to determine that a finger is substantially stationary, at least two scans reporting the finger at the same location are required. Take for instance the

---

[2] Philips makes no assertion regarding the scan period or other touchscreen specifications for any accused device. *See* Ex. 5 (Cockburn report) ¶¶ 90-94. ASUS takes Philips' allegations as given for purposes of this motion.

scenario shown in Dr. Cockburn's report, Ex. 5 ¶ 140, shown at right. There, the scan of a particular location is indicated by the tickmarks. The time between tickmarks is the scan period



(for example, the 10 millisecond period discussed above). The touchscreen does not recognize that a finger is present on the screen until it scans the finger location. Thus, in this example where the user's finger first touches the screen after the first scan represented by the first tickmark, the system will not recognize that a finger is present until the second scan represented by the second tickmark. At that point, the system knows that there is a finger touch on the screen. However, until yet *another* scan of the same location occurs, the system does not know whether that finger touch is stationary. The system may conclude it is stationary *only* if, at the next scan, the finger is in substantially the same location. Philips' expert agrees:

> Q. So, in order to determine if that finger is stationary, at least two scans need to occur?
>
> A. So, as I described, when the user puts their finger down, a scan may be, you know, sort of in some point of its scan, so it might or might not detect it. But by the time the scan period is done, it will know. And then once it's detected, then *it needs to be down for another period.*
>
> Q. In order to determine it's stationary?
>
> A. That's correct. Substantially stationary.

Ex. 9 (August 2 Schmidt Tr.) at 90:2-16 (emphasis added); *see also* Ex. 5 (Cockburn report) ¶ 189.

**B.    The Operation of the Accused Android and Chrome Devices**

There are two different types of scrolling disclosed in the '064 patent, stick-to-finger scrolling and inertial scrolling or flinging. *E.g.*, Ex. 8 (Schmidt report) ¶¶ 47. Philips contends that the "scrolling" to which the "stopping motion program instructions" apply is so-called "inertial scrolling" or "fling" scrolling, where information on the screen is left scrolling after a user moves their finger and then lifts it from the screen. *E.g.*, Ex. 9 (August 2 Schmidt Tr.) at 100:19-101:14 ("[I]n that discussion about stopping motion program instructions, . . . that's relating to the inertial scrolling motion, which is, I believe, the focus of claim one."); *see also* Ex. 8 (Schmidt report) ¶¶ 358, 360, 364, 367, 430, 432, 490,

573-74, 643. Philips has accused multiple Android and Chrome applications of infringing the '064 patent. But there is no dispute that the systems operate the same in the following respects:

First, when a user first touches the screen and the touchscreen recognizes that touch, the touchscreen notifies the operating system of that contact. The operating system in response generates an event of type ACTION_DOWN.[3] Ex. 5 (Cockburn report) ¶ 126; Ex. 8 (Schmidt report) ¶¶ 112-13, 125, 140, 162, 178, 210, 239, 302, 315, 453, 456, 525, 536.

Second, when the accused systems receive an ACTION_DOWN event, they immediately terminate any in-process fling scroll. Ex. 5 (Cockburn report) ¶¶ 176-181; Ex. 8 (Schmidt report) ¶ 127 ("[w]hen the user first presses his or her finger to the screen, the ███████████ receives an ACTION_DOWN event" which leads the "scroller's ███████████ *to terminate the fling*"); ¶ 142 ("[w]hen the user first presses his or her finger to the screen, the ███████████ receives an ACTION_DOWN event and, if a fling is in progress, calls the scroller's ███████████ *to terminate any in-progress flings*"); ¶ 158 (accused Android devices, "upon detecting a finger down event during an active fling call a ███████████ ███████████ event that *causes the fling animation to halt*"); ¶ 202 (accused Chrome devices "upon detecting a finger down event during an active fling, call a ███████████ ███████████ event that *causes the fling animation to halt*.") (emphases added).

### C. The Accused Devices Do Not Have Code That Terminates a Fling After Detecting a Substantially Stationary Finger Touch

As noted above, the asserted claims of the '064 patent require "stopping motion program instructions," *i.e.*, computer code, that terminate scrolling when "a *substantially stationary finger touch* on the screen enduring for a period longer than a preset minimum time" is sensed. It is undisputed that determination of a "substantially stationary finger touch" requires a minimum of two scans that report that a finger has remained in substantially the same location on the touch screen. *See supra* § II.A. Philips

---

[3] An "event" is an action or occurrence that is detected by a program. Events can be user actions (clicking a mouse button; touching the screen) or system occurrences (running out of memory).

has identified no code for any ASUS accused Android or Chrome device that determines whether a finger is substantially stationary and terminates scrolling if so. That is because there is no such code.

To the contrary, while it is not ASUS's burden to prove non-infringement, the undisputed evidence is that the ASUS products terminate a fling scroll when a user's finger is first recognized, at the ACTION_DOWN event. The ACTION_DOWN event is generated as soon as a finger is determined to have touched the screen, at the first scan that recognizes a finger. The length and duration of the finger touch are irrelevant. Indeed, there is no disagreement that, at the time of initial recognized contact, the system has no idea whether the finger is substantially stationary or not—that determination requires an additional scan showing the finger at the same location. Because the accused devices cease scrolling immediately on a touch, the accused devices need not (and do not) determine whether the touch is "substantially stationary."

Philips' only answer to this argument is to attempt to read the "substantially stationary" requirement out of the claim. In short, Philips asserts that, because the accused products terminate scrolling when a user's first touch is first recognized, they will also stop scrolling if the user touches the screen and her finger remains stationary. *See, e.g.*, Ex. 8 (Schmidt report) ¶¶ 361, 673 ("The claim language only identifies what will happen when the duration endures for a period longer than a preset minimum time, and does not identify what can or cannot happen before that time. A POSA would understand the language of this claim to express the reliable result of what happens after the preset minimum time, without regard to what happens before it."). Philips ignores that the claims, by their plain terms, require *code* that performs a specific function—specifically, code that will terminate scrolling upon detecting "a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time." The claims do not cover products, such as the accused products, that terminate scrolling whenever any touch is detected, irrespective of whether the touch is substantially stationary. For these reasons, summary judgment of no infringement is appropriate.

## III. The Asserted Claims of the RE'564 Patent Are Invalid

U.S. Patent No. RE43,564 (Ex. 10) is directed to devices "with a relatively small screen real estate, such as handheld information appliances (palmtops, mobile phones, Web pads, PDA's or notebook computers, etc.)." Ex. 10 ('564 Patent) at 1:20-24. The patent describes an "auto-zoom" functionality

that magnifies "graphical information on a display too small for the total information content, given the display's resolution and size." *Id*. at 2:27-30. Philips asserts independent claim 1 and its dependent claims and 2 and 7. Claim 1 requires, among other things, (1) a "handheld communication device," (2) "comprising . . . a display" that (3) "has a substantially small size suitable for the handheld communication device." The third aspect of this limitation—which, tellingly, Philips would read out of the claim—does not reasonably apprise a person of ordinary skill in the art ("POSA") of the applicant's intended scope of the invention, rendering the claim indefinite.

As initially filed, the application that led to the patent reissued as RE'564 merely claimed a handheld device with "a display," without the further qualification that it "has a substantially small size suitable for the handheld communication device." Ex. 11 (Excerpts of the '203 prosecution history) at PHILIPS0004570. Philips added the qualifying clause during prosecution, *id*. at PHILIPS0004650, explaining it did so "in order to clarify the invention." *Id*. at PHILIPS0004642. Distinguishing the prior art, Philips further argued in that same paper that the patent's purported zooming invention was of "particular interest . . . in electronic devices having a relative [sic] small display for providing a graphical user interface (GUI) . . . ." *Id*. at PHILIPS0004647. Thus Philips argued that the purported invention of the RE'564 patent is not relevant to every size device and display. Instead, according to Philips, it is specifically relevant to devices with a "relative[ly] small display," where zooming in on the displayed content may be useful to a user. *Id*. In response to the amendments and arguments made by Philips, the Examiner in the next action allowed the patent, explicitly noting the newly added claim language in the Notice of Allowability: "None of the prior art of record either singularly or in combination teach or fairly suggest a handheld communication device comprising . . . a display that has a substantially small size suitable for the handheld communication device . . . ." *Id*. at PHILIPS0004656.

For patent claims to be definite, the "claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *see also Nautilus*, 572 U.S. at 909-10 ("[A] patent must be precise enough to afford clear notice of what is claimed," lest there be "[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims."). Here, nothing in the intrinsic record defines the boundaries of what is meant by the "substantially small

size suitable for the handheld communication device" limitation. The patent and its prosecution history are silent regarding when a display on a handheld device would be too large to be considered a "substantially small size suitable" for the device. A POSA has nothing to guide him or her in determining what is meant by this phrase. *See* Ex. 12 (Dunlop report) at 288:5-24.

In an effort to give the phrase meaning, Philips argues that "a POSA would have understood 'substantially small size' to be a size small enough to fit on at least one of the example hand-held devices articulated in the '564 Patent"—namely, "palm-tops, mobile phones, Web pads, PDA's [sic] or notebook computers, etc." Ex. 13 (Schmidt rebuttal report) ¶¶ 620-22; Ex. 10 ('564 Patent) at 1:22-24. Relying on this language, Philips has accused of infringement a wide range of devices, from smartphones to laptops—the latter of which have display sizes that match or exceed those of *desktop* computers at the time of the alleged invention. *Compare, e.g.*, Ex. 21 (Product Specification, ROGG752VL) (laptop screen size of 17.3") and Ex. 22 (Product Specification Q551) (laptop screen size of 15.6") *with* Ex. 14 (August 1 Schmidt Tr.) at 92:12-22 (at priority date desktop monitors and laptops had 15" display sizes).

If Philips' position were correct, it would mean that, so long as a handheld device has a display, then that display *must be* of "a substantially small size suitable for the handheld communication device." Philips thus would read the "substantially small size" limitation, which *modifies* the term "display," entirely out of the claim and would interpret the claim as it existed—reciting only "a display"—before the amendment adding the limitation. Philips's view is not only inconsistent with the prosecution history, but also runs afoul of the claim-construction principle that meaning should be given to all of a claim's terms. "Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *see also, e.g., Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004).

Philips' expert Dr. Schmidt had every opportunity at deposition to assign some meaning to the "substantially small size" limitation, or to explain what criteria a POSA would use to determine whether the display on a handheld device has a substantially small size or not. Ex. 9 (August 2 Schmidt Tr.) at

170:3-188:5.  He could not do so.  Instead, he confirmed his view that essentially *any* display, including a display that is the same size as the handheld device itself, is within the scope of the claim.  *Id*. at 186:8-188:5; *see* Ex. 15 (August 2 Schmidt Tr., Ex. 12).  That position flatly contradicts the language of the claim, which in using the term "substantially *small* so as to be suitable" for a device, sets some (undefined) upper boundary on size.  Because a POSA would not be able to determine whether any given handheld device has "a display that has a substantially small size suitable for the handheld communication device," the claim is indefinite.

## IV.    ASUS's Products Do Not Infringe The '809 Patent

The Court should grant summary judgment of non-infringement of U.S. Patent No. 9,436,809 (Ex. 16) because the accused products do not perform the steps of the claims in the required order.  Specifically, the accused products do not determine compliance before sending a secret or first signal.

The '809 patent purports to solve a simple problem:  allowing "a user visiting his neighbor to watch a movie, which he owns, on the neighbor's big television screen . . . if it can be proved that a license holder of that movie (or a device that the license holder owns) is near that television screen."  Ex. 16 ('809 patent) at 2:16-21. Philips allegedly solved this problem by "combin[ing] a distance measurement protocol with an authentication protocol," which may include "checking a certificate stored in [a device seeking to display the movie]."  *Id*. at 2:50-51, 3:60-61.  In describing a solution to the problem, the '809 patent refers to Figures 1 and 2:





In Figure 1 and as described at 4:59-5:8, a computer (shown by 101) is placed in the center of the circle.  The computer has content, such as video, stored on a hard disk, DVD or a CD.  The owner of the

computer owns the content and therefore the computer is authorized to access and present the multimedia content for the user. When the user wants to make a legal copy of the content available on another device, the distance between the other device and the computer is measured and only devices within a predefined distance (105, 107, 109, 111, 113 inside the circle) can receive the content. The devices outside the circle (115, 117, 119) cannot receive the content. The patent refers to this combination of a distance measurement protocol with an authentication protocol as authenticated distance measurement.

Figure 2 and accompanying text 5:20-6:24 illustrate and describe the general idea of performing authenticated distance measurement between two devices, 201 and 203. The first device 201 has content that the second device 203 has requested. The authenticated distance measurement involves steps 205, 207, 209, and 211. In step 205 (authentication), the first device 201 authenticates the second device 203, which "could comprise the steps of checking whether the second device 203 is a compliant device." *Id*. at 5:26-27. The first device may perform an authentication check "by checking whether the second device is compliant with a set of predefined compliance rules." *Id*. at 3:40-44. In step 207 (secret), if the second device is compliant, the first device 201 exchanges a secret with the second device 203, which could be performed by transmitting the secret to the second device. In step 209 (distance measurement), a first signal for distance measurement is transmitted from the first device to the second device. The second device modifies the received first signal according to the secret and retransmits the modified signal back to the first device. The first device measures the round-trip time between the first signal leaving and the modified signal returning and checks if the returned signal was modified according to the exchanged secret. Finally, in step 211 (content), after the distance has been measured in a secure authenticated way as described above, content data can be sent between the first and the second device.

Philips asserts that independent claims 1 and 49 and their dependent claims 9, 50, and 53 are infringed by ASUS products that have HDCP 2.x functionality. HDCP 2.x refers to version 2.0, 2.1, or 2.2 of the High-bandwidth Digital Content Protection ("HDCP") technical specifications promulgated by non-party Digital Content Protection LLC. Philips alleges that ASUS's accused phone, tablet, and computer devices can use the HDCP 2.x specifications to transmit content to a display device, such as a 4K smart television. Ex. 17 (Goodrich report) ¶¶ 184, 372, 472, 550.

This motion focuses on two related limitations in claims 1 and 49. The claim 1 limitations require that a first device, for controlling delivery of protected content to a second device, include a processor arranged to (1) "determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate" and (2) "provide a first signal to the second device depending *when* the second device is determined to be compliant with the set of compliance rules." Ex. 16 ('809 patent) at 7:13-18 (emphasis added). The claim 49 limitations require that a first device, for controlling delivery of protected content to a second device, include a processor arranged to (1) "determine from the certificate if the second device is compliant" and (2) "provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, *if* the second device is compliant." *Id*. at 10:41-46 (emphasis added). In both claims 1 and 49, thus, the claim language requires that the "compliance" determination occur before providing the first signal or secret to the second device, which is consistent with Figure 2 and the disclosure in the specification.

The accused products do not perform these steps in the required order. There is no dispute about the order of the steps in the accused HDCP 2.x specifications; the only dispute is about what it means for the second device to be "compliant with a set of compliance rules" or "compliant." ASUS contends that such compliance determinations require the second device to comply with the entire set of compliancy rules set forth in the HDCP 2.x specifications for determining whether a device is permitted to receive protected content—after all, if the device fails to meet all of the compliancy rules, then it is by definition non-compliant. Philips, in contrast, asserts that a device can be considered "compliant" if only a *subset* of the compliancy checks occur before the first device provides a secret and first signal to the second device. Philips would deprive the word "compliant" of all meaning. Under the correct reading, the signals Philips contends are the "first signal" (claim 1) and the "secret" (claim 49) in the HDCP 2.x specifications are provided to the second device *before* the second device is determined to be (1) "compliant with a set of compliance rules" (claim 1) or (2) "compliant" (claim 49), and the accused devices do not infringe.

Referring to the HDCP 2.x specifications, Philips alleges that the accused products act as an HDCP 2.x Transmitter and determine whether a second device (an HDCP Receiver) is compliant with a set of compliance rules by (i) checking that the second device's certificate conforms with the established certificate format and (ii) verifying the digital signature in the certificate. Ex. 17 (Goodrich report) ¶ 215.

While these steps may be a subset of the HDCP 2.x "compliancy rules," they do not complete the compliance check; a second device is not "compliant" to receive protected content until the HDCP Transmitter (among other things) (iii) checks to see if the Receiver ID in the second device's certificate is on a revocation list (Ex. 18 (HDCP Specification) at 13), and (iv) determines that the second device is not an HDCP Repeater (*id*. at 27-29, including Figure 2.12 and States A4 and A5); *see also* Ex. 19 (Jakobsson report) ¶¶ 51-55, 71-77, 92, 96. If the second device is a Repeater, additional procedures check the compliance of downstream receivers connected to it. Ex 18 at 18-24 (Section 2.5 Authentication with Repeaters); 27-29 (including Figure 2.12 and States A6 and A7); Ex. 19 (Jakobsson report) ¶¶ 51-55, 71-77. Importantly, the revocation list check for the second device occurs *after* the alleged secret of claim 49 is provided to the second device. Ex. 18 (HDCP Specification) at 12 (Figures 2.1 and 2.2) and 28 (State A1 description); Ex. 19 (Jakobsson report) ¶¶ 51-55, 71-77. Likewise, the Repeater check for the second device and any subsequent revocation list checks for receivers downstream of a Repeater, occurs *after* the locality check procedures, which include the alleged providing of a first signal to the second device of claim 1. *Id*.

Thus, the issue on summary judgment is whether a second device is "compliant with a set of compliance rules utilizing said information provided in said certificate" or "compliant" when it has not satisfied the entire set of compliance rules necessary to receive protected content. The Court should find that the compliance determination in the claims requires looking to the complete set of rules used to determine whether a device can receive protected content, not simply a subset of the rules, because only a device that meets *all* of the relevant rules can be considered "compliant."

Because an HDCP Receiver is not permitted to receive content until all relevant *Receiver ID's* are checked against the revocation list and the Repeater check is performed, the HDCP Receiver cannot be deemed "compliant with a set of compliancy rules" or "compliant" before the alleged secret and first signal are provided to the HDCP Receiver. Therefore, the following limitations of claims 1 and 49 cannot be satisfied as a matter of law: (claim 1) "provide a first signal to the second device depending *when* the second device is determined to be compliant with the set of compliance rules" (emphasis added) and (claim 49) "provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, *if* the second device is compliant."

The Court should therefore grant summary judgment of non-infringement of the asserted claims of the '809 patent.

## V.    The '806 Patent Fails to Provide Corresponding Structure for "Means for Downloading"

Philips asserts claims 1 and 12 of U.S. Patent No. 7,529,806 (the "'806 patent", Ex. 23) against ASUS.  In September 2018, the Patent Trial & Appeal Board issued a final written decision on a petition for inter partes review of the '806 patent, finding claims 1-11 unpatentable.  The remaining asserted claim, claim 12, requires a "means for downloading files to the client device."  During claim construction, no party sought construction of this term.  Because the '806 patent does not describe how to perform the function of "downloading," claim 12 is invalid as indefinite under Section 112.

 "[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1367 (Fed. Cir. 2008).  "Whether a claim satisfies the so-called definiteness requirement of Section 112 [b] is a matter of law and is therefore appropriately decided at summary judgment."  *Apple, Inc. v. Samsung Elecs. Co*., 876 F. Supp. 2d 1141, 1153 (N.D. Cal. 2012).  To survive Section 112, the patent must do more than simply tell one of skill in the art to program a computer to perform the downloading function; it must "adequately describe how that programming can be achieved."  *SPEX Techs., Inc. v. Kingston Tech. Corp., et al*., 2017 WL 5495149, at *14 (C.D. Cal. Oct. 18, 2017).

### A.    "Means for Downloading" Is a Means-Plus-Function Term

Whether a term is a "means plus function" term subject to 35 U.S.C. 112 ¶ 6 is a matter of law.  *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1299 (Fed. Cir. 2018); *see also DESA IP v. EML Techs.,* 211 Fed. App'x. 932 (Fed. Cir. 2007) (noting that despite the presence of expert testimony, the district court's "conclusion could have been reached without the aid of extrinsic evidence.").  Use of the word "means" in a limitation renders it presumptively subject to § 112 ¶ 6.  *Id*. at 1297-28.  To overcome this presumption, Philips must show that "the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id*. at 1297.

Philips cannot make this showing.  Claim 12 includes prototypically functional language, "downloading files to a client device."  Ex. 23 ('806 patent) at 6:44; *see Sage Products, Inc. v. Devon*

*Industries, Inc.,* 126 F.3d 1420 at 1427 (Fed. Cir. 1997); *DESA IP*, 211 Fed. App'x. at 936. Claim 12 also does not "elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function." *Id.* at 1247-48. Philips' argument to the contrary boils down to a single sentence from its expert, who asserts that "'means for downloading' connotes well-known programming instructions for downloading a file from a server to a client." Ex. 20 (Polish opening report) ¶ 221; Ex. 24 (Polish rebuttal report) ¶ 343. But Dr. Polish provided no basis for his opinion, and "[n]owhere in his testimony does he explain with any degree of definiteness what structure or class of structures a person of ordinary skill would understand the term to encompass." *Diebold Nixdorf*, 899 F.3d at 1300. If a patentee could avoid means-plus-function treatment by having an expert state without explanation that a POSA's external knowledge is sufficient, the requirement to "elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function" would have no meaning. Dr. Polish's unsupported statement cannot overcome the presumption that "means for downloading" is a means-plus-function term subject to 35 U.S.C. 112 ¶ 6.

### B. Philips is Limited to the Agreed Corresponding Structure

The parties do not dispute where the Court should look to determine whether "means for downloading" lacks adequate structure: Figure 1, and the '806 patent specification at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14 (Ex. 23). In his report, Dr. Polish, identifies the following "corresponding structure" for "means for downloading" in the '806 patent:

> single purpose media player or multipurpose computing device programmed with software to perform the function, such as the algorithm disclosed in Figure 1 and at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14.

Ex. 20 (Polish opening report) ¶ 221; Ex. 24 (Polish rebuttal report) ¶ 345. Dr. Polish's identification of corresponding structure is copied verbatim from Philips' infringement contentions and he cites the identical lines of the patent. Although he and Philips initially presented these citations as if they were exemplary, using "such as" to describe them, during his deposition Dr. Polish confirmed that these citations are the *only* definition of corresponding structure in the patent:

> A. My understanding is that the — the corresponding structure is what's listed in the quotes here, which is the sections of the patent, and that that defines the scope of what — of what's within that claim limitation.

> Q.   So, the scope is limited to the algorithm disclosed in Figure 1, and at Column 2, lines 57 through 63; Column 3, lines 3 through 7; Column 3, lines 14 through 30; and Column 3, line 57 through Column 4, line 14.  Correct?
>
> A.   I think that's right.  If I understand the legalities here.  I think that's right.

Ex. 25 (July 19 Polish Tr.) at 283:3-15; *see also id.* at 277:17-22.  Thus the Court need only determine whether these citations disclose sufficient structure corresponding to "means for downloading" to survive 112.  They do not.

### C.   The Agreed Corresponding Structure Includes No Algorithm For Downloading

None of Philips' citations disclose an algorithm corresponding to "downloading."  Figure 1 of the '806 patent "is a flow diagram illustrating the various steps in a method according to the invention."  Ex. 23 ('806 Patent) at 2:45-46.  While Figure 1 does include the words "downloading" and "download," it does not show any algorithm to achieve this function.  Instead, downloading is listed among the "various steps" of Figure 1.  Nowhere does Figure 1 describe *how* to download the files associated with the alleged invention, or how it occurs:   At Step 102, the figure says only to "select content and contact server for downloading control information file."  It does not explain how "downloading" will occur.  At step 106, Figure 1 says to "download file segment for play-out."  Again, the Figure provides no color, let alone "how that programming can be achieved."  *SPEX Techs.*, 2017 WL 5495149, at *14.  Finally, Step 110 states to "download next file segment & buffer while preceding segment is being played out."  As above, the Figure provides no programming instructions to achieve the downloading function.



FIG. 1

Case No. 4:18-cv-1885-HSG-EDL

Dr. Polish next cites to the patent specification at Column 2, Lines 57 to 63. Describing Figure 1, this section states that "[i]n step 102, the client contacts the server selects the particular content file and downloads the control information that enables the retrieving and playing out of the segmented file," Ex. 20 (Polish opening report) ¶ 283; Ex. 24 (Polish rebuttal report) ¶ 101 (emphasis omitted), and that "[t]he control information describes the locations, e.g., URL's, and size of the various file segments, and provides, e.g., UI functionalities at the client. **In this example**, the control information is coded in XML," Ex. 20 (Polish opening report) ¶ 86 (emphasis in original); *see* Ex. 24 (Polish rebuttal report) ¶ 96 (emphasis in original). While this citation recites the claimed function—"downloads"—it fails to provide any instructions on how to achieve this function. Instead, this paragraph describes the first step of Figure 1, which, again, simply recites the word "downloading."

Dr. Polish next cites to the patent specification at Column 3, Lines 3 to 7. Here, he opines that "[o]ne manner of performing the algorithm is disclosed in the '806 patent at 3:3-7." Ex. 20 (Polish opening report) ¶ 222; Ex. 24 (Polish rebuttal report) ¶ 391. By presenting this as an example—"one manner"—Dr. Polish confirms his view that other manners (or any manner) of performing this "algorithm" would suffice to confer structure. Describing Figure 1, this section reads, "[i]n step 106, the first file segment is downloaded for play-out. Communicating with a remote server is a well known technology. For example, Java 2.0 provides a set of standard classes that enable retrieving a remote file into a buffer or as a stream." Ex. 24 (Polish rebuttal report) ¶ 385. Again, this section recites the claimed function—"is downloaded"—but does not explain how downloading is to be accomplished in the context of the alleged invention. Instead, it simply states that "communicating with a remote server is a well known technology." Even if "communicating with a remote server" was sufficient to describe downloading—it is not—knowledge of one skilled in the art cannot suffice as "corresponding structure." *See Blackboard, Inc. v. Desire2Learn, Inc*., 574 F.3d 1371, 1384 (Fed. Cir. 2009); *see also Function Media, L.L.C. v. Google, Inc.,* 708 F.3d 1310, 1319 (Fed. Cir. 2013) ("[a patentee] cannot rely on the knowledge of one skilled in the art to fill in the gaps").

> The correct inquiry is to look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software for digital-to-digital conversion and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program . . . It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent.

*Id.* (quoting *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003) (emphasis in original); *ePlus, Inc. v. Lawson Software, Inc*., 700 F.3d 509, 519 (Fed. Cir. 2012) ("The indefiniteness inquiry is concerned with whether the bounds of the invention are sufficiently demarcated, not with whether one of ordinary skill in the art may find a way to practice the invention.").

Dr. Polish next cites to the specification at Column 3, Lines 14 to 30, again describing Figure 1:

In step 110, the next file segment is downloaded at the client and stored in a buffer while the previous file segment, here the first file segment, is being played out. One option is to have the downloaded files buffered in a sequence or linked list of buffers. This functionality is typically provided by the operating system of the client. For example, MS Windows family of products creates a memory buffer associated with the file every time an API call opens the file. Alternatively, in a thread- and/or process-rich environment, several threads and/or processes can be organized to independently retrieve file segments, while playing out the content of other segments. Working with threads is a skill common for software engineers. For example, Java 2.0 from Sun Microsystems provides classes Supporting multiple threads. Similarly, Microsoft SDK for the Windows family of products makes thread- or process-related functionalities available to programmers.

Ex. 20 (Polish opening report) ¶ 284. As above, this section recites the claimed function—"is downloaded"—but does not explain how. Instead, this section provides that existing software could achieve buffering of "the downloaded files."

Finally, Dr. Polish cites to the patent specification at Column 3, Lines 57 to Column 4, Line 14, which states that "When the client has selected the proper file, either the one of which the first part is represented here as in the preferred format or the one in the alternative format, the content of the first part is downloaded from the location specified and playing out is started automatically under application control." Id. ¶¶ 272, 285; see Ex. 24 (Polish rebuttal report) ¶¶ 116, 412. Once again, this section recites the claimed function—"is downloaded"—but does not explain how the claimed downloading actually works. The vast majority of this section of the specification paragraph concerns combining multiple inputs or file parts which have been downloaded or will be downloaded, but even that discussion does not explain how the downloading occurs. Ex. 23 ('806 Patent) at 3:57-4:14. Indeed, in this example discussion of combining multiple files, the specification explicitly notes that the files to be combined are "multiple local files" which have already been downloaded. *Id.* at 4:8-12.

Whatever Figure 1 and its corresponding description disclose, it is not an algorithm *for downloading*.  Yet, having claimed a "means for downloading," the law requires that the specification of the '806 patent contain "an algorithm for performing th[at] claimed function."  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359,  1367 (Fed. Cir. 2008).  It does not.  At most, the patent notes the existence of third-party software that may be capable of downloading, with no mention of how that software works.  That is insufficient as a matter of law, *ePlus*, 700 F.3d at 519, and the Court should therefore grant summary judgment of invalidity.

### CONCLUSION

For the foregoing reasons, ASUS respectfully requests that the Court grant summary judgment to ASUS on each of the issues above.[4]

Date:  August 29, 2019

Respectfully submitted,

Bruce Genderson *(pro hac vice)*
Kevin Hardy *(pro hac vice)*
Aaron Maurer *(pro hac vice)*
David Krinsky *(pro hac vice)*
Andrew Trask *(pro hac vice)*
Kyle Thomason *(pro hac vice)*
Christopher A. Suarez *(pro hac vice)*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C., 20005
+1 (202) 434-5000
+1 (202) 434-5029 facsimile
viceroy@wc.com

Matthew S. Warren
Erika H. Warren
Angela M. He
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
18-1885@cases.warrenlex.com

Michael J. Newton (Bar No. 156225)
Sang (Michael) Lee  *(pro hac vice)*
Derek Neilson (*pro hac vice*)
ALSTON & BIRD LLP

---

[4] Intervenors Microsoft Corporation and Microsoft Mobile Inc. (collectively, "Microsoft") will concurrently file a motion for summary judgment issues including non-infringement of the '064 and '806 patents based on certain Microsoft Windows functionality.  Philips accuses ASUS's Windows products of infringement based on the same functionality addressed in Microsoft's motion, and Philips' infringement allegations are the same for ASUS and Microsoft as to that functionality.  *See* Ex. 8 (Schmidt report) ¶ 271 (relying on and incorporating by reference Philips' expert report against Microsoft to argue infringement of ASUS's Microsoft Windows products); Ex. 20 (Polish opening report) ¶¶ 379-381 (same).  Therefore, ASUS's accused Windows products do not infringe the '064 and '806 patents for the same reasons raised in Microsoft's motion, and ASUS incorporates those arguments by reference.

2200 Ross Avenue, Suite 2300
Dallas, Texas, 75201
+1 (214) 922-3400
+1 (214) 922-3899 facsimile
asus-philips@alston.com

*Attorneys for Defendants ASUSTeK Computer*
*Inc. and ASUS Computer International*