EXHIBIT A
to
Motion to Exclude
(Stamm - HTC)
(Redacted Version
Of Document Sought
To Be Sealed)

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

In re Koninklijke Philips Patent Litigation

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Case No. 4:18-cv-01885-HSG

**REBUTTAL EXPERT REPORT OF**

**LAURA B. STAMM**

June 20, 2019

Highly Confidential – Outside Counsel's Eyes Only

# TABLE OF CONTENTS

I.      Executive Summary .................................................................................................... 2

    A.    Assignment ......................................................................................................... 2

    B.    Qualifications and Experience ............................................................................ 3

    C.    Compensation ..................................................................................................... 3

    D.    Facts, Data, and Information Considered ........................................................... 4

    E.    Summary of Opinions ........................................................................................ 4

II.     Relevant Entities ........................................................................................................ 7

III.    Patents-in-Suit .......................................................................................................... 10

    A.    '809 Patent ........................................................................................................ 12

    B.    '797 Patent ........................................................................................................ 13

    C.    '806 Patent ........................................................................................................ 13

    D.    '064 Patent ........................................................................................................ 14

    E.    '564 Patent ........................................................................................................ 14

    F.    '913 Patent ........................................................................................................ 15

IV.     Accused Products ..................................................................................................... 16

V.      Reasonable Royalty Construct ................................................................................. 17

    A.    Legal Framework .............................................................................................. 17

    B.    Hypothetical Negotiation Construct ................................................................. 19

    C.    Date of the Hypothetical Negotiation .............................................................. 20

VI.     Analysis of Licensing Transactions ......................................................................... 20

    A.    Philips' Licenses .............................................................................................. 23

    B.    Philips' Offers .................................................................................................. 42

    C.    HTC's Licenses ................................................................................................ 45

VII.    *Georgia-Pacific* Factor Analysis ............................................................................ 49

    A.    Relevant Licenses ............................................................................................ 50

    B.    Terms and Scope .............................................................................................. 52

    C.    Relationship of the Parties ............................................................................... 53

    D.    Nature and Advantage of Patented Technology ............................................... 55

    E.    Profit Attributable to the Invention ................................................................. 63

    F.    Derivative or Convoyed Sales ......................................................................... 71

    G.    Conclusion with Respect to Reasonable Royalty ............................................ 72

VIII.   Calculation of Royalty Damages .............................................................................. 74

Highly Confidential – Outside Counsel's Eyes Only

# I.   EXECUTIVE SUMMARY

## A.   Assignment

1.  I have been retained by counsel for HTC Corp. and HTC America (collectively "HTC" or "Defendants") to provide expert analysis and testimony, if necessary, regarding the damages that may have been sustained by Koninklijke Philips N.V. and U.S. Philips Corporation (collectively "Philips" or "Plaintiffs") in the matter of *In re Koninklijke Philips Patent Litigation* as a result of the alleged infringement by HTC of the following patents ("patents-in-suit"):

- U.S. Patent No. RE 44,913 ("'913 Patent"): "Text Entry Method and Device Therefor" issued on May 27, 2014;

- U.S. Patent No. 7,184,064 ("'064 Patent"): "Touch-Screen Image Scrolling System and Method" issued on February 27, 2007;

- U.S. Patent No. 7,529,806 ("'806 Patent"): "Partitioning of MP3 Content File for Emulating Streaming" issued on May 5, 2009;

- U.S. Patent No. 5,910,797 ("'797 Patent"): "Portable Data Processing Apparatus Provided with a Screen and a Gravitation-Controlled Sensor for Screen Orientation" issued on June 8, 1999;

- U.S. Patent No. 9,436,809 ("'809 Patent"): "Secure Authenticated Distance Measurement" issued on September 6, 2016; and

- U.S. Patent No. RE 43,564 ("'564 Patent"): "Hand-Held with Auto-Zoom for Graphical Display of Web Page" issued on August 7, 2012.[1]

2.  According to Plaintiffs, Defendants manufacture, market, sell and/or offer to sell within the United States and/or import into the United States smartphones and tablet computers that include hardware and/or software containing functionality covered by one or more claims of the patents-in-suit.[2]   The Plaintiffs are seeking damages as a consequence of HTC's alleged infringement.

---

[1]   Second Amended Complaint for Patent Infringement, November 23, 2016 ("Complaint").

[2]   Complaint, p. 3.

2

Highly Confidential – Outside Counsel's Eyes Only

3. The Plaintiffs have submitted the expert report of Michael Tate in support of their damages claim.[3] I have been asked to review and respond to Mr. Tate's opinions, and to provide my own assessment of damages.  In conducting my analyses, I have necessarily assumed that the patents-in-suit are valid, enforceable, and infringed by HTC.  I hold and express no opinions on liability in this matter, and I understand that HTC contends that the asserted claims of the patents-in-suit are either invalid or not infringed.

### B.      Qualifications and Experience

4. I am an affiliate of Analysis Group, Inc. ("Analysis Group").  Analysis Group is an economic, financial, and strategy consulting firm with offices in Boston, MA; Chicago, IL; Dallas, TX; Denver, CO; Los Angeles, CA; Menlo Park, CA; Montreal, Quebec; New York, NY; San Francisco, CA; Washington, D.C.; Beijing, China; London, the United Kingdom; Brussels, Belgium; and Paris, France.

5. Throughout the course of my career, I have provided research and analysis in a variety of business, litigation, and regulatory matters, and have particular expertise in intellectual property matters, having been engaged in numerous cases involving patents, copyrights, trademarks, and trade secrets.  I received a B.A. degree from Williams College in 1984 and a Master of Science degree in management with a concentration in finance from the Massachusetts Institute of Technology in 1989.  I am a certified public accountant and am accredited in business valuation by the AICPA. Prior to my joining Analysis Group, I spent several years in the Business Investigation Services Group at Coopers & Lybrand.  I have spoken at conferences and seminars and have published articles on topics dealing with valuation and patent damages issues.  A copy of my curriculum vitae is attached as **Appendix A**.  **Appendix B** includes a list of cases in which I have testified either at deposition or trial within the last four years.

### C.      Compensation

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[3]    Expert Report of Michael E. Tate, April 25, 2019 ("Tate Report").

Highly Confidential – Outside Counsel's Eyes Only

[REDACTED]

114 Philips' Disclosure of Damages Contentions Against the Acer Defendants in Accordance with Patent Local Rule 3-8, October 31, 2018, Appendices A-B.

115 Plaintiff's Fourth Amended Identification of the Acer Defendants' Accused Products, August 23, 2018, Appendix A.

Highly Confidential – Outside Counsel's Eyes Only

---

[116]   PHILIPS00095760-773 at 772.

[117]   Tate Report, p. 37.

[118]   Weintraub, Seth, "NPD: HTC was leading U.S. smartphone vendor in Q4 2010," *Fortune*, March 22, 2011.

[119]   "Google operating system" includes Android, Google OMS, and Tapas.  "Google's Android Becomes World's Leading Smart Phone Platform," *Canalys Newsroom*, January 31, 2011.

Highly Confidential – Outside Counsel's Eyes Only

---

120 Tate Report, pp. 33-36.

121 Eleveld Deposition Exhibit 10 (PHILIPS00097231-239).

122 SEA000001-000007.

123 I assume that Samsung's smartphone sales would maintain the 2018 level (**Exhibit 5**).

Highly Confidential – Outside Counsel's Eyes Only

[124] Samsung unveiled its first Android-powered mobile phone in April 2009 and its first Android-powered tablet computer in September 2010.  Samsung Press Release, "Samsung Launches I7500, the Company's First Android-powered Mobile Phone," April 27, 2009. *See also* "Galaxy Tab Unveiled as Samsung's First Tablet Computer," *BBC*, September 2, 2010.

[125] SEA000001-000007.

[126] Eleveld Deposition, p. 100.

45

Highly Confidential – Outside Counsel's Eyes Only

127   HTC-PHIL-130838-851 at 840.

128   *See e.g.* Philips 2010 Annual Report. Its business is divided into four main sectors – Healthcare, Consumer Lifestyle, Lighting, and Group Management & Services (p. 81). Within Consumer Lifestyle, Philips has: "[l]eading positions in categories such as male shaving and grooming, coffee appliances, and oral healthcare," with no mention of their position as a smart phone producer (p. 89).

Highly Confidential – Outside Counsel's Eyes Only

[129] The '978 Patent was issued on December 4, 2001, and is to expire on April 20, 2019, 20 years from the patent application filing date of April 20, 1999.  U.S. Patent No. 6,326,978 B1.

[130] HTC-PHIL-129942; HTC-PHIL-236054.

Highly Confidential – Outside Counsel's Eyes Only

---

131   HTC-PHIL-130547-556 at 549-550.

Highly Confidential – Outside Counsel's Eyes Only

## VII.   *GEORGIA-PACIFIC* FACTOR ANALYSIS

109.   My final determination of a reasonable royalty is based upon the results of my analysis of the comparable licenses as discussed in the last section of my report and my consideration of qualitative evidence regarding various factors that might influence the outcome of a hypothetical negotiation.  These qualitative factors include the factors identified by the Court in *Georgia-Pacific*.[134]

110.   In the following section, I review each of the *Georgia-Pacific* factors grouped by broader topic.  For each factor, I discuss the facts and circumstances surrounding the hypothetical negotiation, and the influence of the factor on the likely outcome of the hypothetical negotiation.

---

[132]   The '873 Patent was issued on December 4, 2001, and is to expire on August 4, 2020, 20 years from the patent application filing date of August 4, 2000.  U.S. Patent No. 6,784,873 B1.

[133]   HTC-PHIL-129942; HTC-PHIL-236054.

[134]   *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

Highly Confidential – Outside Counsel's Eyes Only

A.    **Relevant Licenses**

_Factor 1:  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty_





Highly Confidential – Outside Counsel's Eyes Only

**B.**     **Terms and Scope**

_Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or respect to whom the manufactured product may be sold._

_Factor 7: The duration of the patent and term of the license._

119.   I understand that the hypothetical license is assumed to be non-exclusive and would cover all accused products manufactured, sold, or offered for sale in the U.S.

52

Highly Confidential – Outside Counsel's Eyes Only

120.  The hypothetical license for the patents-in-suit would be valid until the last-to-expire patents-in-suit, which I understand to be October 17, 2023.

121.  Consideration for the duration of a license to the patents-in-suit is relevant to a licensee in light of the risk of technical obsolescence of the patented technology.  As discussed earlier, the smartphone industry is characterized by rapid product development and technological changes.[139]  Therefore, patents in this industry can become more valuable if technology evolves in a manner that implements the patents' teachings, or patents can become less valuable if technology evolves away from the patents' teachings.  The value of the patents-in-suit would decrease if future smartphones cease to employ the teachings of the patents-in-suit in favor of new technology.



C.      **Relationship of the Parties**

*Factor 4: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.*

---

[139]  *See* Cecere, Grazia, Nicoletta Corrocher, and Ricardo David Battaglia, "Innovation and Competition in the Smartphone Industry: Is There a Dominant Design?" *Telecomunications Policy* Vol. 39, Iss. 3 (2014) pp. 162-175 at 162 ("Technical change and new product proliferation have made this industry extremely dynamic, even if market shares are highly concentrated in the hands of very few companies…[P]roduct differentiation still characterizes the competition among manufacturers and a dominant design has not yet emerged.").

[140]  PHILIPS00214723-771.

Highly Confidential – Outside Counsel's Eyes Only

relevant licenses I have considered.

124. 

*Factor 5: The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

125. 

---

[141] Im 3/20/2018 Deposition, pp. 77-88.

[142] ███████████████████████████████████████████████████

[143] Philips Website, "About Royal Philips," available at https://www.philips.com/a-w/about/company html. ("Royal Philips (NYSE: PHG, AEX: PHIA) is a leading health technology company focused on improving people's health and enabling better outcomes across the health continuum from healthy living and prevention, to diagnosis, treatment and home care.")

Highly Confidential – Outside Counsel's Eyes Only

### D.     Nature and Advantage of Patented Technology

*Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.*

*Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

*Factor 14: The opinion testimony of qualified experts*

126.   For my understanding of the nature and advantages of the patented technology, I have relied in large part on the opinions of technical experts who are also filing reports on behalf of HTC.  I have included footnotes within this section to indicate information I have obtained from my discussions with these experts.

127.   At the outset, it is worth noting that I agree with Mr. Tate that insofar as the relevant licenses I have considered are for the same or comparable technology, the rates in those licenses will reflect the nature and advantage of the patented technology.  However, the rates in those licenses are portfolio rates and as such reflect the nature and advantages of the technology embodied in all patents.  Thus, a discussion of the nature and advantage of the patented technology is pertinent to the apportionment of the portfolio value to the patents-in-suit.

128.   In general, the benefits of the patented technology are not the drivers of consumers' demand for the accused products.  Nigel Newby-House, HTC's Associate Vice President of Product Planning and Go-to-Market, testified regarding the marketing of the accused products.

---

[144]   Newby-House Deposition, pp. 52-56.  *See also*, p. 117.

Highly Confidential – Outside Counsel's Eyes Only

███████████████████   ████████████████████████████████████████

129.   In the sections below, I discuss the nature and limited advantages of the patents-in-suit.  In many instances, because of the insignificant value of the patented technology to the user, the simplest and most obvious non-infringing alternative is to ███████████████████

### 1.   The '913 Patent

130.   I understand from Professor Scott MacKenzie, a technical expert retained on behalf of HTC, the '913 Patent relates (as interpreted by Philips) to a keyboard feature whereby secondary characters can be entered with only two key selections through the use of a long press.

131.   Mr. Tate claims that the benefit of the functionality accused by Philips is that it provides an effective design and an efficient, intuitive way to implement character entry on mobile devices.[147] Based on my review of Mr. Tate's support and my discussions with Professor MacKenzie, I believe this accused functionality has limited value for two reasons:  ██████████████████████
██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████   Mr. Tate claims this alternative is not acceptable because the technology has become common in the marketplace and that users would have difficulty composing messages with an alternative keyboard.[148]  Mr. Tate does not provide support for his opinion.

133.   First of all, he provides no information related to the importance of this feature to consumers or the prevalence of its use.  The only evidence he points to is survey results where users liked the feature after being told about it.  Mr. Tate cites separate statistics for the prevalence of texting (in

---

[145]   Newby-House Deposition, p. 153.

[146]   ████████████████████████████████████████████████████
████████████████████████

[147]   Tate Report, p. 58.

[148]   Tate Report, p. 59.

Highly Confidential – Outside Counsel's Eyes Only

any language) and the number of people in the U.S. who speak a foreign language.[149]  However, none of this is sufficient to demonstrate the value of the accused feature for the '913 patent to consumers of HTC handsets sold in the United States.[150]

134.   Second, Mr. Tate focuses on the ability to quickly access non-English characters when assessing the benefits. ███████████████████████████████████████

    **2.    The '797 Patent**

136.   I understand from Mr. Parulski, a technical expert retained by HTC, that the '797 Patent (as interpreted by Philips) relates to the animation when rotating the screen of a smartphone or tablet.  I

---

[149]   Tate Report, pp. 58-59.

[150]   Laliberte, Marissa, "9 Hidden Symbols You Never Knew You Could Text," *Reader's Digest*; Laliberte, Marissa, "13 Hidden Android Hacks You Never Knew About," *Reader's Digest*. These two web pages indicate that bringing up the accented letters by long pressing on a key is "little known" trick, contrary to the claim that the functionality is widely used by handset users.

[151]   Gboard Help Website, "Type in a different language," available at https://support.google.com/gboard/answer/7068494; Neagu, Codrut, "How to install and switch the keyboard input languages in Android," *Digital Citizen*, June 1, 2017. These two web pages explain how to install, switch to, and type on an alternative language keyboard.

[152]   Per discussion with Professor MacKenzie.

Highly Confidential – Outside Counsel's Eyes Only

understand that the functionality in HTC Accused Products alleged to infringe the '797 patent is

137.  Mr. Tate describes the benefit as the ability of the device to utilize an animation pervasive among competing smartphones and that the screen rotation has a more natural look and feel.[154]  Not surprisingly, Mr. Tate offers no evidence that having this animation is at all valued by users.  I

---

[153]  ████████████████████████████████

[154]  Tate Report, p. 60.

[155]  *See, e.g.*, Sprint Press Release, "America's First 3G/4G Phone, HTC EVO 4G from Sprint, Honored with POPULAR MECHANICS' Breakthrough Award," October 5, 2010; Moynihan, Tim, and Nate Ralph, "2011 CES Best of Innovations Honorees, *PCWorld*, November 11, 2010; IDSA Website, "HTC EVO 4G,"available at https://www.idsa.org/awards/idea/communication-tools/htc-evo-4g.

[156]  Per discussion with Mr. Parulski.

Highly Confidential – Outside Counsel's Eyes Only

### 3.    The '809 Patent

139.  I understand from my discussions with Seth Nielson, a technical expert retained by HTC, that the '809 Patent (as interpreted by Philips) teaches a way to perform screen mirroring -- wirelessly connecting audio and video between a smartphone and another viewing device.  The accused feature for the '809 patent is directed towards devices with a HDMI port, which HTC's accused products do not have.[157]

140.  Mr. Tate asserts that the '809 patent provides significant benefit and value to HTC users but the evidence he puts forward support the value of streaming not the value of the '809 patent.  For example, Mr. Tate presents survey results that show a high percentage of respondents who stream movies on smartphones or tablets.  Mr. Tate concludes that customers would be dissatisfied with an HTC handset if it did not have the ability to play high value protected content.[158]  He conflates streaming with mirroring. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[159]  Mr. Tate presents no evidence on the percentage of consumers who do such mirroring or the value to customers of having that ability.

141.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[160] Among the projected 182.6 million U.S. connected TV users, 59.2 million users were estimated to use Roku hardware or software to connect to the internet at least once per month in 2018.[161] ████████████████████████████████████████████████████████████████████████████████████████



---

[157]  Per discussion with Dr. Nielson.

[158]  Tate Report, pp. 50-52.

[159]  Per discussion with Dr. Nielson.

[160]  *See, e.g.* Roku Website, "Who is Roku?" available at https://www.roku.com/how-it-works.

[161]  Enberg, Jasmine, "Roku is winning the connected TV race, and Amazon probably won't catch up anytime soon," *Business Insider*, July 19, 2018.

Highly Confidential – Outside Counsel's Eyes Only

████████████████████████████████████

### 4.    The '806 Patent

142.   I understand from my discussions with Professor Kevin Jeffay, a technical expert retained by HTC, that the '806 patent (as interpreted by Philips) relates to an approach for downloading multimedia content that involves checking system constraints prior to downloading a video.  I understand from counsel that the accused HTC products are alleged to infringe the '806 patent as a result of having been preloaded with Google's YouTube app.

143.   ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

[162]   Newby-House Deposition, pp. 139-141.

[163]   Tate Report, pp. 52-53.

[164]   Tate Report, p. 53.

[165]   "Tops of 2013: Digital", *Nielsen*, December 16, 2013, available at
https://www.nielsen.com/us/en/insights/news/2013/tops-of-2013-digital.html.

Highly Confidential – Outside Counsel's Eyes Only

147.   Finally, I understand Apple devices have been sold without YouTube preloaded since 2012,[170]

with no demonstrable adverse consequences for Apple's sales and market position.  Indeed, Apple

captured 15.6 percent of the worldwide smartphone sales and sold 150.8 million units in 2013.[171]

This undermines Mr. Tate's opinion that HTC's customers derive a significant benefit from having

YouTube as a preloaded application.

---

[166]   "Tops of 2014: Digital", *Nielsen*, December 18, 2014, available at
https://www.nielsen.com/us/en/insights/news/2014/tops-of-2014-digital.html.

[167]   "Tops of 2015: Digital", *Nielsen*, December 17, 2015, available at
https://www.nielsen.com/us/en/insights/news/2015/tops-of-2015-digital.html.

[168]   Per discussion with Professor Jeffay.

[169]   Per discussion with Professor Jeffay.

[170]   Leswing, Kif "Google is the reason YouTube isn't a default app on the iPhone anymore," *Business Insider*,
June 30, 2017.

[171]   Gartner Press Release, "Gartner Says Annual Smartphone Sales Surpassed Sales of Feature Phones for the
First Time in 2013," February 13, 2014.

Highly Confidential – Outside Counsel's Eyes Only

### 5.    The '064 Patent

148.  I understand from Professor Ben Bederson, a technical expert retained by HTC, that the '064
Patent (as interpreted by Philips) relates to a method for determining whether scrolling, dragging, or
some other action should occur.  I understand that the patent references two prior art concepts of
inertial scrolling and touch dragging, and that the alleged innovation is the interface to selectively
activate these or other actions based on time thresholds.

149.  Mr. Tate claims that the primary benefit of the invention relates to providing the user with a
realistic and natural user experience.  Mr. Tate claims the implementation of the patent in the
Launcher and Chrome browser applications creates a natural, intuitive and easy to use interface
which allows the user to easily and intuitively customize its Launcher applications.[172]  However, I
understand that the patent does not protect touch dragging as that was a concept well known in prior
art.[173]  Additionally, Mr. Tate points to the five most popular apps such as Facebook and Twitter as
evidence of scrolling being important to users.[174]  Again, I understand the patent does not protect
scrolling generally, as that is a concept well known in prior art.[175]

150.  I understand that what the patent does cover is the choice of a particular set of interactions to
distinguish between certain actions, including a scrolling action and a dragging action.  ████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████[176]

---

[172]  Tate Report, pp. 54-55.

[173]  Per discussion with Professor Bederson.

[174]  Tate Report, p. 55.

[175]  Per discussion with Professor Bederson.

[176]  Per discussion with Professor Bederson.

Highly Confidential – Outside Counsel's Eyes Only

### 6.    The '564 Patent

151.  I understand from Professor Bederson that the '564 Patent (as interpreted by Philips) relates to a zooming mechanism that enables a user to zoom in an area of interest so that user can then select a feature.  I understand that the core zooming technology was already well-known in prior art and the patent claims zooming with additional requirements, among them that the zooming facilitates the selection of a feature when displayed at a second scale.[177]

152.  Mr. Tate contends that the primary benefit of the patent is that it provides zooming functionality to all users and specifically that it helps users with low vision to navigate their devices more easily. Again, Mr. Tate misleadingly points to viewing-based applications such as Facebook and Instagram as examples of applications for which users would desire zooming functionality.[178]  However, I understand that the basic ability to zoom in an application such as Facebook is not claimed by the patent.[179]

153.  

### E.    Profit Attributable to the Invention

*Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.*

*Factor 11: The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

154.  In his consideration of *Georgia-Pacific* Factors 8 and 11, Mr. Tate reports that



---

[177]  Per discussion with Professor Bederson.

[178]  Tate Report, p. 56.

[179]  Per discussion with Professor Bederson.

Highly Confidential – Outside Counsel's Eyes Only

████████████████████████████████████████ Further, Mr. Tate reports the gross margin of HTC's accused products.[180]  He asserts tha████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[181]  Mr. Tate concludes that this factor has an upward impact on the reasonable royalty rates for the patents-in-suit.[182]

155.  Mr. Tate has not established that the patented technology is fundamental to the features allegedly covered by the patents-in-suit or to the demand or sales of the accused products.  As shown above in *Georgia-Pacific* factors 9 and 10, some of the patents-in-suit provide no functionality-related benefits; the patented technology is limited to aesthetic feature and ████████████████████████████████████████████████████████████████████  Hence, Mr. Tate has not established a link between the patented technology and sales or profit margin of the accused products.

156.  ████████████████████████████████████████████████████████████████████Hence this factor has a downward effect on the royalty rate relative to the licenses under Philips' Portable Features program.

*Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

157 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[180]   Tate Report, pp. 48-50.

[181]   Tate Report, pp. 48-49.

[182]   Tate Report, p. 49.

Highly Confidential – Outside Counsel's Eyes Only

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████[183]

158.   Mr. Tate's claims suffer from a number of problems.

159.   █████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████ █ ███████

██████████████████████████████████████████

███████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████ █ █████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████████████

_____

[183]   Tate Report, pp. 61-62.

[184]   ████████████████████████████████████████████
         █████████████████████████████

[185]   Tate Report, p. 61.

Highly Confidential – Outside Counsel's Eyes Only

accepted apportionment methods that could be used to apportion the portfolio rate to each patent-in-suit.



Highly Confidential – Outside Counsel's Eyes Only

### 2. *Apportionment Based on Log Normal Distribution*

166.   Academic research has shown that in contrast to a pro-rata distribution, there is evidence that the distribution of patent value in a portfolio is skewed, with a small percentage of patents accounting for a disproportionate share of the value of the portfolio.  Indeed, research has shown most patents in a portfolio have little to no value.[190]

167.   In research published in 1998 by Mark Schankerman, he estimates distributions of patent values for patents in various technology fields based on patent renewal data.  The intuition behind the analysis is that the costs incurred by companies to renew their patent protection each year reflect their valuation of the patents.[191]  Schankerman (1998) finds that in the electronics field, the top 1%

---

[189]   Plaintiffs' Supplemental Responses to Defendants HTC Corp. And HTC America, Inc.'s Individual Interrogatory No. 2, March 19, 2018..  *See also*, PHILIPS-HTC00003978; HTC-PHIL-MH-005050; PHILIPS-HTC00001214; PHILIPS-HTC00003997.

[190]   Schankerman, Mark "How Valuable is Patent Protection? Estimates by Technology Field," *The RAND Journal of Economics*, Vol. 29, No. 1 (Spring, 1998), pp. 77-107. *See also* Putnam, Jonathan D., "Value Shares of Technologically Complex Products," (2014); Harhoff, Dietmar, Frederic M. Scherer, and Katrin Vopel, "Citations, family size, opposition and the value of patent rights," *Research Policy*, Vol. 1596 (2002), pp. 1-21; Harhoff, Dietmar, Frederic M. Scherer, and Katrin Vopel, "Exploring the Tail of Patented Invention Value Distributions," in Granstrand O. (ed) *Economics, Law and Intellectual Property* (Springer ed. 2003), pp. 279-309.

[191]   Schankerman, Mark "How Valuable is Patent Protection? Estimates by Technology Field," *The RAND Journal of Economics*, Vol. 29, No. 1 (Spring, 1998), pp. 77-107.

Highly Confidential – Outside Counsel's Eyes Only

of patents account for 24% of the value of the portfolio.[192]

168.  If I conservatively assume that the six patents-in-suit are among the most valuable of the ■ patents in the portfolio such that they account for the top 1% of the patents in the portfolio, then using this distribution, I would apportion 24% of the portfolio rate to the six patents-in-suit. Assuming equal value amongst the six patents-in-suit, each patent-in-suit would be apportioned 4% of the value of the entire portfolio.[193]

### 3.    Forward Citation Analysis

169.    Rather than just assuming the patents-in-suit are the most valuable, I have undertaken a forward citation analysis to determine a rank order of all the U.S. patents in the portfolio.[194]  The forward citation methodology has been extensively studied in the economics literature and accepted by the courts.[195]  In this approach, the number of citations a patent receives from other patents (i.e., forward citations) is used as a proxy for the patent's relative value to other patents, holding

---

[192]  Schankerman, Mark "How Valuable is Patent Protection? Estimates by Technology Field," *The RAND Journal of Economics*, Vol. 29, No. 1 (Spring, 1998), pp. 77-107, at 94.

[193]  As shown in the next section, a forward citation analysis does not support that the six patents-in-suit are the most valuable six patents in the portfolio, confirming the conservative nature of this assumption.

[194]  The forward citation analysis is usually performed for U.S. patents only due to data constraints.  As will be shown later and in the attached technical appendix, the patent-related data from the USPTO contains a rich set of information that allows a determination of a patent's forward citations by U.S. patents.  In contrast, information for foreign patents is fragmented and less comprehensive.  Consequently, I only perform the forward citation analysis on the ■ U.S. Patents in Philips' touch-enabled device patent portfolio.  This method yields conservative results as to the relative value of the patents in Philips' portfolio because the value of the foreign patents is implicitly assumed to be zero.

[195]  The patent citation analysis has been accepted by courts as a reliable and relevant method for determining the value of individual patent within a portfolio.  *See, e.g.*, *Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375, 382-384 (E.D. Penn. 2016) ("the forward citation method of analysis has been recognized in the academic literature as reliable since the 1990s … Dr. Cox's use of forward citation analysis in his expert opinion is therefore reliable under Daubert"); *Better Mouse Co. v. SteelSeries ApS*, No. 14-198, 2016 U.S. Dis. LEXIS 16611 (E.D. Tex. 2016) ("Forward citation can be both relevant and reliable."); *Intel Corp. v. Future Link Sys., LLC*, No. 14-377, 2017 U.S. Dist. LEXIS 91699 (D. Del. June 8, 2017) ("In cases where forward citation analysis has been found unreliable, it was because the expert failed to 'tie the methodology to the facts'…" (quoting Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-cv-03999, 2015 WL 4272870, at *8 (N.D. Cal. July 14, 2015))); *PersonalWeb Techs. LLC v. IBM*, No. 16-1266, 2017 U.S. Dist. LEXIS 116422 (N.D. Cal. July 25, 2017) ("Plaintiffs do not dispute that forward citation analysis is itself an accepted and reliable methodology for apportioning the value of a particular patent in a portfolio").

Highly Confidential – Outside Counsel's Eyes Only

everything else constant.[196]  Several empirical studies have established a positive relationship between a patent's value and its forward citation counts.[197]  The economic intuition behind that finding is that relatively valuable inventions will encourage new inventions which in turn leads to the patent being cited by subsequent patents.  Hence, one can estimate the relative economic value of patents within a portfolio based on their relative forward citation counts.

170.  For each of the ▉ U.S. patents contained in the touch-enabled device patent portfolio, I obtained forward citation counts using data provided by Clarivate Analytics.[198]  **Appendix D** contains detailed analyses and results of my analysis.  I compare the forward citation counts of the ▉ U.S. patents with comparable patents (in terms of patent age and technology class) in order to determine age- and technology-adjusted forward citation counts.  Studies show that older patents tend to have more citations than newer patents, all else equal.  Studies also show that the speed of citation accumulation may differ by the field of technology.[199]  To ensure comparability of forward citation counts of the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ I

---

[196]  When patent B cites patent A, patent B generates one forward citation to patent A.  The patent being cited (i.e., Patent A) is referred as part of patent B's backward citations.

[197]  *See, e.g.,* Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations," *RAND Journal of Economics*, vol. 21, 1990, pp. 172-187; Hall, Bronwyn, Adam Jaffe, and Manuel Trajtenberg, "Market Value and Patent Citations," *RAND Journal of Economics*, 2005, pp. 16-38; Harhoff, Dietmar, Francis Narin, Frederic M. Scherer, and Katrin Vopel, "Citation Frequency and the Value of Patented Inventions," *Review of Economics and Statistics*, vol. 81(3), 1999, pp. 511-515.

[198]  Clarivate Analytics, formerly a part of Thomson Reuters, is a data service provider.  Clarivate Analytics Press Release, "Acquisition of the Thomson Reuters Intellectual Property and Science Business by Onex and Baring Asia Completed," October 3, 2016.  Its Derwent World Patents Index sources from 50 worldwide sources, covers over 36 million patent families, over 100 million patent documents worldwide across a broad set of industries.  "Derwent World Patents Index," available at https://clarivate.com/wp-content/uploads/dlm_uploads/2018/07/DWPI_SellSheet_0718_v1.0.pdf. Clarivate's patent data has been used widely in academic research.  *See, e.g.,* Schwartz, David and Ted Sichelman, "Data Sources on Patents, Copyrights, Trademarks, and Other Intellectual Property," in Peter S. Menell, David L. Schwartz & Ben Depoorter (eds), *Research Handbook on the Law & Economics of Intellectual Property* (Edgar Elgar Publishing ed, 2018); Yamashita, Yasuhiro, "Exploring Characteristics of Patent-Paper Citations and Development of New Indicators," in Mari Jibu & Yoshiyuki Osabe (eds), *Scientometrics* (IntechOpen 2018); Pereira, Cristiano Goncalves and Geciane Silveira Porto, "Uncovering Innovation Features and Emerging Technologies in Molecular Biology through Patent Analysis," in Picanco-Castro V., Swiech K. (eds) *Recombinant Glycoprotein Production.  Methods in Molecular Biology*, Vol 1674 (Humana Press ed. 2018).

[199]  *See, e.g.,* Hall, Bronwyn, Adam B. Jaffe, and Manuel Trajtenberg, "The NBER Patent Citations Data File: Lessons, Insights and Methodological Tools," *National Bureau of Economic Research*, 2001, No. w8498.

Highly Confidential – Outside Counsel's Eyes Only

control for the effect of technology class on these patents' citation counts by comparing each of the ▮ U.S. patents' citation counts with those of the other patents in the same technology class.  The resulting age- and technology class-adjusted citation counts for the ▮ U.S. patents can then be compared.[200]

171.  After obtaining the adjusted forward citation counts for the ▮ U.S. patents, I derive the relative value of each U.S. patent as a percent of the portfolio value based on its adjusted forward citation count.[201]  Using this apportionment approach, I find that the '064 Patent is the most valuable of the patents-in-suit, accounting for 28.86% of the portfolio value.  The other values are 0%, 0.28%, 1.36%, 5.04% and 1.22% for the '809, '797, '806, '564, and '913 patents respectively.[202]

### 4.    Summary of Apportionment Approaches

172.  **Table 6** below summarizes the apportionment that would be applied to each patent-in-suit under each of the apportionment approaches I considered.  I use these apportionment findings to reach a conclusion as to the reasonable royalty rate as discussed below under *Georgia-Pacific* Factor 15.

---

[200]  Following methodology that has been accepted by the courts, I also adjusted forward citation counts by excluding foreign citations and self-citations.  *See, e.g., Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999, 2015 WL 4272870, (N.D. Cal. July 14, 2015).  For details of my analysis, *see* **Appendix D**.

[201]  This is an approach taken in the matter of *Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375, 382-384 (E.D. Penn. 2016) ("the forward citation method of analysis has been recognized in the academic literature as reliable since the 1990s … Dr. Cox's use of forward citation analysis in his expert opinion is therefore reliable under Daubert").  *See also*, Testimony of Alan Cox, March 8, 2017.  Under this approach, a patent's value in the portfolio is proportional to its adjusted forward citation counts as a percent of the total number of adjusted citation counts of all ▮ U.S. patents.

[202]  This approach has been accepted by courts in prior patent litigations. *See e.g. Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375, 382-384 (E.D. Penn. 2016) ("the forward citation method of analysis has been recognized in the academic literature as reliable since the 1990s... Dr. Cox's use of forward citation analysis in his expert opinion is therefore reliable under *Daubert*").  *See also, Better Mouse Co. v. SteelSeries ApS*, No. 14-198, 2016 U.S. Dis. LEXIS 16611 (E.D. Tex. 2016) ("The Court finds that Mr. Eichmann's testimony clears *Daubert* because it is sufficiently relevant and reliable… SteelSeries has shown that Mr. Eichmann's methodology is reasonably reliable.").  I also conducted a sensitivity analysis by assuming that the adjusted forward citations follow a log-normal distribution with parameter values contained in Shankerman (1998).  This is an approach taken in the matter of *Koninklijke Philips N.V. et al. v. Zoll Medical Corporation*, Case no. 12-cv-12255-NMG.  This alternative analysis yields similar results.

Highly Confidential – Outside Counsel's Eyes Only

**Table 6**
**Estimated Value of the Six Patents-in-Suit**
**as a Percent of Total Portfolio Value**



### F.    Derivative or Convoyed Sales

*Factor 6: The effect of selling the patented specialty in promoting revenue of other products of the licensee; the existing value of the invention to the licensor as a generator of revenue of his non-patented items; and the extent of such derivative or convoyed revenue.*

173.    As discussed under *Georgia-Pacific* Factors 9 and 10, the patents-in-suit have limited value to the accused products and do not drive sales or profitability of the accused products.  Even if HTC sold accessories with the accused products, such sales cannot be attributed to the alleged infringement.  Therefore this factor does not inform the hypothetical negotiation.

*Factor 12:  The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*

174.    I have not seen evidence of a particular custom in this business regarding the portion of the profit or selling price that should be paid for use of the patents-in-suit, other than the specific evidence provided by the agreements considered in *Georgia-Pacific* Factor 1.  Therefore, this factor does not

Highly Confidential – Outside Counsel's Eyes Only

provide guidance for the outcome of the hypothetical negotiation.

### G.    Conclusion with Respect to Reasonable Royalty

*Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both have been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*



177.    **Table 7** below summarizes the royalty rate of the six patents-in-suit under the various apportionment methods.

Highly Confidential – Outside Counsel's Eyes Only

**Table 7**



Highly Confidential – Outside Counsel's Eyes Only

## VIII.    CALCULATION OF ROYALTY DAMAGES

179.   To calculate reasonable royalty damages, the per unit royalty rates are applied to HTC's accused product sales.  As indicated before, I understand that the parties dispute the appropriate damages start dates.  I have calculated Philips' royalty damages based on the damages start dates provided to me by counsel for HTC.  To the extent the trier of fact determines a different damages start date should be applied, damages figures can be readily adjusted based on the data and schedules attached to my report.

180.   **Table 8** below summarizes Philips' royalty damages by patent.  The calculations are contained in **Exhibit 6**.

Highly Confidential – Outside Counsel's Eyes Only

**Table 8**
**Philips' Royalty Damages**



---

203   Tate Report, Exhibit 4.0 and 4.1.

204   Tate Report, Exhibit 4.0.

Highly Confidential – Outside Counsel's Eyes Only



_____

Laura Stamm

_____

[205]   Tate Report, p. 63.

[206]

Highly Confidential – Outside Counsel's Eyes Only

### Appendix D
### Forward Citation Analysis

## I.  Overview

This appendix provides details to the forward citation methodology I employed as one method for apportioning the value of Philips' touch-enabled device portfolio to the six patents-in-suit.  "Forward citation counts" refer to the number of times a patent is referenced by subsequent patents as prior art. The methodology of forward citation analysis is well established in the economics literature and accepted in many patent litigations.[1] The intuition behind the approach is that more valuable patents tend to receive more forward citations than less valuable patents, keeping other things equal. Therefore, the relative value of patents can be estimated based on their forward citation counts with appropriate controls for the age of the patent and the field of technology.

## II.  Data

I use data for 501,209 patents issued under ▮ U.S. Patent Classification ("USPC") Codes of interest between January 1, 1995 and June 6, 2019 ("Sample Universe").[2] The



For each patent, the following information is used:

- Class: The 3-digit USPC [4] under which the patent is issued.

---

1    *See, e.g.* Trajtenberg, Manuel, "A Penny for Your Quotes: Patent Citations and the Value of Innovations," *The Rand Journal of Economics* (1990): 172-87; Harhoff, Dietmar, Francis Narin, Frederic M. Scherer, and Katrin Vopel, "Citation Frequency and the Value of Patented Inventions," *Review of Economics and Statistics* 81.3 (1999): 511-15; Harhoff, Dietmar, Frederic Scherer, and Katrin Vopel, "Citation, Family size, Opposition and the Value of Patent Rights," *Research Policy*, 1596 (2002); Hall, Bronwyn H., Adam Jaffe, and Manuel Trajtenberg, "Market Value and Patent Citations," *RAND Journal of Economics* (2005): 16-38; Moser, Petra, Joerg Ohmstedt, and Paul W. Rhode. "Patent citations and the size of patented inventions: Evidence from hybrid corn," *National Bureau of Economic Research*, No. w21443 (2015).; Kogan, Leonid, Dimitris Papanikolaou, Amit Seru, and Noah Stoffman, "Technological Innovation, Resource Allocation, and Growth," *The Quarterly Journal of Economics* 132, no. 2 (2017): 665-712; *Comcast Cable Communs., LLC v. Sprint Communs. Co., LP*, 218 F. Supp. 3d 375, 382-384 (E.D. Penn. 2016) ("the forward citation method of analysis has been recognized in the academic literature as reliable since the 1990s... Dr. Cox's use of forward citation analysis in his expert opinion is therefore reliable under *Daubert*"); *Intel Corp. v. Future Link Sys., LLC*, No. 14-377, 2017 U.S. Dist. LEXIS 91699, at 9-16 (D. Del. June 8, 2017); *Better Mouse Co. v. SteelSeries ApS*, No. 14-198, 2016 U.S. Dist. LEXIS 16611 (E.D. Tex. 2016); *PersonalWeb Techs. LLC v. IBM*, No. 16-1266, 2017 U.S. Dist. LEXIS 116422, at 6-8 (N.D. Cal. July 25, 2017).
2    Data were provided by Clarivate Analytics on June 6, 2019.
3    The list of U.S. patents in Philips' Portable Features program is as of May 2015, *see* PHILIPS00022962-3022 at 2992-3002. According to the Tate Report, the number of patents included in the program remained the same as of August 2017 (Tate Report, p. 8.)
4    The USPC is a system for organizing U.S. patents into relatively small collections based on "common subject matter." According to the USPTO, "[e]ach subject matter division in the USPC includes a major component

Highly Confidential – Outside Counsel's Eyes Only

- Days: Number of days from the patent's publication date through June 6, 2019.

- Assignee: People / Entity / Entities who own the patent.

- Count of citing patents: Number of subsequent patents that cite to the patent of interest.

- Citing patents: List of subsequent patents that cite to the patent of interest.[5]

- Citing patents assignee: List of assignees of subsequent patents that cite to the patent of interest.

A few notes:

1. Using "Citing patents" and "Citing patents assignee," I was able to exclude foreign citations and self-citations from *unadjusted* forward citation counts. I exclude foreign citations because they may count the same forward citations of a foreign version of a U.S. patent.  I exclude self-citations, i.e. citations made by patents with the same assignee, following the court's decision regarding self citations in prior cases.[6]

2. Due to the limitation of data availability, I consider only the ▮ U.S. patents in the Philips Portable Features Program ("Philips' U.S. Patents") in this analysis.  By excluding the 390 foreign patents, I am conservatively assuming that their value is zero.

3. The USPC was replaced by the Cooperative Patent Classification ("CPC") system on January 1, 2013.[7] Patent applications filed on and after January 1, 2015 no longer have a USPC code,[8] making it implausible to select comparable patents consistently before and after the change.[9] As a result, my sample excludes patent applications filed in and after 2015. Since those excluded patents are several years younger than most of the Philips' U.S. Patents, the impact on the results is minimal.

4. One of the patents-in-suit, the '809 Patent, was not issued until 2016 and does not have a USPC.[10] The '809 Patent is related to U.S. Patent, US 8,543,819 (the '819 Patent) and has the same specifications.[11] Because patents are cited for their specifications and not specific claims,[12] forward citations of the '819 Patent is a reasonable proxy for the forward citations of the '809 Patent.

---

called a class and a minor component called a subclass. A class generally delineates one technology from another. Subclasses delineate processes, structural features, and functional features of the subject matter encompassed within the scope of a class." *See* USPTO Website, "Overview of the U.S. Patent Classification System (USPC),"December 2012, p. I-1, available at https://www.uspto.gov/sites/default/files/patents/resources/classification/overview.pdf.

5   Each patent ID begins with a 2-digit country code, allowing me to identify its country of filing. For example, all U.S. patents begin with "US".

6   *See, e.g., Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999, 2015 WL 4272870, (N.D. Cal. July 14, 2015).

7   "Cooperative Patent Classification (CPC) - FAQ," *Thomson Reuters*, available at http://ips.clarivate.com/m/pdfs/dwpicovkinds/CPC-2013.pdf, at 1.

8   Technology & Patent Research, "Making the Switch from USPC to CPC: What Attorneys and Searchers Need to Know," October 2015.

9   Each CPC subclass can be mapped to multiple USPCs.

10  As a matter of fact, the '809 Patent has not received any forward citation by June 6, 2019.

11  U.S. Patent No. 9,436,809 B2 and U.S. Patent No. 8,543,819 B2.

12  *See, Oracle America, Inv. V. Google, Inc.,* 2012 U.S. Dist. LEXIS 35393; 2012 2L 877125 (N.D. Cal. March 15, 2012).