# **EXHIBIT C**

REDACTED VERSION OF DOCUMENT SOUGHT
TO BE SEALED (EXHIBIT 2 TO MICROSOFT AND
ASUS'S DAUBERT MOTION TO EXCLUDE EXPERT
OPINIONS OF MICHAEL E. TATE (DAMAGES))

# Exhibit 2

**(Unredacted version of document sought to be sealed)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**In re Koninklijke Philips Patent Litigation**

Case No.: 4:18-cv-01885-HSG

JURY TRIAL DEMANDED

**EXPERT REPORT OF MICHAEL E. TATE – ASUS Defendants**

**April 25, 2019**

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Table of Contents**

1    PROFESSIONAL AND EDUCATIONAL BACKGROUND ................................................ 1
2    INFORMATION RELIED UPON ..................................................................................... 2
3    SUMMARY OF CONCLUSIONS ...................................................................................... 2
4    BACKGROUND ................................................................................................................ 3
    4.1   ASUS ................................................................................................................. 3
    4.2   Philips ............................................................................................................... 3
    4.3   Markets for the Accused Products ..................................................................... 5
    4.4   Patents-in-Suit .................................................................................................. 6
    4.5   Philips' Portable Features Patent Release Program ........................................... 8
    4.6   Damages Start Dates ....................................................................................... 11
5    ANALYSIS ..................................................................................................................... 12
    5.1   Analysis of License Agreements Entered by the Parties ................................... 13
    5.2   Availability of Acceptable Non-Infringing Alternatives ................................. 40
    5.3   *Georgia-Pacific* Analysis ................................................................................. 41
6    CONCLUSION ................................................................................................................ 64
    6.1   Reasonably Royalty Damages ......................................................................... 64
7    PREJUDGMENT INTEREST ......................................................................................... 64

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

My name is Michael E. Tate.  I have been retained as the damages expert in this case by counsel for Koninklijke Philips N.V. ("Philips N.V.") and U.S. Philips Corporation ("Philips U.S.") (collectively, "Philips").

The following report sets forth my opinions as to the amount of financial harm suffered by Philips as a result of ASUSTeK Computer Inc.'s and ASUS Computer International's (collectively "ASUS" or "Defendant") infringement of Philips' U.S. Patent Nos. RE 44,913 ("the '913 patent"), 7,184,064 ("the '064 patent"), 7,529,806 ("the '806 patent"), 5,910,797 ("the '797 patent"), 9,436,809 ("the '809 patent"), and RE 43,564 ("the '564 patent")[1] (collectively, the "Patents-in-suit").

# 1    PROFESSIONAL AND EDUCATIONAL BACKGROUND

I am a Vice President of Charles River Associates ("CRA") in its Chicago office.  CRA is an international business consulting firm focusing on, among other things, intellectual property matters in the context of strategy, licensing, valuation and litigation consulting.  CRA is a leading provider of expert damage analysis and testimony for complex intellectual property litigation matters.

I obtained a Bachelor of Business Administration degree, with a concentration in finance, from the University of Houston in Houston, Texas.  Thereafter, I obtained a Master of Science degree in Industrial Administration from Purdue University in West Lafayette, Indiana.

I have served as a consultant to a wide variety of business and industrial clients on matters involving financial analysis and modeling for the purpose of interpreting and projecting data and evaluating the economic impact of business decisions, transactions and economic events.  I have served as an expert witness or consultant in a wide range of litigation matters, including patent, copyright, trademark and trade secret cases.  My work on patent infringement litigation matters has involved the quantification of economic damages and evaluation of

---

[1] Opinions Concerning Infringement by the ASUS Defendants of U.S. Patent No. RE44,913 ("Greenspun ASUS Infringement Report '913 Patent"); Opening Expert Report of Douglas Schmidt, Ph.D., Regarding Infringement by the ASUS Defendants of U.S. Patent No. 7,184,064 ("Schmidt ASUS Infringement Report '064 Patent"); Expert Report of Nathaniel Polish, Ph.D., Regarding Infringement by the ASUS Defendants of U.S. Patent No. 7,529,806 ("Polish ASUS Infringement Report '806 Patent"); Opinions Concerning Infringement by the ASUS Defendants of U.S. Patent No. 5,910,797 ("Greenspun ASUS Infringement Report '797 Patent"); Expert Report of Dr. Michael T. Goodrich Regarding Infringement by the ASUS Defendants of U.S. Patent No. 9,436,809 ("Goodrich ASUS Infringement Report '809 Patent"); Opening Expert Report of Douglas Schmidt, Ph.D. Regarding Infringement by the ASUS Defendants of U.S. Patent No. RE43,564 ("Schmidt ASUS Infringement Report '564 Patent").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

commercial success.  I have also advised clients on strategic and valuation issues relating to intellectual property and license negotiations.

My curriculum vitae is attached hereto at Tab 1.  A list of the cases in which I have testified at trial or by deposition within the last four years is attached hereto at Tab 2.

CRA is being compensated on a rate-times-hours basis for the work my staff and I perform.  My current rate is $645 per hour.  CRA's compensation does not depend in any way on the outcome of this litigation.

## 2      INFORMATION RELIED UPON

In performing the analyses and developing the opinions reflected in this report, I have relied upon publicly available information, deposition testimony, and various documents produced by the parties in this matter.  I have had discussions with Philips' technical experts Nathaniel Polish, Ph.D., Dr. Michael T. Goodrich, Douglas Schmidt, Ph.D. and Phillip Greenspun, Ph.D., and I have relied on their expert reports.  I have also had discussions with Philips personnel, including Kevin Scott, Brian Wieghaus, Paul Im, and Andrei Filip.  A list of the information I have reviewed and/or relied upon is attached hereto at Tab 3 or referenced in the text, footnotes and attached exhibits of this report.  I reserve the right to supplement and/or amend my report to reflect information made available to me post-issuance.

## 3      SUMMARY OF CONCLUSIONS

For purposes of my analyses and opinions contained in this report, I was asked to assume that the ASUS products listed in Exhibit 7.0 (the "Accused Products") will be found to infringe the Patents-in-Suit.  I was also asked to assume that the Patents-in-Suit will not be found invalid. Under these assumptions, Philips would be entitled to damages adequate to compensate for that infringement but in no event less than a reasonable royalty.

Based on my review of information gathered during my work in this case, I have concluded that the appropriate measure of damages to compensate Philips for ASUS's alleged use of the Patents-in-Suit would be a reasonable royalty.  I have concluded that reasonable royalty damages for ASUS's infringing use of the Patents-in-Suit through December 31, 2018 would total ███████.[2]

---

[2] Exhibit 4.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

## 4       BACKGROUND

### 4.1      ASUS

ASUSTeK Computer Inc. is based in Taipei, Taiwan, was founded in 1990, and develops, designs, sells and repairs computers, communications and consumer electronics products.[3]

Asus Computer International, Inc. is based in Fremont, California, was founded in 1994, and engages in manufacturing and wholesaling computing, communications, and consumer electronics solutions.[4]  Its products include phones, laptops, 2-in-1 PCs, tablets, motherboards, graphics cards, servers, workstations, desktop and all-in-one PCs; and display, wearable, networking, sound, home and automobile, peripheral and gaming products.[5]  Asus Computer International, Inc. operates as a subsidiary of ASUSTeK Computer Inc.[6]  ASUS earned approximately $14.6 billion in revenue in 2017.[7]

### 4.2      Philips

Philips N.V. is based in Amsterdam, the Netherlands and was founded in 1891.[8]  It "operates as a health technology company worldwide.  The company offers mother and child care, and oral healthcare products; male grooming and beauty products; kitchen appliance, coffee, air, garment care, and floor care products; and sleep, respiratory care, and respiratory drug delivery products.  It also provides diagnostic X-ray, integrated clinical, magnetic resonance imaging, computed tomography, and molecular imaging solutions.  In addition, the company offers interventional X-ray systems, and imaging and therapy devices for the treatment of coronary artery and peripheral vascular disease; imaging products that focus on diagnosis, treatment planning, and guidance for cardiology, general imaging, obstetrics/gynecology, and point-of-care applications; and proprietary software to enable diagnostics and intervention.  Further, it provides enterprise wide patient monitoring solutions; patient analytics and monitoring, and clinical decision support systems; therapeutic care products; patient monitoring and therapeutic care consumables; and customer services.  Additionally, the company offers

---

[3] S&P Capital IQ Financial Database.
[4] S&P Capital IQ Financial Database.
[5] S&P Capital IQ Financial Database.
[6] S&P Capital IQ Financial Database.
[7] TWD 433.967 billion (ASUS 2017 Annual Report) / 29.6537 (USD/TWD 12/31/17 exchange rate - https://www.poundsterlinglive.com/best-exchange-rates/us-dollar-to-taiwan-dollar-exchange-rate-on-2017-12-31).
[8] S&P Capital IQ Financial Database.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

healthcare information technology (IT), clinical, and visualization and quantification informatics solutions for radiology, cardiology, and oncology departments; universal data management solutions, picture archiving and communication systems, and integrated electronic medical record systems; clinical and hospital IT platforms; technology-enabled monitoring and intervention, actionable program, cloud-based, and population health management software solutions.  It also provides digital platforms that connect consumers, patients, and healthcare providers in a cloud-based connected health ecosystem of devices, apps, and tools."[9]

For many years, Philips operated in several sectors, including lighting, consumer electronics and semiconductors.  The Patents-in-Suit were invented by Philips' employees. Compensation received for Philips' inventions are reinvested into further R&D, primarily in the healthcare space.[10]

The consolidated Philips entities generated approximately $20.7 billion total revenue in 2018,[11] earning 40% of revenue from its Diagnosis & Treatment segment, 40% from its Personal Health segment, 17% from its Connected Care and Health Informatics segment and 3% from other segments.[12]

Philips U.S. is a Delaware Corporation formed in 1968.  It holds U.S. granted patents that originated outside of the U.S., and is a subsidiary of Philips Holding USA, which is 100% owned by Philips N.V.[13]

Philips' intellectual property portfolio consists of 62,000 patent rights, 37,600 trademarks, 47,800 design rights and 3,000 domain names.[14]  Philips' Intellectual Property and Standards ("IP&S") is a world-wide business unit of Philips charged with managing all of the intellectual property of Philips' businesses and has world-wide responsibility for handling its intellectual property licensing activity.[15] ██████████████████████████

████████████████████████████████████████

---

[9] S&P Capital IQ Financial Database.
[10] Discussion with Brian Wieghaus.
[11] [€18.1 billion (https://www.results.philips.com/#/ - "Philips Fourth Quarter and Full Year 2018 Results" presentation)] x [1.145 (12/31/18 exchange rate at https://www.x-rates.com/historical/?from=USD&amount=1&date=2018-12-31).
[12] https://www.results.philips.com/#/ - "Philips Fourth Quarter and Full Year 2018 Results" presentation.
[13] Discussion with Brian Wieghaus.
[14] http://www.ip.philips.com/about (last accessed 4/4/19).
[15] B. Wieghaus 1/11/19 deposition, pp. 256-258.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

████████████████████████████████████[16]  The group employs approximately 245 IP professionals and 75 support staff across 18 offices and 11 countries worldwide.[17]  Philips generated annual IP royalty income of between €200 and €300 million from 2015 to 2018[18] (Philips' IP&S personnel also indicated the annual license revenues generated by its IP&S business has been in this range[19]).

### 4.3    Markets for the Accused Products

The Accused Products in this matter include various ASUS smartphones, tablets, and PC's.[20]  These items are sold and licensed in the smartphone, tablet, and PC markets.

<u>Smartphones</u>

The mobile phone market is comprised of feature phones and smartphones.  Smartphones are defined as "advanced cell phones that serve as computing devices in addition to being mobile handsets and that run on an advanced mobile operating system."[21]  The United States mobile phone market was valued at approximately $10 billion in 2009.[22]  The North American mobile phone market (of which the United States accounted for approximately 84.3%) was valued at approximately $72 billion in 2016 and was projected to increase to $79 billion by 2021.[23]

<u>Tablets and PC's</u>

The United States tablet sales market is comprised of tablet computers, including media tablets, but excluding e-readers.[24]  The market was valued at approximately $7 billion in 2010[25] (peaking at $23.7 billion in 2014[26]) and $18 billion in 2016 and is projected to decrease to approximately $15 billion by 2021.[27]

The United States PC market is comprised of desktop and portable PCs, the latter of which includes laptops, notebooks, and netbooks, but excludes tablets.[28]  The market was valued

---

[16] Discussion with Brian Wieghaus.
[17] http://www.ip.philips.com/about (last accessed 4/4/19).
[18] Philips 2017 Annual Report, p. 49.  Philips 2018 Annual Report, p. 9.
[19] B. Wieghaus 1/11/19 deposition, p. 335.
[20] Exhibit 7.0.
[21] MarketLine, <u>Mobile Phones in North America</u>, March 2017, p. 7.
[22] DataMonitor, <u>Mobile Phones – North America (NAFTA) Industry Guide</u>, February 2011, p. 91.
[23] MarketLine, <u>Mobile Phones in North America</u>, March 2017, p. 2.
[24] MarketLine, <u>Tablet Sales in the United States</u>, March 2017, p. 7.
[25] MarketLine, <u>Tablet Sales in the United States</u>, November 2014, p. 8.
[26] MarketLine, <u>Tablet Sales in the United States</u>, November 2014, p. 2.
[27] MarketLine, <u>Tablet Sales in the United States</u>, March 2017, p. 2.
[28] MarketLine, <u>PCs in the United States</u>, March 2017, p. 7.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

at approximately $45.9 billion in 2009,[29] decreased to $35.9 billion in 2016 and is projected to increase to approximately $36.2 billion by 2021.[30]

### 4.4    Patents-in-Suit

#### 4.4.1    Authentication/DRM Patent

##### *4.4.1.1    The '809 patent[31]*

The '809 patent issued on September 6, 2016, is entitled "Secure Authenticated Distance Measurement," and is a continuation of U.S. Patent 8,886,939 (application 10/521,858).[32]  Based on Dr. Goodrich's expert report and my discussions with him, the '809 patent generally relates to methods, devices, and systems for protecting the transfer of digital content from one device to another.  I understand that the '809 patent addresses challenges associated with unauthorized copying and pirating of digital content.  I understand that the '809 patent is an approach to accomplish those objectives using a digital certificate and a time-based proximity assessment.

#### 4.4.2    Streaming and Services Patent

##### *4.4.2.1    The '806 patent[33]*

The '806 patent issued on May 5, 2009 and is entitled "Partitioning of MP3 Content File for Emulating Streaming."[34]  Based on Dr. Polish's expert report and my discussions with him, I understand that the '806 patent provides an open architecture solution for content delivery (e.g., delivery of video or audio content) over a network.  In particular, the patent describes a modified download approach for multimedia content that allows for the emulation of streaming with low or negligible play-out latency.

#### 4.4.3    Touch Screen Interfaces Patents

##### *4.4.3.1    The '064 patent[35]*

The '064 patent issued on February 27, 2007 and is entitled "Touch-Screen Image Scrolling System and Method."[36]  Based on Dr. Schmidt's expert report and my discussions with him, the '064 patent generally relates to an improved touchscreen scrolling system that enables

---

[29] DataMonitor, <u>PCs in the United States,</u> February 2011, p. 2.
[30] MarketLine, <u>PCs in the United States,</u> March 2017, p. 2.
[31] Goodrich ASUS Infringement Report '809 Patent and discussion with Dr. Goodrich, unless otherwise noted.
[32] '809 patent.
[33] Polish ASUS Infringement Report '806 Patent and discussion with Dr. Polish, unless otherwise noted.
[34] '806 patent.
[35] Schmidt ASUS Infringement Report '064 Patent and discussion with Dr. Schmidt, unless otherwise noted.
[36] '064 patent.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

users to interact with scrollable data and other items displayed on a touchscreen in a seemingly natural way.  The invention resides primarily in the use of finger touch gestures to enable users to selectively activate a variety of touchscreen functionalities, including scrolling that "sticks to the finger," continued scrolling with inertia – or "intertial scrolling," and moving a touch-selected object in correspondence with the finger touch – or "touch dragging."

### 4.4.3.2   The '564 patent[37]

The '564 patent issued on August 7, 2012, is entitled "Hand-Held with Auto-Zoom for Graphical Display of Web Page," is a reissue of U.S. Patent 6,466,203 (application 09/619,426) and is a continuation-in-part of U.S. Patent 6,211,856 (application 09/062,364).[38]  Based on Dr. Schmidt's expert report and my discussions with him, the '564 patent generally relates to a zooming mechanism that enables a user to zoom in on an area of interest so that, when that area is enlarged at what the patent calls a "second scale," the user can select a feature more easily.

### 4.4.3.3   The '913 patent[39]

The '913 patent issued on May 27, 2014, is entitled "Text Entry Method and Device Therefor," and is a reissue of U.S. Patent 6,885,318 (application 10/156,409).[40]  Based on Dr. Greenspun's expert report and my discussions with him, I understand the '913 patent generally relates to a method and device for improved text input that overcame drawbacks of preexisting character entry methods.

### 4.4.4   Graphical User Interfaces

### 4.4.4.1   The '797 patent[41]

The '797 patent issued on June 8, 1999 and is entitled "Portable Data Processing Apparatus Provided with a Screen and a Gravitation-Controlled Sensor for Screen Orientation."[42] Based on Dr. Greenspun's expert report and my discussions with him, I understand the '797 patent generally relates to portable electronic devices that include sensors called accelerometers, which measure how a user manipulates the device and, in response, move what is displayed on

---

[37] Schmidt ASUS Infringement Report '564 Patent and discussion with Dr. Schmidt, unless otherwise noted.
[38] '564 patent.
[39] Greenspun ASUS Infringement Report '913 Patent and discussion with Dr. Greenspun, unless otherwise noted.
[40] '913 patent.
[41] Greenspun ASUS Infringement Report '797 Patent and discussion with Dr. Greenspun, unless otherwise noted.
[42] '797 patent.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

the device's screen.  I understand that the '797 patent enables the display of more realistic motion patterns as compared to the prior art.

### 4.5    Philips' Portable Features Patent Release Program

Philips offers a "Portable Features" (also referred to as "Touch-Enabled Devices") patent release program (the "Portable Features program") that started in 2009.[43]  The Portable Features program was created by Philips to provide access to intellectual property used in devices such as mobile phones, tablets, laptops, all-in-one PCs and desktops and to recoup and provide a fair return on its investments in research and development.[44]  Due to patent expirations and new patent issuances/additions to the portfolio, the number of patents in the program can vary.  That said, the portfolio included 72 U.S. patents, including the issued, unexpired Patents-in-Suit, in both May 2015 and August 2017.[45]  The program's patent portfolio subdivides into the technological feature sets reflected in Figure 1 below.

**Figure 1: Portable Features Program Feature Sets[46]**

| Feature Set |
|---|
| AMR |
| WMA/FLAC |
| Audio Interfacing |
| Authentication/DRM |
| Backlighting |
| Chipset & Accelerometer Design |
| Compiler/Software Architecture |
| DLNA/Connectivity |
| Graphical User Interfaces |
| Streaming & Services |
| Touch Screen Interfaces |

Per Philips' website and discussions with Philips personnel, prospective registrants to the program may elect to pay either a blended rate for the portfolio or a discrete rate for each of the feature sets shown above.[47]

---

[43] A. Filip 3/1/2018 deposition, pp. 148-149 and J. Eleveld 12/20/18 deposition, p. 117.
[44] Plaintiffs' Supplemental Responses to ASUS Defendants' First Set of Interrogatories (Nos. 1, 3, 4, and 7) – Response to Interrogatory No. 7.
[45] https://www.ip.philips.com/data/downloadables/1/9/7/6/portable-features-patent-list-per-country-20150529.pdf and PHILIPS00231366-457 at 421-422.
[46] https://www.ip.philips.com/licensing/program/111.
[47] https://www.ip.philips.com/licensing/program/111.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

### _Blended Rate_[48]

The Blended Rate agreement incorporates a flat royalty rate applicable to each touch-enabled device, which involves less recordkeeping, paperwork and interaction between Philips and its registrants.  The agreement has a standard rate of $0.99 per device and a compliance rate of $0.75 per device.  The compliance rate is available upon pre-payment of royalties each calendar quarter and full compliance with the terms of the agreement.  It is intended for those licensees who enter a license without litigation and does not apply to companies Philips is in litigation with.[49]  A blended rate licensee pays the $0.99 standard rate or $0.75 compliance rate irrespective of the number of patents it uses in each of its licensed devices.[50]

### _Discrete Rate_[51]

The Discrete Rate agreement incorporates a product-by-product royalty calculation method based on the number of feature sets used in a given product.  Each feature set has a corresponding royalty rate and the total royalty for each product is the sum of the royalties for the feature sets used.  The royalty may vary from product to product and country to country.  Each feature set, some of which include the Patents-in-Suit, includes multiple patents:

---

[48] https://www.ip.philips.com/licensing/program/111.
[49] J. Eleveld 12/20/18 deposition, pp. 123-124.
[50] See my discussion of Philips' licenses below.
[51] https://www.ip.philips.com/licensing/program/111.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Figure 2: Portable Features Program Discrete Royalty Rates[52]**

| Feature Set | Per Unit Discrete Royalty Rate | Related Patent(s)-in-Suit |
|---|---|---|
| AMR | $0.10 | |
| WMA/FLAC | $0.10 | |
| Audio Interfacing | $0.10 | |
| Authentication/DRM | $0.25 | '809 |
| Backlighting | $0.25 | |
| Chipset & Accelerometer Design | $0.25 | |
| Compiler/Software Architecture | $0.25 | |
| DLNA/Connectivity | $0.25 | |
| Graphical User Interfaces | $0.40 | '797 |
| Streaming & Services | $0.25 | '806 |
| Touch Screen Interfaces | $0.40 | '064, '564, '913 |

A discrete rate licensee pays the royalty rate associated with a licensed feature set irrespective of the number of patents it uses within the feature set. In other words, a discrete rate licensee pays the stated feature set royalty rate whether it uses one or more than one patent in the category. I understand that these feature set rates were set with the understanding that they were fair rates for prospective licensees (who did not concede either the validity or infringement of Philips' patents) to pay for access to each feature set whether the licensees used one or all of the patents in that feature set.[53]

These Portable Features program rates



[52] http://www.ip.philips.com/data/downloadables/1/9/7/4/discrete-rate-agreement-may-29-2015.pdf. The Patents-in-Suit are aligned with the feature set to which they belong.
[53] Discussions with Brian Wieghaus.
[54] J. Eleveld 12/20/18 deposition, pp. 127-128 and B. Wieghaus 1/10/19 deposition, pp. 35-38, 40.
[55] J. Eleveld 12/20/18 deposition, pp. 131 and 134.
[56] J. Eleveld 12/20/18 deposition, pp. 128-130 and B. Wieghaus 1/10/19 deposition, pp. 37, 41, 44.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



[58]

Under both the blended and discrete rate agreements, licensees pay rates irrespective of the number of patents used in each licensed product.  Depending on how many covered functions a product incorporates, choosing a discrete rate structure may be more economically beneficial to a licensee than a blended rate agreement (or vice versa).

I discuss the licenses that Philips has entered under this program in greater detail below.

### 4.6    Damages Start Dates

I understand that there is a dispute between the parties relating to the damages start dates. The following table reflects the damages start dates that I have been asked to assume for purposes of quantifying damages in this case.  To the extent it is determined that damages start on a different date than those reflected in the table below, the amount of damages for those varying start dates can be calculated using the data and analyses attached to and/or underlying this report.

---

[57] B. Wieghaus 1/10/19 deposition, pp. 56-57.
[58] J. Eleveld 12/20/18 deposition, pp. 26, 79, 130-131, A. Filip 3/1/2018 deposition, pp. 164, 188, and B. Wieghaus 1/10/19 deposition, pp. 65-66, 68-69.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

**Figure 3: Damages Start Dates[59]**

| Patent-in-Suit | Damages Start Date |
|---|---|
| '809 | 9/6/2016 |
| '806 | 11/1/2014 |
| '064 | 5/21/2013 |
| '564 | 5/21/2013 |
| '913 | 3/28/2014[60] |
| '797 | 11/21/2013 |

## 5    ANALYSIS

Damages in patent infringement cases are governed by 35 U.S.C. §284, which states: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."

A reasonable royalty is the amount of compensation that a willing licensor (the patentee) would have agreed to accept and a willing licensee (the infringer) would have agreed to pay if both had been reasonably and voluntarily attempting to reach an agreement.  The agreement is often characterized as arising from a "hypothetical negotiation" between the parties on the eve of the alleged infringement, or about the time that the alleged infringement began.  The analysis presumes that the parties to the negotiation would have access to the same information, including the knowledge that the patents are valid and would be infringed by the prospective licensee's product(s) unless the infringer obtained a license.  The hypothetical negotiation in this case for the Patents-in-Suit would take place between Philips and ASUS.

In order to determine the reasonable royalty that is appropriate for ASUS's use of the Patents-in-Suit, I conducted an analysis of the information that would have been considered by the parties to the hypothetical negotiation including a consideration of license agreements entered by the parties, the availability of acceptable non-infringing alternatives and an analysis of the *Georgia-Pacific* factors.  The results of my analyses are as follows:

---

[59] To the extent the damages start dates vary from those assumed in my damages calculation, the damages which would result from the varied outcomes can be calculated using the underlying data and analyses attached to this report.

[60] I have been asked to assume this damages start date applies to all Accused Products except those which incorporate the Chrome browser.  I was asked to assume a damages start date of January 1, 2015 for the Accused Products incorporating the Chrome browser.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

### 5.1     Analysis of License Agreements Entered by the Parties

In the case of royalties for intellectual property assets, the rate for intellectual property rights may be based on the amounts paid for similar intellectual property in actual licensing or sales transactions.  The degree of reliance on comparable transactions depends on an assessment of whether the assets and the circumstances of the transactions are sufficiently similar to provide a reliable indicator of value for the assets in question.

#### 5.1.1    Philips Transactions

I have reviewed Philips agreements involving various intellectual property assets.  Some of the license agreements produced by Philips in this case include the Patents-in-Suit while others do not.  A summary of all agreements I reviewed is attached at Tab 11.  I discuss a subset of those agreements in more detail below.

##### *5.1.1.1    Registrations – Portable Features Program*



i.

---

[61] PHILIPS00014878-915.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



ii.

[62] B. Wieghaus 1/10/19 deposition, pp. 120-121.  Discussion with Brian Wieghaus.
[63] Exhibit 9.0.

[66] PHILIPS00245782-835.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



_____

[67] S&P Capital IQ Financial Database.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY



[71] S&P Capital IQ Financial Database; https://www.statista.com/statistics/412794/euro-to-u-s-dollar-annual-average-exchange-rate/.
[72] PHILIPS00014860-14877.
[73] B. Wieghaus 1/10/19 deposition, pp. 113-115.  Exhibit 9.0.
[74] S&P Capital IQ Financial Database.

[77] S&P Capital IQ Financial Database (conversion rate of $1.13/€ as of 4/11/2019).
[78] PHILIPS00020859-876.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**





82 Exhibit 9.0.

86 PHILIPS00064210-260.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



[87] Exhibit 9.0.
[88] S&P Capital IQ Financial Database.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY



https://www.statista.com/statistics/412794/euro-to-u-s-dollar-annual-average-exchange-rate/.

92 PHILIPS00064150-209.

93 Exhibit 9.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



94 S&P Capital IQ Financial Database.

96 PHILIPS00231052-109.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY



[97] Exhibit 9.0.

[99] PHILIPS00014943-995.
[100] B. Wieghaus 1/10/19 deposition, pp. 81-82.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



---

[101] Exhibit 9.0.
[102] S&P Capital IQ Financial Database.
[103] S&P Capital IQ Financial Database.
[104] S&P Capital IQ Financial Database.
[105] S&P Capital IQ Financial Database.
[106] PHILIPS00231718-721.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



[107] Exhibit 9.0.
[108] S&P Capital IQ Financial Database.
[109] S&P Capital IQ Financial Database.
[110] PHILIPS00237350-398.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



---

[111] Exhibit 9.0.

[113] PHILIPS00231761-811.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



---



[118] Exhibit 9.0.

[120] PHILIPS00098099-202 and PHILIPS00231362-365.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



[121] S&P Capital IQ Financial Database.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY





[130] Exhibit 9.0.

[135] Linkedin.com.
[136] PHILIPS00226862-873 (B. Wieghaus 1/11/19 deposition, Ex. 39).
[137] B. Wieghaus 1/11/19 deposition, p. 305.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

███████████████████████████████

█████████████████████████████

████████ ████████████████████████

███████████████ ███████████████████

███████████████████████████████████

█████████████████████

### 5.1.1.2   *Settlement Agreements – Portable Features Program*

i.   **Southern Telecom, Inc.:**[141]   On ███████████, Philips entered into a

Touch-Enabled Device Patent Registration and Settlement Agreement with

Southern Telecom, Inc. ("Southern Telecom") pursuant to a settlement of an

existing litigation against it.   Under the agreement, Philips agreed to ████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████ In consideration of these

rights, Southern Telecom agreed to pay ██████████████████████

████████████████████████████████████

█████████████████████████████. It also agreed to pay ████████

███████████████████████████████████████

███████████████████████████. It agreed to make █████████████

████████████████████████████████████████

███████████████████

---

[138] S&P Capital IQ Financial Database.
[139] S&P Capital IQ Financial Database.
██ ██████████████████████████████████
[141] PHILIPS00231366-457. The parties entered into a Stipulation of Dismissal and Release of Claims Agreement concurrent with the Portable Features Patent Registration and Settlement Agreement and its side letter agreement, all of which were dated ████████████  This agreement concerned dismissal of Philips litigation against Southern Telecom pursuant to settlement – Case No. 15-1128.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

A side letter dated the same day amended the ███████████ Touch-Enabled Device Patent Registration and Settlement Agreement in several ways, including the following:



I am not able to determine Southern Telecom's guaranteed per unit minimum payment obligation because ███████████████████████████████ ████████████████████████████████.

Southern Telecom was established in 1992 and is a consumer electronics manufacturer.  Today, it sells consumer electronics under its emerging in-house brands and under brands such as Polaroid, Sharper Image, Emerson, Westinghouse, and Brookstone.[144]

---

[142] B. Wieghaus 1/10/19 deposition, pp. 150-151.
[143] Discussion with Brian Wieghaus.
[144] https://southerntelecom.com/who-we-are.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

ii. **Shenzen Zowee Technology Co., Ltd., Zowee Marketing Co., Ltd. and Double Power Technology, Inc.:**[145]   On ███████████, Philips entered into a Settlement Agreement with Shenzen Zowee Technology Co., Ltd., Zowee Marketing Co., Ltd. and Double Power Technology, Inc., ("Zowee" and "Double Power") to resolve an existing litigation against it and to accept a █████   ████████████████████████████████████████   ██████   In consideration of the foregoing, the defendants agreed to ██████████   ██████.

I am not able to determine Zowee and Double Power's effective rate ████████████████████████████████████████   ████████.

Zowee was founded in 2004 and was listed on the Shenzhen Stock Exchange in March 2010.[146]  It is based in Shenzhen, the People's Republic of China.[147]  Zowee researches, designs, manufactures and sells products for use in communication products, computers, and consumer electronics worldwide.[148] Zowee earned revenue totaling $0.6 million, $0.4 million and $0.4 million in 2015, 2016 and 2017, respectively.[149]  Double Power manufactures tablets, speakers, and accessories, offering multi-touch screen tablets, internet tablets and wireless bluetooth speakers.[150]  It provides its products through retail stores and online, is based in Ontario, California, and as of January 2014, operated as a subsidiary of Shenzhen Zowee Technology Co., Ltd.[151]

iii. **Visual Land, Inc.:**[152]  On ████████████ Philips entered into a Settlement Agreement with Visual Land, Inc. ("Visual Land") to resolve an existing litigation.  Under the agreement, Philips granted Visual Land ██████████   ████████████████████████████████████████

---

[145] PHILIPS00212965-996.
[146] http://www.zowee.com.cn/about.aspx.
[147] S&P Capital IQ Financial Database.
[148] S&P Capital IQ Financial Database.
[149] S&P Capital IQ Financial Database.
[150] S&P Capital IQ Financial Database.
[151] S&P Capital IQ Financial Database (conversion rate of $0.15/¥ as of 4/11/2019).
[152] PHILIPS00213013-042.  See also, B. Wieghaus 1/10/19 deposition, pp. 152-155.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

███████████. It also granted Visual Land a █████████████████████

████████████████████████████████████████████████

In consideration of these rights, Visual Land agreed to pay ██████████████

███████████████████████████████████████████████

█████████████████████████████████████████. It agreed to ████

████████████████████████████████████████████████

███████████████████████████

       Visual Land is a tablet manufacturer based in California.[153]  Its tablets range in price from $49.99 to $269.99.[154]

### 5.1.1.3   *Other Licenses (and Offers) Involving the Portable Features Program and/or Patents-in-Suit*

████████████████████████ ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[153] https://visual-land.com/index.php?route=information/information&information_id=4.
[154] https://visual-land.com/index.php?route=product/category&path=60.
[155] PHILIPS00214723-771, unless otherwise noted.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



---

[156] J. Eleveld 12/20/18 deposition, pp. 66-67.
[157] K. Scott 2/21/19 deposition, p. 17.
[158] PHILIPS00237402.
[159] J. Eleveld 12/20/18 deposition, p. 74 and K. Scott 2/21/19 deposition, Ex. 32.  Philips prepared an alternative valuation that valued the assigned patents ▮▮▮▮▮▮▮▮▮▮ (K. Scott 2/21/19 deposition, p. 49 and Ex. 30).
[160] J. Eleveld 12/20/18 deposition, p. 71 and PHILIPS00221492-497.
[161] Plaintiffs' Responses to HTC Defendants' Fourth Set of Interrogatories – Response to Interrogatory No. 16.
[162] Plaintiffs' Responses to HTC Defendants' Fourth Set of Interrogatories – Response to Interrogatory No. 16.
[163] J. Eleveld 12/20/18 deposition, p. 60.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



164 J. Eleveld 12/20/18 deposition, pp. 60-61.
165 J. Eleveld 12/20/18 deposition, pp. 34-37, 80-81 and K. Scott 2/21/19 deposition, pp. 56-57 and 66-67.
166 J. Eleveld 12/20/18 deposition, pp. 23, 40, 42, 45 47-49 and 53 and K. Scott 2/21/19 deposition, pp. 58-59 and 68-69.
167 J. Eleveld 12/20/18 deposition, p. 74.
168 J. Eleveld 12/20/18 deposition, pp. 74-75.
169 K. Scott 2/21/19 deposition, p. 53.
170 Exhibit 11.2.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



The guaranteed per unit minimum payment obligation figures that I outlined above were based on the number of units required to meet the contractual minimum obligation under the

---

171 Exhibit 11.2.
172 Discussion with Brian Wieghaus.
173 P. Im 3/20/18 deposition, Ex. 67 at PHILIPS00095758-773 at 772.  Discussion with Brian Wieghaus.
174 P. Im 3/20/18 deposition, pp. 412-423 and J. Eleveld 12/20/18 deposition, p. 141.
175 ASUS's Responsive Damages Contentions Under Patent L.R. 3-9, pp. 20-21.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

agreements.  For the various licenses entered under Philips' Portable Features program, the

guaranteed minimum per unit payment obligation figures ranged from █████████ per unit.[176]

It should be noted that these license agreements contained ████████████████

████████████████████████████ that would not apply

to the hypothetical negotiation with ASUS (some of the guaranteed minimum per unit payment

obligations are calculated using both pre-notice and post-notice sales.  See for example, the

registration agreement summaries above between Philips and ██████ or between Philips and

███████).  I understand that among those factors are the following:[177]



[178]  In addition,

I understand that Philips entered these agreements with an expectation of future licensing fee

---

[176] Exhibit 9.0.
[177] Discussion with Brian Wieghaus.
[178] B. Wieghaus 1/11/19 deposition, p. 324.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

revenue streams.[179]  However, the go-forward royalty rates in those agreements were based on the licensee paying either the blended $0.99 standard rate or the $0.75 compliance rate for each licensed unit. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████  The licensee in these agreements was required to pay a royalty to Philips equal to the blended rate for each licensed product irrespective of how many patents the licensed products used.

I also recognize that real world licenses and those resulting from a hypothetical negotiation differ in that there is usually uncertainty regarding infringement and validity of patents licensed in a real-world license; whereas, the patents in a hypothetical license are assumed to be valid and infringed.  The foregoing suggests that the reasonable royalty resulting from the hypothetical negotiation in this case would be based conservatively on the royalty rates reflected in Philips' actual licenses and Portable Features license program.

### 5.1.2   ASUS Transactions

#### 5.1.2.1   *Running Royalty Agreements*

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[179] Discussion with Brian Wieghaus.
[180] Exhibit 12.0.
[181] Exhibit 12.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



### 5.1.2.2   *Other Agreements*

### 5.2     **Availability of Acceptable Non-Infringing Alternatives**

A party at the hypothetical negotiation would generally not pay more for a license than the cost of buying/licensing or building an equivalent asset.  This approach, when applied to patents, usually requires a consideration of the next-best acceptable non-infringing alternative to using the patent.  Philips and ASUS would have evaluated whether the latter had available and could have implemented an acceptable alternative technology that would not infringe the Patents-in-Suit.  The cost associated with implementing such an alternative (if one was available) would be considered during the negotiation to determine the reasonable royalty that would be paid to use the Patents-in-Suit.

ASUS has suggested that it could implement acceptable non-infringing alternatives to the Patents-in-Suit.[185]  Based on discussions with Dr. Polish, Dr. Goodrich, Dr. Schmidt and Dr. Greenspun and review of their expert reports, I understand that there are no acceptable non-

---

[182] Exhibit 12.0.
[183] ASUS's Responsive Damages Contentions Under Patent L.R. 3-9, pp. 17-18.
[184] Goodrich ASUS Infringement Report '809 Patent.
[185] Greenspun ASUS Infringement Report '913 Patent; Schmidt ASUS Infringement Report '064 Patent; Polish ASUS Infringement Report '806 Patent; Greenspun ASUS Infringement Report '797 Patent; Goodrich ASUS Infringement Report '809 Patent; Schmidt ASUS Infringement Report '564 Patent.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

infringing alternatives to the inventions claimed in the Patents-in-Suit because they (i) infringe one or more of Patents-in-Suit, (ii) are not commercially acceptable substitutes because they lack the advantages of the patented products, and/or (iii) are not alternatives because they merely remove the patented features.  In addition, ASUS has not identified how long such alternatives would take to develop, test and commercialize and what the total cost of such proposed alternatives would be.  A more detailed discussion of ASUS's proposed alternatives for each of the Patents-in-Suit can be found in *Georgia-Pacific* Factors 9 and 10 below.

### 5.3     *Georgia-Pacific* Analysis

The *Georgia-Pacific* case reflects commonly used guidelines for determining a reasonable royalty in a litigation context.  I evaluated the *Georgia-Pacific* factors to determine what impact they would have on the reasonable royalty rate for the Patents-in-Suit.

A reasonable royalty is generally determined in the context of a hypothetical negotiation between the patent owner and the accused patent infringer at or around the time of first infringement.

The hypothetical negotiation would take place on the date of first infringement which is generally the later of the date of the first accused sale or the patent issue date.  Given that the Patents-in-Suit cover multiple features of the same Accused Products, it is reasonable to expect that ASUS would have desired to negotiate a license for all the Patents-in-Suit in a single negotiation on the earliest date of first infringement.

Alternatively, the parties would enter a separate hypothetical negotiation on the earliest date of first infringement for each feature set grouping reflected in Figure 2 above.  A second alternative would be a separate hypothetical negotiation for each of the Patents-in-Suit. Depending on the patent, the hypothetical negotiation would take place on either the date the patent issued or on the date of the first allegedly infringing sale of a previously issued patent, and in some cases, ASUS has not produced data that extends back to the relevant date.  The following table reflects the hypothetical negotiation dates in this case:

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Figure 4: Hypothetical Negotiation Dates**

| Portfolio | Hypothetical Negotiation Date[186] | | |
|---|---|---|---|
| All Patents-in-Suit | | ███ | |
| **Feature Set** | | | |
| Authentication/DRM | | ███ | |
| Streaming & Services | | ███ | |
| Touch Screen Interfaces | | ███ | |
| GUI | | ███ | |
| **Patent-in-Suit** | | | |
| '809 | | ███ | |
| '806 | | ███ | |
| '064 | | ███ | |
| '564 | | ███ | |
| '913 | | ███ | |
| '797 | | ███ | |
| *Date of first allegedly infringing sale. | | | |
| **Date of patent issuance. | | | |

For the purpose(s) of the hypothetical negotiation(s), I have made the following assumptions:

1. The asserted claims of the Patents-in-Suit are presumed to be valid and infringed.

2. The hypothetical negotiation would take place between Philips and ASUS.

3. The hypothetical negotiation would take place on the date or dates discussed above.

4. The hypothetical license provides the non-exclusive right to use the asserted claims of the Patents-in-Suit in the U.S.

My analysis of the *Georgia-Pacific* factors is as follows:

**Factor 1:**   **The royalties received by the patentee for the licensing of the Patents-in-Suit, proving or tending to prove an established royalty.**

In this case, numerous licenses have been entered for the Patents-in-Suit. These licenses were part of Philips' Portable Features program. I incorporate by reference herein my detailed discussion of Philips' licensing program and activity above. Philips' Portable Features program offers licensees two options as it relates to payment of a license fee for use of the licensed

---

[186] ASUS has not produced sales data for the Accused Products prior to January 1, 2010. It is possible that ASUS made infringing sales prior to this date.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

patents (including the Patents-in-Suit) – a blended rate or a discrete rate.  The blended rate requires payment of either a standard royalty rate of $0.99 or a compliance royalty rate of $0.75 per licensed product.  The discrete rate is based on payment of a separate royalty fee for the use of patents in different functional areas.  Regardless of which program is selected by the licensee, they are required to pay the specified royalty whether they use one patent or multiple patents.  The guaranteed per unit minimum payment obligations agreed to by the registrants under the Portable Features program (based on exact number of units required to meet the contractual minimum obligation) ranged from $0.30 to $0.99 per unit.[187]  However, the go-forward royalty rates in these agreements were based on the licensee paying either the blended $0.99 standard rate or the $0.75 compliance rate for each licensed unit.  Thus, the effective rates paid by those licensees would approach the blended rates over time.

These agreements are instructive of terms and of the royalty rates that the parties would have considered and negotiated as part of the hypothetical negotiation in this case.  The following is a comparison between the actual Portable Features program licenses entered by Philips and the Philips/ASUS hypothetical license.  The parties would consider these similarities during the hypothetical negotiation for the Patents-in-Suit as follows:

---

[187] Exhibit 9.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Figure 5: Comparison Between Real-World Licenses and
the Philips/ASUS Hypothetical License**

| Factor | Adjustment |
|---|---|
| Like the hypothetical license, Philips' Portable Features registration agreements include a license to the Patents-in-Suit. | None |
| Unlike the hypothetical license, Philips' Portable Features registrants were relatively early signers of their respective agreements. | Upward |
| Unlike the hypothetical license, some of Philips' Portable Features registrants were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ | Upward |
| Unlike the hypothetical license, Philips' Portable Features registrants were ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇may have been limited by various factors including, without limitation: when notice was given to particular entities, the availability of past damages, and the likelihood of collection on a judgment. | Upward |
| The Portable Features registrations include more patents than the Patents-in-Suit.  However, the structure of the program is such that a prospective licensee can elect a discrete rate option relating to a particular functionality it needs to license and pays the same rate irrespective of the number of patents the licensee uses within that functionality. | None |
| Both the actual Portable Features registrations and the hypothetical license are non-exclusive licenses. | None |
| The Portable Features registrations grant the right to make, use or sell products using the licensed patents including the Patents-in-Suit.  The licensed products include smart phones, tablets and personal computers.  These products are the same or similar types of products as the Accused Products that would be covered by the hypothetical license. | None |
| Some of the Portable Features registrations include coverage of licensed products manufactured or sold in the U.S.  Similarly, the hypothetical license would provide ASUS the right to manufacture, sell and license the Accused Products in the U.S. | None |
| The Touch Enabled licensees ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  This relationship is the same as the relationship between Philips and ASUS (the parties to the hypothetical negotiation for the Patents-in-Suit). | None |
| I understand that t▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇represent a compromise in lieu of litigation and a recognition that if Philips ▇▇▇▇▇▇▇▇▇ ▇▇ they would have to accept the risk that the patents would be found not infringed or invalid.<br>Real world licenses and licenses resulting from a hypothetical negotiation differ in that there is usually uncertainty with regard to infringement and validity of the patents licensed in the real-world licenses.  Whereas, in the hypothetical license the patent-in-suit is assumed to be valid and infringed. | Upward |

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

Together, the foregoing comparisons suggest that the reasonable royalty resulting from the hypothetical negotiation in this case would be based on at least the royalty rates reflected in Philips' actual licenses and license program.

**Factor 2:**     **The rates paid by the licensee for the use of other patents comparable to the Patents-in-Suit.**

I incorporate by reference herein my discussions of ASUS's licensing activity in Section 5.1.2 above.



---

[188] Exhibit 12.0.
[189] Exhibit 12.0.
[190] Exhibit 12.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**



Based on my review of these agreements, I have concluded that the agreements do not provide insight into the royalty rate for use of the Patents-in-Suit.

**Factor 3:      The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

The license that would be agreed to by the parties would be a non-exclusive license to the Patents-in-Suit.  Generally, royalty rates associated with a non-exclusive license are generally lower than those associated with an exclusive license.  However, to the extent the reasonable royalty that results from the hypothetical negotiation is based at least in part on Philips license rates and license agreements, which already took into account the impact of the provision of non-exclusive license rights, this factor would have a neutral impact on the reasonably royalty rates for the Patents-in-Suit.

**Factor 4:      The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

Philips did not have an established policy or marketing program to maintain its patent monopoly by not licensing others to use its inventions.  As discussed above, Philips actively licenses its patent portfolios, including the Portable Features portfolio that includes the Patents-in-Suit.  I understand that Philips is generally willing to license its patents to other companies.  In fact, Philips has established a business unit which is responsible for licensing activities relating to its patent portfolio including the Patents-in-Suit.  To the extent the reasonable royalty that results from the hypothetical negotiation is based at least in part on Philips Portable features license rates and license agreements, which already took into account the impact of Philips willingness to license the Patents-in-Suit, this factor would have a neutral impact on the reasonable royalty rates for the Patents-in-Suit.

---

[191] ASUS's Responsive Damages Contentions Under Patent L.R. 3-9, pp. 17-18.
[192] Goodrich ASUS Infringement Report '809 Patent.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Factor 5:**     **The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

The analysis under this factor focuses on the commercial relationship between the parties, which can impact the royalty that would have been agreed to in the hypothetical negotiation. Generally, royalty rates tend to be higher when the negotiating parties are direct competitors compared to when they are not. Philips concentrated on high volume electronics including mobile phones in the mid-1990's, but gradually changed its business portfolio and by 2006 it was focused on healthcare, lighting and consumer products in the areas of health and well-being.[193] Thus, Philips and ASUS would not have been competitors for sales of the Accused Products at the time of the hypothetical negotiation or during the damages period.[194] To the extent the reasonable royalty rates that result from the hypothetical negotiation are based at least in part on Philips Portable features license rates and license agreements, which already took into account the fact that Philips did not compete with the licensees of the actual licenses that it entered relating to the Patents-in-Suit, this factor would have a neutral impact on the reasonable royalty rates for the Patents-in-Suit.

**Factor 6:**     **The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

The analysis under this factor focuses on sales of products related to the patented products. To the extent the Accused Products promote sales of a licensee's other products, the reasonable royalty rate may be higher. For example, ASUS sells various accessories for its Accused Product hardware.[195]

Despite ASUS's sales of accessory products, and because real-world licensees may have sold accessory products too, I assumed that this factor would have a neutral impact on the reasonable royalty rates for the Patents-in-Suit.

---

[193] https://www.philips.com/a-w/research/100-years-research/history.html.
[194] A. Filip 3/1/2018 deposition, pp. 37-39.
[195] https://store.asus.com/us/category/ALLaccessories.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Factor 7:**      **The duration of the patent and the term of the license.**

The license term in the hypothetical agreement for the Patents-in-Suit would extend through the expiration date of each patent.  I have calculated damages in this case for ASUS's use of the Patents-in-Suit from the damages start dates through December 31, 2018.  The damages start dates are reflected in Figure 3 above and the patent expiration dates are shown below.

**Figure 6: Patents-in-Suit Expiration Dates**

| Patent-in-Suit | Expiration Date |
|----------------|-----------------|
| '809 | 6/27/2023 |
| '806 | 11/4/2019 |
| '064 | 7/30/2022 |
| '564 | 4/17/2018 |
| '913 | 10/17/2023 |
| '797 | 2/13/2016 |

This factor would have a neutral impact on the reasonable royalty rates for the Patents-in-Suit.

**Factor 8:**      **The established profitability of the product made under the patent; its commercial success; and its current popularity; and,**

**Factor 11:**     **The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

I understand that Philips does not currently sell products covered by the Patents-in-Suit. However, during the period ███████████████████ Philips sold approximately ████████ ███████████████████████████████████████████████████ [96]  This product embodied the ███████████████ Patents-in-Suit.[197]  In addition, certain products sold by companies that participate in Philips' Brand Licensing program ████████████████ ███████████████████████████████████████████████████████████████ ████ [198]

ASUS made extensive use of the Patents-in-Suit.  As discussed in greater detail in Factors 9 and 10, the functionalities afforded by the Patents-in-Suit contribute to a user's

---

[196] A. Filip 3/1/2018 deposition, pp. 97-102, 106-107 and 121-122.
[197] A. Filip 3/1/2018 deposition, pp. 97-102.
[198] A. Filip 3/1/2018 deposition, pp. 80-81 and 87 and Ex. 7.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

experience with the Accused Products and allow the Accused Products to perform consistently compared to competing products in the market.  The unit sales that ASUS generated from its sale of Accused Products during the period (1) beginning on the damages start dates (indicated in Figure 3 above) and (2) beginning on the dates of first infringement (indicated in Figure 4 above), through December 31, 2018, are summarized below.

**Figure 7: ASUS Accused Products Unit Sales During Damages and Infringement Periods (Millions)[199]**

| Patents-in-Suit | Beginning on Damages Start Dates | Beginning on Dates of First Infringement |
|---|---|---|
| All | | |
| | | |
| Authentication/DRM | | |
| Streaming & Services | | |
| Touch Screen Interfaces | | |
| GUI | | |
| | | |
| '809 | | |
| '806 | | |
| '064 | | |
| '564 | | |
| '913[200] | | |
| '797 | | |

The gross profit margins earned by ASUS on the Accused Products during the infringement period is summarized below:

**Figure 8: ASUS Accused Products Gross Profit Margins During Infringement Period (Percentage of Sales Revenue)[201]**

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

Given ASUS's extensive use of the Patents-in-Suit as indicated by its unit sales, this factor would tend to have an upward impact on the reasonable royalty rates for the Patents-in-Suit.

---

[199] Exhibits 5.0 and 5.1.
[200] I understand that Philips is seeking a pre-issuance damages start date with respect to this patent.
[201] Exhibit 10.0.  Beginning in January 2010.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Factor 9:**   The utility and advantages of the patent over the old modes or devices, if any, which had been used for working out similar results; and

**Factor 10:**   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

### i.   Authentication/DRM

#### a.   '809 patent[202]

Based on Dr. Goodrich's expert report and my discussions with him, the '809 patent generally relates to methods, devices, and systems for protecting the transfer of digital content from one device to another.  I understand that the '809 patent addresses challenges associated with unauthorized copying and pirating of digital content.  I understand that the '809 patent is an approach to accomplish those objectives using a digital certificate and a time-based proximity assessment.

I understand that the HDCP 2.x protection protocol practices the '809 patent.  Moreover, I understand content providers are the authorities designating the level of protection mechanisms required of their content and they rely on HDCP 2.x to protect distribution of their content – HDCP 2.0 and 2.1 are currently used to protect high-definition (HD) content, while HDCP 2.2 and higher are currently used to protect the highest-value content (*e.g.*, Ultra-HD (UHD) 4k content).  I understand HDCP 2.x protection is employed across a variety of content sources, both physical (*e.g.*, BluRay discs) and streaming (*e.g.*, Netflix).[203]  Furthermore, I understand that the requirement of HDCP 2.2 or higher for protecting 4k content arose from strict requirements that content providers imposed because they were concerned about ensuring adequate protections for distributing such valuable content.[204]

I understand that the '809 patent provides a significant benefit and value to ASUS and users of the Accused Products.  Content providers currently protect their 4K content using HDCP 2.2 and protect their HD content using HDCP 2.0 and 2.1.  Many major content providers required HDCP 2.2 protection for 4K content.  Device manufacturers like ASUS that do not support the required protection scheme would have devices that would be unable to play the

---

[202] Goodrich ASUS Infringement Report '809 Patent and discussion with Dr. Goodrich, unless otherwise noted.
[203] See also, S. Balogh 2/13/19 deposition, pp. 88-89.
[204] See also, M. Rosner 1/4/19 deposition, pp. 49-50 and 134.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

protected content.  If ASUS's devices do not have the ability to play high value protected content, its customers would be dissatisfied with the device and it would place ASUS at a competitive disadvantage.

Similarly, consumer facing resources like CNET reported that "anyone with (or buying a non-4K 1080p TV doesn't need to worry [about HDCP 2.2, but that o]nce we start seeing more widely available 4K content, it will be more of an issue.[205]  CNET warned consumers that if they bought non-HDCP 2.2 compliant devices, those devices might not work in the near future.[206]  And CNET's warning applied to all consumer electronics, components, and accessories because HDCP 2.2 compliance requirements apply to the entire chain of connected devices.[207]  CNET advised consumers that "resistance is futile" because content providers have the fiduciary responsibility to do everything they can to protect their content and make it profitable – and those making the move to 4K need to buy HDCP 2.2 compliant devices to make them as "futureproof" as possible.[208]  In 2015 CE Pro wrote that "HDCP 2.2 is going to happen.  It is a certainty… [i]t's inevitable you will encounter it when we see broad availability of 4K Hollywood content."[209]  Everything "from the source to the display and everything in between must be compliant for the homeowner to view the images… if the system does not support it, the viewer will receive an onscreen message indicating non-compliance."[210]  In 2017, Grand View Research, Inc. predicted that the global 4K television market is expected to reach $380.9 billion by 2025, reflecting a growth rate of 21.2 percent – with even higher growth in North America, which is expected to be the highest growing region.[211]  It also reported that the market is expected to grow at this high rate because consumer preferences are changing from high definition to ultra-high definition technology and, more broadly, high-end home products.[212]  IHS Market reported in February 2017 that about three-quarters of all large screen televisions sold the year prior in the United States were 4K, ultra-high definition sets, and that in 2018

---

[205] https://www.cnet.com/news/hdcp-2-2-what-you-need-to-know/.
[206] https://www.cnet.com/news/hdcp-2-2-what-you-need-to-know/.
[207] https://www.cnet.com/news/hdcp-2-2-what-you-need-to-know/.
[208] https://www.cnet.com/news/hdcp-2-2-what-you-need-to-know/.
[209] https://www.cepro.com/article/8_vital_truths_about_the_future_of_4k.
[210] https://www.cepro.com/article/8_vital_truths_about_the_future_of_4k.
[211] https://www.grandviewresearch.com/press-release/global-4k-tv-market.
[212] https://www.grandviewresearch.com/press-release/global-4k-tv-market.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

nearly 100 percent of big screens sold would be at least 4K capable.[213]  The consumer preference
for high-end home products, and ultra-high definition 4K TVs in particular, extends to the other
devices they use and on which they consume media – such as the Accused Products in this
matter.  A 2017 survey of 1,243 respondents 18 years or older in the United States reflected that
in only *a single month* – October 2017 – 49 percent of respondents had streamed a show or
movie on a smartphone and 41 percent had on a tablet.[214]  As consumer demand for 4K content
increases, they will expect it to be available to them after spending the money to buy 4K capable
devices.  Device manufacturers who only offer downgraded resolutions for some 4K content and
who are blocked altogether from transmitting other 4K content will be at a competitive
disadvantage.

According to Dr. Goodrich, I understand that ASUS proposes that an alternative to the
'809 patent would be to modify the code of the accused devices to comply with the requirements
of HDCP 1.4 rather than HDCP 2.2.  Based on my discussions with Dr. Goodrich, a review of
his expert report, and the foregoing evidence, I understand that this proposed alternative involved
modifying source code on devices but that the modified source code would not be an acceptable
design around in light of, as described above: (1) testimony regarding HDCP 2.x; (2) content
providers' ultimate authority to dictate what minimum protection mechanisms are required to
play their content; and (3) consumers' expectations and preferences with respect to device
compatibility and content accessibility including that content which requires HDCP 2.x.

## ii.  Streaming & Services

### a.  '806 patent[215]

Based on Dr. Polish's expert report and my discussions with him, I understand that the
'806 patent provides an open architecture solution for content delivery (e.g., delivery of video or
audio content) over a network.  In particular, the patent describes a modified download approach
for multimedia content that allows for the emulation of streaming with low or negligible play-out
latency.  The Accused Products that relate to this patent are ASUS's smartphones, tablets, and
PC's that run the Android operating system and were preloaded with and run the YouTube
application for Android.  YouTube is the top video streaming site in the U.S.[216]  I understand that

---

[213] https://www.tellusventure.com/blog/4k-tv-sales-growing-with-20-u-s-market-share-in-sight/.
[214] Statista (statistic IDs 777762 and 777798).
[215] Polish ASUS Infringement Report '806 Patent and discussion with Dr. Polish, unless otherwise noted.
[216] Statista (statistic IDs 910895 and 910887).

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

without the '806 patent, YouTube streaming would not be possible without problems related to buffering, delays and waiting for videos to start, large bandwidth requirements, and adaptations to changing network conditions.

Based on my review of Dr. Polish's expert report, I understand that ASUS asserts that it had acceptable non-infringing alternatives to the '806 patent.  Dr. Polish has concluded that these alleged alternatives if implemented would result in slower playback, an inability to adapt to changing network conditions, and use of more bandwidth which is costly and would slow down other traffic and would still infringe the '806 patent and/or be inefficient.

### iii.    Touch Screen Interface Patents

Based on Dr. Schmidt's and Dr. Greenspun's expert reports and my discussions with them, I understand that the Patents-in-Suit relating to this feature set relate to gestures used to interact with touch-enabled devices, specifically: scrolling, zooming, and text/character input/selection.

Users are relatively predictable when it comes to the gestures they expect to result in specific actions.  The International Usability Partners ("IUP") is a network of 12 independent usability companies based in 12 countries who joined to provide user experience services worldwide.[217]  It conducted a study in 2010 to identify cultural similarities and differences in the use of gestures across nine countries.[218]  More specifically, it ran "a global study aimed at identifying the most common user-generated gestures for control of a touchscreen."[219]  It asked participants to indicate gestures that they expected would result in 28 actions (or outcomes).[220]  While there were small differences between countries, participants from different countries tended to generate similar gestures for individual actions.[221]  The IUP created a proposed "cross-cultural" gesture set, which included:

---

[217] Mauney, Dan et al.  "Cultural differences and similarities in the use of gestures on touchscreen user interfaces."  2010.  https://prezi.com/of9ihhm6_sgd/upa-presentation/.
[218] Mauney, Dan et al.  "Cultural differences and similarities in the use of gestures on touchscreen user interfaces."  2010.  https://prezi.com/of9ihhm6_sgd/upa-presentation/.
[219] Mauney, Dan et al.  "Cultural differences and similarities in the use of gestures on touchscreen user interfaces."  2010.  https://prezi.com/of9ihhm6_sgd/upa-presentation/.
[220] Mauney, Dan et al.  "Cultural differences and similarities in the use of gestures on touchscreen user interfaces."  2010.  https://prezi.com/of9ihhm6_sgd/upa-presentation/.
[221] Mauney, Dan et al.  "Cultural differences and similarities in the use of gestures on touchscreen user interfaces."  2010.  https://prezi.com/of9ihhm6_sgd/upa-presentation/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

**Figure 9: Selected IUP Cross-Cultural Gestures[222]**

| Actions | Proposed Gesture |
|---|---|
| Continuous Scroll Down | Swipe up repeatedly anywhere |
| Move Object | Drag/swipe object |
| Magnify | Spread from object |
| Zoom In | Spread from object |
| Zoom Out | Pinch with any number of fingers on object |

### a. '064 patent[223]

Based on Dr. Schmidt's expert report and my discussions with him, the '064 patent generally relates to an improved touchscreen scrolling system that enables users to interact with scrollable data and other items displayed on a touchscreen in a seemingly natural way. The invention resides primarily in the use of finger touch gestures to enable users to selectively activate a variety of touchscreen functionalities, including scrolling that "stick-to-finger," continued scrolling with inertia – or "intertial scrolling," and moving a touch-selected object in correspondence with the finger touch – or "touch dragging." I understand that the invention is a novel system that uses a combination of contact-duration and motion to determine whether a scrolling action (including the rate thereof and when it should be terminated) or a dragging action should occur. The invention of the '064 patent offers a significant benefit to the end user of ASUS devices. It is important that smartphone devices (including ASUS's) and users of smartphones have a realistic and natural experience. The primary benefit of the patent relates to program instructions for scrolling or dragging and how those program instructions provide the user with a realistic and natural user experience.

A 2017 article titled "How Scrolling Can Make or Break Your User Experience" says that "[t]he smallest details can make or break your user experience… Much of what we do on the internet is subconscious. We absentmindedly flip through screens, browse the web, and interact with content. While what much of a user does might be subconscious, the back end must be hyper-conscious… Scrolling is an often underrated but vital aspect of your user experience."[224] The top five most popular mobile social networking apps in the United States as of July 2018

---

[222] Mauney, Dan et al. "Cultural differences and similarities in the use of gestures on touchscreen user interfaces." 2010. https://prezi.com/of9ihhm6_sgd/upa-presentation/.
[223] Schmidt ASUS Infringement Report '064 Patent and discussion with Dr. Schmidt, unless otherwise noted.
[224] https://usabilitygeek.com/how-scrolling-can-make-or-break-your-user-experience/.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

were Facebook, Instagram, Facebook Messenger, Twitter, and Pinterest,[225] all but the third of which are apps designed as feeds through which users scroll.

I understand ASUS's proposed alternatives are not acceptable, non-infringing alternatives to the '064 patent.  I understand ASUS alleged it would have been trivial to modify relevant source code of the Accused Products and set forth a number of hypothetical non-infringing alternatives.  I understand that ASUS does not have access to the source code for the Chrome web browser and that it would be more than trivial to modify this code without access to it.  ASUS does not indicate the time or resources necessary to implement the proposed alternatives nor does it provide evidence of consumer acceptability.  I also understand that some design arounds would still infringe the '064 patent, some of them are extremely complex if even possible to implement, some would result in unintended consequences on-screen during use,[226] and none of the design arounds would be acceptable to consumers.  For example, the proposed design arounds if implemented would be unnatural and unexpected to users and some may be visually unappealing.

### b.   **'564 patent**[227]

Based on Dr. Schmidt's expert report and my discussions with him, the '564 patent generally relates to a zooming mechanism that enables a user to zoom in on an area of interest so that, when that area is enlarged at what the patent calls a "second scale," the user can select a feature more easily.  I understand that a limiting factor of handheld communication devices is that the size of a handheld's display is necessarily small due to the required form factors and weight limitations of devices, and when rendering graphical information on its display, such a device often cannot render the total information content in its entirety due to this limited screen size.  The invention of the '564 patent provides a unique zoom feature that overcomes this limitation, such that screen size no longer need be a limiting factor of handheld devices.  The invention helps users easily navigate images of downloaded data (like webpages) that are displayed on small screens.  The primary benefit of the patent is that it provides zooming

---

[225] Statista (statistic ID 248074).
[226] For example, at CLANTON-PHIL-0002, the user enters the TV guide space and attempts to trace the Space Shuttle TV program to drag it.  Instead, the screen moves in correspondence with the finger and jerks around, and does not allow the object to be dragged.  As another example, at CLANTON-PHIL-0001, a user enters a living room space and attempts to trace around the TV to move it.  Instead, the TV is selected and opens to a new space.
[227] Schmidt ASUS Infringement Report '564 Patent and discussion with Dr. Schmidt, unless otherwise noted.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

functionality to all users and specifically that it helps users with low vision to navigate their devices more easily.

A significant portion of the U.S. population suffers from visual disabilities. For context, the National Federation of the Blind estimated that 2.8 percent of people aged 16 through 75+ had a visual disability in 2016 (2.0 percent of people aged 16 through 64).[228] As described above, Facebook, Instagram, Twitter and Pinterest are among the five most popular social networking apps in the United States[229] and all extensively revolve around viewing pictures, text, or both. Until late 2016, there was no way to zoom on a photo on Instagram, and users disliked it – it had "always been one of the most annoying parts of [the app]."[230] While adding zoom to Instagram was merely the resolution of an app limitation, even if some devices had zooming functionality in their software, the importance of zooming to users is evident. I understand that the '564 patent provides benefits to these user groups.

I understand ASUS's proposed alternatives are not acceptable, non-infringing alternatives to the '564 patent. I understand ASUS alleged it could modify the source code to remove the features of the '564 patent from the Accused Products. I understand ASUS alleged it would have been trivial to modify relevant source code of the Accused Products and set forth six hypothetical non-infringing alternatives. I understand that ASUS does not have access to the source code for the Chrome web browser and that it would be more than trivial to modify this code without access to it. I understand that ASUS's alleged hypothetical design arounds do not indicate the time or resources necessary to implement them nor evidence of consumer acceptability. I also understand that ASUS does not explain how its design arounds would work and whether those designs would be feasible. I also understand that none of the design arounds would be acceptable to consumers including the fact that they would be unnatural, inefficient and visually unappealing to the user.

### c. '913 patent[231]

As electronic devices became smaller for handheld use, there became a need to minimize the size of the keyboard while maintaining its full functionality. The advent and widespread use of touch-screen graphical devices provided further tools for designers seeking to optimize text

---

[228] https://nfb.org/blindness-statistics.
[229] Statista (statistic ID 248074).
[230] https://www.theatlantic.com/technology/archive/2016/08/you-can-pinch-to-zoom-in-instagram-now/498200/.
[231] Greenspun ASUS Infringement Report '913 Patent and discussion with Dr. Greenspun, unless otherwise noted.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

entry on mobile devices.  Based on Dr. Greenspun's expert report and my discussions with him, I understand the '913 patent generally relates to a method and device for improved text input that overcame drawbacks of preexisting character entry methods.  The primary benefit of the patent is that it provides an effective design and an efficient, intuitive way to implement character entry on mobile devices, where secondary characters are available with only two key selections, and the keypad returns to the default state following character selection.  The technology enables users to quickly access and type, for example, the letter "á" by holding down the "a" on the Accused Product default keyboards and selecting "á" from a selection that pops up in response to the users touch and hold gesture.  The '913 patent provides an effective design for addressing the concerns of both new and experienced users and it does so while maintaining a familiar keypad layout that makes efficient use of the limited space on a mobile device.  It addressed the drawbacks of text input methods that existed by providing a character input method that both minimized the necessary number of keys (thereby alleviating size constraints) and requires little to no additional training.  It also allows for an efficient keyboard that still provides full access to the features of a traditional keyboard.

Texting is a prevalent activity among users:

- Adults send and receive between 16 (55+ year olds) and 128 (18-24 year olds) text messages per day and spend 23 hours texting per week.[232]
- Americans text twice as much as they call.[233]
- Text is the most used form of communication for American adults under 50.[234]
- The most popular daily activities on smartphones and tablets in the United States in January 2014 was email and text messaging.[235]

Additionally, one in five people living in the U.S. speak a language other than English[236] and may find utility in the ability to quickly access non-English characters when using their devices.  Additionally, I understand the patented technology has become common in the marketplace (including iOS and Android) among almost all users.[237]

---

[232] https://www.textrequest.com/blog/texting-statistics-answer-questions/ (citing Experian Marketing Services and USA Today).
[233] https://www.textrequest.com/blog/texting-statistics-answer-questions/ (citing Nielsen).
[234] https://www.textrequest.com/blog/texting-statistics-answer-questions/ (citing Gallup).
[235] Statista (statistic ID 294377).
[236] https://www.census.gov/newsroom/press-releases/2017/acs-single-year.html?CID=CBSM+ACS16.
[237] See also, https://www.pcworld.com/article/2863538/9-typing-tips-every-android-and-ios-user-should-know.html.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

I understand ASUS's proposed alternatives are not acceptable, non-infringing alternatives to the '913 patent. I understand that simply removing the features of the patent without addressing the benefits achieved by the '913 patent's invention or the drawbacks of the prior art that the '913 patent addresses, ignores the realities of modern mobile device keypad design, would present a solution that is different from the common solution used across the industry and users would have difficulty composing messages using the alternative keyboard. The alternatives proposed by ASUS (modifying the code so that a key on the touch keyboard would change after inputting a second character to display the most recently selected character so the keyboard would not return to the default state or to use a dedicated non-input key to toggle characters displayed on the screen) would also lead to some of the same issues. The proposed alternatives would present a behavior to the user that is different from what is used across the industry. This would include the fact that all ASUS Android Accused Products include the '913 patent features and removing that feature would cause ASUS's phones to operate differently from other Android devices that include the features. The same is true for the Apple smartphones. They would also result in character input that is more difficult and less efficient and take up space on the keyboard.

### xiv.  Graphical User Interfaces

#### a.  '797 patent[238]

Based on Dr. Greenspun's expert report and my discussions with him, I understand the '797 patent generally relates to portable electronic devices that include sensors called accelerometers, which measure how a user manipulates the device and, in response, move what is displayed on the device's screen. I understand that the '797 patent enables the display of more realistic motion patterns as compared to the prior art. The primary benefits of the patent are that it enables devices to utilize an animated auto-screen rotation pervasive among competing smartphones and tablets and that it enables screen rotation to have a more natural look and feel, which is an advantage in the field of designing graphical user interfaces.[239]  Without this

---

[238] Greenspun ASUS Infringement Report '797 Patent and discussion with Dr. Greenspun, unless otherwise noted.
[239] See also, e.g., https://www.smashingmagazine.com/2017/01/how-functional-animation-helps-improve-user-experience/; https://uxplanet.org/ui-animation-eye-pleasing-problem-solving-a8b27013f55c; https://hal.archives-ouvertes.fr/tel-01881889/file/TheseAChalbiNeffati.pdf; https://www.shopify.com/partners/blog/using-animation-to-improve-mobile-app-user-experience.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

functionality the ASUS Accused devices would be missing a feature that is common in devices of competitors.

I understand ASUS's proposed alternatives are not acceptable, non-infringing alternatives to the '797 patent.  I understand that ASUS proposed modifying the source code to remove the animation that occurs when the screen reorients.  However, I understand that this would result in a user experience that is different from what is used across the industry and less natural to users. I also understand that would cause ASUS's phones to operate differently from other Android devices despite that one purpose of Android is to present a similar user experience across devices; similarly, it would cause ASUS's phones to operate differently from Apple's iOS devices.  ASUS also proposed a fixed speed animation solution as a non-infringing alternative, but I understand that proposed alternative would still infringe the '797 patent.

I have assumed that for purposes of analyzing these *Georgia-Pacific* factors that the benefits of the Patents-in-Suit were known by actual licensees who entered into agreements with Philips.  To the extent the reasonable royalty rates that result from the hypothetical negotiation are based at least in part on Philips license rates and license agreements, which already took into account the benefits of the Patents-in-Suit, this factor would have a neutral impact on the reasonable royalty rate for the Patents-in-Suit.

**Factor 12:**  **The portion of the profits or of the selling price that may be customary in the particular business or in comparable businesses to allow for use of the invention or analogous inventions.**

I incorporate by reference my discussion of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and *Georgia-Pacific* Factors 1 and 2.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, this factor would have a neutral impact on the reasonable royalty rates for the Patents-in-Suit.

**Factor 13:**  **The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

This factor considers the relative contribution of the patented technologies to the overall value of the product.  I recognize that the Patents-in-Suit cover a subset of the technologies that

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

make up the Accused Products in this case.  However, as discussed in Factors 9 and 10, the functionality provided by the Patents-in-Suit provides various benefits to ASUS and allow it to be competitive with Apple and Android based systems.

As discussed above, the royalty rates in the Portable Features license program (both blended and discrete) were set by Philips based on its experience with other license programs. To the extent a registrant selects the discrete rate option (rather than the blended rate option) in Philips' Portable Features program, the registrant only pays a license fee for the functionality that it uses. The actual royalty rates associated with each functional area and the structure of the Portable Features program build in the concept of apportionment.  Based on the terms of the Portable Features program, if a licensee needs to license a particular functionality, it must pay the discrete rate whether it uses one or multiple patents in that functional area.  The discrete rates for each functional area were the smallest rate-divisions available to registrants under the program.  Thus, no further apportionment beyond the discrete rates would be necessary.

As it relates to the actual registrations, the registrants chose the blended rate option because that provided them the most economic and flexible option under the licensing program. Here, the parties would have considered both the blended rate option and the discrete rate option. The blended rate option would have provided ASUS more flexibility and simplicity. The discrete rate option would be based on only the four functional areas it is currently accused of using out of a possible 11 functional areas.  The parties would understand that if ASUS wanted to use the licensed functionality in its Accused Products, it would pay the market value for the functionalities that contained the Patents-in-Suit as reflected in the actual rates paid by other licensees.

**Factor 14:      The opinion testimony of qualified experts.**

This factor incorporates by reference all the opinions as stated in this report.  In addition, I have relied on the opinions of Dr. Polish, Dr. Goodrich, Dr. Schmidt and Dr. Greenspun.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

**Factor 15:**     **The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

    To determine a reasonable royalty rate for a license to the Patents-in-Suit, I have analyzed *Georgia-Pacific* factors 1 through 14 above, including Philips' Portable Features licensing program and registration agreements. The hypothetical negotiation would take place on the date of first infringement, which is generally the later of the date of the first accused sale or the patent issue date. Given that the Patents-in-Suit cover multiple features of the same Accused Products, ASUS would have desired to negotiate a license for all the Patents-in-Suit in a single negotiation on the earliest date of first infringement. In this instance the hypothetical negotiation would take place ██████████████ .

    Alternatively, the parties would enter a separate hypothetical negotiation on the earliest date of first infringement for each accused feature set grouping. A second alternative would be a separate hypothetical negotiation for each of the Patents-in-Suit. Depending on the patent, the hypothetical negotiation would take place on either the date the patent issued or on the date of the first allegedly infringing sale of a previously issued patent, and in some cases, ASUS has not produced data that extends back to the relevant date.

    Based on my analysis, at the time of the hypothetical negotiation, Philips and ASUS would have been aware, among other considerations: 1) that Philips established its Portable Features program for the purpose of licensing the Touch Enabled Patents in ███; 2) of Philips' Portable Features program, which called for royalty rates of $0.75 and $0.99 under the blended rate option and discrete rates ranging from $0.25 to $0.40 per unit for the four feature sets containing the Patents-in-Suit; 3) of the scope and nature of the infringement and the validity of the Patents-in-Suit; 4) of the extent of ASUS's significant use of the Patents-in-Suit – ASUS sold

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

███████  Accused Product units during the damages period;[240] 5) of the features/functionalities provided by the Patents-in-Suit; 6) of the benefits and advantages from use of the Patents-in-Suit in ASUS's Accused Products; 7) of the real world license agreements that included the Patents-in-Suit and go forward royalty rates of $0.75 and $0.99 per unit sold. Based on the minimum units covered by these agreements, the guaranteed per unit minimum payment obligations ranged from ████████;[241] 8) of the differences between real world licensees and the Philips/ASUS hypothetical license detailed in Figure 5 above; 9) that the discrete rates for each functional area were the smallest rate-divisions available to registrants under the Portable Features program; and 10) that, on balance, the *Georgia-Pacific* factors would have a neutral to upward influence on the royalty rates for the Patents-in-Suit as compared to the rates in Philips' Portable Features program.

Based on my analysis of the information that I have described above, I conclude that the reasonable royalty in the hypothetical negotiation would be determined using the rates reflected in Philips' Portable Features program.  In the hypothetical negotiation between Philips and ASUS, the parties could have elected the blended rate option.  Had it elected the blended rate and paid the standard rate of $0.99 per Accused Product, its royalty obligation would have been ████████.[242]  However, in retrospect it is also possible that the parties would have agreed to a license for the Patents-in-Suit based on the discrete rates for only the four (out of a possible 11) functional areas it is currently accused of using. In hindsight, this would have provided ASUS with the most economically beneficial option.  The discrete rate option is conservative for a number of reasons, including the fact that ASUS might have elected the blended rate for simplicity or other reasons and that the discrete and blended rates in Philips' Portable Features program do not reflect the assumption of infringement and validity that is required in the reasonable royalty analysis.  The parties would understand that real-world registrants had previously established the market value (in terms of royalty rates) and terms (particularly that each discrete rate was the smallest rate-division available to registrants under the program) of Portable Features program registrations.  The parties would understand that beyond the smallest

---

[240] Exhibit 4.0.
[241] Exhibit 9.0.
[242] Exhibit 4.1.  I understand that ASUS is not eligible for the $0.75 compliance rate for past use in this analysis given the alleged actions that led to the present matter.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

rate-divisions available, registrants paid rates for each functional area irrespective of the number of patents they utilized.

To be clear, I have applied the same terms faced and accepted by real-world registrants to the hypothetical negotiation between Philips and ASUS.  In doing so I have apportioned to the smallest rate-divisions available to real-world registrants under the program and this would be the smallest rate division available to ASUS.  The following rates would be applied to the Accused Product units in this case:

**Figure 10: Portable Features Program Discrete Royalty Rates[243]**

| Feature Set | Per Unit Discrete Royalty Rate | Patent(s)-in-Suit |
|---|---|---|
| Authentication/DRM | $0.25 | '809 |
| Streaming & Services | $0.25 | '806 |
| Touch Screen Interfaces | $0.40 | '064, '564, and/or '913 |
| Graphical User Interfaces | $0.40 | '797 |

Applying these discrete rates to ASUS's accused units (as discussed below) results in an effective royalty rate of ███ per Accused Product unit,[244] which is reasonable in comparison to the $0.75 and $0.99 go-forward royalty rates under the blended rate option agreed to be paid by numerous other Portable Features program registrants.   It is reasonable even when compared to the range █████████ of guaranteed minimum per unit payment obligations for the licenses I calculated above.  The guaranteed minimum per unit payment obligations in this range were impacted by a variety of factors (outlined above) that provided Philips with an incentive to make concessions that reduced them for registrants but that would not apply to the hypothetical reasonable royalty analysis.  Additionally, unlike the guaranteed minimum per unit payment obligations associated with certain of the registration agreements, ASUS's effective royalty rate reflected above does not consider pre-notice units.  In addition, unlike the hypothetical license (or release), in the actual registration agreements entered, the licensed patents were not determined to be valid and infringed with certainty.  Furthermore, the actual registrants willingly negotiated licenses with Philips without litigation, and a number were considered by Philips to be early signers.

---

[243] http://www.ip.philips.com/data/downloadables/1/9/7/4/discrete-rate-agreement-may-29-2015.pdf.  The Patents-in-Suit are aligned with the feature set to which they belong.
[244] Exhibit 4.0.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

## 6    CONCLUSION

### 6.1    Reasonably Royalty Damages

The appropriate royalty base against which to multiply the reasonable royalty rate determined above, is the number of Accused Product units sold or licensed by ASUS for each of the Patents-in-Suit over the damages period.  My calculation of the royalty base is reflected on Exhibits 5.0 through 7.2 as attached hereto.

Applying the royalty rates discussed in Factor 15 above to ASUS's Accused Products, I determined that during the period ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ if ASUS is found to infringe all the Patents-in-Suit, the total reasonable royalty ASUS owes Philips is conservatively ▮▮▮▮▮▮[246]  As I noted above, it is possible that ASUS and Philips would have elected the blended rate, which would yield a total of ▮▮▮▮▮▮[247]

## 7    PREJUDGMENT INTEREST

A prevailing patent owner in a patent infringement case is generally entitled to an award of prejudgment interest on the damages it suffered.  Since it is not known at this time what, if any, amount of damages will be awarded to Philips, I have not prepared a determination of prejudgment interest.  Once the amount of damages owed, if any, is determined, and if requested, I will calculate prejudgment interest at a rate consistent with an instruction of the Court or otherwise consistent with case law.

---

[245] As of the date of this report, ASUS has produced unit sales data through December 31, 2018 for its Accused Products.  I anticipate updating my analysis to reflect ASUS's infringing sales of each Accused Product after the last date through which ASUS produced unit sales data at such time that ASUS produces its sales data for that period.

[246] Exhibit 4.0.  To the extent not all the Patents-in-Suit are found valid and infringed or the damages start dates vary from those assumed in my damages calculation, the damages which would result from the varied outcomes can be calculated using the underlying data and analyses attached to this report.

[247] Exhibit 4.1.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**

Respectfully submitted,

Michael E.  Tate

Vice President
Charles River Associates
April 25, 2019

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY**