John P. Schnurer (CBN 185725)
JSchnurer@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
Telephone: (858) 720-5700
Facsimile: (858) 720-5799

Ryan J. McBrayer (*pro hac vice*)
RMcBrayer@perkinscoie.com
Jonathan R. Putman (*pro hac vice*)
JPutman@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000

Attorneys for Defendants
HTC CORP.
HTC AMERICA, INC.

*[Additional Attorneys listed on signature page.]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE KONINKLIJKE PHILIPS PATENT LITIGATION. | Case No. 4:18-cv-01885-HSG-EDL<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PHILIPS' MOTION TO EXCLUDE CERTAIN OPINIONS IN DR. NIELSON'S OPENING EXPERT REPORT SERVED ON BEHALF OF HTC CONCERNING U.S. PATENT NO. 9,436,809**<br><br>Date:       November 14, 2019<br>Time:       2:00 p.m.<br>Judge:      Hon. Haywood S. Gilliam, Jr.<br>Courtroom: 2<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

III.  ARGUMENT ....................................................................................................... 2

     A.     DTCP 1.2 is Substantively Identical to the DTCP White Paper that Philips Itself Submitted to the Patent Office in an Information Disclosure Statement.................................................................................................... 2

     B.     Philips has Presented No Evidence Indicating that DTCP 1.2 is Unreliable .......... 5

     C.     Philips Substantively Responded to Dr. Nielson's Theories Based on DTCP and is in No Way Prejudiced. ...................................................... 6

IV.  CONCLUSION ................................................................................................... 7

**INTRODUCTION**

Philips asks this Court to exclude portions of Dr. Nielson's opening expert report, because according to it, Dr. Nielson's opinions are based on unreliable evidence. Yet, the DTCP 1.2 specification evidence that Dr. Nielson relies upon is substantively *identical* to the 5C Digital Transmission Content Protection White Paper ("DTCP White Paper"), an earlier version of the specification that Philips itself submitted to the patent office in an information disclosure statement during prosecution of U.S. Patent No. 8,543,819, the parent of the asserted U.S. Patent No. 9,436,809.

Furthermore, Philips has presented no evidence that Digital Transmission Content Protection Specification, Revision 1.2 ("DTCP 1.2") is unreliable, nor that it was not publicly available as of July 11, 2001, the date on the face of the document. Nor has Philips attacked Dr. Nielson's qualifications or his methodology. Moreover, Dr. Nielson was not asked to provide an opinion of whether DTCP 1.2 qualified as prior art—Dr. Nielson was asked to provide his analysis of the invalidity of the '809 patent in light of DTCP 1.2 as prior art. Philips' sole complaint is that Dr. Nielson treated DTCP 1.2 as prior art. But the Federal Rules of Evidence permit Dr. Nielson to rely on hearsay, including hearsay that establishes the date of publication of a prior art reference.

Finally, Philips has not and cannot make any claims of prejudice. Philips was substantively on notice of HTC's theories concerning DTCP through HTC's Patent Local Rule 3-3 and 3-4 disclosures which disclosed Digital Transmission Content Protection Specification, Revision 1.2a ("DTCP 1.2a"). Dr. Goodrich responded to Dr. Nielson's theories in his rebuttal report and admitted that DTCP 1.2a and DTCP 1.2 are identical with respect to the portions that he analyzed and cited. Dr. Goodrich also admitted in his rebuttal report that the DTCP White Paper "overwhelmingly discloses the same aspects of DTCP 1.2a" and thus, DTCP 1.2 as well. Philips' motion to exclude is an improper attack on the admissibility of Dr. Nielson's opinion on DTCP 1.2, where Philips' real issue appears to be the weight which should be accorded to Dr. Nielson's opinion. Philips' rationale for bringing this motion is based on a flawed premise—

1   nowhere does Philips attack Dr. Nielson's methodology underpinning his invalidity theories

2   related to DTCP 1.2.

3   **I.      FACTUAL BACKGROUND**

4          Dr. Nielson's opening expert report describes four separate invalidity theories based on

5   DTCP 1.2 as a primary reference in combination with other secondary prior art references.  (Dkt.

6   No. 716-2 at 5.[1])  Dr. Goodrich's rebuttal report substantially addressed Dr. Nielson's theories.

7   (Ex. 1 at v-vii.)  Dr. Nielson was not asked to, nor did he, provide an analysis as to the public

8   availability of DTCP 1.2.  Dr. Nielson relied on the publication date on the front page DTCP as

9   the date of its publication and hence public availability.  (Dkt. 716-2 at 10, ¶ 221.)

10         Dr. Goodrich admitted in his rebuttal expert report that while the patent examiner "did not

11  specifically consider revision 1.2a of the DTCP specification, he did consider an earlier revision

12  1.0 of the DTCP specification ('DTCP White Paper')."  (Ex. 1 at ¶ 70.)  Moreover, Dr. Goodrich

13  admitted that the DTCP White Paper and DTCP 1.2a "overwhelmingly discloses the **same**

14  **aspects** of DTCP 1.2a relied upon by Defendants' experts (emphasis added)."  (Ex. 1 at ¶ 70.)

15  Dr. Goodrich then explained, at great lengths in the next four paragraphs, how the disclosure in

16  DTCP White Paper and DTCP 1.2a are substantively the same.  (Ex. 1 at ¶¶ 71-74.)

17  Dr. Goodrich concluded that "the Examiner fully considered the **noteworthy aspects** of DTCP

18  1.2a which Defendants' experts rely on in their invalidity theories (emphasis added)."  (Ex. 1 at ¶

19  75.)

20         During deposition, Dr. Goodrich admitted that he performed "a comparison side by side

21  between this version [DTCP 1.2] and the Version 1.2a and **for all passages that I rely on, they**

22  **are identical** (emphasis added)."  (Ex. 2 at 187:11-24.)

23  **II.     ARGUMENT**

24         **A.      DTCP 1.2 is Substantively Identical to the DTCP White Paper that Philips**
               **Itself Submitted to the Patent Office in an Information Disclosure Statement.**
25

26         Philips' argues that Dr. Nielson's opinions should be excluded because DTCP 1.2 is

27

28         _____
                [1] Citations are to the ECF Docket Number and ECF page number.

1    unreliable evidence.  However, the sections Dr. Nielson opined on in the DTCP 1.2 are

2    substantively identical to the DTCP White Paper, which Philips identified as prior art and

3    submitted to the USPTO in an Information Disclosure Statement.

4        Philips itself submitted 5C Digital Transmission Content Protection White Paper to the

5    patent office during prosecution of U.S. Patent No. 8,543,819, the parent of asserted U.S. Patent

6    No. 9,436,809.  (Ex. 3.)  Dr. Goodrich explained in his rebuttal expert report and provided side by

7    side examples of the disclosure in the DTCP White Paper and DTCP 1.2a that the two references

8    "overwhelmingly discloses the same aspects [] relied upon by Defendants' experts."  (Ex. 1 at

9    ¶ 70.)  For example, Dr. Goodrich provided the following chart in his rebuttal report:

| DTCP White Paper | DTCP 1.2a |
|---|---|
| Figure 2 gives an overview of the content protection protocol flow. In this overview, the source device has been instructed to transmit a copy protection stream of content. In this and subsequent diagrams, a source device is one that can send a stream of content. A sink device is one that can receive a stream of content. Multifunction devices such as PCs and record/playback devices such as digital VCRs can be both source and sink devices. | Figure 1 gives an overview of content protection. In this overview, the source device has been instructed to transmit a copy protection stream of content. In this and subsequent diagrams, a source device is one that can send a stream of content. A sink device is one that can receive a stream of content. Multifunction devices such as PCs and record/playback devices such as digital VCRs can be both source and sink devices. |
|  |  |
| 1. The source device initiates the transmission of a stream of encrypted content marked with the appropriate copy protection status (e.g. copy-one-generation, copy-never, or no-more-copies) via the EMI bits. | 1. The source device initiates the transmission of a stream of encrypted content marked with the appropriate copy protection status (e.g., "copy-one-generation," "copy-never," or "no-more-copies") via the EMI bits. |
| 2. Upon receiving the content stream, the sink device inspects the EMI bits to determine the copy protection status of the content. If the content is marked copy-never the sink device requests that the source device initiate Full AKE. If the content is marked copy-one-generation or no-more-copies the sink device will request Full AKE, if supported, or Restricted AKE. If the sink device has already | 2. Upon receiving the content stream, the sink device inspects the EMI bits to determine the copy protection status of the content. If the content is marked "copy-never," the sink device requests that the source device initiate Full AKE. If the content is marked "copy-one-generation" or "no-more-copies" the sink device will request Full AKE, if supported, or Restricted AKE. If the sink device has already |

| performed the appropriate authentication, it can immediately proceed to Step 4. | performed the appropriate authentication, it can immediately proceed to Step 4. |
|---|---|
| 3. When the source device receives the authentication request it proceeds with the type of authentication requested by the sink device. If the sink device requests Full AKE and the source device is only capable of Restricted AKE, the authentication performed will be Restricted Authentication . | 3. When the source device receives the authentication request, it proceeds with the type of authentication requested by the sink device, unless Full AKE is requested but the source device can only support Restricted AKE, in which case Restricted AKE is performed. |
| 4. Once the devices have completed the required AKE procedure, a content channel encryption key (content key) can be exchanged between them. This key is used to encrypt the content at the source device and decrypt the content at the sink. | 4. Once the devices have completed the required AKE procedure, a content channel encryption key can be exchanged between them. This key is used to encrypt the content at the source device and decrypt the content at the sink. |
| (DTCP White Paper at 5.) | (DTCP 1.2a at 10.) |

(Ex. 1 at ¶ 71; *see also id*. at ¶¶ 72-74.)  Dr. Goodrich concluded "that the Examiner fully considered the noteworthy aspects of DTCP 1.2a which Defendants' experts rely on in their invalidity theories."  (Ex. 1 at ¶ 75.)  Dr. Goodrich further admitted that "[g]iven the overwhelming similarities between the DTCP White Paper and DTCP 1.2a, the Examiner's finding of allowability, which accounts for the DTCP White Paper, effectively accounts also for DTCP 1.2a."  (Ex. 1 at ¶ 294.)

Dr. Goodrich also admitted during his deposition, when asked if he had addressed DTCP 1.2, that he had performed "a comparison side by side between this version [DTCP 1.2] and the Version 1.2a and **for all passages that I rely on**, they are **identical** (emphasis added)."  (Ex. 2 at 187:11-24.)  Thus, by Philips' and Dr. Goodrich's own admissions, DTCP 1.2 is identical to the very same DTCP White Paper that Philips itself submitted to the patent office.  Tellingly, Philips and Dr. Goodrich have never attacked the reliability or the public availability of the DTCP White Paper.

Because the passages that Dr. Nielson relied upon are substantively identical, as admitted by Dr. Goodrich, to the DTCP White Paper, Dr. Nielson did not rely on unreliable evidence and the jury should be allowed to hear his opinions related to DTCP 1.2.

**B.      Philips has Presented No Evidence Indicating that DTCP 1.2 is Unreliable.**

Philips complains that Dr. Nielson "has failed to present sufficient evidence to establish that DTCP 1.2 was publicly accessible prior to the '809 patent priority date."  (Opening Motion Dkt. No. 716 at 4).  But, the status of DTCP 1.2 as prior art is a legal and factual issue that Dr. Nielson was not asked to provide any opinions on.  Rather, Dr. Nielson's opinions are with regard to the invalidity of the '809 patent in light of DTCP 1.2 as prior art.  And, Philips has never affirmatively stated that DTCP 1.2 or DTCP 1.2a is not prior art.  Philips' complaints go to the weight of Dr. Nielson's opinion, not its admissibility.  Moreover, the case that Philips cites *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, for support of its flawed position is inapposite here.  In *Oxford*, the alleged prior art references that the expert opined on bore publication dates after the priority date of the challenged patent.  345 F.Supp.2d 431, 439-440.  Here, DTCP 1.2 bears a publication date of July 11, 2001, well before both the July 26, 2002 filing date of the European patent application to which Philips contends the '809 patent is entitled to claim priority to and the '809 patent's effective U.S. filing date of June 27, 2003.

Philips' contention that the "available evidence indicates that DTCP 1.2 was actually <u>not</u> published (underlining in the original)" is inaccurate.  While several sections of DTCP 1.2 are labeled [Draft Version 0.9], that statement does not establish that the standard was not published.  The Preface to DTCP 1.2 warns that "[s]ome portions of this document, identified as 'Draft' are in an intermediate draft form and are subject to change without notice.  Adopters and users of this Specification are cautioned these portions are preliminary, and that products based on it may not be interoperable with the final version or subsequent versions thereof."  (Dkt. No. 716-4 at 3.)  This same admonition exists verbatim in both DTCP 1.2a and the latest version, Revision 1.71 dated February 4, 2015.  (Dkt. No. 716-7 at 3; Dkt. No. 716-9 at 3.)  The notice is intended to allow developers to identify sections of the specification that are still under development, not to tell the reader that the document was not published.  Philips' argument about this admonition is nonsensical—if these DTCP specifications were not published, then this Draft admonition would not be needed.  Moreover, Dr. Nielson did not rely on any of the sections that were labeled "Draft" in his invalidity analysis.

1    Moreover, under the Federal Rules of Evidence Rule 703, Dr. Nielson is allowed to rely

2  on hearsay—and that reliance does not make his analysis of DTCP 1.2 unreliable.  *See Fed. Trade*

3  *Comm'n. v. Qualcomm Inc.*, No. 17-cv-00220-LHK, 2018 WL 6460573 at *2, (N.D. Cal. Dec.

4  10, 2018) ("In fact, an expert is of course permitted to testify to an opinion formed on the basis of

5  information that is handed to rather than developed by him—information of which he lacks first-

6  hand knowledge and which might not be admissible in evidence no matter by whom presented.")

7    Other patent publications, including U.S. Patent Pub. 2006/0018469 which claims a

8  foreign priority date of October 16, 2002, establish that DTCP 1.2 was publicly available on the

9  internet as of July 11, 2001.  (Ex. 4 at ¶ 2.) ("Copy Protection Systems (CPS) that have been

10  studied rely on link encryption (see for example the 'DTCP' proposal disclosed in '*Digital*

11  *Transmission Copy Protection Specification—Vol. 1 (Informational version)—Rev. 1.2—Jul.* 11,

12  2001" available at the following internet address

13  http://www.dtcp.com/data/info_dtcp_v1_12_20010711.pdf).")

14    Additionally, there are other indicia of reliability.  The cover of DTCP 1.2 and the DTCP

15  White Paper list the same five companies, many of them household names, including Hitachi,

16  Intel, Sony, and Toshiba.  Both refer to the same "Digital Transmission Content Protection" and

17  DTCP 1.2 refers to the companies as "collectively, the '5C'" which is the same moniker used in

18  the title of the DTCP White Paper—"5C Digital Transmission Content Protection White Paper."

19  Philips has presented no evidence to doubt the authenticity and reliability of the information

20  contained within DTCP 1.2, and in fact has already admitted that it is substantively identical to

21  what already exists in the file history of the parent '819 patent, specifically, what Philips itself

22  provided to the USPTO.  Moreover, Philips was aware of DTCP, because Martin Rosner, one of

23  its employees, attended DTCP meetings during the 1999 to 2002 time frame, the period in which

24  both DTCP 1.2 and DTCP 1.2a were published.  (Ex. 5 at 42:7-43:5.)

25    **C.    Philips Substantively Responded to Dr. Nielson's Theories Based on DTCP
26          and is in No Way Prejudiced.**

27    Dr. Goodrich addressed and fully responded to Dr. Nielson's invalidity theories based on

28  DTCP 1.2.  Philips was operatively on notice of DTCP 1.2 via HTC's disclosure of DTCP 1.2a in

1  its invalidity contentions and cannot claim otherwise, particularly given that it has already

2  admitted that DTCP 1.2a, DTCP 1.2, and the DTCP White Paper are all effectively identical for

3  disclosures relied upon by *both* experts.  Dr. Goodrich provided a lengthy 29-page response (not

4  including internal cross-references to previous sections ostensibly directed towards Microsoft's

5  expert's theories) to Dr. Nielson's theories based on DTCP.  At least one court in this district has

6  denied a motion to strike on similar facts.  *See Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*,

7  No. 14-cv-00876-RS (JSC), 2018 WL 3646842, at *8 (N.D. Cal. Aug. 1, 2018) (denying KSEA's

8  motion to strike defendants' expert report on allegedly new theory, particularly finding no

9  prejudice given that KSEA provided a lengthy rebuttal to that theory in its expert report).

10  Furthermore, Dr. Nielson has never "impermissibly substituted a new theory altogether" and

11  Philips substantively responded to Dr. Nielson's invalidity theories based on DTCP 1.2.  *Digital*

12  *Reg of Texas, LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2014 WL 1653131, at *2

13  (N.D. Cal. Apr. 24, 2014).  Finally, Philips had the opportunity and in fact took Dr. Nielson's

14  deposition after service of both his and Dr. Goodrich's expert reports concerning the validity of

15  the '809 patent.

16  **III.   CONCLUSION**

17          For the reasons stated above, HTC respectfully requests that Philips' Motion to Exclude

18  Certain Opinions in Dr. Nielson's Opening Expert Report Served on Behalf of HTC Concerning

19  U.S. Patent No. 9,436,809 be DENIED.

20

21

22

23

24

25

26

27

28

1

Dated: September 26, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ John Schnurer
John P. Schnurer (CBN 185725)
James Young Hurt (CBN 312390)
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, California, 92130 -2080
Tel.: (858) 720-5700
Fax: (858) 720-5799
htc-philipsperkinsservice@perkinscoie.com

Ryan McBrayer (*pro hac vice*)
Jonathan Putman (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington, 98101
Tel.: (206) 359-8000
Fax: (206) 359-9000
htc-philipsperkinsservice@perkinscoie.com

Elizabeth Banzhoff (*pro hac vice*)
PERKINS COIE LLP
1900 16th Street, Suite 1400
Denver, CO 80202
Tel.: (303) 291-2397
Fax: (303) 291-2497
htc-philipsperkinsservice@perkinscoie.com

*Attorneys for Defendants HTC Corp. and
HTC America, Inc.*