Michael P. Sandonato (admitted *pro hac vice*)
msandonato@venable.com
John D. Carlin (admitted *pro hac vice*)
jcarlin@venable.com
Natalie Lieber (admitted *pro hac vice*)
ndlieber@venable.com
Christopher M. Gerson (admitted *pro hac vice*)
cgerson@venable.com
Jason M. Dorsky (admitted *pro hac vice*)
jmdorsky@venable.com
Stephen K. Yam (admitted *pro hac vice*)
syam@venable.com

Jonathan M. Sharret (admitted *pro hac vice*)
jsharret@venable.com
Joshua D. Calabro (admitted *pro hac vice*)
jdcalabro@venable.com
Daniel A. Apgar (admitted *pro hac vice*)
dapgar@venable.com
Robert S. Pickens (admitted *pro hac vice*)
rspickens@venable.com
Sean M. McCarthy (admitted *pro hac vice*)
smccarthy@venable.com
Caitlyn N. Bingaman (admitted *pro hac vice*)
cnbingaman@venable.com

VENABLE LLP
1290 Avenue of the Americas
New York, New York 10104-3800
Tel: (212) 218-2100
Fax: (212) 218-2200

Chris Holland (SBN 164053)
cholland@hollandlawllp.com
Lori L. Holland (SBN 202309)
lholland@hollandlawllp.com
Ethan Jacobs (SBN 291838)
ejacobs@hollandlawllp.com

HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, CA 94104
Tel: (415) 200-4980
Fax: (415) 200-4989

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re Koninklijke Philips Patent Litigation | Case No. 4:18-cv-01885-HSG<br><br>**PHILIPS'S OPPOSITION TO ASUS'S MOTION FOR SUMMARY JUDGMENT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  THE COURT SHOULD DENY ASUS'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE '797 PATENT ...................................... 1

   A.   The Accused Products Include A "gravitation-controlled sensor integrated with said screen means and feeding data processing means for measuring an acceleration of the screen means induced by user manipulation…" ...................... 1

   B.   The Accused Products Also Include "programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to … objects." .................................................. 3

III. ASUS IS NOT ENTITLED TO SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '064 PATENT FOR THE ACCUSED ANDROID AND CHROME DEVICES ........................................................................................ 7

   A.   The '064 Patent Claims ................................................................................. 7

   B.   Overview of ASUS Infringement Evidence .................................................. 7

   C.   Argument ....................................................................................................... 8

IV.  THE ASSERTED CLAIMS OF THE '564 PATENT ARE NOT INVALID ..................... 10

   A.   Legal Standard .............................................................................................. 11

   B.   Argument ...................................................................................................... 12

        1.   The Scope of the '564 Invention is Reasonably Certain .............................. 12

        2.   Philips' Interpretation of the Claim Does Not Read Out Claim Terms ........................................................................................................ 14

        3.   Philips' Infringement Allegations Do Not Bear on Indefiniteness .............. 14

V.   ASUS'S ACCUSED PRODUCTS INFRINGE THE '809 PATENT ............................... 14

   A.   ASUS's Products Determine Whether a Second Device Is "Compliant With a Set of Compliance" Rules Before "Provid[ing] a First Signal [or Secret] to the Second Device…" ....................................................................... 15

   B.   ASUS Misinterprets the Claim Terms "Compliant With a Set of Compliance Rules" and "Compliant" .......................................................... 18

   C.   The HDCP 2.x Revocation and Repeater Checks Are Not Compliance Rules ............................................................................................................... 19

VI.  "MEANS FOR DOWNLOADING" IN THE '806 PATENT IS NOT INDEFINITE .................................................................................................... 21

   A.   Means for Downloading Is Not Subject to 35 U.S.C. § 112 ¶ 6 .............................. 21

B.     The '806 Patent Provides Structure for Means for Downloading under §
112 ¶ 6 .................................................................................................. 22

      1.     A General Purpose Computer Suffices Because  Downloading is a
Basic Function of a Microprocessor .............................................. 22

      2.     The '806 Patent Discloses an Algorithm for Downloading ......................... 22

          a.     ASUS Relies on the Wrong Legal Standard ..................................... 23

          b.     ASUS Ignores the Disclosure of the '806 Patent ............................. 24

C.     ASUS Failed to Carry Its Burden ............................................................. 25

VII.     CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alacritech, Inc. v. Century Link Commc'ns LLC*,
  271 F. Supp. 3d 850 (E.D. Tex. 2017) ..................................................................14

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017) .........................................................................12

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) .........................................................................24

*Cacace v. Meyer Mktg. Co., Ltd.*,
  812 F.Supp.2d 547 (S.D.N.Y. 2011) ..................................................................25

*Creo Prods., Inc. v. Presstek, Inc.*,
  305 F.3d 1337 (Fed. Cir. 2002) .........................................................................24

*DESA IP, LLC v. EML Techs., LLC*,
  211 F. App'x. 932 (Fed. Cir. 2007) ...................................................................22

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
  899 F.3d 1291 (Fed. Cir. 2018) .........................................................................22

*In re Dossel*,
  115 F.3d 942 (Fed. Cir. 1997) ...........................................................................24

*DR Sys., Inc. v. Eastman Kodak Co.*,
  No. 08-CV-669-H (BLM), 2009 WL 3756765 (S.D. Cal. Nov. 9, 2009) ...................26

*DSU Med. Corp. v. JMS Co.*,
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) .............................................................11

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ...........................................................................24

*Finjan, Inc. v. Sophos, Inc.*,
  No. 14-CV-01197-WHO, 2015 WL 890621 (N.D. Cal. Mar. 2, 2015) .....................23

*Finjan, Inc. v. Symantec Corp.*,
  No. 14-CV-02998-HSG, 2017 WL 550453 (N.D. Cal. Feb. 10, 2017) .....................23

*Freeny v. Apple Inc.*,
  No. 13-cv-00361, 2014 WL 4294505 (E.D. Tex. Aug. 28, 2014) .............................25

*Function Media, L.L.C. v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) .........................................................................23

*Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*,
  620 F.3d 1287 (Fed. Cir. 2010)............................................................12, 14, 25

*Intel Corp. v. VIA Techs., Inc.*,
  319 F.3d 1357 (Fed. Cir. 2003)..................................................................23, 25

*In re Katz Interactive Call Proc. Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011).........................................................................23

*Mallinckrodt, Inc. v. Masimo Corp.*,
  147 F. App'x. 158 (Fed. Cir. 2005) ...................................................................25

*MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*,
  731 F.3d 1258 (Fed. Cir. 2013)..........................................................................11

*Medical Instrumentation & Diags. Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003)..........................................................................24

*Moore U.S.A., Inc. v. Standard Register Co.*,
  229 F.3d 1091 (Fed. Cir. 2000)..........................................................................14

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)........................................................................................12

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008)..........................................................................24

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
  806 F.2d 1565 (Fed. Cir. 1986)..........................................................................14

*Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*,
  No. 12-282, 2014 WL 1370038 (D. Del. Apr. 7, 2014).....................................25

*Procter & Gamble Co. v. Team Techs., Inc.*,
  46 F. Supp. 3d 764 (S.D. Ohio 2014) ................................................................25

*Regents of Univ. of Cal. v. Dako N. Am., Inc.*,
  Case No. 05-cv-03955-MHP, 2009 WL 1083446 (N.D. Cal. Apr. 22, 2009) ..............11

*S3 Inc. v. NVIDIA Corp.*,
  259 F.3d 1364 (Fed. Cir. 2001)..........................................................................24

*Sage Prods., Inc. v. Devon Indus., Inc.*,
  126 F.3d 1420 (Fed. Cir. 1997)..........................................................................22

*SanDisk Corp. v. Memorex Prods., Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005)............................................................................6

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005)..........................................................................15

*SPEX Techs., Inc. v. Kingston Tech. Corp.*,
    No. CV16-07349, 2017 WL 5495149 (C.D. Cal. Oct. 18, 2017) ..................................25

*TecSec, Inc. v. Int'l Bus. Machs. Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013)..................................................................................21

*THX, Ltd. v. Apple, Inc.*,
    No. 13-cv-01161-HSG, 2016 WL 6563340 (N.D. Cal. Nov. 4, 2016).........................12

*TurboChef Techs., Inc. v. Garland Commercial Indus., LLC*,
    No. 3-07-cv-1330-F, 2009 WL 5947299 (N.D. Tex. Nov. 17, 2009)...........................14

**Statutes**

35 U.S.C. § 112 ¶ 6............................................................................................ *passim*

## I.   INTRODUCTION

The Court should deny ASUS's motion for summary judgement ("Motion" or "Mot.") in its entirety.  The issues raised by ASUS are replete with unresolved factual issues, and ASUS ignores the contradictory testimony proffered by Philips' experts.  Moreover, the law on which ASUS relies does not support its arguments that it is entitled to summary judgment.[1]

## II.  THE COURT SHOULD DENY ASUS'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE '797 PATENT

ASUS argues that summary judgment on the '797 patent is warranted because Philips cannot show infringement of two claim elements: 1) "gravitation-controlled sensor integrated with said screen means and feeding data processing means for measuring an acceleration of the screen means induced by user manipulation…;" and 2) "programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to … objects." (Mot. at 4-5).  ASUS is wrong on both counts, ignores disputed issues of material fact, ignores Judge Sleet's prior rulings on claim construction, and misapprehends the scope of the claims.

### A.   The Accused Products Include A "gravitation-controlled sensor integrated with said screen means and feeding data processing means for measuring an acceleration of the screen means induced by user manipulation…"

ASUS asserts there is no dispute that "the ███████████████████████████ ████████████████████████████████████████████ ███████████████████████…" (Mot. at 2, 4).  Initially, this claim element does not refer to "triggering."  It merely refers to "measuring an acceleration of the screen means…"  And, the evidence demonstrates that the accused products ████████ ████████████████████████████ ████████████████████████████████████ ███████████████████████████████. (*See* Ex. 1 at §§ III; IV.A.2; ¶¶ 35-40 (including evidence cited therein)).  As Dr. Greenspun explained in his opening report:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

---

[1]  Citations to "Ex." herein refer to exhibits to the Declaration of Caitlyn N. Bingaman.

1

2

3

4

5

6

7 (Ex. 1 at ¶¶ 51, 131, 137; *see also* Ex. 30

8 ██████ in the accused products, as well as evidentiary cites); Ex. 2 at 12:11-13:11, 25:15-27:10,

9 32:8-37:17; Ex. 3 at 62:7-63:3 (ASUS designated 30(b)(6) deponent confirming that all ASUS

10

11 84:17-85:6, 88:18-89:5

12 .

13     ASUS's argument otherwise "[c]ritically" relies on the assertion that the accused devices

14 . (Mot. at 3). This

15 statement is inaccurate. As Dr. Greenspun explained, the accused products

16

17

18

19

20 " (emphasis added)).

21

22

23

24

25

26

27

28

ASUS further asserts that this limitation is not met because

To the extent ASUS would point to the "under control of a screen motion sensed by said sensing means" language, that phrase is contained in the "programmed calculating means" limitation addressed below, which also does not require the relationship that ASUS suggests (as explained below).  (*Id.*).  Accordingly, ASUS cannot meet its burden to show that there is no genuine dispute as to whether this limitation is infringed.

**B.    The Accused Products Also Include "programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to … objects."**

This claim element was construed by the Court subject to § 112 ¶ 6.  (Ex. 6 at 12 n.18).  Philips has established that the accused products include structure–equivalent to the construed structure ("a computer program that performs an algorithm for imparting an acceleration based motion patter[n], such as those disclosed in Figures 3-5 and at 3:3[]2-4:39.")–which performs the construed function of this claim limitation ("receiving screen motion information and imparting an acceleration based motion pattern to one or more or all displayed objects").  (*See* Ex. 1 at §§ III; IV.A.3; ¶¶ 35-40 (including evidence cited therein)).  Dr. Greenspun described, "as one example":



(Ex. 1 at ¶ 168; *see also id.* at ¶¶ 161-176).  ASUS does not explain why a reasonable jury could not conclude from Dr. Greenspun's testimony (and supporting evidence) that the accused structure is equivalent to that in the Court's claim construction and that it performs the function as expressed in the Court's claim construction.  ASUS simply asserts that Philips must show how "the *acceleration*

measured by the sensor [is] used to impart an *acceleration based* motion pattern that is 'induced by user manipulation…'" and that the rotation of the screen image in the accused devices is "based on *acceleration* of the screen induced by the user." (Mot. at 5 (emphasis in original)). ASUS ignores the claim construction (which instead requires "receiving *screen motion* information and imparting an *acceleration based* motion pattern") and improperly reads into the claims a requirement that there be a particular relationship between a measured acceleration of the screen and the acceleration based motion pattern imparted to objects on the screen. (Ex. 6 at 12).

But, the Delaware Court previously considered and rejected Defendants' attempts to construe the claims to include that requirement. Judge Sleet construed the claim term "acceleration based motion pattern" to simply mean a "pattern of motion that reflects acceleration," and expressly rejected Defendants' attempts to require that term to correspond to sensed screen acceleration:

> Defendants argue that the term should be construed as "motion proportional to the sensed screen motion, as if the user's manipulation of the screen were instead manipulating the objects." The court declines to adopt this proposed construction because Defendants improperly seek to import a limitation from the specification into the claim. (D.I. 117 at 6.) *While the specification and prosecution history may suggest a relationship between the measured acceleration of the screen and the motion pattern imparted to the object, the claim language does not evince any particular type of acceleration.* (Id.)

(Ex. 6 at 11 n.17 (emphasis added)). Judge Sleet's decision foreclosed any argument that the claimed "acceleration based motion pattern" must bear any particular relationship to user imparted acceleration, and ASUS should not be permitted to relitigate the issue.

To the extent ASUS continues to ignore the Court's construction of the "programmed calculating means" and points to the "under control of a screen motion sensed by said sensing means" language, the accused products ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████ (Ex. 1 at ¶¶ 77-79, 90, 160-176; *see also* Ex. 1 at §§ III.A.6, IV.A.3). As a result, and as explained by Dr. Greenspun, to the extent the claims require ██████████████████████████████ ███████████████████████████████, the accused products satisfy that requirement.

ASUS also incorrectly asserts that Philips disclaimed coverage of the accused functionality during prosecution to avoid the Donahue reference (U.S. Patent No. 5,526,022, Ex. 8). (Mot. at 5). But, ASUS already pursued (and the Court already considered and rejected) essentially the same argument during claim construction. Specifically, ASUS argued that the "acceleration based motion pattern" should be narrowly construed to require a particular correspondence between sensed screen acceleration and on screen motion based on Philips distinguishing Donahue during prosecution. (Ex. 11 at 4; Ex. 12 at 3-4 (quoting same)). ASUS also argued that Philips' proposed construction of "acceleration based motion pattern" would improperly read on the background of the invention. (Ex. 44 at 123:9-15). And, in a moment of candor, ASUS's counsel admitted that ASUS's real concern was that if the Court adopted Philips' proposed construction, it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 123:16-19). Judge Sleet considered all those arguments, rejected them, and adopted Philips' proposed construction. (Ex. 6 at 11 n.17). The Court should not permit ASUS to relitigate these issues through this motion.

Moreover, Philips did not distinguish the asserted '797 claims on the grounds that Donahue disclosed an acceleration based motion pattern that was imparted to an object based on an orientation change, as ASUS appears to contend. Instead, Philips observed that Donahue did not disclose the ability measure acceleration in any manner. (Ex. 9 at PHILIPS00004214 ("while Donahue's sensor can measure tilt by measuring the angle of rotation . . ., ***it cannot measure acceleration*** as do the sensors" disclosed by the '797 patent); *see also* Ex. 10 at ¶ 34 ("Donahue does not measure acceleration because it only measures the tilt of the sensor.")). Indeed, Donahue discloses a device that uses a "tilt sensor [to] detect[] the magnitude and direction of tilt of the [device] away from the vertical axis." (Ex. 8 at 2:29-33). In contrast, the '797 patent discloses, and the accused devices infringe based on, the use of accelerometers to determine orientation. (Ex. 1 at ¶ 51 ("the ASUS Accused Products . . . each include an accelerometer"); ¶ 43 ("The '797 patent improves on the prior art by, for example, incorporating accelerometers into a portable device and then using accelerometer data for display of acceleration based motion patterns on the device's screen.")). Accelerometers are distinct from the tilt sensors of Donahue in that they can measure acceleration. (*Id.* at ¶¶ 35-43 (contrasting the functionality of accelerometers and tilt sensors and noting that

"[u]nlike an accelerometer, a tilt sensor does not sense acceleration")).  As a result, Philips did not disclaim the concept of determining orientation by measuring acceleration – at the very least, this record cannot satisfy the "clear and unmistakable" standard for prosecution history disclaimer.  *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) (disclaimer must be "clear and unmistakable" and "[t]here is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation").

ASUS's renewed disclaimer argument misrepresents the file history.  Specifically, ASUS relies on a purported attempt to distinguish claims 1 and 6 over Donahue on the grounds that it does not "suggest[] imparting an acceleration based movement to an object which *corresponds* to an acceleration of the display screen."  (Mot. at 3:17-21; Ex. 9 at PHILIPS0004232 (emphasis added)).  But, this statement was not an attempt to distinguish those claims, which make no reference to any "correspondence."  Instead, this statement was made in the context of "new claim 11" (which is not asserted here), and which actually does include a limitation requiring a certain correspondence (*i.e.*, "imparting an acceleration based motion pattern . . . which motion *corresponds* to the dynamical change of the spatial orientation of the screen").  (*See* Ex. 9 at PHILIPS0004229-30, 4232).  This limitation should not be imputed claim 1 and 6, which do not contain the same language.

Even if ASUS were correct that using measured acceleration to determine screen motion were excluded from the claims (and ASUS is not correct), ASUS's admission that

. (*See id.*; Mot. at 5; Ex. 6 at 12).[2]

## III. ASUS IS NOT ENTITLED TO SUMMARY JUDGMENT OF NO INFRINGEMENT OF THE '064 PATENT FOR THE ACCUSED ANDROID AND CHROME DEVICES

### A. The '064 Patent Claims

The '064 patent claims, *inter alia,* an "improved touch-screen image scrolling system" comprising "stopping motion program instructions associated with said microprocessor for terminating scrolling displacement of the image on said screen upon first occurrence of any signal in the group of signals comprising: (a) a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time." (*See, e.g.*, Ex. 13 at 6:1-37). The specification explains that in one embodiment, the duration of contact for a stationary touch on the screen serves as a distinction between a "selection touch" and a "stop scrolling" touch, but that the system could also be set up so that the a finger touch would act solely as a "stop motion" signal regardless of the length of the touch. (*See id.* at 4:65-5:9). The specification also explains that in contrast to "stationary touching in step 108, if the system senses motion of the finger touch on the screen, the method reverts to step 104, again converting the speed and direction of motion of the touch into scrolling motion of the displayed data and restarting the scrolling process." (*See id.* at 5:10-15).

### B. Overview of ASUS Infringement Evidence

Philips accuses of infringement ASUS's touchscreen devices that include a version of the Windows operating system (version 7, 8, RT 8, 8.1, RT 8.1, and 10), the Android operating system (version 2.1 and later), Android devices with the Chrome web browser (version 36 and later), and the ChromeOS (version 36 and later). (*See* Ex. 14 at ¶ 75). ASUS's Motion is limited to the Android and ChromeOS devices. (*See* Mot. at 5-9).[3]

---

[3] In its conclusion, ASUS incorporates by reference its Microsoft's motion. Philips objects to this incorporation by reference as an attempt to avoid the page limitations of its summary judgment motion, but to the extent it is proper, Philips likewise incorporates its opposition to that motion.

On this motion, ASUS asserts that the "stopping motion program instructions" element of the asserted '064 patent is not met. Philips has pointed to substantial evidence from which a jury could conclude that claim element is met.[4] For example, Philips' expert, Dr. Schmidt, has opined that the accused products include capacitive touchscreens which in turn include program instructions to scan across the entire touch screen at programmed intervals ("scan" or "scan rate") to determine whether and at what position the touchscreen was contacted. (*See* Ex. 14 at ¶¶ 86-89; *see also* Ex. 17 at 18:24-20:7; 50:19-52:19; 54:11-55:10; 86:23-87:16).[5] Dr. Schmidt also opined that ASUS's Android and ChromeOS capacitive touchscreen devices include program instructions such that if a user were to touch the screen while inertial scrolling is in progress in any of the accused applications, and the user were to keep their finger substantially stationary for a duration exceeding the time for the touchscreen to complete one scan, then the device would terminate scrolling motion in those applications. (*See* Ex. 14 at ¶¶ 86-89; 355-369 (Launcher application); 488-492 (Android Chrome web browser application); 572-578 (ChromeOS File Explorer and Chrome web browser); 672-677; *see also* Ex. 17 at 88:15-90:16; 95:5-96:11; 97:11-100:13; 103:25-105:12; 106:7-107:14; 108:11-109:7; 113:17-114:16). Dr. Schmidt further explained that if the touch is not substantially stationary for a duration longer than one scan period and instead moves, the display will stick-to-the-finger and scroll in correspondence with the finger movement. (*See id.*).

### C.  Argument

ASUS asserts that the accused products do not satisfy the "stopping motion program instructions" element of the asserted claims because they purportedly do not "terminate scrolling when 'a *substantially stationary* finger touch on the screen enduring for a period longer than a preset minimum time' is sensed." In particular, ASUS asserts that the accused products will stop scrolling

---

[4] Moreover, all accused ASUS Microsoft devices include a capacitive touchscreen. (*See* Ex. 14 at ¶¶ 75-79, 86-89; Ex. 19).

[4] *See* Ex. 14 at ¶¶ 45-56, 75-89, 100-269, 355-369, 429-436, 488-492, 572-578, 642-645, 672-677 (and references cited therein); Ex. 15; Ex. 16; Ex. 17 at 18:24-20:7; 50:19-52:19; 54:11-55:10; 86:23-87:16; 88:15-90:16; 95:5-96:11; 97:11-100:13; 103:25-105:12; 106:7-107:14; 108:11-109:7; 113:17-114:16; Ex. 18.

[5] Dr. Schmidt explained in his first-day of deposition that the capacitive touchscreens include program instructions to scan the screen for capacitance changes at programmed intervals. (*See* Ex. 20 at 43:7-44:8; 45:2-6; 50:8-23; 58:3-7; 60:1-13).

in response to a touch before it is confirmed to remain stationary. (*See* Mot. at 8). ASUS asserts in this regard that an ACTION_DOWN event "is generated as soon as a finger is determined to have touched the screen, at the first scan that recognizes a finger." (*See id.*). Implicit in ASUS's argument is the notion that the "stopping motion program instructions" limitation requires that an inertial scroll must continue until either a "substantially stationary finger touch" or an "end-of-scroll" signal occurs, and no other input type can stop the scroll. But, the scrolling motion program instructions on their face state what should happen in the event a stationary touch longer than a preset minimum time occurs. They do not say what must happen prior to completion or in the absence of occurrence of such a stationary touch.

Dr. Schmidt, on the other hand, opines that this claim element is met because if a user were to touch the screen while inertial scrolling is in progress in any of the accused applications, and the user were to keep their finger substantially stationary for a duration exceeding the time for the touchscreen to complete one scan, then the device would terminate scrolling motion in those applications. (*See* Ex. 14 at ¶¶ 86-89; 355-369; 488-492; 572-578; 672-677; *see also* Ex. 17 at 88:15-90:16; 95:5-96:11; 97:11-100:13; 103:25-105:12; 106:7-107:14; 108:11-109:7; 113:17-114:16). Dr. Schmidt further explained that if there was movement between the time the touch was detected and the time duration of a scan period, the devices would not terminate scrolling displacement but would cause the display to stick-to-the-finger and continue scrolling. (*See id.*). Though ASUS's motion appears to characterize Dr. Schmidt's opinions as agreeing with its position that the ACTION_DOWN event is generated when the user first presses his or her finger to the screen and immediately terminates scrolling (*see* Mot. at 8), Dr. Schmidt clarified in his depositions that his analysis was performed after the touch was already detected (*i.e.*, at the first scan) and after it had endured for a duration longer than a scan period (*i.e.*, the second scan), and explained that the ACTION_DOWN event could not be read in isolation while ignoring the ACTION_MOVE event that immediately follows it if the touch was not substantially stationary for the preset minimum time. (*See e.g.*, Ex. 17 at 88:15-90:16; 95:5-96:11; 97:11-100:13; 103:25-105:12; 106:7-107:14; 108:11-109:7; 113:17-114:16; *see also* Ex. 14 at ¶¶ 86-89; 355-369; 488-492; 572-578; 672-677).

To the extent ASUS is arguing that there can be no infringement because touches other than

substantially stationary touches can also stop or alter scrolling motion in the ASUS Android and Chrome OS devices, ASUS is wrong. ASUS cannot escape infringement by arguing that other touch contacts (such as moving touches or touches prior to a predetermined minimum time, as alleged by ASUS) also can stop or alter a scroll. The scrolling motion program instructions element state that scrolling displacement is terminated "upon first occurrence of any signal in the group of signals comprising…" *See ICU Medical, Inc*, 2005 WL 588341, at *6 (explaining that a claim incorporating the term "comprising" is "generally understood to signify that the claims do not exclude the presence in the accused apparatus … of factors in addition to those explicitly recited" and holding that the accused product "infringes despite the fact that the piston component is not the only element obstructing fluid flow through the valve."); *see also Vivid Techs., Inc.*, 200 F.3d at 811-12. Here, the accused ASUS devices infringe because they include program instructions that terminate scrolling upon a substantially stationary touch that endures for a duration longer than one scan period (*see e.g.*, Ex. 17 at 88:15-90:16; 95:5-96:11; 97:11-100:13; 103:25-105:12; 106:7-107:14; 108:11-109:7; 113:17-114:16; Ex. 14 at ¶¶ 86-89; 355-369; 488-492; 572-578; 672-677), regardless of whether such input may not be (according to ASUS) the only input that may terminate scrolling motion.

Clear issues of material fact prevent summary judgment as to the '064 patent with respect to ASUS's instant motion—whether ASUS's Android and ChromeOS devices terminate scrolling in response to a substantially stationary finger touch enduring for a period longer than a preset minimum time (which Dr. Schmidt has opined is satisfied by the touchscreen's scan rate). As the parties and their retained experts disagree on this issue, ASUS is asking the Court to resolve matters of weight, credibility, and issues of ultimate fact and to resolve a "battle of the experts," which is improper on summary judgment. *See DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1156 (N.D. Cal. 2003) ("Matters of weight, credibility and ultimate fact are for the fact-finder."); *MeadWestVaco Corp. v. Rexam Beauty & Closures, Inc.*, 731 F.3d 1258, 1268-69 (Fed. Cir. 2013); *Regents of Univ. of Cal. v. Dako N. Am., Inc.*, Case No. 05-cv-03955-MHP, 2009 WL 1083446, at *15 (N.D. Cal. Apr. 22, 2009) (a "battle of the experts" is appropriately left to the trier of fact to resolve).

## IV. THE ASSERTED CLAIMS OF THE '564 PATENT ARE NOT INVALID

The '564 Patent claims are not invalid for indefiniteness, as the scope of the phrase "a

display that has a substantially small size suitable for the handheld communication device" would have been readily understood by a POSA. In its motion, ASUS makes three arguments, none of which have merit. First, ASUS argues that a POSA would not understand what it means for a display to have a "substantially small size suitable for the handheld communication device." But the intrinsic record, including the claims, specification, and prosecution history, provide a POSA with reasonable certainty as to the claim term's plain meaning—i.e., a display small enough to fit in a handheld device. Philips' expert, Dr. Schmidt, confirmed this understanding in rebutting the indefiniteness opinion of ASUS's expert, Dr. Dunlop. At minimum, Dr. Schmidt's testimony raises disputed issues of fact that preclude summary judgment. Second, ASUS argues that Philips' interpretation of the limitation at issue renders particular phrases of the limitation redundant and reads them out of the claim. This position is, again, belied by the claim's plain meaning, and even if it were correct, does not render the claim indefinite. Finally, ASUS argues that Philips' accusation of a wide range of devices with varying display sizes shows that the claim has no defined meaning. But it is black-letter law that breadth is not indefiniteness.

## A.    Legal Standard

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Definiteness is evaluated from the perspective of a POSA. *Id*. at 2128. "'Reasonable certainty' does not require absolute or mathematical precision." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (citation and internal quotation marks omitted). "If intrinsic evidence provides 'a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine the scope of the claims, the claims are not indefinite' even though they use a descriptor such as 'substantially' 'without reference to a precise numerical measurement.'" *THX, Ltd. v. Apple, Inc.*, Case No. 13-cv-01161-HSG, 2016 WL 6563340, at *12 (N.D. Cal. Nov. 4, 2016) (citation omitted). Indefiniteness is a "question[] of law with underlying factual determinations." *See Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298-99 (Fed. Cir. 2010). The party alleging indefiniteness has the burden of proving it by clear and

convincing evidence. *BASF*, 875 F.3d at 1365.

**B.      Argument**

**1.      The Scope of the '564 Invention is Reasonably Certain**

ASUS has failed to meet its burden, as the asserted claims of the '564 Patent are clear on their face and not indefinite. Claim 1 of the '564 Patent claims, in relevant part for the purposes of ASUS's motion, "A handheld communication device comprising . . . a display that has a substantially small size suitable for the handheld communication device." (*See, e.g.*, Ex. 21 at claim 1). As Dr. Schmidt explained, a POSA would understand that the claim requires a handheld device and then a display that fits in (i.e., is substantially small in size so as to be suitable for inclusion in) handheld devices. (*See, e.g.*, Ex. 22 at ¶¶ 620-22). This is dictated by the words and structure of the claim itself, and, as explained below, is consistent with the remainder of the intrinsic record. In other words, the term in question limits the scope of the size of the display of the claimed invention by requiring that it can fit in a handheld communication device. The claim term in question makes clear that the size of the display is not to be evaluated for substantial smallness based upon other undefined metrics (*e.g.*, marketability of the display, the size of the user of the device, the content being displayed, other types of displays, etc.).

Dr. Schmidt's explanation of how the claims would be understood by a POSA is consistent with the remainder of the intrinsic record. ASUS is correct that Philips amended the claims in an August 13, 2002 amendment to recite "a display that has a substantially small size suitable for the handheld communication device" (*see, e.g.*, Ex. 23 at PHILIPS00004643). But what ASUS fails to acknowledge in arguing that nothing in the intrinsic record defines the boundaries of what is meant by the claim limitation at issue (*see* Mot. at 10-11), is that in the very same amendment, Philips discloses two portions of the original application as supporting the claim limitation "a display that has a substantially small size suitable for the handheld communication device." (*See, e.g.*, Ex. 23 at PHILIPS00004644). These portions of the original application correlate to column 1, lines 20-24 and column 2, lines 58-63 of the '564 Patent's specification. (*See id.* at PHILIPS00004564-66). Dr. Schmidt relied upon these same two specific portions of the '564 Patent's specification to rebut Dr. Dunlop's opinion on indefiniteness and explain how the scope of the claim limitation at issue would

have been readily understood by a POSA.  (*See, e.g.*, Ex. 22 at ¶¶ 620-22).

As described by Dr. Schmidt, the cited portions of the '564 Patent (and thus the portions of the original application cited in the August 13, 2002 amendment) articulate a number of exemplary handheld communication devices, such as palmtops, mobile phones, Web pads, PDA's, and notebook computers, the scope of which would have been understood by a POSA.  (*See, e.g.*, Ex. 22 at ¶¶ 621-22).  These handheld devices have displays that are necessarily "small" due to the required form factor of the handheld devices.  (*See, e.g.*, *id.* at ¶¶ 620-22).  Thus, the scope of the claim term "a display that has a substantially small size suitable for the handheld communication device" would have been readily understood by a POSA to mean a display that has a size small enough to fit on handheld devices, such as the exemplary devices articulated in the specification of the '564 Patent.  (*See, e.g.*, *id.*).  Dr. Schmidt testified as much during his deposition.  (*See, e.g.*, Ex. 17 at 170:12-173:25, 187:16-188:5).

Contrary to the assertion at page 11 of ASUS's brief, Dr. Schmidt's opinion is entirely consistent with the prosecution history, as noted above.  For example, on page 10 of its opening brief ASUS excerpts another statement made by Philips in the prosecution history, but again leaves out the portion of that statement where Philips connects "small" displays with handheld devices.  (*See* Ex. 23 at PHILIPS00004647) ("This is of particular interest, as pointed out by the applicant, in ***electronic devices having a relative [sic] small display*** for providing a graphical user interface (GUI), ***and, in particular, to a hand-held electronic device having a GUI and touch screen*** for accessing an entire collection of functions of the electronic device." (emphasis added)).

In sum, the intrinsic record confirms that, consistent with Dr. Schmidt's opinion, the term-at-issue is not indefinite.  While Dr. Dunlop expert may disagree, Dr. Schmidt's testimony raises disputed issues of fact that preclude summary judgment.[6]  *See Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298-99 (Fed. Cir. 2010) (indefiniteness is a "question[] of law

---

[6] ASUS's conduct in two IPR petitions against the '564 Patent further supports that ASUS has not satisfied their burden to show by clear and convincing evidence that a POSA would not understand the term "a display that has a substantially small size suitable for the handheld communication device." ASUS was a real party in interest for two IPR petitions filed by Google against the '564 Patent.  In these petitions and their accompanying expert declaration, neither ASUS nor Dr. Cockburn had any trouble understanding the claim term and applying it to the prior art.  (*See, e.g.*, Ex. 24 at 40, Ex. 25 at 33-34, Ex. 26 at ¶¶ 158, 212).

with underlying factual determinations.").

### 2. Philips' Interpretation of the Claim Does Not Read Out Claim Terms

Moreover, Philips' position regarding the meaning of the claim limitation "a display that has a substantially small size suitable for the handheld communication device" does not read claim terms out of the claim. Instead, the language "suitable for the handheld communication device" provides a POSA with the necessary context regarding how to determine if a display has a "substantially small size" for purposes of infringement of the '564 Patent.[7] The Federal Circuit has noted that "there is nothing wrong with defining the dimensions of a device in terms of the environment in which it is to be used." *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1111 (Fed. Cir. 2000); *see also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1575–76 (Fed. Cir. 1986). Moreover, even if ASUS were correct that there is redundancy in the claim language that would result in handheld devices with displays necessarily meeting the claim limitation at issue, that would not render the claims indefinite. *See Alacritech, Inc. v. Century Link Commc'ns LLC*, 271 F. Supp. 3d 850, 878-79 (E.D. Tex. 2017) ("The Court is not persuaded that this term renders any claim indefinite simply because it may be redundant."); *TurboChef Techs., Inc. v. Garland Commercial Indus., LLC*, No. 3-07-cv-1330-F, 2009 WL 5947299, at *8-9 (N.D. Tex. Nov. 17, 2009).

### 3. Philips' Infringement Allegations Do Not Bear on Indefiniteness

ASUS incorrectly attempts to support its argument that the claim term at issue is indefinite by pointing to the number and types of devices that Philips has accused of infringement. (*See* Mot. at 11). But, ASUS's argument is inapposite, as "breadth is not indefiniteness." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005). Further, by highlighting the display sizes of certain accused devices as exceeding the display sizes of certain desktop computers, ASUS appears to be conflating indefiniteness with factual issues of infringement to be decided by a jury—*e.g.*, whether the accused device is a handheld device, etc. Accordingly, the Court should deny ASUS's motion for summary judgment that the '564 Patent is invalid for indefiniteness.

## V. ASUS'S ACCUSED PRODUCTS INFRINGE THE '809 PATENT

The '809 patent is directed to methods for performing secure authenticated transfer of

---

[7] *See, e.g.* Ex. 17[Schmidt ASUS Transcript] at 174:21-176:15.

content within a limited distance. In the patent specification, the inventor, Mr. Kamperman, observed that many digital rights management (DRM) systems, in order to satisfy content providers, place restrictions on end users that limited their use and enjoyment of digital media they had purchased. (Ex. 27 at 1:47-2:16). Mr. Kamperman worked to develop new methods for performing secure authenticated distance measurement in DRM systems in ways that better serve the interests of both content providers and end users. His invention is employed by a number of today's leading DRM systems, including the High-bandwidth Digital Content Protection (HDCP) 2.x specifications[8] for protecting digital content from unauthorized distribution, which was developed by Intel and has been selected by many content providers as the chosen mechanism for securing the final link of the distribution chain during content playback. (*See* Ex. 28 at 16:14-17:24, 88:19-91:17).

### A. ASUS's Products Determine Whether a Second Device Is "Compliant With a Set of Compliance" Rules Before "Provid[ing] a First Signal [or Secret] to the Second Device…"

The accused ASUS devices (including smartphones and computers) infringe claims 1, 9, 49, 50 and 53 of the '809 patent because they implement and support one or more versions of HDCP 2.x.[9] (*See* Ex. 29 at Section X). Digital Content Protection LLC ("DCP"), a wholly-owned subsidiary of Intel[10], is responsible for maintaining and licensing HDCP 2.x. HDCP 2.x defines protocols to protect the transmission of content from a transmitting device (e.g., a smartphone or tablet) to a receiving device (e.g., large screen TV). (*See, e.g.*, Ex. 53 (HDCP 2.0 Interface Independent Adaption specification) at 5; *see also* Exs. 45-52, 54).

ASUS contends that the HDCP 2.x protocols do not make the compliance determinations referenced in the following elements of asserted independent claims 1 and 49 until after the first device (transmitter) has already sent the accused first signal and secret to the second device:

---

[8] The HDCP 2.x series of specifications cover several revisions for a variety of different interfaces. (*See* Exs. 45-54). Although citations herein are to the HDCP 2.0 Interface Independent Adaption specification, the relevant HDCP 2.x functionality discussed herein is likewise implemented across these HDCP 2.x revisions and interfaces.

[9] *See, e.g.* Ex. 32 ("About DCP," https://www.digital-cp.com/about_dcp (last visited March 30, 2019)), at "About DCP".

[10] *See, e.g.*, Ex. 32 at "Glossary and Acronyms"; Ex. 28 at 16:3-10 ("Q … ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

- determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate ("element [1d]")

- provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules ("element [1e]")

- determine from the certificate if the second device is compliant ("element [49d]")

- provide a secret to the second device via encryption by a public key of a private/public keypair of the second device, if the second device is compliant, said secret comprising a random number ("element [49e]")

ASUS is wrong. A wealth of evidence shows that these claim elements read on the HDCP 2.x specifications and therefore the accused ASUS products.[11]

Philips' expert, Dr. Michael Goodrich, explained in his opening report that the nonce $r_n$ and master key $k_m$ of the HDCP 2.x protocols correspond, respectively, to the "first signal" and "secret" of the asserted '809 patent claims. (*See* Ex. 29 at ¶¶ 229-30, 234, 239, 293-96). He also explained that the HDCP 2.x protocols do not permit a transmitter device to transmit either $k_m$ (accused secret) or nonce $r_n$ (accused first signal) to the second device (receiver) until <u>after</u> the first device has made a compliance determination based on information contained in the second device's (receiver) certificate. (*See id.* at ¶¶ 215-222, 291-300). To summarize, the HDCP 2.x protocols comprise three stages: Authentication and Key Exchange (AKE), Locality Check, and Session Key Exchange (SKE). (Ex. 29 at ¶ 116).[12] The AKE stage is performed first. During the AKE stage, the first (transmitter) device receives <u>and verifies</u> the second device's (receiver's) certificate <u>before</u> it sends $k_m$ (the secret) or nonce $r_n$ (the first signal) to the second device. This is evident from Fig. 2.1 of the HDCP 2.x specification which plainly shows that the certificate is verified before $k_m$ is sent to the receiver. (Ex. 53 at 12; *see also* Ex. 29 at ¶¶ 299-300). Nonce $r_n$ is not sent (if at all) until the Locality Check stage, which is not initiated unless the device first passes the AKE stage. (Ex. 53 at 16 ("Locality check is performed after AKE"); *see also* Ex. 29 at ¶¶ 219-30).

During certificate verification, the first device checks the second device's certificate to see whether the certificate conforms to the established HDCP 2.x format and whether it contains a valid

---

[11] *See* Ex. 29 at ¶¶ 215-30, 291-304, 377-80, 403-06, 477-80, 502-05 (including all evidence cited therein); Exs. 32-35, 45-54.

[12] A fourth stage is also activated if a receiving device is a repeater. (*See, e.g.*, Ex. 29 at ¶ 116; Ex. 53 at 11 ("Authentication with Repeaters – The step is performed by the HDCP Transmitter only with HDCP Repeaters")).

digital signature from DCP, the administration authority for HDCP 2.x. (Ex. 29 at ¶¶ 215-17, 291, 299-300). That is, the HDCP 2.x transmitter determines whether the receiver is compliant, based on whether the information in the certificate satisfies the compliance rules of (i) the receiver's public key certificate conforms with the established certificate format at 40-bit Receiver ID, 1048-bit Receiver public key, 4-bit protocol descriptor, 12-bit reserved, and 3072-bit digital signature fields, and (ii) the digital signature within the receiver's public key certificate is verified as being calculated over all preceding fields of the certificate using DCP's public key $kpub_{dcp}$. (*See id.* at ¶¶ 215, 291, 299). These two rules constitute "a set of compliance rules" which are checked utilizing information contained within the second device's (*e.g.*, receiver's) certificate.

Further, DCP requires that entities seeking to implement HDCP 2.x ("HDCP 2.x Adopters"), like ASUS, sign an HDCP License Agreement and HDCP 2.0 Addendum in order to obtain valid HDCP 2.x certificates for their licensed products. (*See, e.g.*, Ex. 33; Ex. 34 at 1; Ex. 35 at 174:5-176:5). Therefore, once the second device's (receiver's) certificate is verified during the AKE stage as being a valid HDCP 2.x certificate, this also indicates that the manufacturer of the second device has agreed to comply with the latest version of the HDCP 2.x specification and satisfy all the requirements that are labelled as "Compliance Rules" or "Robustness Rules" in the HDCP 2.x specification. (*See, e.g.*, Ex. 33 at ASUSPH_00052796 (HDCP 2.0 Addendum, amendments to Section 2.7); *see also* Ex. 35 at 174:5-176:5, 177:11-179:3).

The foregoing compliance determinations are made utilizing information contained within the second device's certificate <u>before</u> either $k_m$ (the secret) or nonce $r_n$ (the first signal) are sent to the second device. If either of these rules fails during certificate verification, the protocol is aborted. (Ex. 29 at ¶ 216). In that case, neither $k_m$ (the secret) nor $r_n$ (the first signal) are sent to the second device. If, on the other hand, these rules do pass, the first device sends $k_m$ (the secret) to the second device and later, during the Locality Check stage, sends the nonce $r_n$ (first signal). (*Id.* at ¶¶ 215-17, 221-22, 229-30, 291-92, 299-300). Accordingly, ample evidence shows that the disputed elements [1d–e] and [49d–e] are met by HDCP 2.x and therefore ASUS's accused products. (*See, e.g.*, *id.* at ¶¶ 215-30, 291-304, 377-80, 403-06, 477-80, 502-05, 555-58, 580-83).

### B.  ASUS Misinterprets the Claim Terms "Compliant With a Set of Compliance Rules" and "Compliant"

ASUS contends that the terms "compliant with a set of compliance rules" (claims 1 and 9) and "compliant" (claims 49, 50 and 53) should be narrowly construed to "require the second device to comply with the entire set of compliance rules set forth in the HDCP 2.0 specifications for determining whether a device is permitted to receive protected content…" (Mot. at 14). The Court should decline this invitation to reopen claim construction and reject ASUS's interpretation, which is contrary to the plain and ordinary meaning of the claim language and the prosecution history.

Claim element [49d] refers to "determin[ing] from the certificate if the second device is compliant." The '809 patent specification refers to two examples of determining compliance; namely, compliance with "a set of predetermined compliance rules" (Ex. 27 at 3:40-50) or an "expected identification" (id. at 3:56-59). Claim element [49d] would be met so long as either determination is made in HDCP 2.x.

Claim element [1d] refers to utilizing certificate information to determine compliance with "a set of compliance rules" (emphasis added). On its face, this element requires only that a determination be made with respect to a set of compliance rules. It does not say a determination must be made for "all" compliance rules or for "the entire set of compliance rules set forth in the HDCP 2.0 specifications," which did not even exist when the original application for the '809 patent was filed. And, it does not say a determination must be made with respect to "all" requirements that must ultimately be satisfied before "determining whether a device is permitted to receive protected content…" In fact, any such interpretation of elements [1d-e] or [49d-e] would conflict with the balance of the language in claims 1 and 49, which impose additional requirements the second device must satisfy after the secret and first signal are sent; namely, deriving the correct second signal from the secret and sending that second signal to the first device within a predetermined time.

ASUS's claim interpretation is also contrary to, and more restrictive than, the plain and ordinary meaning of the term "compliance rules," which a POSA would understand to refer generally to some "requirements set by an authority" (Ex. 35 at 173:12-174:4), not necessarily all requirements that must be satisfied before "a device is permitted to receive protected content…"

ASUS's claim interpretation is also contrary to the prosecution history. During prosecution

of U.S. Patent App. No. 10/521,858 (the first application in the chain which led to the '809 patent), the Examiner took a broad view of the terms "compliance" and "a set of compliance rules," and made clear such compliance determinations could be met by checking a single rule. For instance, in a November 29, 2013 Office Action, the Examiner broadly interpreted the phrase "transmitting a secret to said second device after said second device is determined to be compliant with a set of compliance rules" to encompass a simple rule to validate 3 "digits":

> The Examiner notes that "compliance" is defined as "conformity in fulfilling official requirements" (Webster's Ninth New Collegiate Dictionary, Merriam Webster, 1991).
>
> Accordingly, the validation of the digits between the pairing device in Figure 5a, element 6 can be ***broadly interpreted*** as authenticating both devices which can be broadly, yet reasonably interpreted as validating compliance of each device. ***Such validation of the digits of both devices teaches a predefined compliance rule and thus teaches, at least, a set of predefined compliance rules***. Subsequent to such positive authentication, the link key is shared by encrypting the link key with an encryption key and subsequently decrypting the link key using the encryption key at the receiving device. Such steps of securely sharing the link key is predicated if-and-only-if Figure 5A, element 6 matches the digits displayed on both devices which teaches the claimed means for sharing the common secret with the second communication device the second communication device is compliant.

(Ex. 36 at 6-7 (emphasis added)). The Examiner made similar comments during prosecution of related co-pending U.S. Patent App. No. 12/508,917. (*See* Ex. 37 at 2-4, 6-7). Neither Philips, nor the Examiner, ever suggested that any of claim elements [1d-e] or [49d-e] required checking all requirements that must be satisfied before protected content is actually sent to the second device.

### C.  The HDCP 2.x Revocation and Repeater Checks Are Not Compliance Rules

Even if the Court were to agree with ASUS that one or more of claim elements [1d-e] and [49d-e] require the first device to determine—prior to sending the first signal or secret—that the second device complies with "the entire set of compliancy rules set forth in the HDCP 2.x specifications…," summary judgment would still be improper, at least because there is a genuine dispute as to whether the HDCP 2.x repeater and revocation list checks are, in fact, compliance rules.

The revocation list check is not identified in the HDCP 2.x Adopter Agreement as a Compliance Rule or a Robustness Rule. (Ex. 33 at ASUSPH_00052772-83 and ASUSPH_00052801-03 (Exhs. C, D)).

The repeater check is also not identified in the HDCP 2.x Adopter Agreement as a Compliance Rule or a Robustness Rule. (Ex. 33 at ASUSPH_00052772-83 and ASUSPH_00052801-03 (Exhs. C, D)). Moreover, repeater status itself does not dictate whether or not a device conforms to the HDCP 2.x specifications.

Finally, even if the HDCP 2.x repeater check is found to be a compliance rule, it would still not avoid infringement of elements [1d-e] or [49d-e], because those elements relate to a compliance determination that is made from the second device's certificate (or information contained in the certificate). The HDCP 2.x repeater check is not based on the second device's certificate. Rather, it is based on the value of the REPEATER field within the AKE_Send_Cert message. (Ex. 53 at 13 (transmitter "[r]eceives AKE_Send_Cert from the receiver containing REPEATER and $cert_{rx}$ values. REPEATER indicates whether the connected receiver is an HDCP Repeater"), 23 (Figure 2.12 illustrates state "A4: Test for Repeater"), 25 ("State A4: Test for Repeater. The HDCP Transmitter evaluates the REPEATER value that was received in State Al. … Transition A4:A5. REPEATER is 'false' (the HDCP Receiver is not an HDCP Repeater")). As shown in Figure 2.1 of the HDCP 2.x specification, the second device's actual certificate ($cert_{rx}$) is distinct from the REPEATER field. (*Id.* at 12; *see also id.* at 11 ("The HDCP Receiver['s] … public key is stored in a Public Key Certificate issued by DCP LLC, denoted by *$cert_{rx}$*")). Table 4.3 of the specification shows that an HDCP 2.x certificate ($cert_{rx}$) does not contain a REPEATER field. (*Id.* at 48 (Table 4.3, indicating contents of AKE_Send_Cert message includes separate REPEATER and $cert_{rx}$ fields)).

## VI.    "MEANS FOR DOWNLOADING" IN THE '806 PATENT IS NOT INDEFINITE

### A.    Means for Downloading Is Not Subject to 35 U.S.C. § 112 ¶ 6

"[M]eans for downloading files to the client device" carries its ordinary meaning and is not subject to § 112 ¶ 6 because the term itself connotes sufficient structure to a POSA to perform the claimed function.  A claim that recites sufficient structure for performing a function overcomes the presumption that § 112 ¶ 6 applies to a "means" term.  *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013).  In *TecSec*, the Court held that § 112 ¶ 6 did not apply to the term "digital logic means" because it "designates structure to skilled artisans—namely digital circuits that perform Boolean algebra."  *Id.* at 1348.  Here, Dr. Polish testified that "means for downloading" connotes well-known programming instructions, such as Java 2.0, for downloading a file to a client. (Ex. 39 at ¶¶ 384-85).  ASUS criticizes Dr. Polish for "provid[ing] no basis for his opinion" (Mot. at 17) but ignores his reliance on admissions of Microsoft's expert and the '806 patent, which confirm that a POSA would have used and understood "downloading" to designate well-known programming instructions.  (Ex. 39 at ¶ 385 ("Dr. Bhattacharjee concedes that the '806 patent 'explicitly identifies standard tools used in the conventional manner []e.g., using standard classes[,] to download data . . .'"), quoting Bhattacharjee Op. Rpt. ¶ 333).

ASUS misplaces reliance on *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1302 (Fed. Cir. 2018), where patentee pointed to no "evidence that the term 'cheque standby unit' was used either in 'common parlance' or by skilled artisans in the pertinent field to designate structure"—that term had been "coined by the applicant himself for purposes of claiming his invention."  ASUS does not and could not contend that Philips coined "downloading."  Moreover, the Court in *Diebold* found that "the specification d[id] not describe what an exemplary 'cheque standby unit' might be," nor did patentee's expert "explain what 'well-known components' a skilled artisan would understand could be used to design a 'cheque standby unit.'"  *Id.* at 1300-01.  By contrast, here the patent describes exemplary programming instructions for downloading (*e.g.*, Java 2.0), and Dr. Polish testified about well-known components a POSA would have understood could be used for downloading (*e.g.*, a general purpose computer with an Ethernet card).  (Ex. 39 at ¶¶ 384-85, 388-89).  ASUS's other authority lends no more support to its argument.  In *DESA IP, LLC*

*v. EML Techs., LLC*, 211 F. App'x. 932, 936 (Fed. Cir. 2007), the claims "recite[d] a function . . . without specifying what structure(s) would be required to perform" it. In *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1428 (Fed. Cir. 1997), the claims failed to "recite[] the structure ... needed to perform the[] functions." Here, the claims specify structure (*e.g.*, files and a client device) to perform the downloading function, and the specification makes clear that the client device can implement known software for downloading the files. Accordingly, § 112 ¶ 6 does not apply to "means for downloading files to the client device."

**B. The '806 Patent Provides Structure for Means for Downloading under § 112 ¶ 6**

**1. A General Purpose Computer Suffices Because Downloading is a Basic Function of a Microprocessor**

If "means for downloading" were subject to § 112 ¶ 6, a general purpose microprocessor or computer—not limited to any specific algorithm—provides adequate structure for performing the function of "downloading files to the client device." (*See* Ex. 40 at 4:32-44 (describing implementing the invention "on a multi-purpose computing device, e.g., a PC")). A general purpose microprocessor or computer lends sufficient structure to basic functions of a microprocessor, such as receiving data, storing data, and processing data. *In re Katz Interactive Call Proc. Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011); *see also, e.g., Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2015 WL 890621, at *8–9 (N.D. Cal. Mar. 2, 2015) (following *Katz* and finding no need to specify an algorithm for "receiving a downloadable" because any general purpose microprocessor could perform that function); *Finjan, Inc. v. Symantec Corp.*, No. 14-CV-02998-HSG, 2017 WL 550453, at *4–5 (N.D. Cal. Feb. 10, 2017) (same). Dr. Polish's uncontroverted testimony establishes that, as of the priority date, downloading was a basic function of a microprocessor, similar to receiving data. (Ex. 39 at ¶¶ 386-89). As he explained, general purpose computers could receive both local and remote data, and downloading simply involved receipt of remote data. (*Id.*). HTC's expert similarly testified that "the plain and ordinary meaning of . . . download means that a device and entity is receiving data from another entity . . . ." (Ex. 41 at 41:16-21).

**2. The '806 Patent Discloses an Algorithm for Downloading**

Even if § 112 ¶ 6 applies and *Katz* does not, claim 12 still would not be indefinite because

the '806 patent discloses structure, including an algorithm, for the function of "downloading files to the client device," namely, a single purpose media player or multipurpose computing device programmed with software to perform the function, such as the algorithm disclosed in Figure 1 and at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14.  (*See, e.g.,* Ex. 40 at 2:57-63 ("[T]he client contacts the server selects the particular content file and downloads the control information that enables the retrieving and playing out of the segmented file.")).  "One manner of performing the algorithm is disclosed in the '806 patent at 3:3-7 and includes Java 2.0 standard classes that enable retrieving a remote file into a buffer or as a stream."  (*See* Ex. 39 ¶ 390-91).

a.    **ASUS Relies on the Wrong Legal Standard**

ASUS's argument that the specification lacks detail on "*how* to download the files" (Mot. at 18) fails to account for knowledge in the art.  *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366-67 (Fed. Cir. 2003) (finding a "generic description of the [structure] sufficient; "how to modify [it] to perform [the function] on the circuitry level may . . . be properly left to the knowledge of those skilled in the art, and need not be specified in the patent.").  ASUS misplaces reliance on cases where the patent "***failed to provide any disclosure*** *at all*.  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) (emphasis added); *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012) ("The problem here is not the adequacy of the substance or form of the disclosure, but the absence of any disclosure at all."); *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 & n.3 (Fed. Cir. 2008) ("no dispute . . . that the specification fails to disclose an algorithm").  Here, the specification undisputedly discloses structure, and ASUS only challenges the sufficiency of that structure.  And, "[u]nder [Federal Circuit] case law interpreting § 112, ¶ 6, knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness."  *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002).  In *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001), for example, the Court held that a "selector" provided structure corresponding to a "selectively receiving" function—even though the patent did not describe the "electronic structure of the selector and the details of its electronic operation"—because patents "need not include subject matter that is known in the field of the invention."

ASUS's authority merely admonishes against "look[ing] to the knowledge of [a POSA] *apart from and unconnected to the disclosure of the patent*." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) (emphasis added). The '806 patent expressly invokes the POSA's knowledge when it sets forth an algorithm for downloading files to the client device. (Ex. 40 at 3:3-7 ("In step 106, the first file segment is downloaded for play-out. Communicating with a remote server is a well known technology. For example, Java 2.0 provides a set of standard classes that enable retrieving a remote file into a buffer or as a stream.")). In *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997), the Court relied on "common experience" in the field to find sufficient structure for a "means for reconstructing" limitation. The patent did not mention a computer, let alone quote any computer code, but stated that "'known algorithms' can be used" in the reconstruction process. *Id.* at 946. ASUS's authority precluded reliance on a statement that, "[i]n contrast to *Dossel* . . . in no way link[ed] [known] software to the function." *Medical Instrumentation & Diags. Corp. v. Elekta AB*, 344 F.3d 1205, 1217 (Fed. Cir. 2003). Here, the specification expressly links the "skill[s] common for software engineers" and known software, *e.g.*, Microsoft Windows and Java 2.0, with the "download[]" function. (Ex. 40 at 3:14-30).

### b.    ASUS Ignores the Disclosure of the '806 Patent

In any event, the specification itself describes an example of how to download files. ASUS relies on *SPEX Techs., Inc. v. Kingston Tech. Corp.*, No. CV16-07349 JVS(AGRx), 2017 WL 5495149, at *14 (C.D. Cal. Oct. 18, 2017), where the patent stated that structure "must be programmed to perform its desired function," yet did not state "how that programming c[ould] be achieved." Here, the patent expressly explains how programming can be achieved with, *e.g.*, Java 2.0. (*See* Ex. 40 at 3:57-4:14). ASUS believes that this disclosure relates only to local files that "have already been downloaded." (Mot. at 20). It does not. The section explicitly relates to "download[ing]," and mentions "local temporary files *into which the parts are being downloaded*." (Ex. 40 at 3:57-4:14 (emphasis added)). ASUS also dismisses disclosure concerning "buffering." (Mot. at 20). But its own expert testified that "*buffering . . . refer[s] to the process of downloading / fetching successor content before it is required.*" (Ex. 42 at 82, lines 10-11 (emphasis added)). Thus, the alleged "buffering" disclosures support the downloading function.

### C. ASUS Failed to Carry Its Burden

ASUS relies solely on attorney argument and thus fails to satisfy its burden to "prove indefiniteness by clear and convincing evidence." *Intel Corp.*, 319 F.3d 1357 at 1367 ("conclusory" arguments insufficient); *Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x. 158, 179 (Fed. Cir. 2005) (rejecting indefiniteness challenge based "entirely on attorney argument"); *Cacace v. Meyer Mktg. Co., Ltd.*, 812 F.Supp.2d 547, 561 (S.D.N.Y. 2011) ("mere attorney argument" insufficient to establish indefiniteness); *Procter & Gamble Co. v. Team Techs., Inc.*, 46 F. Supp. 3d 764, 772 (S.D. Ohio 2014) ("unfounded speculation and attorney argument is not evidence ... of indefiniteness.").

Dr. Polish's uncontroverted expert testimony forecloses any finding of indefiniteness. *See Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, No. 12-282, 2014 WL 1370038, at *7 (D. Del. Apr. 7, 2014) (terms not indefinite because "[w]ithout an opposing expert to identify the deficiencies, if any, in [plaintiff's expert's] declaration, it is difficult to say that his opinion regarding a [POSA's] understanding of the claim language is incorrect"); *Freeny v. Apple Inc.*, No. 13-cv-00361, 2014 WL 4294505, at *5 (E.D. Tex. Aug. 28, 2014) (claims not indefinite where "defendant has not submitted a contrary expert declaration on the issue of indefiniteness"). At minimum, Dr. Polish's testimony raises disputed issues of fact that preclude summary judgment. *See Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298-99 (Fed. Cir. 2010) (indefiniteness is a "question[] of law with underlying factual determinations."); *DR Sys., Inc. v. Eastman Kodak Co.*, No. 08-CV-669-H (BLM), 2009 WL 3756765, at *8 (S.D. Cal. Nov. 9, 2009) (finding "a triable issue exists as to whether Kodak's patent discloses an algorithm which a [POSA] would understand to correspond to the control means function" in view of expert's testimony that "any number of commercially available software routines that perform these functions when executed on a processor and would have been known to, and immediately recognized by," a POSA).

### VII. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny ASUS's motion for summary judgment in its entirety.

Dated: September 26, 2019

By: /s/ Chris Holland
Chris Holland (SBN 164053)
cholland@hollandlawllp.com

HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, CA 94104
Tel: (415) 200-4980
Fax: (415) 200-4989

Michael P. Sandonato (*admitted pro hac vice*)
msandonato@venable.com

VENABLE LLP
1290 Avenue of the Americas
New York, New York 10104-3800
Tel: (212) 218-2100
Fax: (212) 218-2200

*Attorneys for Plaintiffs*