# **EXHIBIT 1**

REDACTED VERSION OF DOCUMENT
SOUGHT TO BE SEALED (HTC'S OPPOSITION
TO PHILIPS' MOTION FOR PARTIAL
SUMMARY JUDGMENT)

1   John P. Schnurer (CA Bar No. 185725)
    PERKINS COIE LLP
2   11988 El Camino Real, Suite 350
    San Diego, CA 92130
3   Telephone: (858) 720-5700
    Facsimile: (858) 720-5799
4
    Ryan J. McBrayer (*pro hac vice*)
5   Jonathan R. Putman (*pro hac vice*)
    PERKINS COIE LLP
6   1201 Third Avenue, Suite 4900
    Seattle, WA 98101
7   Telephone: (206) 359-8000
    Facsimile: (206) 359-9000
8
    Attorneys for Defendants
9   HTC CORP.
    HTC AMERICA, INC.
10

11

12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16   IN RE KONINKLIJKE PHILIPS PATENT       Case No. 4:18-cv-01885-HSG-EDL
     LITIGATION.
17                                          JURY TRIAL DEMANDED

18                                          **HTC'S OPPOSITION TO PLAINTIFF'S**
                                            **MOTION FOR PARTIAL SUMMARY**
19                                          **JUDGMENT ON CERTAIN AFFIRMATIVE**
                                            **DEFENSES RAISED BY THE HTC**
20                                          **DEFENDANTS**

21

22   ███████████████████████████████████████

23

24                                          Hearing Date: November 14, 2019

25                                          Hearing Time: 2:00 p.m.

26

27

28

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     HTC IS NOT PRECLUDED FROM ANY INVALIDITY ARGUMENTS BASED ON
        ANOTHER COMPANY'S IPRS ........................................................................... 1

        A.    HTC Did Not Control Google's IPRs ...................................................... 2
              1.   MADA Does Not Give HTC or Google Control Over Each Other ................. 2
              2.   Google And HTC Are Not Related Companies ................................................ 3
              3.   HTC Was Not Involved With Google's IPRs ................................................... 3
              4.   The Timing Of HTC's IPR Petitions Demonstrates A Lack Of Coordination .. 4
              5.   The PTAB Agreed That HTC Was Not An RPI To Google.............................. 5

        B.    HTC Is Not An RPI Or Privy To Google.................................................. 5
              1.   Legal Standard For RPIs And Privity Require Control Or Broad Legal
                   Relationship ...................................................................................................... 6
              2.   HTC Does Not Come Close To Meeting The RPI/Privity Standard ................. 7
              3.   Undisputed Facts Show HTC Had No Control Over Google's IPRs ................. 9

III.    EVEN IF IT WERE AN RPI, HTC IS NOT ESTOPPED FROM RAISING THE
        INVALIDITY GROUNDS AT ISSUE ................................................................ 10

        A.    Legal Standard: IPR Estoppel Does Not Apply To System Art ........................... 10
        B.    Background: The GRiNS System and RealSystem Are System Art .................... 11
        C.    Philips Seeks To Exclude System Art That Could Not Have Been Raised At The
              IPR ........................................................................................................... 13
        D.    The RealSystem And GRiNS Invalidity Grounds Should Not Be Excluded For The
              '806 patent. ............................................................................................... 13
              1.   The Law Does Not Require Publication Art Raised In An IPR To Be
                   "Substantively Different" Than System Art Raised In Litigation ................... 13
              2.   There Is A Genuine Issue Of Material Fact As To Whether The RealSystem
                   and GRiNS Systems Differ Substantially From The Publication Art.............. 14
              3.   The RealSystem and GRiNS System Grounds Could Not Have Been Raised in
                   the IPR. ............................................................................................................ 16
        E.    HTC's '913 System Art Patent Invalidity Grounds Should Not Be Excluded ...... 18
        F.    Section 315 Does Not Estop The Other Invalidity Grounds HTC Has Raised For
              the '806 and '913 Patents ......................................................................... 19

IV.     HTC'S AFFIRMATIVE DEFENSES SHOULD NOT BE DISMISSED .................... 19

        A.    The '564 Patent Is Invalid Due To Philips' Broadening On Reissue ................... 19
        B.    The '913 Patent Is Invalid Due To Inequitable Conduct ..................................... 20
        C.    HTC Is Licensed To The '809 Patent As An HDCP Licensed Adopter................ 22
        D.    Genuine Issues of Material Fact Exist As To HTC's Equitable Affirmative
              Defense Regarding The '806 Patent ........................................................ 23
        E.    HTC Has Intervening Rights To The Asserted Patents ........................................ 24

V.      CONCLUSION ................................................................................................... 25

**TABLE OF AUTHORITIES**

CASES

*01 Communique Laboratory, Inc. v. Citrix Sys., Inc.,*
    151 F. Supp. 3d 778 (N.D. Ohio 2015) ................................................................. 11

*1st Media, LLC v. Elec. Arts, Inc.,*
    694 F.3d 1367 (Fed.Cir.2012) ............................................................................. 21

*Apple Inc. v. Achates Ref. Publg., Inc.,*
    IPR2013-00080, 2013 WL 6514049 (PTAB, Apr. 3, 2013) ................................... 9

*Applications in Internet Time, LLC v. RPX Corp.,*
    897 F.3d 1336 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1366 (2019) .................. 6

*Bae Sys. Info. and Elec. Sys. Integration, Inc. v. Cheetah Omni, LLC,*
    IPR2013-00175, 2013 WL 5653116 (Patent Tr. & App. Bd. July 23, 2013) ........... 9

*Cisco Sys., Inc. v. Hewlett Packard Enter. Co.,*
    IPR2017-01933, 2018 WL 1364821 (Patent Tr. & App. Bd. Mar. 16, 2018) .......... 9

*Duncan v. Cohen,*
    C 08-2243 BZ, 2008 WL 2891065 (N.D. Cal. July 22, 2008) ............................... 7

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009) ........................................................................... 20

*Finjan, Inc. v. Blue Coat Sys., LLC,*
    283 F. Supp. 3d 839 (N.D. Cal. 2017) ............................................................ 11, 19

*Finjan, Inc. v. Symantec Corp.,*
    10-CV-593 (GMS), 2013 WL 5302560 (D. Del. Sept. 19, 2013) .......................... 17

*Good Tech. Corp. v. Mobileiron, Inc.,*
    5:12-CV-05826-PSG, 2015 WL 4197554 (N.D. Cal. July 10, 2015) ..................... 17

*Intellectual Ventures II LLC v. Kemper Corp.,*
    No. 6:16-CV-0081, 2016 WL 7634422 (E.D. Tex. Nov. 7, 2016) .................... 11, 13

*Linear Tech. Corp. v. Micrel, Inc.,*
    524 F. Supp. 2d 1147 (N.D. Cal. 2005) ............................................................... 25

*Microsoft Corp. v. Koninklijke Philips Electronics N.V.,*
    IPR2017-01766, 2018 WL 444029 (Patent Tr. & App. Bd. Jan. 16, 2018) ............. 5

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.,*
    568 F.Supp.2d 1152 (C.D. Cal. 2008) ................................................................... 7

*Oil-Dri Corporation of America v. Nestle Purina Petcare Co.,*
    No. 15 C 1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019) ............................ 16, 17

# TABLE OF AUTHORITIES

*Polaris Indus., Inc. v. Arctic Cat Inc.*,
No. CV 15-4475, 2019 WL 3824255 (D. Minn. Aug. 15, 2019)..................................... passim

*Star Envirotech, Inc. v. Redline Detection, LLC*,
No. SACV 12-01861 JGB (DFMX), 2015 WL 4744394 (C.D. Cal. Jan. 29, 2015) ..................................................................................................................................15

*Stertz v. Gulf Oil Corp.*,
685 F.2d 1367 (Temp. Emer. Ct. App. 1981) ........................................................................20

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ...........................................................................................................6, 7, 8

*Therasense, Inc. v. Becton, Dickinson and Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ..............................................................................................20

*TVIIM, LLC v. McAfee, Inc.*,
13-CV-04545-HSG, 2015 WL 3956313 (N.D. Cal. June 28, 2015), aff'd, 851
F.3d 1356 (Fed. Cir. 2017) ...............................................................................................21, 22

*Universal Engraving, Inc. v. Metal Magic, Inc.*,
CV-08-1944-PHX-GMS, 2010 WL 4922703 (D. Ariz. Nov. 29, 2010) ..................................8

*Ventex Co., Ltd. v. Columbia Sportswear N.A., Inc.*,
IPR2017-00651, 2019 WL 764130 (Patent Tr. & App. Bd. Jan. 24, 2019) .............................9

*Verinata Health*, Inc. v. Ariosa Diagnostics, Inc,
No. 12-CV-05501-SI, 2017 WL 235048 (N.D. Cal. Jan. 19, 2017) ........................................19

*WesternGeco LLC v. ION Geophysical Corp.*,
889 F.3d 1308 (Fed. Cir. 2018) ......................................................................................6, 7, 10

*Zenith Elecs. Corp. v. PDI Commun. Sys., Inc.*,
522 F.3d 1348 (Fed. Cir. 2008) ...............................................................................................17

*Zitovault, LLC v. Intl. Bus. Machines Corp.*,
3:16-CV-0962-M, 2018 WL 2971178 (N.D. Tex. Apr. 4, 2018) .............................10, 11, 14

**STATUTES**

U.S.C. § 252 ..................................................................................................................................25

35 U.S.C. § 102 .............................................................................................................................12

35 U.S.C. § 311(b) ........................................................................................................................10

35 U.S.C. § 315(e)(2) ......................................................................................................6, 11, 14, 16

TABLE OF AUTHORITIES

**OTHER AUTHORITIES**

Rule 12(c)...................................................................................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Philips motion should be denied because it ignores the law and a host of disputed facts.  First, Philips seeks to preclude HTC from making certain invalidity arguments made by Google at the PTAB.  But Philips ignores the law on this issue and argues supposition instead of fact.  Philips cites to no evidence for the touchstones of whether HTC might have been a "real party in interest" that controlled Google's *inter partes* review ("IPR") through hidden strings: actual control, payment, collaboration, or any involvement by HTC in Google's IPRs.  The facts are that HTC and Google did not control or contribute to each other's IPRs.  Neither was the other's agent or proxy.  Philips' motion thus reduces to speculation and conjecture that is not good enough to deprive HTC of core defenses.

Philips goes even further regarding IPR estoppel by attempting to improperly broaden the statute to exclude system art from this case that could not have been raised before the PTAB.  Further, Philips ignores cases in which this Court expressly refused to bar defendants like HTC from asserting art that could have, but was not, raised by others in their IPRs.  This too lacks all legal and factual support.

Lastly, Philips seeks summary judgment on many of HTC's affirmative defenses, despite there being material issues of disputed fact to be resolved.  For these reasons, as explained in greater detail below, Philips' motion for summary judgment should be denied.

## II.    HTC IS NOT PRECLUDED FROM ANY INVALIDITY ARGUMENTS BASED ON ANOTHER COMPANY'S IPRS

None of the touchstones required for a party to be deemed a real party in interest ("RPI") or privy are present here.  The key analysis over whether a party is an RPI or privy to another centers on whether the party at issue - here HTC - had a right to control that prior litigation, or a broad legal relationship with the prior litigant that rises to the level of being its agent or trustee.  None of these factors are present here.  HTC did not have control over Google's IPRs, was not involved with those IPRs, and independently chose to file its own IPRs several months after Google filed its petitions.

A.    **HTC Did Not Control Google's IPRs**

1.    **MADA Does Not Give HTC or Google Control Over Each Other**

Philips first contends that HTC should be considered an RPI of Google because HTC and Google are parties to a contract called the Mobile Application Distribution Agreement ("MADA") regarding Android.  But there is no provision in the MADA that gives HTC control over Google's IPRs or patent litigation decisions.  *See* Ex. 6.[1]  Likewise, the MADA does not give Google control over HTC's IPRs or patent litigation decisions.  *See id.*  Indeed, there is no right in the MADA agreement that allows Google or HTC to control any legal matters for the other.  *Id.*  Neither party is even required to notify the other of an intention to file an IPR.  *Id.*  Google has no obligation under the MADA to indemnify HTC for any patent infringement claims.  *See generally id.*

Looking at the MADA, HTC is merely one of many original equipment manufacturers (OEMs) that sells mobile Android devices preloaded with a suite of Google applications, such as Gmail, Chrome, Google Calendar, Google Drive, and YouTube, which Google distributes pursuant to this basic commercial agreement.  Any OEM that wishes to distribute devices with these Google applications must execute a MADA with Google.  *See* https://www.vox.com/2014/5/3/11626422/a-look-at-googles-not-always-secret-contracts-with-android-phone.  As this article notes, the MADA is focused on entirely different issues other than control for the OEM over Google's IPRs (or any other legal matters).  At most, Google *sometimes* agrees to indemnify the OEM in patent cases (*e.g.* for Samsung) *but it has no such obligation to HTC*. *See id.;* Ex. 6.  (And even for Samsung, there appears to be no ability for Samsung to control Google or that makes Google into Samsung's agent.)  The parties to the MADA remain independent and do not share revenue.  Ex. 6 at §4.1 (████) ████████████████████████████████ ████████████████████████████ Nothing about the MADA gives any party control over the other's

---

[1]    Numerical exhibits referenced herein are exhibits to the Declaration of Caitlin Bingaman (Dkt. No. 732-1).  Lettered exhibits are exhibits to the Declaration of Elizabeth Banzhoff, filed concurrently herewith.

1    IPRs or patent litigations.

2                   **2.       Google And HTC Are Not Related Companies**

3          Philips next attempts to suggest that HTC should be deemed an RPI based on its past

4    business dealings with Google.  Google and HTC have in the past collaborated on the

5    development of certain phones, each company maintaining its corporate independence in

6    those discussions.  *See* Ex. 17; Lam Decl., ¶6.  In 2017, Google announced that a team of

7    "HTC talent will join Google as part of the hardware organization."  Ex. 18 at 2.  Philips

8    attempts to characterize this as a business "acquisition,"  Mot. at 3, but there was no

9    corporate merger, acquisition, joint venture, or other business entity formed, and no

10   corporate entity was transferred or purchased through this event.  Lam Decl., ¶6.  Instead, the

11   arrangement involved the transition of certain HTC R&D employees to Google.  *See* Ex. 17.

12   Both entities retained their corporate independence before, during, and after this transition of

13   employees.  Lam Decl., ¶6.

14                  **3.       HTC Was Not Involved With Google's IPRs**

15         Philips thirdly suggests that HTC was a "privy" of Google because of the patents

16   covered in the IPRs, but HTC had no control over Google's decision to file IPRs, nor did it

17   direct or control those matters.  Google filed IPR petitions on the '913 and '806 patents in

18   early December of 2016.  *See* IPR 2017-00386, IPR 2017-00387, and IPR2017-00447.[2]  In

19   each of these cases, Google identified Acer Inc., Acer America Corporation, ASUSTek

20   Computer Inc., ASUS Computer International, and Google, Inc. as the RPIs, so presumably

21   there was some relationship between these parties that was and is not present between HTC

22   and Google.  Google did ***not*** identify HTC as an RPI, and Philips did not challenge this.

23         The undisputed facts demonstrate that HTC did not have any control over Google's

24   IPR petitions.  Lam Decl., ¶¶4-5.  HTC did not fund or otherwise pay for Google's IPR

25   petitions.  *Id.*  HTC did not direct Google how to prepare the IPR petitions.  *Id.*  Google was

26   not acting at the behest of or authorized to act on behalf of HTC with its IPR petitions.  *Id.*

27

28   ───────────────
     [2]    Google also filed a number of other IPR petitions at the same time for other patents.

HTC, and its counsel, did not review Google's IPR petitions before Google filed them.  *Id.*

HTC and Google's Common Interest Agreement regarding this case also does not provide for any control by HTC over Google's IPR petitions.  Rather, the Common Interest Agreement provides that ████████████████████████████████████████ ████████████████████████████████████████ Ex. 19 at §3.  Furthermore, although the Common Interest Agreement says that the Parties ███████████ ████████████████ (Ex. 19 at §6 (emphasis added)), HTC and Google did not share the costs of any of the IPRs filed by Google or HTC.  Lam Decl., ¶5.  Each party bore its own respective costs for its own IPR petitions.  *Id.*

> **4.      The Timing Of HTC's IPR Petitions Demonstrates A Lack Of Coordination**

Philips then insinuates that Google and HTC filing IPRs on different patents asserted by Philips somehow demonstrates coordination.  But the chronology of the filing of the petitions in fact demonstrates that HTC was not coordinating with Google on Google's IPR petitions and that HTC had no control over Google for those IPRs.

Google filed its IPR petitions in December of 2016.  As discussed above, Acer and ASUS were named by Google as RPIs to those petitions, indicating that there was some relationship between those parties not present between HTC and Google.  Further, at that time, the Philips cases against Acer and ASUS had not been consolidated with the case against HTC.  This Court did not order consolidation until nearly ***two years later***, after a transfer to the Northern District of California, in September of 2018.  Dkt. No. 306.

HTC was thus left on the outside as a mere observer of Google's IPR petitions.  HTC saw that three of the patents that Philips had asserted against it were not currently subject to an IPR, yet HTC was aware of very good prior art that would invalidate these patents.[3] Thus, while Philips attempts to make it appear that there was a coordinated effort between Google and HTC on the IPR petitions, HTC did not file its petitions until several months

---

[3]   Indeed, the PTAB ultimately found the '006 and '695 patent claims challenged by HTC to be invalid.  *See* IPR2017-00857, Paper 33; IPR2017-00890, Paper 49.

after Google filed its IPR petitions.  HTC then filed its IPR petitions for review of the '797 and '006 patents in February of 2017.  *See* IPR2017-00856, IPR2017-00857.  HTC also at that time joined Microsoft in filing an IPR petition seeking review of the '695 patent. IPR2017-00890.

**5.      The PTAB Agreed That HTC Was Not An RPI To Google**

Philips raised similar arguments before the PTAB about HTC being an RPI to Google and lost.  For example, in the -00890 IPR, Philips made the same argument it makes here, and claimed that these separately-filed IPRs were a coordinated effort, warranting discovery into whether Google, Acer, and ASUS were RPIs to the HTC/Microsoft petition.  *Id.*, Paper No. 15.  Philips even used the same graphic it uses now to make this point:

| Petitioner | Challenged Patent | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | '913 | '564 | '387 | '064 | '114 | '806 | '797 | '006 | '695 |
| Google/Acer/ASUS[1] | X | X | X | X | X | X | | | |
| HTC | | | | | | | X | X | |
| Microsoft/HTC | | | | | | | | | X |

*IPR2017-00890, Paper 15 at 2.*

The PTAB rejected Philips' argument and denied discovery.  IPR2017-00890, Paper 47.  The PTAB also did not find persuasive Philips' same evidence raised here about the MADA between HTC and Google.  *Id.* at 6 ("Patent Owner does not explain in the record before us why the Google MADA would have influence or control in this particular proceeding.")

Philips raised this same argument again with later-filed IPRs by Microsoft.  The PTAB again rejected Philips' argument that the existence of challenges against other asserted patents without overlap amongst patents "suggests a level of coordination."  *Microsoft Corp. v. Koninklijke Philips Electronics N.V.*, IPR2017-01766, 2018 WL 444029, at *7 (Patent Tr. & App. Bd. Jan. 16, 2018) ("We are not persuaded by Patent Owner's argument.").

**B.      HTC Is Not An RPI Or Privy To Google**

Philips' entire RPI/privy argument rests upon speculation and conjecture.  Ultimately, the undisputed facts demonstrate that HTC was like most of the hundreds of Android manufacturers who signed Google's MADA in order to distribute Google mobile

applications.  HTC did not control Google's legal affairs, including the filing, conduct or

payment for any of Google's IPRs.  Although HTC agrees that the patents challenged by

Google should be invalidated, "a common desire among multiple parties to see a patent

invalidated, without more, does not establish privity."  *WesternGeco LLC v. ION*

*Geophysical Corp.*, 889 F.3d 1308, 1321 (Fed. Cir. 2018).  Something more is required to

apply the doctrine of estoppel.  Yet none of the hallmarks for estoppel are present here.

Philips' argument runs "against the deep-rooted historic tradition that everyone should have

his own day in court."  *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008).

### 1. Legal Standard For RPIs And Privity Require Control Or Broad Legal Relationship

Pursuant to 35 U.S.C. § 315(e)(2), "[t]he petitioner in an inter partes review of a

claim in a patent under this chapter that results in a final written decision under section

318(a), or the real party in interest or privy of the petitioner, may not assert [] in a civil action

… that the claim is invalid on any ground that the petitioner raised or reasonably could have

raised during that inter partes review."  "The Supreme Court has provided a non-exhaustive

list for examining whether the legal relationship between two parties establishes that one is

the privy of the other," which is used to evaluate time bar determinations under Section 315.

*See Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1360 (Fed. Cir. 2018),

cert. denied, 139 S. Ct. 1366 (2019).  The list includes six categories that create independent

exceptions to the common law rule that forbids non-party preclusion in litigation: (1) an

agreement between the parties to be bound; (2) pre-existing substantive legal relationships;

(3) adequate representation by the named party; (4) the non-party's control of the prior

litigation; (5) non-party acts as a proxy for the named party; and (6) where special statutory

schemes foreclose successive litigation.  *Id.*, citing *Taylor v. Sturgell*, 553 U.S. at 894.  This

framework applies to both the RPI and privity analysis.  *See Applications in Internet Time*,

897 F.3d at 1360 (Reyna, J., concurring) ("The Supreme Court did not limit the application

of the framework to either real party in interest or privity; it equally applies to both." (citing

*Taylor*, 553 U.S. at 894 n.8)).

### 2.      HTC Does Not Come Close To Meeting The RPI/Privity Standard

Here, Philips points to *Taylor* factors two (pre-existing substantive legal relationship), three (adequate representation by named party), and five (where the non-party acts as a proxy for the named party to relitigate the same issues).  None of these factors are appropriately applied to HTC and Google.

As to factor two, a "preexisting substantive legal relationship" traditionally refers to special legal relationships that gave one party control over the other in that proceeding or matter, such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor."  *Taylor v. Sturgell*, 553 U.S. at 894 (2008); *see, e.g., Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc*., 568 F.Supp.2d 1152, 1176–77 (C.D. Cal. 2008) (holding beneficiaries of decedent's will were in privity with executor of estate); *Duncan v. Cohen,* C 08-2243 BZ, 2008 WL 2891065, at *4 (N.D. Cal. July 22, 2008) (declining to apply preclusion where party to prior suit was no longer plaintiff's agent). "These exceptions originated 'as much from the needs of property law as from the values of preclusion by judgment.'"  *Taylor*, 553 U.S. at 894 (citation omitted).

As a threshold matter, Philips makes **no** showing **whatsoever** that HTC and Google had a bailor/bailee, assignee/assignor, or other special legal relationship for Google to act for HTC when it brought IPRs.  This alone should end the inquiry under this factor.

Nor could Philips do so, because the undisputed facts are that HTC had no control over Google's IPRs.  Lam Decl., ¶¶4-5.  Philips attempts to shoehorn HTC into this category based on the execution of the MADA and prior business dealings between the companies.  But basic contractual arrangements that do not grant control by one over the other in the matter are insufficient to establish a "preexisting substantive legal relationship."  "[F]airly standard customer-manufacturer relationship regarding the accused product" does not make parties' in privity with one another.  *WesternGeco.,* 889 F.3d at 1321.

As to factor three (adequate representation by a named party), the Supreme Court held this factor to refer to "certain limited circumstances" relating to the relevant litigation, such as class actions and suits brought by "trustees, guardians, and other fiduciaries."

1   *Taylor,* 553 U.S. at 894.  Moreover, applying estoppel is only appropriate if "there are

2   'special procedures to protect the nonparties' interests, or an understanding by the concerned

3   parties that the first suit was brought in a representative capacity.'"  *See Taylor*, 553 U.S. at

4   897.  This factor does not apply here.  HTC is not a class member, nor is Google a trustee,

5   guardian, or other fiduciary of HTC.  Lam Decl., ¶¶4-5.  HTC certainly had no understanding

6   that Google was representing it in the IPRs and had no control over Google.  *Id.*

7        For factor five ("proxies"), this factor centers on "when a person who did not

8   participate in a litigation later brings suit as the designated representative of a person who

9   was a party to the prior adjudication."  *Taylor,* 553 U.S. at 895.  This applies in limited

10  circumstances where a litigation is brought by one party on behalf of another, such as an

11  agent for a principal or a trustee for a beneficiary.  *See id.*, citing *Chicago, R. I. & P. Ry. Co.*

12  *v. Schendel*, 270 U.S. 611, 620 (1926).  Here, Philips offers no evidence that HTC brought

13  the IPRs as a designated representative, general agent, or trustee of Google or that Google

14  brought its IPRs in any of these roles for HTC.  HTC nonetheless extinguishes this

15  possibility with real evidence.  *See* Lam Decl., ¶5.

16       Philips contends that HTC falls into categories three and five because of its common

17  interest agreement with Google.  But as a matter of law, a joint defense or common interest

18  agreement alone does not establish that parties are RPIs or in privity.  *Universal Engraving,*

19  *Inc. v. Metal Magic, Inc.*, CV-08-1944-PHX-GMS, 2010 WL 4922703, at *18 (D. Ariz. Nov.

20  29, 2010)("To the Court's knowledge, no court has held that the existence of a joint defense

21  agreement, as a matter of law, establishes privity.").[4]  The Court here should hesitate to

22  depart from this standard given the number of patent cases before it in which defendants are

23  consolidated and forced or encouraged for the benefit of the Court to submit common briefs

24  and positions.  Such parties should not be deemed through this participation and the mere

25

26  ―――――――――――――――
    [4]   The PTAB's guidance expressly states that a party does not become an RPI or privy based
27  solely on participation in a joint defense group.  Patent Trial Practice Guide, 77 FR 48756-01
    ("[I]f Party A is part of a Joint Defense Group with Party B in a patent infringement suit, and
28  Party B files a PGR petition, Party A is not a 'real party-in-interest' or a 'privy' for the
    purposes of the PGR petition based solely on its participation in that Group.").

1    pre-existence of contracts between them to be estopped from viable defenses.

2         Philips primarily relies on PTAB caselaw, which is not binding on this Court, to

3    argue that HTC is somehow an RPI.  But each of these cases are materially different than the

4    situation here.  For instance, Philips relies upon *Ventex Co., Ltd. v. Columbia Sportswear*

5    *N.A., Inc.,* IPR2017-00651, 2019 WL 764130, at *6 (Patent Tr. & App. Bd. Jan. 24, 2019),

6    where an alleged RPI had paid for the IPR and had an ***exclusive*** manufacturing agreement

7    with the party to the IPR.  Here, it is undisputed that HTC did not pay for the Google IPR

8    petitions, nor did HTC have an exclusive MADA agreement with Google.  Lam Decl., ¶¶4-5.

9    Philips also cites *Cisco Sys., Inc. v. Hewlett Packard Enter. Co.*, IPR2017-01933, 2018 WL

10   1364821, at *6 (Patent Tr. & App. Bd. Mar. 16, 2018), in an apparent attempt to suggest

11   HTC is in privity with Google because of an "acquisition" of HTC by Google.  But Google

12   did not acquire HTC (or any related companies) such that it would have ownership over HTC

13   and exercise board influence, as was the issue in *Cisco*.  Certain HTC employees transitioned

14   their work to Google, but HTC and Google have at all times remained separate corporate

15   entities.  And Philips provides no evidence that those engineers transitioned to Google and

16   somehow had control over its legal proceedings.

17        In more similar circumstances to the situation here the PTAB has found parties not to

18   be in privity.  *See Bae Sys. Info. and Elec. Sys. Integration, Inc. v. Cheetah Omni, LLC,*

19   IPR2013-00175, 2013 WL 5653116, at *2 (Patent Tr. & App. Bd. July 23, 2013) (no privity

20   where contractual clauses did not establish that party had the "right to exercise, or that it

21   could have exercised control, over the United States' participation in the Federal Claims

22   litigation or that [party] is responsible for funding and directing the proceeding"); *Apple Inc.*

23   *v. Achates Ref. Publg., Inc.*, IPR2013-00080, 2013 WL 6514049, at *3 (PTAB, Apr. 3, 2013)

24   (finding no RPI or privity where "[t]he agreement does not give the developer the right to

25   intervene or control Apple's defense to any charge of patent infringement").

26        **3.    Undisputed Facts Show HTC Had No Control Over Google's IPRs**

27        Here, the undisputed facts demonstrate that Philips' speculation that HTC somehow

28   had control over Google on its IPRs or that Google was HTC's agent in the PTAB is

1    incorrect.  Although HTC has a common interest agreement with Google that provides

2    ████████████████████████████████████ it did not actually share the cost of Google's

3    IPRs, nor did it control any aspect of Google's petitions.  Lam Decl., ¶5.  HTC had no role—

4    financial, supervisory, or otherwise—with Google's filing of IPR petitions, and the common

5    interest agreement provided that Google retained all such rights to pursue its own legal

6    strategy.  *Id.*; Ex. 19.  Philips has no evidence to the contrary, nor could it.

7         In sum, none of the hallmarks required to apply estoppel against a non-party are

8    present here.  Philips' contention that merely the mutual "desire" for review of a patent by

9    two parties is sufficient to warrant the application of estoppel is wrong both under the law

10   and the facts of this case.  *See WesternGeco LLC*, 889 F.3d at 1321 ("[A] common desire

11   among multiple parties to see a patent invalidated, without more, does not establish

12   privity.").  HTC should be afforded its own full and fair opportunity to litigate the validity of

13   the '913 and '806 patents, and should not be precluded from making any arguments based on

14   the fact that they were raised by Google in a separate IPR proceeding.

15   **III.    Even If It Were An RPI, HTC Is Not Estopped From Raising The Invalidity
          Grounds At Issue**

16        If the Court determines that HTC is not an RPI, then the Court need not reach this

17   issue.  But if HTC were to be deemed an RPI, which it should not be, the invalidity grounds

18   HTC has raised for the '806 and '913 patents should not be precluded because they are not

19   the same as those raised in the IPRs filed by Google.  Philips attempts to expand the concept

20   of IPR estoppel beyond what the statute provides and estop HTC from using system art,

21   which cannot be raised in IPRs and thus should not be estopped based on those IPRs.

22        **A.    Legal Standard: IPR Estoppel Does Not Apply To System Art**

23        In an IPR, a party may raise an invalidity challenge to a patent "only on the basis of

24   prior art consisting of ***patents or printed publications***."  35 U.S.C. § 311(b) (emphasis

25   added).  This means that "systems, such as products and software," cannot be raised during

26   IPR proceedings—only printed documents such as patents and other publications may be

27   used.  *See Zitovault, LLC v. Intl. Bus. Machines Corp.*, 3:16-CV-0962-M, 2018 WL

28

1   2971178, at *4 (N.D. Tex. Apr. 4, 2018).

2           35 U.S.C. § 315(e)(2) provides that an IPR petitioner who receives a final written

3   decision for a challenged claim may not assert later "that the claim is invalid on any ground

4   that the petitioner raised or reasonably could have raised during that inter partes review."  35

5   U.S.C. § 315(e)(2).  Because system prior art cannot be used in IPRs, courts have

6   consistently recognized that § 315 does not apply to system art.  *E.g., ZitoVault*, 2018 WL

7   2971178, at *4 ("Plaintiff responds that the 'accused infringer cannot avoid statutory

8   estoppel simply by relying on a system where all of the teachings of the system also exist in

9   patents or printed publications …' This argument has been rejected in at least two prior

10  cases, including one from this Court."); *Intellectual Ventures II LLC v. Kemper Corp*., No.

11  6:16-CV-0081, 2016 WL 7634422, at *3 (E.D. Tex. Nov. 7, 2016) ("Petitioners may use

12  only patents or printed publications in IPR proceedings. Therefore, regardless of any

13  estoppel, defendants have considerable latitude in using prior art systems (for example,

14  software) embodying the same patents or printed publications placed before the PTO in IPR

15  proceedings."); *Polaris Indus., Inc. v. Arctic Cat Inc.*, No. CV 15-4475 (JRT/TNL), 2019

16  WL 3824255, at *3 (D. Minn. Aug. 15, 2019); *01 Communique Laboratory, Inc. v. Citrix*

17  *Sys., Inc.*, 151 F. Supp. 3d 778, 798 (N.D. Ohio 2015)("Citrix also intends to introduce at

18  trial fact and expert testimony, expert reports, and deposition testimony, which Communique

19  recognizes could not be introduced during reexamination.")

20          This District has also recognized that § 315 estoppel does not extend to invalidity

21  grounds that are different from those that were affirmatively raised in the IPR proceeding.

22  *See Finjan*, *Inc. v. Blue Coat Sys*., *LLC*, 283 F. Supp. 3d 839, 856 (N.D. Cal. 2017) (it was

23  impossible for the petitioner to have "raised or reasonably could have raised" the non-

24  instituted grounds during IPR.")

25          **B.      Background: The GRiNS System and RealSystem Are System Art**

26          HTC's case invalidity case at issue here is centered around system art.  Philips claims

27  that HTC should be estopped from arguing two of its invalidity grounds regarding the '806

28  patent: (1) the Graphical Interface to SMIL 1.0 System ("GRiNS System"), including in

1   combination with the SMIL 1.0 Specification ("SMIL" or "SMIL specification") and (2) the

2   RealSystem G2 System ("RealSystem") in combination with the SMIL 1.0 Specification.

3       The GRiNS System was a software system for streaming media that was sold in the

4   U.S. by Oratix Development BV.  Ex. A, Jeffay Report, ¶312.  HTC thus contends that this

5   ***system*** is prior art under 35 U.S.C. § 102 because it was used and on sale in the U.S., not

6   because it represented a "printed publication" according to the same statute.  HTC's expert

7   tested the actual GRiNS system (depicted below) and confirmed its functionality.  HTC will

8   prove the functionality of the GRiNS System at trial with the software itself and

9    testimony about the system

10   from Sjoërd Mullender and

11   Albert Jansen, the engineers

12   who developed the GRiNS

13   system, and Dr. Jeffay, who

14   used and tested the GRiNS

15   system.  HTC will also

16   *HTC-PHIL-EXP-KJ-0020 at 35 seconds* present evidence of the source

17   *(RealSystem)* code for the GRiNS System

18   and Dr. Jeffay's testing of the system.  None of this evidence could have been presented in the

19   IPRs.  HTC will also present evidence from the GRiNS 1.0 Quickstart Guide showing how the

20   system functioned.

21       Likewise, the RealSystem was software for streaming multimedia files over a network.

22   It was used and sold in the U.S. by RealNetworks, Inc. and is thus a prior art ***system*** (not merely

23   a printed publication).  The RealSystem consisted of three main components:  a RealServer, a

24   RealPlayer, and production tools.  Ex. A, ¶¶493.  To prove at trial how the RealSystem worked,

25   HTC will introduce a variety of evidence, including the testimony of Jeff Ayars about the

26   development and operation of the RealSystem and how the source code for the product worked.

27   HTC also will present testimony of Dr. Jeffay about how the system worked and he will

28   demonstrate versions of the software at trial.  None of this evidence could have been presented

at the IPRs.  HTC will also use the RealSystem G2 Production Guide to demonstrate how the RealSystem worked.

**C.     Philips Seeks To Exclude System Art That Could Not Have Been Raised At The IPR**

Philips admits that the GRiNS System and RealSystem grounds are based on media "players" that were installed in computer systems.  Mot. at 11.  Although it admits these products are system art, Philips nonetheless contends that HTC should be estopped from relying on these products for two unsupported reasons.  First, Philips contends that because the systems are "substantively identical" to a document, the SMIL specification, that Google used in the IPR, HTC should be estopped from using this system art.  *Id.*  Second, Philips also contends that, even if there are differences between HTC's GRiNS and RealSystem arguments in this case and the SMIL specification, HTC should be estopped from asserting these grounds because Google "could have" raised these grounds in the IPR by simply referencing the RealSystem G2 Production Guide or the GRiNS 1.0 Quickstart Guide alone.  Mot. at 12.  In other words, Philips seeks to prevent HTC from relying on system art because it is, in part, using documents that show how these systems work that Google "could have" raised in the IPR.  Neither of these positions is correct under the law or facts.

**D.     The RealSystem And GRiNS Invalidity Grounds Should Not Be Excluded For The '806 patent**

**1.     The Law Does Not Require Publication Art Raised In An IPR To Be "Substantively Different" Than System Art Raised In Litigation**

Philips cites no case law supporting its broad assertion that HTC should be estopped because the product art is "substantively identical" to the grounds raised in the IPR.  Mot. at 11.  Indeed, courts that have considered this question have expressly rejected Philips' position and declined to limit the use of system art where similar printed publications were used in IPRs.  "Defendants have considerable latitude in using prior art systems (for example, software) ***embodying the same patents or printed publications*** placed before the PTO in IPR proceedings."  *Intellectual Ventures II LLC*, 2016 WL 7634422, at *3 (emphasis added); *see also ZitoVault*, 2018 WL 2971178, at *4 (rejecting argument that Defendant should be

1  estopped from using system art where "all of the teachings of the system also exist in patents

2  or printed publications"); *Polaris Indus., Inc.*, 2019 WL 3824255, at *3 ("Polaris has not

3  produced, nor could this court find, any court granting the relief Polaris now requests—to

4  apply § 315(e)(2) estoppel to products. ").  Thus, HTC should not  be estopped from asserting

5  the GRiNS System and RealSystem grounds in this case.

6
7
      **2.**      **There Is A Genuine Issue Of Material Fact As To Whether The RealSystem and GRiNS Systems Differ Substantially From The Publication Art**

8  Even if Philips were correct in its unsupported position that the law requires a

9  "substantial difference" between art raised in an IPR and system art raised in district court

10  litigation, RealSystem and the GRiNS System differ substantially from the SMIL

11  specification—or, at a minimum, there are genuine issues of fact regarding the difference

12  between these prior art references rendering summary judgment inappropriate.

13  The SMIL specification raised in the IPR did not disclose a particular device or

14  complete working software that was sold in the U.S.  Rather, the specification described the

15  components and syntax of the SMIL markup language, that could be used by someone looking

16  to draft code for an actual working media player software system.  Philips' corporate

17  representative testified, "[the] SMIL specification is not about the player.  It's about the syntax

18  and semantics of the language."  Ex. C ("Ten Kate Tr.") at 236:15-17; *id.* at 179:15-17.

19  The SMIL specification only referred to a "generic" media player that could cause a

20  SMIL-encoded media presentation to behave in the manner specified by the author.  It did not

21  disclose how this "generic" media player would achieve the result.  Indeed, the PTAB's

22  decision in the '806 IPR highlighted on this lack of implementation detail.  For example, for

23  the element requiring "continu[ing] the presentation" concurrent with playback, the PTAB

24  found that SMIL did not disclose this limitation, but that it would have been obvious to use

25  well-known "pipelining" techniques to play back SMIL files while downloading additional

26  content. Ex. B ('806 Final Written Decision) at 22-23.  Additionally, Philips' witness testified

27  that he specifically recommended that the SMIL Specification leave the decision of how to

28  perform prefetching up to the implementation.  Ex. C (Ten Kate Tr.) at 146:15-21.("[Q.] 'It is

1    up to the player … to decide to prefetch at presentation initiation, to prefetch 'just in time,' or

2    not to prefetch.' Correct?  A. Yes.").

3         Unlike the markup language disclosed in the SMIL specification, RealSystem and

4    GRiNS are specific, real-world, working media players.   RealSystem included three

5    components:  a RealServer, a RealPlayer, and production tools.  Jeffay Rep. at ¶ 493.  The

6    RealPlayer component of RealSystem could "parse a control information file" using an XML

7    parser to extract information needed to playback the SMIL presentation.  *Id.* ¶ 518.  The

8    RealPlayer component could continue a presentation concurrent with playback by using a

9    "preroll" buffer.  *Id.* at ¶ 542.  The GRiNS system parses a control information file with an

10   XML parser to parse the SMIL document.  *Id.* at  ¶ 337; Ex. D ("Mullender Tr.") at 99:2-24;

11   Ex. E (source code for the GRiNS XML parser, produced at PRIORART054849-59).

12        Philips incorrectly asserts that Dr. Jeffay "does not contend that GRiNS or RealSystem

13   players contained any special functionality that meets any limitation in the claims of the '806

14   patent that the 'SMIL 1.0 players' in the SMIL Specification did not."  Motion at 11.  As

15   discussed above, Dr. Jeffay testified that RealSystem and GRiNS performed the recited '806

16   functions in unique ways.  As in *Star Envirotech, Inc. v. Redline Detection*, *LLC*, No. SACV

17   12-01861 JGB (DFMX), 2015 WL 4744394 (C.D. Cal. Jan. 29, 2015), cited by Philips,

18   RealSystem and GRiNS disclosed features recited by the '806 claims—specific XML parsing

19   algorithms, prefetch functionality for concurrent download and playback—that are not

20   disclosed in the SMIL specification.  *Id.*, at *4 ("[T]he physical machine itself discloses

21   features claimed in the '808 Patent that are not included in the instruction manual, and it is

22   therefore a superior and separate reference.").

23        Philips also argues that HTC  "equated" the SMIL specification with "the functionality

24   of any prior art systems that used or implemented the SMIL 1.0 standard" in the invalidity

25   contentions.  Motion at 11.  But SMIL is not the same as RealSystem and GRiNS.  The SMIL

26   specification disclosed a "generic" media player (Motion at 11), that "evaluate[d] the [SMIL]

27   elements in the order in which they occur" according to an algorithm (Ex. N ('806 IPR) at 17).

28   RealSystem and GRiNS, on the other hand, disclosed media players with specific components

(Ex. O ('806 patent, claims 1 and 12 ("client device")), that parsed XML in unique ways (*id.*, claim 12 ("means for parsing a control information file"), and that used specific pre-fetch techniques to retrieve additional media components while others were being played out (*id.*, claims 1 and 12 ("concurrent with the media presentation … using content of the next file to continue the media presentation")).   There are thus material differences between the RealSystem and GRiNS systems and the SMIL specification

### 3.    The RealSystem and GRiNS System Grounds Could Not Have Been Raised in the IPR

Although Philips admits that the RealSystem and GRiNS grounds "involve products," not publications, it argues that the Court should still apply § 315 estoppel because Google could somehow have raised these grounds in the IPRs by referencing the RealSystem G2 Production Guide or the GRiNS 1.0 Quickstart Guide.  Mot. at 6.

This argument fails initially for the reasons discussed in Section III(A): invalidity grounds based on ***products*** or ***systems*** are not subject to § 315 estoppel, even if the products are also described in documents.  *See Polaris Indus.*, 2019 WL 3824255 at *3 (the patentee "has not produced, nor could this court find, any court granting the relief [patentee] now requests—to apply § 315(e)(2) estoppel to products … ***[S]uch a rule has not been recognized by any circuits***.") (emphasis added).

In addition, even if Philips' theory was correct under the law, HTC will introduce confidential source code, fact and expert witness testimony, and evidence of product availability and use, none of which could have been presented during IPR.  For example, witness Jeff Ayars will testify about the development of the RealSystem, and how its source code worked.  Similarly, HTC anticipates introducing testimony from Dr. Jeffay, Sjoërd Mullender, and others who will testify as to source code and other aspects of the GRiNS media player that the manuals did not disclose.  None of this information was disclosed by the documents Philips cites.

Philips relies on *Oil-Dri Corporation of America v. Nestle Purina Petcare Co.*, No. 15 C 1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019), to argue that HTC "cannot avoid estoppel

1   simply by pointing to its finished product (rather than the printed materials)."  Motion at 13.

2   As the *Polaris* court observed last month, *Oil-Dri*'s approach is not the law in any circuit.

3   *Polaris*, 2019 WL 3824255, at *3 ("such a rule has not been recognized by any circuits").

4   Furthermore, the *Oil-Dri* court in fact **rejected** the patentee's estoppel argument.  *Id*., at *10

5   (finding patentee failed to carry its burden on estoppel).  The court explained that "the estoppel

6   proponent must present some evidence that a printed publication **sufficiently describing the**

7   **relevant product** existed and was available upon a reasonable search," and determined that the

8   patentee had failed to establish that the documents in question "contained sufficient detail to

9   constitute a printed publication of the product."  *Id*.  Here, the documents Philips cites are not

10  the same as RealSystem and GRiNS products.  As disclosed in Dr. Jeffay's report, the record

11  contains expert and fact testimony and source code that provide this information.

12      Philips lastly seems to suggest that HTC should be estopped both from presenting the

13  **entire system** as a prior art reference and from using the SMIL and Real documents as one

14  piece of HTC's overall proof regarding how those systems worked.  This is unsupported.

15  Philips cites no precedent for the possibility that a defendant would be estopped from

16  presenting **an entire system** for even suggesting that its proof might include one document,

17  and HTC could find none.  Meanwhile, courts have allowed defendants to rely on documents

18  as components of an overall case when proving the functionality of a system.  *See Zenith Elecs.*

19  *Corp. v. PDI Commun. Sys., Inc.,* 522 F.3d 1348, 1357 (Fed. Cir. 2008)(system established as

20  prior art with "testimony from other witnesses, documentary evidence, and Zenith's own

21  admissions"); *Good Tech. Corp. v. Mobileiron, Inc.,* 5:12-CV-05826-PSG, 2015 WL 4197554,

22  at *5 (N.D. Cal. July 10, 2015) (system art may be "established with multiple pieces of

23  evidence" including documents); *Finjan, Inc. v. Symantec Corp*., 10-CV-593 (GMS), 2013

24  WL 5302560, at *12 (D. Del. Sept. 19, 2013) (user manual, source code, and software used to

25  establish prior art product), aff'd, 577 Fed. Appx. 999 (Fed. Cir. 2014)(unpublished).  HTC

26  should accordingly be free to present any part of its invalidity case.

27      The record evidence confirms that HTC could not have raised the GRiNS/RealSystem

28  grounds at the PTAB via Philips' cited publications.  At the very least, there is an issue of fact

1   as to the difference between the RealSystem and GRiNS prior art products and the disclosure

2   of Philips' cited publications that is sufficient to defeat summary judgment.

3       **E.**     **HTC's '913 System Art Patent Invalidity Grounds Should Not Be Excluded**

4       Philips tries similar tactics to exclude HTC's invalidity grounds for the '913 patent.

5   Dr. MacKenzie's expert report refers to the prior art system of an Apple Newton

6   MessagePad 120 device (depicted below).  Philips admits that that Dr. MacKenzie's report



discusses a device, but nonetheless argues that "Dr. MacKenzie cites extensively to the 1995 Newton Manual to illustrate the features and operations that he … identifies in the device itself."  Motion at 15.  As discussed above, it is improper to attempt to estop HTC from using system art because it uses documents to show part of how that system art worked.  Furthermore, Philips admits the Newton manual did not disclose multiple claim limitations and thus is not identical to the system art.  For example, it failed to disclose that the Newton's keyboard returned the primary character in response to a quick tap

*HTC-PHIL-EXP-SM-2503*
*(Newton Device)*

satisfying limitation 1[e] and similar limitations) or that, when the Newton device was in an

alternate mode, selection of a key that displayed a secondary character (such as the 'å'

character) caused that character to be input (satisfying 1[h] and similar limitations).

Additionally, it did not disclose that selection of this secondary character (such as 'å') caused

the keyboard to return to the default state (satisfying 1[i] and similar limitations).  Mot. at

n.12; Ex. P, MacKenzie Rep. ¶¶ 684, 695, 699.  Thus, the Newton invalidity ground is not

estopped under § 315 because it is product prior art and because no prior art publication that

"sufficiently describ[ed] the relevant product existed."  *Polaris*, 2019 WL 3824255, at *3.

       Philips argues that the Newton manual disclosed limitation 1[i], "returning the

keypad to the default state."  Mot. at 12, n.13.  But the manual's reference to the shift key

"releas[ing] automatically" discloses nothing about the state of the Newton's overall keyboard. Nor does the Newton manual contain the required disclosure for limitations 1[e] and 1[h]. At the very least, there is a genuine issue of material fact as to the difference between the Newton device and product manual that suffices to defeat summary judgment.

### F.     Section 315 Does Not Estop The Other Invalidity Grounds HTC Has Raised For the '806 and '913 Patents

Philips argues that HTC's other GRiNS publications identified in its invalidity contentions for the '806 patent, as well as the Buxton, Hawkins, and Sakata II grounds for the '913 patent, are all "patents or printed publications" known to Defendants prior to filing the IPR petition, and therefore could have been raised in the IPR proceeding, but were not. Mot. at 13,1 5. As discussed above in Section II, HTC was not a party to those IPRs and thus should not be estopped from presenting any prior art because it could have been disclosed by other parties in the IPR. HTC did not make the decision to present that art at an IPR, and should not be hindered in its case now.

Furthermore, even if HTC had been a party, Philips' position contradicts precedent from the Federal Circuit and this District on estoppel. Although there is a split among district courts (which Philips does not discuss), this District has consistently limited § 315 estoppel to grounds that were ***actually raised in the IPR petition*** and instituted in the IPR proceeding. *See Finjan*, *Inc. v. Blue Coat Sys.*, *LLC*, 283 F. Supp. 3d 839 (N.D. Cal. 2017) (it was impossible for the petitioner to have "raised or reasonably could have raised" the non-instituted grounds during IPR); *accord Verinata Health*, *Inc. v. Ariosa Diagnostics*, *Inc*, No. 12-CV-05501-SI, 2017 WL 235048, at *3 (N.D. Cal. Jan. 19, 2017) ("The [*Shaw*] court chose instead to interpret the IPR estoppel language literally, plainly stating that only arguments raised or that reasonably could have been raised *during* IPR are subject to estoppel.") (emphasis in original). Philips cites no evidence that these references were actually raised in the IPR petitions; thus, estoppel is not appropriate here.

### IV.    HTC's Affirmative Defenses Should Not Be Dismissed

### A.     The '564 Patent Is Invalid Due To Philips' Broadening On Reissue

1   HTC acknowledges that the Court has already determined, as a matter of law, that no

2   broadening of the '564 patent occurred during reissuance.  *See* Dkt. No. 632.  The denial of a

3   Rule 12(c) motion, however, is not a final judgment that is appealable.  *See Stertz v. Gulf Oil*

4   *Corp.*, 685 F.2d 1367, 1370 (Temp. Emer. Ct. App. 1981).  If the Court wishes to reconsider

5   its decision, HTC stands on its previous briefing.  Otherwise, however, HTC preserves its

6   right to appeal this defense.  For avoidance of doubt, HTC does not waive its objections to

7   the pleadings or this defense, and expressly reaffirms and reasserts this affirmative defense,

8   for the same reasons raised in the Motion for Judgment on the Pleadings (Dkt. No. 94-95).[5]

9   **B.      The '913 Patent Is Invalid Due To Inequitable Conduct**

10   HTC asserts the affirmative defense of unenforceability due to inequitable conduct

11   regarding the '913 patent.  4:18-cv-1887, Dkt. No. 79 at ¶¶23-45.  As set forth in great detail

12   in HTC's answer, the attorney who prosecuted the '913 patent, Michael E. Belk, filed a

13   request for continued examination and submitted an information disclosure statement (IDS)

14   about a prior art reference that materially misrepresented the contents of that reference.  *Id.*

15   To prove inequitable conduct, a party must establish that "(1) an individual associated

16   with the filing and prosecution of a patent application made an affirmative misrepresentation

17   of a material fact, failed to disclose material information, or submitted false material

18   information; and (2) the individual did so with a specific intent to deceive the PTO."

19   *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009).  "When

20   the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an

21   unmistakably false affidavit, the misconduct is material."  *Therasense, Inc. v. Becton,*

22   *Dickinson and Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).  "[B]ecause evidence of direct

23   intent is rare, intent may be inferred from indirect and circumstantial evidence."  *id.* at 1290.

24   To prevail on its motion for summary judgment on this defense, Philips "has the

25   burden of establishing the absence of evidence supporting an essential element of [HTC's]

26   case."  *TVIIM, LLC v. McAfee, Inc.*, 13-CV-04545-HSG, 2015 WL 3956313, at *7–8 (N.D.

27

28   [5]   Had Philips conferred with HTC prior to the filing of this motion, briefing on this issue could have been avoided.

1    Cal. June 28, 2015), aff'd, 851 F.3d 1356 (Fed. Cir. 2017).  But there are factual disputes

2    over whether Mr. Belk's actions constituted material misrepresentations, and whether Mr.

3    Belk acted with intent to deceive.  This factual dispute precludes summary judgment on this

4    affirmative defense.  *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1372 (Fed.Cir.2012)

5    ("Both intent and materiality are questions of fact for the defense of inequitable conduct.").

6         Mr. Belk signed and submitted an IDS to the Patent Office that purported to attach a

7    foreign prior art reference, Japanese App. No. 4-019512 ("Sakata Application").  Ex. F.  The

8    submission included the Sakata Application in Japanese.  Immediately appended to the

9    Sakata reference was a document in English that contained a translation of the Sakata

10   Application, with three pages of reproductions of Figures 10-12 annotated with

11   "descriptions."  *Id.*  These descriptions were, misleadingly, ***not*** part of the translation, but

12   rather argument concerning the disclosures of the Sakata Application.  The arguments

13   included the statements that "[a]ctually the invention [Sakata] didn't disclose concept of

14   'pre-determined time'" and "[t]he patent doesn't disclose timing concept, but selecting

15   secondary character via primary character of keyboard is obvious in light of the invention."

16   *Id.*  These are misleading, as one of the Sakata Application embodiments describes a

17   variation in which a menu of secondary characters is displayed after a primary character key

18   has been held for a fixed time period.  *Id*.

19        Importantly, the examiner, just days before this IDS, issued a notice of allowability

20   identifying the purported absence in the prior art of a "device [that] displays a default

21   character associated with a key when the key is pressed for a period shorter tha[n] a

22   predetermined time and when the key is pressed for a longer period secondary characters are

23   displayed which are selected by a second key pressing" as the reason for allowance of the

24   '913 claims.  Thus, the issue of whether Sakata disclosed a timing requirement was highly

25   material to patentability.

26        Philips now argues that because Mr. Belk testified at his deposition that he "did not

27   know" who prepared the notes appended to the Sakata application, and that he was unaware

28   that they were included in the IDS (Mot. at 19), the Court should grant summary judgment in

Philips' favor on this defense.  But, as discussed above, the documentary record here

demonstrates an inference that there was inequitable conduct, which precludes summary

judgment.  *See TVIIM, LLC,* 2015 WL 3956313, at *8 (denying summary judgment on

affirmative defense of inequitable conduct, stating in part "[t]he record supports an inference

that during the prosecution of the '168 Patent, the applicants selectively submitted

documents").  Moreover, Mr. Belk was an experienced patent attorney who admitted that it

was "obvious" that these descriptions were "notes from somebody," not an official

translation of the Sakata reference.  Ex. G (Belk Tr. at 87:9-11).  Taking these facts together,

the "single most reasonable inference" to draw regarding this misleading and false

submission about the Sakata reference to the Patent Office is that there was deceptive intent

that was material to patentability.

## C.   HTC Is Licensed To The '809 Patent As An HDCP Licensed Adopter

Philips seeks summary judgment on HTC's Ninth Affirmative Defense as to the '809

patent relating to the HDCP 1.x License Agreement.  Philips and HTC both signed the

HDCP 1.x Agreement, and are thus each an "Adopter" and "Fellow Adopter" under the

HDCP 1.x License Agreement.  *See* Mot. at 21; Ex. H.  The HDCP 1.x Agreement provides

that "Adopter … promises not to assert or maintain against … any Fellow Adopter, any

claim of infringement … for activities or products for which any Fellow Adopter has been

granted a license by [DCP] under any trade secrets or copyrights embodied in the HDCP

Specification[.]"  Ex. H at 10.  The agreement defines "Necessary Claims" as "claims of any

patent or patent application that are necessarily infringed by those portions of Licensed

Products and Licensed Components that implement HDCP and are owned or controlled by

… any Fellow Adopter[.]"  *Id.* at 5, § 1.43.  The agreement defines "HDCP Specification" as

"the specification entitled 'HDCP Content Protection Specification, Release 1.1' (including

the 'Errata' thereto), *as such specification may be amended from time to time pursuant to*

*Section 5*."  *Id.* at 4, § 1.32 (emphasis added).  Section 5 of the HDCP 1.x Agreement

provides that "[DCP] may, at any time, make changes as necessary or appropriate to the

HDCP Specification … *that would clarify, but not materially amend, alter or expand the*

1    ***HDCP Specification***[.]”  *Id*. at 13, § 5.1 (emphasis added).

2            Philips contends that summary judgment should be granted because, as a matter of

3    contract interpretation, the HTDCP 1.x Agreement does not cover HDCP 2.x.  But there is a

4    genuine issue of material fact as to whether the HDCP 2.x had changes that “clarif[ied], but

5    [did] not materially amend, alter or expand the HDCP Specification” (HDCP 1.x Agreement

6    at 13, § 5.1) and thus qualified as “amend[ments] … pursuant to Section 5 [of the HDCP 1.x

7    Agreement]” (*id*. at 4, § 1.32).  If so, the HDCP 1.x agreement applies, and Philips is barred

8    from pursuing its claims on the ’809 patent against HTC, a Fellow Adopter.

9            There is substantial evidence in the record that the “underlying protocols,

10   methodologies, and technologies” of HDCP 1.x and HDCP 2.x are not “significantly different

11   from one another.”

12

13

14

15           Philips implies that Section 5 the of the HDCP 1.x Agreement excludes HDCP 2.x

16   from the permitted “amend[ments]” because it defines the unrelated term “Different Licensed

17   Products” as referring to products with “a higher numerical designation to the left of the

18   decimal point (e.g., the change from Version 1.0 to Version 2.0[)].”  Mot. at 23, n. 17.  But

19   Philips fails to acknowledge the *other* requirement for this term: to be considered a “different”

20   licensed product, the product must also “perform[] the HDCP functions ***by substantially***

21   ***different means and in a substantially different way***,” or “enable[] HDCP protection of a

22   service that would not have been protectable.”  Ex. H at 14, § 5.2.  If it were not possible for

23   HDCP 1.x and 2.x to perform functions in a different way, then there would be no need to

24   include the “substantially different” language in this agreement.

25           **D.     Genuine Issues of Material Fact Exist As To HTC’s Equitable**
             **Affirmative Defense Regarding The ’806 Patent**
26
             Philips’ also seeks summary judgment on HTC’s Ninth Affirmative Defense as to the
27
28   ’806 patent based on Philips’ participation in the SYMM Working Group for Synchronized

Multimedia Integration Language (SMIL) ("Working Group").[6]  HTC has alleged that the Working Group required its members to agree to license intellectual property rights essential to a W3C standard on a royalty-free basis.  Philips was a participating member of the Working Group, actively participated in Working Group discussions regarding SMIL, and was privy to the discussions giving rise to SMIL recommendations.  Philips then applied for the '806 patent on overlapping technology, failed to disclose the pending application as required to the Working Group, then withdrew from the Working Group to avoid its patent disclosure and RAND licensing obligation.  *See* 4:18-cv-1887 at Dkt. No. 79, ¶52.  HTC reiterated these allegations by incorporating them through reference in its interrogatory response about this defense.  Ex. 59 at 12.

Discovery has established corroborating evidence for this defense.  Philips was a member of the Working Group.  Ex. J at 1-2.; Ex. C (Ten Kate Tr.) at 155:25-156:4.  The SMIL specification was published by the Working Group.  Ex. K.  The Working Group's standard policy was for its members to agree to license intellectual property rights essential to the standard on a royalty-free basis.  Ex. C (Ten Kate Tr.) at 156:24-157:1.  Accordingly, there is sufficient evidence in the record to create a genuine issue of material fact regarding HTC's defense that Philips is obligated to license the '806 patent on a royalty-free basis to HTC.  Philips is therefore not entitled to summary judgment.

**E.      HTC Has Intervening Rights To The Asserted Patents**

HTC asserted the defense of intervening rights for the '913, '564, and '006 patents.  4:18-cv-1887, Dkt. No. 79 at ¶53.  The '006 patent is no longer part of the case, and although HTC continues to assert this defense as to the '564 patent, HTC believes this has been resolved as a matter of law by the Court in its decision on the Motion for Judgment on the Pleadings, as discussed in Section IV(A), *supra*.  Accordingly, presumably the patent at issue

---

[6]     HTC raised other issues as part of this defense that apparently Philips does not challenge.

1    in Philips's motion on this defense is the '913 patent.  Summary judgment is not proper here

2    because the '913 patent was amended on reissue.  Pursuant to 35. U.S.C. section 252, a

3    patent infringer may raise the defense of intervening rights if he or she can demonstrate that

4    the claims asserted in the "reissued patent" are not "identical" to those of the original patent.

5    "[T]he doctrine of intervening rights, if found to be appropriate, affords an infringer of a

6    reissued patent an absolute right to make, purchase, or offer to sell otherwise infringing

7    products and a discretionary equitable right to continue to manufacture or sell such infringing

8    products."  *Linear Tech. Corp. v. Micrel, Inc*., 524 F. Supp. 2d 1147, 1156 (N.D. Cal. 2005).

9         Philips claims that summary judgment should be granted because HTC "has not

10   offered any evidence" as to intervening rights.  Mot. at 25.  This is incorrect.  The only

11   evidence necessary to resolve this issue is the patent itself.  *See Linear Tech. Corp.*, 524 F.

12   Supp. 2d at 1156 ("in determining whether an infringer is eligible for the defense of

13   intervening rights, the court must determine whether the claims asserted in the reissued

14   patent . . . are identical to those asserted in the earlier patent").  It is apparent on the face of

15   the '913 patent that the claims are not identical, as evidenced by the italics.  *See* Ex. M

16   ("matter printed in italics indicates the additions made by reissue").  Entire claims have been

17   added to the '913 patent that were not present in the original patent.  *Id.* at claims 8-16.

18   Further, additional limitations have been added to existing claims.  *See id.* at claim 3 (adding

19   three additional limitations, including "returning the primary character as an input character

20   in response to selection of the at least one key for a period shorter than a predetermined time

21   period; switching to a second state after detecting a first key selection of the at least one key

22   for a period longer than the predetermined time period.").  Accordingly, there is evidence

23   that the claims are not identical, and summary judgment is not appropriate.

24   **V.    CONCLUSION**

25        Philips' motion should be denied regarding every issue raised.

26

27   Respectfully submitted September 26, 2019.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/ Ryan McBrayer*
Ryan McBrayer (*pro hac vice*)
Jonathan Putman (*pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington, 98101
+1 (206) 359-8000
+1 (206) 359-9000 facsimile
htc-philipsperkinsservice@perkinscoie.com

John P. Schnurer (Cal. Bar No. 185725
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, California, 92130
+1 (858) 720-5700
+1 (858) 720-5799 facsimile
htc-philipsperkinsservice@perkinscoie.com

*Attorneys for Defendants HTC Corp. and HTC America, Inc.*