# Exhibit 9
### to
### Motion to Exclude
### (Dr. Nielson – HTC)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

KONINKLIJKE PHILIPS N.V.,
U.S. PHILIPS CORPORATION,

        *Plaintiffs*,

    v.

HTC CORP.,
HTC AMERICA, INC.,
        *Defendants*.

Case No. 4:18-cv-01887-HSG

**EXPERT REPORT OF DR. SETH JAMES NIELSON REGARDING INVALIDITY OF
ASSERTED CLAIMS OF U.S. PATENT NO. 9,436,809**

# Table of Contents

**Page**

I.     INTRODUCTION AND QUALIFICATIONS ..................................................................1

     A.    Qualifications and Background.................................................................1

     B.    Materials Considered ...............................................................................5

II.    SUMMARY OF OPINIONS .......................................................................................6

     A.    The Asserted Claims Are Invalid as Obvious in View of Prior Art ......6

III.   UNDERSTANDING OF THE APPLICABLE LAW .......................................................7

     A.    Level of Ordinary Skill in the Art ...........................................................8

     B.    Claim Interpretation ................................................................................8

     C.    Prior Art .................................................................................................10

     D.    Presumption of Validity.........................................................................11

     E.    Anticipation............................................................................................11

     F.    Obviousness ...........................................................................................12

     G.    Indefiniteness .........................................................................................16

     H.    Written Description.................................................................................17

     I.    Enablement .............................................................................................17

IV.   THE ASSERTED CLAIMS .......................................................................................18

V.    CLAIM CONSTRUCTION .......................................................................................18

VI.   LEVEL OF ORDINARY SKILL IN THE ART ..............................................................18

VII.  STATE OF THE ART ..............................................................................................20

     A.    A Very Brief Overview of Cryptographic Communications..................20

     B.    The Basics: Symmetric and Asymmetric Encryption............................21

     C.    Authentication Protocols and Key Exchange ........................................23

           1.    Challenge-Response......................................................................24

           2.    Authentication by Digital Signature ...........................................25

     D.    Certificates and Certificate Authorities ................................................29

     E.    Time Based Locality ...............................................................................33

VIII. OVERVIEW OF THE '809 PATENT.......................................................................41

     A.    Background and '809 Specification........................................................41

IX.   ANTICIPATION AND OBVIOUSNESS ......................................................................46

     A.    Prior Art Cited During Prosecution of The Philips' Patent .................46

1. File History of the '809 Patent ...................................................46

2. File History of the Related '939 Patent...................................47

3. File History of the Related '819 Patent...................................50

B. Invalidating Prior Art References ................................................57

1. Applied Cryptography 2nd Edition by Schneier........................57

2. A Cryptanalysis of the High-bandwidth Digital Content Protection System by Crosby ...............................................58

3. Digital Transmission Content Protection (DTCP) Specification Volume 1 (Informational Version) Revision 1.2 ......................59

4. High-bandwidth Digital Content Protection System (HDCP) Revision 1.0 ...............................................61

5. ISO/IEC 9798 - Entity Authentication.......................................62

6. ISO/IEC 11770 - Key Management.............................................63

7. SmartRight - Answer to the Call for Proposal for Content Protection & Copy Management Technologies and SmartRight - Technical White Paper.....................................64

8. U.S. Patent No. 7,516,325 - Device Authentication in a PKI to Willey...............................................71

9. WO 02/35036 A1 - A Method for Controlling Authorization to an Object and a Computer Program Product for the Authorization Control to Lundkvist ...............................................74

C. Overview of Claimed Functionality............................................76

1. Authentication....................................................................76

2. Secure Transmission of the Common Secret ............................76

3. Round-Trip Time ...............................................................76

D. Obvious Combinations of Prior Art ............................................77

1. Analysis of Obviousness Considerations.................................77

a) Scope and content of the prior art and differences between the prior art and the claimed invention ............................77

b) Secondary Considerations of Non-Obviousness.........................78

c)     Global Reasons to Modify and/or Combine the Prior Art References ...................................................................80

2.     Proposed Combinations ..........................................................83

a)     Ground 1: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP and Lundkvist....................................83

b)     Ground 2: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP, Lundkvist, and ISO/IEC 11770......146

c)     Ground 3: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight and Lundkvist .......................150

d)     Ground 4: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight, Lundkvist, and ISO/IEC 11770...................................................................................228

e)     Ground 5: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP and Willey .......................................233

f)     Ground 6: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP, Willey, and ISO/IEC 11770. ..........296

g)     Ground 7: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight and Willey..............................300

h)     Ground 8: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight, Willey, and ISO/IEC 11770...................................................................................374

i)     Ground 9: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by HDCP 1.0, ISO/IEC 9798, and ISO/IEC 11770........................................................................380

j)     Ground 10: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by HDCP 1.0, ISO/IEC 9798, ISO/IEC 11770, and Willey....................................................................415

k)     Ground 11: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by Schneier and Lundkvist.............................442

l)     Ground 12: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by Schneier and Willey ..................................485

X.    OTHER CASES IN WHICH I HAVE TESTIFIED DURING THE PAST FIVE YEARS .................................................................................526

XI.    EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS .................529

XII.    COMPENSATION TO BE PAID FOR WORK ON THE CASE....................................530

XIII.   CONCLUSION.............................................................................................................530

iv

## Table of Appendices

| Appendix | Description |
|:---:|---|
| A | Curriculum Vitae of Dr. Seth James Nielson |
| B | Materials Considered in Forming Opinions |
| C | Text of Asserted Claims of Philips' Patent |

# I.    INTRODUCTION AND QUALIFICATIONS

1.      My name is Seth James Nielson, and I have been retained as an expert by Defendants HTC Corp. and HTC America, Inc.

2.      In this report, I will set forth my opinions regarding the validity of the asserted claims of U.S. Patent No. 9,436,809 ("the '809 patent").

3.      This report contains statements of certain opinions that I have formed in this case to date and provides the bases and reasons for my opinions.  I may offer additional opinions based on further review of materials in this case, including opinions and/or testimony of other expert witnesses.

4.      In this section, I have summarized my educational background, career history, publications, and other relevant qualifications.  My full curriculum vitae is attached as Appendix A to this report.

## A.    Qualifications and Background

5.      I am a subject matter expert in cyber security, including the sub-fields of applied cryptography and network security.  I am the Founder and Chief Scientist of Crimson Vista, a computer security research and consulting company.  Furthermore, I hold appointments at Johns Hopkins University as the Director of Advanced Research Projects in the Information Security Institute and as an Adjunct Associate Research Scientist in the Computer Science department.  For collaborative purposes, I also hold a senior staff appointment at the Johns Hopkins University Applied Physics Lab (APL) and a currently hold a U.S. security clearance of Secret.

6.      I have been working in the Computer Science field for nearly twenty years in both academic and industrial circles.  In the years 2000 and 2004 respectively, I earned a B.S. and M.S. in Computer Science from Brigham Young University (BYU) in Provo, UT.  In 2009, I completed my Ph.D. in Computer Science from Rice University in Houston, TX.

### a)       Crosby's Qualification as Prior Art

216.    Crosby was published on November 5, 2001, by the Association for Computing Machinery at the 8th ACM Conference on Computer and Communications Security, ACM Workshop on Digital Rights Management.  I understand that Crosby is prior art to the'809 patent because it was published more than year before the earliest possible U.S. filing date for the '809 patent in June 2003.

### 3.       Digital Transmission Content Protection (DTCP) Specification Volume 1 (Informational Version) Revision 1.2

217.    DTCP described a "cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms."  DTCP at 10.

218.    DTCP described an end-to-end cryptographic system that includes device authentication, secure key exchange, content encryption, and system renewability through the use of a revocation list and system renewability messages.



**Figure 1 Content Protection Overview**

EXPERT INVALIDITY REPORT OF DR. NIELSON

219.     DTCP described a Full Authentication process that uses a public key-based certificate based on the Elliptical Curve Digital Signature Algorithm (EC-DSA) for signing and verification and the Elliptic Curve Diffie-Hellman (EC-DH) key exchange algorithm to generate a shared authentication key.



**Figure 10 Full Authentication Protocol Flow Overview**

220.     DTCP also described the secure transmission of the Exchange key which is subsequently used for the generation of the Content Key after the device has been authenticated. The Content Key is used to encrypt the actual content to be transmitted.

### a)     DTCP's Qualification as Prior Art

221.     DTCP was published on July 11, 2001, by a consortium of five companies ("5C") that consisted of Hitachi, Intel, Matsushita, Sony, and Toshiba.  I understand that DTCP is prior art to the '809 patent because it was published more than a year before the earliest possible foreign priority date for the '809 patent in July 2002.

EXPERT INVALIDITY REPORT OF DR. NIELSON

### 2. Proposed Combinations

287. The following claimed features were well known in the art. To the extent that any of the invalidating prior art references discussed above do not disclose these claimed features, it would have been obvious to combine or modify that prior art with the prior art identified below. This is not an exhaustive list of all the possible combinations but is intended to demonstrate that many different combinations of prior art were available to render the Asserted Claims invalid for obviousness.

### a) Ground 1: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP and Lundkvist

288. In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by DTCP and Lundkvist. DTCP taught authentication in the context of content protection using a challenge-response protocol based on a Diffie-Hellman key exchange, which the '809 patent acknowledges was well known in the prior art. DTCP also disclosed the secure transmission of an Exchange key which was subsequently used to create a Content key for the actual encipherment of the data to be protected. DTCP did not disclose the calculation of a round-trip time to determine the distance between the communication devices. Lundkvist disclosed using a challenge-response protocol with an integrated round-trip time measurement to calculate the distance between two communicating devices to restrict access to an object using secure cryptographic communications.

289. It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to incorporate Lundkvist's teachings to improve the content protection system of DTCP. As previously set forth in my report, DTCP is an authentication technology for accessing protected content. Lundkvist is an authentication technology with distance-bounding to ensure that two devices are sufficiently close together. At the time of the alleged invention of the '809

patent, it was well known that distance bounding was "often" required.  "[i]t is *often* the case in applications of cryptographic protocols that one party would like to determine a practical upper-bound on the *physical distance to the other party*."  Distance-Bounding Protocols at Abstract, emphasis added.

290.    A person of ordinary skill in the art at the time of the alleged invention would have known of the technique of using distance-bounding protocols and that permitting access based on distance or geographical restrictions was frequently a requirement.  Prior art to the '809 patent described systems that benefitted from and enforced that authenticating devices were physically near to each other.  These systems included features such as control over *ownership* rights of files, such as copying and using, based on geographical restrictions as described by Caswell:  "[a]nother example is when supervision of *place resources* is needed.  If a guest comes into Carol's office and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to be able to save or print the file*.  She wants to *maintain ownership*.  She also wants access to the file to go away once the guest leaves her office, where she can no longer supervise their use."  Creating Web Representations at Protect Revenues 122-23, emphasis added.

291.    The controls described by Caswell include copyright controls and applies equally to media and documents.  A person of ordinary skill in the art at the time of the alleged invention would have understood that Caswell's controlled copying of a file included media files and would also have understood that printing a file is a form of rendering and is analogous to displaying on a screen.  A person of ordinary skill in the art at the time of the alleged invention would have recognized the applicability of distance bounding restrictions to DTCP, a protocol designed to enforce copyright protections and media delivery.

84

292.     Japanese inventors modified DTCP with distance-bounding capabilities.  As taught by Saito et al. in U.S. Patent Publication 2003/0145214A (and corresponding Japanese patent applications filed in January 2002), Saito explained that the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance:  "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer (including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*."  '214 Patent Publication at [0060], emphasis added.

293.     A person of ordinary skill in the art at the time of the alleged invention would have recognized the value and importance of distance bounding protocols in strengthening DTCP's stated goal:  enforcing copyright protection.  A person of ordinary skill in the art at the time of alleged invention would have also been aware of distance bounding protocols based on round-trip measurement times, particularly those based on or used in cryptographic systems, such as Lundkvist.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify the content protection system of DTCP with the addition of a round-trip measurement challenge-response protocol as described in Lundkvist.

294.     At the time of the alleged invention of the '809 patent there existed a motivation to combine the well-known prior art authentication and round-trip time measurement techniques into a content protection system.

295.     A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Lundkvist into DTCP's content protection system.  Lundkvist, for example, disclosed securely transmitting a shared secret from the device being accessed to the device being authenticated.  The device being accessed receives, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance is measured by the time it takes to send the shared secret and receive the response.

296.     This challenge-response protocol described in Lundkvist in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed receives, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

297.     Annotated DTCP Figure 19, reproduced below, shows the DTCP full authentication protocol modified in view of Lundkvist.



**Figure 19 Full Authentication Command Flow**

298.    As shown in annotated DTCP Figure 19, reproduced above, DTCP's described its transmission of the Exchange Key the same as Lundkvist's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device is the same as Lundkvist's second signal. The distance between the two devices is then determined by the round-trip time measurement.

299.    The details of these components, both individually and in combination, are discussed further below.

## 1.  Claim 1

**(i)**    **Preamble:** *A first device for controlling delivery of protected content to a second device, the first device comprising:*

300.    I have assumed that the Preamble is limiting.  DTCP disclosed a first device for controlling delivery of protected content to a second device.  DTCP's stated purpose and defined scope was to "define[] a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms such as a high-performance serial bus that conforms to the IEEE 1394-1995 standard. … While DTCP has been designed for use by devices attached to serial buses as defined by the IEEE 1394-1995 standard, the developers anticipate that it will be appropriate for use with future extensions to this standard, other transmission systems, and other types of content as authorized by the DTLA (Digital Transmission Licensing Administration)."  DTCP at 10.

301.    DTCP addressed four layers of copy protection:

- Copy Control Information (CCI)

    CCI included information regarding how the content could be used such as copy-once, copy-never, etc.  DTCP at 10.

- Device Authentication and Key Exchange (AKE)

    "Before sharing valuable information, a connected device must first verify that another connected device is authentic."  DTCP at 10.

- Content Encryption

  "Devices include a channel cipher subsystem that encrypts and decrypts copyrighted content.  To ensure interoperability, all devices must support the specific cipher specified as the baseline cipher."  DTCP at 10.

- System Renewability

  "Devices that support Full Authentication can receive and process system renewability messages (SRMs) created by the DTLA and distributed with content and new devices.  System renewability ensures long-term integrity of the system through the revocation of compromised devices."  DTCP at 10.



**Figure 1 Content Protection Overview**

302.   Figure 1 of DTCP, reproduced above, outlines the content protection system described in DTCP.  The source device of Figure 1 is the first device and the sink device of Figure 1 is the second device.  The source device controls delivery of protected content to the sink device.  The protected content located on the source device is the Clear Text Content that is accessed by the sink device over the encrypted content stream, after the sink device has been properly authenticated and there has been an exchange of the key to be used for encryption.  "Once the devices have completed the required AKE procedure, a content channel encryption key can be

exchanged between them.  This key is used to encrypt the content at the source device and decrypt the content at the sink."  DTCP at 11.

303.    The source device of Figure 1 is further clarified by DTCP to be a "device that is a *source of content*."  DTCP at 18, emphasis added.  As further illustrated in Figure 5 of DTCP, reproduced below, the source device controlled delivery of the protected content by requiring the sink device to be authenticated before sending the content keys necessary to access the protected content.  As illustrated below, state A4: Send Content Channel Key occurs only after state A3: Authenticated.



**Figure 5 Content Source Device State Machine**

304.    With reference to DTCP Figure 5 reproduced above, DTCP emphasized that content keys are only sent to authenticated devices:  "[i]n this state, the source device sends values necessary to create a content key to an authenticated sink device by executing *SendContentChannelKey(Sink_Device)*."  DTCP at 19, italics in original.

305.    DTCP also explained how the sink device requests access to protected content. DTCP Figure 6, reproduced below, illustrates this process wherein the sink device first

authenticates itself to and then requests a content key from the source device.  As shown below, state A4: Request Content Channel Key occurs after state A3: Authenticated.



**Figure 6 Content Sink Device State Machine**

306.    With reference to DTCP Figure 6 reproduced above, DTCP emphasized that the source device controls access to the protected content through authentication.  A sink device must be authenticated to access the protected content.  "An authenticated device [needs] to request a Content Key to gain access to copy protected content… an authenticated sink device requests the values necessary to create a Content Key by executing the process *RequestContentChannelKey(Source_Device)*."  DTCP at 20, italics in original.

307.    The '809 patent describes its content protection the same as DTCP.  "The invention relates to a method for a first communication device to perform authenticated distance measurement between a first communication device and second communication device.  The invention also relates to a method of determining whether data stored on a first communication device is to be accessed by a second communication device."  '809 patent at 1:26-31.

EXPERT INVALIDITY REPORT OF DR. NIELSON

308.     Thus, I conclude that DTCP satisfies the preamble of claim 1.

(ii)     **1[a]:** *a memory;*

309.     DTCP in view of Lundkvist disclosed a memory.  DTCP, alone, taught a memory implicitly by indicating the protocol would be implemented in PC and consumer electronic (CE) devices.  "To balance the protection requirements of the content industries with the real-world requirements of PC and consumer electronics (CE) device users, this specification includes two authentication levels, Full and Restricted."  DTCP at 10.  A person of ordinary skill in the art at the time of the alleged invention would have known that PC devices and consumer electronic devices have memories.  A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to use a memory in a device that implemented DTCP.

310.     Lundkvist also disclosed a memory.  "The control unit 7 of the vehicle 1 comprises a memory, which in turn comprises a program segment, or software components, for controlling at least part of the signal communication."  Lundkvist at 7:7-9.



311.     A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Lundkvist generally, as I explained above.  More specifically, to the extent that DTCP does not explicitly disclose a memory, it would have been obvious to incorporate Lundkvist's teachings about a memory to achieve DTCP's stated goal of supporting PC and consumer electronic devices.

EXPERT INVALIDITY REPORT OF DR. NIELSON

312.    The '809 patent describes a memory the same as Lundkvist.  "The device further comprises means for performing the steps described above, which could be performed by executing software using a microprocessor 413 connected to memory 415 via a communication bus 417."  '809 patent at 6:62-66.



FIG. 4

313.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[a].

(iii)    **1[b]:** *a processor, said processor arranged to:*

314.    DTCP in view of Lundkvist disclosed a processor.  DTCP, alone, taught a processor implicitly by indicating the protocol would be implemented in PC and consumer electronic (CE) devices.  "To balance the protection requirements of the content industries with the real-world requirements of PC and consumer electronics (CE) device users, this specification includes two authentication levels, Full and Restricted."  DTCP at 10.  A person of ordinary skill in the art at the time of the alleged invention would have known that PC devices and many consumer electronic devices have processors.  A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to use a processor in a device that implemented DTCP.

315.    Lundkvist also disclosed a processor, or control unit, that comprises software components.  "The control unit 7 of the vehicle 1 comprises a memory, which in turn comprises a program segment, or software components, for controlling at least part of the signal communication.  The control unit 7 is arranged to check information transmitted by the portable

unit 2 during the signal communication, to measure the signal time and to compare the measured signal time with a predetermined value for the purpose of determining whether the vehicle 1 and the user card 2 are located sufficiently near to each other during the signal communication. Similarly, the control unit 7 of the vehicle 1 is arranged to determine at least a part of the information in the signals that are to be sent from the vehicle for the identity information control." Lundkvist at 7:7-15.



316.    To the extent that Lundkvist does not disclose a processor, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to implement the control unit described in Lundkvist with a processor.

317.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Lundkvist generally, as I explained above.  More specifically, to the extent that DTCP does not explicitly disclose a processor, it would have been obvious to incorporate Lundkvist's teachings about a processor to achieve DTCP's stated goal of supporting PC and consumer electronic devices.

318.    The '809 patent describes a processor the same as Lundkvist.  "The device further comprises means for performing the steps described above, which could be performed by executing software using a microprocessor 413 connected to memory 415 via a communication bus 417."  '809 patent at 6:62-66.



FIG. 4

319.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b].

> **(iv)    1[b.1]:** *receive a certificate of the second device, the certificate providing information regarding the second device;*

320.    DTCP in view of Lundkvist disclosed a processor arranged to receive a certificate of the second device, the certificate providing information regarding the second device.

321.    I understand the Court has construed the term "certificate" to mean "information containing at least the entity's distinguishing identifier and public key, and signed by a certification authority to guard against forgery."  The certificate described in DTCP satisfies this definition of certificate.

322.    As I explained with reference to the Preamble of Claim 1, the sink device must authenticate itself to the source device before it may obtain protected content.  One step of this authentication process is the transmission of the sink device's certificate to the source device.



**Figure 10 Full Authentication Protocol Flow Overview**

323.    As shown in Figure 10 of DTCP, reproduced above, in step 1, the sink device must transmit its certificate.  In step 2, the source device receives and verifies the certificate.

| 31 30 29 28 | 27 26 25 24 | 23 22 21 20 | 19 18 17 16 15 14 13 12 11 10 9 8 | 7 | 6 5 4 3 2 1 0 |
|---|---|---|---|---|---|
| Certificate Type | Format | Dev Gen | Reserved (Zero) | AP | Device ID |
| Device ID (40 bits) | | | | | |
| Device EC-DSA Public Key (320 bits) | | | | | |
| DTLA EC-DSA signature of all preceding fields (320 bits; c value followed by d value) | | | | | |

**Figure 7 Baseline Device Certificate Format**

96

324.     As shown in Figure 7 of DTCP, reproduced above, DTCP's certificate format included a device ID, which was a distinguishing identifier, the device's public key, and a signature over the data to prevent forgery.

325.     The '809 patent refers to certificates in the specification and claims; but the specification fails to describe a certificate.  However, the '809 patent also incorporates by reference the industry standards ISO/IEC 11770 and ISO/IEC 9798.  ISO/IEC 11770 described a certificate with the same identified fields that DTCP does.  "Entity *A* requests the Certification Authority CA to certify its public key information (or a subset thereof) *including its public key and its distinguished name*.  The submission of the public key information to the CA shall take place in a way that assures its authenticity and integrity.  The CA verifies the authenticity of *A*'s public key information, possibly adds system specific data, and *then signs the completed public key information to produce A's public key certificate*.  The public key certificate may then be transferred back to *A*."  ISO/IEC 11770-1 at 17, emphasis added.

326.     ISO/IEC 9798 also described certificates the same as in DTCP.  "In the following parts of ISO/IEC 9798 public key certificates (certificates) can be used to ensure the authenticity of public keys.  In this case, a certificate contains an entity's public key information, which consists of at least the entity's distinguishing identifier and public key… The certificate consists of the public key information signed by the trusted third party."  ISO/IEC 9798-3 at 8 (Annex C).

327.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.1].

> **(v)     1[b.2]:** *determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;*

328.     DTCP in view of Lundkvist disclosed a processor arranged to determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate.

329.    I understand the Court has construed the term "certificate" to mean "information containing at least the entity's distinguishing identifier and public key, and signed by a certification authority to guard against forgery."  The certificate described in DTCP satisfies this definition of certificate.

330.    As part of the authentication process that I have already described with reference to the Preamble of Claim 1, DTCP's source and sink devices mutually authenticate each other's identity.  This process ensured that the devices complied with DTCP rules before transmitting or receiving the copyright-protected content.  To establish their status as an authorized device, both the source and the sink devices transmitted their certificates to the other.  Each device subsequently inspected the received certificate to verify that the peer device complied with the required rules. For example:

    a.  DTCP devices were required to comply with version and protocol rules. Compliance was verified by ensuring that certificate type and format fields reported expected values or values within legitimate ranges:

        i.  The device was required to comply with producing a certificate of an expected type.  This was identified by the certificate's "Certificate Type" field, which must be 0 (all other types are reserved) and the Certificate's "Reserved" field, which must be 0.

        ii.  The device was required to support a valid authentication mechanism.  This was identified by the certificate's "Certificate Format" field, which must be 0, 1, or 2 (and just 1 or 2 for "full authentication as described above; all other types are reserved).

     iii.   The device was required to be part of an authorized "generation" of devices. This was identified by the certificate's "Device Generation" field, which must be 0 or 1.

    b.   The device was required to be authorized to receive content. This was identified by the certificate's EC-DSA signature, which must be signed by a valid authority key.

    c.   The device was required to not have had its authorization revoked. This was identified by validating that the device's certificate was not on the revocation list. DTCP at 29.

331.    If any of these rules were violated, the device would not authenticate the corresponding peer device. DTCP at 29.

332.    In order to determine if a device's certificate has been revoked, DTCP disclosed checking a Certificate Revocation List from "System Renewability Messages." "After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked." DTCP at 29. A device may be revoked if it has been compromised and is no longer adequately protecting the content. DTCP at 48.

333.    DTCP described exchanging system renewability messages between devices after authentication. "The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device." DTCP at 29. System renewability messages are also contained in media content such as DVD's or CD's. DTCP at 48. DTCP described that system

EXPERT INVALIDITY REPORT OF DR. NIELSON

renewability messages could be updated from: (a) "other compliant devices (connected via the digital transmission means) that have a newer list, or (b) prerecorded content media, or (c) content streams via real-time compliant devices that can communicate externally (e.g., via the Internet, phone line, cable system, direct broadcast satellite, etc.).  DTCP at 50.  Thus, if devices were compromised in the field, the combination of the system renewability messages, along with the revocation list enabled source and sink devices to refuse to communicate with a compromised non-compliant device.

334.    DTCP furthered disclosed, "[c]ompliant devices that support Full Authentication can receive and process system renewability messages (SRMs) created by the DTLA and distributed with content.  These messages are used to ensure the long-term integrity of the system." DTCP at 48.

335.    One of the components of the System Renewability Messages, as disclosed by DTCP, is the Certificate Revocation List (CRL).  "The CRL [is] used to revoke the certificates of devices whose security has been compromised."  DTCP at 48.

336.    "The Certificate Revocation List (CRL) identifies devices that are no longer compliant.  It consists of the CRL Length field that specifies the length of the CRL in bytes.  This field is followed by a sequence of entry type blocks (1 byte) which are in turn followed by the number of CRL entries specified by the entry type block.  Two types of entry block are supported.  One type provides for the revocation of individual devices while the second allows for the revocation of blocks of up to 65535."  DTCP at 49.

337.    The '809 patent lacks detail regarding compliance checking but, does discuss identity checking the same as in DTCP, as a compliance function.  "In another embodiment the authentication check further comprises checking if the identification of the second device is

*compliant with an expected identification*.  Thereby, it is ensured that the second device really is the device that it should be.  The identity could be obtained by checking a certificate stored in the second device."  '809 patent at 3:56-61, emphasis added.

338.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.2].

> **(vi)    1[b.3]:** *provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;*

339.    DTCP in view of Lundkvist disclosed a processor arranged to provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules.

340.    As I already explained with reference to limitation 1[b.2], if the sink device (the second device) were not compliant with any of the DTCP compliance rules, the source device (first device) would not authenticate the sink device.  DTCP at 29.  Thus, there would be no first signal to the second device if the device were not compliant with the compliance rules.

341.    DTCP did not describe computing a round-trip time in order to determine distance.  Nevertheless, DTCP disclosed transmitting a first signal to the second device at a first time.  DTCP disclosed transmitting an encrypted shared secret, the Exchange Key, from a first device (the source device) to a second device (the sink device).

342.    Lundkvist disclosed authenticating a portable unit by some other object (such as a car door).  The authentication of the portable unit included both validating the portable unit's identity and ensuring that the round-trip time between the challenge and response was within an acceptable range.  "The present invention relates to a method for controlling authorization for access to an object, in which a signal communication via electromagnetic waves is established between the object and a wireless portable unit when a tripping device on the object is actuated, the signal communication comprising at least one first signal that is sent from the object to the

EXPERT INVALIDITY REPORT OF DR. NIELSON

portable unit and at least one second signal that is sent from the portable unit to the object in response to said first signal(s), in which said second signal(s) comprise sufficient information for verifying that the portable unit has an approved identity, in which the verification information is checked, in which a distance is measured between the object and the portable unit and in which the authorization is confirmed if both the checked verification information is approved and the measured distance is less than a predetermined value."  Lundkvist at 1:5-15, emphasis added. Thus, Lundkvist described using a round-trip time measurement to measure distance for authentication purposes.

343.    The Exchange Key disclosed by DTCP was random data created by the source device and was securely transmitted to the sink device after authentication.  To secure the transmission of the Exchange Key $K_X$, the source device "scrambled" (i.e., encrypts) the Exchange Key using the $K_{AUTH}$ key that was agreed upon between the two devices during authentication.  The sink device was able to un-scramble the Exchange Key if it successfully completed authentication and was in possession of the $K_{AUTH}$ key.  See DTCP at 36.

344.    The transmission of the Exchange Key occurred at a first time as disclosed by DTCP Figure 19, an annotated portion of which is reproduced below.



EXPERT INVALIDITY REPORT OF DR. NIELSON

345.    Lundkvist also disclosed transmitting information from the object to the portable unit, and even described this transmission as a "first signal."  "The control unit 7 of the object 1 then creates a message that comprises first information x that is intended to be utilized for verifying the identity of the portable unit.  The first information x consists of identity information O_ID unique to the object and a random number O_RND generated by the control unit 7.  *The message is encrypted and sent to the portable unit 2 in a first signal X*."  Lundkvist at 8:12-17, emphasis added.

346.    Lundkvist further disclosed measuring the time between the transmission of a first signal (a first time) and the receipt of a second signal (a second time).  "In order to determine the distance between the object and the unit, a time is measured by the object from the transmission of one of said first signals until the reception of one of said second signals with verification information, the authorization is confirmed if both the checked verification information is approved and the measured time is less than a predetermined value."  Lundkvist at 5:24-29.

347.    Annotated Figure 2 of Lundkvist, reproduced below, illustrates the round-trip time measurement and highlights the transmission of the first signal (circled in red).  The time measurement T1 is measured from the transmission of the first signal (a first time) to the receipt of the second signal (a second time).

EXPERT INVALIDITY REPORT OF DR. NIELSON



Fig.2

348.    According to Lundkvist's disclosure, the transmission of X, the first signal, is the beginning of the measurement of time T1 (a first time).  "Figure 2 illustrates a first embodiment of the signalling [sic] method between the vehicle 1 and the portable unit 2… The control unit 7 of the object 1 then creates a message that comprises first information x that is intended to be utilized for verifying the identity of the portable unit… The message is encrypted and sent to the portable unit 2 in a first signal X… The portable unit 2 processes the first information x and sends a second encrypted signal Y1 to the object 1… A time T1 is measured by the control unit 7 of the

object 1 from the transmission of the first signal X until the reception of the second signal Y1."
Lundkvist at 8:8-26.

349.     I have previously set forth my analysis of why and how a person of ordinary skill in the art at the time of the alleged invention would combine DTCP and Lundkvist.  I incorporate by reference that analysis into this section.

350.     Additionally, a person of ordinary skill in the art at the time of the alleged invention would have known that the first signal, taught by Lundkvist, was part of a challenge-response protocol in the context of a round-trip time measurement.  Although DTCP did not disclose a round-trip time measurement, it would have been obvious, in view of Lundkvist, to modify DTCP's Exchange Key transmission, and subsequent response, to do so.  DTCP, like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed receives, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.  As previously explained, combining DTCP with Lundkvist strengthens DTCP's stated aim of protecting and enforcing copyright restrictions.

351.     A person of ordinary skill in the art at the time of the alleged invention would have understood that the Exchange Key, $K_X$, was a shared secret, just as $O\_RND$ was in Lundkvist.  Although DTCP's Exchange Key was described as a "key", these types of keys are just random data.  As described by DTCP:  "[a]fter the completion of Full or Restricted Authentication, the source device establishes the Exchange Key(s) described in Section 6.2.1.  The following procedure is used for each key… The source device assigned a *random value for the particular*

*Exchange Key ($K_x$)* being established… It then scrambles the key $K_x$ using $K_{Auth}$ resulting in $K_{SX}$…
The source device sends $K_{SX}$ to the sink device."  DTCP at 36, emphasis added.

352.    DTCP disclosed that the Exchange Key was used the same as Lundkvist's *O_RND*.
In particular, the Exchange Key was used as a random value to a function in order to produce
another value, in this case the Content Key.  DTCP explained:  "[t]he **Content Key** ($K_c$) is used as
the key for the content encryption engine.  $K_c$ is computed from the three values… Exchange Key
$K_x$… A random number $N_c$… [and] Constant value $C_a$, $C_b$, or $C_c$…"  DTCP at 35, emphasis
original.  Of these three values, $N_c$ is sent as plaintext and the constants are known.  See DTCP at
35 and 37.  Thus, only the Exchange Key was a secret.  Once it has been transmitted, *both devices
computed the Content Key* from this common secret.

353.    In other words, DTCP's Exchange Key was being used to generate values derived
from a common secret in parts of the overall DTCP protocol.  A person of ordinary skill in the art
at the time of the alleged invention would have found it obvious to use the Exchange Key in the
same way for other functionality as well.

354.    A person of ordinary skill in the art at the time of the alleged invention would have
understood that the Exchange Key, $K_x$, as disclosed by DTCP was a shared secret.  In view of
Lundkvist, the second signal received by the source device would be modified to comprise a value
derived from the shared secret, and that the third signal generated by the source device would be
the identical value derived from the same shared secret.

355.    The '809 patent specification indicates that the round-trip signal (including both the
first signal and the second signal) could be a data transmission and the first time is the transmission
of the first signal, as disclosed by Lundkvist.  For example, the '809 specification describes a
round-trip time measurement:  "[t]he first device 201 measures the round trip time between the

signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret… The signal used for the distance measurement may be a normal data bit signal." '809 patent at 5:39-49.

356.     The '809 further describes its round-trip time measurement the same as Lundkvist, including the transmission time of the first signal comprising the first time.  "In microprocessor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and reception time can then be used for determining the physical distance between the first device and the second device." '809 patent at 6:50-59.

357.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.3].

> **(vii)     1[b.4]:** *receive a second signal from the second device after providing the first signal;*

358.     DTCP in view of Lundkvist disclosed a processor arranged to receive a second signal from the second device after providing the first signal.

359.     As I previously set forth with reference to limitation 1[b.3], DTCP did not disclose computing a round-trip time in order to determine distance.  Nevertheless, DTCP disclosed a source device that received a second signal from the second device at a second time.  DTCP disclosed receiving a response at a source device (first device) from a sink device (second device) after transmitting an Exchange Key (a first signal transmitted at a first time).  I also explained earlier in my background overview, that Lundkvist disclosed authenticating a portable unit by an object (such as a car door).  And, I further explained with reference to limitation 1[b.3] that

Lundkvist disclosed transmitting a "first signal X" from the object to the portable unit.   I incorporate my discussion of limitation 1[b.3] into this section by reference.

360.    The transmission of the Exchange Key occurred at a first time as disclosed by DTCP Figure 19, an annotated portion of which is reproduced below.



361.    Lundkvist also disclosed that the object received a response signal (second signal) from the portable unit at a later time (second time).   "The portable unit 2 receives the first signal X and decrypts the message.   The portable unit 2 processes the first information x and sends *a second encrypted signal Y1 to the object* 1.   The second signal Y1 comprises the first information x in processed form, more specifically a function f(x) of the first information x.   In particular, f(x) comprises the message part E_SVAR = f(O_RND).   The signal Y1 is received by the object 1 and the message is decrypted.   A time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X *until the reception of the second signal Y1*."   Lundkvist at 8:19-26, emphasis added.

362.    Lundkvist further disclosed measuring the time between the transmission of a first signal (a first time) and the receipt of a second signal (a second time).   "In order to determine the distance between the object and the unit, a time is measured by the object from the transmission

of one of said first signals until the reception of one of said second signals with verification information, the authorization is confirmed if both the checked verification information is approved and the measured time is less than a predetermined value." Lundkvist at 5:24-29.

363.  Annotated Figure 2 of Lundkvist, reproduced below, illustrates the round-trip time measurement and highlights the reception of the second signal Y1 (circled in red).  The time measurement T1is measured from the transmission of the first signal (a first time) to the receipt of the second signal (a second time).



Fig.2

EXPERT INVALIDITY REPORT OF DR. NIELSON

364. Lundkvist disclosed the receipt of Y1, a second signal, at a second time that marked the end of the time interval T1. "Figure 2 illustrates a first embodiment of the signalling [sic] method between the vehicle 1 and the portable unit 2… The control unit 7 of the object 1 then creates a message that comprises first information x that is intended to be utilized for verifying the identity of the portable unit… The message is encrypted and sent to the portable unit 2 in a first signal X… The portable unit 2 processes the first information x and sends a second encrypted signal Y1 to the object 1… A time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X until the reception of the second signal Y1." Lundkvist at 8:8-26.

365. I have previously set forth my analysis of why and how a person of ordinary skill in the art at the time of the alleged invention would combine DTCP and Lundkvist. I incorporate by reference that analysis into this section.

366. Additionally, a person of ordinary skill in the art at the time of the alleged invention would have known that receiving the second signal as taught by Lundkvist, was part of a challenge-response protocol in the context of a round-trip time measurement. Although DTCP did not disclose a round-trip time measurement, it would have been obvious, in view of Lundkvist, to modify DTCP's Exchange Key transmission, and subsequent response, to do so. DTCP, like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated. The device being accessed received, in response, a signal from the device confirming receipt. A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to include data derived from the shared secret and measure the round-trip time to

EXPERT INVALIDITY REPORT OF DR. NIELSON

determine the distance between the two devices.  As previously explained, combining DTCP with Lundkvist strengthens DTCP's stated purpose of protecting and enforcing copyright restrictions.

367.    A person of ordinary skill in the art at the time of the alleged invention would have understood that the Exchange Key, $K_X$, was a shared secret, just as $O\_RND$ was in Lundkvist. Although DTCP's Exchange Key was described as a "key", these types of keys were just random data.  As expressed by DTCP:  "[a]fter the completion of Full or Restricted Authentication, the source device establishes the Exchange Key(s) described in Section 6.2.1.  The following procedure is used for each key... The source device assigned a *random value for the particular Exchange Key ($K_x$)* being established... It then scrambles the key $K_x$ using $K_{Auth}$ resulting in $K_{SX}$... The source device sends $K_{SX}$ to the sink device."  DTCP at 36, emphasis added.

368.    DTCP disclosed that the Exchange Key was used the same as Lundkvist's $O\_RND$. In particular, the Exchange Key was used as a random value to a function in order to produce another value, in this case the Content Key.  DTCP explained:  "[t]he **Content Key** ($K_c$) is used as the key for the content encryption engine.  $K_c$ is computed from the three values... Exchange Key $K_x$... A random number $N_c$... [and] Constant value $C_a$, $C_b$, or $C_c$..."  DTCP at 35, emphasis original.  Of these three values, $N_c$ is sent as plaintext and the constants are known.  See DTCP at 35 and 37.  Thus, only the Exchange Key is a secret.  Once it has been transmitted, *both devices compute the Content Key* from this common secret.

369.    A person of ordinary skill in the art at the time of the alleged invention would have understood that the Exchange Key, $K_x$, as disclosed by DTCP was a shared secret.  In view of Lundkvist, the second signal received from the sink device would be modified to comprise a value derived from the shared secret, and the third signal used for verification generated by the source device would be derived from the same shared secret.

370.     The '809 patent specification teaches that the signal (including both the first signal and the second signal) used for the round-trip time measurement could be a data transmission and the second time is the receipt of the second signal, as disclosed by Lundkvist.  For example, the '809 specification describes a round-trip time measurement:  "[t]he first device 201 measures the round trip time between the signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret… The signal used for the distance measurement may be a normal data bit signal."  '809 patent at 5:39-49.

371.     The '809 further describes a round-trip time measure the same as Lundkvist, including receipt of a second signal comprising a second time.  "In microprocessor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and reception time can then be used for determining the physical distance between the first device and the second device."  '809 patent at 6:50-59.

372.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.4].

> **(viii)   1[b.5]:** *determine whether the second signal is derived from a secret known by the first device;*

373.     DTCP in view of Lundkvist disclosed a processor arranged to determine whether the second signal is derived from a secret known by the first device.

374.     As I explained with reference to limitation 1[b.3] DTCP disclosed transmitting the Exchange Key $K_x$ as a first signal from the source device to the sink device.  The Exchange Key was the encrypted secret.  Lundkvist also disclosed transmitting a first signal from an object (e.g. a car) to a portable unit.  The first signal included the encrypted secret O_RND.  I incorporate my discussion of limitation 1[b.3] into this section by reference.

375.    As explained with reference to limitation 1[b.4], Lundkvist disclosed receiving a second signal by an object (e.g., a car door) from a portable unit.  The second signal included the value E_SVAR, computed as f(O_RND) for some pre-agreed upon function.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify the response signal to the Exchange Key disclosed in DTCP to include data derived from Exchange Key as described in Lundkvist.

376.    Lundkvist disclosed that the object (first device) locally computed the value E_SVAR (encrypted shared variable)—a third signal—as a function of the shared secret, f(O_RND) (object random number) and compared the locally computed value with the received value (second signal).  If the second and third signals are equal, Lundkvist taught that the object then determined that the second signal was derived from O_RND (the common secret).  "The signal Y1 is received by the object 1 and the message is decrypted.  A time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X until the reception of the second signal Y1. E_SVAR and T1 are checked by the object 1, after which the lock 11 is unlocked if $E\_SVAR = f(O\_RND)$ and the measured time is less than a predetermined value."  Lundkvist at 8:23-28, emphasis added.

377.    This challenge-response protocol described in Lundkvist in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Lundkvist, disclosed securely transmitting a shared secret (the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to

include data derived from the shared secret and to measure the round-trip time to determine the distance between the two devices.

378.    Annotated DTCP Figure 19, reproduced below, shows the DTCP full authentication protocol modified in view of Lundkvist.



**Figure 19 Full Authentication Command Flow**

379.    As shown in annotated DTCP Figure 19, reproduced above, DTCP's transmission of the Exchange Key was the same as Lundkvist's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device (i.e., using standard challenge-response protocol principles as I described in the technical background) was derived from Exchange Key (the shared secret) and was compared to a third signal generated at the source device (from the same shared secret).  DTCP already disclosed using a challenge-response protocol during the authentication phase of the protocol.  "The source device generates a random challenge and sends it to the sink device... After receiving a random challenge back from the source device, the sink device computes a response using a verification key that it has computed and sends it to the source." DTCP at 34.  A person of ordinary skill in the art at the time of the alleged invention would have known and found it obvious to include a subsequent challenge-response protocol for the RTT measurement.

380.    DTCP also disclosed transmission data structures for sending challenges and receiving responses as shown below in the following unlabeled table:

| Value | Subfunction | Comments |
|-------|-------------|----------|
| $01_{16}$ | CHALLENGE | Send random value.  This subfunction when sent from a sink device initiates the AKE procedure. |
| $02_{16}$ | RESPONSE | Return data computed with the received random value. |
| $03_{16}$ | EXCHANGE_KEY | Send an encrypted Exchange Key ($K_X$) to the authenticated contents-sink device. |
| $04_{16}$ | SRM | Send SRM to a device that has an outdated or smaller SRM. |
| $C0_{16}$ | AKE_CANCEL | Notify a device that the current authentication procedure cannot be continued. |
| $80_{16}$ | CONTENT_KEY_REQ | Request the data required for making Content Key ($K_C$). |

DTCP at 56.

381.    A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to combine the verification technique described in Lundkvist—comparing the second received signal against the locally generated third signal for equivalence based on a shared

secret—into DTCP's protocol because DTCP already described and used a shared secret for other purposes. A person of ordinary skill in the art at the time of the alleged invention would have known and would have found it obvious to use the shared secret disclosed in DTCP, $K_x$, for other purposes as well, such as in a challenge-response protocol for an RTT measurement.

382. The '809 patent describes this verification of the second and third signals the same as in Lundkvist. The specification states: "[t]he second device receives the signal via a receiver 311, and microprocessor 313 modifies the signal by using the locally stored secret. The signal is modified by the second device according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315. The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device." '809 patent at 6:31-48.

383. Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.5].

> **(ix)    1[b.6]:** *determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and*

384. DTCP in view of Lundkvist disclosed a processor arranged to determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time. I have already explained with reference to limitation 1[b.3] that Lundkvist disclosed sending a first signal and with reference to limitation 1[b.4] that Lundkvist disclosed receiving a second signal. I have also already explained how DTCP in view of Lundkvist disclosed these elements. I incorporate my analyses of limitations 1[b.3] and 1[b.4] into this section by reference.

385.   I understand the Court has construed the term "predetermined time" to mean "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content."

386.   Lundkvist also disclosed computing T1, which was the difference between the time when the first signal (challenge) was sent (a first time) and the time when the second signal (response) was received (a second time).   "The portable unit 2 receives the first signal X and decrypts the message.  The portable unit 2 processes the first information x and sends *a second encrypted signal Y1 to the object* 1.  The second signal Y1 comprises the first information x in processed form, more specifically a function f(x) of the first information x.  In particular, f(x) comprises the message part E_SVAR = f(O_RND).  The signal Y1 is received by the object 1 and the message is decrypted.  *A time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X until the reception of the second signal Y1.*"  Lundkvist at 8:19-26, emphasis added.

387.   A person of ordinary skill in the art at the time of the alleged invention would have known how to perform an RTT measurement, as described in Lundkvist, between the transmission of DTCP's Exchange Key from the source device to the sink device until the response from the sink device back to the source device.

388.   This challenge-response protocol described in Lundkvist in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist,

to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

389.   Annotated DTCP Figure 19, reproduced below, shows the DTCP full authentication protocol modified in view of Lundkvist.



**Figure 19 Full Authentication Command Flow**

EXPERT INVALIDITY REPORT OF DR. NIELSON

390.     As shown in annotated DTCP Figure 19, reproduced above, DTCP's transmission of the Exchange Key was the same as Lundkvist's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device was the same as Lundkvist's second signal.  The round-trip time is measured from the transmission of what I have annotated as the first signal until the receipt of what I have annotated as the second signal.

391.     The '809 patent describes a round-trip time measurement the same as in Lundkvist. "In microprocessor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and reception  time can then be used for determining the physical distance between the first device and the second device."  '809 patent at 6:50-59.

392.     DTCP in view of Lundkvist further disclosed only allowing access if the round-trip time is within a predetermined time.  For example, Lundkvist stated:  "[a] time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X until the reception of the second signal Y1.  E_SVAR and T1 are checked by the object 1, after which *the lock 11 is unlocked if* E_SVAR = f(O_RND) and *the measured time is less than a predetermined value*."  Lundkvist at 8:24-28, emphasis added.

393.     Lundkvist taught that the round-trip time measurement and comparison to a predetermined time was to ensure that the object and the portable unit are sufficiently near one another, and that the result was necessary for authentication and access.  "The present invention relates to a method for controlling authorization for access to an object, in which a signal

communication via electromagnetic waves is established between the object and a wireless portable unit when a tripping device on the object is actuated, the signal communication comprising at least one first signal that is sent from the object to the portable unit and at least one second signal that is sent from the portable unit to the object in response to said first signal(s), in which said second signal(s) comprise sufficient information for *verifying that the portable unit has an approved identity*, in which the verification information is checked, *in which a distance is measured between the object and the portable unit and in which the authorization is confirmed if both the checked verification information is approved and the measured distance is less than a predetermined value*. The predetermined value corresponds to a *maximal permitted distance* between the portable unit and the object." Lundkvist at 1:5-17, emphasis added.

394.    Lundkvist further described that its control unit "is arranged to check information transmitted by the portable unit 2 during the signal communication, to measure the signal time and to compare the measured signal time with a *predetermined value* for the purpose of determining whether the vehicle 1 and the user card 2 are *located sufficiently near* to each other during the signal communication (emphasis added)." Lundkvist at 7:9-13.

395.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Lundkvist in order to ensure that sink devices were within a sufficiently bounded distance to source devices. Authentication protocols with distance limitations were well known and well understood.

396.    As I explained previously, the 1993 research paper entitled, "Distance-Bounding Protocols" expressed:  "[i]t is *often* the case in applications of cryptographic protocols that one party would like to determine a practical upper-bound on the *physical distance to the other party*." Distance-Bounding Protocols at Abstract, emphasis added. The paper further explained that a

distance-bounding protocol can be integrated with an authentication ("identification") algorithm: "[o]ur distance-bounding protocols can be integrated with known public-key identification schemes…" Distance-Bounding Protocols at Introduction.

397.   Kindberg's paper "Context Authentication Using Constrained Channels" equally emphasized the importance of "location" as a critical part of authentication:

> This paper presents a paradigm shift from conventional authentication—of a principal's identity—to authentication of parameters that characterise a principal's context. *Location*, in particular, is a highly significant contextual parameter. It is one that features in what are known as mobile, ubiquitous, pervasive and nomadic computing systems. We present a model of context authentication based on the characteristics of communication channels. As an example, *we present protocols for location authentication that are based on physical channel characteristics*.

(Context at Abstract, emphasis added).

398.   Kindberg also cited to and expanded upon another research paper, "Creating web representations for places," which further motivates this combination. "It is valuable for a place to be able to *authenticate a person/device's presence in the place*. For purposes of *user convenience, revenue protection, and place resource protection*, there are times when *services should only be offered to those who are physically present in a place*, and withhold those services from those viewing the place's web representation remotely." Creating Web Representations at Place-Specific Requirements 117, emphasis added.

399.   An example given from the paper is based on the following use-case: "[a]nother example is when supervision of *place resources* is needed. If a guest comes into Carol's office and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to be able to save or print the file*. She wants to *maintain ownership*. She also wants access to the file to go away once the guest leaves her office, where she can no longer supervise their use." Creating Web Representations at Protect Revenues 122-23, emphasis added.

400.    Or, as taught by Saito et al. in U.S. Patent Publication 2003/0145214A published on July 31, 2003 from Application No. 10/352,128 filed on January 28, 2003 (which claims priority to a Japanese application filed on January 28, 2002), the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance.  "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer (including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*."  '214 Patent Publication at [0060], emphasis added.

401.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP with Lundkvist's distance-bounding protocol.  DTCP was designed to protect content from unauthorized use.  "The Digital Transmission Content Protection Specification defines a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms…"  DTCP at 10.

402.    DTCP further disclosed that protected content had variable restrictions.  Different types of content from different content owners had different limitations and restrictions.  "Content owners need a way to specify how their content can be used… This content protection system is capable of securely communicating copy control information (CCI) between devices…"  DTCP at 10.

403.    A person of ordinary skill in the art at the time of the alleged invention would have recognized that Lundkvist's distance bounding RTT measurement strengthened DTCP's capacity to enforce different copyright restrictions, such as those referenced by Saito or even the controls suggested by Caswell, by including the ability to have copy control information (CCI) based on distance.

404.    Moreover, a person of ordinary skill in the art at the time of the alleged invention would have known the modification to DTCP required to incorporate Lundkvist's teachings was minimal.  A person of ordinary skill in the art at the time of the alleged invention would have known that DTCP disclosed a modular AKE process with multiple subfunctions.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify DTCP to incorporate an additional challenge-response, including a measurement of the round-trip time to enforce distance restrictions; such a modification of DTCP's modular AKE protocol would have been trivial and produced expected results.

405.    A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Lundkvist into DTCP's content protection system.  Lundkvist, for example, disclosed securely transmitting a shared secret from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance was determined by the time it takes to send the shared secret and receive the response.

406.    This challenge-response protocol described in Lundkvist in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a

signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

407.    Annotated DTCP Figure 19, reproduced below, shows the DTCP full authentication protocol modified in view of Lundkvist.

EXPERT INVALIDITY REPORT OF DR. NIELSON



**Figure 19 Full Authentication Command Flow**

408.    As shown in annotated DTCP Figure 19, reproduced above, DTCP's transmission of the Exchange Key was the same as Lundkvist's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device was the same as Lundkvist's second signal.  The distance between the two devices was then determined by the round-trip time measurement.

409.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.6].

(x)    **1[b.7]:** *allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.*

410.    DTCP in view of Lundkvist disclosed a processor arranged to allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

411.    I understand the Court has construed the term "predetermined time" to mean "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content."

412.    As I explained with reference to the Preamble of claim 1, DTCP disclosed allowing access of the protected content provided that the second device was authenticated. I incorporate my analysis of the Preamble of Claim 1 into this section by reference.

413.    Lundkvist disclosed allowing access to the resources and functions of an object (e.g., a car or a building, etc.) provided that the measured round-trip time was within the predefined interval and said second signal was derived from the shared secret. I have already explained with reference to limitation 1[b.5] that Lundkvist disclosed determining if the second signal was derived from the shared secret. I have also already explained that Lundkvist disclosed determining the time difference between the first and second signals with reference to limitation 1[b.6]. I have also already explained how DTCP in view of Lundkvist disclosed these elements. I incorporate my analyses of limitations 1[b.5] and 1[b.6] into this section by reference.

414.    DTCP in view of Lundkvist further disclosed only allowing access if the round-trip time was less than a predetermined time. For example, Lundkvist stated: "[a] time T1 is measured by the control unit 7 of the object 1 from the transmission of the first signal X until the reception

of the second signal Y1.  E_SVAR and T1 are checked by the object 1, after which *the lock 11 is unlocked if* E_SVAR = f(O_RND) and *the measured time is less than a predetermined value*." Lundkvist at 8:24-28, emphasis added.

415.    Lundkvist taught that the round-trip time measurement and comparison to a predetermined time was to ensure that the object and the portable unit are sufficiently near one another, and that the result was necessary for authentication and access.  "The present invention relates to a method for controlling authorization for access to an object, in which a signal communication via electromagnetic waves is established between the object and a wireless portable unit when a tripping device on the object is actuated, the signal communication comprising at least one first signal that is sent from the object to the portable unit and at least one second signal that is sent from the portable unit to the object in response to said first signal(s), in which said second signal(s) comprise sufficient information for *verifying that the portable unit has an approved identity*, in which the verification information is checked, *in which a distance is measured between the object and the portable unit and in which the authorization is confirmed if both the checked verification information is approved and the measured distance is less than a predetermined value*.  The predetermined value corresponds to a *maximal permitted distance* between the portable unit and the object."  Lundkvist at 1:5-17, emphasis added.

416.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Lundkvist in order to ensure that sink devices were within a sufficiently bounded distance to source devices.   Authentication protocols with distance limitations were well known and well understood.

417.    As I explained previously, the 1993 research paper entitled, "Distance-Bounding Protocols" expressed:  "[i]t is *often* the case in applications of cryptographic protocols that one

party would like to determine a practical upper-bound on the *physical distance to the other party*."
Distance-Bounding Protocols at Abstract, emphasis added.  The paper further explained that a
distance-bounding protocol can be integrated with an authentication ("identification") algorithm:
"[o]ur distance-bounding protocols can be integrated with known public-key identification
schemes…"  Distance-Bounding Protocols at Introduction.

418.    Kindberg's paper "Context Authentication Using Constrained Channels" equally
emphasized the importance of "location" as a critical part of authentication:

> This paper presents a paradigm shift from conventional authentication—of a
> principal's identity—to authentication of parameters that characterise a principal's
> context.  *Location*, in particular, is a highly significant contextual parameter.  It is
> one that features in what are known as mobile, ubiquitous, pervasive and nomadic
> computing systems.  We present a model of context authentication based on the
> characteristics of communication channels.  As an example, *we present protocols
> for location authentication that are based on physical channel characteristics*.

> (Context at Abstract, emphasis added).

419.    Kindberg also cited to and expanded upon another research paper, "Creating web
representations for places," which further motivates this combination.  "It is valuable for a place
to be able to *authenticate a person/device's presence in the place*.  For purposes of *user
convenience, revenue protection, and place resource protection*, there are times when *services
should only be offered to those who are physically present in a place*, and withhold those services
from those viewing the place's web representation remotely."  Creating Web Representations at
Place-Specific Requirements 117, emphasis added.

420.    An example given from the paper is based on the following use-case:  "[a]nother
example is when supervision of *place resources* is needed.  If a guest comes into Carol's office
and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to
be able to save or print the file*.  She wants to *maintain ownership*.  She also wants access to the

file to go away once the guest leaves her office, where she can no longer supervise their use." Creating Web Representations at Protect Revenues 122-23, emphasis added.

421.    Or, as taught by Saito et al. in U.S. Patent Publication 2003/0145214A published on July 31, 2003 from Application No. 10/352,128 filed on January 28, 2003 (which claims priority to a Japanese application filed on January 28, 2002), the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance.   "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer (including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*."   '214 Patent Publication at [0060], emphasis added.

422.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP with Lundkvist's distance-bounding protocol.   DTCP was designed to protect content from unauthorized use.   "The Digital Transmission Content Protection Specification defines a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms…"   DTCP at 10.

423.    DTCP further disclosed that protected content had variable restrictions.   Different types of content from different content owners had different limitations and restrictions.   "Content owners need a way to specify how their content can be used… This content protection system is

capable of securely communicating copy control information (CCI) between devices…" DTCP at 10.

424.    A person of ordinary skill in the art at the time of the alleged invention would have recognized that Lundkvist strengthened DTCP's capacity to enforce different copyright restrictions, such as those referenced by Saito or even the controls suggested by Caswell, by including the ability to have copy control information (CCI) based on distance.

425.    Moreover, the modification to DTCP required to incorporate Lundkvist's teachings at the time of the alleged invention was minimal.  A person of ordinary skill in the art at the time of the alleged invention would have known that DTCP disclosed a modular AKE process with multiple subfunctions.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify DTCP to incorporate an additional challenge-response, including a measurement of the round-trip time to enforce distance restrictions.  Modification of DTCP's modular AKE protocol would have been trivial and produced expected results.

426.    A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Lundkvist into DTCP's content protection system.  Lundkvist, for example, disclosed securely transmitting a shared secret from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance was determined by the time it takes to send the shared secret and receive the response.

427.    This challenge-response protocol described in Lundkvist in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Lundkvist, disclosed securely transmitting a shared secret (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a

signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Lundkvist, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

428.    Annotated DTCP Figure 19, reproduced below, shows the DTCP full authentication protocol modified in view of Lundkvist.



**Figure 19 Full Authentication Command Flow**

429.    As shown in annotated DTCP Figure 19, reproduced above, DTCP's transmission of the Exchange Key was the same as Lundkvist's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device was the same as Lundkvist's second signal.  The distance between the two devices was then determined by the round-trip time measurement.

430. The '809 patent describes granting access to the protected content the same as Lundkvist. "After the distance has been measured in a secure authenticated way as described above, content data can be sent between the first and second device in step 211 in FIG. 2." '809 patent at 6:21-24. The '809 patent makes clear that the "time difference between a transmittal time and a reception time can then be used for determining the physical distance between the first device and the second device." '809 patent at 6:56-59.

431. Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 1[b.7].

### 2. Claim 9

(i)    **9[a.1]:** *The first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: modify the first signal according to the secret;*

432. DTCP in view of Lundkvist disclosed the first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: modify the first signal according to the secret. I have already explained that DTCP in view of Lundkvist disclosed the first device of claim 1 wherein the processor is arranged to determine whether the second signal is derived from the (shared) secret, as set forth in my analysis of limitation 1[b.5]. I incorporate my analysis of Claim 1 into this section by reference.

433. Lundkvist disclosed that the object (first device) locally computed the value E_SVAR (encrypted shared variable)—third signal—by modifying the shared secret O_RND (first signal) (object random number) using a function f to create a locally modified first signal. The locally modified value f(O_RND) (third signal) was compared to the received value E_SVAR (second signal). If the second and third signals were equal, Lundkvist taught that the object then determined that the second signal was derived from O_RND (the common secret). "The signal Y1 is received by the object 1 and the message is decrypted. A time T1 is measured by the control

unit 7 of the object 1 from the transmission of the first signal X until the reception of the second signal Y1.  E_SVAR and T1 are checked by the object 1, after which the lock 11 is unlocked if $E\_SVAR = f(O\_RND)$ and the measured time is less than a predetermined value."  Lundkvist at 8:23-28, emphasis added.

434.    I have already explained why a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine the DTCP and Lundkvist references generally and also specifically with reference to limitation 1[b.5].  I incorporate my analyses of these motivations to combine into this section by reference.

435.    The '809 patent describes this verification of the second and third signals the same as in Lundkvist.  The specification states:  "[t]he second device receives the signal via a receiver 311 and microprocessor 313 modifies the signal by using the locally stored secret.  The signal is modified by the second device according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315.  The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device."  '809 patent at 6:31-48.

436.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 9[a.1].

> **(ii)    9[a.2]:** *compare the modified first signal with the second signal; and*

437.    DTCP in view of Lundkvist disclosed a processor arranged to compare the modified first signal with the second signal.

438.    As I explained with reference to limitation 9[a.1], Lundkvist disclosed comparing the locally computed f(O_RND) (the modified first signal) with the received E_SVAR (second

signal). I also explained why a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine these references and how the '809 patent describes these operations in the same way. I incorporate these previous analyses into this section by reference.

439. The '809 patent describes this verification of the second and third signals (the locally modified first signal) the same as in Lundkvist. The specification states: "[t]he second device receives the signal via a receiver 311 and microprocessor 313 modifies the signal by using the locally stored secret. The signal is modified by the second device according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315. The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device." '809 patent at 6:31-48.

440. Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 9[a.2].

> **(iii)    9[a.3]:** *provide an indication when said modified first signal is identical to the second signal.*

441. DTCP in view of Lundkvist disclosed a processor arranged to provide an indication when said modified first signal is identical to the second signal.

442. As I explained with reference to limitation 9[a.1], Lundkvist disclosed comparing the locally computed f(O_RND) (the modified first signal) with the received E_SVAR (second signal). If the signals were identical, Lundkvist disclosed unlocking a lock (providing an indication). I also explained why a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine these references and how the '809 patent describes these operations in the same way. I incorporate these previous analyses into this section by reference.

EXPERT INVALIDITY REPORT OF DR. NIELSON

443. The '809 patent describes this verification of the second and third signals (the locally modified first signal) the same as in Lundkvist. The specification states: "[t]he second device receives the signal via a receiver 311 and microprocessor 313 modifies the signal by using the locally stored secret. The signal is modified by the second device according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315. The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device." '809 patent at 6:31-48.

444. Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 9[a.3].

### 3. Claim 49

**(i)     Preamble:** *A first device for controlling delivery of protected content to a second device, the first device comprising:*

445. I have assumed the Preamble is limiting. DTCP in view of Lundkvist disclosed a first device for controlling delivery of protected content to a second device. I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of the Preamble of Claim 1. I incorporate my previous analysis into this section by reference.

446. Thus, I conclude that DTCP in view of Lundkvist satisfies the Preamble of Claim 49.

**(ii)     49[a]:** *a memory;*

447. DTCP in view of Lundkvist disclosed a memory. I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[a]. I incorporate my previous analysis into this section by reference.

448. Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[a].

        **(iii)**    **49[b]:** *a processor, the processor arranged to:*

449.     DTCP in view of Lundkvist disclosed a processor.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b].  I incorporate my previous analysis into this section by reference.

450.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b].

        **(iv)**    **49[b.1]:** *receive a certificate from the second device prior to sending a first signal;*

451.     DTCP in view of Lundkvist disclosed a processor arranged to receive a certificate from the second device prior to sending a first signal.  I have already explained how DTCP in view of Lundkvist received a certificate from the second device in my analysis of limitation 1[b.1] and how DTCP in view of Lundkvist sent a first signal after determining that the second device is compliant with compliance rules in my analysis of limitation 1[b.3].  I incorporate my previous analysis into this section by reference.

452.     Because DTCP in view of Lundkvist did not send the first signal until it has determined that the second device is compliant with compliance rules, and because DTCP in view of Lundkvist received a certificate from the second device in order to determine compliance, DTCP in view of Lundkvist received the certificate prior to sending the first signal.

453.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.1].

        **(v)**    **49[b.2]:** *determine from the certificate if the second device is compliant;*

454.     DTCP in view of Lundkvist disclosed a processor arranged to determine from the certificate if the second device is compliant.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b.2].  I incorporate my previous analysis into this section by reference.

455.     Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.2].

> **(vi)    49[b.3]:** *provide a secret to the second device via*
> *encryption by a public key of a private/public key-pair of the*
> *second device, if the second device is compliant, said secret*
> *comprising a random number;*

456.    DTCP in view of Lundkvist disclosed a processor arranged to provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number.

457.    I understand the Court has construed the term "[provide/providing] [a]/the secret to the second device" to mean "securely [transmits/transmitting] the common secret with the second device according to a key transport protocol or a key agreement protocol."

458.    I have already explained that DTCP in view of Lundkvist transmitted the encrypted secret O_RND, which was a random number, as a first signal to the second device if the second device was compliant in reference to limitations 1[b.2], 1[b.3], and 49[b.2].  I incorporate my previous analyses into this section by reference.

459.    Lundkvist further disclosed that O_RND could be encrypted by asymmetric encryption keys.  "The information in all signals with identity information that are sent between the vehicle 1 and the portable unit 2 is encrypted in such a way that the information in a message transmitted by the object can only be decrypted in its entirety by the portable unit 2 and vice versa.  Such an encryption method is normally called strong encryption.  A so-called asymmetric key pair is used for the decryption function, the control unit of the portable unit holding one of the keys and the control unit of the object holding the other key.  The key of the portable unit 2 comprises identity information for the portable unit and the key of the vehicle 1 comprises identity information for the vehicle."  Lundkvist at 7:25-8:1.

460.    As I explained previously in my explanation of asymmetric encryption technology, public keys are used for providing data securely to another party with a corresponding private key.

Thus, Lundkvist inherently disclosed encryption with a public key for transmitting the shared secret from the first device to the second device. But at the very least, it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to use the public key of an asymmetric pair of the second device to encrypt the shared secret. It was well known at the time of the alleged invention that public keys could be made public while private keys were to be kept private. The first device would not even have the second device's private key. A person of ordinary skill in the art at the time of the alleged invention would have recognized Lundkvist's description of using asymmetric encryption keys to encrypt and transmit O_RND as a standard key transport protocol.

461.    The '809 patent discloses using a public key to encrypt data. "Where $eP_B$ is encrypted with Public key B…" '809 at 6:6-12. The '809 further disclosed (in ISO/IEC 11770 incorporated by reference) that public keys could be disclosed while private keys could not. "[The] private key [is] [t]hat key of an entity's asymmetric key pair which should only be used by that entity... [the] public key [is] [t]hat key of an entity's asymmetric key pair which can be made public." ISO/IEC 11770-1 at 2.

462.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.3].

(vii)    **49[b.4]:** *provide the first signal to the second device;*

463.    DTCP in view of Lundkvist disclosed a processor arranged to provide the first signal to the second device. I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b.3]. I incorporate my previous analysis into this section by reference.

464.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.4].

**(viii)    49[b.5]:** *receive a second signal from the second device after providing the first signal;*

465.    DTCP in view of Lundkvist disclosed a processor arranged to receive a second signal from the second device after providing the first signal.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b.4].  I incorporate my previous analysis into this section by reference.

466.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.5].

**(ix)    49[b.6]:** *determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret;*

467.    DTCP in view of Lundkvist disclosed a processor arranged to determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analyses of limitations 1[b.5], 9[a.1], 9[a.2], and 9[a.3].  I incorporate my previous analyses into this section by reference.

468.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.6].

**(x)    49[b.7]:** *determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and*

469.    DTCP in view of Lundkvist disclosed a processor arranged to determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b.6].  I incorporate my previous analysis into this section by reference.

470.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.7].

(xi)  **49[b.8]:** *allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.*

471.  DTCP in view of Lundkvist disclosed a processor arranged to allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 1[b.7].  I incorporate my previous analysis into this section by reference.

472.  Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 49[b.8].

### 4.  Claim 50

(i)  **50[a.1]:** *The first device of claim 49, wherein the processor is further arranged to: use the secret to generate a secure authenticated channel between the first device and the second device;*

473.  DTCP in view of Lundkvist disclosed the first device of claim 49, wherein the processor is further arranged to: use the secret to generate a secure authenticated channel between the first device and the second device.  I have already explained that DTCP in view of Lundkvist disclosed the first device of claim 49.  I incorporate my analysis of Claim 49 into this section by reference.

474.  I have already explained that a person of ordinary skill in the art at the time of the alleged invention would have used DTCP's shared secret ($K_x$) as Lundkvist's shared secret (O_RND) with reference to limitation 1[b.3].  I incorporate my previous analysis into this section by reference.

475.  DTCP further explained that the Exchange key was used to produce Content keys which were used to secure content transmission channels.  "This section describes the mechanism for establishing the Content Keys ($K_c$) used to encrypt/decrypt content being exchanged between

the source and sink devices... The Content Key is computed by the source device using the…

Exchange Key $K_x$,.. the sink device [also] computes the current Content Key using… [the

Exchange Key] $K_x$." DTCP at 36-37.

476.   DTCP taught that the Content Key (derived from the common secret, the Exchange

Key) was used to create a secure channel.  "The Odd/Even bit (the 3rd bit of the synch field of the

IEEE 1394 isochronous packet header) is used to indicate which Content Key ($K_c$) is currently

being used to *protect the content channel*."  DTCP at 38, emphasis added.

477.   The '809 patent describes establishing a secure channel using the shared common

secret (key) the same as in DTCP.  "Further, the shared secret can afterwards be used for generating

a SAC (secure authenticated channel) channel between the two devices."  '809 patent at 3:50-52.

478.   Thus, I conclude that DTCP satisfies limitation 50[a.1].

>   **(ii)   50[a.2]:** *use the secure authenticated channel to provide
>   the protected content to the second device.*

479.   DTCP disclosed a processor arranged to use the secure authenticated channel to

provide the protected content to the second device.



**Figure 1 Content Protection Overview**

480.   Figure 1 of DTCP, reproduced above, outlines the content protection system

described in DTCP.  The source device of Figure 1 is the first device and the sink device of Figure

1 is the second device.  The source device controlled delivery of protected content to the sink device.  The protected content located on the source device was the Clear Text Content that was accessed by the sink device over the encrypted content stream (a secure authenticated channel), after the sink device had been properly authenticated and there had been an exchange of the key to be used for encryption.  "Once the devices have completed the required AKE procedure, a content channel encryption key can be exchanged between them.  This key is used to encrypt the content at the source device and decrypt the content at the sink."  DTCP at 11.

481.    The source device of Figure 1 is further clarified by DTCP to be a "device that is a *source of content*."  DTCP at 18, emphasis added.  As further illustrated in Figure 5 of DTCP, reproduced below, the source device controls the delivery of the protected content by requiring the sink device to be authenticated before sending the content keys necessary to access the protected content.  As illustrated below, state A4: Send Content Channel Key occurs only after state A3: Authenticated.



**Figure 5 Content Source Device State Machine**

482.   With reference to DTCP Figure 5 reproduced above, DTCP emphasized that content keys were only sent to authenticated devices:  "[i]n this state, the source device sends values necessary to create a content key to an authenticated sink device by executing *SendContentChannelKey(Sink_Device)*."  DTCP at 19, italics in original.

483.   DTCP also explained how the sink device requested access to protected content. DTCP Figure 6, reproduced below, illustrates this process wherein the sink device first authenticates itself to and then requests a content key from the source device.  As shown below, state A4: Request Content Channel Key occurs after state A3: Authenticated.



**Figure 6 Content Sink Device State Machine**

484.   With reference to DTCP Figure 6 reproduced above, DTCP emphasized that the source device controlled access to the protected content through authentication.  A sink device must be authenticated to access the protected content.  "An authenticated device [needs] to request a Content Key to gain access to copy protected content… an authenticated sink device requests

the values necessary to create a Content Key by executing the process *RequestContentChannelKey(Source_Device)*." DTCP at 20, italics in original.

485.    The '809 patent describes using the secure authenticated channel to share content with the second device the same as in DTCP.  "Further, the shared secret can afterwards be used for generating a SAC (secure authenticated channel) channel between the two devices." '809 patent at 3:50-52.  "After the distance has been measured in a secure authenticated way as described above, content data can be sent between the first and the second device in step 211 in FIG. 2." '809 patent at 6:21-24.

486.    Thus, I conclude that DTCP satisfies limitation 50[a.2].

### 5.  Claim 53

(i)    **53[a.1]:** *The first device of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: modify the first signal according to the secret;*

487.    DTCP in view of Lundkvist disclosed the first device of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: modify the first signal according to the secret.  I have already explained that DTCP in view of Lundkvist disclosed the first device of claim 49.   I incorporate my analysis of Claim 49 into this section by reference.  I have also already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 9[a.1].  I incorporate my previous analysis into this section by reference.

488.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 53[a.1].

(ii)    **53[a.2]:** *compare the modified first signal with the second signal; and*

489.    DTCP in view of Lundkvist disclosed a processor arranged to compare the modified first signal with the second signal.  I have already explained how DTCP in view of Lundkvist

satisfies these requirements in my analysis of limitation 9[a.2].  I incorporate my previous analysis into this section by reference.

490.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 53[a.2].

> **(iii)    53[a.3]:** *determine that the modified first signal is identical to the second signal.*

491.    DTCP in view of Lundkvist disclosed a processor arranged to determine that the modified first signal is identical to the second signal.  I have already explained how DTCP in view of Lundkvist satisfies these requirements in my analysis of limitation 9[a.3].  I incorporate my previous analysis into this section by reference.

492.    Thus, I conclude that DTCP in view of Lundkvist satisfies limitation 53[a.3].

> **b)    Ground 2: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP, Lundkvist, and ISO/IEC 11770**

493.    In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by DTCP, Lundkvist, and ISO/IEC 11770.  As this ground is identical to the first ground, except for the addition of the secondary reference ISO/IEC 11770, I incorporate fully my discussion of Ground 1 herein.  I specifically address only those limitations in which ISO/IEC 11770 provided pertinent additional non-cumulative disclosure.

494.    ISO/IEC 11770 described mechanisms for key management using asymmetric techniques based on key agreement algorithms, key transport algorithms, and public key transport algorithms both with and without a trusted third party.  Specifically, ISO/IEC 11770 disclosed using an asymmetric cipher in which the public key from a public/private key-pair was used to encrypt a symmetric key that was to be used for bulk data encryption.

495.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP, Lundkvist, and ISO/IEC 11770, because ISO/IEC 11770 provided known secure cryptographically proven algorithms for "establish[ing] keying material

EXPERT INVALIDITY REPORT OF DR. NIELSON

whose origin, integrity, timeliness and (in the case of secret keys) confidentiality can be guaranteed to both direct and indirect users."  ISO/IEC 11770-1 at v.  A person of ordinary skill in the art at the time of the alleged invention would have known that the problem of secure exchange of keying material was common in all cryptographic systems and that ISO/IEC 11770 documented already well-known solutions to this problem.  Incorporating the techniques disclosed in ISO/IEC 11770 into the DTCP-Lundkvist system would have been trivial.  The resulting system would have been the product of combining known prior art elements disclosed in DTCP, Lundkvist, and ISO/IEC 11770 according to known methods and would have yielded predictable results.

### 1.  Claim 1

496.    The DTCP-Lundkvist system analyzed in Ground 1 renders obvious all of the limitations of Claim 1 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 1 herein.

### 2.  Claim 9

497.    The DTCP-Lundkvist system analyzed in Ground 1 renders obvious all of the limitations of Claim 9 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 9 herein.

### 3.  Claim 49

498.    The DTCP-Lundkvist system analyzed in Ground 1 renders obvious all of the limitations of Claim 49 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 49 herein.

    **(i)**    **49[b.3]:** *provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number;*

499.    The DTCP-Lundkvist system in combination with ISO/IEC 11770 disclosed a processor arranged to provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number.

500.    I understand the Court has construed the term "[provide/providing] [a]/the secret to the second device" to mean "securely [transmits/transmitting] the common secret with the second device according to a key transport protocol or a key agreement protocol."

501.    I have already explained that the DTCP-Lundkvist system transmitted the encrypted secret O_RND, which was a random number, as a first signal to the second device if the second device was compliant in reference to Ground 1 limitations 1[b.2], 1[b.3], and 49[b.2]. I incorporate my previous analyses into this section by reference.

502.    ISO/IEC 11770 further disclosed transmitting keys (a common secret) between devices using PKI according to a key transport protocol. ISO/IEC 11770-3 described one of its goals as: "[e]stablish a shared secret key for a symmetric cryptographic technique between two entities *A* and *B* by key transport. In a secret key transport mechanism the secret key is chosen by one entity *A* and is transferred to another entity *B*, suitably protected by *asymmetric* techniques (emphasis added)." ISO/IEC 11770-3 at 1.

503.    ISO/IEC 11770-3 described a number of key transport mechanisms. The first described mechanism "transfers in one pass a secret key from entity *A* to entity *B* with implicit key authentication from *B* to *A*." ISE/IEC 11770-3 at 13. ISO/IEC 11770 described that the

requirements for this mechanism included device B having an asymmetric encipherment system and that device A had access to device B's public key.

1.  Entity $B$ has an asymmetric encipherment system ($E_B$,$D_B$).
2.  A has access to an authenticated copy of B's public encipherment transformation $E_B$. This may be achieved using the mechanisms of clause 8.

ISO/IEC 11770-3 at 13.

504.   ISO/IEC 11770-3 described the secure transmission and reception of the secret $K$ from device $A$ to device $B$.

**Key Token Construction (A1)** *A* has obtained a key *K* and wants to transfer it securely to *B*. *A* constructs a key data block consisting of its distinguishing identifier *A* (optional), the key *K*, an optional *TVP* and an optional data field *Text1*. Then *A* encrypts the key data block using the receiver's public encipherment transformation $E_B$ and sends the key token

$$KT_{A1} = E_B(A \;//\; K \;//\; TVP \;//\; Text1) \;//\; Text2$$

to *B*.

**Key Token Deconstruction (B1)** *B* deciphers the received key token $KT_{A1}$ using its private decipherment transformation $D_B$, recovers the key *K*, checks the optional *TVP*, and associates the recovered key *K* with the claimed originator *A*.

ISO/IEC 117790-3 at 13.

505.   ISO/IEC 11770-3 acknowledged that the well-known RSA private/public-key pair mechanism was an example of this mechanism. ISO/IEC 11770-3 at 13.

506.   The '809 patent acknowledges that the transmission of the secret "should be shared securely, e.g., according to some key management protocol as described in e.g. ISO 11770." '809 patent at 5:33-35. It is axiomatic that ISO/IEC 11770 disclosed what is contained therein.

507.   Thus, I conclude that the DTCP-Lundkvist system in view of ISO/IEC 11770 satisfies limitation 49[b.3].

#### 4.   Claim 50

508.   The DTCP-Lundkvist system analyzed in Ground 1 renders obvious all of the limitations of Claim 50 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 50 herein.

#### 5.   Claim 53

509.   The DTCP-Lundkvist system analyzed in Ground 1 renders obvious all of the limitations of Claim 53 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 53 herein.

### c)   Ground 3: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight and Lundkvist

510.   In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by SmartRight and Lundkvist.  SmartRight taught authentication in the context of content protection using a challenge-response protocol based on public-key infrastructure (PKI) between a terminal card and a presentation device, e.g. a television, which the '809 patent acknowledges was well known in the prior art.  SmartRight also disclosed the secure exchange of a Session Key between a terminal card and a presentation device for use in a symmetric cipher for encryption of data between the terminal card and the presentation device.  SmartRight did not disclose the calculation of a round-trip time to determine the distance between the terminal card and the presentation device.

511.   The SmartRight White Paper additionally disclosed a challenge-response protocol between the converter card and the terminal card.  The converter card also transmitted a shared secret to the terminal card via the presentation device.  The SmartRight White Paper also did not disclose the calculation of a round-trip time to determine the distance between the two devices.

797.   ISO/IEC 11770-3 acknowledged that the well-known RSA private/public-key pair mechanism was an example of this mechanism.  ISO/IEC 11770-3 at 13.

798.   The '809 patent acknowledges that the transmission of the secret "should be shared securely, e.g., according to some key management protocol as described in e.g. ISO 11770."  '809 patent at 5:33-35.  It is axiomatic that ISO/IEC 11770 disclosed what is contained therein.

799.   Thus, I conclude that the SmartRight-Lundkvist system in view of ISO/IEC 11770 satisfies limitation 49[b.3].

### 4.   Claim 50

800.   The SmartRight-Lundkvist system analyzed in Ground 3 renders obvious all of the limitations of Claim 50 as discussed above.  I incorporate by reference all of my previous analyses of Ground 3, Claim 50 herein.

### 5.   Claim 53

801.   The SmartRight-Lundkvist system analyzed in Ground 3 renders obvious all of the limitations of Claim 53 as discussed above.  I incorporate by reference all of my previous analyses of Ground 3, Claim 53 herein.

### e)   Ground 5: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP and Willey

802.   In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by DTCP and Willey.  DTCP taught authentication in the context of content protection using a challenge-response protocol based on a Diffie-Hellman key exchange, which the '809 patent acknowledges was well known in the prior art.  DTCP also disclosed the secure transmission of an Exchange key which was subsequently used to create a Content key for the actual encipherment of the data to be protected.  DTCP did not disclose the calculation of a round-trip time to determine the distance between the communication devices.

Willey disclosed using a challenge-response protocol with an integrated round-trip time measurement to calculate the distance between two communicating devices to restrict access and communication to devices that have been both authenticated and determined to be within a predetermined distance bound.

803.    It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to incorporate Willey's teachings to improve the content protection system of DTCP.  As previously set forth in my report, DTCP disclosed an authentication technology for accessing protected content.   Willey disclosed an authentication technology with distance-bounding to ensure that two devices were sufficiently close together.  At the time of the alleged invention of the '809 patent, it was well known that distance bounding was "often" required.  "[i]t is *often* the case in applications of cryptographic protocols that one party would like to determine a practical upper-bound on the *physical distance to the other party*."  Distance-Bounding Protocols at Abstract, emphasis added.

804.    A person of ordinary skill in the art at the time of the alleged invention would have known of the technique of using distance-bounding protocols and that permitting access based on distance or geographical restrictions was frequently a requirement.  Prior art to the '809 patent described systems that benefitted from and enforced that authenticating devices were physically near to each other.  These systems included features such as control over *ownership* rights of files, such as copying and using, based on geographical restrictions as described by Caswell: "[a]nother example is when supervision of *place resources* is needed.  If a guest comes into Carol's office and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to be able to save or print the file*.  She wants to *maintain ownership*.  She also wants access to the

file to go away once the guest leaves her office, where she can no longer supervise their use." Creating Web Representations at Protect Revenues 122, emphasis added.

805. The controls described by Caswell include copyright controls and applies equally to media and documents. A person of ordinary skill in the art at the time of the alleged invention would have understood that Caswell's controlled copying of a file included media files and would also have understood that printing a file is a form of rendering and is analogous to displaying on a screen. A person of ordinary skill in the art at the time of the alleged invention would have recognized the applicability of distance bounding restrictions to DTCP, a protocol designed to enforce copyright protections and media delivery.

806. Japanese inventors modified DTCP with distance-bounding capabilities. As taught by Saito et al. in U.S. Patent Publication 2003/0145214A (and corresponding Japanese patent applications filed in January 2002), Saito explained that the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance: "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer (including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*." '214 Patent Publication at [0060], emphasis added.

807. A person of ordinary skill in the art at the time of the alleged invention would have recognized the value and importance of distance bounding protocols in strengthening DTCP's stated goal: enforcing copyright protection. A person of ordinary skill in the art at the time of

EXPERT INVALIDITY REPORT OF DR. NIELSON

alleged invention would have also been aware of distance bounding protocols based on round-trip measurement times, particularly those based on or used in cryptographic systems, such as Willey. A person of ordinary skill in the art at the time of the alleged invention would have known how to modify the content protection system of DTCP with the addition of a round-trip measurement challenge-response protocol as described in Willey.

808.    At the time of the alleged invention of the '809 patent there existed a motivation to combine the well-known prior art authentication and round-trip time measurement techniques into a content protection system.

809.    A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Willey into DTCP's content protection system.  Willey, for example, disclosed transmitting a signal from the authenticating device (e.g. a cell phone) to the authenticated device (e.g. headphones).  The authenticating device (e.g. a cell phone) receives, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance is measured by the time it takes to send the signal and receive the response.

810.    This challenge-response protocol described in Willey in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, like Willey, disclosed securely transmitting a shared secret (called the Exchange Key) from the authenticating device (e.g. a cell phone) to the authenticated device (e.g. headphones).  The authenticating device receives, in response, a signal from the authenticated device.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Willey, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

811.    Annotated DTCP Figure 19 at 59, reproduced below, shows the DTCP full authentication protocol modified in view of Willey.



**Figure 19 Full Authentication Command Flow**

812.    As shown in annotated DTCP Figure 19 at 59, reproduced above, DTCP's described its transmission of the Exchange Key the same as Willey's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a

trivial modification to DTCP such that the response from the sink device is the same as Willey's second (response) signal.  The distance between the two devices is then determined by the round-trip time measurement.

813.    The details of these components, both individually and in combination, are discussed further below.

### 1.  Claim 1

> **(i)        Preamble:** *A first device for controlling delivery of protected content to a second device, the first device comprising:*

814.    I have assumed that the Preamble is limiting.  DTCP disclosed a first device for controlling delivery of protected content to a second device.  DTCP's stated purpose and defined scope was to "define[] a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms such as a high-performance serial bus that conforms to the IEEE 1394-1995 standard. … While DTCP has been designed for use by devices attached to serial buses as defined by the IEEE 1394-1995 standard, the developers anticipate that it will be appropriate for use with future extensions to this standard, other transmission systems, and other types of content as authorized by the DTLA (Digital Transmission Licensing Administration)."  DTCP at 10.

815.    DTCP addressed four layers of copy protection:

- Copy Control Information (CCI)

    CCI included information regarding how the content could be used such as copy-once, copy-never, etc.  DTCP at 10.

- Device Authentication and Key Exchange (AKE)

    "Before sharing valuable information, a connected device must first verify that another connected device is authentic."  DTCP at 10.

EXPERT INVALIDITY REPORT OF DR. NIELSON

- Content Encryption

     "Devices include a channel cipher subsystem that encrypts and decrypts copyrighted content.  To ensure interoperability, all devices must support the specific cipher specified as the baseline cipher."  DTCP at 10.

- System Renewability

     "Devices that support Full Authentication can receive and process system renewability messages (SRMs) created by the DTLA and distributed with content and new devices.  System renewability ensures long-term integrity of the system through the revocation of compromised devices."  DTCP at 10.



**Figure 1 Content Protection Overview**

816.  Figure 1 of DTCP at 11, reproduced above, outlines the content protection system described in DTCP.  The source device of Figure 1 is the first device and the sink device of Figure 1 is the second device.  The source device controls delivery of protected content to the sink device. The protected content located on the source device is the Clear Text Content that is accessed by the sink device over the encrypted content stream, after the sink device has been properly authenticated and there has been an exchange of the key to be used for encryption.  "Once the devices have completed the required AKE procedure, a content channel encryption key can be

exchanged between them.  This key is used to encrypt the content at the source device and decrypt the content at the sink."  DTCP at 11.

817.    The source device of Figure 1 is further clarified by DTCP to be a "device that is a *source of content*."  DTCP at 18, emphasis added.  As further illustrated in Figure 5 of DTCP, reproduced below, the source device controlled delivery of the protected content by requiring the sink device to be authenticated before sending the content keys necessary to access the protected content.  As illustrated below, state A4: Send Content Channel Key occurs only after state A3: Authenticated.



**Figure 5 Content Source Device State Machine**

818.    With reference to DTCP Figure 5 at 18 reproduced above, DTCP emphasized that content keys are only sent to authenticated devices:  "[i]n this state, the source device sends values necessary to create a content key to an authenticated sink device by executing *SendContentChannelKey(Sink_Device)*."  DTCP at 19, italics original.

819.    DTCP also explained how the sink device requests access to protected content. DTCP Figure 6, reproduced below, illustrates this process wherein the sink device first

authenticates itself to and then requests a content key from the source device. As shown below, state A4: Request Content Channel Key occurs after state A3: Authenticated.



**Figure 6 Content Sink Device State Machine**

820. With reference to DTCP Figure 6 at 19 reproduced above, DTCP emphasized that the source device controls access to the protected content through authentication. A sink device must be authenticated to access the protected content. "An authenticated device [needs] to request a Content Key to gain access to copy protected content… an authenticated sink device requests the values necessary to create a Content Key by executing the process *RequestContentChannelKey(Source_Device)*." DTCP at 20, italics original.

821. The '809 patent describes its content protection same as DTCP. "The invention relates to a method for a first communication device to perform authenticated distance measurement between a first communication device and second communication device. The invention also relates to a method of determining whether data stored on a first communication device is to be accessed by a second communication device." '809 patent at 1:26-31.

822.     Thus, I conclude that DTCP satisfies the preamble of claim 1.

**(ii)     1[a]:** *a memory;*

823.     DTCP in view of Willey disclosed a memory.  DTCP, alone, taught a memory implicitly by indicating the protocol would be implemented in PC and consumer electronic (CE) devices.  "To balance the protection requirements of the content industries with the real-world requirements of PC and consumer electronics (CE) device users, this specification includes two authentication levels, Full and Restricted."  DTCP at 10.  A person of ordinary skill in the art at the time of the alleged invention would have known that PC devices and consumer electronic devices have memories.  A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to use a memory in a device that implemented DTCP.

824.     Willey also disclosed a memory.  "Generally, the mobile telephone 100 includes a processor 110 for executing an instruction set for the operation of the mobile telephone handset 100, including instruction to perform the link key establishment.  The processor 110 preferably includes a microprocessor and a digital signal processor for manipulating different types of information, such as sound, images, and video."  Willey at 5:37-44.

EXPERT INVALIDITY REPORT OF DR. NIELSON



Figure 2

825.    To the extent that Willey did not disclose a memory, it is inherent or would have been obvious.  A person of ordinary skill in the art at the time of the alleged invention would have known that a processor requires a memory both to store its instructions and the data that it manipulates as it performs the operations specified in its instructions.

826.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Willey generally, as I explained above.  More specifically, to the extent that DTCP does not explicitly disclose a memory, it would have been obvious to incorporate Willey's teachings about a memory to achieve DTCP's stated goal of supporting PC and consumer electronic devices.

827.    The '809 patent describes a memory the same as Willey.  "The device further comprises means for performing the steps described above, which could be performed by

executing software using a microprocessor 413 connected to memory 415 via a communication bus 417." '809 patent at 6:62-66.



FIG. 4

828.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[a].

**(iii)    1[b]:** *a processor, said processor arranged to:*

829.    DTCP in view of Willey disclosed a processor.  DTCP, alone, taught a processor implicitly by indicating the protocol would be implemented in PC and consumer electronic (CE) devices.  "To balance the protection requirements of the content industries with the real-world requirements of PC and consumer electronics (CE) device users, this specification includes two authentication levels, Full and Restricted."  DTCP at 10.  A person of ordinary skill in the art at the time of the alleged invention would have known that PC devices and many consumer electronic devices have processors.  A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to use a processor in a device that implemented DTCP.

830.    Willey also disclosed a processor.  "Generally, the mobile telephone 100 includes a processor 110 for executing an instruction set for the operation of the mobile telephone handset 100, including instruction to perform the link key establishment.  The processor 110 preferably includes a microprocessor and a digital signal processor for manipulating different types of information, such as sound, images, and video."  Willey at 5:37-44.

EXPERT INVALIDITY REPORT OF DR. NIELSON



Figure 2

831.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Willey generally, as I explained above.  More specifically, to the extent that DTCP does not explicitly disclose a processor, it would have been obvious to incorporate Willey's teachings about a processor to achieve DTCP's stated goal of supporting PC and consumer electronic devices.

832.    The '809 patent describes a processor the same as Willey.  "The device further comprises means for performing the steps described above, which could be performed by executing software using a microprocessor 413 connected to memory 415 via a communication bus 417."  '809 patent at 6:62-66.



FIG. 4

833.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b].

        **(iv)**    **1[b.1]:** *receive a certificate of the second device, the certificate providing information regarding the second device;*

834.    DTCP disclosed a processor arranged to receive a certificate of the second device, the certificate providing information regarding the second device.

835.    As I explained with reference to the Preamble of Claim 1, the sink device must authenticate itself to the source device before it may obtain protected content.  One step of this authentication process is the transmission of the sink device's certificate to the source device.



**Figure 10 Full Authentication Protocol Flow Overview**

836.    As shown in Figure 10 of DTCP at 29, reproduced above, in step 1, the sink device must transmit its certificate.  In step 2, the source device receives and verifies the certificate.

837.    I understand the Court has construed the term "certificate" to mean "information containing at least the entity's distinguishing identifier and public key, and signed by a certification authority to guard against forgery."  The certificate described in DTCP satisfies this definition of certificate.



**Figure 7 Baseline Device Certificate Format**

838.    As shown in Figure 7 of DTCP at 24, reproduced above, DTCP's certificate format included a device ID, which was a distinguishing identifier, the device's public key, and a signature over the data to prevent forgery.

839.    The '809 patent refers to certificates in the specification and claims; but the specification fails to describe a certificate.  However, the '809 patent also incorporates by reference the industry standards ISO/IEC 11770 and ISO/IEC 9798.  ISO/IEC 11770 described a certificate with the same identified fields that DTCP does.  "Entity A requests the Certification Authority CA to certify its public key information (or a subset thereof) *including its public key and its distinguished name*.  The submission of the public key information to the CA shall take place in a way that assures its authenticity and integrity.  The CA verifies the authenticity of A's public key information, possibly adds system specific data, and *then signs the completed public key information to produce A's public key certificate*.  The public key certificate may then be transferred back to A."  ISO/IEC 11770-1 at 17.

840.    ISO/IEC 9798 also described certificates the same as in DTCP.  "In the following parts of ISO/IEC 9798 public key certificates (certificates) can be used to ensure the authenticity

of public keys.  In this case, a certificate contains an entity's public key information, which consists of at least the entity's distinguishing identifier and public key… The certificate consists of the public key information signed by the trusted third party."  ISO/IEC 9798 at 8.

841.    Thus, I conclude that DTCP satisfies limitation 1[b.1].

> **(v)    1[b.2]:** *determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;*

842.    DTCP disclosed a processor arranged to determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate.

843.    As part of the authentication process that I have already described with reference to the Preamble of Claim 1, DTCP's source and sink devices mutually authenticate each other's identity.  This process ensured that the devices complied with DTCP rules before transmitting or receiving the copyright-protected content.  To establish their status as an authorized device, both the source and the sink devices transmitted their certificates to the other.  Each device subsequently inspected the received certificate to verify that the peer device complied with the required rules.  For example:

   a. DTCP devices were required to comply with version and protocol rules. Compliance was verified by ensuring that certificate type and format fields reported expected values or values within legitimate ranges:

   i. The device was required to comply with producing a certificate of an expected type.  This was identified by the certificate's "Certificate Type" field, which must be 0 (all other types are reserved) and the Certificate's "Reserved" field, which must be 0.

   ii. The device was required to support a valid authentication mechanism.  This was identified by the certificate's "Certificate Format" field, which must be

    0, 1, or 2 (and just 1 or 2 for "full authentication as described above; all other types are reserved).

   iii. The device was required to be part of an authorized "generation" of devices. This was identified by the certificate's "Device Generation" field, which must be 0 or 1.

  b. The device was required to be authorized to receive content. This was identified by the certificate's EC-DSA signature, which must be signed by a valid authority key.

  c. The device was required to not have had its authorization revoked. This was identified by validating that the device's certificate was not on the revocation list. DTCP at 29.

844. If any of these rules were violated, the device would not authenticate the corresponding peer device. DTCP at 29.

845. In order to determine if a device's certificate has been revoked, DTCP disclosed checking a Certificate Revocation List from "System Renewability Messages." "After the random challenge and device certificate exchange, each device verifies the integrity of the other device's certificate using EC-DSA. If the DTLA signature is determined to be valid, the devices examine the certificate revocation list embedded in their system renewability messages (see Chapter 7) to verify that the other device has not been revoked." DTCP at 29. A device may be revoked if it has been compromised and is no longer adequately protecting the content. DTCP at 48.

846. DTCP described exchanging system renewability messages between devices after authentication. "The devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system

EXPERT INVALIDITY REPORT OF DR. NIELSON

renewability message stored by the device." DTCP at 29. System renewability messages are also contained in media content such as DVD's or CD's. DTCP at 48. DTCP described that system renewability messages could be updated from: (a) "other compliant devices (connected via the digital transmission means) that have a newer list, or (b) prerecorded content media, or (c) content streams via real-time compliant devices that can communicate externally (e.g., via the Internet, phone line, cable system, direct broadcast satellite, etc.). DTCP at 50. Thus, if devices were compromised in the field, the combination of the system renewability messages, along with the revocation list enabled source and sink devices to refuse to communicate with a compromised non-compliant device.

847.    DTCP furthered disclosed, "[c]ompliant devices that support Full Authentication can receive and process system renewability messages (SRMs) created by the DTLA and distributed with content. These messages are used to ensure the long-term integrity of the system." DTCP at 48.

848.    One of the components of the System Renewability Messages, as disclosed by DTCP, is the Certificate Revocation List (CRL). "The CRL [is] used to revoke the certificates of devices whose security has been compromised." DTCP at 48.

849.    "The Certificate Revocation List (CRL) identifies devices that are no longer compliant. It consists of the CRL Length field that specifies the length of the CRL in bytes. This field is followed by a sequence of entry type blocks (1 byte) which are in turn followed by the number of CRL entries specified by the entry type block. Two types of entry block are supported. One type provides for the revocation of individual devices while the second allows for the revocation of blocks of up to 65535." DTCP at 49.

EXPERT INVALIDITY REPORT OF DR. NIELSON

850.    The '809 patent lacks detail regarding compliance checking but, does discuss identity checking the same as in DTCP, as a compliance function.  "In another embodiment the authentication check further comprises checking if the identification of the second device is *compliant with an expected identification*.  Thereby, it is ensured that the second device really is the device that it should be.  The identity could be obtained by checking a certificate stored in the second device."  '809 patent at 3:56-61, emphasis added.

851.    Thus, I conclude that DTCP satisfies limitation 1[b.2].

> **(vi)    1[b.3]:** *provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;*

852.    DTCP in view of Willey disclosed a processor arranged to provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules.

853.    As I already explained with reference to limitation 1[b.2], if the sink device (the second device) were not compliant with any of the DTCP compliance rules, the source device (first device) would not authenticate the sink device.  DTCP at 29.  Thus, there would be no first signal to the second device if the device were not compliant with the compliance rules.

854.    DTCP did not describe computing a round-trip time in order to determine distance.  Nevertheless, DTCP disclosed transmitting a first signal to the second device at a first time.  DTCP disclosed transmitting a random value, the Exchange Key, from a first device (the source device) to a second device (the sink device).

855.    Willey disclosed authenticating two devices by ensuring that they were physically near to each other.  "Returning to FIG. 11, in order to overcome the man-in-the-middle attack, both devices 200, 1010 perform a key agreement, and then each device 200, 1010 computes two separate antispoof variables 36 based on the shared secret (one for itself and one for the other

EXPERT INVALIDITY REPORT OF DR. NIELSON

device).  The devices 200, 1010 then authenticate each other based upon distance from one another. A secure method to determine the distance from one device 200 to the other device 1010 follows and is used for the authentication based upon distance."  Willey at 13:29-37.  Thus, Willey described using a round-trip time measurement to measure distance for authentication purposes.

856.    The Exchange Key disclosed by DTCP was random data created by the source device and was securely transmitted to the sink device after authentication.  To secure the transmission of the Exchange Key $K_X$, the source device "scrambled" (i.e., encrypts) the Exchange Key using the $K_{AUTH}$ key that was agreed upon between the two devices during authentication.  The sink device was able to un-scramble the Exchange Key if it successfully completed authentication and was in possession of the $K_{AUTH}$ key.  See DTCP at 36.

857.    The transmission of the Exchange Key occurred at a first time as disclosed by DTCP Figure 19 at 59, an annotated portion of which is reproduced below.



858.    Willey also disclosed transmitting a challenge at a first time in Figure 11, an annotated portion of which is reproduced below.



859.    With reference to this figure, Willey explained:  "[n]ow referring to the flowchart of FIG. 11a, generally one challenge bit is transmitted by authenticating device 200 to the authenticated device 1010 during a single transmission time period, in step 40.  However, it is possible to transmit more than one challenge bit during a single transmission time period… In step 42, the authenticating device 200 measures the time of the response from authenticated device 1010."  Willey at 15:17-32.

860.    I have previously set forth my analysis of why and how a person of ordinary skill in the art at the time of the alleged invention would combine DTCP and Willey.  I incorporate by reference that analysis into this section.

861.    Additionally, a person of ordinary skill in the art at the time of the alleged invention would have known that the first signal, taught by Willey, was part of a challenge-response protocol in the context of a round-trip time measurement.  Although DTCP did not disclose a round-trip time measurement, it would have been obvious, in view of Willey, to modify DTCP's Exchange Key transmission, and subsequent response, to do so.  DTCP disclosed securely transmitting a random number (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed receives, in response, a signal from the device

confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to treat the Exchange Key as a challenge and modify that response signal, in view of Willey, to include data derived from the shared secret (e.g., Willey's antispoof variable) and measure the round-trip time to determine the distance between the two devices.  As previously explained, combining DTCP with Willey strengthens DTCP's stated aim of protecting and enforcing copyright restrictions.

862.   A person of ordinary skill in the art at the time of the alleged invention would have understood that the Exchange Key, $K_X$ was a random number just as the challenge was in Willey. Although DTCP's Exchange Key was described as a "key", these types of keys are just random data.  As described by DTCP:  "[a]fter the completion of Full or Restricted Authentication, the source device establishes the Exchange Key(s) described in Section 6.2.1.  The following procedure is used for each key… The source device assigned a *random value for the particular Exchange Key ($K_x$)* being established… It then scrambles the key $K_x$ using $K_{Auth}$ resulting in $K_{SX}$… The source device sends $K_{SX}$ to the sink device."  DTCP at 36, emphasis added.

863.   In view of Willey, a person of ordinary skill in the art at the time of the alleged invention would have understood that DTCP's Exchange Key transmission could have been used as a first signal in the same way as Willey.  Just like Willey's challenge, DTCP's Exchange Key was used to derive other values.  In particular, the Exchange Key was used as a random value to a function in order to produce another value, in this case the Content Key.  DTCP explained: "[t]he **Content Key** ($K_c$) is used as the key for the content encryption engine.  $K_c$ is computed from the three values… Exchange Key $K_x$… A random number $N_c$… [and] Constant value $C_a$, $C_b$, or $C_c$…" DTCP at 35, emphasis original.  Of these three values, $N_c$ is sent as plaintext and the constants are known.  DTCP at 35, 37.

EXPERT INVALIDITY REPORT OF DR. NIELSON

864.    In other words, DTCP's Exchange Key was being used to generate values derived from a common secret in parts of the overall DTCP protocol.  A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to use the Exchange Key in the same way for other functionality as well.

865.    The '809 patent specification indicates that the round-trip signal (including both the first signal and the second signal) could be a data transmission and the first time is the transmission of the first signal, as disclosed by Willey.  For example, the '809 specification describes a round-trip time measurement:  "[t]he first device 201 measures the round trip time between the signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret… The signal used for the distance measurement may be a normal data bit signal." '809 patent at 5:36-53.

866.    The '809 further describes its round-trip time measurement the same as Willey, including the transmission time of the first signal comprising the first time.  "In micro-processor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and receive time can then be used for determining the physical distance between the first device and the second device."  '809 patent at 6:52-59.

867.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b.3].

> (vii)    1[b.4]: *receive a second signal from the second device after providing the first signal;*

868.    DTCP in view of Willey disclosed a processor arranged to receive a second signal from the second device after providing the first signal.

869.     As I previously set forth with reference to limitation 1[b.3], DTCP did not disclose computing a round-trip time in order to determine distance.   Nevertheless, DTCP disclosed a source device that received a second signal from the second device at a second time.   DTCP disclosed receiving a response at a source device (first device) from a sink device (second device) after transmitting an Exchange Key (a first signal transmitted at a first time).   I also explained with reference to limitation 1[a] that Willey disclosed authenticating an "authenticated" device by another "authenticating" device (such as a cell phone).   And, I further explained with reference to limitation 1[b.3] that Willey disclosed transmitting a challenge value from the authenticating device to the authenticated device.   I incorporate my discussion of limitation 1[b.3] into this section by reference.

870.     The transmission of the Exchange Key occurred at a first time as disclosed by DTCP Figure 19 at 59, an annotated portion of which is reproduced below.



871.     Willey also disclosed that the authenticating device received a response (second signal) from the authenticated device at a later time (second time) as illustrated by Figure 11a, an annotated portion of which is illustrated below:



872.    With reference to this figure, Willey explained:  "[n]ow referring to the flowchart of FIG. 11a, generally one challenge bit is transmitted by authenticating device 200 to the authenticated device 1010 during a single transmission time period, in step 40.  However, it is possible to transmit more than one challenge bit during a single transmission time period… In step 42, the authenticating device 200 measures the time of the response from authenticated device 1010."  Willey at 15:17-32.

873.    Willey further disclosed that the response was generated as a combination of the challenge and "a particular piece of information" such as the "antispoof variable."  "In the following step 44, the authenticating device 200 determines whether the response is a function of the portion of the challenge that was transmitted and *the particular piece of information* in the authenticated device 1010.  If the response meets these two requirements, the process proceeds to the next step 46, else authentication fails and can be restarted.  This verification function may be performed with an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's public key.  It should be noted that the verification function does not necessarily need to operate on one response at a time; it could potentially operate on a number of responses combined.  In FIG. 11, the authenticating device 200 measures the time of the response bit and

also take the XOR of the response bit with the random bit to which the response bit is a response and verifies that it is the same as the appropriate bit of the antispoof variable 36." Willey at 15:17-32.

874.    Willey further disclosed that the challenge and the antispoof variable were XOR'd together one bit at a time. "In FIG. 11, the response is a single bit and is the output of an exclusive or (XOR) function whose inputs are the just received bit of the random number and a bit of the device's antispoof variable 36 (which may be one based upon its own address). For example, the first response bit is formed by taking the XOR of the received most significant bit of the random number and the most significant bit of the antispoof variable 36; subsequent response bits are formed by taking the XOR of the received bit of the random number and subsequently less significant bits." Willey at 13:53-14:4.

875.    The antispoof variable, disclosed by Willey, was derived from a shared secret. "Returning to FIG. 11, in order to overcome the man-in-the-middle attack, both devices 200, 1010 perform a key agreement, and then each device 200, 1010 computes two separate antispoof variables 36 based on the shared secret (one for itself and one for the other device). The devices 200, 1010 then authenticate each other based upon distance from one another." Willey at 13:29-52.

876.    With reference to the shared secret, Willey disclosed that the authenticating device and the authenticated device created a shared secret using a key agreement protocol such as Diffie-Hellman. "Preferably the key agreement is an elliptic curve Diffie Hellman key agreement, preferred for the fast execution speed of the cryptographic operations using elliptic curve cryptography. During key agreement, in step 3, each device 100 or 300 exchanges public keys by sending a message that includes its public key to the other device 100 or 300. The next step 4

EXPERT INVALIDITY REPORT OF DR. NIELSON

includes the computation of the shared secret by both devices 100 and 300, so that as a result of the key agreement procedure, both devices 100 and 300 have a shared secret value that is used to derive a symmetric key 36." Willey at 6:50-59.

877. Willey further explained that the time from the transmission of the challenge to the reception of the response was a "round-trip" time that was used to ensure that the devices were sufficiently close. "Upon reception of the response, the authenticating device 200 determines the round trip time from the time the transmittal of the challenge and the time of the response. In step 46, the authenticating device 200 then multiplies this time by the speed of the signal used and divides it by two to determine the distance of device 1010 from device 200. A determination is made by device 200 as to whether the other device 1010 is within the maximum allowed distance, in step 48." Willey at 15:33-40.

878. I have previously set forth my analysis of why and how a person of ordinary skill in the art at the time of the alleged invention would combine DTCP and Willey. I incorporate by reference that analysis into this section.

879. Additionally, a person of ordinary skill in the art at the time of the alleged invention would have known that receiving the second signal as taught by Willey, was part of a challenge-response protocol in the context of a round-trip time measurement. Although DTCP did not disclose a round-trip time measurement, it would have been obvious, in view of Willey, to modify DTCP's Exchange Key transmission, and subsequent response, to do so.

880. DTCP, like Willey, first computed a shared secret using Diffie-Hellman. "$K_{AUTH}$ [is an] [a]uthentication key which is the least significant 96-bits of shared data created through EC-DH key exchange." DTCP at 23.

881.     Furthermore, DTCP, like Willey, disclosed securely transmitting a random number (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Willey, to include data derived from the shared secret (e.g., Willey's antispoof variable combined with the challenge) and measure the round-trip time to determine the distance between the two devices.  As previously explained, combining DTCP with Willey strengthens DTCP's stated purpose of protecting and enforcing copyright restrictions.

882.     A person of ordinary skill in the art at the time of the alleged invention would have understood that the Exchange Key, $K_x$, as disclosed by DTCP was a random value usable as a challenge.  In view of Willey, the second signal received from the authenticated device would be a value derived from the shared secret (i.e., Willey's response, which includes the antispoof variable derived from the shared secret).  When the second signal was sent back to the source device, the source device would determine if the second signal was derived from the shared secret, as taught by Willey.

883.     The '809 patent specification teaches that the signal (including both the first signal and the second signal) used for the round-trip time measurement could be a data transmission and the second time is the receipt of the second signal, as disclosed by Willey.  For example, the '809 specification describes a round-trip time measurement:  "[t]he first device 201 measures the round trip time between the signal leaving and the signal returning and checks if the returned signal was modified according to the exchanged secret… The signal used for the distance measurement may be a normal data bit signal."  '809 patent at 5:36-53.

884.     The '809 further describes a round-trip time measure the same as Willey, including receipt of a second signal comprising a second time.  "In micro-processor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and receive time can then be used for determining the physical distance between the first device and the second device."  '809 patent at 6:52-59.

885.     Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b.4].

> **(viii)   1[b.5]:** *determine whether the second signal is derived from a secret known by the first device;*

886.     DTCP in view of Willey disclosed a processor arranged to determine whether the second signal is derived from a secret known by the first device.

887.     As I explained with reference to limitation 1[b.3] DTCP disclosed transmitting the Exchange Key $K_x$ as a first signal from the source device to the sink device.  The Exchange Key was a random value.  Willey also disclosed transmitting a first signal from an authenticating device (e.g. a cell phone) to an authenticated device (e.g., a headset).  The first signal included comprised a random value representing a challenge.  I incorporate my discussion of limitation 1[b.3] into this section by reference.

888.     As explained with reference to limitation 1[b.4], Willey disclosed receiving a second signal by an authenticating device (e.g., a cell phone) from the authenticated device.  The second signal included a response, computed as a combination of the challenge and an antispoof variable derived from a shared secret.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify the response signal to the Exchange Key disclosed in

DTCP to include a response derived from the Exchange Key (challenge) and a shared secret as described in Willey.

889.    Willey disclosed that the authenticating device (first device) locally computed the antispoof variable—a third signal—from the shared secret and compared the locally computed value with the antispoof value extracted from the received value (second signal).  To extract the antispoof value, the challenge-response value was XOR'd with the challenge, which removes the challenge and leaving just the antispoof value alone.  "In FIG. 11, the authenticating device 200 measures the time of the response bit and also take the XOR of the response bit with the random [challenge] bit to which the response bit is a response and verifies that it is the same as the appropriate bit of the antispoof variable 36."  Willey at 15:17-32.

890.    If the antispoof values were equal, and if the measured round-trip time was within accepted bounds, Willey taught that the authenticating device authenticated the authenticated device.  "In the following step 44, the authenticating device 200 determines whether the response is a function of the portion of the challenge that was transmitted and the particular piece of information in the authenticated device 1010.  If the response meets these two requirements, the process proceeds to the next step 46, else authentication fails and can be restarted.  This verification function may be performed with an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's public key.  It should be noted that the verification function does not necessarily need to operate on one response at a time; it could potentially operate on a number of responses combined.  In FIG. 11, the authenticating device 200 measures the time of the response bit and also take the XOR of the response bit with the random bit to which the response bit is a response and verifies that it is the same as the appropriate bit of the antispoof variable 36."  Willey at 15:17-32.

891.    This challenge-response protocol described in Willey in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, like Willey, disclosed transmitting a random number (the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Willey, to include a response derived from the random number (challenge) and to measure the round-trip time to determine the distance between the two devices.

892.    Annotated DTCP Figure 19 at 59, reproduced below, shows the DTCP full authentication protocol modified in view of Willey.

EXPERT INVALIDITY REPORT OF DR. NIELSON



**Figure 19 Full Authentication Command Flow**

893.    As shown in annotated DTCP Figure 19 at 59, reproduced above, DTCP's transmission of the Exchange Key was the same as Willey's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device (i.e., using standard challenge-response protocol principles as I described in the technical background)  was derived from the Exchange

Key (the random challenge) and was compared to a third signal generated at the source device (from the same shared secret). DTCP already disclosed using a challenge-response protocol during the authentication phase of the protocol. "The source device generates a random challenge and sends it to the sink device… After receiving a random challenge back from the source device, the sink device computes a response using a verification key that it has computed and sends it to the source." DTCP at 34. A person of ordinary skill in the art at the time of the alleged invention would have known and found it obvious to include a subsequent challenge-response protocol for the RTT measurement.

894.    DTCP also disclosed transmission data structures for sending challenges and receiving responses as shown below in the following unlabeled table:

| Value | Subfunction | Comments |
|---|---|---|
| $01_{16}$ | CHALLENGE | Send random value. This subfunction when sent from a sink device initiates the AKE procedure. |
| $02_{16}$ | RESPONSE | Return data computed with the received random value. |
| $03_{16}$ | EXCHANGE_KEY | Send an encrypted Exchange Key ($K_X$) to the authenticated contents-sink device. |
| $04_{16}$ | SRM | Send SRM to a device that has an outdated or smaller SRM. |
| $C0_{16}$ | AKE_CANCEL | Notify a device that the current authentication procedure cannot be continued. |
| $80_{16}$ | CONTENT_KEY_REQ | Request the data required for making Content Key ($K_C$). |

DTCP at 56.

895.    A person of ordinary skill in the art at the time of the alleged invention would have found it obvious to combine the verification technique described in Willey—comparing the antispoof variable from the second received signal against the locally generated spoof variable comprising the third signal for equivalence based on a shared secret—into DTCP's protocol because DTCP already described and used a shared secret for other purposes. A person of ordinary skill in the art at the time of the alleged invention would have known and would have found it obvious to use the shared secret disclosed in DTCP, $K_{AUTH}$, for other purposes as well, such as in a challenge-response protocol for an RTT measurement.

896.    The '809 patent describes this verification of the second and third signals the same as in Willey.  The specification states:  "[t]he second device receives the signal via a receiver 311 and micro-processor 313 modifies the signal by using the locally stored secret.  The signal is modified according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315.  The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device."  '809 patent at 6:31-48.

897.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b.5].

(ix)    **1[b.6]:** *determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and*

898.    DTCP in view of Willey disclosed a processor arranged to determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time.  I have already explained with reference to limitation 1[b.3] that Willey disclosed sending a first signal and with reference to limitation 1[b.4] that Willey disclosed receiving a second signal.  I have also already explained how DTCP in view of Willey disclosed these elements.  I incorporate my analyses of limitations 1[b.3] and 1[b.4] into this section by reference.

899.    I understand the Court has construed the term "predetermined time" to mean "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content."

900.    Willey also disclosed computing a time interval to ensure that the first and second communication devices were sufficiently near one another to permit access to the protected

EXPERT INVALIDITY REPORT OF DR. NIELSON

content.  Willey also taught that the time from the transmission of the challenge to the reception of the response was a "round-trip" time that was used to ensure that the devices were sufficiently close.  "Upon reception of the response, the authenticating device 200 determines the round trip time from the time the transmittal of the challenge and the time of the response.  In step 46, the authenticating device 200 then multiplies this time by the speed of the signal used and divides it by two to determine the distance of device 1010 from device 200.  A determination is made by device 200 as to whether the other device 1010 is within the maximum allowed distance, in step 48."  Willey at 15:33-40.

901.    A person of ordinary skill in the art at the time of the alleged invention would have known how to perform an RTT measurement, as described in Willey, between the transmission of DTCP's Exchange Key from the source device to the sink device until the response from the sink device back to the source device.

902.    This challenge-response protocol described in Willey in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, like Willey, disclosed transmitting a random number (the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Willey, to include a response derived from the random number (challenge) and to measure the round-trip time to determine the distance between the two devices.

903.    Annotated DTCP Figure 19 at 59, reproduced below, shows the DTCP full authentication protocol modified in view of Willey.



**Figure 19 Full Authentication Command Flow**

904.    As shown in annotated DTCP Figure 19 at 59, reproduced above, DTCP's transmission of the Exchange Key was the same as Willey's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device was the same as Willey's second signal.  The

round-trip time is measured from the transmission of what I have annotated as the first signal until the receipt of what I have annotated as the second signal.

905.    The '809 patent describes a round-trip time measurement the same as in Willey. "In micro-processor 323 the distance is calculated between the first and the second device; this could e.g. be performed by measuring the time, when the signal is transmitted by the transmitter 309 from the first device to the second device and measuring when the receiver 317 receives the signal from the second device.  The time difference between transmittal time and receive time can then be used for determining the physical distance between the first device and the second device." '809 patent at 6:52-59.

906.    DTCP in view of Willey further disclosed only allowing access if the round-trip time was within a predetermined time.  For example, if the antispoof values from the second and third signals were equal, and if the measured round-trip time was within accepted bounds, Willey taught that the authenticating device authenticated the authenticated device.  "In the following step 44, the authenticating device 200 determines whether the response is a function of the portion of the challenge that was transmitted and the particular piece of information in the authenticated device 1010.  If the response meets these two requirements, the process proceeds to the next step 46, else authentication fails and can be restarted.  This verification function may be performed with an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's public key.  It should be noted that the verification function does not necessarily need to operate on one response at a time; it could potentially operate on a number of responses combined. In FIG. 11, the authenticating device 200 measures the time of the response bit and also take the XOR of the response bit with the random bit to which the response bit is a response and verifies that it is the same as the appropriate bit of the antispoof variable 36."  Willey at 15:17-32.

270

907.    Willey further explained that the time from the transmission of the challenge to the reception of the response was a "round-trip" time that was used to ensure that the devices were sufficiently close.  "Upon reception of the response, the authenticating device 200 determines the round trip time from the time the transmittal of the challenge and the time of the response.  In step 46, the authenticating device 200 then multiplies this time by the speed of the signal used and divides it by two to determine the distance of device 1010 from device 200.  A determination is made by device 200 as to whether the other device 1010 is within the maximum allowed distance, in step 48."  Willey at 15:33-40.

908.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Willey in order to ensure that sink devices, especially wireless sink devices the same as Willey's authenticated device, were within a sufficiently bounded distance to source devices.  Authentication protocols with distance limitations were well known and well understood.

909.    As I explained previously, the 1993 research paper entitled, "Distance-Bounding Protocols" expressed:  "[i]t is *often* the case in applications of cryptographic protocols that one party would like to determine a practical upper-bound on the *physical distance to the other party*."  Distance-Bounding Protocols at Abstract, emphasis added.  The paper further explained that a distance-bounding protocol can be integrated with an authentication ("identification") algorithm:  "[o]ur distance-bounding protocols can be integrated with known public-key identification schemes…"  Distance-Bounding Protocols at Introduction.

910.    Kindberg's paper "Context Authentication Using Constrained Channels" equally emphasized the importance of "location" as a critical part of authentication:

This paper presents a paradigm shift from conventional authentication—of a principal's identity—to authentication of parameters that characterise a principal's

EXPERT INVALIDITY REPORT OF DR. NIELSON

context. *Location*, in particular, is a highly significant contextual parameter. It is one that features in what are known as mobile, ubiquitous, pervasive and nomadic computing systems. We present a model of context authentication based on the characteristics of communication channels. As an example, *we present protocols for location authentication that are based on physical channel characteristics.* (Context at Abstract 1, emphasis added).

911. Kindberg also cited to and expanded upon another research paper, "Creating Web Representations for Places," which further motivates this combination. "It is valuable for a place to be able to *authenticate a person/device's presence in the place*. For purposes of *user convenience, revenue protection, and place resource protection*, there are times when *services should only be offered to those who are physically present in a place*, and withhold those services from those viewing the place's web representation remotely." Creating Web Representations for Places at Place-Specific Requirements 117, emphasis added.

912. An example given from the paper is based on the following use-case: "[a]nother example is when supervision of *place resources* is needed. If a guest comes into Carol's office and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to be able to save or print the file*. She wants to *maintain ownership*. She also wants access to the file to go away once the guest leaves her office, where she can no longer supervise their use." Creating Web Representations for Places at Protect Revenues 122-23, emphasis added.

913. Or, as taught by Saito et al. in U.S. Patent Publication 2003/0145214A published on July 31, 2003 from Application No. 10/352,128 filed on January 28, 2003 (which claims priority to a Japanese application filed on January 28, 2002), the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance. "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the

TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer (including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*." '214 Patent Publication at [0060], emphasis added.

914.    A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP with Willey's distance-bounding protocol.  DTCP was designed to protect content from unauthorized use.   "The Digital Transmission Content Protection Specification defines a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms…"  DTCP at 10.

915.    DTCP further disclosed that protected content had variable restrictions.  Different types of content from different content owners had different limitations and restrictions.  "Content owners need a way to specify how their content can be used… This content protection system is capable of securely communicating copy control information (CCI) between devices…"  DTCP at 10.

916.    A person of ordinary skill in the art at the time of the alleged invention would have recognized that Willey's distance bounding RTT measurement strengthened DTCP's capacity to enforce different copyright restrictions, such as those referenced by Saito or even the controls suggested by Caswell, by including the ability to have copy control information (CCI) based on distance.

917.    Moreover, a person of ordinary skill in the art at the time of the alleged invention would have known the modification to DTCP required to incorporate Willey's teachings was minimal.  A person of ordinary skill in the art at the time of the alleged invention would have

known that DTCP disclosed a modular AKE process with multiple subfunctions.  A person of ordinary skill in the art at the time of the alleged invention would have known how to modify DTCP to incorporate an additional challenge-response, including a measurement of the round-trip time to enforce distance restrictions; such a modification of DTCP's modular AKE protocol would have been trivial and produced expected results.

918.    A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Willey into DTCP's content protection system.  Willey, for example, disclosed transmitting a random challenge from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance was determined by the time it takes to send the random challenge and receive the response.

919.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b.6].

> **(x)    1[b.7]:** *allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.*

920.    DTCP in view of Willey disclosed a processor arranged to allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

921.    I understand the Court has construed the term "predetermined time" to mean "a time interval selected to ensure that the first and second communication devices are sufficiently near one another to permit access to the protected content."

922.    As I explained with reference to the Preamble of claim 1, DTCP disclosed allowing access of the protected content provided that the second device was authenticated.  I incorporate my analysis of the Preamble of Claim 1 into this section by reference.

EXPERT INVALIDITY REPORT OF DR. NIELSON

923.     Willey disclosed allowing access to the resources and functions of an authenticated object (e.g., a Bluetooth headset) provided that the measured round-trip time was within the predefined interval and said second signal was derived from the shared secret.  I have already explained with reference to limitation 1[b.5] that Willey disclosed determining if the second signal was derived from the shared secret.  I have also already explained that Willey disclosed determining the time difference between the first and second signals with reference to limitation 1[b.6].  I have also already explained how DTCP in view of Willey disclosed these elements.  I incorporate my analyses of limitations 1[b.5] and 1[b.6] into this section by reference.

924.     DTCP in view of Willey further disclosed only allowing access if the round-trip time was less than a predetermined time.  For example, if the antispoof values of the second and third signals were equal, and if the measured round-trip time was within accepted bounds, Willey taught that the authenticating device authenticated the authenticated device.  "In the following step 44, the authenticating device 200 determines whether the response is a function of the portion of the challenge that was transmitted and the particular piece of information in the authenticated device 1010.  If the response meets these two requirements, the process proceeds to the next step 46, else authentication fails and can be restarted.  This verification function may be performed with an antispoof variable 36 or, if public key cryptography is used, the authenticated device 1010's public key.  It should be noted that the verification function does not necessarily need to operate on one response at a time; it could potentially operate on a number of responses combined.  In FIG. 11, the authenticating device 200 measures the time of the response bit and also take the XOR of the response bit with the random bit to which the response bit is a response and verifies that it is the same as the appropriate bit of the antispoof variable 36."  Willey at 15:17-32.

925.     Willey further explained that the time from the transmission of the challenge to the reception of the response was a "round-trip" time that was used to ensure that the devices were sufficiently close.  "Upon reception of the response, the authenticating device 200 determines the round trip time from the time the transmittal of the challenge and the time of the response.  In step 46, the authenticating device 200 then multiplies this time by the speed of the signal used and divides it by two to determine the distance of device 1010 from device 200.  A determination is made by device 200 as to whether the other device 1010 is within the maximum allowed distance, in step 48."  Willey at 15:33-40.

926.     A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP and Willey in order to ensure that sink devices were within a sufficiently bounded distance to source devices.  Authentication protocols with distance limitations were well known and well understood.

927.     As I explained previously, the 1993 research paper entitled, "Distance-Bounding Protocols" expressed:  "[i]t is *often* the case in applications of cryptographic protocols that one party would like to determine a practical upper-bound on the *physical distance to the other party*."  Distance-Bounding Protocols at Abstract, emphasis added.  The paper further explained that a distance-bounding protocol can be integrated with an authentication ("identification") algorithm: "[o]ur distance-bounding protocols can be integrated with known public-key identification schemes…"  Distance-Bounding Protocols at Introduction, emphasis added.

928.     Kindberg's paper "Context Authentication Using Constrained Channels" equally emphasized the importance of "location" as a critical part of authentication:

> This paper presents a paradigm shift from conventional authentication—of a principal's identity—to authentication of parameters that characterise a principal's context.  *Location*, in particular, is a highly significant contextual parameter.  It is one that features in what are known as mobile, ubiquitous, pervasive and nomadic

EXPERT INVALIDITY REPORT OF DR. NIELSON

computing systems.  We present a model of context authentication based on the characteristics of communication channels.  As an example, *we present protocols for location authentication that are based on physical channel characteristics*.  (Context at Abstract 1, emphasis added).

929.    Kindberg also cited to and expanded upon another research paper, "Creating Web Representations for Places," which further motivates this combination.  "It is valuable for a place to be able to *authenticate a person/device's presence in the place*.  For purposes of *user convenience, revenue protection, and place resource protection*, there are times when *services should only be offered to those who are physically present in a place*, and withhold those services from those viewing the place's web representation remotely."  Creating Web Representations for Places at Place-Specific Requirements 117, emphasis added.

930.    An example given from the paper is based on the following use-case:  "[a]nother example is when supervision of *place resources* is needed.  If a guest comes into Carol's office and she wants to share the contents of her file on the guest's PDA, *she might not want the guest to be able to save or print the file*.  She wants to *maintain ownership*.  She also wants access to the file to go away once the guest leaves her office, where she can no longer supervise their use."  Creating Web Representations for Places at Protect Revenues 122-23, emphasis added.

931.    Or, as taught by Saito et al. in U.S. Patent Publication 2003/0145214A published on July 31, 2003 from Application No. 10/352,128 filed on January 28, 2003 (which claims priority to a Japanese application filed on January 28, 2002), the DTCP protocol could be modified with distance-bounding technology to prevent media access at an unauthorized distance.  "In other words, if the case of carrying out the AKE [Authentication and Key Exchange of DTCP] procedure by using the TCP/IP packets is considered, it would become possible to exchange the AKE packets, between neighboring homes, over a long distance, or across the national border (because the TCP/IP packets can be exchanged in such a manner), and *there can be cases where the transfer*

*(including copy) of the AV data becomes possible over a range that exceeds a range of the private use according to the Japanese copyright law article 30, for example*." '214 Patent Publication at [0060], emphasis added.

932.     A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP with Willey's distance-bounding protocol.  DTCP was designed to protect content from unauthorized use.   "The Digital Transmission Content Protection Specification defines a cryptographic protocol for protecting audio/video entertainment content from unauthorized copying, intercepting, and tampering as it traverses digital transmission mechanisms…"  DTCP at 10.

933.     DTCP further disclosed that protected content had variable restrictions.  Different types of content from different content owners had different limitations and restrictions.  "Content owners need a way to specify how their content can be used… This content protection system is capable of securely communicating copy control information (CCI) between devices…"  DTCP at 10.

934.     A person of ordinary skill in the art at the time of the alleged invention would have recognized that Willey strengthened DTCP's capacity to enforce different copyright restrictions, such as those referenced by Saito or even the controls suggested by Caswell, by including the ability to have copy control information (CCI) based on distance, especially for the wireless devices disclosed by Willey.

935.     Moreover, the modification to DTCP required to incorporate Willey's teachings at the time of the alleged invention was minimal.  A person of ordinary skill in the art at the time of the alleged invention would have known that DTCP disclosed a modular AKE process with multiple subfunctions.  A person of ordinary skill in the art at the time of the alleged invention

would have known how to modify DTCP to incorporate an additional challenge-response, including a measurement of the round-trip time to enforce distance restrictions.  Modification of DTCP's modular AKE protocol would have been trivial and produced expected results.

936.    A person of ordinary skill in the art at the time of the alleged invention would have known how to combine Willey into DTCP's content protection system.  Willey, for example, disclosed securely transmitting a challenge from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device being authenticated wherein the signal comprises data derived from the shared secret.  The distance was determined by the time it takes to send the challenge and receive the response.

937.    This challenge-response protocol described in Willey in the context of a round-trip time measurement fits into the protocol disclosed in DTCP.  DTCP, just like Willey, disclosed securely transmitting a challenge (called the Exchange Key) from the device being accessed to the device being authenticated.  The device being accessed received, in response, a signal from the device confirming receipt.  A person of ordinary skill in the art at the time of the alleged invention would have found it trivial to modify that response signal, in view of Willey, to include data derived from the shared secret and measure the round-trip time to determine the distance between the two devices.

938.    Annotated DTCP Figure 19 at 59, reproduced below, shows the DTCP full authentication protocol modified in view of Willey.



**Figure 19 Full Authentication Command Flow**

939.    As shown in annotated DTCP Figure 1 at 599, reproduced above, DTCP's transmission of the Exchange Key was the same as Willey's first signal.  A person of ordinary skill in the art at the time of the alleged invention would have known how to make a trivial modification to DTCP such that the response from the sink device was a value derived from the shared secret

(i.e., Willey's antispoof variable) the same as Willey's second signal.  The distance between the two devices was then determined by the round-trip time measurement.

940.    The '809 patent describes granting access to the protected content the same as Willey.  "After the distance has been measured in a secure authenticated way as described above, content data can be sent between the first and second device in step 211 in FIG. 2." '809 patent at 6:21-24.  The '809 patent makes clear that the "time difference between a transmittal time and a reception time can then be used for determining the physical distance between the first device and the second device." '809 patent at 6:56-59.

941.    Thus, I conclude that DTCP in view of Willey satisfies limitation 1[b.7].

### 2.   Claim 9

(i)    **9[a.1]:** *The first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: modify the first signal according to the secret;*

942.    DTCP in view of Willey disclosed the first device of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: modify the first signal according to the secret.  I have already explained that DTCP in view of Willey disclosed the first device of claim 1 wherein the processor is arranged to determine whether the second signal is derived from the (shared) secret, as set forth in my analysis of limitation 1[b.5].  I incorporate my analysis of Claim 1 into this section by reference.

943.    To summarize the operation of Willey:

a.   The authenticating device (e.g., the cell phone) sends a random number (first signal) to the authenticated device (e.g., the Bluetooth headset).

b.   The authenticated device (e.g., the Bluetooth headset) combines the random number and a pre-computed antispoof variable, derived from a shared secret.

EXPERT INVALIDITY REPORT OF DR. NIELSON

> c. The authenticated device (e.g., the Bluetooth headset) sends the combined random number and antispoof variable (second signal) to the authenticating device (e.g., the cell phone).
>
> d. The authenticating device (e.g., the cell phone) extracts the antispoof variable from the response and compares it to a locally computed antispoof variable.

944.    A person of ordinary skill in the art at the time of the alleged invention would have known that the "combination" taught by Willey (XOR) is trivial to re-order.  It would have been obvious for the authenticating device (e.g., the cell phone) to modify the challenge (first signal) by combining it with the antispoof variable (derived from the shared secret) and compare this combination with the second signal.

945.    Because of the nature of the XOR mathematical operation, this minor variation is just as fast and just as effective.  XOR has the property of being its own inverse.  That is, (A XOR B) XOR B = A.  Thus, as disclosed by Willey, the second signal was (challenge XOR antispoof). XOR'ing the second signal with the same challenge value results in (challenge XOR antispoof) XOR challenge = antispoof.

946.    Represented mathematically, Willey disclosed that the authenticating device (e.g., the cell phone) performs the following upon receipt of the response (second signal):

> a. Response XOR challenge = antispoof.
>
> b. Compare antispoof against the locally generated antispoof.

947.    A person of ordinary skill in the art at the time of the alleged invention would have known that the same mathematics is easily re-arranged to do the following upon receipt of the response (second signal):

> a. Local antispoof XOR challenge = expected response.

      b.   Compare response against the expected response.

948.    Not only is this scheme equivalent in terms of computational cost and security power, but it is potentially faster because the expected response value can be pre-computed, rather than extracting the antispoof value upon receipt.  Willey already acknowledged the value of pre-computations on the authenticated device (e.g., Bluetooth headset) side:  "[t]he authenticated device 1010 is configured to return a response within this amount of processing time, since longer processing times would give an attacker an opportunity to appear to be closer.  Accordingly, in FIG. 11, the shared secret and antispoof variable 36 are precomputed…"  Willey at 14:5-30.

949.    I have already explained why a person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine the DTCP and Willey references generally and also specifically with reference to limitation 1[b.5].  I incorporate my analyses of these motivations to combine into this section by reference.

950.    The '809 patent describes this verification of the second and third signals the same as in Willey.  The specification states:  "[t]he second device receives the signal via a receiver 311 and micro-processor 313 modifies the signal by using the locally stored secret.  The signal is modified according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315.  The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device."  '809 patent at 6:31-48.

951.    Thus, I conclude that DTCP in view of Willey satisfies limitation 9[a.1].

> **(ii)    9[a.2]:** *compare the modified first signal with the second signal; and*

952.    DTCP in view of Willey disclosed a processor arranged to compare the modified first signal with the second signal.

953.    As I explained with reference to limitation 9[a.1], Willey disclosed comparing a value contained in the second signal with a precomputed value, but it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to precompute the response instead.  The precomputed response would be the challenge (first signal) modified by the antispoof value, which is derived from the shared secret, by combining them together.  This value would have been compared against the second signal.  I incorporate these previous analyses into this section by reference.

954.    The '809 patent describes this verification of the second and third signals (the locally modified first signal) the same as in Willey.  The specification states: "[t]he second device receives the signal via a receiver 311 and micro-processor 313 modifies the signal by using the locally stored secret.  The signal is modified according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315.  The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device."  '809 patent at 6:31-48.

955.    Thus, I conclude that DTCP in view of Willey satisfies limitation 9[a.2].

> **(iii)    9[a.3]:** *provide an indication when said modified first signal is identical to the second signal.*

956.    DTCP in view of Willey disclosed a processor arranged to provide an indication when said modified first signal is identical to the second signal.

957.     As I explained with reference to limitation 9[a.1], Willey disclosed comparing a value contained in the second signal with a precomputed value, but it would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to precompute the response instead.  The precomputed response would be the challenge (first signal) modified by the antispoof value, which is derived from the shared secret, by combining them together.  This value would have been compared against the second signal.  I incorporate this previous analysis into this section by reference.

958.     As I explained with reference to limitation 1[b.7], Willey disclosed authenticating devices (providing an indication) when the second signal was determined to be derived from the shared secret.  I incorporate this previous analysis into this section by reference.

959.     The '809 patent describes this verification of the second and third signals (the locally modified first signal) the same as in Willey.  The specification states:  "[t]he second device receives the signal via a receiver 311 and micro-processor 313 modifies the signal by using the locally stored secret.  The signal is modified according to rules known by the first device 301 and transmitted back to the first device 301 via a transmitter 315.  The first device 301 receives the modified signal via a receiver 317 and in 319 the received modified signal is compared to a signal, which has been modified locally… If the received modified signal and the locally modified signal are identical, then the received signal is authenticated and can be used for determining the distance between the first and the second device."  '809 patent at 6:31-48.

960.     Thus, I conclude that DTCP in view of Willey satisfies limitation 9[a.3].

### 3. Claim 49

(i)    **Preamble:** *A first device for controlling delivery of protected content to a second device, the first device comprising:*

961.    I have assumed the Preamble is limiting.  DTCP in view of Willey disclosed a first device for controlling delivery of protected content to a second device.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of the Preamble of Claim 1.  I incorporate my previous analysis into this section by reference.

962.    Thus, I conclude that DTCP in view of Willey satisfies the Preamble of Claim 49.

(ii)    **49[a]:** *a memory;*

963.    DTCP in view of Willey disclosed a memory.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[a].  I incorporate my previous analysis into this section by reference.

964.    Thus, I conclude that DTCP in view of Willey satisfies limitation 49[a].

(iii)    **49[b]:** *a processor, the processor arranged to:*

965.    DTCP in view of Willey disclosed a processor.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b].  I incorporate my previous analysis into this section by reference.

966.    Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b].

(iv)    **49[b.1]:** *receive a certificate from the second device prior to sending a first signal;*

967.    DTCP in view of Willey disclosed a processor arranged to receive a certificate from the second device prior to sending a first signal.  I have already explained how DTCP in view of Willey received a certificate from the second device in my analysis of limitation 1[b.1] and how DTCP in view of Willey sent a first signal after determining that the second device is compliant

with compliance rules in my analysis of limitation 1[b.3]. I incorporate my previous analysis into this section by reference.

968. Because DTCP in view of Willey did not send the first signal until it has determined that the second device is compliant with compliance rules, and because DTCP in view of Willey received a certificate from the second device in order to determine compliance, DTCP in view of Willey received the certificate prior to sending the first signal.

969. Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.1].

> **(v)    49[b.2]:** *determine from the certificate if the second device is compliant;*

970. DTCP in view of Willey disclosed a processor arranged to determine from the certificate if the second device is compliant. I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b.2]. I incorporate my previous analysis into this section by reference.

971. Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.2].

> **(vi)    49[b.3]:** *provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number;*

972. DTCP in view of Willey disclosed a processor arranged to provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number.

973. I understand the Court has construed the term "[provide/providing] [a]/the secret to the second device" to mean "securely [transmits/transmitting] the common secret with the second device according to a key transport protocol or a key agreement protocol."

974. I have already explained that DTCP disclosed a first device receiving a certificate from a second device and subsequently determined whether the second device was compliant

based on information in said certificate in reference to limitations 1[b.1], 1[b.2], and 49[b.2].  I incorporate my previous analyses into this section by reference.

975.    DTCP further disclosed performing a key agreement protocol after determining that the second device was compliant.  "[After authentication,] [t]he devices then exchange messages containing the EC-DH key exchange first-phase value, the Renewability Message Version Number and Generation of the system renewability message stored by the device."  DTCP at 29.

976.    A person of ordinary skill in the art at the time of the alleged invention would have known that the various key exchange mechanisms used in asymmetric cryptography systems were interchangeable.  A person of ordinary skill in the art at the time of the alleged invention would have been aware of both key agreement and key transport protocols for the secure exchange of the shared key.  A person of ordinary skill in the art at the time of the alleged invention would have recognized that DTCP described using a standard key agreement protocol (e.g., Diffie-Hellman), and that it would have been trivial to use a key transport protocol (e.g., RSA encryption) instead.  A person of ordinary skill in the art at the time of the alleged invention would have known that deciding whether to use a key transport or key agreement protocol was a well-known design parameter, and the design choice on whether to use one or the other was well-understood and the tradeoffs were well understood and known.  A person of ordinary skill in the art at the time of the alleged invention would have known that the use of either a key transport or key agreement protocol was a simple design choice with the predictable result of both devices having access to the same shared secret or key.  The '809 patent acknowledges as much in its specification and admits that both key transport and key agreement protocols were in the prior art and could be interchanged.  "The secret could be shared using e.g. key transport mechanisms described in ISO

11770-3.  Alternatively, a key agreement protocol could be used, which e.g. is also described in ISO 11770-3."  '809 patent at 3:52-55.

977.    The '809 patent discloses using a public key to encrypt data.  "Where $eP_B$ is encrypted with Public key B…"  '809 at 6:6-12.  The '809 further disclosed (in ISO/IEC 11770 incorporated by reference) that public keys could be disclosed while private keys could not.  "[The] private key [is] [t]hat key of an entity's asymmetric key pair which should only be used by that entity... [the] public key [is] [t]hat key of an entity's asymmetric key pair which can be made public."  ISO/IEC 11770-1 at 2.

978.    Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.3].

(vii)    **49[b.4]:** *provide the first signal to the second device;*

979.    DTCP in view of Willey disclosed a processor arranged to provide the first signal to the second device.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b.3].  I incorporate my previous analysis into this section by reference.

980.    Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.4].

(viii)    **49[b.5]:** *receive a second signal from the second device after providing the first signal;*

981.    DTCP in view of Willey disclosed a processor arranged to receive a second signal from the second device after providing the first signal.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b.4].  I incorporate my previous analysis into this section by reference.

982.    Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.5].

> **(ix)**   **49[b.6]:** *determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret;*

983.   DTCP in view of Willey disclosed a processor arranged to determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret.  I have already explained how DTCP in view of Willey satisfies these requirements in my analyses of limitations 1[b.5], 9[a.1], 9[a.2], and 9[a.3].  I incorporate my previous analyses into this section by reference.

984.   Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.6].

> **(x)**   **49[b.7]:** *determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and*

985.   DTCP in view of Willey disclosed a processor arranged to determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b.6].  I incorporate my previous analysis into this section by reference.

986.   Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.7].

> **(xi)**   **49[b.8]:** *allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.*

987.   DTCP in view of Willey disclosed a processor arranged to allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 1[b.7].  I incorporate my previous analysis into this section by reference.

EXPERT INVALIDITY REPORT OF DR. NIELSON

988.     Thus, I conclude that DTCP in view of Willey satisfies limitation 49[b.8].

### 4. Claim 50

(i)     **50[a.1]:** *The first device of claim 49, wherein the processor is further arranged to: use the secret to generate a secure authenticated channel between the first device and the second device;*

989.     DTCP in view of Willey disclosed the first device of claim 49, wherein the processor is further arranged to: use the secret to generate a secure authenticated channel between the first device and the second device.  I have already explained that DTCP in view of Willey disclosed the first device of claim 49.  I incorporate my analysis of Claim 49 into this section by reference.

990.     I have already explained that DTCP disclosed a shared secret ($K_{AUTH}$) with reference to limitation 49[b.3].  I incorporate my previous analysis into this section by reference.

991.     DTCP further explained that the shared secret was used to transmit an Exchange key ($K_X$):  "[a]fter the completion of Full or Restricted Authentication, the source device establishes the Exchange Key(s) described in Section 6.2.1.  The following procedure is used for each key… The source device assigned a *random value for the particular Exchange Key ($K_x$)* being established… It then scrambles the key $K_x$ using $K_{Auth}$ resulting in $K_{SX}$… The source device sends $K_{SX}$ to the sink device."  DTCP at 36, emphasis added.

992.     The Exchange Key, in turn, was used to produce Content Keys used to secure content transmission channels.  DTCP disclosed:  "This section describes the mechanism for establishing the Content Keys ($K_c$) used to encrypt/decrypt content being exchanged between the source and sink devices... The Content Key is computed by the source device using the… Exchange Key $K_x$,.. the sink device [also] computes the current Content Key using… [the Exchange Key] $K_x$."  DTCP at 36-37.

993.   DTCP taught that the Content Key (derived from the common secret, the Exchange Key) was used to create a secure channel.  "The Odd/Even bit (the 3rd bit of the synch field of the IEEE 1394 isochronous packet header) is used to indicate which Content Key ($K_c$) is currently being used to *protect the content channel*."  DTCP at 38, emphasis added.

994.   The '809 patent describes establishing a secure channel using the shared common secret (key) the same as in DTCP.  "Further, the shared secret can afterwards be used for generating a SAC (secure authenticated channel) channel between the two devices."  '809 patent at 3:50-52.

995.   Thus, I conclude that DTCP in view of Willey satisfies limitation 50[a.1].

> **(ii)**   **50[a.2]:** *use the secure authenticated channel to provide the protected content to the second device.*

996.   DTCP disclosed a processor arranged to use the secure authenticated channel to provide the protected content to the second device.



**Figure 1 Content Protection Overview**

997.   Figure 1 of DTCP at 11, reproduced above, outlines the content protection system described in DTCP.  The source device of Figure 1 is the first device and the sink device of Figure 1 is the second device.  The source device controlled delivery of protected content to the sink device.  The protected content located on the source device was the Clear Text Content that was accessed by the sink device over the encrypted content stream (a secure authenticated channel),

after the sink device had been properly authenticated and there had been an exchange of the key to be used for encryption.  "Once the devices have completed the required AKE procedure, a content channel encryption key can be exchanged between them.  This key is used to encrypt the content at the source device and decrypt the content at the sink."  DTCP at 11.

998.    The source device of Figure 1 is further clarified by DTCP to be a "device that is a *source of content*."  DTCP at 18, emphasis added.  As further illustrated in Figure 5 of DTCP, reproduced below, the source device controls the delivery of the protected content by requiring the sink device to be authenticated before sending the content keys necessary to access the protected content.  As illustrated below, state A4: Send Content Channel Key occurs only after state A3: Authenticated.



**Figure 5 Content Source Device State Machine**

999.    With reference to DTCP Figure 5 at 18 reproduced above, DTCP emphasized that content keys were only sent to authenticated devices:  "[i]n this state, the source device sends values necessary to create a content key to an authenticated sink device by executing *SendContentChannelKey(Sink_Device)*."  DTCP at 19, italics original.

293

EXPERT INVALIDITY REPORT OF DR. NIELSON

1000.   DTCP also explained how the sink device requested access to protected content. DTCP Figure 6, reproduced below, illustrates this process wherein the sink device first authenticates itself to and then requests a content key from the source device.  As shown below, state A4: Request Content Channel Key occurs after state A3: Authenticated.



**Figure 6 Content Sink Device State Machine**

1001.   With reference to DTCP Figure 6 at 19 reproduced above, DTCP emphasized that the source device controlled access to the protected content through authentication.  A sink device must be authenticated to access the protected content.  "An authenticated device [needs] to request a Content Key to gain access to copy protected content… an authenticated sink device requests the values necessary to create a Content Key by executing the process *RequestContentChannelKey(Source_Device)*."  DTCP at 20, italics original.

1002.   The '809 patent describes using the secure authenticated channel to share content with the second device the same as in DTCP.  "Further, the shared secret can afterwards be used for generating a SAC (secure authenticated channel) channel between the two devices."  '809

patent at 3:50-52.  "After the distance has been measured in a secure authenticated way as described above, content data can be sent between the first device and the second device in step 211 in FIG. 2."  '809 patent at 6:21-24.

1003.   Thus, I conclude that DTCP satisfies limitation 50[a.2].

### 5.   Claim 53

> **(i)       53[a.1]:** *The first device of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: modify the first signal according to the secret;*

1004.   DTCP in view of Willey disclosed the first device of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: modify the first signal according to the secret.  I have already explained that DTCP in view of Willey disclosed the first device of claim 49.  I incorporate my analysis of Claim 49 into this section by reference.  I have also already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 9[a.1].  I incorporate my previous analysis into this section by reference.

1005.   Thus, I conclude that DTCP in view of Willey satisfies limitation 53[a.1].

> **(ii)      53[a.2]:** *compare the modified first signal with the second signal; and*

1006.   DTCP in view of Willey disclosed a processor arranged to compare the modified first signal with the second signal.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 9[a.2].  I incorporate my previous analysis into this section by reference.

1007.   Thus, I conclude that DTCP in view of Willey satisfies limitation 53[a.2].

(iii)    **53[a.3]:** *determine that the modified first signal is identical to the second signal.*

1008.   DTCP in view of Willey disclosed a processor arranged to determine that the modified first signal is identical to the second signal.  I have already explained how DTCP in view of Willey satisfies these requirements in my analysis of limitation 9[a.3].  I incorporate my previous analysis into this section by reference.

1009.   Thus, I conclude that DTCP in view of Willey satisfies limitation 53[a.3].

**f)      Ground 6: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by DTCP, Willey, and ISO/IEC 11770.**

1010.   In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by DTCP, Willey, and ISO/IEC 11770.  As this ground is identical to Ground 5, except for the addition of the secondary reference ISO/IEC 11770, I incorporate fully my discussion of Ground 5 herein.  I specifically address only those limitations in which ISO/IEC 11770 provided pertinent additional non-cumulative disclosure.

1011.   ISO/IEC 11770 described mechanisms for key management using asymmetric techniques based on key agreement algorithms, key transport algorithms, and public key transport algorithms both with and without a trusted third party.  Specifically, ISO/IEC 11770 disclosed using an asymmetric cipher in which the public key from a public/private key-pair was used to encrypt a symmetric key that was to be used for bulk data encryption.

1012.   A person of ordinary skill in the art at the time of the alleged invention would have been motivated to combine DTCP, Willey, and ISO/IEC 11770, because ISO/IEC 11770 provided known secure cryptographically proven algorithms for "establish[ing] keying material whose origin, integrity, timeliness and (in the case of secret keys) confidentiality can be guaranteed to both direct and indirect users."  ISO/IEC 11770-1 at v.  A person of ordinary skill in the art at the time of the alleged invention would have known that the problem of secure exchange of keying

296

material was common in all cryptographic systems and that ISO/IEC 11770 documented already well-known solutions to this problem.  Incorporating the techniques disclosed in ISO/IEC 11770 into the DTCP-Willey system would have been trivial.  The resulting system would have been the product of combining known prior art elements disclosed in DTCP, Willey, and ISO/IEC 11770 according to known methods and would have yielded predictable results.

### 1.  Claim 1

1013.  The DTCP-Willey system analyzed in Ground 5 renders obvious all of the limitations of Claim 1 as discussed above.  I incorporate by reference all of my previous analyses of Ground 5, Claim 1 herein.

### 2.  Claim 9

1014.  The DTCP-Willey system analyzed in Ground 5 renders obvious all of the limitations of Claim 9 as discussed above.  I incorporate by reference all of my previous analyses of Ground 1, Claim 9 herein.

### 3.  Claim 49

1015.  The DTCP-Willey system analyzed in Ground 5 renders obvious all of the limitations of Claim 49 as discussed above.  I incorporate by reference all of my previous analyses of Ground 5, Claim 49 herein.

> **(i)      49[b.3]:** *provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number;*

1016.  The DTCP-Willey system in combination with ISO/IEC 11770 disclosed a processor arranged to provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number.

1017.   I understand the Court has construed the term "[provide/providing] [a]/the secret to the second device" to mean "securely [transmits/transmitting] the common secret with the second device according to a key transport protocol or a key agreement protocol."

1018.   I have already explained that the DTCP-Willey system transmitted the encrypted secret, the exchange key $K_X$, which was a random number, as a first signal to the second device if the second device was compliant in reference to Ground 5 limitations 1[b.2], 1[b.3], and 49[b.2]. I incorporate my previous analyses into this section by reference.

1019.   ISO/IEC 11770 further disclosed transmitting keys (a common secret) between devices using PKI according to a key transport protocol.  ISO/IEC 11770-3 described one of its goals as:  "[e]stablish a shared secret key for a symmetric cryptographic technique between two entities $A$ and $B$ by key transport.  In a secret key transport mechanism the secret key is chosen by one entity $A$ and is transferred to another entity $B$, suitably protected by *asymmetric* techniques (emphasis added)."  ISO/IEC 11770-3 at 1.

1020.   ISO/IEC 11770-3 described a number of key transport mechanisms.  The first described mechanism "transfers in one pass a secret key from entity $A$ to entity $B$ with implicit key authentication from $B$ to $A$."  ISE/IEC 11770-3 at 13.  ISO/IEC 11770 described that the requirements for this mechanism included device B having an asymmetric encipherment system and that device A had access to device B's public key.

1.   Entity B has an asymmetric encipherment system ($E_B,D_B$).
2.   A has access to an authenticated copy of B's public encipherment transformation $E_B$.  This may be achieved using the mechanisms of clause 8.
ISO/IEC 11770-3 at 13.

1021.   ISO/IEC 11770-3 described the secure transmission and reception of the secret $K$ from device $A$ to device $B$.

**Key Token Construction (A1)** *A* has obtained a key K and wants to transfer it securely to *B*. *A* constructs a key data block consisting of its distinguishing identifier *A* (optional), the key *K*, an optional *TVP* and an optional data field *Text1*. Then A encrypts the key data block using the receiver's public encipherment transformation $E_B$ and sends the key token

$$KT_{A1} = E_B(A // K // TVP // Text1) // Text2$$

to B.

**Key Token Deconstruction (B1)** *B* deciphers the received key token $KT_{A1}$ using its private encipherment transformation $D_B$, recovers the key *K*, checks the optional *TVP*, and associates the recovered key *K* with the claimed originator *A*.
ISO/IEC 117790-3 at 13.

1022.   ISO/IEC 11770-3 acknowledged that the well-known RSA private/public-key pair mechanism was an example of this mechanism.  ISO/IEC 11770-3 at 13.

1023.   The '809 patent acknowledges that the transmission of the secret "should be shared securely, e.g., according to some key management protocol as described in e.g. ISO 11770."  '809 patent at 5:33-35.  It is axiomatic that ISO/IEC 11770 disclosed what is contained therein.

1024.   Thus, I conclude that the DTCP-Willey system in view of ISO/IEC 11770 satisfies limitation 49[b.3].

### 4.   Claim 50

1025.   The DTCP-Willey system analyzed in Ground 5 renders obvious all of the limitations of Claim 50 as discussed above.  I incorporate by reference all of my previous analyses of Ground 5, Claim 50 herein.

### 5.   Claim 53

1026.   The DTCP-Willey system analyzed in Ground 5 renders obvious all of the limitations of Claim 53 as discussed above.  I incorporate by reference all of my previous analyses of Ground 5, Claim 53 herein.

g) **Ground 7: Claims 1, 9, 49, 50, and 53 of the '809 patent are rendered obvious by SmartRight and Willey**

1027.   In my opinion, the claimed subject matter in each of claims 1, 9, 49, 50, and 53 of the '809 patent is rendered obvious by SmartRight and Willey.  SmartRight taught authentication in the context of content protection using a challenge-response protocol based on public-key infrastructure (PKI) between a terminal card and a presentation device, e.g. a television, which the '809 patent acknowledges was well known in the prior art.  SmartRight also disclosed the secure exchange of a Session Key between a terminal card and a presentation device for use in a symmetric cipher for encryption of data between the terminal card and the presentation device. SmartRight did not disclose the calculation of a round-trip time to determine the distance between the terminal card and the presentation device.  Willey disclosed using a challenge-response protocol with an integrated round-trip time measurement to calculate the distance between two communicating devices to restrict access and communication to devices that have been both authenticated and determined to be within a predetermined distance bound.

1028.   The SmartRight White Paper additionally disclosed a challenge-response protocol between the converter card and the terminal card.  The converter card also transmitted a shared secret to the terminal card via the presentation device.  The SmartRight White Paper also did not disclose the calculation of a round-trip time to determine the distance between the two devices.

1029.   It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention to incorporate Willey's teachings to improve the content protection system of SmartRight.   As previously set forth in my report, SmartRight disclosed an authentication technology for accessing protected content.  Willey disclosed an authentication technology with distance-bounding to ensure that two devices were sufficiently close together.  At the time of the alleged invention of the '809 patent, it was well known that distance bounding was "often"

the right to present demonstrative exhibits in response to any opinions or exhibits presented by Philips' expert witnesses in this case.

## XII.   COMPENSATION TO BE PAID FOR WORK ON THE CASE

1861.   For time spent in connection with study and analysis in this matter, I will be compensated in the amount of $450 per hour.  For time spent in connection with testifying in this matter, I will be compensated in the amount of $450 per hour.  My compensation does not depend on the outcome of this case.

## XIII.  CONCLUSION

1862.   For the reasons explained above, I conclude that each of the Asserted Claims of the Philips' patent is invalid for multiple independent reasons.  My opinions on other relevant issues such as the priority date to which each Asserted Claim may be entitled are also set forth herein.

1863.   I reserve the right to amend and/or supplement the foregoing in accordance with applicable Court rules, orders and procedures, and in response to newly disclosed positions on any issues I have opined about by Philips.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the results of these proceedings.

Executed on April 25, 2019
at __Cheyenne, WY__.

By: _____
Dr. Seth James Nielson

# Seth Nielson Expert Report Appendix B

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| PHILIPS00006372 | PHILIPS00006381 | U.S. Patent No. 8,543,819 |
| PHILIPS00006382 | PHILIPS00007163 | U.S. Patent No. 8,543,819 File History |
| PHILIPS00014257 | PHILIPS00014267 | U.S. Patent No. 9,436,809 |
| PHILIPS00013518 | PHILIPS00014033 | U.S. Patent No. 9,436,809 File History |
| HTC-PHIL-201812 | HTC-PHIL-201822 | U.S. Patent No. 8,886,939 |
| HTC-PHIL-EXP-SN-1077 | HTC-PHIL-EXP-SN-1770 | U.S. Patent No. 8,886,939 File History |
|  |  | Complaint for Patent Infringement, dated December 7, 2015 with exhibits |
|  |  | First Amended Complaint for Patent Infringement, dated April 11, 2016 with exhibits |
|  |  | Second Amended Complaint for Patent Infringement, dated November 23, 2016 with exhibits |
|  |  | Final Joint Claim Chart, dated February 10, 2017 with exhibits |
|  |  | HTC Answer to Second Amended Complain, dated December 22, 2016 with exhibits |
|  |  | Plaintiffs' opening claim construction brief, dated March 3, 2017 and accompanying declarations and exhibits thereto |
|  |  | Defendants' opening claim construction brief, dated March 3, 2017 and accompanying declarations and exhibits thereto |
|  |  | Plaintiffs' responsive claim construction brief, dated March 31, 2017 and accompanying declarations and exhibits thereto |
|  |  | Defendants' responsive claim construction brief, dated March 31, 2017 and accompanying declarations and exhibits thereto |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Transcript of Markman hearing dated May 3, 2017 |
| | | Declaration of Dr. Michael T. Goodrich, dated March 3, 2017 |
| | | Order Construing the Terms of U.S. Patent Nos. RE44,913, 6,690,387, 7,184,064, 7,529,806, 5,910,797, 6,522,695, 8,543,819, 9,436,809, 6,772,114, RE43,564, 6,211,856, D.I. 160, filed 7/11/17 |
| | | Initial Infringement Contentions to HTC and accompanying exhibits and appendices, dated August 26, 2016 |
| | | First Amended Identification of Accused Products to HTC, dated August 26, 2016 |
| | | Initial Invalidity Contentions and Exhibits thereto, dated September 30, 2016 |
| | | First Amended Infringement Contentions to HTC and accompanying exhibits and appendices, dated December 9, 2016 |
| | | Initial Invalidity Contentions and Exhibits Thereto (re 809 patent), dated December 20, 2016 |
| | | Second Amended Identification of Accused Products to HTC, dated January 19, 2017 |
| | | First Supplemental Invalidity Contentions, dated July 21, 2017 |
| | | Second Amended Infringement Contentions to HTC and accompanying exhibits and appendices, dated September 29, 2017 |
| | | Third Amended Identification of Accused Products to HTC, dated October 20, 2017 |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Second Supplemental Invalidity Contentions, dated November 3, 2017 |
| | | Plaintiff's Third Amended Infringement Contentions Against the HTC Defendants, dated February 2, 2018 with Appendices |
| | | Third Supplemental Invalidity Contentions, dated March 18, 2018 |
| | | Philips' Disclosure of Asserted Claims and Infringement Contentions Against HTC, dated October 25, 2018 |
| | | Defendants' Rule 3-3 Disclosures and related materials, dated November 15, 2018 |
| | | Defendants' Rule 3-4 Disclosures and related materials, dated November 15, 2018 |
| | | Philips' First Amended Disclosure of Asserted Claims and Infringement Contentions Against HTC, dated March 8, 2019 |
| | | Excerpt from 819 / 809 Noninfringement Contentions dated March 12, 2018 |
| | | Exhibit K-1 through K-13 Invalidity Claim Charts for U.S. Patent No. 9,436,809 |
| | | Exhibit H-1 through H-13 Invalidity Claim Charts for U.S. Patent No. 8,543,819 |
| | | Philips Responses to Defs First Common Rogs |
| | | HTC's Responses to Philips' First Individual Rogs |
| | | Philips Responses to Defs Second Common Rogs |
| | | Philips Responses to Defs Third Common Rogs |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Philips Responses to HTC 1st Individual Rogs |
| | | HTC Supplemental Response to Philips Rog 4 |
| | | Philips Amended Response to Defendants 2nd Common Rogs (3-7) |
| | | Philips Supp Response to Defs Common Rog 2 |
| | | Philips Sup Response to Defs Common Rog 3 |
| | | HTC Response to Philips 2nd Rogs (7-14) |
| | | HTC Supplemental Response to Philips Common Rogs (1, 2 and 5) |
| | | Philips Supplemental Response to 3rd Common Rogs |
| | | HTC Responses to 3rd Individual Rogs |
| | | HTC Supplemental Responses to Rogs 1, 4, 6, 7 and 8 |
| | | HTC Objections and Responses to Philips Rogs 16-17 |
| | | HTC Supplemental Response to Philips Interrogatory No. 10 |
| | | Philips Responses to HTC 2nd Individual Rogs |
| | | HTC Responses to Philips 5th Rogs (18-20) |
| | | Philips Response to HTC 3rd Rogs (10-15) |
| | | Philips 2nd Supp Response to Common Rog Nos. 2, 8 |
| | | Philips 3rd Amended Response to Defs 2nd common rogs (3-7) |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
|  |  | Philips Supp. Response to HTC Rog Nos 1, 2 and 10 |
|  |  | HTC Supplemental Responses to Philips Rog 16 |
|  |  | HTC Fourth Supplemental Response to Philips Rog 4 |
|  |  | Philips Response to HTC 4th Rogs No 16 |
|  |  | HTC Fifth Supplemental Response to Interrogatory No. 4 |
|  |  | HTC Supplemental Response To Interrogatory Nos. 1, 2, 18 and 19 |
|  |  | Philips Objections and Responses to Microsoft's Requests for Admissions Nos. 1-50, dated January 4, 2019 (REDACTED) |
|  |  | Philips Responses to HTC's First RFAs |
|  |  | Philips Responses to HTC's Second RFAs |
|  |  | Philips Responses to HTC's RFA 49 |
|  |  | Deposition of Martin Rosner, dated January 4, 2019 |
| PHILIPS00006940 | PHILIPS00006954 | 5C Digital Transmission Content Protection White Paper, Revision 1.0, July 14, 1998 |
| HTC-PHIL-EXP-SN-1053 | HTC-PHIL-EXP-SN-1076 | Anderson, Security Engineering, A Guide to Building Dependable Distributed Systems, Chapter 2 |
| PRIORART004486 | PRIORART004501 | Brands and Chaum, Distance-Bounding Protocols (Extended Abstract) |
| PRIORART004612 | PRIORART004616 | Bussard and Roudier, Authentication in Ubiquitous Computing (Extended Extract) |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| HTC-PHIL-EXP-SN-0897 | HTC-PHIL-EXP-SN-0909 | Caswell and Debaty, Creating Web Representing for Places |
| PRIORART005071 | PRIORART005080 | Crosby, et al., A Cryptanalysis of the High-Bandwidth Digital Content Protection System |
| HTC-PHIL-EXP-SN-0910 | HTC-PHIL-EXP-SN-0980 | Digital Transmission Content Protection Specification, Volume 1 (Informational Version), Revision 1.2, dated July 11, 2001 |
| HTC-PHIL-EXP-SN-0001 | HTC-PHIL-EXP-SN-0009 | DTCP Volume 1, Supplemental F, DTCP 1394 Additional Localization (Informational Version), Revision 1.0, June 15, 2007 |
| HTC-PHIL-EXP-SN-2008 | HTC-PHIL-EXP-SN-2018 | Corner and Noble, Zero-Interaction Authentication |
| PRIORART040421 | PRIORART040504 | European Patent Application No. EP 1 100 035 |
| PHILIPS00000066 | PHILIPS00000143 | High-bandwidth Digital Content Protection System, Interface Independent Adaptation, Revision 2.2 |
| PRIORART006932 | PRIORART006991 | High-bandwidth Digital Content Protection Systems, Revision 1.0, February 17, 2000 |
| HTC-PHIL-EXP-SN-1936 | HTC-PHIL-EXP-SN-2007 | International Patent Pub. No. WO 01/93434 |
| PRIORART028535 | PRIORART028563 | International Patent Pub. No. WO 02/35036 |
| PHILIPS00014160 | PHILIPS00014246 | International Standard ISO/IEC 11770-1, Information Technology - Security techniques - Key management |
| PRIORART008287 | PRIORART008326 | International Standard ISO/IEC 11770-3, Information Technology - Security techniques - Key management - Part 3: Mechanisms using asymmetric techniques |
| PHILIPS00014075 | PHILIPS00014159 | International Standard ISO/IEC 9798-1, Information Technology - Security techniques - Entity authentication - Part 1: General |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| PRIORART029668 | PRIORART029753 | Internet Security Association and Key Management Protocol (ISAKMP), Network Working Group, RFC: 2408 |
| PRIORART010832 | PRIORART010840 | Kindberg and Zhang, Context authentication using constrained channels |
| HTC-PHIL-EXP-SN-0010 | HTC-PHIL-EXP-SN-0803 | Menezes et al., Handbook of Applied Cryptography |
| HTC-PHIL-EXP-SN-0804 | HTC-PHIL-EXP-SN-0893 | Micronas and Thomson Multimedia Showcase a New Copy Protection System That Will Drive the Future of Digital Television (0202), January 8, 2002, Trade News |
| HTC-PHIL-EXP-SN-0804 | HTC-PHIL-EXP-SN-0893 | Network Working Group, Internet X.509 Public Key Infrastructure Certificate and CRL Profile, RFC: 2459 |
| HTC-PHIL-226045 | HTC-PHIL-226124 | Network Working Group, The TLS Protocol Version 1.0, dated January 1999, RFC: 2246 |
| HTC-PHIL-EXP-SN-0981 | HTC-PHIL-EXP-SN-1052 | Network Working Group, Public-Key Cryptography Standards (PKCS) #1 RSA Cryptography Specifications Version 2.1, RFC: 3447 |
| PRIORART043996 | PRIORART044027 | Schneier, Applied Cryptography, Protocols, Algorithms and Source Code in C |
| PRIORART055224 | PRIORART055254 | Schneier, Applied Cryptography, Protocols, Algorithms and Source Code in C |
| PRIORART046362 | PRIORART046414 | SmartRight, Answer to the Call for Proposals for content protection & copy management technologies, Version 1.0, October 19, 2001 |
| PRIORART044211 | PRIORART044296 | SmartRight™ Certification for FCC Approval for Use with the Broadcast Flag, March 1, 2004, submitted by Thomson, on behalf of itself and the following companies supporting the SmartRight system: Axalto, Gemplus SA, Micronas, Nagravision SA, Pioneer Corporation, SCM Microsystems, ST Microelectronics N.V.; to the |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Federal Communications Commission Office of the Secretary |
| PRIORART044422 | PRIORART044445 | SmartRight™ Copy Protection for System for Digital Home Networks, Deployment Process, CPTWG, November 28, 2001, by Thomson multimedia |
| PRIORART044383 | PRIORART044404 | SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, July 11, 2001, by Thomson multimedia |
| PRIORART044405 | PRIORART044421 | SmartRight™ Copy Protection System for Digital Home Networks, CPTWG, May 24, 2001, by Thomson multimedia |
| PRIORART044297 | PRIORART044315 | SmartRight™ Digital Broadcast Content Protection, MB Docket No. 04-59, Presentation to FCC, April 2, 2004 |
| PRIORART044446 | PRIORART044464 | SmartRight™ Technical White Paper, Version 1.7, January 2003, published by Thomson ("White Paper") |
| PRIORART015705 | PRIORART015727 | U.S. Patent App. No. 2003/0065918 |
| | | U.S. Patent App. No. 2003/0145214 |
| PRIORART015761 | PRIORART015803 | U.S. Patent App. No. 2005/0265503 |
| HTC-PHIL-EXP-SN-1794 | HTC-PHIL-EXP-SN-1804 | U.S. Patent No. 4,627,060 |
| HTC-PHIL-EXP-SN-1805 | HTC-PHIL-EXP-SN-1815 | U.S. Patent No. 5,513,319 |
| HTC-PHIL-EXP-SN-1816 | HTC-PHIL-EXP-SN-1827 | U.S. Patent No. 5,949,877 |
| HTC-PHIL-EXP-SN-1828 | HTC-PHIL-EXP-SN-1880 | U.S. Patent No. 6,493,825 |
| PRIORART019585 | PRIORART019602 | U.S. Patent No. 6,550,011 |
| HTC-PHIL-EXP-SN-1881 | HTC-PHIL-EXP-SN-1900 | U.S. Patent No. 6,910,129 |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| PRIORART026394 | PRIORART026430 | U.S. Patent No. 7,242,766 |
| HTC-PHIL-EXP-SN-1901 | HTC-PHIL-EXP-SN-1914 | U.S. Patent No. 7,302,571 |
| HTC-PHIL-EXP-SN-1915 | HTC-PHIL-EXP-SN-1935 | U.S. Patent No. 7,340,596 |
| PRIORART002379 | PRIORART002399 | U.S. Patent No. 7,516,325 |
| PRIORART021041 | PRIORART021072 | U.S. Patent No. 7,898,977 |
|  |  | Mirror Worlds, LLC v. Apple Inc., 692 F. 3d 1351 - Court of Appeals, Federal Circuit 2012 |
|  |  | Jang v. Boston Scientific Corporation, Scimed Life Systems, Inc., NKA Boston Scientific Scimed, Inc., United States Court of Appeals for the Federal Circuit, 2016-1275, 2016-1575, Opinion |
|  |  | Defending Patent Infringement with 'Ensarement' - Law360 |
|  |  | Federal Circuit Upholds District Court Vacular of Jury Verdict Under Doctrine of Equivalents Based Upon Ensarement Defense, Brinks Gilson & Lione, dated October 4, 2017 |
|  |  | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Petition for Inter Partes Review of U.S. Patent No. 8,543,819 |
|  |  | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Patent Owner's Preliminary Response Under 37 C.F.R. 42.107 |
|  |  | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Petitions' Reply to Patent Owner's Preliminary Response |
|  |  | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Patent No. 8,543,819, Patent Owner's Sur-Reply to Petitioners' Reply |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Decision, Denying Institution of Inter Partes Review |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Declaration of William R. Rosenblatt, Exhibit 1009 |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, Supplemental Declaration of William R. Rosentblatt, Exhibit 1015 |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00277, U.S. Patent No. 8,543,819, PTAB Conference Call dated April 6, 2018, Exhibit 2005 |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Petition for Inter Partes Review of U.S. Patent No. 9,436,809 |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Petitioners' Reply to Patent Owner's Preliminary Response |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Patent Owner's Sur-Reply to Petitioners' Reply |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Decision Denying Institution of Inter Partes Review, Paper 11 |

Expert Report of Seth Nielson - Appendix B

Materials Considered

| Beg Bates | End Bates | Title / Description |
|---|---|---|
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Declaration of William R. Rosenblatt, Exhibit 1009 |
| | | Microsoft Corporation and Microsoft Mobile Inc., v. Koninklijke Philips N.V., IPR2018-00279, U.S. Patent No. 9,436,809, Supplemental Declaration of William R. Rosentblatt, Exhibit 1016 |
| | | Deposition of Stephen Balogh, February 13th, 2019 |
| | | Deposition of Priya Devanand, February 13th, 2019 |
| | | Telephonic Interview with Eric Diehl on April 13, 2019 |
| | | All documents and things referenced within this report |