Bruce Genderson *(pro hac vice)*
Kevin Hardy *(pro hac vice)*
Aaron Maurer *(pro hac vice)*
David Krinsky *(pro hac vice)*
Andrew Trask *(pro hac vice)*
Kyle Thomason *(pro hac vice)*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C., 20005
+1 (202) 434-5000
+1 (202) 434-5029 facsimile
viceroy@wc.com

Matthew S. Warren (Bar No. 230565)
Erika H. Warren (Bar No. 295570)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
18-1885@cases.warrenlex.com

Michael J. Newton (Bar No. 156225)
Sang (Michael) Lee *(pro hac vice)*
Derek Neilson *(pro hac vice)*
ALSTON & BIRD LLP
2200 Ross Avenue, Suite 2300
Dallas, Texas, 75201
+1 (214) 922-3400
+1 (214) 922-3899 facsimile
asus-philips@alston.com

*Attorneys for Defendants ASUSTeK Computer Inc. and ASUS Computer International*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE KONINKLIJKE PHILIPS PATENT LITIGATION | Case No. 4:18-cv-1885-HSG-EDL<br><br>JURY TRIAL DEMANDED<br><br>**ASUS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    November 14, 2019<br>Time:    2:00 p.m.<br>Place:    Courtroom 2, 4th Floor (Oakland)<br>Judge:    Hon. Haywood S. Gilliam, Jr. |

**TABLE OF CONTENTS**

ARGUMENT ...........................................................................................................................1

I.   ASUS' Android Products Do Not Infringe the '797 Patent…..…………………………….1

II.  ASUS' Android and Chrome Products Do Not Infringe the '064 Patent……..……………..4

III. The Asserted Claims of the RE'564 Patent Are Indefinite……………………………........7

IV.  ASUS' Accused Products Do Not Infringe the '809 Patent…………..…………………….8

V.   Claim 12 of the '806 Patent is Indefinite…..……………………………………………….11

    A.   "Means for Downloading" Is Still a Means-Plus-Function Term ………..……………..11

    B.   Under Section 112, "Means for Downloading" is Indefinite .........…..…………………13

        1.   The Narrow *Katz* Exception Does Not Apply ………………………………………...13

        2.   The '806 Discloses No Algorithm for "Downloading" …………………………..14

CONCLUSION  ……………………………………………………………………………....15

**TABLE OF AUTHORITIES**

*Cases*                                                                                                                      **Pages**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ......................................................................................................6

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)....................................................................................15

*Bicon, Inc. v. Straumann Co.*,
    441 F.3d 945 (Fed. Cir. 2006)........................................................................................7

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)......................................................................................8

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
    899 F.3d 1291 (Fed. Cir. 2018)........................................................................12, 13, 15

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
    785 F.3d 616 (Fed. Cir. 2015) ................................................................................12, 15

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
    673 F.3d 1361 (Fed. Cir. 2012) ....................................................................................13

*Finisar Corp. v. DirecTV Grp., Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ....................................................................................12

*Finjan, Inc. v. Sophos, Inc.*,
    No. 14-1197, 2015 WL 890621 (N.D. Cal. March 2, 2015).................................13, 14

*Finjan, Inc. v. Symantec Corp.*,
    No. 14-2998, 2017 WL 550453, (N.D. Cal. Feb. 10, 2017) .................................13, 14

*Intellectual Ventures I LLC v. T-Mobile U.S., Inc.*,
    902 F.3d 1372 (Fed. Cir. 2018).....................................................................................8

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).....................................................................................8

*Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011)..............................................................................13, 14

– ii –                              Case No. 4:18-cv-1885-HSG-EDL
ASUS' REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ..............................................................................................................7

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)..................................................................................13, 15

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)..............................................................................................3

*SPEX Techs., Inc. v. Kingston Tech. Corp., et al.*,
    No. 16-7349, 2017 WL 5495149 (C.D. Cal. Oct. 18, 2017) .............................................14

*SanDisk Corp. v. Memorex Prods., Inc.*,
    415 F.3d 1278 (Fed. Cir. 2005).............................................................................................4

*Silong v. United States*,
    No. 06-474, 2007 WL 2712100 (E.D. Cal. Sept. 14, 2007) ..............................................12

*TecSec, Inc. v. Int'l Bus. Machs. Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013)....................................................................................11, 12

*TriMed, Inc. v. Stryker Corp.*,
    514 F.3d 1256 (Fed. Cir. 2008)...........................................................................................11

*Statutes*

35 U.S.C. § 112.............................................................................................................................15

Fed. R. Civ. P. 56(e) .......................................................................................................................7

# ARGUMENT

## I. ASUS' Android Products Do Not Infringe the '797 Patent

Philips' Opposition does not identify any disputed facts regarding operation of the accused screen reorientation functionality in ASUS' products. There is no dispute that the functionality works to change the orientation of what is displayed on the screen (*e.g.*, from landscape to portrait) based on a comparison of the static physical orientation of a device to its currently displayed orientation. Mot. at 3:24 to 4:18. The software is fed continuous reports about the physical orientation of the device. *Id.* If the physical orientation matches the displayed orientation, the software does nothing. *Id.* But if the physical orientation does not match the displayed orientation, and if the physical orientation is stable, the software invokes a switch in the display orientation. *Id.* Claim 1 of the '797 patent, on the other hand, requires an apparatus that has a sensor that measures acceleration "induced by user manipulation of the screen," and then "impart[s] an acceleration based motion pattern" that is "under control of a screen motion"—that is, the motion that the sensor has just sensed. Mot. Ex. 1 at 4:41-51. Because the limitations of the claim are not met by the accused functionality, summary judgment of no infringement is appropriate.

This is a matter of pure claim construction, and one that the District of Delaware did not address. The issue is whether the claim, properly construed, covers the use of the sensed static orientation of a device to control the screen display. It does not. Claim 1 recites:

> A manipulatable apparatus having data processing means and screen means for displaying one or more graphical or other objects presented by said data processing means, ***a gravitation-controlled sensor integrated with said screen means and feeding said data processing means for measuring an acceleration of said screen means induced by user manipulation of the screen means***, wherein said data processing means have ***programmed calculating means for under control of a screen motion sensed by said sensing means*** imparting an acceleration based motion pattern to a predetermined selection among said objects.

*Id.* (emphasis added). The claim requires a sensor that (1) measures an acceleration of the screen (*i.e.*, the device) induced by user manipulation of the device, and (2) feeds the acceleration data resulting from the user manipulation to a data processing means. The data processing means, in turn, has programmed calculating means that, "under control of a screen motion sensed by said sensing means," imparts a motion pattern to one or more displayed objects. *Id.* In line with the claim language, the function of "programmed calculating means" was construed to be "receiving screen motion information and imparting an acceleration based motion pattern to one or more or all displayed objects." Mot. Ex. 2 at 12.

The heart of the parties' dispute regarding the accused functionality is as follows: does the claim require that the animated rotation of the screen image (the asserted "acceleration based motion pattern") be caused by a measured acceleration of the screen induced by user manipulation? *See* Opp. at 3:2-5; 3:28-4:3. The answer provided by the plain language of the claim, and confirmed by the Court's construction, is yes. The claim explicitly links the measured, user-induced acceleration of the screen with imparting a motion pattern to one or more displayed objects. The plain language recites an apparatus with a sensor that measures acceleration from user-induced motion of the device, requires that the acceleration data is fed to a computer program, and further requires that the computer program uses the data to impart a motion pattern to one or more displayed objects. Philips denies any relationship between the motion measured by the "means for measuring an acceleration" and the motion pattern imparted by the "programmed calculating means," but that stretches the claim past its breaking point. The claim expressly requires that the imparting of a motion pattern be "under control" of "screen motion sensed by said sensing means." Philips' incorrect reading would render those limitations meaningless.

Philips' principal response is to attack a straw man. ASUS is not arguing that there must be "a *particular* relationship between a measured acceleration of the screen and the acceleration based motion pattern imparted to objects on the screen." Opp. at 4:3-7 (emphasis added). During *Markman* proceedings, ASUS argued that the displayed motion pattern should be "proportional to the sensed screen motion, as if the user's manipulation of the screen were instead manipulating the objects." *See* Mot. Ex. 2 at 11 n.17. But ASUS is not making the same "proportional" argument here. Instead, ASUS asserts—consistent with the plain language of the claim—that Claim 1 requires an apparatus that uses measurements of acceleration due to movement of the screen by the user to control the motion of objects displayed on the screen, *i.e.*, that there must be some *causal* link between the measured user-induced acceleration and the display of the acceleration based motion pattern. Contrary to Philips' suggestion, that issue was never decided or addressed during claim construction in this case.

Philips alternately argues that, even under a claim construction requiring some causal link between screen motion and the display of an acceleration based motion pattern, the accused products infringe because they "determine screen motion (by sensing acceleration to detect 'a change in orientation' based on changes in measured acceleration), and the accused devices do impart an acceleration based motion

pattern under control of (or based on) that screen motion." Opp. at 4:21-25. If it is inclined to sift through Philips' block citation to 25 paragraphs and two sections of its expert's report, the Court will search in vain for any support for Philips' proposition that the accused products "determine screen motion" based on "changes in measured acceleration" induced by user manipulation of the screen. It is undisputed that the products do not use screen motion in the accused functionality; they use stable orientation. Mot. at 3:24-4:14. Although a device's stable orientation is determined by its accelerometer (using gravity as a reference), the use of an accelerometer to determine which way the screen is oriented toward the Earth does not mean that the accused functionality is controlled by "screen motion" or relies on "measuring an acceleration of said screen means induced by user manipulation of the screen means" as required by the claim. *See* Mot. Ex. 5 ¶ 47; Ex. 1 (Cockburn Rep., 2d excerpts) ¶¶ 52-54.[1]

With respect to the prosecution history, Philips argues that in distinguishing Donahue, its disclaimer was limited to devices that do not have the "ability [to] measure acceleration," Opp. at 5:16-20, and no more. Philips' statements to the Patent Office were not so narrow, however. Although Philips contrasted Donahue's tilt sensor versus acceleration-based sensors, it did so in the course of unambiguously identifying the key distinction between its alleged invention and the prior art—that the claims at issue are directed to a system that senses and responds to user-induced *acceleration*:

> Accordingly, claim 1 has been amended herein to recite a manipulatable apparatus having a screen means with a gravitational controlled sensor integrated with the screen means and feeding the data processing means for measuring an ***acceleration of the screen means induced by user manipulation***. The data processing means, ***under control of a screen acceleration motion sensed by the sensing means*** imparts an acceleration-based motion pattern to an object on the screen.

Mot. Ex. 4 at PHILIPS00004216 (emphasis added).

Moreover, "disclaimer" relates to a narrowing of the scope to which a claim's plain language otherwise would be entitled based on arguments during prosecution. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a

---

[1] "Ex." citations are exhibits to the concurrently filed Declaration of Erika H. Warren in Support of ASUS' Reply Memorandum in Support of Its Motion for Summary Judgment. "Mot. Ex." exhibits relate to ASUS' opening motion. "Opp. Ex." exhibits relate to Philips' opposition to ASUS' motion.

certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) (discussing argument-based prosecution disclaimer). But Philips' disclaimer argument misses a key part of the story. Philips did not just submit arguments about the meaning of its claims; it affirmatively amended them to replace "measuring a ***spatial orientation*** of said screen means" with "measuring ***an acceleration*** of said screen means ***induced by user manipulation of the screen means***." Mot. Ex. 4 at PHILIPS0004213 (emphasis added); *see* Mot. at 3. Philips' amendment substituting "acceleration . . . induced by user manipulation" in place of "spatial orientation" reinforces that Philips should be held to what the claims say on their face. Accordingly, even if there is ambiguity in Philips' arguments during prosecution, *see* Opp. at 5:14 to 6:16, it is irrelevant in light of the plain claim language. (To be clear, Philips' arguments about ambiguity are wrong—for example, the statement ASUS quoted from PHILIPS0004232 is directed to "the claims," not just claim 11 as Philips states, Opp. at 6:12-15.) The claim amendment—which sought to avoid Donahue by replacing the claims' reliance on measured *orientation* with reliance on measured, user-induced *acceleration*—removes the accused functionality from the scope of the claims for the same reasons.

Finally, Philips argues in the alternative that the accused functionality satisfies the claim limitations at issue because the software refuses to invoke a screen reorientation if the device is not stable, a determination that is made using accelerometer data. Opp. at 6:17-7:4. This is a new theory that is not in Philips' infringement contentions and should thus be disregarded. *See* Ex. 2 (Fourth Amended Inf. Contentions, Ex. E) at 7. In any event, Philips' argument turns the claim on its head. In refusing to reorient the screen display until the device is stable, the accused functionality is using acceleration of the device induced by user movement to ***avoid*** "imparting an acceleration based motion pattern." *See, e.g.*, Mot. Ex. 5 ¶ 35, Ex. 1 (Cockburn Rep., 2d excerpts) ¶¶ 55-57. This is the opposite of what is claimed and cannot give rise to infringement liability.

## II.  ASUS' Android and Chrome Products Do Not Infringe the '064 Patent

The independent claims of the '064 patent require program instructions—*i.e.*, source code—that implement the "stopping motion program instructions" limitation. This code must, as required by the claims, "terminat[e] scrolling displacement of the image on said screen upon first occurrence of any signal

. . . comprising: (a) a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time." Mot. at 5. Philips has identified no such code in the accused devices. To the contrary, the testimony of Philips' expert establishes that the accused devices terminate scrolling before any determination whether a touch is substantially stationary. Specifically, Philips' expert opined that:

- In order to determine whether a finger touch is substantially stationary, a system requires *two sequential scans* of the touchscreen showing the finger in substantially the same position. *See* Mot. at 7:13-19 (quoting Schmidt deposition).
- The relevant code on the accused devices stops scrolling actions immediately on the *first scan* sensing a finger touch on the screen. *See* Mot. at 8:3-18 (quoting Schmidt report).

That is, the accused devices terminate scrolling before the existence of a "substantially stationary finger touch" can possibly be determined, leading to a conclusion of no infringement. *See* Mot. at 8-9.

ASUS' motion squarely challenged Philips to identify any material issue regarding whether, as the claims expressly require, the accused devices have computer code that terminates scrolling on sensing a stationary finger touch. Philips has not done so. Instead, Philips argues that the "stopping motion program instructions" limitation is met because, "if a user were to touch the screen while inertial scrolling is in progress in any of the accused applications, and the user were to keep their finger substantially stationary for a duration exceeding the time for the touchscreen to complete one scan, then the device would terminate scrolling motion in those applications." Opp. at 9:10-16. That is no answer at all to ASUS' challenge. These are apparatus claims, not method claims, and the claimed system is required to contain specific computer code that terminates scrolling upon a signal indicating a substantially stationary finger touch. Philips has provided no evidence that the accused devices contain any such code. Rather, its own expert has opined that the accused devices stop scrolling upon the first detection of finger touch, *see* Mot. at 8:3-18 (quoting Schmidt report), which he admits is *before* the system can determine whether the touch to be stationary or not, *see* Mot. at 7:13-19 (quoting Schmidt deposition). The devices simply do not detect or signal a "substantially stationary" touch as a condition of terminating scrolling. *Id.* The fact that scrolling remains stopped if the finger does not move for some additional period of time does nothing to help Philips' infringement case. The code on the accused devices has already "terminat[ed]" the scroll at that point. It makes no sense to contend that scrolling is terminated (again) at a later point in

time with respect to the already-stopped display, and certainly does not mean that the accused devices contain code fulfilling the claim's requirements.

Next, Philips attempts to rewrite its expert's testimony ("Dr. Schmidt clarified in his depositions, . . . ." Opp. at 9:21) to suggest that "his analysis was performed after the touch was already detected (*i.e.*, at the first scan) and after it had endured for a duration longer than a scan period (*i.e.*, the second scan), and explained that the ACTION_DOWN event could not be read in isolation while ignoring the ACTION_MOVE event that immediately follows it if the touch was not substantially stationary for the preset minimum time." Opp. at 9:22-27. Certainly an expert should not be able to rewrite his opinions during deposition. Nonetheless, an examination of the material Philips cites shows that it changes nothing. Philips' first citation, Opp. Ex. 17 at 88:15-90:16, restates exactly what ASUS stated in its motion (indeed, it includes testimony ASUS block-quoted), *i.e.*, a system requires two scans to determine that a finger touch is substantially stationary (there is a first scan "to detect" a finger touch, and only after a second scan can it be determined that the touch is substantially stationary). The remainder of the cited deposition testimony confirms that in-progress flings are terminated upon receipt of the ACTION_DOWN event that is generated when the touchscreen reports the first detection of a finger touch, even before it has been determined whether the finger is moving. *E.g., id.* at 100:3-13 ("A. So what this -- what I say here in paragraph 142 is that an in-progress fling, or in-progress flings are terminated; however, if the user begins to move again, or has been moving their finger, when they put the finger down and continue to move it, then the screen will – display will continue to scroll. It would either stick-to-finger scroll or [be] the beginning of a new inertial scroll . . . ."). Philips' expert's discussion of what happens subsequent to the termination of the first scroll (*e.g.*, beginning a new inertial scroll or a new stick-to-finger scroll, *see id.*) is irrelevant, because the system has already terminated the inertial scroll at issue. Regardless, because Philips cannot point to any computer code that terminates scrolling on sensing a stationary finger touch, its attempts to escape the consequences of its expert's opinions are a side-show.

Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Philips has identified no program instructions in the accused devices that terminate scrolling on a substantially stationary finger touch, much less any

"specific facts showing that there is a genuine issue for trial," *id.* (quoting Fed. R. Civ. P. 56(e)), on a relevant issue. Summary judgment is thus appropriate.

### III. The Asserted Claims of the RE'564 Patent Are Indefinite

Independent claim 1 of the RE'564 patent requires "[a] handheld communication device comprising: . . . a display that has a substantially small size suitable for the handheld communication device." Mot. Ex. 10 at 5:50-53. The "substantially small size suitable for the handheld communication device" language was added during prosecution. *See* Mot. at 10:8-22. Prior to that addition, the limitation recited only "a display." *Id.*

The newly added language should not be considered mere surplusage, as that "would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). And Philips indeed purports to assign meaning to the language, arguing that a "POSA would understand that the claim requires a handheld device and then a display that fits in (i.e., is substantially small in size so as to be suitable for inclusion in) handheld devices." Opp. at 12:8-10. However, that contention evaporates when examined. The claim, prior to amendment, already required "a handheld communication device" that had a "display." Philips' construction would effectively return the claim to its original, pre-amendment meaning. Specifically, Philips argues that the added language has meaning, because "the term in question limits the scope of the size of the display of the claimed invention by requiring that it can fit in a handheld communication device." Opp. at 12:12-13. This is merely a tautological statement of the claim's requirements (a handheld device having a display) before addition of the new language during prosecution. The Court (and ASUS) are accordingly left with no further clarity on how to determine what falls within the "substantially small size . . . " claim language.

This ambiguity is fatal to the claim. "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While terms of degree, such as "substantially," may be recited in claims, their use must be policed such that "it provide[s] enough certainty to one of skill in the art when read in

the context of the invention." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014). "[A] term of degree that is 'purely subjective' and depends 'on the unpredictable vagaries of any one person's opinion' is indefinite." *Intellectual Ventures I LLC v. T-Mobile U.S., Inc.*, 902 F.3d. 1372, 1381 (Fed. Cir. 2018) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350–51 (Fed. Cir. 2005). The term "a display that has a substantially small size suitable for the handheld communication device" is just such a subjective term. That Philips, the patent owner, cannot come up with a construction for the limitation that amounts to more than the pre-existing "handheld device comprising . . . a display" limitation, is conclusive evidence that the "substantially small size suitable for the handheld communication device" limitation is indefinite. Philips' accusation of displays ranging to more than 17" in size as meeting this limitation, *see* Mot. at 11:8-13, exemplifies the problem. Neither Philips nor its expert have been able to say where this limitation begins and ends with respect to screen size, other than to say, in essence, any purported handheld device that has a display meets it. That is, as a matter of law, not sufficient. A claim must, at some minimum, "provide objective boundaries for those of skill in the art." *Interval*, 766 F.3d at 1371. This one does not.

### IV.     ASUS' Accused Products Do Not Infringe the '809 Patent

The issue to be decided on ASUS' motion for summary judgment of non-infringement of the '809 patent is a pure claim construction issue not previously considered: Can a device be deemed "compliant with a set of compliance rules" (element 1[d]) or "compliant" (element [49d]) when the device has not satisfied **all** compliance rules necessary to receive protected content in the accused HDCP 2.x specification? ASUS contends that a receiver or repeater must satisfy all of the HDCP 2.x compliance rules to be deemed "compliant" to receive protected content.

Philips argues that HDCP 2.x's certificate verification procedure invokes "two rules [that] constitute 'a set of compliance rules . . . .'" Opp. at 17:8-9. While these two rules are a subset of the rules used to determine whether a device is compliant to receive protected content, the revocation list and repeater check rules in the HDCP 2.x specification must also be complied with before protected content can be provided to a receiver or repeater device. Specifically, the HDCP 2.x authentication protocol is comprised of four stages: (1) Authentication and Key Exchange; (2) Locality Check; (3) Session Key Exchange; and (4) Authentication with Repeaters. Mot. Ex. 18 at 11. The Authentication and Key

Exchange stage of the authentication protocol includes the revocation list check, which occurs **after** the accused secret $k_m$ is sent to the receiver. *Id.* at 12, Fig. 2.1, and 12-13.  Similarly, the accused first signal nonce $r_n$ is sent to the receiver during the Locality Check stage, which occurs **before** the repeater check and any revocation list checks for downstream receivers, if the receiving device is a repeater. *Id.* at 27, Fig. 2.12, and 27-29.

To deflect the Court's attention from the relevant HDCP 2.x compliance rules, Philips focuses on the so-called "Compliance Rules" in Exhibit C to the HDCP License Agreement and HDCP 2.0 Addendum ("HDCP 2.x Adopter Agreement" attached as Ex. 33 to the Bingaman Declaration), which are a subset of the rules an Adopter agrees to in exchange for the right to use HDCP technology.  Philips argues that "the revocation list check is not identified … as a 'Compliance Rule'" (Opp. at 19:25-28), but fails to note that such "Compliance Rules" also do not identify Philips' two certificate verification rules as "Compliance Rules." Opp. Ex. 33 at ASUSPH_00052772-77.  Indeed, such Compliance Rules do not mention the word "certificate" at all.  The HDCP 2.x Adopter Agreement does, however, discuss revocation lists and the rules surrounding revocation of Receiver IDs.  By way of example, Section 7.2 provides "[s]ubject to the Revocation procedures set out in this Agreement, Licensor, a Fellow Adopter (solely with respect to KSVs or Receiver IDs issued to such Fellow Adopter) or one or more Eligible Content Participant(s), may cause the Revocation of KSVs or Receiver IDs, as applicable …" *Id.* at ASUSPH_00052798.  Thus, the compliance rules of the HDCP 2.x Adopter Agreement provide detailed rules relating to the procedures for placing Receiver IDs on the revocation list, thereby preventing such devices from receiving protected content. *Id.* at ASUSPH_00052761-63 (Section 3 of the Procedural Appendix) and ASUSPH_00052797-99 (Amendment to Section 7 of the HDCP License Agreement).  Under the relevant HDCP 2.x compliance rules, there is no dispute that a receiver cannot receive protected content unless it complies with all compliance rules set forth in the HDCP2.x specification.

Turning to the claim construction issue, ASUS is using the plain and ordinary meaning of these terms, which require that a device comply with all relevant compliance rules to be deemed compliant.  If a device only complies with a subset of the rules, it is not compliant with a set of compliance rules because the set of compliance rules is all the rules necessary to be found compliant.  The specification and file history do not require deviation from this plain and ordinary meaning.  The specification (not including

the claims) uses variations of the words "compliant" and "compliancy" eleven times. *See* Mot. Ex. 16 at 2:1-2, 2:32-34, 2:50-55, 3:40-47, 3:56-61, and 5:26-30. None of the passages provides a detailed description of what it means to determine whether the second device is compliant with a set of compliance rules utilizing information provided in the certificate. The specification states that "[o]ne way of protecting content in the form of digital data is to ensure that content will only be transferred between devices if the receiving device has been authenticated as being a compliant device." *Id.* at 1:65-2:2. Thus, a device is compliant if it has been authenticated. Philips argues that specification provides two examples of determining compliance: (1) compliance with a set of compliance rules (*id.* at 3:40-50) or (2) an expected identification (*id.* at 3:56-59). Looking at the actual text at col. 3, lines 56-59, this passage describes a further step in the authentication procedure, not an authentication process that looks only at the identity of the second (receiving) device.[2]

Philips further argues that ASUS' interpretation is inconsistent with language in claims 1 and 49, which impose additional requirements the second device must satisfy after the secret and first signal. Opp. at 18:15-23. The additional steps of deriving the correct second signal from the secret and sending that second signal to the first device within a predetermined time identified by Philips are not additional compliance rules as that term is used in the specification. Instead, the steps are part of the locality check procedures, which are distinguished from and added to the authentication/compliance check procedures.

Philips also refers to the file history of related applications to argue that ASUS' construction is incorrect. Opp. at 18:28-19:18. Again, Philips misses the point. Regarding the Willey reference discussed in these related file histories, the Examiner noted that the compliance rule of validating the digits of both devices was by itself enough to determine that the devices were fully authenticated. Opp. Ex. 36 at PHILIPS00026747 (*quoting* Willey: "After the user 400 has given positive confirmation on both the headset 300 and the handset 100, then the devices 100 and 300 are fully authenticated.") Thus, in the Willey reference, the Examiner contended there was a single authentication/compliance rule that occurred before the sharing of a common secret as part of the distance measurement procedure. Thus, the

---

[2] This is not to say that the specification excludes systems where the set of compliance rules comprises only a single rule, but the preferred embodiments do not disclose such a single rule set, nor do the compliance rules of the HDCP 2.x specification comprise a single identification check rule.

file history does not support the conclusion that the compliance rules can be a subset of compliance rules used to determine whether a device will be given access to a protected content.

Finally, Philips argues that the repeater check is not based on the second device's certificate to avoid summary judgment. Claims 1 and 49 do not require that every step of the compliance determination utilize information in or from the certificate. The set of compliance rules of HDCP 2.x indisputably utilize information from and in the certificate to determine compliance. Therefore, summary judgment of non-infringement of the '809 patent should be granted.

## V.  Claim 12 of the '806 Patent is Indefinite

### A.  "Means for Downloading" Is Still a Means-Plus-Function Term

Seeking to avoid the seemingly evident conclusion that "means for downloading" is a means-plus-function term, Philips admits that it must overcome this presumption but contends it can do so if "the term itself connotes sufficient structure to a POSA to perform the claimed function." Opp. at 21:4-5. But the case Philips cites in support, *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336 (Fed. Cir. 2013), says something quite different: "this presumption can be overcome is if 'the claim recites sufficient structure for performing the described functions in their entirety.'" *Id.* at 1347 (quoting *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008). Looking at the language of the claims, as it must, the *TecSec* court found that two of the sixteen claims using the term "means" could overcome the presumption, one because the claim itself "comprises specific structures" within the "means" claim—which is not relevant here—and the other, "system memory means for storing data," because "[t]o those skilled in the art, a system memory *is a specific structure that stores data*. Consistent with this understanding, for example, the specification discloses a computer that contains random access memory (RAM) to store data." *Id.* (emphasis added).

By Philips' own analysis, the '806 "means for downloading" fails the *TecSec* test. Philips does not allege that "downloading" is *itself* a structure, like "system memory" in *TecSec*; instead, Philips rests on Dr. Polish's statement that it "connotes well-known programming instructions, such as Java 2.0, for downloading a file to a client," Opp. at 21:9-10, and Dr. Polish confirmed that he has no other basis for this opinion. *See* Ex. 3 (Deposition of Dr. Polish, July 19, 2019) at 268:4-13. Philips cannot use Dr. Polish's self-proclaimed understanding to avoid means-plus-function: to the contrary, courts have

"repeatedly and unequivocally rejected this argument: a person of ordinary skill in the art plays no role whatsoever in determining whether an algorithm must be disclosed as structure for a functional claim element." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015). "Where the specification discloses no algorithm, the skilled artisan's knowledge is irrelevant." *Id*. at 624. No amount of expert testimony can provide structure where the claim does not.[3]

Even assuming that Philips could use Dr. Polish's testimony to fill the structure gap, it would still be insufficient because "simply reciting 'software' without providing some detail about the means to accomplish the function is not enough." *TecSec*, 731 F.3d 1348-49 (quoting *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008)). Dr. Polish said only that "means for downloading" means for him "well known programming instructions" for downloading. Opp. at 21. In his deposition, Dr. Polish admitted that "downloading" includes "anything that would allow the client to receive the contents of the file" and, as a result, "there's probably an infinite number of ways to do it." Ex. 4 (Deposition of Dr. Polish, July 19, 2019) at 18:23 to 19:18. But Section 112 seeks to avoid precisely this result: there are innumerable "programming instructions" with which one achieve this function in innumerable ways, and neither Philips nor its expert has set forth "what structure or class of structures a person of ordinary skill would understand the term to encompass." *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1300 (Fed. Cir. 2018). Philips has not and cannot meet its burden to overcome the presumptive application of Section 112.[4]

---

[3] Philips also relies on Dr. Polish's characterization of Dr. Bhattacharjee's report. Opp. at 21:12-16. Even if Dr. Polish accurately described Dr. Bhattacharjee's opinion, this evidence would be improper here, because Dr. Bhattacharjee is not ASUS' expert, but Microsoft's. Neither Philips nor Microsoft served ASUS with Dr. Bhattacharjee's report; ASUS did not attend his deposition and has not received a transcript. "The Ninth Circuit has expressly disallowed such new 'evidence,' including evidence presented in opposition to summary judgment motions." *Silong v. United States*, No. 06-474, 2007 WL 2712100, at *5 (E.D. Cal. Sept. 14, 2007).

[4] Philips seeks to avoid *Diebold* by addressing arguments ASUS does not assert. In *Diebold*, the court, considering whether to apply Section 112, considered whether the claims, themselves, "recite sufficiently definite structure," and whether the words "connote[] sufficiently definite meaning as the name for structure to persons of ordinary skill in the art"—the same standard as *TecSec*. *Diebold*, 899 F.3d 1291, 1298-1299. The *Diebold* court found that the claim language ("a cheque standby unit," which was not drafted using traditional "means plus function" language, and thus not subject to the presumption), was subject to Section 112 because "[e]xamining the evidence intrinsic to the [] patent, we observe that the claims do not recite *any* structure, much less 'sufficiently definite structure,' for the

B.     **Under Section 112, "Means for Downloading" is Indefinite**

1.     **The Narrow *Katz* Exception Does Not Apply**

As ASUS explained in its opening brief, a "means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); Mot. § V at 16.  Seeking to avoid this rule, Philips attempts to shoehorn the '806 into *Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011), which considered "the claimed functions of 'processing,' 'receiving,' and 'storing,'" and found that "those functions can be achieved by any general purpose computer without special programming" and thus that "it was not necessary to disclose more structure than the general purpose processor that performs those functions." *Id.* at 1316.  The Court noted that "claiming 'means for processing,' 'receiving,' and 'storing' may simply claim a general purpose computer, although in means-plus-function terms." *Id.* n.11.  Thus, *Katz* applies "only in the rare circumstances where any general-purpose computer without any special programming can perform the function." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012).  *Katz* does not apply here.  Philips briefly contends otherwise, *see* Opp. at 22, but its argument cannot survive its own agreement that the corresponding structure requires a "single purpose media player or multipurpose computing device **programmed with software to perform the function**, such as the algorithm disclosed in Figure 1 and at 2:57-63, 3:3-7, 3:14-30, 3:57-4:14." Opp. at 23 (emphasis added).

Seeking to avoid the impact of this admission, Philips cites two cases interpreting different claim language appearing in a different patent: *Finjan, Inc. v. Sophos, Inc.*, No. 14-1197, 2015 WL 890621 (N.D. Cal. March 2, 2015) and *Finjan, Inc. v. Symantec Corp.*, No. 14-2998, 2017 WL 550453, (N.D. Cal. Feb. 10, 2017).  But the two *Finjan* cases only confirm why Philips' claim here cannot survive.  *Finjan v. Sophos* considered the term "means for receiving a Downloadable," and found that, "[t]he patent's context demonstrates that no specific computer-implemented functions are necessary to receive a Downloadable." *Finjan v. Sophos,* 2015 WL 890621, at *7.  On this patent and these facts, however, Philips has already

---

'cheque standby unit.'  Rather, the claims describe the term 'cheque standby unit' solely in relation to its function and location in the apparatus." *Diebold*, 899 F.3d 1291, 1298 (emphasis in original).  The court did not, as Philips suggests, announce a new standard under which only new terms coined by an inventor are subject to Section 112, and ASUS nowhere suggests Philips coined the term "downloading."

admitted that "specific computer-implemented functions *are* necessary" because it agrees that any "multipurpose computer" must be "programmed with software to perform the function." *Id.* (emphasis added); *see supra*.  Considering the same term, *Finjan v. Symantec* found that although "a number of more complex operations ultimately need to occur at the network gateway, the Court agrees with Judge Orrick's conclusion in *Sophos* that the context of the '844 Patent establishes that 'Receiving a Downloadable is a simple function that consists of accepting or intercepting downloaded content when it is initially downloaded and before more complex operations process the file,' so as to be performable by a general purpose microprocessor.'" *Finjan v. Symantec*, 2017 WL 550453 at *5 (quoting *Finjan v. Sophos*, 2015 WL 890621 at *9).  Again, however, on this patent and these facts, Philips has already admitted that "means for downloading" includes "more complex operations" than simply "accepting or intercepting downloaded content," by claiming it covers structure including that the "client contacts the server[,] selects the particular content file[,] and downloads the control information that enables the retrieving and playing out of the segmented file."  Opp. at 23:4-6 (quoting '806 at 2:57-63).  This "contacting" and "selecting," which Philips admits are part of the "means for downloading," place the scope of that term well outside a "simple function that consists of accepting or intercepting downloaded content when it is initially downloaded," as in *Finjan v. Symantec*.  The narrow *Katz* exception does not apply, and "means for downloading" can survive only if the '806 discloses an algorithm in its specification.

### 2. The '806 Discloses No Algorithm for "Downloading"

As ASUS explained in its motion, ASUS and Philips agree on the corresponding structure, and the corresponding structure does not come close to disclosing the required algorithm, which must "adequately describe how that programming can be achieved."  *SPEX Techs., Inc. v. Kingston Tech. Corp., et al.*, No. 16-7349, 2017 WL 5495149, at *14 (C.D. Cal. Oct. 18, 2017); *see* Mot. § V.C. at 18-21.  In response, Philips does not challenge the detailed analysis in ASUS' motion, *see id.* at 18-21, but argues instead that the specification references to "buffering" and "Java 2.0" are sufficient.  *See* Opp. at 24:17-28.  They are not.  First, Philips quotes ASUS' expert stating that "buffering" requires "downloading," and argues that "buffering" is therefore an algorithm for downloading.  Opp. at 24:26-28.  Philips' logic is circular:  if "buffering" requires "downloading," buffering cannot also be an algorithm for downloading.  In any

event, Philips points to no discussion of "buffering" that meets the requirement for an algorithm, and none exists.  Second, Philips argues that "the patent expressly explains how programming can be achieved with, *e.g.*, Java 2.0."  Opp. at 24:21-22.  As ASUS explained in its motion, however, the '806 refers to the existence of programming languages, but does nothing to explain how to use those languages to design an algorithm for downloading.  *See* Mot. at 20-21.  "[W]hen a patentee invokes means-plus-function claiming to recite a software function, it accedes to the reciprocal obligation of disclosing a sufficient algorithm as corresponding structure."  *EON*, 785 F.3d at 623.  Philips cannot avoid this rule by arguing that "devising an algorithm to perform that function would be within the capability of one of skill in the art, and therefore it was not necessary for the patent to designate any particular algorithm to perform the claimed function.  As we have noted above, however, that argument is contrary to this court's law." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008).  The '806 provides no algorithm to support "means for downloading," and is thus indefinite as a matter of law.[5]

### CONCLUSION

For the foregoing reasons, ASUS respectfully requests that the Court grants ASUS summary judgment on the issues above.


Date:  October 17, 2019                                                         Respectfully submitted,

                                                                                 /s/ Matthew S. Warren

Bruce Genderson *(pro hac vice)*                               Matthew S. Warren
Kevin Hardy *(pro hac vice)*                                      Erika H. Warren
Aaron Maurer *(pro hac vice)*                                   WARREN LEX LLP

---

[5] Philips seeks to muddy the waters by claiming the Court must deny ASUS' motion on the procedural grounds that ASUS "relies solely on attorney argument."  Opp. at 25.  As an initial matter, this claim is incorrect:  ASUS' motion relies on the intrinsic evidence as well as expert testimony and Philips' admissions in this litigation.  *See* Mot. at 16-21.  In any event, this question is ripe for resolution:  whether a term is a "means-plus-function" term subject to 35 U.S.C. 112 ¶ 6 is a matter of law (*Diebold*, 899 F.3d at 1299), and "[i]ndefiniteness under 35 U.S.C. § 112 ¶ 2 is also a question of law."  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d at 1365 (affirming summary judgment of indefiniteness where a means-plus-function term failed to include an algorithm).  ASUS provided ample evidence to support its motion.  Finally, Philips claims that Dr. Polish's opinions are "uncontroverted." Opp. at 25:9.  Again, this is incorrect.  Dr. Polish's opinions respond to the opinions of ASUS' expert, Dr. Bulterman, which conclude in detail that "means for downloading."  *See* Ex. 5 (Bulterman Opening Report) at 136-143.

| | |
|---|---|
| David Krinsky *(pro hac vice)* <br> Andrew Trask *(pro hac vice)* <br> Kyle Thomason *(pro hac vice)* <br> WILLIAMS & CONNOLLY LLP <br> 725 Twelfth Street, N.W. <br> Washington, D.C., 20005 <br> +1 (202) 434-5000 <br> +1 (202) 434-5029 facsimile <br> viceroy@wc.com | 2261 Market Street, No. 606 <br> San Francisco, California, 94114 <br> +1 (415) 895-2940 <br> +1 (415) 895-2964 facsimile <br> 18-1885@cases.warrenlex.com <br><br> Michael J. Newton (Bar No. 156225) <br> Sang (Michael) Lee  *(pro hac vice)* <br> Derek Neilson *(pro hac vice)* <br> ALSTON & BIRD LLP <br> 2200 Ross Avenue, Suite 2300 <br> Dallas, Texas, 75201 <br> +1 (214) 922-3400 <br> +1 (214) 922-3899 facsimile <br> asus-philips@alston.com |

*Attorneys for Defendants ASUSTeK Computer Inc. and ASUS Computer International*