Michael P. Sandonato (admitted *pro hac vice*)
msandonato@venable.com
John D. Carlin (admitted *pro hac vice*)
jcarlin@venable.com
Natalie Lieber (admitted *pro hac vice*)
ndlieber@venable.com
Christopher M. Gerson (admitted *pro hac vice*)
cgerson@venable.com
Jason M. Dorsky (admitted *pro hac vice*)
jmdorsky@venable.com
Stephen K. Yam (admitted *pro hac vice*)
syam@venable.com

Jonathan M. Sharret (admitted *pro hac vice*)
jsharret@venable.com
Joshua D. Calabro (admitted *pro hac vice*)
jdcalabro@venable.com
Daniel A. Apgar (admitted *pro hac vice*)
dapgar@venable.com
Robert S. Pickens (admitted *pro hac vice*)
rspickens@venable.com
Sean M. McCarthy (admitted *pro hac vice*)
smccarthy@venable.com
Caitlyn N. Bingaman (admitted *pro hac vice*)
cnbingaman@venable.com

VENABLE LLP
1290 Avenue of the Americas
New York, New York 10104-3800
Tel: (212) 218-2100
Fax: (212) 218-2200

Chris Holland (SBN 164053)
cholland@hollandlawllp.com
Lori L. Holland (SBN 202309)
lholland@hollandlawllp.com
Ethan Jacobs (SBN 291838)
ejacobs@hollandlawllp.com

HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, CA 94104
Tel: (415) 200-4980
Fax: (415) 200-4989

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In Re Koninklijke Philips Patent Litigation | Case No. 4:18-cv-01885-HSG<br><br>**REPLY IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS IN DR. RUBIN'S OPENING AND REBUTTAL EXPERT REPORTS SERVED ON BEHALF OF MICROSOFT CONCERNING U.S. PATENT NO. 9,436,809**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................ 1

II. Dr. Rubin's Noninfringement Theories to be Excluded Are New and Unjustified ................ 1

    A.    Dr. Rubin's New "$r_n$" Noninfringement Theory ............................................................ 1

    B.    Dr. Rubin's New "Session Key" Noninfringement Theory ......................................... 3

    C.    Dr. Rubin's New "Specifications Are Optional" and "Implementers can Deviate from Specification" Noninfringement Theories ............................................. 6

    D.    Dr. Rubin's New Noninfringing Alternative Theory .................................................. 10

    E.    Philips Has Been Prejudiced by Dr. Rubin's Untimely New Theories ..................... 10

III. DR. RUBIN'S "SMARTRIGHT" INVALIDITY THEORIES SHOULD BE EXCLUDED .................................................................................................................... 11

    A.    Microsoft Has Represented That Dr. Rubin Will Not Offer Any Opinion at Trial Based on an Alleged "Combination of SmartRight References" and the Court Should Therefore Preclude Dr. Rubin From Doing So ............................. 11

    B.    Dr. Rubin's Invalidity Theory Based on a "SmartRight System" Purportedly in Public Use ........................................................................................ 12

IV. CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Adenta GmbH v. OrthoArm, Inc.*,
  501 F.3d 1364 (Fed. Cir. 2007) ................................................................................................ 14

*Asia Vital Components Co. v. Asetek Danmark A/S*,
  No. 16-CV-07160-JST, 2018 WL 4945316 (N.D. Cal. Oct. 11, 2018) ........................................ 6

*DCG Sys. v. Checkpoint Techs., LLC*,
  No. C 11-03792 PSG, 2012 WL 1309161 (N.D. Cal. Apr. 16, 2012) ......................................... 8

*Golden Bridge Tech. Inc. v. Apple, Inc.*,
  No. 5:12-cv-4882-PSG, 2014 WL 1928977 (N.D. Cal. May 14, 2014) ...................................... 5

*Huawei Techs., Co, Ltd. v. Samsung Elecs. Co, Ltd.*,
  340 F. Supp. 3d 934 (N.D. Cal. 2018) .................................................................................. 6, 10

*KlausTech, Inc. v. Google LLC*,
  No. 4:10-cv-05899-JSW, 2018 WL 5109383 (N.D. Cal. Sept. 14, 2018) ................................... 8

*Matthew Enter., Inc. v. Chrysler Grp. LLC*,
  No. 13-CV-04236-BLF, 2016 WL 4272430 (N.D. Cal. Aug. 15, 2016) ...................................... 9

*Mitsubishi Elec. Corp. v. Ampex Corp.*,
  190 F.3d 1300 (Fed. Cir. 1999) ................................................................................................ 15

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004) .......................................................................................... 14

*Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001) ................................................................................................ 15

*Shared Memory Graphics LLC v. Apple, Inc.*,
  812 F.Supp.2d 1022 (N.D. Cal. 2010) ........................................................................................ 7

*Space Data Corp. v. Alphabet Inc.*,
  No. 16-cv-03260-BLF, 2019 WL 2603285 (N.D. Cal. June 25, 2019) ..................................... 10

*TransWeb, LLC v. 3M Innovative Props. Co.*,
  812 F.3d 1295 (Fed. Cir. 2016) ................................................................................................ 14

*Verinata Health, Inc. v. Sequenom, Inc.*,
  No. C 12-00865 SI, 2014 WL 4100638 (N.D. Cal. Aug. 20, 2014) ............................................ 6

*View Eng'g, Inc. v. Robotic Vision Sys., Inc.*,
  208 F.3d 981 (Fed. Cir. 2000) .................................................................................................... 8

## I. INTRODUCTION

The Court should grant Philips' Motion ("Mot.") to exclude (i) the invalidity theory based on a "combination of SmartRight References," presented in Dr. Aviel D. Rubin's April 25, 2019 opening expert report served on behalf of Microsoft and concerning the '809 patent, (ii) the invalidity theory based on a "SmartRight System," also presented in Dr. Rubin's opening report, and (iii) the untimely theories that were introduced for the first time in Dr. Rubin's June 20, 2019 rebuttal expert report served on behalf of Microsoft and concerning the '809 patent.

Microsoft's Opposition ("Opp.") does not provide any acceptable justification for not excluding Dr. Rubin's new noninfringement theories.[1] Nor does it provide a sufficient basis for tying the implementation of the "SmartRight System" to the "SmartRight References".

## II. Dr. Rubin's Noninfringement Theories to be Excluded Are New and Unjustified

### A. Dr. Rubin's New "$r_n$" Noninfringement Theory

Microsoft admits that its response to Philips' Interrogatory No. 4 (Mot. Ex. 8[2]) failed to disclose any contention that the "first signal" limitation of the asserted claims is not met because the nonce "$r_n$" value within the LC_Init message is not a "signal." Nevertheless, Microsoft contends that it is free to pursue that theory through its expert Dr. Rubin because Philips' Infringement Contentions purportedly failed to specifically point to the nonce "$r_n$" itself (as distinguished from the entire LC_Init message of which it is a part) to satisfy the claimed "first signal" limitation. Microsoft is wrong. Philips expressly amended its Infringement Contentions to clarify that it was specifically accusing the nonce "$r_n$" and not the entirety of the LC_Init message. Microsoft takes issue with an annotated figure that Philips retained when amending its Infringement Contentions, arguing that the retention of such annotated figure caused Microsoft to "focus on LC_Init"[3] and

---

[1] As Microsoft represents that its omission of Dr. Rubin's "ensnare the prior art" theories from its noninfringement contentions (Philips' Interrogatory No. 4) was an "inadvertent" and honest mistake due to a "copy/paste" error (Opp. at 9-10), and Microsoft does not object to Philips' expert, Dr. Michael Goodrich, testifying as to the contents of his supplemental report (including his response to Dr. Rubin's theory), Philips agrees to withdraw its Motion solely with respect to excluding Dr. Rubin's "ensnare the prior art" theory.

[2] Unless otherwise indicated, "Mot. Ex." refers to exhibits to Philips' Motion (D.I. 709), "Opp. Ex." refers to exhibits to Microsoft's Opposition (D.I. 801), and "Ex." refers to exhibits to the Declaration of Caitlyn N. Bingaman, submitted herewith.

[3] Opp. at 4:17.

overlook the remainder of Philips' contentions (including the portions that Philips amended to specifically reference the $r_n$ value as corresponding to the claimed "first signal"). (Opp. at 4:17-5:3). Microsoft faults Philips for its own inattention.

Philips' amendments to its Infringement Contentions made clear that its theory for infringement of the "first signal" requirement of asserted claims 1, 9, 49, 50, and 53 was based specifically on the $r_n$ value:

| Sept. 27, 2017 Infringement Contentions | Feb. 2, 2018 Infringement Contentions |
|---|---|
| The HDCP Transmitter initiates the locality check by sending a <u>first signal, an LC_Init message</u>, to the HDCP Receiver at a first time … | The HDCP Transmitter initiates the locality check by sending a <u>first signal, nonce $r_n$ in the LC_Init message</u>, to the HDCP Receiver at a first time … |
| The HDCP revision 2.2 specifications show the locality check between the HDCP Transmitter and HDCP Receiver in Figure 2.4 … in which the <u>transmitting of the LC_Init message</u> is outlined in red: | The HDCP revision 2.2 specifications show the locality check between the HDCP Transmitter and HDCP Receiver in Figure 2.4 … in which the <u>transmitting of the nonce $r_n$ in the LC_Init message</u> is outlined in red: |
| (Mot. Ex. 13, App'x I, at 8-9 (emphasis added)). | (Mot. Ex. 14, App'x I, at 11 (emphasis added)). |

This same disclosure regarding the $r_n$ value corresponding to the claimed "first signal" was carried forward in all subsequent contentions that Philips made, including after this litigation was transferred to this Court. (Ex. 18, App'x I at 11-12, 16, 20-21, 26). Therefore, Philips clearly disclosed its infringement theory that *specifically* the $r_n$ value corresponds to the claimed "first signal".

Although Microsoft complains that Philips' Infringement Contentions retained the annotated figure, such annotations continued to have post-amendment significance. Since the corresponding claim limitation recites that a first device includes a processor arranged to "provide a first signal to the second device," Philips' annotation in the figure identifies the operation in HDCP 2.x whereby the first device (*i.e.*, HDCP Transmitter on left) "provides" the first signal (*i.e.*, $r_n$ value within LC_Init message) to the second device (*i.e.*, HDCP Receiver on right).

Microsoft does not contend that a different annotation of the figure would have improved clarity, let alone propose a hypothetical annotation that would have grabbed its attention. Instead, Microsoft essentially asks this Court to focus exclusively on the annotated figure—as it apparently

1. did—and ignore the accompanying text explaining the annotation.

Microsoft intimates that one could reasonably have interpreted the insertion of the specific reference to $r_n$ in Philips' contentions as merely pointing to evidence that the LC_Init message included a random number, which is a requirement of dependent claim 2. (Opp. at 3:21-23, 4:13-16). But, Microsoft ignores the fact that Philips specifically inserted the reference to $r_n$ in its claim chart for claim 1, which does not require the "first signal" comprise a random number. If Philips had intended to accuse the entire LC_Init message as being the "first signal," it would not have pointed to $r_n$ in the chart for claim 1. Rather, it would have done so in the claim chart row for claim 2.

In short, Philips expressly accused the $r_n$ value of corresponding to the claimed "first signal" in its February 2, 2018 Infringement Contentions, almost eleven months prior to the close of fact discovery. If Microsoft intended to assert noninfringement based on a theory that the $r_n$ value cannot be a "signal," it should have disclosed that theory in response to Philips' Interrogatory No. 4, which sought Microsoft's noninfringement contentions. Had it done so, Philips would have been in a position to conduct follow up discovery and to have Dr. Goodrich prepared to address this point in his opening report on infringement. At this late date, Dr. Rubin's "$r_n$" noninfringement theory constitutes an improper and untimely new theory and should be excluded.

**B. Dr. Rubin's New "Session Key" Noninfringement Theory**

Microsoft also admits that its response to Philips' Interrogatory No. 4 (Mot. Ex. 8) did not disclose Dr. Rubin's new "session key" noninfringement theory. Nevertheless, Microsoft asserts that Dr. Rubin is free to raise this new theory because Philips' Infringement Contentions for asserted Claim 50 did not provide the same level of detail set forth in Dr. Goodrich's infringement report. Microsoft is wrong—Philips' infringement contentions provided reasonable and sufficient notice of Philips' infringement theory for claim 50, and Dr. Goodrich's report merely explained that infringement theory in greater detail with reference to the same section of the HDCP 2.x specifications (*i.e.*, the Session Key Exchange (SKE) stage) that was identified in Philips' infringement contentions for claim 50.

Philips' infringement contentions expressly assert infringement of all asserted claims, including claim 50, based on support for one or more versions of the HDCP 2.x family of content

protection protocols: "The '809 HDCP Accused Products are all Microsoft products that support the High-bandwidth Digital Content Protection ("HDCP") System revision 2.x." (Ex. 18, App'x I, at 1; *see also id.*, App'x I, at 40 (incorporating such language into the contentions for claim 49), 44 (incorporating such language into the contentions for claim 50)).

Asserted '809 patent claim 50 depends from claim 49 and additionally recites "us[ing] the secret to generate a secure authenticated channel between the first device and the second device." Philips' infringement contentions for claim 50 specifically identified the secret—key $k_m$ in HDCP 2.x—used to generate the secure authenticated channel (Ex. 18, App'x I at 44 ("common secret, the key $k_m$")), and specifically noted that "*[a]fter* the HDCP Receiver … passes the locality check a secure channel is generated between the HDCP Transmitter and HDCP Receiver so the HDCP Transmitter can send protected content to the HDCP Receiver." (Ex. 18, App'x I, at 44 (emphasis added)). Immediately following that statement, Philips' contentions point to Exhibits B (at B3), C (at C3), D (at D3) and E (at E3). (*Id.*) Those Exhibits specifically identify the "Session Key Exchange (SKE)" stage as the stage that follows the locality check, and expressly state that "[a]t the end of the authentication protocol [*i.e.*, based on completion of the SKE stage], a communication path [*i.e.*, a secure authenticated channel] is established between the HDCP Transmitter and HDCP Receiver that only Authorized Devices can access":

> **B3**   **2 Authentication Protocol**
>
> **2.1 Overview**
>
> The HDCP authentication protocol is an exchange between an HDCP Transmitter and an HDCP Receiver that affirms to the HDCP Transmitter that the HDCP Receiver is authorized to receive HDCP Content. It is comprised of the following stages
>
> - Authentication and Key Exchange (AKE) – The HDCP Receiver's public key certificate is verified by the HDCP Transmitter. A Master Key $k_m$ is exchanged.
> - Locality Check – The HDCP Transmitter enforces locality on the content by requiring that the Round Trip Time (RTT) between a pair of messages is not more than 7 ms.
> - Session Key Exchange (SKE) – The HDCP Transmitter exchanges Session Key $k_s$ with the HDCP Receiver.
> - Authentication with Repeaters – The step is performed by the HDCP Transmitter only with HDCP Repeaters. In this step, the repeater assembles downstream topology information and forwards it to the upstream HDCP Transmitter.
>
> Successful completion of AKE and locality check stages affirms to the HDCP Transmitter that the HDCP Receiver is authorized to receive HDCP Content. At the end of the authentication protocol, a communication path is established between the HDCP Transmitter and HDCP Receiver that only Authorized Devices can access

(Ex. 18, App'x I, Ex. B at row B3 (highlighted)). In short, Philips' contentions pointed specifically to the SKE stage of the HDCP 2.x specifications to satisfy the additional requirements of claim 50.

(Ex. 18, App'x I, Exs. B at 3 (row B3), C at 3 (row C3), D at 2 (row D3), E at 2 (row E3); *see also id.*, App'x I, at 44 (cross-referencing rows B3, C3, D3, and E3)). Full copies of the HDCP 2.x specifications for multiple interfaces, including the full description of the SKE stage, were specifically identified by bates number in Philips' contentions. (Ex. 18, App'x I, at 2 n.36, 4).

The description and role of the key $k_m$ during the Session Key Exchange stage is plainly laid out in the HDCP 2.x specifications which were produced and identified by bates number in Philips' contentions. (Ex. 18, App'x I, at 2 n.36, 4). Microsoft cannot dispute it had access to the same specifications from which Dr. Goodrich's infringement report quotes. Dr. Goodrich's infringement report did not articulate a new infringement theory—it merely walked through the previously-identified SKE stage, explaining in more detail how the secret (key $k_m$) is used in the SKE stage to generate a secure authenticated channel: "the HDCP 2.x transmitter <u>uses the master key $k_m$</u> to generate a secure authenticated channel between the transmitter and the receiver, <u>by using the master key $k_m$</u> to derive a key $dkey_2$, which is <u>used during the session key exchange stage</u> of the authentication protocol to encrypt a session key $k_s$ to establish a HDCP 2.x encrypted session between the transmitter and the receiver." (Opp. Ex. 4 at ¶ 319 (emphasis added)). Such explanation does not constitute an undisclosed "new" theory, but is rather a permissible further explanation of the previously disclosed theory, which this Court has held proper. *See Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2016 WL 612907, at *5 (N.D. Cal. Feb. 16, 2016) (expert "is entitled to provide further explanation and examples of a theory disclosed in Plaintiff's infringement contentions"); *id*. at *4 ("expert's further explanation is proper as elaboration on the previously disclosed theory").

Microsoft's argument is essentially that Philips' infringement contentions do not provide the same level of detailed explanation into how the HDCP 2.x Session Key Exchange stage operates as is contained in Dr. Goodrich's infringement report. But such burden would well surpass a "reasonable notice" requirement. Patent L.R. 3-1 disclosures do not require such an elevated threshold. *See, e.g.*, *Golden Bridge Tech. Inc. v. Apple, Inc.*, No. 5:12-cv-4882-PSG, 2014 WL 1928977, at *3 (N.D. Cal. May 14, 2014) ("scope of contentions and expert reports are not … coextensive").

Microsoft cites *Asia Vital* and *Huawei*[4] in its Opposition (Opp. at 5:14-26), neither of which is applicable to this case. *Asia Vital* merely held that "where an expert report opines that prior art teaches additional limitations not identified in the invalidity contentions, 'these are new invalidity theories that were not properly disclosed' and are properly struck." *Asia Vital*, 2018 WL 4945316 at *5 (citing *Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL 4100638, at *7 (N.D. Cal. Aug. 20, 2014)). But Dr. Goodrich's opinions concern neither invalidity nor additional limitations of prior art not identified in invalidity contentions.

The court in *Huawei* declined to strike rebuttal theories on the basis that "certain positions were unforeseeable until [the patentee] served its opening infringement reports." *Huawei*, 350 F. Supp. 3d at 1001. In this case, Philips' infringement theory involving the operations within the SKE stage was entirely foreseeable, given that its Infringement Contentions specifically referenced this stage (which immediately follows the locality check stage) and cross-referenced rows B3, C3, D3, and E3 of Exhibits B, C, D, and E, respectively, providing yet additional detail drawn from the HDCP 2.x specifications.

For the above reasons, Microsoft was provided reasonable notice of Philips' infringement theory to which Dr. Goodrich simply elaborates in his infringement report. Therefore, Dr. Rubin's "session key" noninfringement theory constitutes an improper new theory and should be excluded.

**C.  Dr. Rubin's New "Specifications Are Optional" and "Implementers can Deviate from Specification" Noninfringement Theories**

Microsoft does not dispute that its response to Philips' Interrogatory No. 4 (Mot. Ex. 7) did not disclose Dr. Rubin's "specifications are optional" or "implementers can deviate from specification" noninfringement theories. Nor does Microsoft dispute that (i) Philips' infringement contentions identified features within HDCP 2.x corresponding to each '809 patent claim limitation and (ii) Microsoft's responses to Philips' interrogatories acknowledge that its accused products support HDCP 2.x. Instead, Microsoft incorrectly asserts that Philips' infringement contentions did not reference third-party components within Microsoft's accused products that perform the HDCP

---

[4] *Asia Vital Components Co. v. Asetek Danmark A/S*, No. 16-CV-07160-JST, 2018 WL 4945316 (N.D. Cal. Oct. 11, 2018); *Huawei Techs., Co, Ltd. v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934 (N.D. Cal. 2018).

2.x functions identified in Philip's contentions. (Opp. at 7:14-18). In fact, Philips' Infringement Contentions disclosed its theory that HDCP 2.x functionality was provided, at least in part, by third-party components within Microsoft's accused products. Philips' claim charts within its Contentions for the '809 patent (*i.e.*, Appendix K) referenced two additional Appendices (L and O) that identified third-party components:

> The '809 HDCP Accused Products are all Microsoft products that support the High-bandwidth Digital Content Protection ("HDCP") System revision 2.x, as explained in Appendix O. *See also* Appendix L.

(Ex. 18, App'x I, at 1). Appendix O is entitled "Microsoft HDCP Accused Product Appendix" and discloses that ██████████████████████████ within Microsoft's accused products allow such products to "support HDCP 2.x over a wired connection" (Ex. 18, App'x O, at 1) and that ████████████████ within Microsoft's accused products allow such products to "support HDCP 2.x over a wireless connection" (*id*., App'x O, at 1). Appendices K and O also refer to another appendix—Appendix L—which identifies processors within Microsoft's accused products. (Ex. 18, App'x L, at 1-3, 5). Therefore, Philips clearly disclosed its infringement theory that HDCP 2.x support within Microsoft's accused products was based at least in part on third-party components. If Microsoft held any theory that the third-party components *within its own products* that are responsible for implementing HDCP 2.x do not actually implement HDCP 2.x according to the specifications, it was obligated to disclose such theory in its response to Philips' Interrogatory No. 4 (noninfringement contention interrogatory). But Microsoft did not.

Dr. Goodrich's references to third-party components performing the previously-identified HDCP 2.x operations simply serve as additional evidentiary proof that Microsoft's accused products implement the relevant aspects of HDCP 2.x identified in Philips' infringement contentions. Courts in this district have repeatedly cautioned that infringement contentions (*i.e.*, Patent L.R. 3-1 disclosures) do not carry a burden of proving infringement, but instead are intended to provide defendants with "reasonable notice" of the infringement theory. *See, e.g., Shared Memory Graphics LLC v. Apple, Inc.*, 812 F.Supp.2d 1022, 1025 (N.D. Cal. 2010) ("[A]ll courts agree that the degree of specificity under Local Rule 3-1 must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement' and to 'raise a

reasonable inference that all accused products infringe.'") (quoting *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 986 (Fed. Cir. 2000); *Antonious v. Spalding & Evenflo Cos., Inc.*, 275 F.3d 1066, 1075 (Fed. Cir. 2002))); *KlausTech, Inc. v. Google LLC*, No. 4:10-cv-05899-JSW, 2018 WL 5109383, at *2 (N.D. Cal. Sept. 14, 2018) ("The Patent Local Rules 'do not, as is sometimes misunderstood, require the disclosure of specific evidence nor do they require a plaintiff to prove its infringement case.'") (citing *DCG Sys. v. Checkpoint Techs., LLC*, No. C 11-03792 PSG, 2012 WL 1309161, at *2 (N.D. Cal. Apr. 16, 2012))). Philips satisfied such requirement of reasonable notice by identifying relevant aspects of HDCP 2.x for each claim limitation.

In fact, Microsoft was already independently aware of third-party components within its accused products used to implement HDCP 2.x. In its response to Philips' Interrogatory No. 1 (which sought information concerning HDCP 2.x support among Microsoft's accused products), Microsoft admitted that ████████████████████████████████████████████ (Mot. Ex. 11 at 13 n. 3 (emphasis added)). And in its response to Philips' Interrogatory No. 19 (which sought information concerning whether an HDCP 2.x transmitter from third-party component supplier ARM was provided on any accused device that supported Miracast), Microsoft responded ████████████████████████████████████████████ (Mot. Ex. 12 at 9). Again, if Microsoft held any theory that the third-party components *within its own products* responsible for implementing HDCP 2.x do not actually implement HDCP 2.x according to the specifications, it was obligated to disclose such theory in its response to Philips' Interrogatory No. 4. But Microsoft did not.

Microsoft also focuses on a section of Dr. Goodrich's report opining that ████████████████████████████████████████████ (Opp. Ex. 4 at ¶ 386), alleging that this section "put deviations from the HDCP 2.x Specification directly at issue" which justifies Dr. Rubin's "optional" and "deviations" noninfringement theories. (Opp. at 7:19-8:10). This is untrue.

As an initial matter, the "deviations" that Dr. Goodrich references in his report pertain solely

8

PHILIPS' REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS IN DR. RUBIN'S OPENING
AND REBUTTAL EXPERT REPORTS SERVED ON BEHALF OF MICROSOFT
CONCERNING U.S. PATENT NO. 9,436,809
CASE NUMBER 4:18-CV-01885-HSG

1  to ███████, not third-party ███████—therefore, Microsoft's "third-party component"
2  justification fails. (Opp. Ex. 4 at ¶¶ 382-86). Moreover, Dr. Goodrich addressed these points in the
3  ███████ because Microsoft had, in its response to Philips' Interrogatory No. 4, referred
4  cryptically to testimony from one of its Rule 30(b)(6) witnesses (Beau Crawford), who had testified
5  concerning ████████████████████████████████████████████████
6  ███████. (*Id.*; Mot. Ex. 8 at 81:11). But, Mr. Crawford had not testified concerning ██
7  ████████████████████████████████████████████. And,
8  Microsoft had not suggested anywhere else in its response to Philips' Interrogatory No. 4 that any of
9  the third party components responsible for implementing HDCP 2.x in Microsoft's products did so
10 in a way that "deviated" in any manner from the HDCP 2.x specifications. As a result, while Dr.
11 Goodrich specifically addressed ████████████████ in his opening report, he
12 had no reason to anticipate any issue would be raised with respect to third-party components.
13       Indeed, Dr. Rubin's "optional" and "deviations" noninfringement theories are not even
14 specific to HDCP 2.x, nor are they specific to Microsoft's accused products. Rather, Dr. Rubin
15 presents a broad theory that <u>in general</u>, ████████████████████████████
16 ████████████████████████████ (Mot. Ex. 2 at ¶ 223).
17 And Dr. Rubin presents a broad theory that <u>in general</u>, ████████████████████
18 ████████████████ (Mot. Ex. 2 at ¶ 224; *see also id.* (referring to the "<u>general</u>
19 <u>practice</u> of deviation from specifications" (emphasis added)). Dr. Rubin's theories do not actually
20 refer to any relevant aspect of the HDCP 2.x specifications that he believes is absent from the
21 accused products. Therefore, Microsoft's argument that Dr. Rubin's "optional" and "deviations"
22 noninfringement theories are predicated on third-party components is simply incorrect and
23 misleading. Finally, the scope of proper rebuttal here is whether such deviations within the ████
24 ███████ affect Microsoft's infringement—"[t]he proper function of rebuttal evidence is to
25 contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Matthew*
26 *Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2016 WL 4272430, at *1 (N.D. Cal. Aug.
27 15, 2016). Dr. Rubin's generic "optional" and "deviations" theories do not contradict, impeach, or
28 defuse Dr. Goodrich's opinions specific to ████████████████ They are not rebuttal.

1  Dr. Rubin cannot use Dr. Goodrich's opinions concerning ▮▮▮▮▮▮▮▮▮▮▮▮ as a
2  springboard to present new theories as to hypothetical "deviations" or "optional" aspects.
3      Microsoft also cites *Huawei* and *Space Data* in support (Opp. at 8:21-28).  But *Huawei* is
4  inapposite, inasmuch as Dr. Rubin's (generic) "optional" and "deviations" theories are not "directly
5  responsive" to Dr. Goodrich's opinions concerning ▮▮▮▮▮▮▮▮▮▮▮▮, as
6  discussed above.  *Huawei*, 340 F. Supp. 3d at 995.  And *Space Data* is likewise inapposite, as Dr.
7  Rubin is not challenging any "assumptions" that Dr. Goodrich made with respect to the ▮▮▮▮
8  ▮▮▮▮▮▮▮▮.  *Space Data Corp. v. Alphabet Inc.*, No. 16-cv-03260-BLF, 2019 WL 2603285,
9  at *3 (N.D. Cal. June 25, 2019).
10     If Microsoft intended to assert a noninfringement theory based on potential deviations from
11 the HDCP 2.x specifications, it should have disclosed it in response to Philips' Interrogatory No. 4.
12 Instead, Microsoft did not do so, all the while acknowledging that its accused products support
13 HDCP 2.x.[5]

14     **D.    Dr. Rubin's New Noninfringing Alternative Theory**

15     Microsoft admits that Dr. Rubin's "built-in-screen" theory is being offered so that
16 Microsoft's damages expert, Dr. Nisha Mody, can rely on it to support her damages analysis.  (Opp.
17 at 10:10-17).  But, Microsoft ignores that Dr. Mody relies on Dr. Rubin's "built-in-screen" opinion
18 only in the section of her report that is entitled "'809 Patent <u>Design-Around Options</u>" (Opp. Ex. 5 at
19 73-75 (emphasis added)), and only to support her dubious conclusion that viewing 4K content on the
20 built-in-screen of a Surface device is for most end users a preferred alternative to streaming it to a
21 large screen 4K-capable TV.  Whether or not Microsoft uses the term "noninfringing alternative" to
22 refer to the built-in screen of the Surface device is not the issue.  This theory plainly falls within the
23 scope of Philips' Interrogatory No. 14, which specifically sought disclosure of "each actual or
24 hypothetical ***design-around*** and/or alleged alternative technology ***or method that can be used as an***
25 ***alternative*** to the patented technology."  (Mot. Ex. 9 at 15 (emphasis added)).

26     **E.    Philips Has Been Prejudiced by Dr. Rubin's Untimely New Theories**

27     Microsoft argues that Philips has not suffered prejudice, based on its service of Dr.

28 ---
[5] Mot. Ex. 11 at 6-15.

Goodrich's supplemental report. (Opp. at 11:8-10). While it is appropriate that Microsoft has raised no objection to Dr. Goodrich's supplemental report, this does not excuse Microsoft's discovery failures or demonstrate a lack of prejudice. Philips had no opportunity to conduct fact discovery on these new theories and Dr. Goodrich noted in his supplemental report that he has "not been afforded a full opportunity to consider the arguments and evidence (including source code) that Dr. Rubin offers in his Rebuttal Report" (Mot. Ex. 4 at ¶ 5). Accordingly, Philips remains prejudiced by Dr. Rubin's untimely new theories.

### III. DR. RUBIN'S "SMARTRIGHT" INVALIDITY THEORIES SHOULD BE EXCLUDED

#### A. Microsoft Has Represented That Dr. Rubin Will Not Offer Any Opinion at Trial Based on an Alleged "Combination of SmartRight References" and the Court Should Therefore Preclude Dr. Rubin From Doing So

In its Opposition, Microsoft represents that "Dr. Rubin's opinions … are based on the SmartRight *system*, not on a combination of publications." (Opp. at 12:12-13 (emphasis in original), *see also* 13:17-18 ("Philips is thus incorrect that Dr. Rubin is asserting an obviousness theory based on a combination of the SmartRight publications")). Accordingly, while Dr. Rubin's expert report appeared to reserve the right to offer an opinion based on a combination of documentary references—*see* ¶ 443 of Dr. Rubin's opening report (Mot. Ex. 1) which expressly states that "the term 'SmartRight' refers either to the SmartRight System, ***or to the combination of the SmartRight References, or both***"—Philips now understands that Microsoft is affirmatively representing that Dr. Rubin will only offer an opinion based on the "SmartRight System," which was purportedly "publicly demonstrated … by Micronas and Thompson Multimedia to attendees of the Consumer Electronics Show in Las Vegas, NV" in January 2002 (*id*. at ¶ 441).

Based on Microsoft's representation, this Court should grant Philips' Motion to exclude any testimony or opinions proffered by Microsoft or Dr. Rubin pertaining to invalidity based on a combination of SmartRight References. (Mot. at 1 ("Relief Sought", item (i)), 24:12-15 (excluding the invalidity theory based on a "combination of SmartRight References")). Further, the Court should also exclude any testimony or opinions based on the so-called "SmartRight System" for the reasons stated below.

### B. Dr. Rubin's Invalidity Theory Based on a "SmartRight System" Purportedly in Public Use

Microsoft does not dispute that, other than a non-technical press release, Dr. Rubin has not presented any evidence specifically referencing the particular "SmartRight System" purportedly demonstrated at the Consumer Electronics Show in Las Vegas, NV in January 2002. Instead, Microsoft attempts to create fictional connections between that purported system and the "SmartRight References," many of which were not even created, much less published, prior to the '809 patent's critical date. But Microsoft failed to point to sufficient admissible evidence to show the "SmartRight System" purportedly demonstrated in January 2002 actually contained the functionality described in the SmartRight References.

First, Microsoft acknowledges that Dr. Rubin relies "exclusively"[6] on two documents, the "DVB Paper" and the "White Paper"[7], to "reasonably infer[]"[8] the functionality of the purported "SmartRight System." (Opp. at 16:3-9, 16:18-21). But Dr. Rubin's purported "inference" is undermined by his own belief that implementers "fairly common[ly]" make "modifications" relative to technical design documents when implementing them:

> Companies can choose to implement standards … <u>exactly as described</u> in the Specifications, <u>or they can choose to make modifications</u>. Companies may choose to make modifications to a Specification, for example, to help the product function more efficiently on their own hardware. In my experience, it is <u>fairly common</u> for companies <u>to choose to make modifications to a Specification when implementing its functionality</u>.

(Ex. 19 at ¶ 229 (emphasis added)).[9]

Second, Microsoft alleges that the DVB Paper and the White Paper contain "substantively identical disclosures" of aspects relating to SmartRight, and concludes that this is somehow evidence that the so-called SmartRight System "operated similarly, in all relevant aspects, in October 2001 and in January 2003." (Opp. at 16:10-19). Initially, this argument is a *non sequitur*, given that Dr. Rubin's expert report never indicated that he relied on the purported similarity of these documents as an indication of the functionality of the purportedly-demonstrated SmartRight System. In fact, he

---

[6] Opp. at 16:8.
[7] Opp. Exs. 8 (bates-stamped PRIORART046362-414) and 9 (bates-stamped PRIORART044446-464, another copy produced as PRIORART044293-311 (Ex. 20)), respectively.
[8] Opp. at 16:18-21.
[9] *See also* Ex. 19 at ¶ 224 (referring to the "general practice of deviation from specifications").

testified as to his (erroneous) belief that "it doesn't matter" whether DVB Paper and White Paper refer to the same system (let alone the purportedly-demonstrated system):

> Q. How do you know whether all of these documents refer to the same SmartRight system?
>
> A. Most of them say they were by Thompson Multimedia and the name is trademarked. And so, they deal with protecting a system for digital home networks. The same company with the trademark and the same name, <u>I assume it is dealing with the same system</u>.
>
> Q. So you assumed that all of these documents refer to the same system?
>
> A. Well, in my grounds I say <u>I'm talking about the system</u> in the combination of references. And in doing an invalidity analysis it is enough that something is disclosed. And so if it is disclosed in one of these documents, <u>it doesn't matter whether or not it is the same system</u>, if I am using that document as my reference.

(Mot. Ex. 3 at 134:4-22 (emphasis added)). Indeed, these two documents *cannot* be "substantively identical," given that for a number of assertions in his report, Dr. Rubin relies exclusively on the White Paper (a document bearing a date after the '809 patent's critical date) without a secondary citation to the DVB Paper[10]. (*See, e.g.*, Mot. Ex. 1 at ¶¶ 458, 461). Moreover, Dr. Rubin concedes that each document uses different terminology in referring to certain features. (*See*, *e.g.*, Mot. Ex. 1 at ¶ 463 ("In DVB-CPT-715, the key is referred to as $K_A$ instead of Vo_key"), 490 ("SmartRight discloses that Vo_key [the secret] comprises a random number. 'The converter card picks at random two numbers Vo_key and Vo_R.' White Paper at 10-11; *see also* DVBCPT-715 at 23 ('The converter card picks at random two numbers *KA* and *KV*.').").). Further, even if Dr. Rubin had relied on alleged similarities between the DVB Paper and the White Paper to conclude that they both referred to and accurately described the same system (which he plainly did not), that is not a reliable basis on which to form any such conclusion.

Third, Microsoft asserts that the DVB Paper and the White Paper were both published by Thompson Multimedia, both included the "SmartRight" trademark, and both referenced a content protection system. (Opp. at 16:18-26). But, none of this provides a reliable basis on which to conclude that they both accurately describe the same system that was purportedly demonstrated in January 2002. In fact, Microsoft's own products provide a classic example contradicting the

---

[10] Dr. Rubin refers to the DVB Paper as "DVB-CPT-715".

relevance of such associations—Microsoft's "Windows" product family are all produced by Microsoft, all include a "Windows" trademark, and all are operating systems. Yet Microsoft's Windows product family spans a wide range of versions (all having differing functionality and operation), including Windows 3.1, Windows 95, Windows 98, Windows 2000, Windows XP, Windows Vista, Windows 7, Windows 8, and Windows 10. Likewise, Dr. Rubin's belief that the DVB Paper and the White Paper underlies the purportedly-demonstrated "SmartRight System," based simply on the same company, trademark, and overall purpose, is insufficient to satisfy the *Daubert* standard. In fact, Dr. Rubin conceded during his deposition that the White Paper and the DVB Paper refer to different version numbers of "SmartRight." (Mot. Ex. 3 at 144:8-19, 135:13-136:8 (exhibits 14 and 15 corresponding to the White Paper and DVB Paper, respectively), 6:5-10).

Microsoft cites *Adenta* to support its position (Opp. at 15:7-12), but this case is not applicable. In *Adenta*, "[t]he parties agreed that … a photo of a bracket, represented the type of Time bracket that was allegedly shown at [a] trade show," and the patentee "presented testimony from five witnesses to verify that the [same] type of bracket … was in fact displayed at the … trade show." *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1367 (Fed. Cir. 2007). While the patentee there also presented documents relating to the bracket, such documents served only as corroborating evidence "in addition to the oral testimony." *Id*. at 1372. In this case, Microsoft has offered <u>no</u> testimonial evidence concerning the actual system purportedly demonstrated in January 2002, and the parties have <u>not</u> agreed to the nature or functionality of the purportedly-demonstrated system. In fact, this is the very issue in dispute.

Microsoft also cites to *TransWeb*, *Sandt Tech*, and *Mitsubishi Elec.* (Opp. at 16:26-17:6), all of which are likewise inapposite.[11] In *TransWeb* and *Sandt Tech*, the documentary evidence were used solely to corroborate witness testimony, not as primary evidence.[12] On the other hand,

---

[11] While Microsoft also argues that *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004) cited by Philips is inapposite as the bases of invalidity there involved printed publications rather than systems (Opp. at 17 n.8), this case is actually relevant to the ultimate issue that an expert's basis for invalidity must in fact qualify as prior art, or otherwise exclusion of the expert's opinions is proper.

[12] *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1303-04 (Fed. Cir. 2016) ("[The documentary] evidence provides abundant <u>support for the credibility of Mr. Ogale's claim</u> that he distributed the plasma-fluorinated material at the expo. As such, … Mr. Ogale's testimony <u>was</u>

Microsoft is presenting the DVB Paper and White Paper as primary evidence, not as corroborating evidence to witness testimony concerning the system purportedly demonstrated in January 2002.

In *Mitsubishi Elec.*, the documentary evidence in that case was specific to the actual device demonstrated at a demonstration and, in addition to describing circuitry within that actual demonstrated device, noted that "'the performance' of the device was demonstrated" at the demonstration. *Mitsubishi Elec. Corp. v. Ampex Corp.*, 190 F.3d 1300, 1304-05 (Fed. Cir. 1999). The documentary evidence in *Mitsubishi Elec.* is a far cry from the DVB Paper and the White Paper, neither of which reference the purported January 2002 demonstration (*see* Mot. at 13:15-22)[13].

Dr. Rubin's reasoning falls short of the requisite evidence required under Fed. R. Evid. 702 to support that the functionality of the purportedly-demonstrated SmartRight System was implemented in the same manner as the DVB Paper or the White Paper. Therefore, exclusion of his opinions concerning invalidity based on the purportedly-demonstrated "SmartRight System" is warranted.

## IV. CONCLUSION

For the reasons set forth herein, Philips respectfully requests that the Court exclude (i) the invalidity theory based on a "combination of SmartRight References," presented in Dr. Aviel D. Rubin's April 25, 2019 opening expert report served on behalf of Microsoft and concerning the '809 patent, (ii) the invalidity theory based on a "SmartRight System," also presented in Dr. Rubin's opening report, and (iii) the untimely theories that were introduced for the first time in Dr. Rubin's June 20, 2019 rebuttal expert report served on behalf of Microsoft and concerning the '809 patent.

---

sufficiently corroborated [by documentary evidence]" (emphasis added)); *Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350-51 (Fed. Cir. 2001) ("[In] judg[ing] whether or not an inventor's testimony has been sufficiently corroborated[,] [d]ocumentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable proof that the inventor's testimony has been corroborated" (emphasis added)).

[13] The DVB Paper also bears a date prior to the January 2002 purported demonstration date.

| | |
|---|---|
| Dated: October 17, 2019 | By: ___/s/ John D. Carlin___<br>Chris Holland (SBN 164053)<br>cholland@hollandlawllp.com<br><br>HOLLAND LAW LLP<br>220 Montgomery Street, Suite 800<br>San Francisco, CA  94104<br>Tel: (415) 200-4980<br>Fax: (415) 200-4989<br><br><br>John D. Carlin (*admitted pro hac vice*)<br>jcarlin@venable.com<br><br>VENABLE LLP<br>1290 Avenue of the Americas<br>New York, New York 10104-3800<br>Tel: (212) 218-2100<br>Fax: (212) 218-2200<br><br>*Attorneys for Plaintiffs* |

16

PHILIPS' REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN OPINIONS IN DR. RUBIN'S OPENING
AND REBUTTAL EXPERT REPORTS SERVED ON BEHALF OF MICROSOFT
CONCERNING U.S. PATENT NO. 9,436,809
CASE NUMBER 4:18-CV-01885-HSG