# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE KONINKLIJKE PHILIPS PATENT LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 18-cv-01885-HSG<br><br>**ORDER REGARDING DAUBERT MOTIONS**<br><br>Re: Dkt. Nos. 711, 713, 766, 742<br><br>[UNDER SEAL] |

Pending before the Court are Defendants ASUSTeK Computer Inc. and ASUS Computer International (collectively, "ASUS") and Plaintiffs Koninklijke Philips N.V. and U.S. Philips Corporation (collectively, "Philips") motions to exclude expert testimony. Philips seeks to exclude testimony from three ASUS technical experts: (1) Mark Dunlop, (2) Markus Jakobsson, and (3) Dick Bulterman. *See* Dkt. Nos. 711, 713, 766. ASUS seeks to exclude testimony from Philips's damages expert, Michael Tate. Dkt. No. 742. Having carefully considered the parties' arguments and evidence submitted, the Court (1) **DENIES** without prejudice Philips's motion to exclude Dr. Dunlop's opinions, (2) **GRANTS IN PART** and **DENIES IN PART** Philips's motion to exclude Dr. Jakobsson's opinions, (3) **DENIES** Philips's motion to exclude Dr. Bulterman's opinions, and (4) **GRANTS IN PART** and **DENIES IN PART** ASUS's motion to exclude Mr. Tate's opinions.

**I. BACKGROUND**

Philips contends that ASUS infringes six of its patents: U.S. Patent Nos. 5,910,797 ("'797 Patent"), 7,184,064 ("'064 Patent"), 7,529,806 ("'806 Patent"), 9,436,809 ("'809 Patent"), and RE43,564 ("'564 Patent"), and RE44,913 ("'913 Patent"). On January 6, 2020, the Federal

Circuit found all claims of the '913 Patent unpatentable. *See* Dkt. No. 949. In response, Philips agreed to stay all claims related to the '913 Patent pending further appeal. Dkt. No. 970.

According to the schedule adopted in this case, fact discovery closed on January 4, 2019, with opening expert reports due on March 14, 2019 and rebuttal expert reports due on May 16, 2019. Dkt. No. 573. After multiple extensions, the opening expert report deadline was extended to April 25, 2019 and the rebuttal expert report deadline to June 20, 2019. Dkt. Nos. 631, 644. Although the scheduling order did not permit reply expert reports, Philips filed supplemental expert reports to rebut certain allegedly new theories in Dr. Dunlop's and Dr. Jakobsson's rebuttal reports. *See* Dkt. Nos. 710-11, 713-6.

## II. LEGAL STANDARD

### A. Federal Rule of Evidence 702

Federal Rule of Evidence 702 governs the admission of expert testimony. Rule 702 permits a qualified expert to testify based on "scientific, technical, or other specialized knowledge" if (1) it will "help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based on sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In permitting expert testimony, district courts play a "'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008) (citing *Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993)). In so doing, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir 2013); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'" (citation omitted)).[1]

---

[1] The decision to admit expert testimony in a patent case follows the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).

The test for reliability is "fluid and contextual"; district courts have "'broad latitude' to 'decide *how* to test an expert's reliability' and '*whether or not* [an] expert's relevant testimony is reliable." *Murray v. S. Route Maritime SA*, 870 F.3d 915, 923 (9th Cir. 2017). "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove." *Primano*, 598 F.3d at 565. Testimony is relevant if it "will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). When expert opinion meets the reliability and relevance threshold, "the expert may testify and the jury decides how much weight to give that testimony." *Primano*, 598 F.3d at 565. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (quoting *Daubert*, 509 U.S. at 594, 596).

### B. Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26 also applies to expert testimony. Rule 26(e) requires a party "who has responded to an interrogatory" to "supplement or correct its disclosure or response" "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). Rule 37 "gives teeth" to Rule 26 requirements by "forbidding the use at trial of any information that is not properly disclosed" in discovery unless the failure was "substantially justified or harmless." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011); Fed. R. Civ. P. 37(c)(1). Under Rules 26 and 37, an expert opinion may be excluded for including information not disclosed during fact or expert discovery. *See, e.g.*, *Goodman*, 644 F.3d at 827; *Berman v. Knife River Corp.*, 687 F. App'x 616, 617 (9th Cir. 2017).[2] The party that failed to disclose information bears the burden to demonstrate that the failure was "substantially justified or harmless." *Torres v. City of L.A.*, 548 F.3d 1197, 1213 (9th Cir. 2008).

---

[2] As an unpublished Ninth Circuit decision, *Berman* is not precedent, but can be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

3

## III. PHILIPS'S DAUBERT MOTIONS

Philips seeks to exclude the testimony of Dr. Dunlop, Dr. Jakobsson, and Dr. Bulterman. According to Philips, all three experts introduced new theories in their rebuttal reports that were not disclosed during fact discovery. Philips also challenges the reliability of Dr. Jakobsson's invalidity opinions on the grounds that they employ improper hindsight analysis. Because Philips agreed to stay all claims and defenses related to the '913 Patent, which includes Dr. Dunlop's opinions at issue, the Court **DENIES** Philips's motion to exclude Dr. Dunlop's testimony without prejudice to renewal if the Federal Circuit's invalidity finding is reversed on banc or by the U.S. Supreme Court. The remaining expert opinions are addressed below.

### A. Dr. Jakobsson's Invalidity Opinions

Philips seeks to exclude Dr. Jakobsson's invalidity opinions for the '809 Patent under 35 U.S.C. § 103 (obviousness) on the basis that they employ improper hindsight reasoning. A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Importantly, "[a]n invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934 (Fed. Cir. 2019). Instead, there must be "a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Id.* (quoting *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999)); *see also In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) ("Most if not all inventions arise from a combination of old elements . . . . [T]o establish obviousness based on a combination of the elements disclosed in the prior art, there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant.").

Motivation to combine "can be found explicitly or implicitly in the prior art references themselves, in market forces, in design incentives, or in 'any need or problem known in the field of endeavor at the time of invention and addressed by the patents.'" *Forest Labs.*, 918 F.3d at 934

4

1  (quoting *Arctic Cat Inc. v. Bombardier Rec. Prods. Inc.*, 876 F.3d 1350, 1359 (Fed. Cir. 2017)).
2  However, the Federal Circuit has cautioned against using hindsight reasoning to "piece together
3  elements to arrive at the claimed invention" using the patent itself. *In re NTP, Inc.*, 654 F.3d
4  1279, 1299 (Fed. Cir. 2011); *see InTouch Techs., Inc. v. VGO Comms., Inc.*, 751 F.3d 1327, 1351-
5  52 (Fed. Cir. 2014) (rejecting as hindsight bias expert testimony that relied on the patent at issue
6  as a "roadmap" for putting the "jigsaw puzzle" of prior art elements together); *Grain Processing
7  Corp. v. Am. Maize-Products Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to
8  avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art
9  references, combining the right references in the right way so as to achieve the result of the claims
10  in the suit.'" (citation omitted)).

11  At the outset, the Court notes that this is not a typical hindsight analysis case. In *NTP*,
12  *InTouch*, and *Grain Processing*, the party challenging validity relied on the patent-at-issue to piece
13  together the *solution* described by the patented invention. For example, in *NTP*, the Federal
14  Circuit rejected a finding of obviousness based on a "piecemeal analysis" that selectively plucked
15  missing elements from the prior art to arrive at the patented invention. 654 F.3d at 1298-99.
16  Here, on the other hand, Dr. Jakobsson relies on the specification of the '809 Patent to provide the
17  *problem* motivating the combination of prior art. He opines that "*[g]iven* the object of invention"
18  of the '809 Patent, and "*once* the goal of the invention and problem to be solved are set forth," the
19  combination of prior art references would have been obvious. Dkt. No. 713-3 ("Jakobsson
20  Report") ¶ 154; *see also id.* ¶¶ 168 ("[A] POSITA would have been motivated to look closely at
21  Willey to address concerns raised in the [']809 Patent."), 187 (opining that a POSITA facing the
22  problem set forth by the '809 Patent would combine the elements of the prior art), 212 (same), 251
23  (same), 281 (same), 317 (same). Dr. Jakobsson does not independently consider or provide
24  evidence that the problem described in the '809 Patent was known in the art at the time of the
25  invention. *See* Dkt. No. 713-5 ("Jakobsson Depo.") at 92:19-93:7, 98:4-100:15, 102:1-9.

26  Relying on the specification to supply a problem presumably poses less risk of hindsight
27  bias than relying on it for the solution. Inventors typically invent solutions, not problems.
28  Nevertheless, the Federal Circuit has recognized that "an invention can often be the recognition of

5

a problem itself." *Leo Pharma. Products, Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("Often the inventive contribution lies in defining the problem in a new and revelatory way."). In *Leo Pharmaceutical Products*, the Federal Circuit reversed a finding of obviousness for a composition comprising ingredients that were well-known in the art. *Id.* at 1353. Although a person of ordinary skill would have been "familiar" with each ingredient and would have known how to combine them in a composition, the Federal Circuit concluded that the inventors "recognized and solved a problem" involving the stability of existing compositions "that the prior art did not recognize." *Id.* Since none of the prior art recognized the problem to be solved, "the record show[ed] no reason for one of ordinary skill in the art to attempt to improve [the prior art]" by adding additional ingredients and the invention was not obvious. *Id.* at 1354.

Accordingly, since the inventive contribution may lie in "defining the problem in a new revelatory way," relying on the specification of a challenged patent to supply the motivation to combine prior art presents impermissible hindsight bias.[3] *See Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858-60 (Fed. Cir. 2015) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness."); *Mintz*, 679 F.3d at 1377-78 (vacating invalidity finding where "[t]he district court has used the invention to define the problem that the invention solves"); *see also Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 966 (Fed. Cir. 2016) ("[T]o the extent that Purdue relies on the problem to be solved to supply the reason to combine the prior art, it failed to demonstrate . . . that the problem was known in the art or that Purdue's formulation of the problem was derived directly from the prior art, rather than from the challenged claims.").

Philips's motion is nevertheless overbroad in seeking to exclude the entirety of Dr. Jakobsson's invalidity opinions. Dr. Jakobsson provides additional opinions concerning the motivation to combine prior art elements that do not rely on the '809 Patent. For example, he

---

[3] Of course, if the specification itself admits that either the problem or elements of the solution were known in the art, the parties may rely on the admission without additional analysis. *See, e.g.*, *NTP*, 654 F.3d at 1297 (discussing "applicant's admitted prior art"). Here, however, the specification does not suggest that its specific framing of the problem was previously known.

6

opines that the ISO 9798 and ISO 11770 standards themselves suggest making their combination and that Willey discusses the desirability of using public key certificates, such as those described in the specifications. Jakobsson Report ¶¶ 161, 164. Since these opinions rely on motivation to combine found in the prior art, they are both relevant and reliable in helping determine invalidity. *See Forest Labs.*, 918 F.3d at 934 (motivation to combine may come from teachings in the prior art). Moreover, to the extent that ASUS can lay the foundation to show that the problem described in the '809 Patent was known in the art, Dr. Jakobsson may testify that "given" that problem, a person of ordinary skill confronting the same challenge would have combined the prior art as stated. Thus, the Court **GRANTS** Philips's motion to exclude Dr. Jakobsson's invalidity opinions to the extent that they rely on the '809 Patent specification to supply the motivation to combine but **DENIES** the motion as to opinions regarding the teachings of the prior art references and the motivation to combine found outside of the '809 Patent specification.[4]

### B. Dr. Jakobsson's Noninfringement and Noninfringing Alternative Theories

Philips also moves to exclude the following theories disclosed in Dr. Jakobsson's rebuttal expert report: (1) a noninfringement theory based on "additional steps" performed after the locality check, (2) a noninfringing alternative theory based on "DTCP IP," (3) a noninfringing alternative theory based on providing the first signal before the second device is determined to be compliant, and (4) a noninfringing alternative theory based on using a key exchange protocol. Dkt. No. 713-4 ("Jakobsson Rebuttal Report") ¶¶ 83-84, 99-100, 101-02. Philips contends that none of these theories or alternatives were disclosed in ASUS's interrogatory responses in violation of Federal Rule of Civil Procedure 26.

ASUS concedes that three of these theories were not disclosed in interrogatory responses and agrees not to introduce expert testimony regarding those theories. However, for the DTCP IP noninfringing alternative, ASUS contends that it disclosed that alternative in its interrogatory

---

[4] The parties dispute whether Philips disclosed the novelty of the problem solved by the '809 Patent in its validity contentions and whether the inventor of the '809 Patent admitted that the problem was known in the art. Neither of those disputes is relevant to the question of whether Dr. Jakobsson's opinion used reliable methods. In any case, Philips appeared to have sufficiently disclosed hindsight reasoning as part of its validity contentions and the inventor testimony is sufficiently contradictory to be best left for the parties' cross-examination.

7

responses. Specifically, in response to Philips's interrogatory number 16, ASUS stated that "the code could be modified to use DTCP IP for content protection for proximal devices rather than PlayReady-ND and MBDRM-ND." Dkt. No. 713-11 ("ASUS ROG 16 Responses") at 8-9. According to the parties, PlayReady-ND and MBDRM-ND were additional accused products that Philips withdrew prior to expert discovery. In other words, ASUS identified DTC IP as a noninfringing alternative for a different set of products than the ones currently accused. The currently-accused products (based on HDCP 2.x functionality) were separately addressed in the interrogatory responses. For those products, ASUS stated that code could be modified to remove HDCP 2.x functionality and rely on HDCP 1.x instead. *Id.* at 9.

      The Court finds that ASUS's disclosures were not sufficient to disclose DTCP IP as a noninfringing alternative. ASUS's responses clearly identify DTCP IP as a noninfringing alternative to the PlayReady-ND and MBDRM-ND products only. If ASUS intended to rely on the functionality as a noninfringing alternative to the currently-accused products, it was obligated to supplement its responses to clearly indicate its intention. *See* Fed. R. Civ. P. 26(e)(1)(A). Having failed to do so, ASUS denied Philips the opportunity to conduct fact discovery on the noninfringing alternative in relation to the currently-accused products and to perform full expert discovery on the theory. ASUS's disclosure of the noninfringing alternative in relation to *other* products is not sufficient; Philips was justified in relying on ASUS's interrogatory responses in believing the theory was no longer relevant. Accordingly, ASUS fails to show that the violation of Rule 26 was substantially justified or harmless and exclusion applies. *See Asia Vital Components Co., Ltd. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003-05 (N.D. Cal. 2019) (excluding theories disclosed in rebuttal expert report but not interrogatory responses); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 3155574, at *5 (N.D. Cal. Aug. 2, 2012) (same). The Court therefore **GRANTS** Philips's motion to exclude Dr. Jakobsson's new noninfringement and noninfringing alternative theories.

### C. Dr. Bulterman's Noninfringement Theories

      Philips next moves to exclude noninfringement theories in Dr. Bulterman's rebuttal expert report for the '806 Patent on the ground that they were not disclosed in ASUS's noninfringement

8

contentions. Contention interrogatories are a special type of discovery disclosure intended to "require parties to crystallize their theories of the case early in the litigation." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006). Contentions "act as forms of pleading that disclose the parties' theories of their case and thereby shape discovery and the issues to be determined at trial." *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630-LHK PSG, 2013 WL 3246094, at *3 (N.D. Cal. June 26, 2013). They do not, however, require parties to disclose specific evidence or prove their case. *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1331, 1338 (Fed. Cir. 2014); *Finjan, Inc. v. Symantec Corp.*, No. 14-cv-02998-HGS (JSC), 2018 WL 620169, at *2 (N.D. Cal. Jan. 30, 2018). Thus, in deciding whether to exclude expert testimony, "[t]he dispositive inquiry . . . [is] whether the allegedly undisclosed 'theory' is in fact a new theory . . . or whether the 'theory' is instead the identification of additional evidentiary proof." *Finjan*, 2018 WL 620169, at *2; *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 5:12-cv-0630-LHK-PSG, 2014 WL 12917334, at *1 (N.D. Cal. Jan. 9, 2014) (framing the question as "has the expert permissibly specified the application of a disclosed theory, or has the expert impermissibly substituted a new theory altogether").

Here, the parties dispute whether the allegedly undisclosed noninfringement theories are, in fact, theories. Philips contends that ASUS failed to disclose (1) the ▮▮▮ theory and (2) the ▮▮▮▮▮ theory of noninfringement. Because the parties dispute the characterization of these theories, the Court looks at the underlying opinions in Dr. Bulterman's report and compares them to ASUS's final interrogatory responses. *See* Dkt. Nos. 766-2 ("Bulterman Report"); 766-3 ("ASUS ROG Response").

Philips cites pages 129-132, 149-150 and 170 in Dr. Bulterman's report for the ▮▮▮ theory. In these pages, Dr. Bulterman explains that the ▮▮▮ functionality is an ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Bulterman Report at 129. Because the asserted claims of the '806 Patent require the client device to perform the downloading method, the accused products do not practice the claims when the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 150. In its noninfringement contentions, ASUS disclosed that "Philips' source-code contentions

9

1    do not correctly describe the functionality of the YouTube application, at least by failing to

2    include the ▇▇ functionality of YouTube." ASUS ROG Responses at 108. The Court finds

3    that this response adequately put Philips on notice of ASUS's theory that the accused products do

4    not practice the claimed method when the ▇▇ functionality is enabled. *Cf. Finjan*, 2018 WL

5    620169, at *2 (finding disclosures sufficient if they "provide reasonable notice" of "why the

6    [party] believes it has a reasonable chance of proving" its case (quotation and citation omitted)).

7    Philips cites pages 30-31, 85, 96-103, and 122-123 of Dr. Bulterman's report as evidence

8    of the "▇▇" theory. In these pages, Dr. Bulterman rebuts Philips's expert's opinion

9    that the "protocol buffer file" is the "control information file" recited in the asserted claims

10   because, among other reasons, it is not a file and does not contain information required for the

11   "control information file." Bulterman Report at 97. The Court finds that ASUS adequately

12   disclosed this theory in its noninfringement contentions. Specifically, in its interrogatory

13   responses, ASUS stated that the accused products do not satisfy the claims because they do not

14   contain a "control information file." ASUS ROG Responses at 107. Although ASUS's responses

15   do not mention "▇▇," "▇▇," or "protocol information file," neither do Philips's

16   infringement contentions. *See* Dkt. No. 832-17 ("Philips Infringement Contentions"). Instead, Dr.

17   Bulterman's opinion appears to respond to Dr. Polish's report that identifies the ▇▇

18   ▇▇ as the "control information file." *See* Bulterman Report at 99-100.

19   Because ASUS had disclosed that the accused products do not have a "control information file,"

20   Philips was put on notice that ASUS intended to argue that whichever components Philips accused

21   for this limitation did not meet the claim requirements.

22   Philips argues that even though ASUS disclosed these theories, it nonetheless failed to

23   disclose them in sufficient detail, citing *KlausTech, Inc. v. Google LLC*, No. 10-cv-05899-JSW

24   (DMR), 2018 WL 5109383 (N.D. Cal. Sept. 14, 2018) and *Thought, Inc. v. Oracle Corp.*, No. 12-

25   cv-05601-WHO, 2016 WL 3230696 (N.D. Cal. June 13, 2016). The current situation is different

26   from those cases, however. In *KlausTech* and *Thought*, the court rejected arguments that a party

27   had "implicitly" disclosed certain accused components because it disclosed *other* components that

28   included the accused components. *See KlausTech*, 2018 WL 5109383, at *4 (rejecting argument

that KlausTech implicitly disclosed "operating systems" as the claimed browsers where the term "operating system" did not appear in the contentions); *Thought*, 2016 WL 3230696, at *6 (rejecting argument that Thought "implicitly" accused wrapped sessions where infringement contentions referred generally to TopLink functionality without mentioning wrapped sessions). Here, on the other hand, ASUS *expressly* identified the "▆▆▆" functionality as preventing infringement and *expressly* argued that the accused products did not contain a "control information file." These disclosures gave Philips "reasonable notice" as to why ASUS "believes it has a reasonable chance of proving" noninfringement and allowed it to structure its discovery and evidence in anticipation of ASUS's arguments. *See Finjan*, 2018 WL 620169, at *2; *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1025 (N.D. Cal. 2010).[5]

Accordingly, the Court **DENIES** Philips's motion to exclude Dr. Bulterman's "▆▆▆" and "▆▆▆▆▆▆" noninfringement theories.

### IV. ASUS'S DAUBERT MOTION

ASUS seeks to exclude the opinions of Philips's damages expert, Mr. Tate, on the ground that they are not reliable. Specifically, ASUS argues that Mr. Tate (1) did not conduct an independent economic assessment of the asserted patents and instead applied aspirational royalty rates derived from Philips's licensing program, without evaluating whether those rates were reasonable, (2) failed to apportion damages by relying on a hypothetical negotiation that includes unasserted patents, (3) failed to meaningfully assess the comparability of certain licenses, (4) ignored relevant data, and (5) failed to provide any evidence or analysis to support a "blended rate" royalty in his report. The Court agrees that Mr. Tate's opinions are not helpful.

35 U.S.C. § 284 provides that damages for patent infringement shall be "adequate to compensate for the infringement" but "in no event less than the reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35

---

[5] The parties discuss at length Philips's fraught history of seeking discovery from Google Inc. The Court agrees with Philips that these disputes are "largely irrelevant" to the question of the adequacy of ASUS's noninfringement contentions. The proper remedy for document production failure is to move to compel or to seek to exclude specific evidence not timely disclosed during fact discovery. *See Civolution B.V. v. Doremi Labs, Inc.*, No. LA CV14-00962 JAK (RZx), 2015 WL 11072167, at *2 (C.D. Cal. June 11, 2015).

U.S.C. § 284. The best measure of a reasonable royalty is an established royalty—i.e., the royalty that the patentee actually charges for the patent-in-suit—because it "removes the need to guess at the terms to which parties would hypothetically agree." *Monsanto Co. v. McFarling*, 488 F.3d 973, 978-79 (Fed. Cir. 2007). A patentee can demonstrate an established royalty by showing that it "has consistently licensed others to engage in conduct comparable to the defendant's at a uniform royalty." *Id.*; *see also Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990) (requiring evidence that a royalty was "paid by such a number of persons as to indicate a general acquiescence in its reasonableness"). For example, in *Monsanto*, the patent owner showed that it consistently licensed farmers patent-protected seeds under a standard license agreement, and the Federal Circuit affirmed a jury award based on the royalty rates derived from that agreement, adjusted to account for license restrictions. 488 F.3d at 979-81.

Where evidence of an established royalty is not available, the Federal Circuit has approved the use of a "hypothetical negotiation" framework that "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). The hypothetical negotiation framework "tries, as best as possible, to recreate the *ex ante* licensing negotiating scenario and to describe the resulting agreement." *Id.* at 1325. A list of non-exhaustive factors for determining a reasonable royalty in a hypothetical negotiation is outlined in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), and includes an examination into the value of the patent, the parties' economic circumstances, and comparable past licenses of the patent-in-suit. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). However, the Federal Circuit has cautioned against relying on non-comparable licenses and reversed damage awards based on "radically different" license agreements. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316-17 (Fed. Cir. 2011) (summarizing cases); *see, e.g.*, *Lucent*, 580 F.3d at 1325-32; *ResQNet.com*, 594 F.3d at 870-71.

Here, Mr. Tate employs a hypothetical negotiation framework and analyzes the *Georgia-Pacific* factors. *See* Dkt. No. 742-3 ("Tate Report") at 12. He also analyzes past licenses and settlement agreements, including ones that included the asserted patents. *Id.* at 13-40. However,

at the end of the analysis, he concludes that "the reasonable royalty in the hypothetical negotiation would be determined using the rates reflected in Philips' Portable Features program." *Id*. at 62. The Portable Features program is a licensing program set up by Philips in 2009 that bundles patents by feature set (e.g., "Touch Screen Interfaces") that have associated royalty rates. *Id*. at 8. Each feature set includes one or more patents, which change over time as patents expire and new patents issue. *Id*. Under the program, a prospective licensee may enter into a "Blended Rate" agreement and pay Philips a flat rate of $0.99 for all of the patents in the program. *Id*. at 9. Alternatively, a licensee may enter into a "Discrete Rate" agreement to pay a smaller royalty rate for only the patents in a particular feature set. *Id*. Under both types of agreements, the royalty rate is the same regardless of the number of patents the licensee ultimately uses. *Id*.

Using the information from the Portable Features program, Mr. Tate opines that ASUS could have selected either the blended rate or the discrete rate in a hypothetical negotiation. *Id*. at 62. Mr. Tate then calculates the royalty obligation if ASUS had paid $0.99 for all patents in the program, as well as if it had paid discrete rates for the four functional areas that it is accused of using. *Id*. Because the Portable Features program involves the same rate regardless of the number of patents used in each feature set, Mr. Tate opines that the reasonable royalty would be the same regardless of whether ASUS infringes one or multiple patents in a given feature set. *See id*. at 63; Dkt. No. 742-4 ("Tate Depo.") at 155:1-15. And he concludes that the *Georgia-Pacific* factors would have no effect on the rates set by Philips. *See id.* at 127:17-128:1. ASUS criticizes this approach by claiming that it blindly adopts Philips's aspirational royalty rates without tying those rates to the economic value of the patented technology. ASUS points out that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[6] *See id.* at 54:9-55:24; Dkt. No. 742-6 ("Wieghaus Depo.") at 70:10-72:23.

As an initial matter, because Philips advertises the Portable Features program royalty rates to prospective licensees, they are properly considered offers to license. Offers to license (without

---

[6] The discrete rates also did not change as the asserted patents expired, which further suggests that they are not tied to the value of any patent. *See* Tate Depo. at 100:24-102:24.

13

more) are not sufficient to demonstrate an established royalty rate. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (requiring "actual licenses" to show an established royalty); *Trell*, 912 F.2d at 1446 (requiring "general acquiescence" to an established royalty rate). They may, nevertheless, be probative of reasonable royalty under a hypothetical negotiation framework where they are consistent with the "commercial value and profitability" of the patented technology. *Atlantic Themoplastics Co., Inc. v. Faytex Corp.*, 5 F.3d 1477, 1482 (Fed. Cir. 1993). However, their evidentiary value "is limited" by "the fact that patentees could artificially inflate the royalty rate by making outrageous offers." *Whitserve, LLC v. Comp. Packages, Inc.*, 694 F.3d 10, 30 (Fed. Cir. 2012). For this reason, multiple courts have excluded evidence of offers that lacked "indicia of reliability." *See, e.g.*, *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 2716512, at **13-15 (N.D. Cal. June 28, 2019) (excluding offer made in the context of litigation); *Wi-Lan Inc. v. LG Elecs., Inc.*, No. 18-cv-01577-H-BGS, 2019 WL 5681622, at *7 (S.D. Cal. Nov. 1, 2019) (excluding "rate sheet" used as a starting point in negotiations where each negotiation ended at a lower rate); *Apple Inc. v. Wi-LAN, Inc.*, No. 14CV2235 DMS (BLM), 2019 WL 4253832, at *2 (S.D. Cal. Mar. 26, 2019) (affirming exclusion of rate sheets as prejudicial).

In line with those decisions, the Court finds that Mr. Tate's damages opinions lack sufficient reliability to be helpful to the jury. Mr. Tate erred by taking Philips's advertised rates as both the starting and the ending points of a hypothetical negotiation, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Dkt. No. 742-7 ("Tate Depo. II") at 39:11-41:9. The purpose of the hypothetical negotiation framework is to approximate the fair market value of the patented invention. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014). By definition, the fair market value must reflect "the two-sided nature of the posited negotiation." *Id*. at 771. As the Ninth Circuit explained in an analogous copyright context, "[f]air market value in a voluntary licensing transaction . . . ordinarily lies somewhere between the two poles of cost to the seller and benefit to the buyer." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1089 (9th Cir. 2014). But Mr. Tate improperly assumed a one-sided negotiation where Philips dictates the terms of the hypothetical agreement based on its Portable Features program and ASUS

14

1   passively accepts them. Had he wished to rely on Philips's advertised rates, Mr. Tate must have at
2   least corroborated the *reasonableness* of those rates by tying them to the economic value of the
3   invention, ███████████████████████████████████████████, or explaining
4   why the rates are consistent with ASUS's willingness to pay for the right to use the invention. Mr.
5   Tate did none of this.

6       ASUS's remaining critiques of Mr. Tate opinions underscore the lack of reliability. Mr.
7   Tate did not conduct an independent economic analysis of the value of the asserted patents—
8   which shows that he cannot demonstrate that Philips's rates are reasonable compared to the value
9   of the invention. Mr. Tate also did not "apportion" the value of the asserted patents compared to
10  the unasserted patents in each portable feature set.[7] Among other concerns, this failure means that
11  Mr. Tate cannot show the licenses he analyzes in his report are comparable to the current case. In
12  particular, if Philips's existing licensees use multiple patents in Philips's Portable Features
13  portfolio—or use patents having significantly greater value compared to the asserted patents—
14  they may have a different willingness to pay compared to ASUS in a hypothetical negotiation.
15  And even if Mr. Tate had shown that the licenses were comparable, ████████████████
16  ███████████████████████████████, which does not support Mr. Tate's conclusions that
17  ASUS would accept the *discrete* royalty rates in a hypothetical negotiation.[8] *See* Tate Report at
18  13-39.

19      Mr. Tate's also fails to meaningfully consider the *Georgia-Pacific* factors. Although he
20  lists the factors in his report, his analysis is conclusory and focuses on how those factors would

---

[7] Apportionment requires damages in a patent case to "reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). ASUS argues that Mr. Tate's opinions violate the apportionment rule because they are based on a hypothetical license that includes the value of unasserted patents. Philips counters that Mr. Tate properly considered a negotiation for the asserted patents only, which happens to "throw in" additional patents. The Court finds that the parties' dispute stems from the same failures as described above. A license that includes additional patents *could* be the result of a hypothetical negotiation if the asserted patents alone are worth the royalty rate. But Mr. Tate failed to show that they are. And regardless of whether portfolio licenses violate the apportionment rule, they make it exceedingly difficult to determine whether past licenses are comparable to the case-at-issue and may be excluded for that reason. *See, e.g.*, *DataQuill Ltd. v. High Tech Comp. Corp.*, 887 F. Supp. 2d 999, 1023 (N.D. Cal. 2011).

[8] Mr. Tate withdrew his blended rate opinions during deposition. *See* Tate Depo. II at 28:10-33:3.

15

"revise" the rates set by the Patent Portfolio program. *See* Tate Report at 41-63. Courts in this district have rejected similar analysis that begins with a "starting point" based on non-case specific data and then revises upward or downward based on the *Georgia-Pacific* factors. *See Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (rejecting approach that picks a starting point based on industry-wide data and revises upward or downward based on the *Georgia-Pacific* factors); *Digital Reg of Tex., LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4090550, at *2 (N.D. Cal. Aug. 19, 2014) (cautioning that "a starting point should be tied to case-specific factors grounded in reliable data"); *Dinetix Design Solutions, Inc. v. Synopsys, Inc.*, No. C 11-05973 PSG, 2013 WL 4538210, at *4 (N.D. Cal. Aug. 22, 2013) (requiring a "case and party specific starting point"). Damages in a patent case must be tied to "the claimed invention's footprint in the market place." *ResQNet.com*, 594 F.3d at 869. Portfolio-wide license rates are simply not a reasonable starting point for measuring the fair market value of an invention. *See Golden Bridge Tech. v. Apple Inc.*, No. 5:12-CV-04882-PSG, 2014 WL 4057187, at *2 (N.D. Cal. June 1, 2014); *see also Exmark Mfg. Co., Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (affirming exclusion of expert testimony that failed to tie *Georgia-Pacific* factors to resulting royalty rate).

At bottom, Mr. Tate improperly conflates an established royalty rate analysis with a hypothetical negotiation analysis. A licensing program cannot demonstrate an established royalty unless it enjoys "widespread acquiescence" from licensees. ███████████████, Mr. Tate was required to recreate the hypothetical negotiation scenario "as best as possible" to approximate the bargaining power and willingness to pay of each party. *Lucent Techs.*, 580 F.3d at 1324. Instead, Mr. Tate assumed—without evidence—that Philips would dictate the terms through the Portable Features program, that ASUS would acquiesce to those terms without modification, and that the rates made sense in the context of the value of the infringing feature. These assumptions are unsubstantiated and therefore not reliable. Accordingly, the Court **GRANTS** ASUS's motion to exclude Mr. Tate's analysis as to the reasonable royalty in this case.

Nevertheless, the Court is cognizant that Philips is entitled to reasonable royalties in the event of infringement even if it has no evidence to proffer for that royalty. *See Info-Hold, Inc. v.*

16

1  *Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) (reversing summary judgment of zero royalties where patentee failed to prove damages); *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003) (rejecting conclusion that failure to prove damages means no damages could be awarded). Accordingly, since the jury will have to determine a reasonable royalty regardless, the Court finds that Mr. Tate's opinions about the royalty base would be helpful in that regard and **DENIES** ASUS's motion as to those opinions.

## V. CONCLUSION

For the reasons stated in this Order, the Court **DENIES** without prejudice Philips's motion to exclude Dr. Dunlop's opinions (Dkt. No. 711), **GRANTS IN PART** and **DENIES IN PART** Philips's motion to exclude Dr. Jakobsson's opinions (Dkt. No. 713), **DENIES** Philips's motion to exclude Dr. Bulterman's opinions (Dkt. No. 766), and **GRANTS IN PART** and **DENIES IN PART** ASUS's motion to exclude Mr. Tate's opinions (Dkt. No. 742).

**IT IS SO ORDERED.**

Dated: April 13, 2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

17