# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE KONINKLIJKE PHILIPS PATENT LITIGATION<br><br>This Document Relates To:<br><br>     ALL ACTIONS | Case No. 18-cv-01885-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART ASUS'S MOTION FOR SUMMARY JUDGMENT AND DENYING PHILIPS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[UNDER SEAL]<br><br>Re: Dkt. Nos. 724, 751 |

Pending before the Court are motions for partial summary judgment filed by Defendants ASUSTeK Computer Inc. and ASUS Computer International (collectively, "ASUS") and Plaintiffs Koninklijke Philips N.V. and U.S. Philips Corporation (collectively, "Philips"). Dkt. Nos. 724 ("ASUS Mot."), 751 ("Philips Mot."). The Court held a hearing on these motions on December 20, 2019. Having carefully considered the parties' arguments and evidence submitted, the Court **GRANTS in Part** and **DENIES in Part** ASUS's motion for partial summary judgment and **DENIES** Philips's motion for partial summary judgment.

## I.   BACKGROUND

Philips contends that ASUS infringes U.S. Patent Nos. 5,910,797 ("'797 Patent"), 7,184,064 ("'064 Patent"), 7,529,806 ("'806 Patent"), 9,436,809 ("'809 Patent"), and RE43,564 ("'564 Patent"), and RE44,913 ("'913 Patent"). The Federal Circuit has found all asserted claims of the '913 Patent invalid. *See* Dkt. No. 949. The Court therefore does not address the '913 Patent, except where relevant to the parties' motions.

### A. The '797 Patent

The '797 Patent is titled "Portable Data Processing Apparatus Provided With a Screen and a Gravitation-Controlled Sensor for Screen Orientation." '797 Patent at Cover Page. The patent describes a portable apparatus where "the orientation of the screen can be used to control various different types of motion [on the screen] depending on the actual spatial orientation." *Id.* at 1:25-29. For example, the invention can be used to "implement a game based on moving an object through a maze, positioning a ball in a shallow dip, and many others that require manipulatory skills from a user person." *Id.* at 2:3-8. In these instances, gravitationally-controlled sensors in the apparatus "operate in a manner of a joystick" in "influencing the motion pattern of the displayed objects." *Id.* at 1:34-38, 1:45-48.

The invention, recited in means-plus-function terms, claims a manipulatable apparatus having (1) data processing means, (2) screen means, and (3) a gravitation-controlled sensor integrated with the screen means. *Id.* at 1:7-13, claims 1, 11. The sensor measures the acceleration of the screen means induced by user manipulation and feeds the data to the data processing means. *Id.* at claims 1, 11. The data processing means includes a "programmed calculating means" that, under control of the sensed motion, imparts an acceleration based motion pattern to objects displayed on the screen means. *Id.*

Philips asserts that ASUS infringes independent claim 1 and dependent claim 6. Dkt. No. 827-2 ("Greenspun Report") §§ IV.A, IV.B. Independent claim 1 provides:

| Claim 1 |
|---|
| 1. A manipulatable **apparatus** having |
|     data processing means and screen means for displaying one or more graphical or other objects presented by said data processing means, |
|     a gravitation-controlled sensor integrated with said screen means and feeding said data processing means for measuring an acceleration of said screen means induced by user manipulation of the screen means, |
|     wherein said data processing means have programmed calculating means for under control of a screen motion sensed by said sensing means imparting an acceleration based motion pattern to a predetermined selection among said objects. |

Dependent claim 6 further provides:

2

United States District Court
Northern District of California

| Claim 6 |
|---|
| 6.  An **apparatus** as claimed in claim 1, wherein said motion is nonuniform in time under control of a static said orientation of the screen means. |

### B.  The '064 Patent

The '064 Patent is titled "Touch-Screen Image Scrolling System and Method."  '064 Patent at Cover Page.  It is directed to improving the scrolling experience by allowing a user to use natural movements on a touchscreen to scroll.  *Id.* at 1:46-56, 2:25-31.  To initiate scrolling, the user presses down and moves a finger in a certain direction, causing the displayed image to scroll in the same direction at a similar speed.  *Id.* at 1:57-59.  When the user separates the finger from the screen, the image continues to scroll at a gradually decreasing speed before coming to a stop.  *Id.* at 1:59-64.  Alternatively, the user may manually stop the scrolling by pressing down on the screen without movement of the finger for a finite period of time.  *Id.* at 1:59-62.

The specification distinguishes between a touch intended to stop scrolling and a "selection" touch, meant to select an object on the screen, by measuring time.  *Id.* at 1:67-2:7, 2:41-46.  Specifically, if the user touches the screen for less than a minimum set time, the touch is determined to be a "selection" touch and the selected item is acted upon.  *Id.* at 2:3-7.  However, if the touch remains stationary for longer than predetermined period of time, the touch is treated as a "stop scrolling" touch and the scrolling ends.  *Id.* at 1:67-2:2, 2:37-41.  At the same time, if the user moves the finger during the touch, the scrolling continues at the speed of the new movement.  *Id.* at 1:64-67, 2:7-12, 2:32-36.

Philips asserts that ASUS infringes independent claims 1 and 8 and dependent claims 2 and 3.  Dkt. No. 724-9 ("Schmidt Report") §§ XI-XIII.  Independent claims 1 and 8 recite similar limitations, but claim 8 adds two substantive limitations, underlined below.  The claims provide:

| Claim 1 |
|---|
| 1.  An improved touch-screen image scrolling **system**, comprising: |
|     an electronic image display screen; |
|     a microprocessor coupled to said display screen to display information thereon and to receive interactive signals therefrom; |

timer means associated with said microprocessor to provide timing capacity therefor;

a source of scroll format data capable of display on said display screen;

finger touch program instructions associated with said microprocessor for sensing the speed, direction and time duration of a finger touch contact with said display screen:

scrolling motion program instructions associated with said microprocessor responsive to said duration of said finger touch contact such that, when said duration exceeds a first given preset minimum time and is accompanied by motion along the surface of said screen followed by separation of said finger touch from said screen, a scroll format display on said screen is caused to begin to scroll in said sensed direction and at said sensed initial speed;

time decay program instructions associated with said microprocessor for reducing the rate of scrolling displacement on said display screen at a given rate until motion is terminated;

stopping motion program instructions associated with said microprocessor for terminating scrolling displacement of the image on said screen upon first occurrence of any signal in the group of signals comprising:

(a) a substantially stationary finger touch on the screen enduring for a period longer than a preset minimum time, and

(b) an end-of-scroll signal received from said scroll format data source.

| Claim 8 |
| --- |

8. An improved touch-screen image scrolling **system**, comprising:

an electronic image display screen;

a microprocessor coupled to said display screen to display information thereon and to receive interactive signals therefrom;

timer means associated with said microprocessor to provide timing capacity therefor;

a source of scroll format data capable of display on said display screen;

finger touch program instructions associated with said microprocessor for sensing the speed, direction and time duration of a finger touch contact with said display screen:

scrolling motion program instructions associated with said microprocessor responsive to said duration of said finger touch contact such that, when said duration exceeds a first given preset minimum time, and is less than a second given preset minimum that is greater than said first minimum, and is accompanied by motion along the surface of said screen, a scroll format display on said screen is caused to begin to scroll in the sensed direction and at the sensed initial speed;

said scrolling motion program instructions further comprising instructions to move a touch-selected item relative to the stationary display in correspondence with movement of the finger touch, in response to motion following a touch having a stationary duration greater than said second given preset minimum time;

said scrolling motion program instructions still further comprising instructions to move said display in correspondence with movement of the finger touch, in response to

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

> motion following a touch having a stationary duration greater than said first given
> preset minimum time and less than said second given preset minimum time;
>
> time decay program instructions associated with said microprocessor for reducing the rate
> of scrolling displacement on said display screen at a given rate until motion is
> terminated;
>
> stopping motion program instructions associated with said microprocessor for terminating
> scrolling displacement of the image on said screen upon first occurrence of any signal
> in the group of signals comprising:
>
> (a) a substantially stationary finger touch on the screen enduring for a period
>   longer than a preset minimum time, and
>
> (b) an end-of-scroll signal received from said scroll format data source.

Claims 2 and 3 depend on claim 1 and recite limitations similar to those found in claim 8:

| Claim 2 |
|---|
| 2.  The improved touch-screen image scrolling **system** of claim 1, wherein said scrolling motion program instructions further comprise instructions to move said display in correspondence with movement of the finger touch, in response to movement following a touch having a stationary duration greater than said first preset given minimum time and less than a second given preset minimum time. |
| **Claim 3** |
| 3.  The improved touch-screen image scrolling **system** of claim 1, wherein said scrolling motion program instructions further comprise instructions to move a touch-selected item relative to the stationary display in correspondence with movement of said finger touch, in response to motion following a touch having a stationary duration greater than said second given preset minimum time. |

### C.  The '564 Patent

The '564 Patent is titled "Hand-Held With Auto-Zoom for Graphical Display of Web Page," and is directed to an auto-zoom functionality on a mobile phone with a touch screen. '564 Patent at Cover Page, 2:24-39.  The "auto-zoom" functionality has been used to allow a user to touch an item on a screen, such as an icon, to magnify it for easier selection.  *Id.* at 2:8-23.  However, the inventor realized that the auto-zoom feature may also be useful for any kind of graphical information displayed on a screen too small to show the total information content, such as in handheld devices.  *Id.* at 2:24-36, 3:40-56.  The '564 Patent thus allows a user to select via touch screen a portion of an image displayed at a first scale (the smaller scale), which is then magnified into a second scale (the zoomed in scale).  *Id.* at 2:44-58.

Philips asserts that ASUS infringes independent claim 1 and dependent claims 2 and 7.

5

ASUS Mot. at 10:2-3.  Independent claim 1 recites:

| Claim 1 |
|---|
| 1.  A handheld communication **device** comprising:<br><br>a wireless modem for receiving data;<br><br>a display that has a substantially small size suitable for in the handheld communication device;<br><br>a data processing system connected to the modem and to the display for processing the received data and for rendering an image corresponding to the data received;<br><br>a touch screen for enabling a user to interact with the device;<br><br>wherein:<br><br>the system is operative to enable the user to select through a touch location on the touch screen a portion of the image, when displayed at a first scale, for rendering the selected portion on the display at a second scale larger than the first scale thereby facilitating a selection of a feature; and<br><br>the selected portion when rendered at the first second scale is a zoomed-in version of part of the image at the first scale substantially centered around the touch screen location. |

Dependent claims 2 and 7 further recite:

| Claim 2 |
|---|
| 2.  The **device** of claim 1, wherein a position of the touch location is arbitrary with respect to the touch screen. |

| Claim 7 |
|---|
| 7.  The handheld communication **device** as claimed in claim 1, wherein the data processing system is further operative to cause a window containing the selected portion displayed at the second scale to scroll across the image such that successive new selected portions of the image are displayed at the second scale. |

### D.  The '809 Patent

The '809 Patent is titled "Secure Authenticated Distance Measurement."  '809 Patent at Cover Page.  The patent is directed to the problem of allowing a "user visiting his neighbor to watch a movie, which he owns, on the neighbor's big television screen."  *Id*. at 2:27-22.  To determine if the user can share content, the content provider must verify that the user is near the television screen, and also that the television is a compliant device.  *Id*. at 1:65-2:4, 2:19-22.  The '809 Patent proposes an "authenticated distance measurement" that accomplishes both goals simultaneously using a shared secret between two communication devices.  *Id*. at 2:35-55.

To perform the authenticated distance measurement, the first communication device sends

United States District Court
Northern District of California

United States District Court
Northern District of California

a signal to the second communication device, which the second communication device modifies according to a shared secret. *Id*. at 2:56-64. The second communication device then returns the modified signal to the first communication device, which authenticates the second communication device by confirming that the received signal has been modified according to the shared secret. *Id*. at 2:65-67. The first communication device also compares the time difference between when the signals were sent and received to determine the distance between the devices. *Id*. at 3:1-3, 6:44-48. Content is provided to the second communication device only if it is authenticated and within a desired distance. *Id*. at 6:21-24.

The invention ensures that only compliant devices have the shared secret by performing an authentication check that verifies that the second device is compliant with a set of predefined compliance rules before sharing the secret. *Id*. at 3:37-3:50, 5:25-35. In a preferred embodiment, the first communication device performs the compliance check before sharing the secret. *See id*. The first communication device may also verify the identity of the second device (i.e., "the second device really is the device that it should be") by checking its certificate. *Id*. at 3:56-61, 5:25-30.

Philips asserts that ASUS infringes independent claims 1 and 49 and dependent claims 9, 50, and 53. Dkt. No. 724-18 ("Goodrich Report") § IX. Independent claim 1 provides:

| **Claim 1** |
| --- |
| 1. A first **device** for controlling delivery of protected content to a second device, the first device comprising:<br>  a memory;<br>  a processor, said processor arranged to:<br>    receive a certificate of the second device, the certificate providing information regarding the second device;<br>    determine whether the second device is compliant with a set of compliance rules utilizing said information provided in said certificate;<br>    provide a first signal to the second device depending when the second device is determined to be compliant with the set of compliance rules;<br>    receive a second signal from the second device after providing the first signal;<br>    determine whether the second signal is derived from a secret known by the first device;<br>    determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and |

United States District Court
Northern District of California

> allow the protected content to be provided to the second device when at least the second signal is determined to be derived from the secret and the time difference is less than the predetermined time.

Independent claim 49 recites similar limitations to claim 1, but further provides that the first communication device shares the secret with the second device after determining compliance.

| Claim 49 |
|---|
| 49.  A first **device** for controlling delivery of protected content to a second device, the first device comprising: |
|   a memory; |
|   a processor, the processor arranged to: |
|     receive a certificate from the second device prior to sending a first signal; |
|     determine from the certificate if the second device is compliant; |
|     provide a secret to the second device via encryption by a public key of a private/public key-pair of the second device, if the second device is compliant, said secret comprising a random number; |
|     provide the first signal to the second device; |
|     receive a second signal from the second device after providing the first signal; |
|     determine if the second signal is derived from the secret by determining whether the second signal is the first signal modified based on the secret; |
|     determine whether a time difference between providing the first signal and receiving the second signal is less than a predetermined time; and |
|     allow the protected content to be provided to the second device at least when the second signal is determined to be derived from the secret and the time difference is less than the predetermined time. |

Dependent claim 9 (which depends on claim 1) and dependent claims 50 and 53 (which depend on claim 49) further recite as follows:

| Claim 9 |
|---|
| 9.  The first **device** of claim 1, wherein the processor arranged to determine whether the second signal is derived from the secret is arranged to: |
|   modify the first signal according to the secret; |
|   compare the modified first signal with the second signal; and |
|   provide an indication when said modified first signal is identical to the second signal. |

| Claim 50 |
|---|
| 50.  The first **device** of claim 49, wherein the processor is further arranged to: |

8

| |
|---|
| use the secret to generate a secure authenticated channel between the first device and the second device, |
| use the secure authenticated channel to provide the protected content to the second device. |

| **Claim 53** |
|---|
| 53. The first **device** of claim 49, wherein the processor, arranged to determine that the second signal is derived from the secret, is further arranged to: |
| modify the first signal according to the secret; |
| compare the modified first signal with the second signal; and |
| determine that the modified first signal is identical to the second signal. |

### E. The '806 Patent

The '806 Patent is titled "Partitioning of MP3 Content File for Emulating Streaming." '806 Patent at Cover Page. It is directed to emulating the experience of streaming a file while using a download approach that ensures low play-out latency. *Id.* at 1:62-64, 2:53-52. To create the experience of streaming, the system first splits a content file into multiple parts, each of which has a short download time. *Id.* at 1:65-66. The client device then receives control information about the file, such as its size and the location in memory of each part. *Id.* at 2:3-7. If the client device is capable of processing split data, it proceeds to simultaneously download and play-out the multiple file parts, such that one part is playing while the others are downloading. *Id.* at 2:10-12.

Philips asserts that ASUS infringes independent claims 1 and 12. ASUS Mot. at 16:4-5. However, the United States Patent Trial and Appeal Board has found claim 1 invalid and ASUS only moves for summary judgment as to claim 12. Claim 12 provides:

| **Claim 12** |
|---|
| 12. A client **device** for forming a media presentation from multiple related files stored on server computers within a computer network, comprising: |
| means for downloading files to the client device; |
| means for parsing a control information file; and |
| means for parsing, based on parsing of the control information file: |
| identifying multiple alternative files corresponding to a give segment of the media presentation; |
| determining which file of the multiple alternative files to retrieve based on system constraints; |

United States District Court
Northern District of California

9

> retrieving the determined file of the multiple alternative files to begin a media
>     presentation, wherein if the determined file is one of a plurality of files required for
>     the media presentation, the means for parsing comprises means for:
>         concurrent with the media presentation, retrieving a next file; and
>         using content of the next file to continue the media presentation.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party has the initial burden of informing the Court of the basis for the motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Id.* at 323.

If the moving party meets its initial burden, the burden shifts to the non-moving party to present facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 324. The Court must view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). Summary judgment is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the disputed issue of material fact in the nonmovant's favor. *Anderson*, 477 U.S. at 248. Nonetheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (internal quotation mark omitted).

Patent infringement requires a two-step inquiry. *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1356 (Fed. Cir. 2005). "First, the court must construe the asserted claim," and "[s]econd, the court must determine whether the accused product or process contains each limitation of the properly construed claims." *Id.* at 1356-57. The first step is a question of law,

United States District Court
Northern District of California

while the second step is a question of fact.  *Id.* at 1357.  The patent holder has the burden to prove

that each accused product "includes every limitation of [an asserted] claim."  *Dolly, Inc. v.*

*Spalding & Evenflo Cos.*, 16 F.3d 394, 397 (Fed. Cir. 1994).  The Court can resolve the issue on

summary judgment only if "no reasonable jury could find that every limitation recited in the

properly construed claim either is or is not found in the accused device."  *Frank's Casing Crew &*

*Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1376 (Fed. Cir. 2004) (internal

quotation mark omitted); *see TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir.

2002) ("[A]ll of the elements of the claim, as correctly construed, must be present in the accused

system.").  "Any deviation from the claim precludes" a finding of literal infringement.  *Telemac*

*Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

With respect to invalidity, "a moving party seeking to invalidate a patent at summary

judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury

could find otherwise."  *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

"Alternatively, a moving party seeking to have a patent held not invalid at summary judgment

must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear

and convincing evidence on an essential element of a defense upon which a reasonable jury could

invalidate the patent."  *Id.*  "In determining whether a genuine issue of material fact exists, the

court views the evidence in the light most favorable to the nonmoving party and resolves all

doubts in its favor."  *Id.*

## III.   ASUS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ASUS seeks summary judgment of noninfringement as to three patents (the '797, '064, and

'809 Patents), contending that Philips cannot show the presence of certain limitations in the

accused products.  As to the other two patents (the '564 and '806 Patents), ASUS contends that the

asserted claims are invalid for indefiniteness.  The Court addresses each patent in turn.

### A.   Noninfringement of the '797 Patent

ASUS argues that it is entitled to summary judgment of noninfringement of the '797 Patent

because Philips cannot establish that the accused products meet the "acceleration" limitations of

claim 1 (and, through dependency, claim 6).  Specifically, the asserted claims require:  (1) "a

11

gravitation-controlled sensor . . . *for measuring an acceleration of said screen means* induced by user manipulation of the screen means," and (2) "programmed calculating means for under control of a screen motion sensed by said sensing means *imparting an acceleration based motion pattern* to a predetermined selection among said objects." '797 Patent at claim 1 (emphases added). Philips accuses the "automatic screen rotation" functionality in ASUS's products that rotates the display between landscape and portrait modes. However, ASUS contends that its products do not use the acceleration of the device—they use orientation instead—to determine proper rotation.[1] The relevant operation of the accused products is not disputed; rather, the parties dispute the requirements of the claims.

Because patent infringement is a "two step inquiry," the Court first considers the scope of the claim limitations and then determines whether the accused products meet each limitation. *Freedman Seating*, 420 F.3d at 1356-57.

### i.   "measuring an acceleration of said screen means"

ASUS first contends that the accused devices measure orientation in determining whether to rotate the screen, and therefore do not have a "gravitationally-controlled sensor for measuring an acceleration of said screen means induced by user manipulation of the screen means."

### a.   Scope of the Claim Limitation

The phrase "measuring an acceleration of said screen means" has a plain and ordinary meaning. On its face, the limitation requires the sensor to measure (i.e., to gauge, ascertain, or determine) the acceleration of the screen. The limitation also requires that the acceleration be "induced by user manipulation of the screen means," but does not plainly preclude the measurement of other types of acceleration. Put differently, the claims allow the sensor to measure acceleration induced by something other than the user, as long as user-induced acceleration is measured. The specification uses this term consistently with its plain and ordinary meaning. *See* '797 Patent at 2:56-3:12.

---

[1] As described by the experts, acceleration refers to the *movement*, or rate of change of velocity, of an object, while orientation refers to the object's stationary position vis-à-vis the earth (i.e., being "the right side up"). Greenspun Report ¶ 35; Dkt. No. 724-6 ("Cockburn Report") ¶¶ 32, 37.

United States District Court
Northern District of California

ASUS nevertheless argues based on the prosecution history that this limitation precludes Philips from claiming a system that uses orientation to determine rotation.  During prosecution, Philips originally sought allowance for claims that recited "measuring spatial orientation of [the] screen means" to impart "non-stationary" motion to displayed objects.  Dkt. No. 724-5 ("'797 Prosecution History") at 4213.[2]  However, the examiner rejected the claims as anticipated by U.S. Patent No. 5,526,022 to Donahue ("Donahue").  *Id*. at 4214.  Donahue described tilt and orientation sensors used to "provide input to a computer system, manipulate a virtual reality environment, and control sensory impressions conveyed to the user."  Dkt. No. 724-4 (Donahue) at 1:6-10, 9:12-16.  In response to the rejection, Philips amended the claims to replace "measuring spatial orientation" with "measuring an acceleration" and further added that the acceleration must be "induced by user manipulation of the screen means."[3]  *Id*. at 4213.  Philips also replaced "non-stationary motion" with "acceleration based motion," as described in more in the next section.  *Id.*

In remarks, Philips argued that Donahue did not meet these limitations because its sensors "cannot measure acceleration as do the sensors in the present invention."  *Id* at 4215.  Philips described how measuring acceleration of the screen allows the '797 Patent invention to move displayed objects "as if the user's manipulation of the screen were instead manipulating the object" to create "pseudo-force" and "pseudo-gravity" effects  *Id*. at 4215-16.  Philips explained that this feature is not obtainable in Donahue because in Donahue's device, "rotation or tilting of the sensor can be detected, but not acceleration of the screen."  *Id*.  Dependent claim 8 was also amended to expressly claim "pseudo-force" effects."  *Id*. at 4216.

Although ASUS is correct that prosecution history may evince disclaimer that narrows the scope of otherwise clear claims, the Court finds no such disclaimer here.  *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005).  Donahue was distinguished on the basis

---

[2] All page citations to the prosecution history refer to the terminal four digits of the bates number.

[3] Notably, the specification of the '797 Patent continues to refer to measuring "spatial orientation." *See, e.g.*, '797 Patent at Abstract, 1:18-22.  Philips amended the specification during prosecution to add "acceleration of the screen" as an example of a possible facility, but the examiner still initially found that the claim amendment was not supported by the written description.  '797 Patent Prosecution History at 4212, 4230.

United States District Court
Northern District of California

that it "cannot measure acceleration," which is clearly precluded by the claim requirement that sensors "measur[e] an acceleration." The remarks concerning "pseudo-force" and "pseudo-gravity" effects, while probative of a relationship between the measured and displayed acceleration, do not clearly and unmistakably disavow all use of orientation data in the claimed device. *See Mass. Inst. of Tech. v. Shire Pharma., Inc.*, 839 F.3d 1111, 1119-20 (Fed. Cir. 2016) (requiring disclaimer to be "clear and unmistakable"). Accordingly, because neither lexicography nor disclaimer applies, the plain and ordinary meaning of "measuring an acceleration of the screen means induced by user manipulation of the screen means" governs and requires nothing more than a sensor that measures the acceleration of a screen.

### b. Application to Accused Products

Material disputes of fact preclude summary judgment on this limitation. Philips provides evidence that ASUS's accused products contain sensors that measure screen acceleration. For example, Philips's expert, Dr. Greenspun, opines that all accused products contain accelerometers that measure acceleration of the device along three dimensions and provide that data to a processor to determine the device orientation. Greenspun Report ¶¶ 51-76. Dr. Greenspun's report incorporates documentary evidence showing the same. *See id.* ASUS's expert, Dr. Cockburn, does not appear to dispute that the accused products contain accelerometers for measuring acceleration, but opines that the processor uses the acceleration data to determine the direction of gravity and angle of the device in order to calculate the orientation of device. Cockburn Report ¶¶ 37-42. The orientation of the device calculated from the acceleration data is then used to determine the rotation of the displayed screen. *Id.* ¶¶ 42-43. Dr. Cockburn's disagreement with Dr. Greenspun thus lies not with the measurement of acceleration, but with the use of acceleration data to control the movement of the displayed objects.

Because this claim limitation requires nothing more than a "gravitationally-controlled sensor" for "measuring an acceleration of the screen means," Philips has demonstrated a material dispute of fact that precludes summary judgment on the basis of this limitation.[4]

---

[4] The claims also recite that the acceleration must be "induced by user manipulation of the screen means." Philips provides evidence that the accelerometers in ASUS's products measure all types

### ii. "imparting an acceleration based motion pattern"

ASUS next argues that that the accused devices do not "impart[] an acceleration based motion pattern to" displayed objects because the automatic screen rotation function considers only the orientation of the device, not its acceleration, when rotating the display.

#### a. Scope of the Claim Limitation

The term "acceleration based motion pattern" was previously construed as "a pattern of motion which reflects acceleration." Dkt. No. 241 ("Claim Construction Order") at 11. During claim construction, ASUS argued that this limitation requires a "motion proportional to the sensed screen motion, as if the user's manipulation of the screen were instead manipulating the objects." Dkt. No. 141 at 3. Philips did not disagree that the sensed and imparted acceleration had to be related, but argued that no particular relationship was required. Philips explained:

> Defendants incorrectly characterize the nature of the parties' dispute by asserting that it primarily "concerns *whether there must be a relationship* between the measured acceleration of the screen and the motion pattern imparted to the object." Philips does not dispute that there must be some relationship between the measured acceleration of the screen means and the imparted motion pattern. To that end, Philips' proposed construction plainly requires that the motion pattern "reflects acceleration." Philips does, however, dispute that the claims require the very specific relationship asserted by Defendants.

Dkt. No. 158 ("Philips Responsive Claim Construction Br.") at 14 (emphasis in original). The court agreed with Philips that "the claim language does not evince any particular type of acceleration" and adopted its construction. Claim Construction Order at 11 n.17.

Now, despite initially agreeing that "there must be some relationship between the measured acceleration of the screen means and the imparted motion pattern," the parties dispute this requirement. ASUS contends that the measured acceleration of the screen must in some way cause the imparted motion of the displayed objects, while Philips argues that no relationship is required. Accordingly, because the parties dispute this claim term, the Court provides additional construction and holds that a causal relationship is required.[5] *See O2 Micro Int'l Ltd. v. Beyond*

---

of acceleration, including those induced by the user. *See* Greenspun Report ¶¶ 72-73.

[5] Philips argues that the claim construction order resolves the dispute because it found that "[w]hile the specification and prosecution history may suggest a relationship between the

15

United States District Court
Northern District of California

1  *Innovation Tech. Co., Ltd*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

2       First, the claim language strongly suggests that the "programmed calculating means"

3  imparts an acceleration based motion "under control of" the screen acceleration.  The claims recite

4  programmed calculating means "*under control of a screen motion sensed by said sensing means*

5  *imparting an acceleration based motion pattern to a predetermined selection among said objects.*"

6  '797 Patent at claim 1 (emphasis added).  The claims thus strongly suggest that when the

7  "programmed calculating means" imparts a motion, it does so according to ("under control of")

8  the sensed screen motion.  The claims further make clear that the "screen motion sensed by said

9  sensing means" refers to the screen acceleration:  the only antecedent basis for "sensing means" is

10  the "gravitation-controlled sensor" that "measur[es] an acceleration of said screen means."  *Id.*;

11  *see also* Claim Construction Order at 10 n.16 (interpreting "sensor" as "sensor means").

12       The specification confirms this understanding.  In the summary of the invention, the

13  specification states that "it is an object of the present invention to provide an apparatus . . .

14  wherein the orientation of the screen can be used to control various different types of motions

15  depending on the actual spatial orientation."[6]  *Id.* at 1:25-29.  The background also states that

16  "[t]he inventor has found that various spatial orientations of an apparatus . . . may control

17  associated object motions on the screen, and has envisaged various useful applications of a device

18  that is enhanced in such manner."  *Id.* at 1:18-22.  These descriptions relate to the "object" and

19  purpose of the invention as a whole, not merely a preferred embodiment.  Hence, controlling the

20  motion of displayed objects by moving the physical device lies at the heart of the invention and is

21  presumably required by the claims.

22       Moreover, the specification describes multiple embodiments where movement of the

23

24  measured acceleration of the screen and the motion pattern imparted to the object, the claim
language does not evince any particular type of acceleration."  Claim Construction Order at 11

25  n.17.  However, read in the context of the parties' dispute, the order holds only that no "particular

26  type" of relationship is required, not that the total absence of a relationship satisfies the claims.

27  [6] As explained above, the specification continues to refer to "orientation" even though the claims
were amended during prosecution to change "orientation" to "acceleration."  The Court

28  understands the terms to refer to the same element (merely substituting "acceleration" for
"orientation"), not to broaden the claims to include orientation.

physical device controls the movement of the displayed objects. The specification explains that the '797 Patent invention can be used to implement games "based on moving an object through a maze, positioning a ball in a shallow potential dip, and many others that require manipulatory skills from a user person." *Id*. at 2:3-8. When implementing a game, "[d]ue to the fact that the motion is acceleration based," the sensors measuring screen motion "may operate in the manner of a joystick." *Id*. at 1:34-38; *see also id.* at 1:45-48 ("This joystick function is in particular effected by the orientation of the screen influencing the motion pattern of the displayed objects."). Figure 4, which shows "various motion characteristics realizable with the invention," shows different relationships between the inclination angle and the force (acceleration[7]) and the movement of the displayed objects, including linear relationships, a threshold relationship, and an asymptotic relationship. *Id*. at 4:1-14, Fig. 4. In all cases, there is *some* relationship between the force or acceleration and the motion imparted on the displayed objects, even though no particular relationship is required.

Finally, the prosecution history further confirms the requirement of "control" between sensed and imparted acceleration. The term "acceleration based motion pattern" was added during prosecution because the term "is more accurate with respect to the 'pseudo-force' and 'pseudo-gravity' motions described in the specification." '797 Prosecution History at 4216. As explained above, "pseudo-force" and "pseudo-gravity" describe implementations where "an object displayed on a screen can be made to move as if the user's manipulation of the screen were instead manipulating the object." *Id*. at 4215. Moreover, in describing the claim amendments, Philips stated that claim 1 requires "[t]he data processing means, *under control of a screen acceleration motion* sensed by the sensing means imparts and acceleration-based motion pattern to an object on the screen." *Id*. at 4216 (emphasis added). These remarks clarify that the "screen motion sensed by said sensing means" refers to the "screen acceleration motion."

Accordingly, based on the claims, specification, and prosecution history, the Court concludes that the limitation of "imparting an acceleration based motion pattern" "under control of

---

[7] Philips explained during prosecution that "[f]orce causes acceleration" so that "measuring force gives an indication of acceleration." '797 Prosecution History at 4231.

United States District Court
Northern District of California

a screen motion sensed by said sensing means" requires a relatively direct causal relationship between the acceleration of the screen and the imparted motion on the selected displayed objects.

### b. Application to the Accused Products

Under the proper construction of the term, ASUS contends that its products do not infringe the asserted claims of the '797 Patent because their rotation of displayed objects is based solely on device orientation, not acceleration. ASUS's expert, Dr. Cockburn, explains that the processor in the accused products uses data from the accelerometers to calculate the orientation of the physical device and then compares that orientation to the orientation of the display. Cockburn Report ¶¶ 34, 37-42. Then, if the displayed orientation is different from the device orientation, the processor invokes a "switch" (or rotation) in the display orientation. *Id.* ¶ 35. During the rotation, the accused devices may play an "animation" showing a screenshot of the display rotating. *Id.* ¶ 43. The rotation occurs only if the device is stable; if the processor detects that the physical device is accelerating, the rotation does not take place. *Id.* ¶ 35.

Dr. Greenspun does not dispute this operation described by Dr. Cockburn. *See* Greenspun Report ¶¶ 75-83; *see also* Dkt. No. 724-7 ("Greenspun Depo.") at 58:6-59:3. However, Philips contends that the accused products meet this limitation based on two additional opinions provided by its expert. First, Dr. Greenspun opines that the motion imparted on the displayed objects is "under control of" the sensed motion because "there is a different rotation animation for different sensed orientation changes that incorporates the original orientation and the degree change to subsequent orientation." Greenspun Report ¶ 168. Put differently, the type of animation differs depending on the orientation change. Second, Dr. Greenspun opines that the screen will not rotate unless the device is stable, so the imparted motion depends on the sensed acceleration. *Id.* ¶ 95; Greenspun Depo. at 13:4-11.

The Court finds that no reasonable jury could conclude that ASUS's accused products meet this limitation based on this evidence. There is no substantive dispute between the experts that the accused products use orientation, not acceleration, of the screen to determine rotation and the rotation animation. Although orientation is calculated using data from accelerometers, the

18

United States District Court
Northern District of California

calculation is several steps removed from the original data.[8]  Philips's evidence is plainly insufficient to establish any type of relationship between the original acceleration measurements and the resulting rotation animation.  Nor is the use of orientation to select among different animations sufficient.  The claims require imparting acceleration based motion under control of the screen motion "sensed by the said sensing means."  '797 Patent at claim 1.  Calculated measurements of orientation are not "sensed by the said sensing means"; they are calculated by the data processing means.  Any relationship between the calculated orientation and the imparted motion therefore does not meet this limitation.  Finally, Philips's theory that *lack* of motion when the device is accelerating satisfies the claims is similarly unavailing.  The claims require imparting an acceleration based motion pattern under control of the sensed motion—not "failing" to impart a motion pattern based on the sensed motion.

Accordingly, because there is no genuine dispute that the accused products do not contain this limitation, the Court **GRANTS** summary judgment of noninfringement of the '797 Patent.

### B.  Noninfringement of the '064 Patent

ASUS next argues that it is entitled to summary judgment of noninfringement of the '064 Patent because its products do not contain "stopping motion program instructions" (i.e., code[9]) for terminating scrolling "upon first occurrence of . . . a substantially stationary finger touch on the screen."  '064 Patent at claims 1, 8.  As with the '797 Patent, the parties' dispute centers on the requirements of the claims, not the relevant operation of the accused products.  Accordingly, the Court first considers claim scope and then the application of the claims to the accused products.

#### i.  Scope of the Claim Limitations

Asserted claims 1 and 8 recite:

**stopping motion program instructions** associated with [the] microprocessor **for**

---

[8] As explained by Dr. Cockburn, acceleration data is first filtered to determine the direction of gravity and the angle of the device in relation to the gravitational vector.  Cockburn Report ¶¶ 37-43.  The results of those operations are then used to calculate orientation.  *Id.*  There is no evidence that the resulting calculation has any relationship to the original acceleration measurements.

[9] The term "stopping motion program instructions" was construed according to its plain and ordinary meaning, which the parties agree refers to computer code.  Claim Construction Order at 7; Cockburn Report ¶ 117; Dkt. No. 724-9 ("Schmidt Report") ¶ 355.

**terminating scrolling displacement** of the image on said screen **upon first occurrence of** any signal in the group of signals comprising:
    (a) **a substantially stationary finger touch on the screen** enduring for a period longer than a present minimum time, and
    (b) an end-of-scroll signal received from said scroll format data source."

'064 Patent at claims 1, 8 (emphasis added). The parties' dispute boils down to this: do the claims require scrolling to terminate *after* the first condition is met, or do they cover systems where scrolling terminates *before* the first condition is met, as long as it remains terminated afterward. The Court finds that "upon" means "after."

The term "upon" is typically construed to mean "after" or "following." *See, e.g.*, *Pragmatus Telecom, LLC v. Volkswagen Grp. Of Am., Inc.*, No. 12-1533-RGA, 2014 WL 4447272, at *3 (D. Del. Sept. 4, 2014) (construing "upon" according to its dictionary definition to require an immediate reaction); *Spireon, Inc. v. CallPass Tech, LLC*, No. C 12-1903, 2013 WL 706867, at *7 (N.D. Cal. Feb. 26, 2013) (construing "upon" as "following"); *CBT Flint P'ners, LLC v. Return Path, Inc.*, 566 F. Supp. 2d 1363, 1370 (N.D. Ga. 2008) (finding "upon" suggests "immediately following" or "very soon after" and requires a sequential order).

The claims and specification of the '064 Patent are consistent with "upon" meaning "after." First, the claims require the "computer program instructions" to terminate the scrolling upon "first occurrence" of a "substantially stationary finger touch." '064 Patent at claims 1, 8. The claims thus suggest a precise order of events: first, the "substantially stationary finger touch" occurs, and second, the instructions for terminating scrolling are executed. Moreover, the claims describe the "substantially stationary finger touch" as a "signal" in the "group of signals." *Id.* The term "signal" suggests a causal relationship. Cause must precede effect—a substantially stationary finger touch cannot signal the instructions to do what they have already done—which further suggests that "upon" means "after."

The specification confirms this understanding. The specification explains that '[t]he reason for requiring a predetermined time-period for stationary [i.e. no-motion] touch time is to assure that the timing mechanisms will have sufficient time to distinguish between a touch intended to stop the scrolling and a touch [shorter in time] intended to 'select' or 'mark' a

United States District Court
Northern District of California

particular item that is included in the scrolled data." *Id.* at 2:41-46; *see also id.* at 4:65-5:1. On the other hand, a moving finger touch serves to continue scrolling in the new direction with the new speed. *Id.* at 5:10-14. Philips points out that in one embodiment, "a finger touch during the scrolling process would act solely as a 'stop motion' signal regardless of the length of the touch." *Id.* at 5:1-7. However, the sentence makes clear that the purpose of such implementation is to "protect against the possibility of unintended 'selections'" and the very next sentence describes a moving finger touch as continuing scrolling. *Id.* at 5:7-14. Accordingly, different touches in the '064 Patent are intended to have different effects and a finger touch must be "substantially stationary" before its precise desired effect can be determined.[10]

Accordingly, the Court interprets "upon" to mean "after"—not "before."

### ii.    Application to the Accused Products

ASUS contends that it does not infringe the '064 Patent because its products terminate scrolling upon the first detection of a finger touch—*before* that touch is determined to be stationary. For purposes of the motion, ASUS assumes the operation described by Philips's expert, Dr. Schmidt, is true. ASUS Mot. at 6 n.2. Dr. Schmidt explains that the accused products scan continuously for the presence of a touch, at an interval of around 10 milliseconds. Schmidt Report ¶ 88. When a scan first detects the presence of a finger touch, the system generates an event ACTION_DOWN, which terminates scrolling. *Id.* ¶¶ 125, 127, 140, 142. Then, if a second scan determines that the finger is moving, the system generates the event ACTION_MOVE to reinitialize scrolling. *Id.* ¶¶ 125, 128, 140, 143. Importantly, Dr. Schmidt agrees that in order to determine whether a touch is substantially stationary, at least two scans are necessary. Dkt. No. 724-10 ("Schmidt Depo.") at 90:2-16; *see also* Cockburn Report ¶¶ 176-80. In other words, the system does not know if a finger touch is moving or stationary unless it can compare two scans from different time periods. The operation described by Dr. Schmidt thus shows that the accused products do not terminate scrolling "upon" a substantially stationary finger touch because the

---

[10] Consistent with this interpretation, claim 8 describes different touches with different stationary touch time periods followed by movement as producing different effects, including moving a touch-selected item and continuing scrolling. *See* '064 Patent at claim 8.

1    termination occurs before a touch becomes "substantially stationary."

2         Philips makes several arguments that the accused products nonetheless meet this

3    limitation.  First, Philips argues that the claim limitations "on their face state what should happen

4    in the event a stationary touch longer than a preset minimum time occurs," but "do not say what

5    must happen prior to completion or in the absence of occurrence of such a stationary touch."

6    Philips Opp. at 9:6-9.  Dr. Schmidt opines that "[a] POSA would understand the language of the

7    claims to express the reliable result of what happens after the preset time, without regard to what

8    happens before it."  Schmidt Report ¶ 361.  Philips also points out that the claims are recited in

9    "comprising" terms, and thus argues that other "signals" (such as *non*-stationary finger touch) may

10   also trigger termination of scrolling.  *See Vivid Techs., Inc. v. Am. Science & Engin., Inc.*, 200

11   F.3d 795, 811 (Fed. Cir. 1999) (finding that "comprising" allows for the presence of additional

12   limitations).

13        Although Philips is correct that "comprising" typically denotes an open-ended list,

14   "comprising" cannot alter or vitiate existing claim limitations.  *Wis. Alumni Res. Found. V. Apple*

15   *Inc.*, 905 F.3d 1341, 1348 n.8 (Fed. Cir. 2018) ("'Comprising' is not a weasel word with which to

16   abrogate claim limitations." (quoting *Spectrum int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380

17   (Fed. Cir. 1998)).  In *Wisconsin Alumni Research Foundation*, the claims recited a prediction

18   associated with a "particular" load instruction.  905 F.3d at 1345.  The court construed "particular"

19   to have its plain and ordinary meaning—a single specific load instruction.  *Id*. at 1348.  The

20   patentee nevertheless argued that predictions associated with *many* load instructions satisfied this

21   limitation because they were associated with a "particular" load instruction even as they were

22   associated with others.  *Id*.  The court rejected this argument and found, in relation to the open-

23   ended "comprising" term, that the patentee's interpretation would "frustrate the plain meaning of

24   'particular' as used in the patent."  *Id*. at 1348 n.8; *see also Liberty Ammunition, Inc. v. U.S.*, 835

25   F.3d 1388, 1399 (Fed. Cir. 2016) (rejecting additional features that would render an existing

26   limitation "a nullity"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352-54 (Fed. Cir.

27   2010) (precluding additional features that would "negate[] a claimed requirement").

28        The same result follows here.  The claims require scrolling to terminate upon (after) a

United States District Court
Northern District of California

22

substantially stationary touch. Allowing a finger touch to satisfy this limitation *before* it becomes substantially stationary would alter the limitation to read out the term "substantially stationary." Even if a non-stationary touch could also terminate scrolling, it would need to constitute a separate "signal" to the stopping motion program instructions and thus cannot stem from the same behavior that indicates a "substantially stationary finger touch." Accordingly, because Philips cannot point to any program instructions that terminate scrolling "upon" (after) detecting a "substantially stationary finger touch," it cannot rely on other signals to satisfy this limitation.

Second, Philips argues, citing Dr. Schmidt, that if a user were to touch the screen while scrolling is in place and keep that finger stationary "for a duration exceeding the time for the touchscreen to complete one scan," then the device would terminate scrolling. Philips Opp. at 9:10-16. Philips also points out that if there was movement between the time the touch was detected and the time duration of the scan period, the devices would not terminate scrolling. *Id*. at 9:16-18. Although Philips does not spell out its argument, it appears to claim that a finger touch is "substantially stationary . . . for a period longer than a preset minimum time" if it endures long enough for a scan period to detect it. *Cf.* Schmidt Report ¶¶ 88, 358, 367, 489-92, 572-75. Dr. Schmidt opines that if a user touches the screen but removes the finger before the corresponding electrode is scanned, scrolling will not be terminated. *Id*. ¶ 674.

Neither party provides any interpretation of the term "substantially stationary." However, Philips' interpretation appears to be contradicted by its own expert. First, the cited portions of the Schmidt Report opine on the limitation requiring "a period longer than a preset minimum time," not a "substantially stationary finger touch." *See* Schmidt Report ¶¶ 355-369, 488-92, 572-78, 672-77. Second, Dr. Schmidt admitted during deposition that "in order to determine if [a] finger is stationary, at least two scans need to occur." Schmidt Depo. at 90:2-16. Although he clarified his remarks to explain that the ACTION_DOWN event occurs after the finger touch is detected (which may require one or two scans), he clearly indicated that "another scan after that" is required "to know that that is a stationary touch." *See id*. Accordingly, because Philips's interpretation is not supported by the opinion of its expert, it cannot rely on that opinion to defeat summary judgment. *See In re Cygnus Telecomm. Tech., LLC, Patent Litig.*, 536 F.3d 1343, 1354

23

1  (Fed. Cir. 2008) ("[A] party cannot create a genuine issue of fact sufficient to survive summary

2  judgment simply by contradicting his or her own previous sworn statement." (quoting *Cleveland v.*

3  *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999))).

4       Finally, Philips argues that the ACTION_DOWN event must be read in the context of the

5  ACTION_MOVE event, which reinitiates scrolling if a touch is not substantially stationary.  Dr.

6  Schmidt testified during deposition that "scrolling only terminates if the finger remains

7  substantially stationary and does not begin to move again," but if the finger moves again, either

8  "stick-to-finger scroll" or a new "inertial scroll" will begin.  Schmidt Depo. at 99:10-100:13,

9  105:4-12, 106:7-107:14, 113:17-114:16.  Dr. Schmidt's testimony, however, makes clear that

10 scrolling *is* terminated upon the detection of a touch and simply reinitiates new scrolling if

11 movement is detected.  *See id.*; *see also* Schmidt Report ¶¶ 126-28.  Literal infringement requires

12 the presence of each limitation in its exact form.  *See Telemac Cellular*, 247 F.3d at 1330 ("Any

13 deviation from the claim precludes [an infringement] finding.").  Although Philips may argue that

14 terminating scrolling and then not reinitiating it is equivalent to terminating it altogether upon a

15 substantially stationary touch, the claims require termination "upon" (meaning after, not before)

16 the substantially stationary touch.

17      Accordingly, because there is no genuine dispute that the accused products do not contain

18 "stopping motion program instructions . . . for terminating scrolling . . . upon . . . a substantially

19 stationary finger touch," the Court **GRANTS** summary judgment of noninfringement of the '064

20 Patent.

21                **C.  Invalidity of the '564 Patent**

22      ASUS next moves for summary judgment of invalidity on the '564 Patent, arguing that the

23 asserted claims are indefinite.  Asserted claim 1 (and, through dependency, claims 2 and 7)

24 requires a handheld communication device comprising a display "that has a substantially small

25 size suitable for the handheld communication device."  '564 Patent at claim 1.  ASUS argues that

26 the term "substantially small size" renders the claim indefinite because the claims "read in light of

27 the specification and prosecution history," fail to "provide objective boundaries for those of skill

28 in the art."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quoting

United States District Court
Northern District of California

1    *Nautilus, Inc. v. Biosig Inst., Inc.*, 572 U.S. 898, 909 (2014)).  Specifically, ASUS argues that

2    nothing in the intrinsic evidence defines the boundaries of "substantially small" to allow a person

3    of ordinary skill in the art to determine whether any given handheld device has such a display.  *See*

4    Dkt. No. 724-13 ("Dunlop Report") at 288.  Philips disagrees and counters that "substantially

5    small" in the context of the '564 Patent means a display that fits in (i.e., is suitable for inclusion

6    in) a handheld device.  *See* Dkt. No.  827-23 ("Schmidt Reb. Report") ¶¶ 620-22.

7            "[A] patent is invalid for indefiniteness if its claims, read in light of the specification

8    delineating the patents and the prosecution history, fail to inform, with reasonable certainty, those

9    skilled in the art about the scope of the invention."  *Nautilus*, 572 U.S. at 901.  Terms of degree

10   are not inherently indefinite, and, on the contrary "[c]laim language employing terms of degree

11   has long been found definite where it provided enough certainty to one of skill in the art when read

12   in the context of the invention."  *Interval Licensing*, 766 F.3d at 1370.  Requisite certainty may

13   come from the specification, the prosecution history, or the claims themselves.  For example, in

14   *Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Products Group, LLC*, the

15   Federal Circuit found the term "elongated and substantially straight baffle portion" definite

16   because the claims required the baffle portion to extend from two "arcuate" (curved) baffle

17   portions.  879 F.3d 1332, 1345-47 (Fed. Cir. 2018).  Based on this claim language, the court

18   determined that the baffle portion must be sufficiently long and straight "to at least connect the

19   two arcuate portions of the baffle."  *Id*. at 1345.  Similarly, in *Tinnus Enterprises, LLC v.*

20   *Telebrands Corporation*, the court found the term "substantially filled" was not indefinite because

21   the claims required containers to detach from hollow tubes when they are "substantially filled."

22   846 F.3d 1190, 1206 (Fed. Cir. 2017).  Hence, under the claimed functional criteria, balloons were

23   substantially filled if they detached when shaken.[11]  *Id*.

24           Requisite definiteness may also come from examples in the specification or prosecution

25

26   _____

27   [11] In so finding, the court noted that the knowledge of a person of ordinary skill plays a significant
     role in determining indefiniteness:  "We find it difficult to believe that a person with an associate's
     degree in science or engineering discipline who had read the specification and relevant
28   prosecution history would be unable to determine with reasonable certainty when a water balloon
     is 'substantially filled.'"  846 F.3d at 1206.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    history.  In *Enzo Biochem, Inc. v. Applera Corp.*, the Federal Circuit found that claims reciting a

2    linkage group "not interfering substantially" with certain functions were definite because the

3    specification, dependent claims, and prosecution history provided examples of linkage groups that

4    met that requirement.  599 F.3d 1325, 1333-36 (Fed. Cir. 2010).  Hence, a person of ordinary skill

5    could presume that at least as much interference as that exhibited by the example structures was

6    permissible.  *Id.*  And in *Apple Inc. v. Samsung Electronics Co., Ltd.*, the court found that

7    "substantially centered" was definite because a figure in the specification showed a document

8    "essentially centered except for 'a predefined amount of padding along the sides.'"  786 F.3d 983,

9    1003 (Fed. Cir. 2015), *rev'd in part on other grounds*, 137 S. Ct. 429 (2016).

10          Here, the claims, specification, and prosecution history provide substantial guidance as to

11    the meaning of "substantially small" display.  First, the claims make clear that the display must

12    have a substantially small size "suitable for the handheld communication device."  '564 Patent at

13    claim 1.  Although the claims do not explain the meaning of "suitable," Dr. Schmidt plausibly

14    interprets the term to mean the display fits on the handheld device.  Schmidt Reb. Report ¶ 622.

15    The claims therefore provide a functional criterion for determining if this limitation is met—as in

16    *Tinnus Enterprises*, a display is "substantially small" if it fits unto a handheld device.

17          Second, the specification explains that the '564 Patent invention relates to "graphical user

18    interfaces . . . for devices with a relatively small screen real estate, such as handheld information

19    appliances (palmtops, mobile phones, Web pads, PDA's or notebook computers, etc.)."  '564

20    Patent at 1:20-24.  The specification thus provides concrete examples which a person of ordinary

21    skill could use for comparison to determine if another display is "substantially small."  *See Enzo*

22    *Biochem*, 599 F.3d at 1334.  Moreover, the specification explains that the invention is useful for

23    "rendering of any kind of graphical information on a display too small for the total information

24    content, given the display's resolution and size."  *Id.* at 2:24-30.  The specification provides

25    several examples of displays on devices that "cannot render [a web] page in its entirety without

26    losing information."  *Id.* at 2:30-36 (listing PDA's, palmtops, and other devices).  The

27    embodiments further show a mobile phone or palmtop PC having a small display that cannot

28    render a web page in its entirety without making some portions illegible.  *Id.* at 3:40-50, 3:57-59,

4:16-21.  Hence, the specification provides additional guidance by explaining that "substantially small" display screens cannot display full web pages without rendering some portions illegible.

Finally, the prosecution history further confirms these standards for determining when a display is "substantially small."  During prosecution, the examiner rejected the applied-for claims of the '564 Patent over U.S. Patent 5,406,307 to Hirayama et al. ("Hirayama") in view of U.S. Patent No. 5,969,706 to Tanimoto ("Tanimoto").  Dkt. No. 724-12 ("'564 Prosecution History") at 4581.  Hirayama described a data processing device where "an input device (tablet) is stuck to a display device (display panel)."  *Id*. at 4731.  The user dragged an icon along the input device to a display portion in order to open it into a window on the display panel.  *Id*.  The examiner found that Hirayama met all elements of the applied-for claims except the requirement for a "first scale," which was taught by Tanimoto.  *Id*. at 4581-84.  Philips argued that there was no motivation to combine the two references because they described alternative methods.  *Id*. at 4589-90.  The examiner nevertheless repeatedly rejected the claims until Philips added the limitation requiring a display with "a substantially small size suitable for the handheld communication device."  *See id*. at 4596 (rejecting claims), 4627-32 (rejecting claims), 4642-45 (amending claims).

In remarks, Philips argued that "the invention . . . is of particular interest, as pointed out by the applicant, in electronic devices having a relatively small display for providing a graphical user interface (GUI) and, in particular, to a hand-held electronic device having a GUI and touch screen for accessing an entire collection of functions in the electronic device."  *Id*. at 4646-47.  As support for the amendment, Philips cited portions of the specification describing PDAs and other handheld devices in the specification.  *Id.* at 4644.  Philips also repeated its earlier arguments concerning motivation to combine in Hirayama.  *See id*. at 4646.  The examiner then allowed the claims.  *Id*. 4655-59.  Hence, the prosecution history confirms that "substantially small" display includes the listed devices and further suggests that the limitation was critical to overcoming a reference over which the claims were rejected three different times.

ASUS makes several arguments urging the Court to find the claims indefinite.  First, ASUS claims that equating "substantially small" with "being able to fit on a handheld device" would render the term superfluous.  In other words, ASUS argues that *any* device on a handheld

communication device is "substantially small" under Philips's interpretation, which makes the amended claims equivalent to those before the prosecution amendment. ASUS cites no authority for the proposition that superfluity renders a claim indefinite.[12] On the contrary, both *Exmark* and *Tinnus* appeared to find claim terms definite based on the requirements of other limitations. *See Exmark*, 879 F.3d at 1345 (finding "relatively straight" baffle definite because other limitations required the baffle to connect two arcuate baffle portions); *Tinnus*, 846 F.3d at 1197 (finding "substantially filled" definite because other limitations required balloons to detach).

More basically, ASUS fails to establish by clear and convincing evidence that a "substantially small" display is equivalent to any handheld device display. *See Cox Comms., Inc. v. Sprint Comm. Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) ("Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence."). During prosecution, the examiner found the limitation of a "substantially small" display dispositive, allowing the claims despite rejecting them three times over Hirayama in view of Tanimoto. Philips did not make any new arguments along with the amendment, but, on the contrary, repeated the arguments the examiner previously rejected. *Compare* '564 Prosecution History at 4646 (arguing that the combination with Tanimoto destroys the purpose of Hirayama), *with id.* at 4603-04 (same), 4589-91 (same). ASUS does not substantively explain the prosecution history or why the examiner found the claim limitation dispositive. On its face, Hirayama describes a tablet attached to a display panel, which could allow the display panel to be significantly larger than the tablet. ASUS similarly does not grapple with the disclosures in the specification that small screens render parts of a web page illegible. In short, ASUS fails to meet its burden.

ASUS further argues that the specification's disclosure of devices including "palm-tops, mobile phones, Web pads, PDA's or notebook computers" is broad and allows Philips to accuse a large range of devices, including desktop computers. '564 Patent at 1:22-24. "Breadth is not

---

[12] ASUS cites cases in the claim construction context that adopted certain constructions to avoid rendering terms superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004). *Bicon* notes in dicta that allowing physical structures and characteristics described in a claim to be superfluous would render the scope of the patent ambiguous. 441 F.3d at 950. However, the Court has found no cases where superfluity was found to make claims indefinite.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   indefiniteness," however, and ASUS is welcome to seek a narrower construction.  *BASF Corp. v.*

2   *Johnson Matthey, Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).  Whether a desktop computer could

3   be the claimed "handheld device" presents a question of infringement and is not related to whether

4   the scope of the claims is reasonably ascertainable.

5          Finally, ASUS argues that the "substantially small" claim limitations are subjective.  They

6   are not.  Claim terms are subjective when they rely on individual tastes or opinions without

7   providing objective guidance.  *See, e.g.*, *Interval Licensing*, 766 F.3d at 1371-73 (finding

8   "unobtrusive manner" indefinite because of a "hazy relationship" to the written description);

9   *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1352 (Fed. Cir. 2005) (finding

10  "aesthetically pleasing" indefinite because the inventor does not explain the "good standards of

11  aesthetics" cited in the specification).  *But see Sonix Tech. Co., Ltd. v. Publ's Int'l, Ltd.*, 844 F.3d

12  1370, 1379-81 (Fed. Cir. 2017) (finding "visually negligible" definite based on the written

13  description and "[t]he examiner's knowing allowance of claims").  Here, the intrinsic evidence

14  provides objective boundaries for determining whether a display meets the claims—if it fits on a

15  handheld device, the screen is probably "substantially small."

16         Accordingly, because ASUS failed to meet its burden to prove that the asserted claims are

17  indefinite, the Court **DENIES** summary judgment of invalidity of the '564 Patent.

18                    **D.  Noninfringement of the '809 Patent**

19         ASUS contends that it does not infringe the '809 Patent based on the order in which its

20  accused products determine compliance.  Asserted claim 1 requires a processor arranged to

21  "determine whether [a] second device is compliant with a set of compliance rules" and then

22  "provide a first signal to the second device depending [on] when the second device is determined

23  to be compliant with the set of compliance rules."  '809 Patent at claim 1.  Asserted claim 49

24  requires a processor arranged to "determine from the certificate [of the second device] if the

25  second device is compliant" and then "provide a secret to the second device . . . if the second

26  device is compliant."  *Id*. at claim 49.

27         By contrast, ASUS contends that its products fully determine compliance only after the

28  first signal and secret are provided.  Philips disagrees that the claims require determining

                                                29

compliance with the full set of rules—arguing that partial compliance satisfies the claims—and further disagrees that the accused products do not determine full compliance until after provision of the secret or signal. The Court first considers whether full compliance is required by the claims and then turns to the operation of the accused products.

### i. Scope of the Claim Limitation

Asserted claims 1 and 49 do not contain the same limitations with respect to compliance. Claim 1 recites determining whether the second device is "compliant with a set of compliance rules" using the information from the certificate of the second device. '809 Patent at claim 1. It also recites providing a first signal "depending [on] when the second device is determined to be compliant with the set of compliance rules." *Id.* By contrast, claim 49 uses absolute language: it requires the device to be found "compliant" and only providing a secret "if the second device is compliant." *Id.* at 49. Claim 49 thus leaves less room for less-than-full compliance than claim 1.

The claims also differ in the actions that occur after compliance is found. Claim 49 recites providing a secret, while claim 1 does not. Instead, dependent claim 4, which depends on claim 1, recites providing a secret, while dependent claim 6 specifies that the secret is provided "if the second device is compliant." *Id.* at claim 6. Moreover, dependent claim 11 recites "determin[ing] an identity of the second device using the certificate," an action that the specification describes as part of compliance. *Id.* at claim 11, 3:56-61. Claim 11 does not specify a time or order in which the identity of the second device must be confirmed. The claim language thus suggests that claim 49 requires full compliance, while claim 1 may be met by partial compliance with a "set of compliance rules," even if other rules—such as an identity check—may be applied later.

The specification reinforces that interpretation. The written description describes performing a compliance or authentication check primarily in relation to the provision of the secret. *See id.* at 3:37-50, 5:25-35. It explains that the invention provides "a secure way of performing the sharing of the secret, ensuring that only devices being compliant with compliance rules can receive the secret." *Id.* at 3:48-50. By contrast, the specification describes multiple embodiments where the first communication device provides a "first signal" without first performing a compliance check. *Id.* at 2:56-3:3, 4:10-24, 4:32-44. However, it notes that "a

30

secure channel is anyhow needed to enable secure communication between devices," so it is "efficient" if "a device can first be tested on compliancy before a distance measurement is executed." *Id*. at 2:50-55. Thus, the specification suggests that checking compliance before providing a secret is critical to "ensur[e] that only devices being compliant with compliance rules can receive the secret," but only "efficient" for providing a "first signal" where "a secure channel is anyhow needed."[13] *Id*. at 3:48-50, 2:51-55.

The prosecution history is also relevant. During prosecution, Philips attempted to overcome a rejection over a prior art reference ("Willey") by arguing that the secret there was shared "prior to the authentication process." Dkt. No. 831-5 ("'809 Prosecution History") at 26746. The examiner, however, noted that "'compliance' is defined as 'conformity in fulfilling official requirements.'" *Id*. at 26748. Because Willey performed *some* authentication prior to sharing the secret, in the form of validating digits, that satisfied the limitation requiring compliance with a set of rules. *Id*. Although the examiner's statements are less relevant to claim construction than the applicant's,[14] the examiner is a person of ordinary skill in the art and thus may evince the ordinary meaning of the term. *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345-47 (Fed. Cir. 2005). Hence, the prosecution history suggests that "compliance with a set of rules" may be satisfied by compliance with a subset of rules.

Based on the differing claim language and treatment in the specification, as well as the prosecution history, the Court concludes that claim 49 requires full compliance before a secret is exchanged, while claim 1 allows only "compliance with a set of compliance rules," even if other

---

[13] ASUS describes the compliance check in Figure 2 as being part of the "authenticated distance measurement." *See* '809 Patent at 5:24-30. However, in other embodiments, the authenticated distance measurement does not include a compliance step. *See id*. at 2:56-3:3. The specification explains that authentication in those cases comes from confirming that the second device has the shared secret. *Id*. at 6:44-50.

[14] *See Altair Engin'ng, Inc. v. LEDdynamics, Inc.*, 413 F. App'x 251, 255 (Fed. Cir. 2011) ("While the examiner's interpretation can be pertinent, the applicant's own interpretation has far more significance."); *Digital Tech. Licensing, LLC v. Cingular Wireless, LLC*, No. 2:06-CV-156, 2007 WL 2300792, at *5 (E.D. Tex. Aug. 7 2007) ("It is the *applicants'* statements that matter when construing the scope of an invention, not whether the *examiner* accepted or rejected them."); *see also In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012) ("In contrast to district court proceedings involving an issued patent, claims under examination before the PTO are given their broadest reasonable interpretation consistent with the specification.").

United States District Court
Northern District of California

1    compliance rules are applied later.

### ii.    Application to the Accused Products

Disputes issues of fact preclude summary judgment on this limitation. The parties and their experts agree that the accused products perform *some* compliance checks prior to providing the signal and secret. *Compare* Goodrich Report ¶¶ 215-21, *with* Dkt. No. 724-20 ("Jakobsson Report") ¶¶ 75-76. However, ASUS contends that the full set of HDCP 2.x compliance rules[15] also includes (1) checking if the second device is on a revocation list, and (2) ascertaining that the second device is not an HDCP Repeater. Jakobsson Report ¶¶ 51-55. Philips disputes that these steps are "compliance rules." Both parties cite HDCP documents. Philips also cites deposition testimony from the President and Vice President of the DCP—the organization that drafted the HDCP 2.x specifications—who testified that the disputed steps are not part of compliance. Dkt. No. 827:29 at 38:8-40:8; Dkt. No. 831:7 at 33:11-24. In light of these genuine disputes of material fact, summary judgment is **DENIED**.

### E.  Invalidity of the '806 Patent

ASUS seeks summary judgment of invalidity of the '806 Patent based on indefiniteness. Asserted claim 12 of the '806 Patent recites "means for downloading files to the client device." '806 Patent at claim 12. ASUS contends that this term is subject to 35 U.S.C. § 112 ¶ 6 (means-plus-function) and is indefinite because the specification fails to disclose any corresponding structure. Philips disputes (1) that the term is subject to 35 U.S.C. § 112 ¶ 6, (2) that the function requires any specialized structure, and (3) that the specification fails to disclose specialized structure. The Court addresses each dispute in turn.

### i.    35 U.S.C. § 112 ¶ 6 Applies

As an initial matter, 35 U.S.C. § 112 ¶ 6[16] applies. The use of the term "means for" creates a rebuttable presumption that means-plus-function applies. *Williamson v. Citrix Online, LLC*, 792

---

[15] Philips accuses ASUS devices that implement the HDCP 2.x technical specification, which defines certain protocols for protecting transmission of content. *See, e.g.*, Dkt. No. 724-19 ("HDCP 2.2 Specification") at 5.

[16] 35 U.S.C. § 112 ¶ 6 permits a claim to be "expressed as [] means or steps for performing a specified function without the recital of structure, material, or acts in support thereof."

United States District Court
Northern District of California

F.3d 1339, 1349 (Fed. Cir. 2015).  That presumption may be rebutted by demonstrating that "the claim recites sufficient structure for performing the described functions in their entirety."  *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259 (Fed. Cir. 2008).  To recite sufficient structure, the claim language must "specif[y] the exact structure that performs the functions in question without the need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure."  *Id.* at 1259-60.  For example, in *TecSec, Inc. v. International Business Machines Corp.*, the claims recited "system memory means" for performing the function of "storing data."  731 F.3d 1336, 1347 (Fed. Cir. 2013).  The court found that 35 U.S.C. § 112 ¶ 6 did not apply because "[a] 'system memory' is sufficient structure to perform the 'storing data' function.'"  *Id.*; *see also TriMed*, 514 F.3d at 1259-60 (finding "holes . . . providing means for" recited sufficient structure, i.e., holes).

Philips argues that "means for downloading" is not subject to 35 U.S.C. § 112 ¶ 6 because the term itself connotes sufficient structure to a person of ordinary skill.  Philips's expert, Dr. Polish, opines that a person of ordinary skill in the art "would have understood 'downloading' to designate well-known programming instructions such as Java 2.0."  Dkt. No. 831-8 ("Polish Report") ¶ 385.  Philips also cites the "files" and "client devices" recited in the preamble.  But Philips's argument fails on the law.  The term "downloading" is a function; it cannot provide its own means for accomplishment.  The terms "files" and "client device" are not clearly linked to the "downloading" function.  On the contrary, the client device is described as comprising the "means for downloading," while files are the subject of the downloading, not the agent of performance.  *See* '806 Patent at claim 12.   In the absence of claim language suggesting structure, Philips cannot rely on the background knowledge of a person of ordinary skill in the art to provide potential structure.  Because Philips fails to overcome the presumption that 35 U.S.C. § 112 ¶ 6 applies, the Court finds that it does.

### ii.    A General Purpose Computer is Insufficient

Philips next argues that a general purpose computer or microprocessor provides adequate structure under *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011).  In *Katz*, the Federal Circuit held that some basic computer functions—such as

United States District Court
Northern District of California

United States District Court
Northern District of California

"processing," "receiving," or "storing"—can be achieved by any general purpose computer without special programming and thus do not require disclosure of additional structure. 639 F.3d at 1316. However, in later cases, the court clarified that *Katz* applies only in "rare circumstances" where the claimed function "can be achieved by any general purpose computer without specialized programming," *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012), and only where "the claimed function is 'coextensive' with a microprocessor itself." *Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015).

Undisputed evidence precludes the application of *Katz* here. The parties' experts agree that specific software is necessary to achieve the "downloading" function. For example, Philips's expert, Dr. Polish, opines that "Java 2.0 programing instructions [are] an example of known programming instructions for downloading." Polish Report ¶ 385. Dr. Polish also states that the accused products meet this limitation because they contain a "microprocessor [] *programmed* to download files," "*instructions* for downloading files," and "*software* . . . for downloading streams." *Id.* ¶ 387 (emphases added). Dr. Bhatacharjee agrees that computers have "standard classes [of software] to download data." *Id.* ¶ 385. Hence, undisputed evidence shows that specialized programming is required to perform "downloading" and *Katz* does not apply.[17]

### iii.   ASUS Fails to Show Indefiniteness

Turning to the heart of the dispute, the parties disagree whether the specification of the '806 Patent discloses an algorithm for performing the "downloading" function. A party that elects to claim its invention in means-plus-function terms "must indicate in the specification what structure constitutes the means." *Ergo Licensing*, 673 F.3d at 1363. The structure must be "clearly linked or associated with the claimed function" or else the claim is indefinite. *Id.* (quoting *Med. Instr. & Diag. Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003)). In cases involving computer inventions, "the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005) (citing *WMS Gaming Inc. v. Int'l Game Tech.*, 184

---

[17] Dr. Polish opines that specialized hardware is not required for downloading. Polish Report ¶ 387. That is not the standard. *Katz* requires lack of specialized software. 639 F.3d at 1316.

F.3d 1339, 1348 (Fed. Cir. 1999)).  An algorithm is a "fixed step-by-step procedure for accomplishing a given result," which can be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart."  *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (citations omitted).

The knowledge of a person of ordinary skill in the art plays a conditional role in determining indefiniteness.  "Where the specification discloses no algorithm, the skilled artisan's knowledge is irrelevant."  *EON Corp. IP Holdings*, 785 F.3d at 624 (citing *Noah Sys. V. Intuit Inc.*, 675 F.3d 1302, 1313 (Fed. Cir. 2012)).  However, "[w]here the specification discloses an algorithm that the accused infringer contends is inadequate," the court "judge[s] the disclosure's sufficiency based on the skilled artisan's perspective."  *Id.*  Thus, the background knowledge of a skilled artisan may be used only to evaluate whether a disclosed algorithm is adequate; it cannot provide structure where none is disclosed.

Here, Philips contends that the '806 Patent provides adequate structure for performing the "downloading" function.  In relevant part, Philips contends that the following disclosure describes an algorithm:

> In step 106, the first file segment is downloaded for play-out.  Communicating with a remote server is a well known technology.  For example, Java 2.0 provides a set of standard classes that enable retrieving a remote file into a buffer or as a stream."

'806 Patent at 3:3-7.  Although not recited in step-by-step terms, this disclosure arguably describes an algorithm:  communicate with a remote server to retrieve a remote file into a buffer or as a stream.  The specification elaborates on the retrieving step, explaining that retrieving is enabled by control information that describes the location and size of various file segments.  *Id.* at 2:57-63.  And it elaborates on how buffers and streams process the downloaded files as they are retrieved.  *Id.* at 3:14-30, 3:57-14.  Moreover, the specification cites "Java 2.0 . . . standard classes" as performing the downloading function.  *Id.* at 3:5-7.  Although "black box" disclosures of software are typically not sufficient to provide structure, the specification here gives some inkling of how the Java classes accomplish the downloading function.  *See TecSec*, 731 F.3d at 1348-49 (finding that disclosure of WordPerfect or Microsoft Word software was sufficient where

United States District Court
Northern District of California

United States District Court
Northern District of California

the specification described how the software accomplished the function). *But see Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009) (finding disclosure of an "access control manager" insufficient where the structure is "a black box that performs a recited function" but "how it does so is left undisclosed"); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) ("Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough.").[18]

Overall, this is a close case. However, precisely because it is close, ASUS fails to meet its burden to show by clear and convincing evidence that no algorithm is disclosed. *See TecSec*, 731 F.3d at 1349 ("The party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence."); *see also Exxon Res. And Engin. Co. v. U.S.*, 265 F.3d 1371, 1380 (Fed. Cir. 2001) (in light of the presumption of validity, "close questions of indefiniteness in litigation involving issues patents are properly resolved in favor of the patentee"), *abrogated on other grounds by Nautilus*, 572 U.S. 898.

Having determined that the specification discloses an algorithm, the Court finds that algorithm adequate. Dr. Polish opines that a person of ordinary skill in the art would have known how to implement Java 2.0 classes to perform the "downloading" function. Polish Report ¶ 393. ASUS does not offer any evidence in response.[19] Although ASUS is correct that the knowledge of a person of ordinary skill "apart from and unconnected to the disclosure of the patent" may not provide structure, Dr. Polish opines on the sufficiency of the disclosure. *See id.*; *Blackboard*, 574 F.3d at 1385. Accordingly, the Court finds that the specification discloses sufficient structure corresponding to the "means for downloading" and **DENIES** summary judgment of indefiniteness of the '806 Patent.

---

[18] Outside of the context of computer implemented inventions, even black box disclosures of structure may be sufficient where they denote well-known structures to a person of ordinary skill in the art. *See, e.g., S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1370-71 (Fed. Cir. 2001) (finding black box disclosure of "selector" was sufficient because selectors were well-known in the art).

[19] ASUS faults Dr. Polish for describing the disclosed algorithm as an "example." However, means-plus-function terms typically cover both the disclosed structure and its equivalents. *See MAS-Hamilton Grp. V. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998). The claims thus cover additional algorithms, so long as those algorithms are equivalent to those described.

## IV.   PHILIPS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Philips seeks summary judgment on the following ASUS affirmative defenses: (1) anticipation and obviousness of the '806 and '913 Patents; (2) invalidity due to broadening re-issue of the '564 Patent; (3) inequitable conduct as to the '913 Patent; (4) license, estoppel, exhaustion, and/or waiver as to the '809 Patent; (5) license, exhaustion, estoppel, and/or waiver as to the '806 Patent; and (6) intervening rights.  Philips Mot.  In response, ASUS has withdrawn its defenses based on broadening re-issue of the '564 Patent, and license, exhaustion, estoppel, and/or waiver for the '809 and '806 Patents.[20]  Dkt. No. 830 ("ASUS Opp.") at 8-9, 12.  Additionally, after the Federal Circuit found the asserted claims of the '913 Patent invalid, the parties have agreed to stay all claims related to the '913 Patent.  Dkt. Nos. 970, 971.

Accordingly, the Court **DENIES** as moot Philips's motion as to the withdrawn affirmative defenses and **DENIES** the motion as to the '913 Patent affirmative defenses without prejudice to renewal if the Federal Circuit's invalidity finding is reversed on banc or by the U.S. Supreme Court.  The only remaining issue to be decided is whether ASUS may assert its anticipation and obviousness invalidity grounds for the '806 Patent.  Philips contends that it cannot because it has previously sought *inter partes* review ("IPR") on related grounds.  The Court finds that it can.

### A.   Background

ASUS contends that the asserted claims of the '806 Patent are invalid as anticipated or obvious under 35 U.S.C. §§ 102, 103 by three product prior art systems: (1) GRiNS version 0.5, (2) GRiNS version 1.0, and (3) RealSystem G2 Beta 1 Release.  Dkt. No. 752-7 ("Bulterman Report") §§ 9.2-9.3.  All three products are "SMIL 1.0 players," meaning that they implement and support SMIL 1.0 functionality.  *Id.* at 247.  SMIL—which stands for "Synchronized Multimedia Integration Language"—is an XML language that allows multiple multimedia objects to be integrated into a single synchronized presentation.  *See* Dkt. No. 799-15 ("SMIL 1.0 Specification") at 2-3.

As relevant to this motion, ASUS was previously named as a real party-in-interest on an

---

[20] Although ASUS did not withdraw its intervening rights defense, it only presented evidence for the '913 Patent.  The Court therefore treats the defense as withdrawn as to all other patents.

1     IPR petition filed by Google Inc. ("Google") before the U.S. Patent and Trademark Office Patent

2     Trial and Appeal Board ("PTAB"). *See* Dkt. No. 752-1 at 2. In its petition, Google argued that

3     the claims of the '806 Patent are anticipated and/or rendered obvious by the SMIL 1.0

4     Specification. *Id*. at 20, 40. The SMIL 1.0 Specification defines the syntax of SMIL documents.

5     *See* SMIL 1.0 Specification at 2-4. For example, the specification defines the "switch" element

6     that allows for selection between two audio files depending on the bit rate, as shown below:

```
<switch>
    <audio src="joe-audio-better-quality" system-bitrate="16000" />
    <audio src="joe-audio" system-bitrate="8000" />
</switch>
```

10     *Id*. at 28. The PTAB instituted Google's IPR and ultimately found that claims 1-7 and 9-

11     13 were anticipated and/or rendered obvious by the SMIL 1.0 Specification, but that claims 12-16

12     were not shown to be unpatentable. *Google Inc. v. Koninklijke Philips N.V.*, IPR2017-00447,

13     Paper 29 (PTAB Sept. 6, 2018). The Federal Circuit affirmed the decision. *See Koninklijke*

14     *Philips N.V. v. Google LLC*, 2019-1177 (Fed. Cir. Jan. 30, 2020).

15     Although ASUS does not name the SMIL 1.0 Specification in its invalidity grounds in this

16     litigation, ASUS's expert, Dr. Bulterman, cites the SMIL 1.0 Specification in describing the prior

17     art SMIL players. For example, Dr. Bulterman opines that the SMIL 1.0 Specification discloses

18     limitations of claim 12, and that "[t]he GRiNS 0.5 Player implements fully this SMIL 1.0

19     functionality" and thus also discloses the limitations. *Id*. at 154:7-10; *see also id.* at 153:6-7

20     ("Although I describe this functionality as coming from 'SMIL 1.0' for simplicity, it was also part

21     of GRiNS 0.5."), 161:1-6 ("As discussed above, SMIL 1.0 discloses [this limitation] . . . . As part

22     of its support of SMIL 1.0, GRiNS 0.5 included all of this functionality."). Dr. Bulterman also

23     relies on source code, product literature, and testing to opine that the prior art systems meet each

24     limitation of the asserted claims. *See id*. at 161:13-20, 161:21-164:10, 179:2-11, 237:1-7.

25     **B.**     **Analysis**

26     Philips contends that IPR estoppel under 35 U.S.C. § 315(e)(2) prevents ASUS from

27     asserting its anticipation and obviousness grounds for the '806 Patent. Section 315(e)(2) states

28     that "[t]he petitioner in an *inter partes* review . . . that results in a final written decision . . . , or the

United States District Court<br>Northern District of California

real party in interest or privy of the petitioner, may not assert . . . in a civil action . . . that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during the *inter partes* review." 35 U.S.C. § 315(e)(2). A petitioner may raise in an IPR "only [] a ground that could be raised under section 102 [anticipation] or 103 [obviousness] and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b).

Philips argues that IPR estoppel applies to ASUS's invalidity grounds for two reasons. First, Philips argues that ASUS merely "repackages" its invalidity arguments based on the SMIL 1.0 Specification in the guise of product prior art systems and thus "raised" those grounds in the IPR. Second, Philips argues that ASUS "could have raised" its product prior art grounds in the IPR because it had access to written publications describing those products prior to filing. ASUS responds by making three arguments. First, ASUS argues that under *Shaw Industrial Group, Inc. v. Automated Creel Systems, Inc. ("Shaw")*, 817 F.3d 1293 (Fed. Cir. 2016), IPR estoppel applies only to grounds that were actually raised and decided in the IPR. Second, ASUS contends that IPR estoppel does not apply to product prior art as a matter of law. Finally, ASUS argues that there is at least a genuine dispute of material fact regarding whether ASUS "raised" or "could have raised" its current invalidity grounds in the IPR.

The Court first addresses the scope of IPR estoppel under *Shaw* and then determines whether ASUS raised or could have raised its current invalidity grounds in the IPR.

### i. IPR Estoppel Extends Beyond Grounds Actually Raised in the IPR

ASUS contends that IPR estoppel extends only to grounds actually raised and decided in an IPR. In *Shaw*, the Federal Circuit considered whether invalidity grounds that were included in the challenger's IPR petition, but that were not instituted because of redundancy with other grounds, were estopped under 35 U.S.C. § 315(e)(2). 817 F.3d at 1296-97. The court resolved the question by interpreting the statute narrowly and literally: "The IPR does not begin until it is instituted" and "[t]hus, Shaw did not raise—nor could it have reasonably raised—the [estopped] ground *during* the IPR." *Id.* at 1300 (emphasis in original). *Shaw* thus suggests that IPR estoppel extends only to grounds that were actually raised or that could have been raised after institution—

39

United States District Court
Northern District of California

1   not those that could have been raised in the petition.[21]

2         Courts have struggled to apply *Shaw* outside of its factual scenario.  While all agree that

3   *Shaw* prevents estoppel from applying to grounds that the challenger petitioned on but that were

4   not instituted because of procedural considerations (such as redundancy), courts have split on

5   whether to apply estoppel to grounds that the challenger failed to include in its petition altogether.

6   Some have applied *Shaw* broadly to prevent estoppel on those facts because non-petitioned

7   grounds "could not have been raised" after institution.  *See, e.g.*, *Koninklijke Philips N.V. v.*

8   *Wangs Alliance Corp.*, No. 14-12298-DJC, 2018 WL 283893, at *4 (D. Mass. Jan. 2, 2018);

9   *Finjan, Inc. v. Blue Coat Sys., LLC*, 283 F. Supp. 3d 839, 855-57 (N.D. Cal. 2017); *Verinata*

10   *Health, Inc. v. Ariosa Diagnostics, Inc.*, No. 12-cv-05501-SI, 2017 WL 235048, at **3-6 (N.D.

11   Cal. Jan. 19, 2017).  Others have cabined *Shaw* to its facts.  *See Trs. Of Columbia Univ. v.*

12   *Symantec Corp.*, 390 F. Supp. 3d 665, 679 (E.D. Vir. 2019) (noting that "[t]he majority of courts

13   to have considered this issue . . . have confined *Shaw* to its procedural posture").  These latter

14   decisions focus on two rationales.

15         First, limiting estoppel to grounds raised in the IPR defeats the legislative purpose of the

16   IPR mechanism.  "Congress created the new IPR proceeding for the purpose of 'providing quick

17   and cost effective alternatives to litigation.'"  *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292,

18   1303 (Fed. Cir. 2015) (quoting H.R. Rep. No. 112-98, pt. 1 at 48 (2011)), *overruled on other*

19   *grounds by Aqua Prods. Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017).  Allowing defendants to

20   hold back invalidity grounds for litigation "would give [them] a second bite at the apple and allow

21   [them] to reap the benefits of the IPR without the downside of meaningful estoppel."  *Parallel*

22   *Networks Licensing, LLC v. Int'l Bus. Machines Corp.*, No. 13-2072 (KAJ), 2017 WL 1045912, at

23   *12 (D. Del. Feb. 22, 2017); *see also Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp.

24   3d 990, 1029 (E.D. Wis. 2017) ("[I]n order for IPR to fulfill its mission of streamlining patent

25   litigation . . . , a petitioner cannot be left with the option to institute a few grounds for IPR while

26   

27      [21] In a typical IPR proceeding, the petitioner first files a petition identifying the grounds for invalidity, and the PTAB decides whether to institute review based on the petition and the

28   patentee's preliminary response.  35 U.S.C. §§ 311-314.  If review of any grounds is instituted, an oral hearing may be held followed by a final decision.  35 U.S.C. §§ 316, 318.

United States District Court
Northern District of California

holding some others in reserve for a second bite at the invalidity apple once in the district court.");
*Douglas Dynamics, LLC v. Meyer Prods. LLC*, No. 14-cv-886-jdp, 2017 WL 1382556, at *4 (W.D. Wis. Apr. 18, 2017) ("[A defendant] cannot expect to hold a second-string invalidity case in reserve in case the IPR does not go defendant's way. . . . Congress intended IPR to serve as a complete substitute for litigation validity in the district court.").

Second, *Shaw* arose in unusual circumstances that no longer apply to IPR proceedings. Prior to 2018, the PTAB had discretion to institute partial review on only some challenged claims and grounds. *See* 37 C.F.R. § 42.108(a), *invalidated by SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018). In *SAS*, the Supreme Court found this practice inconsistent with the plain text of 35 U.S.C. § 318(a), which requires the PTAB to issue a final written decision with respect to "any patent claim challenged by the petitioner." 138 S. Ct. at 1354-55. Thus, while the PTAB in *Shaw* used its discretion to partially deny institution on redundant grounds, it can no longer do so. Accordingly, courts have found that after *SAS*, there is "no such thing as a ground raised in the petition as to which review was not instituted," because any petition that resulted in a final written decision would have been instituted as to all petitioned grounds. *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 602 & n.19 (D. Mass. 2018). In these circumstances, "for the words 'reasonably could have raised' to have any meaning at all, they must refer to grounds that were not actually in the IPR petition, but reasonably could have been included." *Id.* at 602; *see also Cal. Inst. of Tech. v. Broadcom Ltd.*, No. CV 16-3714 GW (AGRx), 2018 WL 7456042, at **8-9 (C.D. Cal. Dec. 28, 2018) (agreeing and adopting the reasoning of *SiOnyx*).

The Court finds the narrower interpretation of *Shaw* more persuasive. Even before *SAS*, it was not clear how a petitioner "could have raised" a ground after IPR institution unless it already had raised that ground in its petition. The PTAB routinely strikes new invalidity theories and references raised after institution. *See, e.g.*, *Haag-Streit AG v. Eidolon Optical, LLC*, IPR2018-01311, Paper 31 (Sept. 5, 2019) (striking new theories and evidence not raised in the initial petition). The Federal Circuit affirms such decisions. *See, e.g.*, *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369-70 (Fed. Cir. 2016) (noting the "utmost importance" of identifying all supporting evidence in "the initial petition"). Under the current

41

United States District Court
Northern District of California

rules, therefore, the petitioner has no luxury of identifying invalidity grounds after IPR institution, and there is no such thing as a ground that "could have been raised" "during" the IPR—only grounds that were actually raised or that could not have been raised.

Rather than interpret *Shaw* to read out a portion of the statute, the Court views it as applying to its facts. The challenger in *Shaw* "could not have" raised the grounds at issue—not merely chose not to—because they were redundant with other grounds. The PTAB at the time had a discretionary rule denying institution on redundant grounds and that rule prevented the petitioner in *Shaw* from raising the grounds at issue. By contrast, a petitioner who merely chooses not to include certain grounds, but is not prevented from doing so, cannot legitimately argue that they "could not" have done so. Following *SAS*, any IPR that results in estoppel would have been instituted on all grounds, which gives petitioner full control over the arguments and references to bring before the PTAB. Petitioner thus "could have raised" any ground in an IPR that it could have included in its initial petition. Accordingly, IPR estoppel in this case extends to all grounds that could have been part of Google's IPR petition, not merely those that were actually raised.

### ii.    ASUS Did Not Raise Its Current Invalidity Grounds in the IPR

Under the correct interpretation of estoppel, Philips contends that ASUS "raised" its current invalidity grounds in the IPR because it "repackages" the same arguments in the guise of product prior art. In the IPR, Google argued that the SMIL 1.0 Specification anticipates and/or renders obvious each claim of the '806 Patent. *See* Dkt. No. 752-1. In this litigation, Dr. Bulterman relies on the same disclosures in the SMIL 1.0 Specification but argues that ASUS's product prior art has the same functionality. *See* Bulterman Report at 153:6-7, 154:7-10, 161:1-6. Philips thus argues that Dr. Bulterman merely substitutes specific examples of SMIL players for the generic SMIL player disclosed in the SMIL 1.0 Specification without relying on any distinct functionality of those systems. ASUS counters that GRiNS and RealSystem products are examples of real systems, not just the markup language described in the SMIL 1.0 Specification, and that IPR estoppel does not apply to product prior art. ASUS also argues that there is a genuine dispute of fact regarding whether the grounds are the same.

Recognizing the potential for abuse in using product prior art to introduce a publication,

United States District Court
Northern District of California

the Court cannot conclude that ASUS "raised" its invalidity grounds in the IPR.  Although Dr. Bulterman cites the SMIL 1.0 Specification in Philips' excerpt of his report, he also cites other evidence, including source code, user manuals, and physical testing for the GRiNS and RealSystem products as well.  *See* Bulterman Report at 154:13-20, 161:13-24.  ASUS states that this additional evidence supplies limitations that Philips argued were missing from the SMIL 1.0 Specification in the IPR.  Philips' corporate representative also testified at deposition that the SMIL 1.0 Specification left certain functionality open for determination by individual SMIL players, which the RealSystem and GRiNS products supply.  Dkt. No. 830-5 at 187:14-20. Viewing the evidence in light most favorable to ASUS, the product prior art constitutes a "superior" reference that discloses limitations not found (or not found in the same way) in the SMIL 1.0 Specification.  *See Star Envirotech, Inc. v. Redline Detection, LLC*, No. SACV 12-01861 JGB (DFMx), 2015 WL 4744394, at *4 (C.D. Cal. Jan. 29, 2015).  Accordingly, ASUS did not "raise" its current invalidity grounds in the IPR and is not estopped on that basis.

### iii.    ASUS Could Not Have Raised its '806 Patent Invalidity Grounds in the IPR

Philips next argues that ASUS "could have raised" its product prior art grounds in the IPR because it had access to publications that describe the products at issue prior to the filing date. Philips argues that ASUS's evidence of the products' operation includes certain publications, such as the RealSystem G2 Production Guide and the GRiNS Quick Start Guide, that ASUS had access to and could have raised in its IPR petition.[22]  Philips cites cases that suggest extending IPR estoppel to publications that describe product prior art that could have reasonably been found prior to the IPR, where the challenger's invalidity case for the product is coextensive with the publication.  *See Milwaukee Elec. Tool*, 271 F. Supp. 3d at 1032; *Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL 2526231, at *8 (E.D. Tex. May 11, 2017); *Clearlamp, LLC v. LKQ Corp.*, No. 12 C 2533, 2016 WL 4734389, at *9 (N.D. Ill. Ma. 18, 2016); *see also*

---

[22] Philips introduces evidence that ASUS "could have reasonably found" the product publications at the time of its IPR filing, including that RealSystem G2 Production Guide and GRiNS Quick Start Guide come up in Google searches for those products.  *See* Dkt. Nos. 753-1, 753-2.  Because the Court finds that ASUS is not estopped from raising those grounds even if it could have introduced the publications in its IPR, it does not address this question.

*Oil-Dri Corporation of America v. Nestle Purina Petcare Co.*, No. 15 C 1067, 2019 WL 861394, at *10 (N.D. Ill. Feb. 22, 2019).  However, none of those cases went so far as to exclude other, non-printed evidence of the product prior art, and, ultimately, none found estoppel.[23]  *See, e.g.*, *Milwaukee Elec. Tool*, 271 F. Supp. 3d at 1032 (declining to extend estoppel to a physical product sample and finding no estoppel because patentee failed to show that the product publication could have been found with a diligent search).

ASUS responds that IPR estoppel does not apply to product prior art as a matter of law.  Under the express terms of 35 U.S.C. § 311(b), a petitioner can only raise "patents or printed publications" in an IPR.  Thus, ASUS contends that it "could [not] have raised" the RealSystem and GRiNS products in its petition.  ASUS cites cases suggesting that product prior art references are "in no way affected by IPR estoppel, since they cannot be raised in such a proceeding."  *Milwaukee*, 271 F. Supp. 3d at 1031; *see Polaris*, 2019 WL 3824255, at *3; *Zitovault, LLC v. Int'l Bus. Mach. Corp.*, No. 3:16-CV-0962-M, 2018 WL 2971178, at *4 (N.D. Tex. Apr. 4, 2018); *Intellectual Ventures II LLC v. Kemper Corp.*, No. 6:16-CV-0081, 2016 WL 7634422, at *3 (E.D. Tex. Nov. 7, 2016).  ASUS also argues that the RealSystem G2 and GRiNS products are distinct from the cited publications and suggests that Dr. Bulterman will introduce additional evidence— including demonstrations of the prior art systems—to establish anticipation and/or obviousness.

The Court finds that IPR estoppel does not apply to ASUS's product prior art grounds.  The plain reading of 35 U.S.C. § 311(b) shows that a petitioner may raise in an IPR only a ground based on "patents or printed publications."  As used by the PTAB, the term "grounds" means something more than "evidence" or "references."  *See Cal. Inst. Of Tech. v. Broadcom Ltd.*, No. CV 16-3714 GW (AGRx), 2018 WL 7456042, at *4 (C.D. Cal. Dec. 28, 2018) ("ground" is "the basis or bases on which a petitioner challenges a claim").  For example, the same evidence arising from the same reference may constitute different grounds under anticipation and obviousness.

---

[23] *Oil-Dri* suggests that as long as the challenging party had "reasonable access to printed publications corresponding to or describing [the] product that it could have proffered during the IPR process," estoppel applies to the resulting grounds.  2019 WL 861394, at *10.  The *Oil-Dri* rule has not been adopted by any circuit and multiple courts have declined to follow it.  *See Polaris Indus., Inc. v. Arctic Cat Inc.*, No. 15-4475 (JRT/TNL), 2019 WL 3824255, at *3 (D. Minn. Aug. 15, 2019).

United States District Court
Northern District of California

United States District Court
Northern District of California

*See, e.g.*, *Google Inc. v. Koninklijke Philips N.V.*, IPR2017-00447, Paper 7 at 20-21 (PTAB June 8, 2017) (instituting IPR on anticipation and obviousness as separate grounds based on the SMIL 1.0 Specification); *see also Google Inc. v. Koninklijke Philips N.V.*, IPR2017-00447, Paper 2 at 40 (Dec. 9, 2016) (citing the same evidence for both).  The term "grounds" therefore includes the arguments and the relevant statutory provisions, in addition to the references and evidence.

Product prior art invalidates a claim under a different statutory provision than patents or printed publications.  Under 35 U.S.C. § 102, a patent or printed publication anticipates a claim if it "describe[s]" the claimed invention, but product prior art anticipates if it shows the invention was "in public use" or "on sale" prior to the filing date.[24]  35 U.S.C. §§ 102(a)(1)-(2).  The different statutory provisions allow for different evidence and arguments.  For example, the party challenging validity may combine multiple types of evidence—including different written publications, source code, physical samples, engineer testimony, and testing—without performing a motivation to combine analysis.  At the same time, a patentee may defeat a showing of invalidity by demonstrating that the product never implemented the described functionality or that it was not implemented in a single product.

Dr. Bulterman's report illustrates this different analysis by relying on multiple publications—including the SMIL 1.0 Specification, product guides and manuals, source code, and physical demonstrations—to argue that the GRiNS and RealNetworks G2 products meet the claims of the '806 Patent.  Had ASUS used the same references in an IPR, some of the evidence would have been unavailable, and ASUS would have had to show motivation to combine for the remaining printed publications.  ASUS therefore could not have brought its product prior art invalidity grounds using the same theory, evidence, and arguments in the IPR, and they constitute different "grounds."[25]  Accordingly, ASUS could not have raised the product prior art grounds in

---

[24] Prior to the America Invents Act (AIA), 35 U.S.C. § 102 had analogous provisions that held a patent invalid if the invention was "known or used in this country," "patented or described in a printed publication," or "in public use or on sale in the United States." Pre-AIA 35 U.S.C. § 102.

[25] Barring the use of a printed publication may of course be appropriate in some circumstances.  If a defendant "purport[s] to rely on a device without actually relying on the device itself" or maintains identical arguments under an allegedly different statutory prong, the policy behind IPR

45

1    the IPR and is not estopped on that basis.

2        For the foregoing reasons, the Court **DENIES** Philips' motion for summary judgment on

3    ASUS's anticipation and obviousness invalidity defenses.

4    **V.    CONCLUSION**

5        The Court **GRANTS** ASUS's motion for summary judgment as to noninfringement of the

6    '797 and '064 Patents and **DENIES** the motion on all other grounds.  The Court further **DENIES**

7    Philips's motion for partial summary judgment.  A case management conference regarding pretrial

8    and trial scheduling is **SET** for May 5, 2020 at 1:00 p.m.  All counsel shall use the following dial-

9    in information to access the case management conference:  Dial-In:  888-808-6929; and

10   Passcode:  6064255.

11

12       **IT IS SO ORDERED.**

13   Dated: April 13, 2020

14

15   HAYWOOD S. GILLIAM, JR.
     United States District Judge

16

17

18

19

20

21

22

23

24

25

———————————

26   estoppel may best be served by excluding that reference.  *See Milwaukee Elec.*, 271 F. Supp. 3d at
     1032; *Cal. Inst. of Tech. v. Broadcom Ltd.*, 2018 WL 7456042, at **15-16.  However, where the
27   party challenging validity (as here) relies on evidence that it could not have shown to the PTAB,
     estoppel is likely not appropriate.  *01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 151 F. Supp. 3d
28   778, 798 (N.D. Ohio 2015); *Star Envirotech*, 2015 WL 4744394, at *4.

46